1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Civil Action No. 23-cv-03076-CNS-STV

4     ALEX FONTENOT and MYA HOLLINGSHED,
      individually and on behalf of all those
5     similarly situated,

6              Plaintiffs,

7              vs.

8     NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
      et al.,
9              Defendants.
     ----------------------------------------------------------------
10                    REPORTER'S TRANSCRIPT
                       Oral Argument
11   ----------------------------------------------------------------
      Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
12    United States District Court for the District of Colorado,
      commencing on the 23rd day of May, 2024, in Courtroom A-702,
13            United States Courthouse, Denver, Colorado.

14                        APPEARANCES
     For the Plaintiffs:
15   ERIC R. OLSON and SEAN C. GRIMSLEY, Olson Grimsley Kawanabe
     Hinchliff & Murray LLC, 700 17th St., Ste. 1600, Denver, CO
16   80202

17   GEORGE A. ZELCS, Korein Tillery LLC, 205 North Michigan Ave.,
     Ste. 1950, Chicago, IL 60601
18
     GARRETT R. BROSHUIS, Korein Tillery LLC, 505 North 7th St.,
19   Ste. 3600, St. Louis, MO 63101

20   For the Defendants:
     KATHRYN A. REILLY and MICHAEL R. KRANTZ, Wheeler Trigg
21   O'Donnell LLP, 370 17th St., Ste. 4500, Denver, CO 80202

22   ROBERT W. FULLER, III, Robinson Bradshaw & Hinson PA, 101
     North Tryon St., Ste. 1900, Charlotte, NC 28246 (by VTC)
23
     NATALI R. WYSON, Sidley Austin LLP, 2021 McKinney Ave, Ste.
24   2000, Dallas, TX 75201

25        Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108
          Proceedings reported by mechanical stenography;
              transcription produced via computer.

1    APPEARANCES (Cont'd):
     DOUGLAS B. TUMMINELLO, Lewis Roca Rothgerber Christie LLP,
2    1601 19th St., Ste. 1000, Denver, CO 80202

3    ANNA M. RATHBUN, Latham & Watkins LLP, 555 11th Street NW,
     Ste. 1000, Washington, DC 20004
4
     CALANTHE A. ARAT, Wilkinson Stekloff LLP, 2001 M St. NW, 10th
5    Floor, Washington, DC 20036

6    BRITT M. MILLER, Mayer Brown LLP, 71 Wacker Dr., Chicago, IL
     60606
7
     RICHARD B. BENENSON, Brownstein Hyatt Farber Schreck LLP, 675
8    15th St., Ste. 2900, Denver, CO 80202

9    WHITTY SOMVICHIAN, Cooley LLP, 3 Embarcadero Center, 20th
     Floor, San Francisco, CA 94111 (by VTC)
10
     MARK F. LAMBERT, Cooley LLP, 3175 Hanover St., Palo Alto, CA
11   94304 (By VTC)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Proceedings reported by mechanical stenography;
                      transcription produced via computer.

23-cv-03076-CNS-STV     Oral Argument          05/23/2024    3

1              *        *        *        *        *

2        (The proceedings commenced at 8:39 a.m.)

3             THE COURT:  We are here in 23-cv-3076, Alex Fontenot

4    v. National Collegiate Athletic Association, et al.  May I

5    have entries of appearance, please.

6             MR. OLSON:  Good morning, Your Honor.  With us is our

7    client and plaintiff Alex Fontenot, Eric Olson, Sean Grimsley,

8    George Zelcs and Garrett Broshuis.

9             THE COURT:  All right.  Good morning to you all.

10            MS. REILLY:  Good morning, Your Honor.  Katie Reilly

11   on behalf of the Southeastern Conference, and with me also

12   representing the Southeastern Conference is my colleague

13   Michael Krantz, and then by video Robert Fuller.

14            THE COURT:  All right.  Good morning to you all.  I

15   apologize we were running a little late.

16            MS. REILLY:  Your Honor, I'm sorry.  I did not

17   introduce all my codefendants.

18            THE COURT:  Oh, go ahead.

19            MS. WYSON:  Your Honor, Natali Wyson from the law

20   firm of Sidley Austin representing the Big 12 Conference.  We

21   also have Douglas Tumminello also representing the Big 12

22   Conference.

23            THE COURT:  All right.  Good morning.

24            MS. RATHBUN:  Good morning, Your Honor.  Anna

25   Rathbun, Latham & Watkins, for the Atlantic Coast Conference.

                    Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    4

1          THE COURT:  Good morning.

2          MS. ARAT:  Good morning, Your Honor.  Cali Arat from

3   Wilkinson & Stekloff on behalf of the NCAA.

4          THE COURT:  Good morning.

5          MS. MILLER:  Good morning, Your Honor.  Britt Miller

6   from Mayer Brown on behalf of the Big Ten Conference, and with

7   me is Rick Benenson also on behalf of the Big Ten Conference.

8          THE COURT:  All right.  Given that introduction, let

9   me ask --

10          THE COURTROOM DEPUTY:  We have VTC participants as

11   well, Your Honor.

12          THE COURT:  Go ahead.  Do you want to do your entry

13   of your appearance, please?  How about Mr. Fuller first.

14          MR. FULLER:  Your Honor, Robert Fuller for the

15   Southeastern Conference.  Ms. Reilly introduced me earlier.

16          MR. SOMVICHIAN:  Good morning, Your Honor.  Whitty

17   Somvichian with Cooley representing the Pac-12 Conference.

18   With me is Mark Lambert as well.  We're both remote.

19          THE COURT:  All right.  Good morning.  Let me ask on

20   behalf of defendants who will be arguing the motion today?

21          MS. REILLY:  Your Honor, I will be splitting the

22   argument with Ms. Wyson.

23          THE COURT:  All right.  And how about on behalf of

24   the plaintiffs?

25          MR. OLSON:  I will, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    5

1          THE COURT:  All right.  I've read the briefing.  I

2     did note there might be some developments yesterday, so let's

3     just start in.  So you can assume I've read what you've

4     written.  This is your chance to amplify what you've written,

5     update me on any new matters, and then I plan to rule from the

6     bench today, so let's see how that goes.

7          Ms. Reilly.

8          MS. REILLY:  Good morning, Your Honor.  Again, I'm

9     Katie Reilly, counsel for the Southeastern Conference.  On

10    behalf of all the defendants I'll be addressing why the

11    interests of justice strongly support transferring the

12    *Fontenot* case to the Northern District of California pursuant

13    to Section 1404.  I'll be splitting the argument with my

14    colleague from the Big 12 Conference, Natalie Wyson, who will

15    address the convenience factors under Section 1404, as well as

16    the first-to-file doctrine.

17         The motion to transfer comes down to three key

18    points.  First, the *Fontenot* case and the *Carter* case in

19    California are largely overlapping, so the parties agree these

20    cases should be litigated together.  Second, there's now only

21    one court where the *Fontenot* and *Carter* cases can be litigated

22    together, and that's the Northern District of California.  And

23    that's because Judge Seeborg denied the Fontenot plaintiffs'

24    motion to transfer the *Carter* case to Colorado due to the

25    Northern District of California's 15-year history presiding

Sarah K. Mitchell, RPR, CRR

1    over related class actions.

2          And, third, this case should be transferred

3    regardless of whether there was a settlement in the California

4    cases, and I will be providing an update on that shortly.  A

5    global settlement would likely resolve the claims in this case

6    and would provide even more reason to consolidate this case

7    with *Carter* to ensure coordination with the class settlement

8    approval process.  The bottom line is under either scenario,

9    no settlement or settlement, the interests of justice

10   overwhelmingly support transfer.

11         So I'll start with the no settlement scenario which

12   is where things currently stand.  The transfer analysis is

13   straightforward.  Allowing two overlapping antitrust cases to

14   proceed at the same time in two different courts does not

15   serve the interests of justice.  And the *Fontenot* plaintiffs

16   agree.  They took that same position when they intervened in

17   the Northern District of California and asked Judge Seeborg to

18   transfer the *Carter* case to Colorado to be litigated together

19   with the *Fontenot* case.

20         Judge Seeborg agreed with the *Fontenot* plaintiffs

21   that judicial efficiency and economy support litigating

22   *Fontenot* and *Carter* together, but Judge Seeborg denied

23   plaintiffs' motion to transfer and kept the *Carter* case in

24   California, and he did that for a good reason.  Judge Seeborg

25   noted that the Northern District of California has been

1    handling class actions addressing compensation and benefits

2    for NCAA student athletes going back to 2009.  That court is

3    well versed in the complex antitrust factual and procedural

4    issues presented by these cases.

5          Judge Seeborg also found it very significant that he

6    can refer all discovery matters in the *Carter* case to the same

7    magistrate judge who has handled the massive and highly

8    complex discovery issues in all of these related cases going

9    back for more than a decade.  Now, Ms. Wyson will address

10   these efficiencies in more detail, but just to give a few

11   examples of what we're talking about here and the burden

12   involved with handling these cases.

13         Discovery from all of the prior cases going back more

14   than a decade became part of the record in the subsequent

15   California cases, and we're talking about millions of pages of

16   documents here.  There have been hundreds of third-party

17   subpoenas served in these cases.  Multiple third parties have

18   intervened to negotiate complex protective orders to protect

19   sensitive media deals and other confidential information.  A

20   FERPA process had to be set up and administered by the court

21   to protect students' privacy rights.  It would not be

22   efficient or a good use of this Court's or the parties'

23   resources to replicate all of the work and expertise that's

24   been developed in the Northern District of California.

25         And if the *Fontenot* case isn't transferred to

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    8

1    California, we're going to have two overlapping cases going

2    forward in two different courts with a very high risk of

3    inconsistent rulings at every stage of the litigation,

4    starting with motions to dismiss, discovery rulings, class

5    certification, *Daubert* motions, summary judgment, and final

6    judgment.  That would not serve the interests of justice.

7         So that's the litigation/no settlement scenario.  I'm

8    going to turn now to the second scenario.  If litigation can

9    be avoided through a global settlement, there's even more

10   reason to transfer this case to the Northern District of

11   California.  Now, the parties have been engaged in settlement

12   negotiations with plaintiffs' counsel in the California case

13   -- cases for more than a year through a court-ordered

14   mediation process.  As Your Honor may have seen, those

15   discussions have advanced, and we are hopeful that we are very

16   close to getting approvals for a settlement in principle.  We

17   will, of course, notify Your Honor promptly if a settlement in

18   principle is reached.

19        The possibility of a settlement further supports

20   transfer to the Northern District of California, because it

21   would become even more of the nerve center of litigation over

22   college sports at that point with the settlement having clear

23   consequences for the putative class in this case.  If there's

24   a global settlement in California, that should resolve the

25   related *Fontenot* case as well.  At a minimum, the settlement

1    is going to impact how and whether the claims in this case can

2    proceed.

3         Now, plaintiffs have raised a number of substantive

4    and procedural objections about plaintiffs' counsel in the

5    California case and media reports on the potential settlement.

6    But in considering the concerns raised by plaintiffs, the

7    question for today's hearing isn't whether those arguments

8    have merit.  The question is whether those issues should

9    ultimately be decided by this Court or the Northern District

10   of California.  Now, plaintiffs' filing from earlier this week

11   makes clear that their issues need to be addressed by the

12   California Court as part of the Rule 23 settlement approval

13   process.  I'll briefly address four of plaintiffs' arguments.

14        First, plaintiffs object to what they understand to

15   be the terms of the potential settlement, but regardless of

16   whether the case is transferred, plaintiffs will be required

17   to raise those objections in the class settlement approval

18   process in California.  Rule 23 requires that the settlement

19   court and no other court must resolve all objections and

20   evaluate the fairness and reasonableness of the class

21   settlement.

22        Second, plaintiffs believe that their counsel are

23   more qualified to represent putative class members than the

24   California plaintiffs' counsel.  But, again, the appointment

25   of class counsel with respect to claims subject to a proposed

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    10

1    class settlement, that's an issue solely within the province

2    of the settlement court.

3            Third, the *Fontenot* plaintiffs may argue that some or

4    all of their case should still proceed while the settlement

5    approval process is pending, and we saw that in their filing

6    on Tuesday.  Again, though, it's the settlement court who will

7    decide what the impact of the settlement is on the *Fontenot*

8    claims and whether any part of that case should go forward

9    while the settlement approval process is pending.

10           And in the unlikely event that some portion of the

11   *Fontenot* case is permitted to proceed despite the global

12   settlement, for all of the reasons I addressed earlier in the

13   no settlement scenario, the Northern District of California is

14   better-positioned to preside over that litigation in

15   coordination with the related cases and the settlement

16   approval process.

17           Finally, despite not yet knowing the settlement

18   terms, the *Fontenot* plaintiffs have announced that they plan

19   to opt out of the potential settlement and will try to recruit

20   other student athletes to opt out and jointly pursue their

21   individual claims in Colorado.  Those opt-out plans only

22   confirm that the *Fontenot* plaintiffs agree that the settlement

23   here would include their claims, and that further supports

24   transfer.

25           Only the settlement court in California can conduct

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    11

1    the opt-out process in determining which claims the *Fontenot*

2    plaintiffs can assert on an individual basis.  In the *Fontenot*

3    putative class action, asserting claims for injunctive relief,

4    the current operative complaint in this case, that's not the

5    correct procedural mechanism for the *Fontenot* plaintiffs to

6    pursue individual opt-out claims down the road.

7        In any event, transferring this case to California

8    won't adversely impact any student athlete's opt-out rights.

9    Whatever procedural rights the *Fontenot* plaintiffs have in

10   Colorado they also have in California, and the California

11   court can determine those issues in coordination with the

12   settlement approval process.

13       No matter which scenario plaintiffs choose to play

14   out, or which argument or objection they raise here today, all

15   paths lead back to the Northern District of California being

16   either the required or the better positioned court to address

17   the complex issues in this case, the overlapping related

18   cases, and the potential settlement.

19       My colleague Ms. Wyson will now address how

20   considerations of convenience also strongly support

21   transferring this case to California.  Thank you.

22       THE COURT:  Thank you.

23       MS. WYSON:  Good morning, Your Honor.  Natali Wyson.

24   I'm with the law firm of Sidley Austin representing the Big 12

25   Conference, but I'm going to be addressing the convenience

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    12

1    factors under 1404 on behalf of all of the defendants today.

2        THE COURT:  All right.

3        MS. WYSON:  As it relates to the issue of litigation

4    convenience, the question before the Court today is not

5    whether Colorado would be more convenient than California

6    because Judge Seeborg has already decided that the *Carter*

7    action is staying in California, so the question is whether

8    it's inconvenient to litigate virtually the same case in two

9    different jurisdictions about a thousand miles apart.  Clearly

10   the answer to that is it would be highly inconvenient.

11       In evaluating the inconvenience of a forum for

12   purposes of 1404, courts consider a variety of factors related

13   to cause, accessibility, considerations of a practical nature

14   that make litigation easier or more expeditious or more

15   economical, but ultimately comes down to inconvenience, and

16   courts approach it very practically considering the whole

17   picture of the case.

18       Here, this case and the inconvenience of litigating

19   it in Colorado can't be viewed in a vacuum.  Rather, it needs

20   to be taken into account the practical realities of the fact

21   that plaintiffs' case is intricately related to several cases

22   that for quite some time have historically been litigated in

23   the Northern District of California or are currently being

24   litigated there.

25       With that in mind, I won't rehash all of the

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    13

1   convenience factors in our briefing, but I did want to briefly

2   address a few of the key reasons why Colorado is an

3   inconvenient forum for this case under 1404, particularly

4   focusing on the accessibility of witnesses and evidence, the

5   cost of proof, and then I'll discuss why plaintiffs' choice of

6   forum and the first-to-file rule do not outweigh the

7   inconvenience issues here.

8        In terms of accessibility, Colorado is an

9   inconvenient forum to litigate the case because the parties

10  and witnesses will already be litigating overlapping issues in

11  California.  Thus, requiring them to travel to Colorado as

12  well to litigate those same issues will add unnecessary time

13  and expense to the case.  Transferring this case to the

14  Northern District of California, by contrast, will allow the

15  parties to -- and the Court to coordinate things like hearing

16  dates, for example, so they can cut down on the travel overall

17  and prevent witnesses and parties from having to travel to two

18  different forums to attend court proceedings.

19        Plaintiffs' extensive arguments about things like

20  flights to San Francisco versus flights to Denver from the

21  places where the various defendants reside is really just a

22  red herring.  All of these defendants will be flying to San

23  Francisco regardless.  The question is simply whether they

24  also have to fly to Denver.  Any amount of litigation work in

25  Colorado, whether in the litigation scenario or the settlement

 1   scenario that Ms. Reilly discussed, will simply be additive to

 2   what is already going to have to happen in California.

 3          While it's true that two of the main plaintiffs

 4   reside in Colorado, numerous putative class members also

 5   reside in the Northern District of California, as does one of

 6   the conference defendants.  Ultimately, travel and some

 7   accessibility issues are unavoidable in a nationwide class

 8   action that plaintiffs decided to bring, especially one that

 9   involves defendants and member institutions across the country

10   and putative class member student athletes across the country.

11   But declining to transfer this case to the Northern District

12   of California would unnecessarily increase the cost, expense,

13   and inconvenience for the vast majority of individuals likely

14   to be involved in this case.

15          Lastly, plaintiffs have incorrectly claimed in their

16   briefing that defendants cannot show inconvenience without an

17   affidavit regarding witness location and materiality.  As

18   shown in two of the cases in our motion, *Choice Hotels*, which

19   is an opinion out of this district by Judge Blackburn, and *Von

20   Coley* out of the Western District of Oklahoma, courts grant

21   1404(a) transfers where the inconvenience is apparent from the

22   context even without affidavits on witness location and

23   materiality.

24          The cost of proof will also be lower in the Northern

25   District of California.  That is both because it will avoid

23-cv-03076-CNS-STV      Oral Argument      05/23/2024    15

1   duplicative litigation in a second forum and because of the

2   efficiencies gained due to the district's long history with

3   the related cases.  Throughout the litigation of these cases,

4   the parties and the Northern District of California have

5   developed a complex and extensive system of protective orders

6   and discovery protocols to address issues specific to these

7   cases.

8           For example, certain documents that were produced in

9   the *House* litigation are subject to multiple different

10  protective orders, and those orders incorporated protections

11  for documents that were originally produced in the *Alston*

12  litigation under four different protective orders.  All of

13  those protective orders have been developed and approved under

14  the framework of California standards and local practices, and

15  they've been negotiated with the input of several different

16  third parties.  They've also incorporated protections required

17  for student athlete information under FERPA.

18          Similarly, the parties have agreed to various

19  procedures related to the sealing of confidential information

20  to address the needs of those various different parties.  In

21  fact, the magistrate who would be deciding these types of

22  issues in this case if it were transferred is the same

23  magistrate who has decided these issues for many, many years.

24  He is currently reviewing an omnibus motion to seal in one of

25  the related cases that has over 1,100 entries, and the parties

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    16

1    anticipate filing 150 declarations in support of that.  He's

2    been addressing these issues since 2015.  It's a significant

3    undertaking and in one of the cases required the court to

4    order -- to issue over 40 orders on motions to seal.  This

5    process will be more efficient with the magistrate who has ten

6    years of experience dealing with it.

7         These collections of protective orders and various

8    stipulations related to those orders are not something that

9    can be merely copy and pasted into a new jurisdiction.  As

10   plaintiffs agree, they'll at least need to be adapted for

11   Colorado's local practice and, of course, reconciled with

12   local rules such as Rule 7.2.  These inevitably would require

13   renegotiations with third parties.  If those negotiations

14   result in changes to, for example, the agreed procedures for

15   designating and redacting confidential documents, those

16   documents would potentially need to be re-reviewed,

17   re-designated, re-redacted to comport with those changes.  All

18   of this could add significant time and expense that could

19   largely be avoided if the cases were transferred.

20        As Ms. Reilly mentioned, significant discovery has

21   taken place in the cases pending in the Northern District to

22   the tune of over 4 million pages of documents, over a hundred

23   custodians, over 3,000 search terms, and that's just in one of

24   the cases.  For cost and convenience reasons, the parties have

25   coordinated discovery in those actions by having the discovery

Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    17

1    produced in *Alston* deemed produced in *House*, and all the

2    discovery in *House* deemed produced in *Hubbard*.

3           That coordination was possible in large part because

4    the discovery protocols and protective orders across the cases

5    were all developed under the same rules, the same standards,

6    and under the supervision of the same magistrate judge.

7    Coordination at that level of efficiency and ease would not be

8    possible across jurisdictions.

9           These cases involve substantial third-party discovery

10   with over 350 subpoenas having been served in *House* and *Alston*

11   and various motions to compel related to the same.  Because of

12   the FERPA issues, when subpoenas are served on a school, which

13   happens a lot, seeking information related to student

14   athletes, the schools need to send FERPA notices to the

15   student athletes who then have an opportunity to file a letter

16   or a motion objecting to the release of their FERPA-protected

17   information.

18          All of these discovery issues, from the third-party

19   subpoenas to the discovery disputes to the FERPA objections,

20   have been consistently ruled on and overseen for many years by

21   the same magistrate judge who would have this case if it were

22   transferred.  That experience is tremendously valuable from a

23   judicial economy standpoint and would save significant time

24   and cost for the parties.

25          Plaintiffs' counterarguments regarding their choice

1    of forum and the first-to-file rule do not override the

2    convenience of litigating the same case in two forums.  On the

3    issue of plaintiffs' choice of forum, courts traditionally

4    give less deference to a plaintiff's choice of forum in a

5    class action lawsuit.

6        As the Supreme Court has explained, where there are

7    hundreds of potential plaintiffs -- here there are thousands

8    -- the claim of only one plaintiff from a forum is

9    appropriately -- is appropriate merely because -- sorry -- the

10   claim that one -- the claim from any one plaintiff that a

11   forum is appropriate merely because it is his home forum is

12   considerably weakened.

13       In the *Von Coley* case we cited in our brief, the

14   court explained that plaintiffs were purporting to represent

15   the interests of persons in 14 states, and because of that the

16   plaintiffs' choice of forum was not given substantial weight.

17   Here, the plaintiffs are purporting to represent the interests

18   of individuals in 49 states.  Thus, their choice of forum

19   should also not be given substantial weight.

20       Lastly, plaintiffs have repeatedly pointed to the

21   first-to-file rule as a reason that they claim this case

22   should stay in Colorado.  That does not weigh against transfer

23   here.  First, *Fontenot* is not even the first-filed case.

24   *Carter* and *Fontenot* are simply following along in a long line

25   of related antitrust challenges to the NCAA rules on student

1    athlete compensation.  As Chief Judge Brimmer held in the

2    *Dumanian v. Schwartz* case, cases need only be substantially

3    similar for the first-filed rule to be implicated, not

4    identical.

5            Such similarity can be demonstrated where the

6    underlying claims arise out of the same allegedly improper

7    actions by defendants, which is the case here.  Given that

8    judges in both the JPML and the Northern District of

9    California have recognized that the issues in this case are

10   substantially similar to the issues that have been and are

11   being litigated in the Northern District of California,

12   including the pending *House* case that's been pending since

13   2020, if the first-filed rule were to apply, it would weigh in

14   favor of transfer.

15           Furthermore, as judges in this district have decided,

16   and others, the first-filed rule is a discretionary doctrine.

17   It's designed to avoid conflicting decisions and promote

18   judicial efficiency.  It's not entitled to mechanical

19   application and is meant to serve the best interests of

20   justice.  In this case, it would be antithetical to the

21   purposes of the first-to-file rule to apply to it the *Fontenot*

22   case because it would decrease judicial efficiency by

23   resulting in two courts deciding the same or overlapping

24   issues and would increase the risk of conflicting decisions.

25           Moreover, as Judge Seeborg noted when he declined to

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    20

1    apply the first-to-file rule upon plaintiffs' request,

2    *Fontenot* was filed only 17 days before *Carter*.  That greatly

3    diminishes any import of the rule as no efficiencies would be

4    gained by applying it.

5            For these reasons and the others that are set forth

6    more completely in our briefing, Colorado is an inconvenient

7    forum for this case under 1404, and thus the case should be

8    transferred to the Northern District of California.  Thank

9    you.

10            THE COURT:  All right.  Thank you.

11            Mr. Olson.

12            MR. OLSON:  Good morning, Your Honor.  I think it's

13    important to talk about what wasn't said just now, which was

14    press accounts indicate that the NCAA and two conferences have

15    approved a settlement in principle already.  That was not

16    disputed or disclosed.  And what we have here is a situation

17    where we filed a lawsuit seeking relief that no other

18    plaintiff in the country had sought when we filed last year in

19    November.  Since that lawsuit, a different group filed seeking

20    the same claim for the first time 17 days after we did, and

21    that group -- insiders who have worked with the NCAA in these

22    lawsuits for many years -- reached a deal to resolve their

23    claim.  And you heard it here.  They're trying to resolve our

24    case.

25            We have not been consulted.  We have not been

1    included.  All we hear is what's in the press accounts, and

2    they don't want outside scrutiny of that deal.  They're trying

3    to cram that settlement on two Colorado athletes who worked

4    for the University of Colorado for four years, who reside in

5    this district.  Mr. Fontenot walked to court this morning.  He

6    has an apartment just down the road.  And they claim that

7    operating -- that using Rule 23 and 1404, they can force us,

8    the first-filed lawsuit, to resolve our settlement -- to

9    resolve our dispute against our will in California.  But

10   that's not how Rule 23 works, and that's certainly not how

11   Rule 1404 works.

12          Mr. Fontenot and Ms. Hollingshed worked here.  They

13   played here.  They were injured here.  They live here.  They

14   filed the first lawsuit here.  We heard a couple references to

15   cases from defense counsel, but none of those have those

16   facts.  They all involve plaintiffs who weren't from Choice

17   Hotels, plaintiffs who weren't from Colorado, who came to

18   Colorado as part of a securities class action to try to get a

19   different venue.  The plaintiffs' choice of venue is very,

20   very strong.

21          I'll go through the arguments specifically that

22   defense counsel raised, but they boil down to two basic

23   misunderstandings and then rely on penalizing us for seeking

24   to move this forward expeditiously.  We filed six months ago

25   and haven't had a substantive hearing anywhere.  They tried to

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    22

 1    move us into the JPML, and the JPML said no.  They tried to

 2    stay the case here.  They tried to stay the case there.  And

 3    then they rushed a ruling on the motion to transfer that we

 4    filed first in California to move it here.  And now they're

 5    using that judge's, frankly, cursory two-page opinion to say

 6    you do not have the ability to decide this question as if you

 7    were approaching it for the first time.

 8            So turning to the specific -- specific arguments they

 9    make, first on this -- if there is a settlement, they say,

10    well, it still should occur in California because Rule 23

11    requires a bunch of proceedings to occur there.  It's true

12    Rule 23 does require a bunch of proceedings to occur, but that

13    does not prohibit prior-filed litigation from proceeding, and

14    it's nowhere in Rule 23 that says that judge and only that

15    judge can consider any issue relating to anything to do with

16    the litigation.  And so the notion that just because there's

17    going to be settlement proceedings in California means we have

18    to wait until that is done is not supported by any authority

19    cited by the defendants and is not supported by practice.

20            We have a case -- we hope it's a class action, but

21    right now it's on behalf of two plaintiffs.  We seek to

22    represent a class -- who have been injured here in Colorado,

23    and we want to move forward.

24            THE COURT:  Mr. Olson, can I interrupt you, because

25    it would be helpful for me to get some context around what you

 1   think the settlement is and how those issues overlap with your

 2   case.

 3          MR. OLSON:  As we -- so all we know about the

 4   settlement is what reporters have said in the press.  We have

 5   asked to be included and have been denied any inclusion, so

 6   I'm giving you my best answer based on information from

 7   reporters in the press.

 8          THE COURT:  I understand.

 9          MR. OLSON:  But at a high level, the settlement

10   agrees to pay athletes proceeds from the revenue they generate

11   for the first time.  That is a good thing.  But then right now

12   the cap on what athletes can receive for the revenue they

13   generate for the schools and the NCAA is zero.  They propose a

14   new artificial cap of around 20 percent of total revenue goes

15   to the athletes, and there's some -- as we understand it, some

16   credits and issues on the margins of it, but it's around

17   20 percent.

18          The settlement also includes a process to neuter any

19   ability of future athletes for ten years to bring antitrust

20   claims by flipping the burden.  Basically requiring someone

21   who may now be in 5th grade to opt-out of being included in a

22   settlement rather than under the traditional Rule 23 process

23   of having the athletes opt in.  So it creates a block to

24   future antitrust enforcement with leverage through this

25   opt-out requirement process.

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    24

1          It also does not provide for any collective

2    bargaining or any effort -- any minimum salary or any efforts

3    by the athletes to themselves determine what is fair and

4    reasonable compensation for their labor, and I note that it's

5    striking.  In leagues that have antitrust exemptions and

6    collective bargaining agreements, athletes typically receive

7    around 50 percent of revenues.  That's more or less the deal

8    in the NBA, the MLB, and the National Football League.  Here,

9    they want to give the athletes just 20 percent without giving

10   the athletes themselves an ability to participate.

11          So those are the major terms of -- and I should say,

12   the settlement does not resolve the ability of state attorney

13   generals to bring claims.  There's a multistate action pending

14   in West Virginia right now.  It does not resolve how Title IX

15   fits into this framework.  It does not resolve how -- whether

16   or not the NCAA or the schools are finally treated as

17   employers of the workers whose labor they benefit from.

18          And most surprisingly, and I think this is what's

19   most concerning to us, is that it seems to indicate that these

20   insider lawyers who have been fighting for years against the

21   tyranny of the NCAA are now to advocate publicly -- a term of

22   the settlement appears to be that they're to advocate publicly

23   that this settlement is procompetitive.  It's unclear exactly

24   what that commitment is, but there's several press accounts

25   that indicate they're to speak in favor of the settlement and

1    against any antitrust criticism of the settlement.  So those

2    are the terms as we understand it.  Your Honor, are there any

3    specific items you'd like more detail on?

4        THE COURT:  Well, what I am concerned about is

5    Ms. Reilly's argument that the proper procedure is simply for

6    your folks to opt out there and pursue their individual claims

7    there.  Why is that not a good option?

8        MR. OLSON:  Well, so Rule 23 allows for the process

9    of opting out.  In fact, the *House* class, which is set for

10   trial in January, the opt-out deadline is July of this year.

11   It hasn't even occurred yet.  But opting out doesn't mean you

12   have to file your lawsuit there.  Opting out just means you

13   are not participating in that settlement there.  These are

14   Colorado plaintiffs who have their case here in Colorado if

15   they opt out.  So, yes, there's an opt-out process.  But, no,

16   the opt-outs need not participate in the lawsuit in the venue

17   chosen by the defendants.  That would be my answer to that.

18       And I do think, candidly, the best argument that

19   plaintiffs have on their side is this -- the notion that a

20   magistrate judge that's dealt with this complicated case has

21   -- will continue to deal with this case.  I think we think the

22   other factors all favor us pretty heavily.  So let me address

23   that argument for a minute, which is it's kind of like a

24   too-big-to-fail argument.  Like, it's so complicated no one

25   else surely can do it.  But that's not how it works.

1       We have exceptional judges here in Colorado with

2   experience handling these hard issues.  As we've mentioned in

3   the briefing, we expect that most of the preexisting

4   arrangements and deals certainly from prior litigation can be

5   brought over with relatively minimal work and effort.  And

6   because this case focuses on something that wasn't at issue in

7   those other cases, the notion that all discovery is just that

8   -- it's already been done is simply not true.

9       This case relates to fair pay.  Those other cases

10  relate to name and likeness issues.  We're the first case

11  seeking payment for the labor of athletes by the people who

12  they worked for, the university and NCAA.

13      THE COURT:  And let me interrupt you there.  As I

14  understood your description of the settlement, the settlement

15  does not address that issue in the *House* case.

16      MR. OLSON:  The settlement says, as we understand it,

17  here is money to release your claims that you have in the

18  past, and I guess there's some mechanism going forward.  It

19  does not address the legal question of whether the schools or

20  the NCAA are employers under federal labor law of the

21  athletes.  That is an open question and an issue going

22  forward.

23      As you know, the Dartmouth basketball team just got

24  recognized as employees by the NLRB, and that process is

25  ongoing.  So that's what I mean when it wasn't addressed.  But

1    this, there's no question in the press accounts they seek to

2    release Mr. Fontenot's claims with this settlement for -- by

3    giving a check to a class that will -- that would be -- would

4    be distributed.

5        And then I want to focus back, and Your Honor just

6    issued an opinion a couple days ago in the *San Juan Associates*

7    case where they're trying to move the case somewhere else, and

8    you identified the five factors that matter the most.  And I

9    think if we look at those factors, and at the end of the day,

10   that's what we're here on is a 1404 transfer motion.

11       The plaintiffs' choice of forum.  Here, Colorado

12   residents, Colorado injury, Colorado plaintiffs.  This

13   *Dumanian* case with Chief Judge Brimmer -- I'm sorry -- that

14   relates to the second claim.  I'm sorry.  But none of the

15   cases they rely on have local plaintiffs seeking to enforce --

16   or seeking to be accounted for local injuries.

17       Second is the convenience of the witnesses.  And as

18   Your Honor noted in *San Juan Associates*, you have to explain

19   what witnesses and what they're going to say and why is it

20   inconvenient.  What we have here is sort of vague allegations

21   of, oh, gee, it's complicated.  Not everyone lives here.  And,

22   by the way, we're going to be proceeding in California.  Well,

23   the settlement is all but done.  Three of the six parties

24   according to the press accounts have inked it.

25       Nothing is going to happen in California

1    substantively.  It's going to be the next many, many months,

2    if not years it's going to be stuck in notice, class

3    certification, settlement issues.  Nothing of substance will

4    happen.  So this notion that it's -- the choice is either

5    there or there and here is a false one.  It's not going to

6    happen there.  And we have no showing.

7         We know that, again, Mr. Fontenot walked to court

8    today.  Ms. Hollingshed when she's not working for the

9    Olympics as she's doing right now lives here in Colorado.  And

10   it's in their interests.  They want to be a part of this

11   process.  He's here today.  And for him to take time off from

12   work to fly to California is much, much more different than

13   being here.  And the injuries of our plaintiffs occurred here

14   in Colorado, whether or not it's a class action.  What

15   happened in Colorado, what their labor would have been worth

16   in Colorado will be a core piece of this case, and so the

17   convenience of the witnesses weighs heavily in our favor.

18        And to the extent that all the stuff has been done

19   already, that just reduces the amount of stuff that has to be

20   done again, and we can use prior depositions, et cetera -- to

21   credit the defendants' argument that it really is the same,

22   then we have a lot done already.  But defendants haven't made

23   the required showing with any sort of, let alone, affidavit,

24   description of who's going to testify and what they're going

25   to say and why it's inconvenient for them.

1          The third factor, the accessibility of witnesses and

2     other sources of proof, again, there's no specific showing.

3     And let's keep in mind, defendants' business models have

4     everyone flying all over the country every week.  That's what

5     they do.  They are all over the country from California to the

6     East Coast.  There's no question that we are more towards the

7     middle of the country, easier to get to than it is in

8     California.

9          In fact, if you look at a map of where the schools

10    are, it's heavily weighted towards the East Coast, making

11    Denver more accessible.  And there's just no showing why the

12    witnesses and other sources of proof are easier in California

13    than here.  All the documents are electronic, easy to transfer

14    around.

15          The fourth factor is the possibility they'll get a

16    fair trial.  I think both courts -- all parties will get a

17    fair trial in both courts.

18          And then the other considerations of a practical

19    nature that make a trial easy, expeditious, and economical,

20    again, they are focused on court congestion.  We talked about

21    the number of ways that Colorado is better suited than

22    California.  Even if you look at the four factors from the one

23    case they cite -- they said, oh, you have to look at these

24    four factors.  Two of them are a push.  Two of them heavily

25    favor us.  The median time from filing to trial here is

1    29 months, there is 49 months.  The pending cases per judge

2    here is around 500.  There it was around 1,000.  Those factors

3    make it much more appropriate to have the case here.

4         And then on the first-to-file rule, which they seek

5    to sort of discount or run away from, it's a rule, and we

6    sought -- we asked for it to be applied in California.  The

7    judge said no in a three-paragraph order, but that doesn't

8    change Your Honor's ability to address this.  And I want to

9    talk about this notion that somehow there's a long line of

10   related cases, we're not the first to file at all.

11        There was one case cited for that proposition, this

12   *Dumanian* case, and I'd urge Your Honor to look at that case,

13   because there they said what a substantial relationship means

14   was they're seeking the same remedy in the first case, that

15   first-filed case in *Dumanian*, it sought a rescission of a

16   board resolution.  It was a fight over control of a company

17   and the consequences of that.  The next case, the second-filed

18   case, sought in the alternative rescission of that same board

19   resolution.  They were seeking the same relief.

20        The reason we filed our case is because in spite of

21   all these years of fighting in California, no one was

22   addressing the core issue of fair pay for student athletes.

23   That issue was not included in *House*, not included in

24   *O'Bannon*, not included in *Alston*.  Those all related to other

25   NCAA rules.  No one else before we filed our lawsuit sought a

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    31

1   piece of the revenue generated from the schools through these

2   television contracts, et cetera, to be shared with the people

3   who were creating that product, the athletes.

4           So we are without question the first-filed case, and

5   the one case they cited to the contrary sought the same

6   relief.  No one has sought the same relief.  And they say, oh,

7   it's just 17 days, you know.  Evidently the other lawyers saw

8   our case and filed a case quickly, and therefore it doesn't

9   matter.  But the first-filed rule, yes, it has some discretion

10  in it.  But it isn't the really first-filed rule or the

11  first-filed rule by a lot.  A lot of cases we cite have one

12  day, four days, two weeks as making the difference.

13          We are the first-to-file rule and -- or the

14  first-filed case, and when you put that factor together along

15  with the 1404 factors, we strongly believe that the law gives

16  you great discretion.  We agree.  But that when you look at

17  what the law is focused on, every factor, with the exception

18  of the magistrate judge experience in California, favors us,

19  and the magistrate judge experience in California is a small

20  factor.  It's just discovery.  It's not on the substantive

21  issues.

22          And we strongly believe that when you look at all of

23  the factors in total as you're required to do, the lack of

24  specific showing by the plaintiffs, the lack of any cases they

25  cite that support this provision, that this case by

23-cv-03076-CNS-STV     Oral Argument     05/23/2024     32

1    Coloradoans should stay in Colorado.  Unless Your Honor has

2    any further questions, those are the issues we wanted to

3    address this morning.

4         THE COURT:  Let me ask you, Mr. Olson.  It does sound

5    like you would opt out in the California matter.  Kind of what

6    then?

7         MR. OLSON:  We would proceed with our case here.

8         THE COURT:  And so let me ask it a different way.  If

9    I did transfer this to California, I assume you agree that

10   means you would then litigate your claims there once you opt

11   out.

12        MR. OLSON:  On behalf of -- so if we transferred to

13   California, on behalf of these two plaintiffs, yes, I think

14   that is correct.  We would be stuck there.  We think that's

15   very unfair for the reasons we've talked about.  But if the

16   case is transferred, yes, I think that would be the case.  We

17   are, of course, in conversation with lots of other folks about

18   these issues, and I don't know where and how those other folks

19   if they decide to opt out as well would move forward.

20        But, again, the reason we say we opt out is we don't

21   know the deal.  All we know is these press accounts.  And what

22   we know about this scares us.  It seems like an insider deal

23   to maintain the power of the current establishment without

24   giving a fair shake to the people who create the value for all

25   these organizations, and what we seek in our case is a fair

```
 1   shake for the athletes that create the value to these

 2   organizations.

 3           THE COURT:  All right.  And let me ask you, at the

 4   beginning you indicated something about it was an insider.

 5   Are you saying -- you believe Carter counsel to be insiders?

 6   Is that who you're referring to?

 7           MR. OLSON:  They say we've been doing this forever.

 8   Trust us.  We don't have to tell you what we're doing.  We

 9   know what we're doing.  We've been fighting the NCAA for

10   years.  Trust us.  But they also say as part of the deal we're

11   going to go out and tell everyone this deal is procompetitive,

12   and that gives us great concern.  So it's both the experience

13   that they rely on, the failure of them to include us and talk

14   about why it is they made the compromises they made in the

15   deal.  That's what we mean by insiders.  And they weren't

16   filing and seeking the biggest, candidly, source of relief for

17   the plaintiffs which was these TV -- share of these TV and

18   revenue deals until we did it, and so all of this together

19   gives us concern.

20           But I don't mean to imply that they're somehow in

21   cahoots with the NCAA.  It's just it -- it's very surprising

22   to us as people who know this industry -- Mr. Broshuis played

23   Division 1 sports -- the terms of the deal that has been sold

24   is a great deal for the plaintiffs given what we think the law

25   and facts demand.
```

1    THE COURT:  All right.  And as I understand your

2    argument, one of your claims is the settlement as articulated

3    as you understand it to present doesn't really take into

4    account this employer/employee notion.  It's just aside from

5    that we're going to cap, yes, you're entitled to revenue.

6    We're going to cap them at this arbitrary number.

7    MR. OLSON:  I guess our concern is two-fold.  I don't

8    know that it's top of mind for us whether or not the National

9    Labor Relations Board categorizes them as employees or

10    employers.  It's important.  Mr. Fontenot broke his hip for a

11    year and was out of practice.  There's no worker comp for that

12    if it ended up being a more serious injury.

13    But our concern is that it is a broad release from

14    everyone who can make those kind of claims going forward in a

15    way that is sort of -- it reminds me of a union deal where the

16    pensions get funded, but the starting wage gets cut, right?

17    The future athletes in this deal are stuck with this regime

18    and are deprived of the mechanism to challenge it.  And so

19    we're less concerned about the employee designation and more

20    concerned about the overall picture of which that is a

21    component I guess would be the best way to say it.

22    THE COURT:  All right.  Thank you.  Let's go back to

23    Ms. Reilly, and, Ms. Reilly, you had promised some sort of

24    update on the settlement.  So you've heard Mr. Olson's

25    characterization.  Really what I'd like you to do is either

1    agree that that's an accurate characterization or how is it

2    not.

3            MS. REILLY:  Thank you, Your Honor.  And I am

4    somewhat limited because a settlement in principle has not yet

5    been reached.  I will provide a little bit more of an update

6    for you on process, and I will commit to Your Honor that we

7    will notify the Court very promptly when -- if and when a

8    settlement in principle is reached, which could be very soon.

9            Here's the status update.  So there are actually --

10   there are six defendants in the California cases.  It's the

11   same six defendants here, right?  These are all very

12   overlapping cases.  And, again, the mediation -- this has been

13   proceeding under a privileged mediation process pursuant to

14   the California court's orders over a period of a year.  We are

15   currently awaiting approvals and seeking approvals on

16   settlement, and Mr. Olson referred to two defendants having

17   approved.  I believe that number -- we are still waiting.  We

18   don't yet have approvals on two, at least two of the six

19   defendants.

20           So because there is -- no settlement in principle has

21   been reached, and even the approvals that Mr. Olson is

22   referring to, those have not reached an agreement in principle

23   either.  This is a global settlement that's being pursued.  I

24   can't go further in addressing the details of the terms of the

25   settlement or the procedural issues surrounding the settlement

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    36

1    negotiations because of the mediation privilege.

2    THE COURT:  All right.  Let me ask this then.  What

3    about Mr. Olson's argument that assuming, if after review of

4    the settlement, these two plaintiffs get the notice to opt

5    out, don't like it, do opt out, that they could file here and

6    not there?

7    MS. REILLY:  So that -- you are correct, Your Honor,

8    that the Rule 23 opt-out process will provide an opportunity

9    for the *Fontenot* plaintiffs -- for Mr. Fontenot to come back

10   to Colorado and file individual claims.  The complaint that's

11   in the case right now -- this is a putative class action

12   asserting claims including for injunctive relief through.  The

13   opt-out process there would be an ability to opt out and

14   proceed with certain individual claims.  And that applies to

15   not just Mr. Fontenot, but to student athletes across the

16   country who may have an interest in opting out and going a

17   different direction.  That all happens -- that process is

18   orchestrated by the settlement court in California.

19   I'd also like to clarify one other issue.  Some of

20   Mr. Olson's statements gave the impression that this is a

21   labor case and has employment claims, et cetera.  The claims

22   here are the same as in the *Carter* case.  They themselves have

23   described the case as largely duplicative of one another, and

24   that's why they asked Judge Seeborg to litigate the two cases

25   together in Colorado.  And so any settlement in the California

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    37

 1    cases would resolve the claims at issue, not claims outside

 2    the scope of the litigation.

 3         And to the extent that, you know, there's been

 4    characterizations of the California counsel as insiders, let's

 5    keep in mind that there has been very hard-fought litigation

 6    for 15 years including going all the way up to the Supreme

 7    Court and the Ninth Circuit multiple times.  These cases --

 8    there has been very, very extensive litigation, and the

 9    suggestion that there's -- I think another phrase that was

10    used -- no outside scrutiny as to what's going to happen with

11    this outside settlement approval process, that I think does a

12    disservice to the federal court in California that would be

13    charged with overseeing the settlement approval process and

14    ensuring that any settlement is fair and reasonable.  And,

15    again, there is the protection of the opt-out process.

16         What this case comes down to -- I'm sorry -- this

17    motion to transfer comes down to is just whether these two

18    class actions, which everyone agrees are overlapping, should

19    proceed in one court or two courts.  That decision, to be

20    clear, it's up to Your Honor, and I'm not suggesting

21    otherwise.  I'm also not suggesting that the District of

22    Colorado is not capable of tackling large, complex and

23    difficult cases.  The question is does that make sense.  Is

24    two better than one from the perspective of inconsistent

25    rulings and wasteful expenditure of judicial resources.  One

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    38

1    is better than two particularly when the one has the 15 years

2    of experience dealing with these cases, some of which are

3    pending and impact this litigation today.

4          And the final point I'll make is the suggestion that

5    this case is somehow completely different than the other cases

6    that have come before, that's simply incorrect.  All of these

7    cases going back to the *O'Bannon* case in 2009, these are

8    antitrust cases that challenge NCAA rules on student athlete

9    compensation and benefits and includes *O'Bannon*, *Alston*,

10   *House*, *Hubbard*, *Carter*.

11         And the JPML recognized the interrelated nature of

12   those cases and specifically the fact that the plaintiffs in

13   this *Fontenot* case and the *Carter* case, what they're doing,

14   they're simply seeking greater shares of the same television

15   broadcast proceeds received by the defendants for college

16   sports that are the damages being sought in that *House* case

17   that's set for trial in January.

18         And for that reason the JPML recognized that

19   resolution of the *House* action, which is the NIL case, may

20   well drive resolution of *Carter* and *Fontenot* as well.  I'm

21   happy to answer any further questions Your Honor has.

22         THE COURT:  I don't think I have.  Let me just say do

23   you want to rebut any of the inconvenience arguments Mr. Olson

24   made?

25         MS. REILLY:  If Your Honor would like to hear

Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV     Oral Argument          05/23/2024     39

1    argument on that, Ms. Wyson will address that.

2              THE COURT:  Okay.

3              MS. WYSON:  Thank you, Your Honor.  I'll keep this

4    really brief.  In support of their argument on plaintiffs'

5    choice of forum, they take issue with our cases.  We take

6    issue with their cases.  Everyone is distinguishing.  The

7    cases that they cite, though, are either not class actions,

8    and then one of them is a California district court case that

9    sought to transfer California state law claims to Utah.  That

10   was the big issue there.  And the other one didn't involve any

11   related cases in another jurisdiction.

12             The cases that we put forward, the *Von Coley* case and

13   the *In Re Choice Hotel* cases, those provide the clearest path

14   on how to address these issues, and the *In Re Choice Hotels*

15   case also adds the notable consideration of how substantial

16   will the plaintiffs' testimony play as part of the trial.  And

17   in a class action where they're seeking compensation for the

18   individualized claims of student athletes across the nation,

19   the testimony of two student athletes is not going to play a

20   material part, and that was another consideration that the *In*

21   *Re Choice Hotels* case thought was important on this issue of

22   whether the plaintiff's choice of forum should be -- should be

23   kept.

24             And then on the first-filed rule, as Judge Seeborg

25   said, their argument here is strained.  They filed an

Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV     Oral Argument     05/23/2024     40

1  antitrust case.  There are several antitrust cases that have

2  been pending for several years.  Those are the same claims as

3  Ms. Reilly mentioned seeking the same types of revenues.

4  There is no basis to apply the first-to-file rule to the

5  *Fontenot* case, both because it's not actually the first filed

6  case, and for the reasons mentioned earlier.  That if it was

7  applied in the way they're suggesting, it would -- it would

8  decrease judicial efficiency and increase risk of conflicting

9  decisions.  Thank you.

10      THE COURT:  All right.  Mr. Olson, I'll give you a

11  brief rebuttal, if you want one.  You don't have to if you

12  don't.

13      MR. OLSON:  Thank you, Your Honor.  Three quick

14  points.  First, in the *Choice Hotels* case, Judge Blackburn,

15  that was a securities fraud case where the only question was

16  what the defendant said and did.  There was no question as to

17  what the plaintiffs -- plaintiffs just owned some stock.  Here

18  Mr. Fontenot and Ms. Hollingshed were injured in Colorado, and

19  leads to my second point, which is I tried one of the few

20  class action cases that's gone to verdict in the Whirlpool

21  smelly washers cases, and the testimony of the class

22  representatives featured quite significantly in that case.

23  They both testified for almost a day each.

24      I hope Mr. Fontenot doesn't face that same ordeal

25  here, but he certainly will testify, and they will play a role

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    41

1    in this case.  So the notion just because the class is big

2    that the class reps don't testify is not true.  The class reps

3    play an integral role both in discovery and in figuring out --

4    to testifying at trial.

5            And then just coming back to the last point about,

6    you know, their reliance on Judge Seeborg's order as somehow

7    resolving this question, they concede, as they must, it's your

8    decision.  And the fact that we tried to move quickly to

9    finally get this case moving after six months of procedural

10   delay and a judge issued a short ruling against us doesn't

11   mean that Your Honor can't look at these issues afresh, apply

12   Colorado law to the question, and we believe when you do that,

13   the law compels an answer that it's in the interest of justice

14   for this case to stay here.  Thank you very much.

15           THE COURT:  Mr. Olson, let me ask you one question,

16   and it may be better for Ms. Reilly.  I don't know.  Where is

17   *Carter*?  What's the status of *Carter*?  Have they started

18   discovery?

19           MR. OLSON:  No.  *Carter*, they filed after us.  The

20   defendants there -- or plaintiffs there, unlike us, agreed to

21   stay everything sort of while this whole process -- while the

22   JPML went.  We eventually got there, but it is on ice pending

23   this.  In fact, there was a -- I believe the schedule has been

24   delayed that nothing -- none of the deadlines start to run

25   until after Your Honor issues a ruling in this case.  So it's

23-cv-03076-CNS-STV      Oral Argument        05/23/2024    42

1   there.

2          THE COURT:  Let me just hear from Ms. Reilly.

3          MR. OLSON:  But nothing is happening.

4          MS. REILLY:  Your Honor, the *Carter* case is not on

5   ice.  It's in the exact same procedural position as this case.

6   Our district, as you know, just gets out in front with the

7   scheduling conference very early, but their process is moving

8   forward in the same initial scheduling --

9          THE COURT:  No stay in place.

10         MS. REILLY:  No stay.

11         THE COURT:  All right.

12         MR. OLSON:  Well, my understanding was there's been

13  no motions filed, no discovery has occurred, and with the

14  settlement sort of pending, nothing is going to happen.

15         MS. REILLY:  Your Honor, we -- we have a deadline to

16  file a responsive pleading.  It tracks the deadlines in this

17  case.  The cases are on the exact same track, and that's

18  intentional.  We've been conferring to make sure no one got

19  ahead of the other.

20         THE COURT:  That's fine.  And you all have a

21  scheduling conference this afternoon, correct?

22         MS. REILLY:  We have one scheduled, Your Honor, for

23  11:00 with Judge Varholak unless there's an order of transfer.

24         THE COURT:  Got it.  All right.  Thank you.  That was

25  helpful.  So after reviewing the briefs and hearing argument,

Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    43

1    I'm going to do what I frequently do is defer back to the

2    rule.  So as I look at 28 Section 1404, I may in my discretion

3    transfer a case to any other district for the convenience of

4    the parties and witnesses in the interest of justice.  There's

5    no "and" in between there.  So the key factor is for the

6    convenience of the parties and witnesses.

7         As Mr. Olson noted, I just issued a decision on this

8    issue that bears repeating here because in *San Juan Associates*

9    I did articulate the five factors that I look at in deciding

10   whether a transfer is in order.  The plaintiff's choice of

11   forum is the first factor.  Here, I understand this is a

12   broader case affecting many more people than a single

13   plaintiff case, but here I find, regardless, that this is

14   potentially a class case.

15        We have two named plaintiffs.  Both reside in

16   Colorado.  Both went to school in Colorado.  Both are claiming

17   injury from actions that occurred in Colorado, and therefore

18   chose Colorado as the choice of forum.  I think it would be an

19   abuse of discretion not to give that some weight in my

20   analysis.  So I find that factor weighs in favor of the

21   plaintiffs.

22        Convenience of the witnesses.  That was explicitly

23   addressed in *San Juan*, and relying on other cases in the Tenth

24   Circuit, the Tenth Circuit does require a more robust finding

25   regarding what has been demonstrated about the convenience of

Sarah K. Mitchell, RPR, CRR

1    the witnesses.  That is the defendants' burden to carry.

2    Typically that is done through detail about the witnesses to

3    be called, where they are located, why they can't travel to

4    the choice of forum.  No showing like that was even remotely

5    attempted here.

6         To the contrary, the plaintiff did put in some

7    evidence about flights and whatnot and how easy it was for

8    many of defendants' witnesses to get to Denver.  There is one

9    defendant located in California, but the larger group of the

10   five are not in California and would be coming from back East

11   anyway.  So given defendants' really lack of effort to make

12   that showing, I find factor number two lends itself to

13   plaintiffs' argument as well.

14        The accessibility of witnesses and sources of proof.

15   Really, this could lean towards defendants.  I understand

16   there's been a host of proceedings in California that would

17   lend itself to perhaps an easier share of information.  I

18   think that argument would have been more persuasive ten years

19   ago.  Today it's a push of a button to share information or a

20   protective order or whatnot, and I find that factor, because

21   of that, while it does sway lightly in defendants' favor, it's

22   a minimal sway because of where we're at.

23        And I would think and hope the parties could

24   communicate and consolidate efforts to utilize much of those

25   materials.  Nobody wants you all to reinvent the wheel here,

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    45

1    and I would assume your clients don't either.  So to the

2    extent there could be sharing of that, that would be

3    sufficient.

4         The fair trial I find is even.  I believe the

5    plaintiffs could get a fair trial here or in California.  That

6    factor is not weighing into my consideration.

7         Looking at the practical factors, I am concerned

8    about pawning off -- and how that is how I view this --

9    pawning off this case to a different district.  These cases

10   are a host of work, and it's a giant workload.  The Northern

11   District of California where I have colleagues is bogged down,

12   and they are even further behind us.  We are all trying to dig

13   out.  COVID did not help that.  But we are trying to dig out.

14   While it is 29 months to trial as an average in this

15   jurisdiction, that is not my average.  Mine is significantly

16   lower, and I would expect to keep that on track here.

17        So I just simply do not believe it is the role of

18   this Court when other factors weigh in favor of keeping a case

19   to subject this magistrate to this level of additional work.

20   Now, that being said, I'm aware that I am somewhat looping in

21   Magistrate Judge Varholak to this endeavor.  Fortunately for

22   you all, he is more than adept to handle this level of case,

23   and I think you'll find his efficiency exceeds mine.  So in

24   that regard, you will be, I think, amazingly surprised at how

25   fast this case can be -- get down the road, and he is more

Sarah K. Mitchell, RPR, CRR

23-cv-03076-CNS-STV    Oral Argument    05/23/2024    46

1    than adept at dealing with the types of issues you're talking

2    about, Ms. Reilly, in terms of confidentiality and different

3    orders that will be necessary.

4         I have him in other cases devoting substantial

5    efforts in single plaintiff cases setting hearing after

6    hearing to make sure cases are marshalled through properly,

7    and I have no doubt he can do that here.  And while Judge

8    Seeborg was eager to loop his magistrate judge in, I will kind

9    of do the same and be eager to loop mine in to this matter

10   finding that really in my estimate the plaintiffs' choice of

11   forum and the lack of showing on convenience of witnesses

12   really does weigh in favor of keeping this case here under

13   Section 1404(a).

14        So I will deny defendants' motion to transfer this

15   case.  In so doing, I am mindful of the fact that now that

16   there may be a settlement, I do believe the California case

17   will be tied up for months after months thereby leaving the

18   plaintiffs without a remedy for any sort of near future, and

19   that concerns me because I did stay this case pending the

20   decision first by the JPML and then the *Carter* court, so this

21   group of -- these two plaintiffs, Colorado residents, have

22   already been sitting idle for six months, and, again, in my

23   courtroom I do not like to see that happen.

24        So defendants' motion will be denied.  You will be

25   visiting with Magistrate Judge Varholak today, so you have

Sarah K. Mitchell, RPR, CRR

```
 1   about an hour before that.  I would suggest getting together

 2   real quick.  If you all have thoughts on what he can do

 3   immediately to assist you, I know he will be open to that.

 4   And it may be worth thinking about that, because the sooner

 5   you loop him in, the better off we're all going to be.

 6            With that, is there anything else?

 7            MR. OLSON:  Nothing from plaintiff, Your Honor.

 8   Thank you very much.

 9            MS. REILLY:  No, Your Honor.  But just, again, we may

10   be in touch very soon about the settlement and seeking

11   additional relief that's appropriate under Rule 23 given the

12   impact of that global settlement on this case.

13            THE COURT:  That's a good point, Ms. Reilly, and let

14   me be clear.  I don't know what that is yet.  I certainly can

15   see that that may cause some issues here, and I would expect

16   to hear about them, because we won't be relitigating anything

17   certainly that is decided through that settlement.  And if the

18   plaintiffs opt out, they opt out, but the effect of a

19   potential class here could dramatically be affected.  I just

20   don't know.  So in no way, shape, or form am I cutting off any

21   argument like that.

22            MS. REILLY:  Thank you, Your Honor.

23            THE COURT:  We'll be in recess.

24            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

25       (The proceedings were concluded at 9:49 a.m.)
```

Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4   United States District Court for the District of Colorado, a

5   Registered Professional Reporter and Certified Realtime

6   Reporter, do hereby certify that I reported by machine

7   shorthand the proceedings contained herein at the time and

8   place aforementioned and that the foregoing pages constitute a

9   full, true and correct transcript.

10          Dated this 24th day of May, 2024.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                     SARAH K. MITCHELL
                       Official Court Reporter
16              Registered Professional Reporter
                    Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR