# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| ALEX FONTENOT, MYA HOLLINGSHED, SARAH FULLER, DEONTAY ANDERSON, and TUCKER CLARK, Individually and on Behalf of All Those Similarly Situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; SOUTHEASTERN CONFERENCE; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; and ATLANTIC COAST CONFERENCE;<br><br>        Defendants. | CASE NO. 1:23-cv-03076-CNS-STV<br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

*"What I don't understand, is how the NCAA, television networks, conferences, universities and coaches can continue to pull in millions and in some cases billions of dollars in revenue off the efforts of college student-athletes across the country without providing enough opportunity to share in the ever-increasing revenues."*

-Jim Harbaugh, then-Head Football Coach, University of Michigan (Aug. 28, 2023)[1]

Plaintiffs Alex Fontenot, Mya Hollingshed, Sarah Fuller, Deontay Anderson, and Tucker Clark, on behalf of themselves and all others similarly situated, bring this amended class action complaint alleging antitrust violations. Plaintiffs allege as follows:

## INTRODUCTION

1.      The score was 14-10, and the game between two top-ten college football teams was in its last minute. Notre Dame's defense had stifled the Ohio State offense for most of the day. But Ohio State was on the move, and they neared the goal line as the seconds counted down. One final play to score a touchdown and win—or not, and lose. The ball was handed to Chip Trayanum, an Ohio State running back. With a plunge, he found the end zone. The Buckeyes scored, and the game was over.

2.      Over 77,000 fans attended that September game in South Bend this year—most of them Notre Dame fans who left the game stunned. Far more people watched on television. The game peaked at 14.2 million viewers during the final scoring drive, and an average of 10.6 million tuned in throughout the game. It was the most-watched regular season college football game on NBC in 30 years.

3.      Because of moments like these, millions of viewers tune in to watch college football and basketball athletes perform on a weekly basis. These college football and basketball players bring in billions of dollars in television revenue for

---

[1] *Michigan's Jim Harbaugh backs student-athlete revenue sharing*, ESPN, Aug. 28, 2013, *available at* https://www.espn.com/college-football/story/_/id/38277849/michigan-jim-harbaugh-backs-student-athlete-revenue-sharing.

**SECOND AMENDED CLASS ACTION COMPLAINT**

Defendants and their member schools. Everyone profits from their efforts: the NCAA, the conferences, the schools, and the coaches. Everyone, that is, except the players themselves, because the NCAA prohibits it.

4.      Defendants have spelled out the restraint in their bylaws. Bylaw 12 prohibits athletes from receiving "pay in any form" for the labor that they provide, no matter how valuable that labor is, and no matter how much the athletes would be paid in an unrestrained market.

5.      This lawsuit aims to change that. It focuses on the ever-increasing television revenue and other revenue brought in by these athletes' labor, of which the athletes would be entitled to receive a substantial portion, but for the NCAA's rules.

6.      There is big money in the television broadcasts of NCAA games. In August 2022, the Big Ten Conference inked a new television rights agreement with several broadcasters. It became operative this year, and pursuant to the agreement, broadcasters will pay $7 billion to the Big Ten Conference over just seven years, in exchange for the right to televise the conference's college football games, as well as a certain number of the conference's college basketball games. The conference is expected to distribute $80 million to $100 million annually to each of its member schools pursuant to the agreement. That's more than double what the Big Ten schools had been making under the previous agreement.

7.      Other conferences have billion-dollar television broadcast agreements as well. The Big 12 Conference has reportedly signed a television revenue agreement worth more than $2.2 billion. The SEC and ACC reportedly have contracts worth over $7 billion and $4 billion, respectively, while the Pac-12 has a $3 billion deal that was not rich enough to prevent most of its members from departing for greener pastures next year. These conferences are known as the "Power Five Conferences" due to the immense popularity of their sports.

**SECOND AMENDED CLASS ACTION COMPLAINT**

8.      Combined, the Power Five Conferences have signed contracts that will pay them more than $20 billion to broadcast their games on television. Their television revenues have increased by roughly 90% in recent years and are expected to continue to grow, as the below chart illustrates:



9.      Thousands of football and basketball athletes at the conferences' schools provide the labor that fuels these multi-billion dollar deals. These athletes are among the best in the world at their jobs. They are hard-working and uniquely talented individuals who have only a limited amount of time to earn money from their skilled labor. NCAA athletes have only four (sometimes five) years of eligibility to play college sports, and as the NCAA is fond of saying, most of these athletes will not work as athletes in professional sports leagues. For many, now is their only chance to earn just compensation for their immense talents, which bring joy to so many fans.

10.      It is the athletes that the viewer tunes in to watch. Yet the athletes are not being paid their fair share of this multi-billion dollar revenue, or any of the other revenue, even though they—the athletes—through their labor, are the most significant driver of that revenue. As Defendants' television and other revenues have increased

**SECOND AMENDED CLASS ACTION COMPLAINT**

exponentially, the athletes' share has remained flat. Indeed, the athletes get nothing. The NCAA's rules prohibit them from receiving a portion of the revenue.

11.     Defendants are operating a cartel that fixes wages—a classic antitrust violation. The NCAA's members (which includes its schools and conferences) are horizontal competitors. In a competitive market, they would compete for players by providing them with salaries commensurate with the true value of their labor. That competition would lead to the athletes receiving a significant share of revenue, including the television revenue from these media agreements. Athletes in other leagues (such as in European soccer leagues, the National Football League, and the National Basketball Association) regularly receive 50-60% of revenue.

12.     By operating as a cartel, however, Defendants have for decades depressed the compensation paid for the athletes' labor. Defendants, via the NCAA rules that the schools and conferences have adopted, have forbidden the sharing of television or other revenue with the very people who deserve it the most. Meanwhile the NCAA's president, who no television viewer tunes in to watch, made nearly $3 million last year.

13.     Defendants' prohibition against compensating players is a horizontal restraint amongst competitors to purposefully restrict competition in the labor market for the athletes' services. The purpose and effect of this horizontal agreement was (and is) to fix and suppress prices so as to make them unresponsive to a competitive marketplace. This amounts to an unlawful restraint under antitrust laws, and it is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Defendants have traditionally argued that the concept of "amateurism" necessitates these rules—that the entire system would break if the athletes are compensated one cent beyond their education-related expenses, because consumer demand would plummet. That is a sham argument, as recent developments have shown. After prior court victories and state laws passed to protect college athletes, the

**SECOND AMENDED CLASS ACTION COMPLAINT**

NCAA recently issued a policy by which the athletes are finally allowed to earn money from their names, images, and likenesses ("NILs"), as long as the payments come from third parties. Before 2021, athletes could not even earn that NIL money because the NCAA rules prohibited it, and they still prohibit athletes from earning NIL money directly from NCAA members.

15.     Even though athletes are now earning some money (though not nearly what they are entitled to earn) in the form of NIL payments, there has been no decrease in viewership or public interest in NCAA sports. The sky has not fallen. Quite the contrary, television ratings are higher than ever, and the money keeps rolling in. As one industry insider recently remarked, "I don't know what in all of TV is trending any better than [college football]."[2]

16.     In October 2023, the football players for the University of Utah received a welcome surprise. They went to the stadium, and all 85 scholarship players were handed the keys to a new Dodge Ram truck. According to reports, the trucks were valued at over $60,000 apiece.

17.     The trucks' leases were paid for by some of the schools' boosters, and were provided as compensation for a portion of the value of the players' NILs. At the players' next game, more than 50,000 people attended. It was the 79th consecutive sold-out football game at the school's stadium. Just a couple of weeks later, more than three million people watched the school's game against University of Southern California on television—one of the top-5 football games by ratings, and one of the top-rated shows of any genre airing that day.

18.     These athletes should be compensated with more than just trucks—they are entitled to their fair share of television revenue and overall revenue. The NCAA's rules still prohibit the conferences and the schools from sharing revenue with the

---

[2] Michael Mulvihill, twitter.com,
https://twitter.com/mulvihill79/status/1711874853144543646.

athletes. If a school or conference did so, the player would be ruled ineligible and the school or conference would be disciplined. The conferences and schools are raking in billions of dollars in television and other revenue without sharing a dime of it with the athletes.

19.     Instead, the money is flowing everywhere except the players' pockets. At least 25 coaches make more than $6 million per year. Schools are paying tens of millions of dollars to coaches who have been fired and are no longer working. And college football staffs now include armies of analysts on the payroll.

20.     Coach Jim Harbaugh, until recently of the University of Michigan, recognizes the injustice of the current system. He recently called for "a system that is fair, equitable and benefits all involved," saying "you can't say you're about diversity, equity and inclusion, if you aren't willing to include the student-athletes in revenue sharing."[3]

21.     This case is about allowing revenue to be allocated by the free market rather than the restrictive and unlawful rules of a labor cartel that takes advantage of the athletes that are the primary source of its massive income. Our country and its antitrust laws operate on the foundational principle that market forces should determine the compensation that a person receives for their labor. That should be as true in sports as in any other industry. The NCAA's stranglehold on athlete compensation must end.

22.     These athletes are entitled to the antitrust damages sustained as a result of these collusive and illegal practices. And the Court should enjoin the NCAA and its members from engaging in this conduct again so that these talented athletes can be fairly compensated for the valuable work they perform.

---

[3] *See supra* n.1.

**SECOND AMENDED CLASS ACTION COMPLAINT**

## PARTIES, JURISDICTION, AND VENUE

23.     Plaintiff Alex Fontenot, an individual, is a resident of Colorado. He worked as a college football player at the University of Colorado from 2017 to 2022.

24.     Plaintiff Mya Hollingshed, an individual, is a resident of Colorado. She worked as a college basketball player at the University of Colorado from 2017 to 2022.

25.     Plaintiff Sarah Fuller, an individual, is a resident of Tennessee. She worked as a college soccer player and a college football player at Vanderbilt University from 2017 to 2020.

26.     Plaintiff Deontay Anderson, an individual, is a resident of Texas. He worked as a college football player at the University of Houston from 2018 to 2021, and at the University of Mississippi from 2016 to 2017.

27.     Plaintiff Tucker Clark, an individual, is a resident of Colorado and currently works as a golfer at the University of Colorado. He previously worked as a golfer at Notre Dame.

28.     Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

29.     The Pac-12 Conference ("Pac 12") is an unincorporated association with a principal place of business in San Francisco, California. During the relevant period, the Pac-12 Conference conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

30.     The Southeastern Conference ("SEC") is an unincorporated association with its principal place of business in Birmingham, Alabama. During the relevant period, the SEC conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

**SECOND AMENDED CLASS ACTION COMPLAINT**

31.     The Atlantic Coast Conference ("ACC") is an unincorporated association with a principal place of business in Greensboro, North Carolina. During the relevant period, the ACC conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

32.     The Big 12 Conference, Inc. ("Big 12") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Irving, Texas. During the relevant period, the Big 12 conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

33.     The Big Ten Conference, Inc. ("Big Ten") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Rosemont, Illinois. During the relevant period, the Big Ten and its member schools were co-conspirators; they participated in the illegal restraint in the market and damaged (and continues to damage) class members.

34.     Various other persons and entities engaged in concert with the named defendants in the conduct alleged herein, and are co-conspirators.

35.      Plaintiffs bring this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

36.     Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants and their member schools transact substantial business in multiple states. Defendants and their member schools routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

37.     Venue is proper in this District because Defendants and some of their members reside, are found, and have agents in this District as provided in 28 U.S.C. §

**SECOND AMENDED CLASS ACTION COMPLAINT**

1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants and some of their members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The bylaws at issue (discussed in greater detail below) apply to athletes who have worked, or currently work, for NCAA member institutions in this District, the NCAA sanctions Division I football and basketball events that regularly take place in this District, including games played by local members, and several Plaintiffs and other members of the proposed Class reside or work in this District. Indeed, in 2023, Denver hosted a portion of the NCAA's popular March Madness men's basketball tournament, and it will do so again in 2025.

38.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under that Clayton Act, as described *supra*. It also has personal jurisdiction because, among other things, Defendants transact substantial, continuous business in this State and District; participate in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; they have substantial contacts in this State and District and several of their members reside in this State and District; and they are engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

**CLASS ACTION ALLEGATIONS**

39.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

**SECOND AMENDED CLASS ACTION COMPLAINT**

All persons who worked as athletes for a Division I athletic team at an NCAA Division I school, from the beginning of the statute of limitations period, as determined by the Court, through judgment in this matter.

40.     While Plaintiffs do not know the exact size of the proposed class, Plaintiffs are informed and believe that the proposed class includes over 100 members residing in various parts of the United States. The class is so numerous that joinder of all members is impracticable.

41.     Plaintiffs' claims are typical of the claims of other members of the proposed class. Plaintiffs and the members of the Proposed Class were subject to the same or similar restraints and compensation practices arising out of Defendants' common course of illegal conduct. Plaintiffs and the Proposed Class have sustained similar types of damages as a result of these common practices.

42.     Common questions of fact or law exists, and they predominate over any individualized questions. They include, *inter alia*:

    a.   Whether by enacting the bylaws, Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of compensation paid to class members;

    b.   Whether that conduct caused Plaintiffs and proposed class members to earn less than what they would have in a truly competitive market;

    c.   Whether Plaintiffs and the proposed class suffered antitrust injury or were threatened with injury; and

    d.   Whether Plaintiffs and the proposed class are entitled to damages and injunctive relief, and the type and scope of that relief.

43.     Plaintiffs will fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiffs have retained counsel competent and experienced in class-action litigation, including antitrust litigation and sports-related litigation.

**SECOND AMENDED CLASS ACTION COMPLAINT**

44.     A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendants and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

45.     Conversely, a class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiffs do not anticipate any difficulty in the management of this action as a class action, and the proposed class has a high degree of cohesion.

46.     Defendants have acted or refused to act—and continue to act—on grounds generally applicable to the class, thereby making appropriate final injunctive or declaratory relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

### A. The NCAA, its co-conspirators, and the exponential growth in revenue.

47.     More than a century ago, our nation's colleges and universities banded together to form the NCAA. The ostensible need for the association was to "protect" players because of the number of injuries occurring in college athletics at the time. Over the years, however, the association began focusing more on protecting its own financial interests, by limiting the compensation provided to athletes, than on actually protecting the athletes from injuries.

48.     As an unincorporated association, the NCAA is governed by its members, which include its schools and conferences. The NCAA has several governance committees, with representatives from member schools and conferences who sit on the

**SECOND AMENDED CLASS ACTION COMPLAINT**

committees and engage in NCAA rulemaking. The highest governing body, the Board of Governors, consists primarily of chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements policies.

49.     The association has adopted a constitution and a number of bylaws. As a condition of membership, member schools and conferences must comply with the association's constitution and bylaws. Certain bylaws have been deemed so important by the association that they cannot be amended without a full vote of the members. One of these bylaws is Bylaw 12, entitled "Amateurism and Athletics Eligibility."

50.     Bylaw 12 states that "[o]nly an amateur student-athlete" can participate in the NCAA's sports. It goes on to say that a "grant-in-aid"—more commonly known as a scholarship—does not violate the amateurism rules. That grant-in-aid has generally been limited to the cost of tuition, room and board, books, and similar education-related expenses.

51.     As a condition of membership, the bylaws require schools to ensure that their athletes maintain their amateur status when participating in Division I athletics. The schools use an amateur certification process. An athlete must receive this amateur certification before participating in practices or competitions.

52.     An athlete loses his amateur status by using athletics skill "for pay in any form in that sport." NCAA Bylaw 12.1.2. Prohibited forms of pay include: "any direct or indirect salary, gratuity, or comparable compensation" or "any division or split of surplus (bonuses, game receipts, etc.)," such as television or other revenues. Likewise, cash awards or cash prizes for performance are prohibited. NCAA Bylaw 12.1.2.1.4. And the athletes "may participate in media activities," including television programs, but they "shall not receive any remuneration" from it. NCAA Bylaw 12.5.3.

53.     Penalties for violating these rules include, for the athlete, loss of ability to compete in NCAA events, and for the school, forfeiture of games, returning revenue, bans on post-season play, and the removal of scholarships. Additionally, in some

**SECOND AMENDED CLASS ACTION COMPLAINT**

circumstances, if an ineligible athlete participates in a game, the NCAA has the right to require the school to pay to the NCAA the school's "share of television receipts" related to the game. NCAA Bylaw 19.13.

54.  The NCAA, its conferences, and its member schools enforce these rules, and many athletes and schools have been penalized for violating them. As Article 2.8 of the NCAA's governing constitution states, a non-compliant school will be subjected to discipline and corrective actions. That includes being "suspended, terminated or otherwise disciplined." NCAA Constitution Article 3.2.5.1.

55.  Indeed, according to Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to boycott an entity that fails to follow the rules.

56.  The wage fix is thus codified in Defendants' own bylaws. This arrangement does not exist in other university contexts, including when it comes to other workers who are simultaneously attending a university and working for it. A graduate student is not barred from being paid to teach or assist in research or perform any other paid work. Neither should an athlete attending the same university.

57.  The NCAA is divided into three levels: Division I, Division II, and Division III. Division I schools generally have the largest athletics department budgets, the better athletes, and often have larger student bodies. There are more than 350 Division I schools. Sixty-nine (formerly 65) of these Division I schools make up the Power 5 Conferences. Notre Dame (which, though independent in football, competes against Power 5 schools and is a member of the ACC for men's and women's basketball) also operates at the Division I level.

**SECOND AMENDED CLASS ACTION COMPLAINT**

58.    In 2022, the NCAA itself earned $1.14 billion. Much of that comes from television contracts for the broadcast of basketball games between NCAA member schools. At the end of each college basketball season, the NCAA hosts a "March Madness" tournament. Its popularity in 2010 garnered a television contract originally worth $10.8 billion over 14 years; the parties later agreed to extend the contract an additional 8 years for an additional $8.8 billion.

59.    Those numbers, of course, do not include the amount earned by the NCAA's members. In 2019, the NCAA Division I member schools generated close to $16 billion in total athletics revenue collectively.

60.    The Power 5 Conferences generated much of that revenue. In 2022-23, there were at least 22 universities with revenues exceeding $150 million. (Private schools like Duke and Notre Dame were not included in the study, meaning the number of such schools is likely higher.) All those schools were members of Power 5 Conferences. In 2022, the 13 public schools in the SEC reported a combined revenue of $2.17 billion, and the 13 public schools in the Big Ten combined for $2.04 billion in revenue.[4]

61.    On the low end, the average athletics department revenue for a Big 12 school amounted to over $110 million in 2022. On the high end, the average revenue for a SEC school amounted to $159.1 million. The other three conferences in the Power 5 fell between those numbers. The Power 5 Conferences enjoyed revenue growth of 260% from 2008 to 2018. Over the same time period, revenue growth for the NBA and NFL was around 100%. The growth has only continued in recent years.

62.    The huge television contracts signed by the Power 5 Conferences drive much of that revenue growth. With its new landmark deal, the Big Ten now earns $1.15 billion per year in television revenue. In 2024, the SEC will be earning over $700 million

---

[4] https://www.usatoday.com/story/sports/college/2023/06/14/sec-big-ten-2-billion-athletics-revenue-power-five/70313053007/

**SECOND AMENDED CLASS ACTION COMPLAINT**

per year in television revenue. The Big 12 earns an average of $220 million in annual revenue, but that will increase to $380 million in 2025. The ACC earns an average of $240 million in such revenue, and the Pac 12 earns $250 million.

63.     Approximately $470 million per year in television revenue is also earned from the College Football Playoff series each year. When the current television deal for the College Football Playoff expires in 2026, industry experts predict that Defendants will be in a position to negotiate a deal that pays over $2 billion per year in television broadcast revenue because of the increased popularity of college football.

64.     In total, the Power 5 conferences have signed television contracts that exceed $20 billion. The annual revenue (which is distributed to the schools) has been growing exponentially, and is expected to continue to grow exponentially, as the below chart demonstrates:



**SECOND AMENDED CLASS ACTION COMPLAINT**

65.     Demand for college football and basketball, and corresponding television viewership ratings, is strong and increasing. For example, an average of 21.736 million people viewed the NCAA's College Football Playoff semifinal game in 2023 between Ohio State and Georgia. Meanwhile, an average of 14.69 million people watched the NCAA's March Madness men's championship basketball game. Ratings for the women's basketball championship game in 2023 reached 9.9 million, which shattered the prior record. In 2024, that record for women's college basketball was shattered again, as an average of over 18 million people watched the championship game.

66.     Each conference generally splits the revenue it receives from television contracts for the broadcast of games evenly amongst that conferences' member schools. That is because schools generally assign their broadcast rights to the conferences so the conferences can negotiate with the television networks. For example, the SEC receives money from its television contracts and then shares it equally with its own member schools. The schools of course have an incentive to try to position themselves in the best place to maximize their revenue, by joining the conference that takes in and then shares the most revenue. That results in revenue-chasing, which in turn has resulted in a significant amount of conference-jumping by schools.

67.     As one industry insider, Amy Perko, recently stated, "[c]onference realignment is driven by this continual chase of revenue. The winners, at least in the media, are being defined as the conferences that bring in the most revenue."

68.     For instance, several members of the Pac-12 have decided to abandon the conference to cash in on more lucrative television deals being negotiated by other Power 5 conferences. The Big Ten—traditionally a Midwestern conference—will soon include UCLA, USC, Washington, and Oregon as members. Why? Because of the Big Ten's huge new television deal, which they are in a position to share with schools who join their conference.

**SECOND AMENDED CLASS ACTION COMPLAINT**

69.     Similarly, the ACC traditionally has been a conference of eastern schools. Now the "Atlantic Coast Conference" will include members from the Pacific coast: Stanford and California-Berkeley. Instead of playing games a few hours south against USC or UCLA, the athletes at Stanford will have to travel cross-country to Boston, Chapel Hill, and Miami on a regular basis.

70.     As television revenues have skyrocketed, the schools and conferences have chased the almighty dollar. There is no end to this chase in sight. Clemson and Florida State continue to make noise about leaving the ACC for greener pastures. And while Defendants have long fussed about the need to protect athletes, they apparently have no problem with increasing the players' travel dramatically or, at times, expanding the number of games scheduled to increase revenue gains. Player welfare is taking a backseat to revenue.

71.     The increased travel caused by realignment hits athletes in sports other than basketball and football particularly hard. One head football coach put it this way: "[W]hat about softball and baseball who have to travel cross-country? Did we ask about the cost to them? Do we know what the number one cause of mental health is: it's lack of rest and sleep."[5]

72.     Or as a head basketball coach stated: "None of it is in the best interest of the student-athlete, no matter what anybody says. It's in the best interest of more money to cover the bills. That's it."[6]

---

[5] Jared Bush, *Mizzou head coach Eli Drinkwitz criticizes conference realignment*, Fox4, Aug. 6, 2023, *available at* https://fox4kc.com/sports/college/mizzou/mizzou-head-coach-eli-drinkwitz-criticizes-conference-realignment/.

[6] Jordan Mendoza, *UCLA coach Mick Cronin: Realignment not 'in the best interest of the student-athlete'*, USA Today, Aug. 17, 2023, *available at* https://www.usatoday.com/story/sports/ncaab/2023/08/17/ucla-coach-mick-cronin-realignment-thoughts/70615325007/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

73.     The administrators and head coaches and nearly everyone else working in college athletics have seen salaries rise along with revenue. Everyone is cashing in, with one exception: the players themselves. That is solely because of Defendants' illegal restraint, which prohibits players from receiving any portion of revenue.

74.     In a competitive market, the athletes working at Power 5 schools would receive compensation that responded to market forces. Just as the schools compete for coaches by paying higher salaries, they would also compete for athletes by paying higher compensation. But the NCAA bylaws prohibit such payment. That amounts to a horizontal restriction amongst competitors that artificially restrains the compensation provided to players.

**B.  College athletics programs have dramatically increased spending on coaching salaries and quality of facilities, and the compensation for the athletes would likewise increase in a competitive market.**

75.     Because the Power 5 schools compete with one another, they have increased their spending as their revenue has increased. That competition has resulted in higher coaches' salaries. In many states, the head football coach at the flagship college is the highest paid public employee in the state.

76.     Nick Saban, the former head football coach at the University of Alabama, earned $11.4 million per year as of 2023. All of the top-25 highest paid college football coaches in 2023 earned more than $6 million annually. The highest paid men's college basketball coach that year, John Calipari (who was then at the University of Kentucky), earned $8.6 million annually. The highest paid coach in women's college basketball, Kim Mulkey of Louisiana State University, recently signed a 10-year, $36 million contract.

77.     On average, head football coaches at Power 5 schools now earn over $6 million per year, an increase of over 14% in just one year. The head men's basketball coach at those schools earns an average of over $3 million per year. Even many

**SECOND AMENDED CLASS ACTION COMPLAINT**

assistant coaches are now earning over $1 million annually. Meanwhile, the average salary for an athletic director at a Power 5 reportedly also exceeds $1 million.

78.     Many schools are in fact paying tens of millions of dollars to terminated coaches to *not* coach. Just recently, Texas A&M University fired their football coach, Jimbo Fisher. They reportedly will be paying him $76 million to no longer lead their football team. If that type of money can go to a fired coach, then surely the players on the team can be fairly compensated.

79.     As coaching salaries have increased, so too have the schools' armies of "analysts" and "recruiters." Staffs have grown as fast as the revenue has grown, with little end in sight.

80.     The schools have also increased their spending on athletics facilities. San Diego State University recently opened a new $310 million football stadium. Vanderbilt University is undergoing $300 million in renovations of athletics facilities, including its football stadium. One study showed that in 2014, just 48 schools spent $772 million on athletics facilities.

81.     Why are schools paying so much for coaches and facilities? Because they compete with one another. And without the ability to pay players, they spend money in other areas to outcompete each other. The spending on facilities and coaches is simply a proxy war for what should be occurring with respect to player compensation as teams try to attract top talent.

82.     Absent Defendants' restraint on compensation for the athletes, class members would be seeing their own compensation increase as well, as the competition for players is intense. The wage suppression has gone on for decades, and it is time for it to come to an end.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**C. In a competitive market, the class members would be paid competitively for their labor.**

83.    To see the effect of this restraint, one need look no further than other sports leagues. In the NFL, players traditionally have received close to 50% of the revenue taken in by the league.[7] Players in the NBA receive a similar percentage, approximately 49-51%.[8]

84.    European soccer, with its strong emphasis on winning, is also an apt comparison. Elite soccer clubs often spend more than 60% of revenue on player compensation, because market forces place a premium on obtaining top players who can score goals and secure wins.

85.    In the absence of Defendants' restraint on compensation, Plaintiffs and the class members would be paid a significant percentage of revenue as well. That includes the revenue coming from Defendants' burgeoning television contracts.

86.    Because of Defendants' horizontal restraint on compensation, Plaintiffs and class members are being robbed of significant sums of money that they deserve. The amount of money paid to Plaintiffs and class members in the form of scholarships and similar education-related benefits is miniscule compared to the television and other revenue coming in, and the percentage pales in comparison to the percentage of revenue paid to athletes in leagues that lack such a restraint.

---

[7] *Players' share of revenue can go as high as 48.8 percent*, NBCSports.com, March 1, 2020 *available at* https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/players-share-of-revenue-can-go-as-high-as-48-8-percent.

[8] Sam Quinn, *NBA players interested in negotiating for ownership stakes in teams in next CBA, says Michele Roberts*, CBSSports.com, Jan. 22, 2021, *available at* https://www.cbssports.com/nba/news/nba-players-interested-in-negotiating-for-ownership-stakes-in-teams-in-next-cba-says-michele-roberts/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**D. The NCAA's prior antitrust losses.**

87.     This of course is not the first antitrust case brought against Defendants. Just two years ago, the Supreme Court ruled against the NCAA in a case brought by athletes seeking greater compensation. As the Court wrote, "Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2147 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n. 27 (1984)). The Court held that the NCAA could not limit education-related compensation paid to its athletes, such as "limiting scholarships for graduate school, payments for tutoring, and the like." *Id.* at 2164.

88.     In his concurrence, Justice Kavanaugh issued a warning to the NCAA regarding its "remaining compensation rules," like "rules [that] generally restrict student athletes from receiving compensation or benefits from their colleges for playing sports." *Id.* at 2166. Those "rules also raise serious questions under the antitrust laws." *Id.* at 2166-67. He wrote that the "NCAA's business model would be flatly illegal in almost any other industry in America." *Id.* at 2167. "Price-fixing labor is price-fixing labor," and that is a "textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167-68.

89.     "Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." *Id.* at 2168. That the NCAA has done so for decades does not excuse the behavior. It simply makes it more egregious and makes change long overdue.

90.     The "remaining compensation rules" referenced by Justice Kavanaugh in his concurrence were not before the Court, and so the majority opinion did not address them. But those remaining rules are just as unlawful under the antitrust laws as the restrictions on scholarships that were struck down by the Court.

**SECOND AMENDED CLASS ACTION COMPLAINT**

91.     Although this case differs in some key respects from *Alston*, Justice Kavanaugh's criticisms apply with equal force.

**E.  The NCAA's supposed need to preserve "amateurism" no longer has any merit because athletes are now being paid for their NILs.**

92.     The NCAA's compensation rules have changed since *Alston* in a way that has revealed the fallacy of the NCAA's traditional and chief procompetitive argument: that amateurism must be preserved in order to maintain consumer demand. That fallacy is both factually untrue and rests on a false premise.

93.     The NCAA recently relaxed its prohibition against paying compensation to athletes by issuing a policy that allows athletes to be paid for their names, images, and likenesses (NILs).[9]  Many athletes are now earning hundreds of thousands of dollars in NIL money each year, and some are earning over $1 million per year. The quarterback for the University of Colorado, Shedeur Sanders, is reportedly earning several million dollars per year in NIL money, and has deals with Gatorade, Mercedes-Benz, and other companies. Caleb Williams, then the quarterback for USC, also reportedly earned several million dollars from NIL money, and had deals with United Airlines and Beats by Dre.

94.     On the women's side, Angel Reese, a star basketball player at LSU, reportedly earned well over $1 million in NIL money and had deals with Pepsi and many others.

95.     Companies such as Pepsi and Mercedes are entering into these deals for a reason: the athletes enjoy immense popularity with fans, and that popularity has great value.

---

[9] NCAA Interim NIL Policy, *available at* https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf (last accessed Nov. 10, 2023).

**SECOND AMENDED CLASS ACTION COMPLAINT**

96.     That same athlete popularity has driven the record television deals signed by Defendants. Yet while the NCAA has relaxed its NIL rules, it still prohibits athletes from receiving any money tied to television or other revenue.

97.     In prior antitrust cases, the NCAA has warned that the sky would fall if athletes began receiving any money beyond that needed to pay for education-related expenses. The NCAA has cried out about a need to preserve "amateurism" to supposedly differentiate its product from professional sports. But the concept of "amateurism" has always been a moving target. Defendants have long allowed athletes to be paid in the form of scholarships in return for their labor. And Defendants have allowed other forms of remuneration as well, such as "athletic participation" awards in the form of Visa gift cards, disbursements from a "Student Assistance Fund" and an "Academic Enhancement Fund," graduation awards, tutoring, loss-of-value insurance policies, legal services, stipends of several thousands to cover the costs of attendance beyond tuition and room and board, and a variety of other payments. As the Ninth Circuit explained in *Alston*, "the NCAA does little to regulate or monitor the use of" some of these funds. 958 F.3d at 1244-45.

98.     "There is nothing amateur about a model that negotiates billion-dollar deals and pays its coaches and administrators millions while denying athletes the ability to share in the revenue or even have a voice in determining whether these deals are a good idea," as a trustee at a major university recently put it.[10] Defendants have turned college sports into a moneygrab for their own pockets in the name of amateurism.

99.     In any event, a purported desire to promote "amateurism" does not justify what amounts to illegal price fixing. Defendants have no exemption from the antitrust

---

[10] Jordan Acker, *The Only Way College Sports Can Begin to Make Sense Again*, N.Y. Times, Sep. 21, 2023, *available at* https://www.nytimes.com/2023/09/21/opinion/college-sports-broken.html (last visited November 10, 2023).

**SECOND AMENDED CLASS ACTION COMPLAINT**

laws, and nowhere does the law allow competitors to agree on input pricing (here, labor) in order to promote some non-efficiency purported justification that does nothing to further consumer welfare.

100.    College sports are as popular as ever even though athletes have long been compensated in various ways, including the recent NIL payments, which are substantial in some cases. As the Big Ten's commissioner testified to Congress recently, "student-athletes are frequently being induced by collectives to attend specific institutions and transfer from one school to another—without a true NIL deal. This has resulted in a 'pay-for-play' system, primarily driven by boosters and executed under the guise of NIL."[11]

101.    Despite this, there has been no corresponding reduction in consumer demand—to the contrary, NCAA football and basketball viewership remain strong and are ever-increasing. The entire college sports world has focused on the large sums of money going to college players through NIL deals in recent years. Attendance has not dipped. Ratings have increased, not decreased. Sports programs remain just as (or more) popular. College sports have not only survived in the era of athletes being paid; they have thrived.

102.    The need for "amateurism" was always a fallacy. But the current state of college athletics has put the proverbial nail in the coffin for the NCAA's amateurism argument. The anticompetitive effect of Defendants' wage-fixing was always evident. Now it is equally apparent that there is no procompetitive justification. Indeed, recent surveys show that the majority of Americans believe that schools *should* in fact be able to directly pay their athletes.

---

[11] Testimony of Tony Petitti, Commissioner of the Big Ten Conference, U.S. Senate Committee on the Judiciary, Oct. 17, 2023, *available at* https://www.judiciary.senate.gov/imo/media/doc/2023-10-17_-_testimony_-_petitti.pdf.

**SECOND AMENDED CLASS ACTION COMPLAINT**

103.    Still, because of the NCAA's restraints, Defendants have prevented pay to the athletes for anything beyond NIL money, such as the share of money that players would receive from television revenue in a competitive market. A pending case against the NCAA attempts to seek compensation from Defendants for the players' fair share of television revenue related to NIL only. An expert in that case opined that value of the television revenue attributable to players' NILs amounted to approximately ten percent of total television revenue. *See In re: College Athlete NIL Litig.*, No. 20-cv-03919 (N.D. Cal. Nov. 3, 2023) (the "*House*" case), ECF No. 387 at 24 (granting class certification and discussing the ten percent estimate).

104.    But that is a thin slice of the overall share of revenue that Plaintiffs and class members would receive in a market not restrained by Defendants' illegal agreement. As demonstrated by the split of revenue in other leagues, the athletes' competitive share would be substantially higher. Over the class period, that amounts to billions of dollars that should belong to Plaintiffs and class members.

105.    Defendants realize that there is no longer any defense for the concept of amateurism. They recently voted to move forward with a proposed settlement in the *House* case that would usher in a form of "revenue sharing" that ostensibly would be tied to NIL payments made by the NCAA's members. But even if that settlement is approved, it would simply usher in a new, artificially low cap that is far below the revenue sharing that a competitive market would yield. While it is an admission that amateurism is not needed, it also simply substitutes one illegal price fix for another.

106.    This case seeks to recover the full amount of compensation that these athletes truly deserve, and to enjoin Defendants from enforcing their illegal agreement in the future. It is not just about NIL but is about full revenue sharing. As a result, this case differs from *House*. It goes farther than *House*, by seeking to challenge the NCAA's restraint on compensation, embodied by Bylaw 12 and other rules not challenged in *House*, rather than merely challenging the NCAA's implementation of its

**SECOND AMENDED CLASS ACTION COMPLAINT**

policy allowing payment for names, images, and likenesses. And it therefore takes aim at the full cut of television and other revenues that the athletes would receive in a truly open market.

**F.  The market at issue.**

107.    The NCAA's Division I promotes itself as the highest level of competition in college sports. That has created a nationwide labor market for college sports within the Division I segment. By creating a separate Division I with rules that are distinct from Divisions II and III, the NCAA has recognized that the lower divisions are not substitutes for Division I.

108.    Division I schools spend more on facilities and coaches and generally compete against each other for athletes. Meanwhile, the NCAA and its Division I members can control the price paid in this labor market for college athletes. They have in fact done so by passing the bylaws at issue in this case and strictly enforcing them. Those bylaws have had the very real effect of decreasing compensation far below what would have been paid to these athletes in an unrestrained, competitive market.

109.    The district court in *Alston* defined the market as one "for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019). The court found:

> Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. This is reflected in the high degree of concentration found in the relevant market. Class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

*Id.*

**SECOND AMENDED CLASS ACTION COMPLAINT**

110.    The district court remarked there that the NCAA did not challenge that market at summary judgment. *Id.* And as the Supreme Court stated, Defendants did "not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2154 (2021).

111.    That the athletes agree to these conditions shows the market power that the NCAA and its members collectively possess. For an elite athlete, there is no reasonable substitute that combines the educational and athletic opportunities offered in the labor market at the Division I level. The other divisions do not offer the same level of competition, do not offer the same number of scholarships, do not offer the same amount of television exposure, and generally do not have as highly regarded coaches or athletic facilities. The same can be said for the National Intercollegiate Athletic Association or junior colleges' athletic programs.

112.    The NFL's, NBA's, and WNBA's rules do not permit players to enter their leagues directly after high school. This forces players to initially play in the college sports labor market. Also, there are other differences between the NFL, NBA, and WNBA as compared to college sports; college sports offer different opportunities by allowing athletes to receive a college education while working at the schools.

113.    Many of these athletes are from disadvantaged backgrounds. They have only a limited window to earn money based on their athletic talents, and they risk serious injury to compete in the sports that they, and fans, love. Only a small percentage of the athletes in the labor market at issue will ever play in the NFL, NBA, or WNBA, so for many of these athletes, college is their *only* chance to be compensated for their athletics skills.

114.    The NCAA's rules have inflicted very serious and very great harm on the thousands of athletes that work so hard to make the NCAA's product possible.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**G. The effect of Defendants' illegal conduct on Plaintiff Alex Fontenot.**

115.    Plaintiff Alex Fontenot worked as college football player at the University of Colorado from 2017 to 2022.

116.    The labor provided by Mr. Fontenot was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

117.    He was a highly recruited prospect out of high school who possessed unique talent. He was a top high school recruit in the Houston area and helped his team win a state title by rushing for three touchdowns in the state championship game. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he went to the University of Colorado in the hopes that he would transfer to another school.

118.    His job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Fontenot was one of the University of Colorado's key running backs. He played in every game during his freshman year for a team that was at times ranked as one of the top 25 teams in college football. During his sophomore season, he started in eleven games and rushed for 874 yards and five touchdowns. That included a win at home over a ranked Nebraska team in front of over 52,000 fans.

119.    After working his way back from an injury, he was named to the preseason watch list for the nation's Doak Walker Award in both 2021 and 2022, which is awarded annually to the country's best college running back. In a 2022 game against University of Southern California, ranked eighth in the country at the time, he rushed for over 100 yards. He continued to consistently contribute as a running back in those seasons, and finished his career with over 1,500 yards rushing and 13 touchdowns.

**SECOND AMENDED CLASS ACTION COMPLAINT**

120.    During this time, the University of Colorado's games were carried on national television, often by either an ESPN network or the Pac 12's own network. (The University of Colorado is currently a member of the Pac 12 but will be joining the Big 12 in 2024.) An average of nearly 1.3 million people watched those games, and one game in 2021 that he played in had over 4.5 million viewers.[12] The Pac 12 distributed $37 million in 2022 to each of its member schools from television revenue.

121.    Yet Mr. Fontenot received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time at Colorado, he was not permitted to receive money from third parties for his NIL, which also harmed him.

122.    Mr. Fontenot was not drafted by the NFL. College football was his only opportunity to earn fair compensation for the immense work and all the sacrifices that went into being a highly skilled football player at a Power 5 conference school.

123.    Defendants' conspiracy greatly harmed Mr. Fontenot. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

---

[12] *See* Matt Schubert, *Measuring CU Buffs, CSU Rams' football brand*, Denver Post, Aug. 2022, *available at* https://www.denverpost.com/2022/08/28/measuring-cu-buffs-csu-rams-football-brand/.

**H. The effect of Defendants' illegal conduct on Plaintiff Mya Hollingshed.**

124.    Plaintiff Mya Hollingshed worked as college basketball player at the University of Colorado from 2017 to 2022.

125.    The labor provided by Ms. Hollingshed was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

126.    She was a highly recruited prospect out of high school who possessed elite talent. She was a top high school recruit and was named an Adidas All-American and Under Armour All-American, and was a McDonald's All-American nominee. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to the University of Colorado in the hopes that she would transfer to another school.

127.    Her job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During her basketball career, Ms. Hollingshed was one of the University of Colorado's key players. By her sophomore season, she became a full-time starter and averaged over 10 points a game. Her junior season, she led Colorado in scoring and rebounding. In her fourth season, she finished sixth in the Pac-12 in points per game and second in rebounds per game. In her fifth season, she again led Colorado in scoring, and also led them to their first NCAA Tournament appearance since 2013. She finished her career ranked sixth on Colorado's all-time scoring and rebounding lists.

128.    In 2022, Ms. Hollingshed was drafted 8th overall in the WNBA's annual draft.

129.    During this time, the University of Colorado's games were generally televised, often by either by the Pac 12's own network or by a streaming platform. (The University of Colorado is currently a member of the Pac 12 but will be joining the Big 12

**SECOND AMENDED CLASS ACTION COMPLAINT**

in 2024.) The Pac 12 distributed $37 million in 2022 to each of its member schools from television revenue.

130.    Yet Ms. Hollingshed received none of that revenue; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. And during most of her time at Colorado, she was not permitted to receive money from third parties for her NIL, which also harmed her.

131.    Defendants' conspiracy greatly harmed Ms. Hollingshed. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and would have received money for her NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

**I.    The effect of Defendants' illegal conduct on Plaintiff Sarah Fuller.**

132.    Plaintiff Sarah Fuller worked as college soccer player at Vanderbilt University from 2017 to 2020, and as a college football player at Vanderbilt in 2020.

133.    The labor provided by Mrs. Fuller was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

134.    She was a highly recruited prospect out of high school who possessed sought-after talent. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to Vanderbilt University in the hopes that she would transfer to another school.

**SECOND AMENDED CLASS ACTION COMPLAINT**

135.    Her job as a college athlete was essentially a full-time one, and an important and valuable one at that. During her senior year of her soccer career, Mrs. Fuller was one of Vanderbilt's key players. She started twelve games that season as a goalie, posting three clean sheets, and started all four games during Vanderbilt's 2020 SEC Tournament championship run. At one point, she had a shutout streak of over 300 minutes.

136.    During this time, Vanderbilt's soccer games were generally televised, often by the SEC Network. (Vanderbilt is a member of the SEC.) The SEC distributed over $50 million in 2020-2021 to each of its member schools from television revenue.

137.    As good as she was as a goalie in 2020, Mrs. Fuller will forever be remembered for her impact on American college football rather than traditional football (a.k.a. "soccer" in the U.S.). After the 2020 soccer season, Mrs. Fuller joined the Vanderbilt football team as place kicker. On November 28, 2020, with a kickoff to start the second half of a game against the University of Missouri, she became the first woman to play football in a Power Five conference. The moment went viral, with her kickoff producing the SEC Network's most viewed tweet and most-liked Instagram post in the network's history. Her name trended in the top two on Twitter for much of that day, and the video clip was the top clip on ESPN's digital platform that week. She was named SEC Co-Special Teams Player of the Week.

138.    On December 12, Mrs. Fuller entered a game against the University of Tennessee to kick an extra point. She succeeded, becoming the first woman to score in a Power Five Football game. She finished the game 2 for 2 on extra points, and again went viral.

139.    Yet Mrs. Fuller received none of the revenue generated by her work; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. And during most of her time at Vanderbilt, she was not permitted to receive money from third parties for her NIL, which

also harmed her. She made history, and those historical and viral moments had great value, but Defendants' conspiracy prevented her from earning the money she would have otherwise earned from those moments.

140.    Defendants' conspiracy greatly harmed Mrs. Fuller. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college soccer and football player than she received and would have received money for her NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

**J.  The effect of Defendants' illegal conduct on Plaintiff Deontay Anderson.**

141.    Plaintiff Deontay Anderson worked as college football player at the University of Houston from 2018 to 2021, and at the University of Mississippi from 2016 to 2017.

142.    The labor provided by Mr. Anderson was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

143.    He was a highly recruited prospect out of high school who possessed elite talent. He was an Under Armour All-America selection in high school and a consensus 4-star recruit. ESPN ranked him as the number one recruit at his position his senior year of high school and the number 41 overall recruit in the country. Other recruiting outlets likewise ranked him as a top 100 recruit in the country. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he was in college in the hopes that he would transfer to another school.

**SECOND AMENDED CLASS ACTION COMPLAINT**

144.    His job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Anderson was a key contributor. After his freshman year at Mississippi, he was named to the Freshman All-SEC second team by Athlon. After he transferred to the University of Houston, he continued to make a valuable impact. In 2018, he started all 13 games at his position and finished the year fourth on the team in tackles. By his last season in 2021, he finished second on the team in total tackles.

145.    During this time, the University of Mississippi's and University of Houston's games were generally televised. Both schools received large sums of money from their conferences' television contracts for the broadcasting of those games.

146.    Yet Mr. Anderson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time in college, he was not permitted to receive money from third parties for his NIL, which also harmed him.

147.    Defendants' conspiracy greatly harmed Mr. Anderson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**K.  The effect of Defendants' illegal conduct on Plaintiff Tucker Clark.**

148.    Plaintiff Tucker Clark works as a golfer at the University of Colorado, and previously worked as a golfer at Notre Dame from 2020 to 2022.

**SECOND AMENDED CLASS ACTION COMPLAINT**

149.    The labor provided by Mr. Clark was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

150.    He was a highly recruited prospect out of high school who possessed sought-after talent. Junior Golf Scoreboard ranked him as the number 15 player nationally in his high school class of 2020. Universities competed for his talent during the recruitment process, and continue to compete for his talent even now that he is in college in the hopes that he would (or will) transfer to another school.

151.    His job as a college golfer is essentially a full-time one, and an important and valuable one at that. During his freshman year at Notre Dame, he helped the school make its first NCAA regionals since 2012 and finished fourth on the team in stroke average. After he transferred to the University of Colorado, he continued to make a valuable impact. During his sophomore year, he had the third-best stroke average at the school and tied a school record for the best score in one round. The school went to the NCAA tournament that year, and Tucker shot a 3-under 67 in the second round of the tournament (the second best mark in the round).[13] At one point during his junior year he had 19 straight holes of par or better.

152.    During this time, the University of Colorado and Notre Dame generated large sums of money from their athletics program, and Mr. Clark contributed (and continues to contribute) to the generation of that revenue.

153.    Yet Mr. Clark has received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses.

---

[13] https://www.buffzone.com/2023/05/27/mens-golf-tucker-clark-again-keeps-cu-buffs-afloat-in-second-round-of-ncaa-championships/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

154.    Defendants' conspiracy greatly harmed Mr. Clark. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college golfer than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

### COUNT I – Violations of Sections 1 & 3 of the Sherman Act
### (Brought by Plaintiffs on Behalf of the Class)

155.    Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

156.    Defendants and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Since at least four years before the filing of this action, the trusts formed by Defendants' cartel has restrained trade and commerce in violation of Sections 1 and 3 of the Sherman Act, and the behavior continues today.

157.    This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels, since Plaintiffs and class members have been unable to negotiate for compensation in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market. It also had the effect of preventing the named Plaintiffs from receiving free market compensation for the use of their NILs (Plaintiffs are not pursuing NIL damages on behalf of a class at this time).

**SECOND AMENDED CLASS ACTION COMPLAINT**

158.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs and members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent Defendants' rules, Plaintiffs and Proposed Class Members would have received a competitive share of the television revenue and other revenue being brought in from Plaintiffs' and Class members' labor. The named Plaintiffs also would have received compensation for the use of their NILs.

159.    As a result, Plaintiffs and the Proposed Class have suffered damages in an amount to be proved at trial.

160.    Defendants' agreements or conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

161.    Defendants' agreements or conspiracies have no procompetitive effect or purposes, or alternatively, even if they did, less restrictive alternatives can be implemented to achieve any purported procompetitive objectives that Defendants might prove.

162.    Plaintiffs and the Proposed Class seek treble damages caused by Defendants' violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of the Sherman Act.

### Prayer for Relief

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated persons, seeks the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

**SECOND AMENDED CLASS ACTION COMPLAINT**

- A finding that Defendants have violated Sections 1 and 3 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiffs and class members have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

- Actual damages in an amount to be determined at trial;

- Treble damages awarded under the Sherman Act to Plaintiffs and class members for the damages sustained by them as a result of Defendants' conduct;

- Judgment entered against Defendants for the amount to be determined and as permitted by law and equity;

- Designation of Plaintiffs as class representatives and designation of counsel of record as Class Counsel;

- Pre-judgment and post-judgment interest as permitted by law;

- A declaratory judgment that the practices complained of herein are unlawful;

- A permanent injunction prohibiting Defendants from continuing or reinstating their unfair and unlawful policies and practices as described within this Complaint;

- Reasonable attorneys' fees and costs of the action;

- Reasonable incentive awards for the Plaintiffs;

- Such other relief as the Court shall deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.

**SECOND AMENDED CLASS ACTION COMPLAINT**

DATED: July 23, 2024

By: /s/ *Eric Olson*
ERIC OLSON
eolson@olsongrimsley.com
SEAN GRIMSLEY
sgrimsley@olsongrimsley.com
JASON MURRAY
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE**
**HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

STEPHEN M. TILLERY
stillery@koreintillery.com
GARRETT R. BROSHUIS
gbroshuis@koreintillery.com
CAROL O'KEEFE
cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:   (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS
gzelcs@koreintillery.com
MARC A. WALLENSTEIN
mwallenstein@koreintillery.com
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

CHRISTOPHER M. BURKE
cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

*Attorneys for Plaintiffs*

**SECOND AMENDED CLASS ACTION COMPLAINT**