# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

| | |
|---|---|
| Alex Fontenot; Aaron Holiday; Aaron Sabato; Aaron Schunk; Aashari Crosswell; Addison Ooms; Adrian Del Castillo; Aidan Robbins; Akayleb Evans; Alaric Jackson; Alerick Soularie; Alex Bachman; Alex Hornibrook; Amani Oruwariye; Amber Melgoza; Andrew Abbott; Anthony Pandy; Asa Edward Lacy; Austin Seibert; Azeez Ojulari; Ben Boulware; Brady McConnell; Brittany Brewer; Bryce Love; Cade McNamara; Cameron Rising; Cam Serigne; Carmen Mlodzinski; Carson Green; Cassius Stanley; Cayden Wallace; Chad Hansen; Charles Matthews; Charlie Woerner; Chase Strumpf; Chazz Surratt; Chris McMahon; CJ Van Eyk; Colby Parkinson; Colton Prater; Connor Prielipp; Curtis Weaver; DaMarcus Fields; Davis McKee Wendzel; Dax Milne; Denzel Mims; Deontay Anderson; Destiny Slocum; Donovan Peoples-Jones; Dorian O'Daniel; Drew Lock; Duncan Robinson; Dylan Smith; Erick Hallett II, Frank Mason III; Franz Wagner; Gabe Brkic; Gavin Cross; Grant Haley; Griffin Conine; Hayden Howerton; Hayden Hurst; Hunter Barco; Hunter Dickinson; Hunter Long; Isaac Rex; Jack Cichy; Jacob Eason; Jacob Huff; Jacob McCarthy; Jaime Jaquez Jr.; Jake Benzinger; Jake Browning; Jake Curhan; Jake Fromm; Jamal Shead; James Blackmon, Jr.; James Lynch; James David Morrissey IV; Jared Hocker; Jason Cabinda; Jason Preston; Jaxson Kirkland; Jaydon Grant; Jeremiah Ledbetter; John Rhodes; John Michael Schmitz, Jr.; John Wolford; Jonathan Anh Juzang; Jordan Beck; Jordan McCabe; Jose Joaquin Arcega-Whiteside; Josh Ali; Josh Smith; Josh Whyle; Julius Brents; Kathleen Doyle; Kathryn Westbeld; Keaton Sutherland; Keir Thomas; Kevin Abel; Kevin Richard Costello; Khalil Tate; Landon Young; Lauren Cox; Marcus Allen; Massimiliano | CASE NO. 1:23-cv-03076-CNS-STV<br><br><br>**FOURTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**FOURTH AMENDED COMPLAINT**

Borghi; Matheu Nelson; Matt McLain;
Matthew Butler; Michael Jordan; Michael
Wiley; Michael Wilson; Michaela
Onyenwere; Mikayla Pivec; Mo Osling III;
Moritz Wagner; Mya Hollingshed; Mykel
Jones; Nakobe Dean; Nate Savino; Nick
Loftin; Nick Swiney; Parker Messick; Quinn
Nordin; Rashan Gary; Richard Thomas
McSorley; Riley Cornelio; Ryan Miller;
Ryan Rolison; Sarah Fuller; Sean Clifford;
Sean Hjelle; Seth Henigan; Shaquem
Griffin; Shaquill Griffin; Shea Langeliers;
Shea Patterson; Slade Cecconi; Sophie
Cunningham; Spencer Jones; Stephan
Blaylock; Tanner Morgan; Taylor Rapp;
Trenton Simpson; Trey Lance; Troy
Fumagalli; Tyler Baum; Tyree DeSean St.
Louis; Valentino Daltoso; Will Levis; Zavier
Simpson; Yetur Gross-Matos; Zachary
Gelof; Zak Irvin; Aleva Hifo; Ammon
Hannemann; Baylor Romney; Ben
Bywater; Blake Freeland; Bracken El-Bakri;
Brady Christensen; Brayden El-Bakri;
Caden Haws; Chaz Ah You; Earl Mariner;
Gabe Summers; Gunner Romney; Harris
LaChance; Hayden Livingston; Isaiah
Kaufusi; Jackson Kaufusi; Jake Oldroyd;
James Empey; Jonah Trinnaman; Jonny
Linehan; Justen Smith; Keenan Ellis;
Lopini Katoa; Malik Moore; Masen Wake;
Payton Wilgar; Pepe Tanuvasa; Trajan Pili;
Uriah Leiataua; Zac Dawe; Zach Wilson;
Kylin Jatavian Hill; Jordan Lewis Tucker;
Michael Anthony Harley, Jr.; Charleston
Cha'caine Rambo; Anthony Gould; Hunter
Echols; Stephen Carr; Bryce Raymond Jon
Nze; Brevin Lamar Jordan; Hasahn
French; Tathan Francis Martell; Trevon
Bradford; Palaie Gaoteote; Timmy
Hernandez; Tyjon Alvin Lindsey; Kellan
Grady; Joshua Noah Gray; Vance
Jackson, Jr.; Chad Patrick Kelly; Joshua
Noah Pierre-Louis; Damuzhea Khalil
Bolden; Kevin Marfo; N'Kosi Travaughn
Perry; Malik Hausman; Carson Brown
Strong; Zion Bethea; Maurice "Moe" Odum;
Nathaniel Pierre-Louis; Jimmy Bell, Jr.;
Demetris Harris, II; Alexander Carl Shaw;
Mekhi Elijah Lapointe; Tru Cymon

**FOURTH AMENDED COMPLAINT**

Thompson; Elijah Dijaie Blades; Dixie
Wooten, III; Westin Branning Graves; Ikem
Okeke; Kahlil Johnson; Alexander Jordan
Perry; Cameron Echols-Luper; Montell
Cozart; Justin Thomas Ragin; Rashard
Markese Davis; Rashad Williams; Jayden
Curry; Stanley O'Neal Dye, Jr.; Amari
Jamon Catchings; Ron Siaosi Tiavaasue;
Gregory Michael Francis; Everett Hunter;
Donell Christopher Paster, Sr.; Tevin Lavell
Broyles; Vincent Paul Sampson; Jawon
Johnson; Marcus Lynard Wallace; Micah
Jett Parten; Amarveer Singh; Ishmael
Hyman; Hannah Crofut; Carter Jakob
Cunningham; Jacob Thomas-Michael Cox;
Edgar Burrola; Trevon Thomas Sidney;
Jaylon Robinson; Lamont James Evans,
IV; Malique Kenneth Jacobs; Erick Neal;
Bryan Thomas Schor; Sean (Jack) Michael
Allison; Davion Ervin-Poindexter; James
Okonkwo; Yoeli Childs; Madelynne Scherr;
Dibaji Walker; Dontaie Allen; Derrick
Barnes; Adam Kunkel; Malik Curry; Erik
Stevenson; Donte Ingram; Romar Reid;
Cam Taylor-Britt; Kam Williams; Cameron
Krutwig; Vincent "Tre" Mitchell; Matt Cross;
Marc Loving; C. J. Jackson; Derek Culver;
Nate Adrian; Tajzmel Sherman; Filip
Petrusev; Nigel Johnson; Lucas
Williamson; Jacob Evans; Marques
Townes; Jerron Cage; Jermaine Haley;
Troy Caupain; Nysier Brooks; Spencer
Macke; Daxter Miles; Aaron Epps; Tayler
Persons; Trevon Scott; Benjamin Mark
Richardson; David Bell; Aaron Nesmith;
Cade Cunningham; Derrick White;
Donovan Clingan; Drew Eubanks; Khyri
Thomas; Marcus Zegarowski; Naz Reid;
Saddiq Bey; Tyler Herro; Marcel Dancy;
Seth Beer; Benjamin Burr-Kirven; Neil
Pau'u; Jared Kapisi,

     Plaintiffs,

   vs.

National Collegiate Athletic Association;
Southeastern Conference; Pac-12
Conference; The Big Ten Conference, Inc.;

**FOURTH AMENDED COMPLAINT**

The Big Twelve Conference, Inc.; and,
Atlantic Coast Conference,

                        Defendants.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

*"What I don't understand, is how the NCAA, television networks, conferences, universities and coaches can continue to pull in millions and in some cases billions of dollars in revenue off the efforts of college student-athletes across the country without providing enough opportunity to share in the ever-increasing revenues."*

-Jim Harbaugh, then-Head Football Coach, University of Michigan (Aug. 28, 2023)[1]

*"It's the worst part of the job. … I was meeting with kids from East St. Louis once, afraid to make an offer. You're waiting for the sticker shock when you say, 'We really love you but – oh by the way – your family will have to pay $30,000 the first year."*

-Tony Vitello, Head Baseball Coach, University of Tennessee (May 18, 2022)[2]

Plaintiffs[3] bring this amended complaint alleging antitrust violations. Plaintiffs allege as follows:

## INTRODUCTION

1.    The score was 14-10, and the game between two top-ten college football teams was in its last minute. Notre Dame's defense had stifled the Ohio State offense for most of the day. But Ohio State was on the move, and they neared the goal line as

---

[1] *Michigan's Jim Harbaugh backs student-athlete revenue sharing*, ESPN, Aug. 28, 2013, *available at* https://www.espn.com/college-football/story/_/id/38277849/michigan-jim-harbaugh-backs-student-athlete-revenue-sharing.

[2] *SEC baseball keeps growing, but scholarships don't, Tony Vitello wants more*, Knoxville News Sentinel (May 18, 2022) https://www.knoxnews.com/story/sports/columnists/university-of-tennessee/johnadams/2022/05/18/sec-baseball-keeps-growing-but-scholarships-dont-john-adams/9760907002/.

[3] "Plaintiffs" refers to all plaintiffs named in the case caption.

**FOURTH AMENDED COMPLAINT**

the seconds counted down. One final play to score a touchdown and win—or not, lose. The ball was handed to Chip Trayanum, an Ohio State running back. With a plunge, he found the end zone. The Buckeyes scored, and the game was over.

2.      Over 77,000 fans attended that September game in South Bend in 2023—most of them Notre Dame fans who left the game stunned. Far more people watched on television. The game peaked at 14.2 million viewers during the final scoring drive, and an average of 10.6 million tuned in throughout the game. It was the most-watched regular season college football game on NBC in 30 years.

3.      Because of moments like these, millions of viewers tune in to watch college athletes perform on a weekly basis. These college athletes bring in billions of dollars in television and other revenue for Defendants and their member schools. Everyone profits from their efforts: the NCAA, the conferences, the schools, and the coaches. Everyone, that is, except the players themselves, because the NCAA prohibits it.

4.      Defendants have spelled out the restraint in their bylaws. Bylaw 12 prohibits athletes from receiving "pay in any form" for the labor that they provide, no matter how valuable that labor is, and no matter how much the athletes would be paid in an unrestrained market.

5.      This lawsuit takes aim at that and similar restraints. It focuses on the ever-increasing television and other revenue brought in by these athletes' labor, of which the athletes would be entitled to receive a substantial portion, but for the NCAA's rules.

6.      There is big money in the television broadcasts of NCAA games. In August 2022, the Big Ten Conference inked a new television rights agreement with several broadcasters. It became operative the following year, and pursuant to the agreement, broadcasters will pay $7 billion to the Big Ten Conference over just seven years, in exchange for the right to televise the conference's college football games, as well as some of the conference's college basketball games. The conference is expected

**FOURTH AMENDED COMPLAINT**

to distribute $80 million to $100 million annually to each of its member schools pursuant
to the agreement. That's more than double what the Big Ten schools had been making
under the previous agreement.

7.      Other conferences have billion-dollar television broadcast agreements as
well. The Big 12 Conference has reportedly signed a television revenue agreement
worth more than $2.2 billion. The SEC and ACC reportedly have contracts worth over
$7 billion and $4 billion, respectively, while the Pac-12 has a $3 billion deal that was not
rich enough to prevent most of its members from departing for greener pastures
recently. These conferences were known as the "Power Five Conferences" due to the
immense popularity of their sports.[4]

8.      Combined, the Power Five Conferences have signed contracts that will
pay them more than $20 billion to broadcast their games on television. Their television
revenues have increased by roughly 90% in recent years and are expected to continue
to grow, as the below chart illustrates:



---

[4] Following conference realignment in 2024, the Pac-12 has been largely gutted,
leaving just four power conferences: the SEC, ACC, Big Ten, and Big 12.

**FOURTH AMENDED COMPLAINT**

9.      While the power conferences bring in the most revenue, other conferences bring in substantial revenue as well. The American Athletic Conference (AAC), home to renowned football programs like Army, Navy, and Memphis, reportedly signed a $1 billion media rights deal with ESPN in 2019. Other so-called Group of Five conferences – Conference USA, the Mid-American Conference, the Mountain West Conference, and the Sun Belt Conference – have also inked major TV deals, worth millions annually.

10.     Thousands of athletes at the conferences' schools provide the labor that fuels these multi-billion-dollar deals. These athletes are among the best in the world at their jobs. They are hard-working and uniquely talented individuals who have only a limited amount of time to earn money from their skilled labor. NCAA athletes have only four (sometimes five) years of eligibility to play college sports, and as the NCAA is fond of saying, most of these athletes will not work as athletes in professional sports leagues. For many, now is their only chance to earn just compensation for their immense talents, which bring joy to so many fans.

11.     It is the athletes that the viewer tunes in to watch. Yet the athletes are not being paid their fair share of this multi-billion-dollar revenue, or any of the other revenue, even though they—the athletes—through their labor, are the most significant driver of that revenue. As Defendants' television and other revenues have increased exponentially, the athletes' share has remained flat. Indeed, the athletes get nothing. The NCAA's rules prohibit them from receiving a portion of the revenue.

12.     Worse still, until recently, the NCAA prohibited athletes from receiving any money for their names, images, and likenesses (NILs), whether from the schools or conferences or from anyone else. That changed in July 2021, but athletes even after 2021 did not receive the full benefit of NIL for at least two reasons. First, the NCAA still prohibited the schools themselves (or the conferences or NCAA) from making direct NIL payments to athletes. Second, the third-party NIL market took several years to reach

**FOURTH AMENDED COMPLAINT**

equilibrium—and may not even be at equilibrium yet today. So even those who received third-party NIL money after July 2021 likely received less than their market value.

13.     Opendorse, a leading clearinghouse for collegiate NIL activity, projected that third-party NIL spending will surpass $2.5 billion in its fifth year—marking a 270 percent increase since the rule change in July 2021. The explosive growth of NIL spending—projected to continue at a rapid pace—indicates that the market was far from reaching equilibrium in its first three years and still has not reached equilibrium today.



14.     Even when it came to the permitted scholarship money, the NCAA for decades artificially suppressed the number of scholarships that schools could offer in many sports such that athletes in many sports were forced to accept partial scholarships. They had to pay to play, no matter the size of the school or popularity of the program. For instance, in the sport of baseball, the NCAA limited schools to just 11.7 scholarships. But that's not nearly enough for a college baseball team. These scholarships are spread amongst 27 players (or sometimes 32 in recent years), so on average, each player is on a 43% scholarship—no matter the school's resources or how

**FOURTH AMENDED COMPLAINT**

much a school wants to invest in baseball. If permitted, many NCAA schools would offer more scholarship money to their college baseball players, and especially to the top players. Given the cost of college, this rule has substantially harmed many Plaintiffs.

15.     With all these rules—prohibiting athletes from earning a cut of TV and other revenues, barring them from profiting off their NIL, and artificially capping the number of scholarships—Defendants are operating a cartel that fixes wages, a classic antitrust violation. The NCAA's members (which includes its schools and conferences) are horizontal competitors. In a competitive market, they would compete for players by providing them compensation commensurate with the true value of their labor, by allowing payments for NIL, and by allowing for scholarships as the market would bear. That competition would lead to the athletes receiving a significant share of revenue, including the television revenue from these media agreements, substantial NIL money for high-level athletes such as the Plaintiffs, and full scholarships for top performers in all sports. Athletes in other leagues (such as in European soccer leagues, the National Football League, and the National Basketball Association) regularly receive 50-60% of their sport's revenue.

16.     By operating as a cartel, Defendants have for decades suppressed the compensation paid for the athletes' labor. Defendants, via the NCAA rules that the schools and conferences have adopted, have forbidden the sharing of television or other revenue with the very people who deserve it most. And for decades, they prohibited athletes from receiving compensation for their NILs, and even artificially suppressed scholarship levels requiring athletes *to pay* to attend schools that profited from their labor. Meanwhile the NCAA's president, who no television viewer tunes in to watch, made over $4 million in 2023.

17.     Defendants' prohibition against compensating players is a horizontal restraint amongst competitors intended to restrict competition in the labor market for the athletes' services. The purpose and effect of this horizontal agreement was (and is) to

**FOURTH AMENDED COMPLAINT**

fix and insulate prices from the competitive marketplace. This amounts to an unlawful restraint under antitrust laws, and it is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

18.    Defendants have traditionally argued that the concept of "amateurism" necessitates these rules—that the entire system would break if the athletes are compensated one cent beyond their education-related expenses, because consumer demand would plummet. That is a sham argument, as recent developments have shown. After prior court victories and state laws passed to protect college athletes, the NCAA issued its interim 2021 NIL policy, which finally allowed athletes to earn money from their NILs, as long as the payments come from third parties.

19.    Even though athletes are now earning some money (though not nearly their fair market value) in the form of third-party NIL payments, there has been no decrease in viewership or public interest in NCAA sports. The sky has not fallen. Quite the contrary, television ratings are higher than ever, and the money keeps rolling in. As one industry insider recently remarked, "I don't know what in all of TV is trending any better than [college football]."[5]

20.    In October 2023, the football players for the University of Utah received a welcome surprise. They went to the stadium, and all 85 scholarship players were handed the keys to a new Dodge Ram truck. According to reports, the trucks were valued at over $60,000 apiece.

21.    The trucks' leases were paid for by some of the schools' boosters, and were provided as third-party NIL compensation. At the players' next game, more than 50,000 people attended. It was the 79th consecutive sold-out football game at the school's stadium. Just a couple of weeks later, more than three million people watched the school's game against University of Southern California on television—one of the

---

[5] Michael Mulvihill, twitter.com, https://twitter.com/mulvihill79/status/1711874853144543646.

**FOURTH AMENDED COMPLAINT**

top-5 football games by ratings, and one of the top-rated shows of any genre airing that
day.

22.    High-level athletes like Plaintiffs should be compensated with more than
just trucks—they are entitled to their fair market value, including their fair share of
television and overall revenue. The NCAA's rules still prohibit the conferences and
schools from sharing revenue with the athletes. If a school or conference did so, the
player would be ruled ineligible and the school or conference disciplined. The
conferences and schools are raking in billions of dollars in television and other revenue
without sharing a dime with the athletes.

23.    Instead, the money is flowing everywhere except the players' pockets. At
least 35 coaches make more than $6 million per year and 12 make over $9 million per
year. Schools are paying tens of millions of dollars to coaches who have been fired and
are no longer working. And college football staffs now include armies of analysts on the
payroll.

24.    Coach Jim Harbaugh, until recently of the University of Michigan,
recognizes the injustice of the current system. He recently called for "a system that is
fair, equitable and benefits all involved," saying "you can't say you're about diversity,
equity and inclusion, if you aren't willing to include the student-athletes in revenue
sharing."[6]

25.    This case is about allowing remuneration—whether from NIL payments or
revenue sharing or scholarships or any other source of compensation—to be allocated
by the free market rather than the restrictive and unlawful rules of a labor cartel that
takes advantage of the athletes that are the primary source of its massive income. Our
country and its antitrust laws operate on the foundational principle that market forces

---

[6] *See supra* n.1.

**FOURTH AMENDED COMPLAINT**

should determine the compensation that a person receives for their labor. That should be as true in sports as in any other industry.

26.    The NCAA's stranglehold on athlete compensation wrecked extensive harm on these Plaintiffs, who were among the best in the world at what they did. These athletes are entitled to the antitrust damages sustained as a result of Defendants' collusive and illegal practices.

## PARTIES, JURISDICTION, AND VENUE

27.    Plaintiff Aaron Holiday, an individual, is a resident of Texas. He worked as a college basketball player at UCLA from 2015 to 2018.

28.    Plaintiff Aaron Sabato, an individual, is a resident of North Carolina. He worked as a college baseball player at the University of North Carolina from 2018 to 2020.

29.    Plaintiff Aaron Schunk, an individual, is a resident of Georgia. He worked as a college baseball player at the University of Georgia from 2016 to 2019.

30.    Plaintiff Aashari Crosswell, an individual, is a resident of Arizona. He worked as a college football player at Arizona State University ("ASU" or "Arizona State") from 2018 to 2020.

31.    Plaintiff Addison Ooms, an individual, is a resident of California. He worked as a college football player at the University of California, Berkeley ("Cal" or "UC Berkeley") from 2014 to 2018.

32.    Plaintiff Adrian Del Castillo, an individual, is a resident of Florida. He worked as a college baseball player at the University of Miami from 2018 to 2021.

33.    Plaintiff Aidan Robbins, an individual, is a resident of Ohio. He worked as a college football player at three different institutions: the University of Louisville from 2019 to 2022, the University of Nevada, Las Vegas ("UNLV") in 2022, and Brigham Young University ("BYU") in 2023.

**FOURTH AMENDED COMPLAINT**

34.     Plaintiff Akayleb Evans, an individual, is a resident of Texas. He worked as a college football player at the University of Tulsa from 2017 to 2020 and the University of Missouri from 2021 to 2022.

35.     Plaintiff Alaric Jackson, an individual, is a resident of Michigan. He worked as a college football player at the University of Iowa from 2016 to 2020.

36.     Plaintiff Alerick Soularie, an individual, is a resident of Texas. He worked as a college baseball player at the University of Tennessee from 2018 to 2020.

37.     Plaintiff Alex Bachman, an individual, is a resident of Texas. He worked as a college football player at Wake Forest University from 2015 to 2019.

38.     Plaintiff Alex Fontenot, an individual, is a resident of Colorado. He worked as a college football player at the University of Colorado from 2017 to 2022.

39.     Plaintiff Alex Hornibrook, an individual, is a resident of Tennessee. He worked as a college football player at the University of Wisconsin-Madison from 2015 to 2019 and Florida State University ("FSU" or "Florida State") in 2019.

40.     Plaintiff Amani Oruwariye, an individual, is a resident of Tennessee. He worked as a college football player at Penn State University from 2014 to 2019.

41.     Plaintiff Amber Melgoza, an individual, is a resident of California. She worked as a college basketball player at the University of Washington from 2016 to 2020.

42.     Plaintiff Andrew Abbott, an individual, is a resident of Texas. He worked as a college baseball player at the University of Virginia ("UVA") from 2017 to 2021.

43.     Plaintiff Anthony Pandy, an individual, is a resident of California. He worked as a college football player at the University of Arizona from 2017 to 2021.

44.     Plaintiff Asa Edward Lacy, an individual, is a resident of Texas. He worked as a college baseball player at Texas A&M University from 2017 to 2020.

45.     Plaintiff Austin Seibert, an individual, is a resident of Illinois. He worked as a college football player at the University of Oklahoma from 2015 to 2018.

**FOURTH AMENDED COMPLAINT**

46.     Plaintiff Azeez Ojulari, an individual, is a resident of Georgia. He worked as a college football player at the University of Georgia from 2018 to 2021.

47.     Plaintiff Ben Boulware, an individual, is a resident of South Carolina. He worked as a college football player at Clemson University from 2013 to 2016.

48.     Plaintiff Brady McConnell, an individual, is a resident of Florida. He worked as a college baseball player at the University of Florida from 2017 to 2019.

49.     Plaintiff Brittany Brewer, an individual, is a resident of Texas. She worked as a college basketball player at Texas Tech University from 2016 to 2020.

50.     Plaintiff Bryce Love, an individual, is a resident of North Carolina. He worked as a college football player at Stanford University from 2015 to 2019.

51.     Plaintiff Cade McNamara, an individual, is a resident of Tennessee. He worked as a college football player at the University of Michigan from 2019 to 2023 and at the University of Iowa from 2023 to 2025.

52.     Plaintiff Cameron Rising, an individual, is a resident of Utah. He worked as a college football player at the University of Utah from 2019 to 2024.

53.     Plaintiff Cam Serigne, an individual, is a resident of North Carolina. He worked as a college football player at Wake Forest University from 2013 to 2017.

54.     Plaintiff Carmen Mlodzinski, an individual, is a resident of Florida. He worked as a college baseball player at the University of South Carolina from 2017 to 2020.

55.     Plaintiff Carson Green, an individual, is a resident of Texas. He worked as a college football player at Texas A&M University from 2017 to 2020.

56.     Plaintiff Cassius Stanley, an individual, is a resident of California. He worked as a college basketball player at Duke University from 2019 to 2020.

57.     Plaintiff Cayden Wallace, an individual, is a resident of Arkansas. He worked as a college baseball player at the University of Arkansas from 2020 to 2022.

**FOURTH AMENDED COMPLAINT**

58.     Plaintiff Chad Hansen, an individual, is a resident of California. He worked as a college football player at Idaho State University from 2013 to 2014 and at the University of California, Berkeley from 2014 to 2017.

59.     Plaintiff Charles Matthews, an individual, is a resident of Illinois. He worked as a college basketball player at the University of Kentucky during the 2015-2016 season and at the University of Michigan from 2016 to 2019.

60.     Plaintiff Charlie Woerner, an individual, is a resident of Georgia. He worked as a college football player at the University of Georgia from 2016 to 2020.

61.     Plaintiff Chase Strumpf, an individual, is a resident of Arizona. He worked as a college baseball player at the University of California, Los Angeles ("UCLA") from 2017 to 2019.

62.     Plaintiff Chazz Surratt, an individual, is a resident of South Carolina. He worked as a college football player at the University of North Carolina at Chapel Hill ("UNC") from 2016 to 2020.

63.     Plaintiff Chris McMahon, an individual, is a resident of Florida. He worked as a college baseball player at the University of Miami from 2017 to 2020.

64.     Plaintiff CJ Van Eyk, an individual, is a resident of Florida. He worked as a college baseball player at Florida State University from 2017 to 2020.

65.     Plaintiff Colby Parkinson, an individual, is a resident of Tennessee. He worked as a college football player at Stanford University from 2017 to 2020.

66.     Plaintiff Colton Prater, an individual, is a resident of Texas. He worked as a college football player at Texas A&M University from 2016 to 2019.

67.     Plaintiff Connor Prielipp, an individual, is a resident of Florida. He worked as a college baseball player at the University of Alabama from 2019 to 2022.

68.     Plaintiff Curtis Weaver, an individual, is a resident of Minnesota. He worked as a college football player at Boise State University from 2016 to 2019.

**FOURTH AMENDED COMPLAINT**

69.     Plaintiff DaMarcus Fields, an individual, is a resident of Texas. He worked as a college football player at Texas Tech University from 2016 to 2021.

70.     Plaintiff Davis McKee Wendzel, an individual, is a resident of Texas. He worked as a college baseball player at Baylor University from 2016 to 2019.

71.     Plaintiff Dax Milne, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2020.

72.     Plaintiff Denzel Mims, an individual, is a resident of Texas. He worked as a college football player at Baylor University from 2016 to 2020.

73.     Plaintiff Deontay Anderson, an individual, is a resident of Texas. He worked as a college football player at the University of Houston from 2018 to 2021, and at the University of Mississippi from 2016 to 2017.

74.     Plaintiff Destiny Slocum, an individual, is a resident of Idaho. She worked as a college basketball player at the University of Maryland from 2016 to 2017, Oregon State University from 2017 to 2020, and the University of Arkansas from 2020 to 2021.

75.     Plaintiff Donovan Peoples-Jones, an individual, is a resident of Michigan. He worked as a college football player at the University of Michigan from 2017 to 2019.

76.     Plaintiff Dorian O'Daniel, an individual, is a resident of Texas. He worked as a college football player at Clemson University from 2013 to 2018.

77.     Plaintiff Drew Lock, an individual, is a resident of Florida. He worked as a college football player at the University of Missouri from 2015 to 2018.

78.     Plaintiff Duncan Robinson, an individual, is a resident of Florida. He worked as a college basketball player at Williams College from 2013 to 2014 and the University of Michigan from 2014 to 2018.

79.     Plaintiff Dylan Smith, an individual, is a resident of Texas. He worked as a college baseball player at the University of Alabama from 2018 to 2021.

80.     Plaintiff Erick Hallett II, an individual, is a resident of Texas. He worked as a college football player at the University of Pittsburgh from 2018 to 2022.

**FOURTH AMENDED COMPLAINT**

81.     Plaintiff Frank Mason III, an individual, is a resident of Georgia. He worked as a college basketball player at the University of Kansas from 2013 to 2017.

82.     Plaintiff Franz Wagner, an individual, is a resident of Florida. He worked as a college basketball player at the University of Michigan from 2019 to 2021.

83.     Plaintiff Gabe Brkic, an individual, is a resident of Ohio. He worked as a college football player at the University of Oklahoma from 2018 to 2021.

84.     Plaintiff Gavin Cross, an individual, is a resident of Tennessee. He worked as a college baseball player at Virginia Tech from 2019 to 2022.

85.     Plaintiff Grant Haley, an individual, is a resident of Pennsylvania. He worked as a college football player at Pennsylvania State University ("Penn State") from 2014 to 2017.

86.     Plaintiff Griffin Conine, an individual, is a resident of Florida. He worked as a college baseball player at Duke University from 2015 to 2018.

87.     Plaintiff Hayden Howerton, an individual, is a resident of Texas. He worked as a college football player at Southern Methodist University ("SMU") from 2017 to 2021.

88.     Plaintiff Hayden Hurst, an individual, is a resident of Florida. He worked as a college football player at the University of South Carolina from 2015 to 2018.

89.     Plaintiff Hunter Barco, an individual, is a resident of Florida. He worked as a college baseball player at the University of Florida ("Florida") from 2019 to 2022.

90.     Plaintiff Hunter Dickinson, an individual, is a resident of Virginia. He worked as a college basketball player at the University of Michigan from 2020 to 2023 and at the University of Kansas from 2023 to 2025.

91.     Plaintiff Hunter Long, an individual, is a resident of California. He worked as a college football player at Boston College from 2017 to 2020.

92.     Plaintiff Isaac Rex, an individual, is a resident of California. He worked as a college football player at Brigham Young University from 2019 to 2023.

**FOURTH AMENDED COMPLAINT**

93.    Plaintiff Jack Cichy, an individual, is a resident of Wisconsin. He worked as a college football player at the University of Wisconsin from 2013 to 2017.

94.    Plaintiff Jacob Eason, an individual, is a resident of Washington. He worked as a college football player at the University of Georgia from 2016 to 2018 and at the University of Washington from 2018 to 2019.

95.    Plaintiff Jacob Huff, an individual, is a resident of Illinois. He worked as a college football player at the University of Minnesota from 2015 to 2018.

96.    Plaintiff Jacob McCarthy, an individual, is a resident of Arizona. He worked as a college baseball player at the University of Virginia from 2015 to 2018.

97.    Plaintiff Jaime Jaquez Jr., an individual, is a resident of California. He worked as a college basketball player at the University of California, Los Angeles from 2019 to 2023.

98.    Plaintiff Jake Benzinger, an individual, is a resident of North Carolina. He worked as a college football player at Wake Forest University from 2015 to 2019.

99.    Plaintiff Jake Browning, an individual, is a resident of Kentucky. He worked as a college football player at the University of Washington from 2015 to 2018.

100.    Plaintiff Jake Curhan, an individual, is a resident of Washington. He worked as a college football player at the University of California, Berkeley, from 2016 to 2020.

101.    Plaintiff Jake Fromm, an individual, is a resident of Georgia. He worked as a college football player at the University of Georgia from 2017 to 2019.

102.    Plaintiff Jamal Shead, an individual, is a resident of Texas. He worked as a college basketball player at the University of Houston from 2020 to 2024.

103.    Plaintiff James Blackmon, Jr., an individual, is a resident of Indiana. He worked as a college basketball player at Indiana University from 2014 to 2017.

104.    Plaintiff James Lynch, an individual, is a resident of Texas. He worked as a college football player at Baylor University from 2017 to 2020.

**FOURTH AMENDED COMPLAINT**

105.    Plaintiff James ("Jimmy") David Morrissey IV, an individual, is a resident of New Jersey. He worked as a college football player at the University of Pittsburgh from 2016 to 2020.

106.    Plaintiff Jared Hocker, an individual, is a resident of Texas. He worked as a college football player at Texas A&M University from 2017 to 2021.

107.    Plaintiff Jason Cabinda, an individual, is a resident of Florida. He worked as a college football player at Pennsylvania State University from 2014 to 2017.

108.    Plaintiff Jason Preston, an individual, is a resident of Ohio. He worked as a college basketball player at Ohio University from 2018 to 2021.

109.    Plaintiff Jaxson Kirkland, an individual, is a resident of Washington. He worked as a college football player at the University of Washington from 2017 to 2022.

110.    Plaintiff Jaydon Grant, an individual, is a resident of Nevada. He worked as a college football player at Oregon State University from 2016 to 2022.

111.    Plaintiff Jeremiah Ledbetter, an individual, is a resident of Florida. He worked as a college football player at Hutchinson Community College from 2012 to 2014 and at the University of Arkansas from 2015 to 2016.

112.    Plaintiff José Joaquín ("JJ") Arcega-Whiteside, an individual, is a resident of South Carolina. He worked as a college football player at Stanford University from 2015 to 2018.

113.    Plaintiff John Michael Schmitz, Jr., an individual, is a resident of New Jersey. He worked as a college football player at the University of Minnesota from 2017 to 2023.

114.    Plaintiff John Rhodes, an individual, is a resident of Tennessee. He worked as a college baseball player at the University of Kentucky from 2019 to 2021.

115.    Plaintiff John Wolford, an individual, is a resident of Florida. He worked as a college football player at Wake Forest University from 2014 to 2017.

**FOURTH AMENDED COMPLAINT**

116.    Plaintiff Jonathan ("Johnny") Anh Juzang, an individual, is a resident of Utah. He worked as a college basketball player at the University of Kentucky from 2019 to 2020 and at the University of California, Los Angeles from 2020 to 2022.

117.    Plaintiff Jordan Beck, an individual, is a resident of Alabama. He worked as a college baseball player at the University of Tennessee from 2019 to 2022.

118.    Plaintiff Jordan McCabe, an individual, is a resident of Wisconsin. He worked as a college basketball player at West Virginia University from 2018 to 2021 and at the University of Nevada, Las Vegas from 2021 to 2023.

119.    Plaintiff Josh Ali, an individual, is a resident of Georgia. He worked as a college football player at the University of Kentucky from 2017 to 2021.

120.    Plaintiff Josh Smith, an individual, is a resident of Texas. He worked as a college baseball player at Louisiana State University ("LSU" or "Louisiana State") from 2016 to 2019.

121.    Plaintiff Josh Whyle, an individual, is a resident of Tennessee. He worked as a college football player at the University of Cincinnati from 2018 to 2022.

122.    Plaintiff Julius Brents, an individual, is a resident of Indiana. He worked as a college football player at the University of Iowa from 2018 to 2020 and at Kansas State University from 2021 to 2022.

123.    Plaintiff Kathleen Doyle, an individual, is a resident of Illinois. She worked as a college basketball player at the University of Iowa from 2016 to 2020.

124.    Plaintiff Kathryn Westbeld, an individual, is a resident of Ohio. She worked as a college basketball player at the University of Notre Dame from 2014 to 2018.

125.    Plaintiff Keaton Sutherland, an individual, is a resident of Texas. He worked as a college football player at Texas A&M University from 2015 to 2018.

126.    Plaintiff Keir Thomas, an individual, is a resident of Florida. He worked as a college football player at the University of South Carolina from 2016 to 2021 and Florida State University in 2021.

**FOURTH AMENDED COMPLAINT**

127.    Plaintiff Kevin Abel, an individual, is a resident of Washington. He worked as a college baseball player at Oregon State University from 2017 to 2021.

128.    Plaintiff Khalil Tate, an individual, is a resident of California. He worked as a college football player at the University of Arizona from 2016 to 2019.

129.    Plaintiff Kevin Richard ("KJ") Costello, an individual, is a resident of California. He worked as a college football player at Stanford University from 2016 to 2019 and at Mississippi State University in 2020.

130.    Plaintiff Landon Young, an individual, is a resident of Kentucky. He worked as a college football player at the University of Kentucky from 2016 to 2021.

131.    Plaintiff Lauren Cox, an individual, is a resident of Texas. She worked as a college basketball player at Baylor University from 2016 to 2020.

132.    Plaintiff Marcus Allen, an individual, is a resident of Texas. He worked as a college football player at Pennsylvania State University from 2014 to 2018.

133.    Plaintiff Massimiliano ("Max") Borghi, an individual, is a resident of Arizona. He worked as a college football player at Washington State University from 2018 to 2021.

134.    Plaintiff Matheu ("Mat") Nelson, an individual, is a resident of Florida. He worked as a college baseball player at Florida State University from 2018 to 2021.

135.    Plaintiff Matt McLain, an individual, is a resident of Arizona. He worked as a college baseball player at the University of California, Los Angeles from 2018 to 2021.

136.    Plaintiff Matthew Butler, an individual, is a resident of Nevada. He worked as a college football player at the University of Tennessee from 2017 to 2022.

137.    Plaintiff Michael Jordan, an individual, is a resident of Kentucky. He worked as a college football player at Ohio State University from 2016 to 2019.

138.    Plaintiff Michael Wiley, an individual, is a resident of Texas. He worked as a college football player at the University of Arizona from 2019 through 2024.

**FOURTH AMENDED COMPLAINT**

139.    Plaintiff Michael Wilson, an individual, is a resident of Arizona. He worked as a college football player at Stanford University from 2018 to 2022.

140.    Plaintiff Michaela Onyenwere, an individual, is a resident of Colorado. She worked as a college basketball player at the University of California, Los Angeles from 2017 to 2021.

141.    Plaintiff Mikayla Pivec, an individual, is a resident of Oregon. She worked as a college basketball player at Oregon State University from 2016 to 2020.

142.    Plaintiff Mo Osling III, an individual, is a resident of California. He worked as a college football player at the University of California, Los Angeles from 2017 to 2022.

143.    Plaintiff Mya Hollingshed, an individual, is a resident of Texas. She worked as a college basketball player at the University of Colorado from 2017 to 2022.

144.    Plaintiff Mykel Jones, an individual, is a resident of Louisiana. He worked as a college football player at the University of Oklahoma from 2016 to 2019 and at Tulane University in 2020.

145.    Plaintiff Nakobe Dean, an individual, is a resident of Pennsylvania. He worked as a college football player at the University of Georgia from 2019 to 2022.

146.    Plaintiff Nate Savino, an individual, is a resident of Florida. He worked as a college baseball player at the University of Virginia from 2020 to 2022.

147.    Plaintiff Nick Loftin, an individual, is a resident of Arizona. He worked as a college baseball player at Baylor University from 2017 to 2020.

148.    Plaintiff Nick Swiney, an individual, is a resident of North Carolina. He worked as a college baseball player at North Carolina State University from 2018 to 2020.

149.    Plaintiff Parker Messick, an individual, is a resident of Florida. He worked as a college baseball player at Florida State University from 2019 to 2022.

**FOURTH AMENDED COMPLAINT**

150.    Plaintiff Quinn Nordin, an individual, is a resident of Florida. He worked as a college football player at the University of Michigan from 2016 to 2020.

151.    Plaintiff Rashan Gary, an individual, is a resident of Georgia. He worked as a college football player at the University of Michigan from 2016 to 2018.

152.    Plaintiff Riley Cornelio, an individual, is a resident of Colorado. He worked as a college baseball player at Texas Christian University ("TCU") from 2019 to 2022.

153.    Plaintiff Ryan Miller, an individual, is a resident of Texas. He worked as a college football player at Baylor University from 2017 to 2020.

154.    Plaintiff Ryan Rolison, an individual, is a resident of Tennessee. He worked as a college baseball player at the University of Mississippi ("Ole Miss") from 2016 to 2018.

155.    Plaintiff Sarah Fuller, an individual, is a resident of Tennessee. She worked as college soccer player at Vanderbilt University from 2017 to 2020, and as a college football player at Vanderbilt in 2020.

156.    Plaintiff Sean Clifford, an individual, is a resident of Wisconsin. He worked as a college football player at Penn State University from 2017 to 2023.

157.    Plaintiff Sean Hjelle, an individual, is a resident of Virginia. He worked as a college baseball player at the University of Kentucky from 2015 to 2018.

158.    Plaintiff Seth Henigan, an individual, is a resident of Texas. He worked as a college football player at the University of Memphis from 2021 to 2024.

159.    Plaintiff Shaquem Griffin, an individual, is a resident of Florida. He worked as a college football player at the University of Central Florida ("UCF") from 2013 to 2018.

160.    Plaintiff Shaquill Griffin, an individual, is a resident of Florida. He worked as a college football player at the University of Central Florida from 2013 to 2016.

161.    Plaintiff Shea Langeliers, an individual, is a resident of Texas. He worked as a college baseball player at Baylor University from 2016 to 2019.

**FOURTH AMENDED COMPLAINT**

162.    Plaintiff Shea Patterson, an individual, is a resident of Texas. He worked as a college football player at the University of Mississippi from 2016 to 2017 and at the University of Michigan from 2018 to 2020.

163.    Plaintiff Slade Cecconi, an individual, is a resident of Florida. He worked as a college baseball player at the University of Miami from 2018 to 2020.

164.    Plaintiff Sophie Cunningham, an individual, is a resident of Arizona. She worked as a college basketball player at the University of Missouri ("Mizzou") from 2015 to 2019.

165.    Plaintiff Spencer Jones, an individual, is a resident of Tennessee. He worked as a college baseball player at Vanderbilt University from 2019 to 2022.

166.    Plaintiff Stephan Blaylock, an individual, is a resident of California. He worked as a college football player at the University of California, Los Angeles from 2018 to 2022.

167.    Plaintiff Tanner Morgan, an individual, is a resident of Minnesota. He worked as a college football player at the University of Minnesota from 2017 to 2022.

168.    Plaintiff Taylor Rapp, an individual, is a resident of Washington. He worked as a college football player at the University of Washington from 2016 to 2018.

169.    Plaintiff Richard Thomas ("Trace") McSorley, an individual, is a resident of Virginia. He worked as a college football player at Pennsylvania State University from 2014 to 2018.

170.    Plaintiff Trenton Simpson, an individual, is a resident of North Carolina. He worked as a college football player at Clemson University from 2020 to 2022.

171.    Plaintiff Trey Lance, an individual, is a resident of Texas. He worked as a college football player at North Dakota State University from 2018 to 2020.

172.    Plaintiff Troy Fumagalli, an individual, is a resident of Illinois. He worked as a college football player at the University of Wisconsin from 2013 to 2017.

**FOURTH AMENDED COMPLAINT**

173.    Plaintiff Tyler Baum, an individual, is a resident of Arizona. He worked as a college baseball player at the University of North Carolina from 2016 to 2019.

174.    Plaintiff Tyree DeSean St. Louis, an individual, is a resident of Texas. He worked as a college football player at the University of Miami from 2015 to 2018.

175.    Plaintiff Valentino Daltoso, an individual, is a resident of California. He worked as a college football player at the University of Oregon from 2016 to 2017 and at the University of California, Berkeley from 2017 to 2021.

176.    Plaintiff Moritz Wagner, an individual, is a resident of Florida. He worked as a college basketball player at the University of Michigan from 2015 to 2018.

177.    Plaintiff Will Levis, an individual, is a resident of Tennessee. He worked as a college football player at Pennsylvania State University from 2018 to 2020 and at the University of Kentucky from 2021 to 2022.

178.    Plaintiff Zavier Simpson, an individual, is a resident of Ohio. He worked as a college basketball player at the University of Michigan from 2016 to 2020.

179.    Plaintiff Yetur Gross-Matos, an individual, is a resident of South Carolina. He worked as a college football player at Pennsylvania State University from 2017 to 2019.

180.    Plaintiff Zachary Gelof, an individual, is a resident of Florida. He worked as a college baseball player at the University of Virginia from 2018 to 2021.

181.    Plaintiff Zak Irvin, an individual, is a resident of Indiana. He worked as a college basketball player at the University of Michigan from 2013 to 2017.

182.    Plaintiff Aleva Hifo, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2016 to 2019.

183.    Plaintiff Ammon Hannemann, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2019 to 2023.

184.    Plaintiff Baylor Romney, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2021.

**FOURTH AMENDED COMPLAINT**

185.    Plaintiff Ben Bywater, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2019 to 2024.

186.    Plaintiff Blake Freeland, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2019 to 2022.

187.    Plaintiff Bracken El-Bakri, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2014 to 2015 and 2017 to 2020.

188.    Plaintiff Brady Christensen, an individual, is a resident of South Carolina. He worked as a college football player at Brigham Young University from 2017 to 2020.

189.    Plaintiff Brayden El-Bakri, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2012 to 2018.

190.    Plaintiff Caden Haws, an individual, is a resident of South Carolina. He worked as a college football player at Brigham Young University from 2019 to 2023.

191.    Plaintiff Chaz Ah You, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University in 2017 and from 2019 to 2023.

192.    Plaintiff Earl Mariner, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2017 to 2022.

193.    Plaintiff Gabe Summers, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2022.

194.    Plaintiff Gunner Romney, an individual, is a resident of California. He worked as a college football player at Brigham Young University from 2018 to 2022.

195.    Plaintiff Harris LaChance, an individual, is a resident of California. He worked as a college football player at Brigham Young University from 2018 to 2022.

196.    Plaintiff Hayden Livingston, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University in 2016 and from 2019 to 2022.

197.    Plaintiff Isaiah Kaufusi, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2016 to 2020.

**FOURTH AMENDED COMPLAINT**

198.    Plaintiff Jackson Kaufusi, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2022.

199.    Plaintiff Jake Oldroyd, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University in 2016 and from 2019 to 2022.

200.    Plaintiff James Empey, an individual, is a resident of Idaho. He worked as a college football player at Brigham Young University from 2017 to 2021.

201.    Plaintiff Jonah Trinnaman, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2016 to 2017.

202.    Plaintiff Jonny Linehan, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2015 to 2017.

203.    Plaintiff Justen Smith, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2020 to 2022.

204.    Plaintiff Keenan Ellis, an individual, is a resident of Tennessee. He worked as a college football player at Brigham Young University from 2017 to 2021.

205.    Plaintiff Lopini Katoa, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2017 to 2022.

206.    Plaintiff Malik Moore, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2023.

207.    Plaintiff Masen Wake, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2019 to 2022.

208.    Plaintiff Payton Wilgar, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2022.

209.    Plaintiff Pepe Tanuvasa, an individual, is a resident of Oregon. He worked as a college football player at the Naval Academy from 2017 to 2019 and at Brigham Young University from 2020 to 2022.

210.    Plaintiff Trajan Pili, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University in 2013 and from 2016 to 2019.

**FOURTH AMENDED COMPLAINT**

211.    Plaintiff Uriah Leiataua, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2016 to 2021.

212.    Plaintiff Zac Dawe, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2016 to 2020.

213.    Plaintiff Zach Wilson, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University from 2018 to 2020.

214.    Plaintiff Kylin Jatavian Hill, an individual, is a resident of Mississippi. He worked as a college football player at Mississippi State University from 2017 to 2020.

215.    Plaintiff Jordan Lewis Tucker, an individual, is a resident of New York. From 2017 to 2020, he worked as a college basketball player at Duke University and Butler University.

216.    Plaintiff Michael Anthony Harley, Jr., an individual, is a resident of Florida. From 2016 to 2021, he worked as a college football player at the University of Miami.

217.    Plaintiff Charleston Cha'Caine Rambo, an individual, is a resident of Texas. From 2018 to 2021, he worked as a college football player at the University of Oklahoma and the University of Miami.

218.    Plaintiff Anthony Gould, an individual, is a resident of Missouri. From 2019 to 2023, he worked as a college football player at Oregon State University.

219.    Plaintiff Hunter Echols, an individual, is a resident of California. From 2017 to 2022, he worked as a college football player at USC and Arizona.

220.    Plaintiff Stephen Carr, an individual, is a resident of California. From 2017-2021, he worked as a college football player at USC and Indiana.

221.    Plaintiff Bryce Raymond Jon Nze is a resident of Wisconsin. From 2016 to 2022, he worked as a college basketball player at Butler University and Milwaukee.

222.    Plaintiff Brevin Jordan, an individual, is a resident of Nevada. From 2018 to 2020, he worked as a college football player at the University of Miami.

**FOURTH AMENDED COMPLAINT**

223.    Plaintiff Hasahn French, an individual, is a resident of New Jersey. From 2017 to 2021, he worked as a college basketball player at Saint Louis University.

224.    Plaintiff Trevon Bradford, an individual, is a resident of Oregon. From 2016 to 2021, he worked as a college football player at Oregon State University.

225.    Plaintiff Palaie Gaoteote, an individual, is a resident of Nevada. From 2018 to 2022, he worked as a college football player at USC and Ohio State.

226.    Plaintiff Timmy Hernandez, an individual, is a resident of Arizona. From 2016 to 2018, he worked as a college football player at Oregon State University.

227.    Plaintiff Tyjon Alvin Lindsey, an individual, is a resident of Nevada. From 2017 to 2018, he worked as a college football player at the University of Nebraska and Oregon State University.

228.    Plaintiff Kellan Grady, an individual, is a resident of Massachusetts. From 2017 to 2022, he worked as a college basketball player at Davidson and the University of Kentucky.

229.    Plaintiff Joshua Noah Gray, an individual, is a resident of New York. From 2020 to 2024, he worked as a college basketball player at LSU, South Carolina, and Missouri.

230.    Plaintiff Vance Jackson, an individual, is a resident of California. From 2016 to 2022, he worked as a college basketball player at University of Connecticut, New Mexico, Arkansas, and East Carolina.

231.    Plaintiff Chad Patrick Kelly, an individual, is a resident of Ontario, Canada. From the years 2015 to 2016, he worked as a college football player at the University of Mississippi.

232.    Plaintiff Joshua Noah Pierre-Louis, an individual, is a resident of New Jersey. From 2019 to 2024, he worked as a college football player at Temple and UC Santa Barbara.

**FOURTH AMENDED COMPLAINT**

233.    Plaintiff Damuzhea Bolden, an individual, is a resident of Nevada. From 2017 to 2021, he worked as a college football player at USC and the University of Miami.

234.    Plaintiff Kevin Marfo, an individual, is a resident of New Jersey. From 2016 to 2022, he worked as a college basketball player at George Washington University, Quinnipiac, and Texas A&M.

235.    Plaintiff Tathan "Tate" Martell, an individual, is a resident of Nevada. He worked as a college football player at Ohio State University from 2017 to 2018, the University of Miami from 2019 to 2021, and the University of Nevada, Las Vegas from 2021 to 2022.

236.    Plaintiff N'Kosi Travaughn Perry, an individual, is a resident of Florida. From 2017 to 2022, he worked as a college football player at the University of Miami and FAU.

237.    Plaintiff Malik Hausman, an individual, is a resident of Nevada. From 2017 to 2022, he worked as a college football player at Arizona and Hawaii.

238.    Plaintiff Carson Brown Strong, an individual, is a resident of Nevada. From 2018 to 2021, he worked as a college football player at Nevada.

239.    Plaintiff Zion Bethea, an individual, is a resident of New Jersey. From 2020 to 2024, he worked as a college basketball player at Hofstra, St. Francis Brooklyn, and Delaware.

240.    Plaintiff Maurice "Moe" Odum, an individual, is a resident of New Jersey. From 2022 to 2024, he worked as a college basketball player at Pacific and Pepperdine.

241.    Plaintiff Nathaniel Pierre-Louis, an individual, is a resident of New Jersey. From 2017 to 2020, he worked as a college football player at Temple.

242.    Plaintiff Jimmy Bell, Jr., an individual, is a resident of Mississippi. From 2020 to 2023, he worked as a college basketball player at Saint Louis University, West Virginia University, and Mississippi State University.

**FOURTH AMENDED COMPLAINT**

243.    Plaintiff Demetris Harris, II, an individual, is a resident of Florida. From 2017 to 2021, he worked as a college football player at the University of South Florida.

244.    Plaintiff Alexander Shaw, an individual, is a resident of Texas. From 2017 to 2023, he worked as a college football player at Jackson State University and Mississippi State University.

245.    Plaintiff Mekhi Elijah LaPointe, an individual, is a resident of Florida. From 2018 to 2022, he worked as a college football player at the University of South Florida.

246.    Plaintiff Tru Cymon Thompson, an individual, is a resident of Georgia. From 2019 to 2022, he worked as a college football player at Florida State University and Jackson State University.

247.    Plaintiff Elijah Dijaie Blades, an individual, is a resident of California. From 2019 to 2022, he worked as a college football player at Texas A&M, Florida, and Buffalo.

248.    Plaintiff Dixie Wooten, III, an individual, is a resident of Texas. From 2016 to 2019, he worked as a college football player at the University of Houston.

249.    Plaintiff Westin Branning Graves, an individual, is a resident of Mississippi. From 2016 to 2017, he worked as a college football player at Mississippi State University.

250.    Plaintiff Ikem Okeke, an individual, is a resident of Nevada. From 2016 to 2019, he worked as a college football player at Arizona and Hawaii.

251.    Plaintiff Kahlil Johnson, an individual, is a resident of Mississippi. From 2019 to 2022, he worked as a college football player at Jackson State University.

252.    Plaintiff Alex Perry, an individual, is a resident of Nevada. From 2017 to 2019, he worked as a college football player at Arizona State University and the University of Nevada, Las Vegas.

**FOURTH AMENDED COMPLAINT**

253.    Plaintiff Cameron Echols-Luper, an individual, is a resident of Florida. From 2015 to 2017, he worked as a college football player at Texas Christian University, Arkansas State University, and Western Kentucky University.

254.    Plaintiff Montell Cozart, an individual, is a resident of Kansas. From 2013 to 2017, he worked as a college football player at the University of Kansas and Boise State University.

255.    Plaintiff Justin Ragin, an individual, is a resident of Mississippi. From 2017 to 2022, he worked as a college football player at Jackson State University.

256.    Plaintiff Rashard Markese Davis, an individual, is a resident of Florida. From 2015 to 2016, he worked as a college football player at James Madison University.

257.    Plaintiff Rashad Williams, an individual, is a resident of Michigan. From 2018 to 2023, he worked as a college basketball player at Oakland University.

258.    Plaintiff Jayden Curry, an individual, is a resident of Virginia. From 2020 to 2024, he worked as a college football player at the University of South Florida and the University of Maine.

259.    Plaintiff Stanley O'Neal Dye, Jr., an individual, is a resident of Florida. From 2016 to 2017, he worked as a college football player at the University of Texas at San Antonio.

260.    Plaintiff Amari Jamon Catchings, an individual, is a resident of Mississippi. From 2017 to 2021, he worked as a college football player at Jackson State University.

261.    Plaintiff Ron Tiavaasue, an individual, is a resident of Utah. From 2021 to 2023, he worked as a college football player at Missouri State University, Utah State University, and New Mexico State University.

262.    Plaintiff Gregory Michael Francis, an individual, is a resident of Nevada. From 2017 to 2021, he worked as a college football player at the University of Nevada, Las Vegas and North Texas University.

**FOURTH AMENDED COMPLAINT**

263.    Plaintiff Everett Hunter, an individual, is a resident of Louisiana. From 2023 to 2024, he worked as a college football player at the University of New Mexico.

264.    Plaintiff Donell Christopher Paster, Sr., an individual, is a resident of Georgia. From 2016 to 2018, he worked as a college football player at Jackson State University.

265.    Plaintiff Tevin Broyles, an individual, is a resident of Alabama. From 2016 to 2017, he worked as a college basketball player at the University of New Orleans.

266.    Plaintiff Vincent Paul Sampson, an individual, is a resident of Tennessee. From 2016 to 2021, he worked as a college football player at Jackson State University.

267.    Plaintiff Jawon Johnson, an individual, is a resident of Mississippi. From 2016 to 2017, he worked as a college football player at Mississippi State University.

268.    Plaintiff Marcus Lynard Wallace, an individual, is a resident of Mississippi. From 2016 to 2020, he worked as a college basketball player at the University of Arkansas at Pine Bluff.

269.    Plaintiff Micah Jett Parten, an individual, is a resident of Maryland. From 2015 to 2016, he was a Division I athlete and played Football at the University of Central Arkansas.

270.    Plaintiff Amarveer Singh, an individual, is a resident of New York. From 2015 to 2017, he worked as a college basketball player at Seton Hall.

271.    Plaintiff Ishmael Hyman, an individual, is a resident of New Jersey. From 2016 to 2017, he worked as a college football player at James Madison University.

272.    Plaintiff Hannah Crofut, an individual, is a resident of California. From 2016 to 2017, she worked as a college soccer and softball player at Bryant University.

273.    Plaintiff Carter Cunningham, an individual, is a resident of Mississippi. From 2020 to 2021, he worked as a college football player at Jackson State University.

274.    Plaintiff Jacob Cox, an individual, is a resident of Mississippi. From 2022 to 2024, he worked as a college football player at the University of Central Arkansas.

**FOURTH AMENDED COMPLAINT**

275.    Plaintiff Edgar Burrola, an individual, is a resident of Nevada. From 2017 to 2020, he worked as a college football player at the University of Arizona.

276.    Plaintiff Trevon Thomas Sidney, an individual, is a resident of California. From 2016 to 2021, he worked as a college football player at the University of Southern California, the University of Illinois, and San Jose State University.

277.    Plaintiff Jaylon Robinson, an individual, is a resident of Texas. From 2018 to 2023 he worked as a college football player at the University of Central Florida, the University of Mississippi, and Texas Christian University.

278.    Plaintiff Lamont James Evans, IV, an individual, is a resident of Florida. From 2021 to 2024 he worked as a college basketball player at the University of South Florida and the Saint Louis University.

279.    Plaintiff Malique Kenneth Jacobs, an individual, is a resident of South Carolina. From 2020 to 2023, he worked as a college basketball player at Kent State University.

280.    Plaintiff Erick Neal, an individual, is a resident of Texas. From 2016 to 2018, he worked as a college basketball player at the University of Texas at Arlington.

281.    Plaintiff Bryan Schor, an individual, is a resident of Georgia. From 2014 to 2017, he worked as a college football player at James Madison University.

282.    Plaintiff James Okonkwo, an individual, is a resident of Ohio. He worked as a college basketball player at West Virginia University from 2021 to 2023, as a college basketball player at North Carolina University from 2023 to 2024, and as a college basketball player at Akron University from 2024 to 2025.

283.    Plaintiff Sean "Jack" Michael Allison, an individual, is a resident of Florida. He worked as a college football player at the University of Miami from 2016 to 2017 and West Virginia University from 2017 to 2020.

**FOURTH AMENDED COMPLAINT**

284.    Plaintiff Davion Ervin-Poindexter, an individual, is a resident of Indiana. He worked as a college football player at Indiana University from 2019 to 2021 and Western Kentucky University from 2022 to 2023.

285.    Plaintiff Yoeli Childs, an individual, is a resident of Utah. He worked as a college basketball player at Brigham Young University from 2016 through 2020.

286.    Plaintiff Madelynne Scherr, an individual, is a resident of Texas. She worked as a college basketball player at the University of Oregon from 2020 to 2022, as a college basketball player at University of Kentucky from 2022 to 2024, and as a college basketball player at the Texas Christian University from 2024 through 2025.

287.    Plaintiff Dibaji Walker, an individual, is a resident of Ohio. He worked as a college basketball player at Cleveland State from 2018 to 2019, University of Massachusetts from 2019 to 2022, and Appalachian State from 2022 to 2023.

288.    Plaintiff Dontaie Allen, an individual, is a resident of Kentucky. Allen worked as a college basketball player at the University of Kentucky from 2019-2022, Western Kentucky University from 2022 to 2024, and the University of Wyoming from 2024 to 2025.

289.    Plaintiff Derrick Barnes, an individual, is a resident of Indiana. He worked as a college football player at Purdue University from 2017 to 2020.

290.    Plaintiff Adam Kunkel, an individual, is a resident of Kentucky. He played college basketball at Belmont University from 2019-20 and Xavier from 2020-23.

291.    Plaintiff Malik Curry, an individual, is a resident of Delaware. He worked as a college basketball player for the University of Delaware from 2019 to 2021 and West Virginia University from 2021 to 2022.

292.    Plaintiff Erik Stevenson, an individual, is a resident of the District of Columbia. He worked as a college basketball player at Wichita State from 2018 to 2020, University of Washington in 2019, the University of South Carolina from 2021 to 2022, and West Virginia from 2022 to 2023.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

293.    Plaintiff Donte Ingram, an individual, is a resident of Illinois. He worked as a college basketball player at Loyola University Chicago from 2014 to 2018.

294.    Plaintiff Romar Reid, an individual, is a resident of New York. He worked as a college basketball player at Manhattan University from 2019 to 2023.

295.    Plaintiff Cam Taylor-Britt, an individual, is a resident of Georgia. He worked as a college football player at the University of Nebraska from 2018 to 2021.

296.    Plaintiff Kam Williams, an individual, is a resident of Texas. He worked as a college basketball player at Ohio State University from 2014 to 2018.

297.    Plaintiff Cameron Krutwig, an individual, is a resident of Illinois. He worked as a college basketball player at Loyola University Chicago from 2017 to 2022.

298.    Plaintiff Vincent "Tre" Mitchell, an individual, is a resident of Pennsylvania. He worked as a college basketball player at the University of Massachusetts from 2019 to 2021, at the University of Texas from 2021 to 2022, at West Virginia University from 2022 to 2023, and at the University of Kentucky from 2023 to 2024.

299.    Plaintiff Matt Cross, an individual, is a resident of Massachusetts. He worked as a college basketball player at the University of Miami from 2020 to 2021, the University of Louisville from 2021 to 2022, the University of Massachusetts from 2022 to 2024, and Southern Methodist University from 2024 to 2025.

300.    Plaintiff Marc Loving, an individual, is a resident of Ohio. He worked as a college basketball player at Ohio State University from 2013 to 2017.

301.    Plaintiff C.J. Jackson, an individual, is a resident of Arizona. He worked as a college basketball player at Ohio State University from 2016 to 2019.

302.    Plaintiff Derek Culver, an individual, is a resident of Ohio. He worked as a college basketball player at West Virginia University from 2018 to 2021.

303.    Plaintiff Nate Adrian, an individual, is a resident of West Virginia. He worked as a college basketball player at West Virginia University from 2014 to 2017.

**FOURTH AMENDED COMPLAINT**

304.    Plaintiff Tajzmel Sherman, an individual, is a resident of Texas. He worked as a college basketball player at West Virginia University from 2019 to 2022.

305.    Plaintiff Filip Petrusev, an individual, is a citizen of Serbia. He worked as a college basketball player at Gonzaga University from 2018 to 2020.

306.    Plaintiff Nigel Johnson, an individual, is a resident of Virginia. He worked as a college basketball player at Kansas State University from 2013 to 2015, Rutgers University from 2016 to 2017, and University of Virginia from 2017 to 2018.

307.    Plaintiff Lucas Williamson, an individual, is a resident of Illinois. He worked as a college basketball player at Loyola University Chicago from 2017 to 2022.

308.    Plaintiff Jacob Evans, an individual, is a resident of Louisiana. He worked as a college basketball player at the University of Cincinnati from 2015 to 2018.

309.    Plaintiff Marques Townes, an individual, is a resident of New Jersey. He worked as a college basketball player at Fairleigh Dickinson from 2014 to 2016 and at Loyola University Chicago from 2017 to 2019.

310.    Plaintiff Jerron Cage, an individual, is a resident of Ohio. He worked as a college football player at Ohio State University from 2018 to 2022.

311.    Plaintiff Jermaine Haley, an individual, is a resident of British Columbia, Canada. He worked as a college basketball player at New Mexico State University from 2016 to 2017 and at West Virginia University from 2018 to 2020.

312.    Plaintiff Troy Caupain, an individual, is a resident of Virginia. He worked as a college basketball player at the University of Cincinnati from 2013 to 2017.

313.    Plaintiff Nysier Brooks, an individual, is a resident of Connecticut. He worked as a college basketball player at the University of Cincinnati from 2016 to 2019, the University of Miami from 2020 to 2021, and at the University of Mississippi from 2021 to 2022.

314.    Plaintiff Spencer Macke, an individual, is a resident of Kentucky. He worked as a college basketball player at West Virginia University from 2019 to 2021.

**FOURTH AMENDED COMPLAINT**

315.    Plaintiff Daxter Miles, an individual, is a resident of Maryland. He worked as a college basketball player at West Virginia University from 2014 to 2018.

316.    Plaintiff Aaron Epps, an individual, is a resident of Louisiana. He worked as a college basketball player at Louisiana State University from 2014 to 2018.

317.    Plaintiff Tayler Persons, an individual, is a resident of Indiana. He worked as a college basketball player at Northern Kentucky University from 2014 to 2015 and Ball State University from 2015 to 2019.

318.    Plaintiff Trevon Scott, an individual, is a resident of Georgia. He worked as a college basketball player at the University of Cincinnati from 2016 to 2020.

319.    Plaintiff Benjamin Mark Richardson, an individual, is a resident of Kansas. He worked as a college basketball player at Loyola University Chicago from 2014 to 2018.

320.    Plaintiff David Bell, an individual, is a resident of Florida. He worked as a college basketball player at Ohio State University from 2015 to 2017 and at Jacksonville University from 2018 to 2020.

321.    Plaintiff Aaron Nesmith, an individual, is a resident of Indiana. He worked as a college basketball player at Vanderbilt University from 2019 to 2020.

322.    Plaintiff Cade Cunningham, an individual, is a resident of Michigan. He worked as a college basketball player at Oklahoma State University from 2020 to 2021.

323.    Plaintiff Derrick White, an individual, is a resident of Massachusetts. He worked as a college basketball player at the University of Colorado – Colorado Springs from 2012 to 2015 and at the University of Colorado – Boulder from 2016 to 2017.

324.    Plaintiff Donovan Clingan, an individual, is a resident of Oregon. He worked as a college basketball player at the University of Connecticut (UConn) from 2022 to 2024.

325.    Plaintiff Drew Eubanks, an individual, is a resident of California. He worked as a college basketball player at Oregon State University from 2015 to 2018.

**FOURTH AMENDED COMPLAINT**

326.    Plaintiff Khyri Thomas, an individual, is a resident of Nebraska. He worked as a college basketball player at Creighton University from 2015 to 2018.

327.    Plaintiff Marcus Zegarowski, an individual, is a resident of Massachusetts. He worked as a college basketball player at Creighton University from 2018 to 2021.

328.    Plaintiff Naz Reid, an individual, is a resident of Minnesota. He worked as a college basketball player at Louisiana State University (LSU) during the 2018–2019 season.

329.    Plaintiff Saddiq Bey, an individual, is a resident of Maryland. He worked as a college basketball player at Villanova University from 2018 to 2020.

330.    Plaintiff Tyler Herro, an individual, is a resident of Florida. He worked as a college basketball player at the University of Kentucky from 2018 to 2019.

331.    Plaintiff Marcel Dancy, an individual, is a resident of California. He worked as a college football player at Laney College from 2016 to 2017 and the University of California, Berkeley from 2018 to 2021.

332.    Plaintiff Seth Beer, an individual, is a resident of Georgia. He worked as a college baseball player at Clemson University from 2016 to 2018.

333.    Plaintiff Benjamin Burr-Kirven, an individual, is a resident of Illinois. He worked as a college football player at the University of Washington from 2015 to 2018.

334.    Plaintiff Neil Pau'u, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University (BYU) from 2017 to 2021.

335.    Plaintiff Jared Kapisi, an individual, is a resident of Utah. He worked as a college football player at Brigham Young University (BYU) from 2017 to 2021.

336.    Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

**FOURTH AMENDED COMPLAINT**

337.    The Pac-12 Conference ("Pac-12") is an unincorporated association with a principal place of business in San Francisco, California. During the relevant period, the Pac-12 Conference conspired with the NCAA and others to illegally restrain competition in the market for college athletes and damaged (and continues to damage) Plaintiffs.

338.    The Southeastern Conference ("SEC") is an unincorporated association with its principal place of business in Birmingham, Alabama. During the relevant period, the SEC conspired with the NCAA and others to illegally restrain competition in the market for college athletes and damaged (and continues to damage) Plaintiffs.

339.    The Atlantic Coast Conference ("ACC") is an unincorporated association with a principal place of business in Greensboro, North Carolina. During the relevant period, the ACC conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) Plaintiffs.

340.    The Big 12 Conference, Inc. ("Big 12") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Irving, Texas. During the relevant period, the Big 12 conspired with the NCAA and others to illegally restrain competition in the market for college athletes and damaged (and continues to damage) Plaintiffs.

341.    The Big Ten Conference, Inc. ("Big Ten") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Rosemont, Illinois. During the relevant period, the Big Ten and conspired with the NCAA and others to illegally restrain competition in the market for college athletes and damaged (and continues to damage) Plaintiffs.

342.    Various other persons and entities engaged in concert with the named Defendants in the conduct alleged herein, and are co-conspirators.

343.    Plaintiffs bring this action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of §§ 1 and 3 of the Sherman Antitrust Act, 15

**FOURTH AMENDED COMPLAINT**

U.S.C. §§ 1, 3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

344.    Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants and their member schools transact substantial business in multiple states. Defendants and their member schools routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

345.    Venue is proper in this District because Defendants and some of their members reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants and some of their members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The bylaws at issue (discussed in greater detail below) apply to athletes who have worked, or currently work, for NCAA member institutions in this District; the NCAA sanctions Division I football and basketball events that regularly take place in this District, including games played by local members; and several Plaintiffs reside or work in this District. Indeed, in 2023, Denver hosted a portion of the NCAA's popular March Madness men's basketball tournament, and is doing so again in 2025.

346.    In a stipulation entered by the Court on October 23, 2024, Defendants stipulated they would "not object to Plaintiffs' amendment of the operative complaint to join additional plaintiffs who opt out of the House settlement, if any, based on either venue or the timeliness of any such joinder or amendment of the pleadings under the scheduling order in this action." Dkt. 146 at 2.

347.    This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under

**FOURTH AMENDED COMPLAINT**

that Clayton Act, as described *supra*. It also has personal jurisdiction because, among other things, Defendants transact substantial, continuous business in this State and District; participate in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; have substantial contacts in this State and District and several of their members reside in this State and District; and are engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

348.    Joinder of Plaintiffs is proper pursuant to Federal Rules of Civil Procedure 20 and 21.

349.    Plaintiffs here all assert rights to relief arising out of the same transaction, occurrence, or series of transactions or occurrences. Plaintiffs were subject to the same or similar restraints and compensation practices arising out of Defendants' common course of illegal conduct. Plaintiffs have sustained similar types of damages as a result of these common practices.

350.    Further, multiple questions of law and fact common to all Plaintiffs will arise in the action, including *inter alia*:

      a.  Whether by enacting the bylaws and other restraints, Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of compensation paid to Plaintiffs;

      b.  Whether that conduct caused Plaintiffs to earn less than what they would have in a competitive market;

      c.  Whether Plaintiffs suffered antitrust injury or were threatened with injury; and

**FOURTH AMENDED COMPLAINT**

d.    Whether Plaintiffs are entitled to damages, and the type and scope of that

relief.

351.    Joinder would significantly enhance efficiency for both the parties involved

and the Court. The prosecution of separate actions by individual plaintiffs would impose

heavy burdens upon the courts and Defendants and create a risk of: (a) inconsistent or

varying adjudications with respect to different plaintiffs which would establish

incompatible standards of conduct for Defendants; and (b) adjudications with respect to

individual plaintiffs which would as a practical matter be dispositive of the interests of

other members not parties to the adjudications or substantially impair or impede their

ability to protect their interests.

352.    Further, joinder would save time, effort, and expense and assure

uniformity of decisions without causing procedural unfairness or any undesirable result.

Plaintiffs do not anticipate any difficulty in the management of this action with multiple

Plaintiffs.

353.    As noted above, Defendants stated they would "not object to Plaintiffs'

amendment of the operative complaint to join additional plaintiffs who opt out of the

House settlement" based on either venue or timeliness. Dkt. 146 at 2.

354.    Plaintiffs will not attempt to represent a class in this case unless final

approval of the settlement in *House* is rejected. If the *House* settlement is rejected,

Plaintiffs reserve the right to assert class action allegations on behalf of the following

("Alternative Proposed Class"):

All persons who worked as athletes for a Division I athletic team at
an NCAA Division I school, from the beginning of the statute of limitations
period, as determined by the Court, through judgment in this matter.

**FOURTH AMENDED COMPLAINT**

355.    This class would contain thousands of members residing in various parts of the United States, and would be so numerous that joinder of all members would be impracticable.

356.    The claims of the class would involve the same or similar restraints and compensation practices arising out of Defendants' common course of illegal conduct, resulting in similar types of damages.

357.    The same common questions identified in paragraph 334, *supra*, would exist, and they would predominate over any individualized issues.

358.    If class allegations are pursued, Plaintiffs would fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiffs have retained counsel competent and experienced in class-action litigation, including antitrust litigation and sports-related litigation.

359.    If the *House* settlement is not approved, a class action would be superior to other methods of adjudication because thousands of people with similar claims would be more practically, more efficiently, and more consistently resolved as a class.

## FACTUAL ALLEGATIONS

### A. The NCAA, its co-conspirators, and the exponential growth in revenue.

360.    More than a century ago, our nation's colleges and universities banded together to form the NCAA. The ostensible need for the association was to "protect" players because of the number of injuries occurring in college athletics at the time. Over the years, however, the association began focusing more on protecting its own financial interests, by limiting the compensation provided to athletes, than on protecting the athletes from injuries.

361.    As an unincorporated association, the NCAA is governed by its members, which include its schools and conferences. The NCAA has several governance committees, with representatives from member schools and conferences who sit on the committees and engage in NCAA rulemaking. The highest governing body, the Board of

**FOURTH AMENDED COMPLAINT**

Governors, consists primarily of chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements policies.

362.    The association has adopted a constitution and a number of bylaws. As a condition of membership, member schools and conferences must comply with the association's constitution and bylaws. Certain bylaws have been deemed so important by the association that they cannot be amended without a full vote of the members. One of these bylaws is Bylaw 12, entitled "Amateurism and Athletics Eligibility."

363.    Bylaw 12 states that "[o]nly an amateur student-athlete" can participate in the NCAA's sports. It goes on to say that a "grant-in-aid"—more commonly known as a scholarship—does not violate the amateurism rules. That grant-in-aid has generally been limited to the cost of tuition, room and board, books, and similar education-related expenses.

364.    As a condition of membership, the bylaws require schools to ensure that their athletes maintain their amateur status when participating in Division I athletics. The schools use an amateur certification process. An athlete must receive this amateur certification before participating in practices or competitions.

365.    An athlete loses his amateur status by using athletics skill "for pay in any form in that sport." NCAA Bylaw 12.1.2. Prohibited forms of pay include: "any direct or indirect salary, gratuity, or comparable compensation" or "any division or split of surplus (bonuses, game receipts, etc.)," such as television or other revenues. Likewise, cash awards or cash prizes for performance are prohibited. NCAA Bylaw 12.1.2.1.4. And the athletes "may participate in media activities," including television programs, but they "shall not receive any remuneration" from it. NCAA Bylaw 12.5.3.

366.    Penalties for violating these rules include, for the athlete, loss of ability to compete in NCAA events, and for the school, forfeiture of games, returning revenue, bans on post-season play, and the removal of scholarships. Additionally, in some circumstances, if an ineligible athlete participates in a game, the NCAA has the right to

**FOURTH AMENDED COMPLAINT**

require the school to pay to the NCAA the school's "share of television receipts" related to the game. NCAA Bylaw 19.13.

367.    The NCAA, its conferences, and its member schools enforce these rules, and many athletes and schools have been penalized for violating them. As Article 2.8 of the NCAA's governing constitution states, a non-compliant school will be subjected to discipline and corrective actions. That includes being "suspended, terminated or otherwise disciplined." NCAA Constitution Article 3.2.5.1.

368.    Indeed, according to Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to boycott an entity that fails to follow the rules.

369.    The wage fix is thus codified in Defendants' own bylaws. This arrangement does not exist in other university contexts, including when it comes to other workers who are simultaneously attending a university and working for it. A graduate student is not barred from being paid to teach or assist in research or perform any other paid work. Neither should an athlete attending the same university.

370.    The NCAA is divided into three levels: Division I, Division II, and Division III. Division I schools generally have the largest athletics department budgets, the better athletes, and often have larger student bodies. There are more than 350 Division I schools. Sixty-nine (formerly 65) of these Division I schools make up the Power 5 Conferences. Notre Dame (which, though independent in football, competes against Power 5 schools and is a member of the ACC for men's and women's basketball) also operates at the Division I level.

**FOURTH AMENDED COMPLAINT**

371.    In 2022, the NCAA itself earned $1.14 billion. Much of that comes from television contracts for the broadcast of basketball games between NCAA member schools. At the end of each college basketball season, the NCAA hosts a "March Madness" tournament. Its popularity in 2010 garnered a television contract originally worth $10.8 billion over 14 years; the parties later agreed to extend the contract an additional 8 years for an additional $8.8 billion.

372.    Those numbers, of course, do not include the amount earned by the NCAA's members. In 2019, the NCAA Division I member schools generated close to $16 billion in total athletics revenue collectively.

373.    The Power 5 Conferences generated much of that revenue. In 2022-23, there were at least 22 universities with revenues exceeding $150 million. (Private schools like Duke and Notre Dame were not included in the study, meaning the number of such schools is likely higher.) All those schools were members of Power 5 Conferences. In 2022, the 13 public schools in the SEC reported a combined revenue of $2.17 billion, and the 13 public schools in the Big Ten combined for $2.04 billion in revenue.[7]

374.    On the low end, the average athletics department revenue for a Big 12 school amounted to over $110 million in 2022. On the high end, the average revenue for a SEC school amounted to $159.1 million. The other three conferences in the Power 5 fell between those numbers. The Power 5 Conferences enjoyed revenue growth of 260% from 2008 to 2018. Over the same time period, revenue growth for the NBA and NFL was around 100%. The growth has only continued in recent years.

375.    The huge television contracts signed by the Power 5 Conferences drive much of that revenue growth. With its new landmark deal, the Big Ten now earns $1.15 billion per year in television revenue. In 2024, the SEC will be earning over $700 million

---

[7] https://www.usatoday.com/story/sports/college/2023/06/14/sec-big-ten-2-billion-athletics-revenue-power-five/70313053007/

**FOURTH AMENDED COMPLAINT**

per year in television revenue. The Big 12 earns an average of $220 million in annual

revenue, but that will increase to $380 million in 2025. The ACC earns an average of

$240 million in such revenue, and the Pac-12 earns $250 million.

376.    Approximately $470 million per year in television revenue is also earned

from the College Football Playoff series each year. When the current television deal for

the College Football Playoff expires in 2026, industry experts predict that Defendants

will be in a position to negotiate a deal that pays over $2 billion per year in television

broadcast revenue because of the increased popularity of college football.

377.    In total, the Power 5 conferences have signed television contracts that

exceed $20 billion. The annual revenue (which is distributed to the schools) has been

growing exponentially, and is expected to continue to grow exponentially, as the below

chart demonstrates:



**FOURTH AMENDED COMPLAINT**

378.    Demand for college football and basketball, and corresponding television viewership ratings, is strong and increasing. For example, an average of 21.736 million people viewed the NCAA's College Football Playoff semifinal game in 2023 between Ohio State and Georgia. Meanwhile, an average of 14.69 million people watched the NCAA's March Madness men's championship basketball game in 2023. Ratings for the women's basketball championship game in 2023 reached 9.9 million, which shattered the prior record. In 2024, that record for women's college basketball was shattered again, as an average of over 18 million people watched the championship game.

379.    Each conference generally splits the revenue it receives from television contracts for the broadcast of games evenly amongst that conferences' member schools. That is because schools generally assign their broadcast rights to the conferences so the conferences can negotiate with the television networks. For example, the SEC receives money from its television contracts and then shares it equally with its own member schools. The schools of course have an incentive to try to position themselves in the best place to maximize their revenue, by joining the conference that takes in and then shares the most revenue. That results in revenue-chasing, which in turn has resulted in a significant amount of conference-jumping by schools.

380.    As one industry insider, Amy Perko, recently stated, "[c]onference realignment is driven by this continual chase of revenue. The winners, at least in the media, are being defined as the conferences that bring in the most revenue."

381.    For instance, several members of the Pac-12 have decided to abandon the conference to cash in on more lucrative television deals being negotiated by other Power 5 conferences. The Big Ten—traditionally a Midwestern conference—now includes UCLA, USC, Washington, and Oregon as members. Why? Because of the Big Ten's huge new television deal, which it is in a position to share with schools who join the Big Ten conference.

**FOURTH AMENDED COMPLAINT**

382.    Similarly, the ACC traditionally has been a conference of eastern schools. Now the "Atlantic Coast Conference" includes members from the Pacific coast: Stanford and California-Berkeley. Instead of playing games a few hours south against USC or UCLA, the athletes at Stanford must travel cross-country to Boston, Chapel Hill, and Miami on a regular basis.

383.    As television revenues have skyrocketed, the schools and conferences have chased the almighty dollar. There is no end to this chase in sight. Clemson and Florida State continue to make noise about leaving the ACC for greener pastures. And while Defendants have long fussed about the need to protect athletes, they apparently have no problem with increasing the players' travel times and distances dramatically or, at times, expanding the number of games scheduled to increase revenue gains. Player welfare is taking a backseat to revenue.

384.    The increased travel caused by realignment hits athletes in sports other than basketball and football particularly hard. One head football coach put it this way: "[W]hat about softball and baseball who have to travel cross-country? Did we ask about the cost to them? Do we know what the number one cause of mental health is: it's lack of rest and sleep."[8]

385.    Or as a head basketball coach stated: "None of it is in the best interest of the student-athlete, no matter what anybody says. It's in the best interest of more money to cover the bills. That's it."[9]

---

[8] Jared Bush, *Mizzou head coach Eli Drinkwitz criticizes conference realignment*, Fox4, Aug. 6, 2023, *available at* https://fox4kc.com/sports/college/mizzou/mizzou-head-coach-eli-drinkwitz-criticizes-conference-realignment/.

[9] Jordan Mendoza, *UCLA coach Mick Cronin: Realignment not 'in the best interest of the student-athlete'*, USA Today, Aug. 17, 2023, *available at* https://www.usatoday.com/story/sports/ncaab/2023/08/17/ucla-coach-mick-cronin-realignment-thoughts/70615325007/.

**FOURTH AMENDED COMPLAINT**

386.   The administrators and head coaches and nearly everyone else working in college athletics have seen salaries rise along with revenue. Everyone is cashing in, with one exception: the players themselves. That is because of Defendants' illegal restraint, which prohibits players from receiving any portion of revenue.

387.   In a competitive market, the athletes working at Power 5 schools would receive compensation that responded to market forces. Just as the schools compete for coaches by paying higher salaries, they would also compete for athletes by paying higher compensation. But the NCAA bylaws prohibit such payment. That amounts to a horizontal restriction amongst competitors that artificially restrains the compensation provided to players.

**B. The NCAA has unlawfully prohibited athletes from profiting off of their NIL.**

388.   NCAA Bylaw 12 also prohibits athletes from profiting from their NIL—whether from third parties, Defendants, or the athlete's university. Specifically, NCAA Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming an Student-Athlete") states that an individual is ineligible for intercollegiate athletics if that athlete:

(a) Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or

(b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service.

389.   NCAA Bylaw 12.4.1.1 ("Athletics Reputation") further prohibits athletes from receiving any compensation based on their publicity, fame, or following gained through athletic ability.

390.   NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales") restricts college athletes from working in sales positions where their name, image, or reputation is used to promote equipment related to their sport.

**FOURTH AMENDED COMPLAINT**

391.    Bylaw 12.4.4 ("Self-Employment") imposes further NIL restrictions by limiting the ability of student-athletes to monetize personal business ventures. While college athletes may establish their own businesses, they are not permitted to use their name, image, appearance, or athletic reputation to promote their ventures.

392.    On July 1, 2021, the NCAA introduced an interim NIL policy, suspending enforcement of some NIL-related restrictions. However, the above-cited NIL restrictions have not been permanently removed, leaving the NCAA with the flexibility to modify or fully reinstate its previous rules at any time. In fact, the NCAA itself has acknowledged that "the current legal and legislative landscape prevents a permanent solution at this time."

393.    Even after the interim rule change on July 1, 2021, college athletes are still not receiving the compensation they rightfully deserve for at least two reasons. First, NIL-related and other compensation restrictions continue to artificially limit their earnings, including the restriction on the ability of schools and conferences to directly compensate athletes for use of their NILs. Second, the rapid growth of NIL payments underscores that the market has yet to reach equilibrium, indicating that student-athletes remain undercompensated relative to their true market value.

394.    According to *The Wall Street Journal*, brands spent $338 million on NIL deals with college athletes last year—double the $171 million spent in 2023. According to a report published by Opendorse, "the total projected NIL market has exploded from $917 million in 2021-22 to an expected $1.67 billion in 2024-25 – with no signs of slowing down." The report further predicts that the total NIL market will surpass $2.5 billion by 2025-26.

395.    The money for top athletes is large—and growing. The expected annual third-party NIL payments for Power Four football players now ranges from $340,000 for running backs to over $800,000 for quarterbacks. According to Opendorse, annual NIL earnings for individual athletes are expected to rise significantly, with Power Four

**FOURTH AMENDED COMPLAINT**

football players seeing a 33% year-over-year increase, men's basketball up 72%, and women's basketball surging by 85%.

396.    For elite athletes, the figures are even more staggering. Carson Beck, who transferred from Georgia to Miami this offseason, reportedly secured close to $10 million in NIL deals in the past twelve months. Quinn Ewers, reportedly had a $6 million offer on the table to transfer from Texas, but turned it down to enter the NFL draft. On average, college basketball players earn more than their football counterparts, with annual average third-party NIL compensation exceeding $600,000. Top basketball players can command seven-figure or even eight-figure deals, with Duke's Cooper Flagg reportedly earning $28 million from two NIL deals during his one year at Duke and Paige Bueckers earning over $1 million in her final season at UConn.

397.    This rapid surge—both in overall market size and individual earnings—highlights how third-party NIL compensation, even once allowed, was initially affected by the lingering effects of decades of unlawful restrictions, and may still be affected, preventing athletes from receiving their true market value from third-party NIL payments.

398.    Additionally, Defendants and their member schools continue to prohibit direct payments by schools or conferences to college athletes for the use of their NIL. This unlawful restriction artificially limits the Plaintiffs' earning potential, comparable to a NFL, MLB, NBA, or WNBA athlete receiving no compensation from their team and relying solely on third-party sponsorship deals.

## C. The NCAA has artificially and unlawfully capped the number of scholarships for Power 5 baseball players.

399.    The NCAA's unlawful restrictions also extend to limits on scholarships offered. For purposes of scholarships, the NCAA bylaws distinguish between "head-count" sports and "equivalency" sports.

**FOURTH AMENDED COMPLAINT**

400.    In head-count sports, the NCAA bylaws allow for a number of scholarships that must be awarded to the same number of athletes. Every athlete that is on an athletic scholarship in a head-count sport receives a full scholarship. The Division I head-count sports are men's and women's basketball, football, women's gymnastics, women's tennis, and women's volleyball.

401.    In equivalency sports, by contrast, the NCAA bylaws allow for a set number of scholarships that are to be divided amongst a number of athletes that is greater than the number of scholarships; i.e., the set number is divided amongst the athletes, resulting in most of the athletes in equivalency sports (and sometimes all of them) receiving only a partial scholarship. The equivalency sports in Division I are all the other Division I sports that are not mentioned in the preceding paragraph.

402.    NCAA Bylaw 15.5.3.2 provides the rule for computing equivalencies: "each institutional financial aid award to a[n] [athlete] shall be computed" by counting "all institutional aid (per Bylaw 15.02.5.2) received up to the full grant-in-aid" for each athlete, with a fraction then created by using the "amount received" by the athlete as the numerator and the "full grant-in-aid value" for the athlete as the denominator. The "sum of all fractional and maximum awards received by [athletes] shall not exceed the total limit for the sport in question for the academic year as a whole."

403.    NCAA bylaws 15.5.3.1 and 15.5.3.2 set forth the scholarship limits for most of the equivalency sports. Thirteen men's sports are listed, and 19 women's sports.

404.    NCAA Bylaw 15.5.4 sets forth the scholarship limit for baseball: "There shall be an annual limit of 11.7 on the value of financial aid awards (equivalencies) to counters and an annual limit of 27 on the total number of counters in baseball." (A counter is an athlete receiving at least a partial scholarship.) Further, a university must "provide each counter" in baseball a scholarship "that is equal to or greater than 25 percent of an equivalency."

**FOURTH AMENDED COMPLAINT**

405.    The NCAA, its conferences, and its member schools make and enforce these rules. If a member school violates the rules, the NCAA's governing constitution calls for disciplinary measures for the members and the athletes involved. Per Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to punish and boycott an entity that fails to follow the rules.

406.    The limits set forth in these bylaws are all horizontal caps amongst competitors that artificially fix the scholarship money being offered to talented college athletes. This results in wage fixing because it artificially caps the compensation going to a group of workers. It is codified in Defendant's own bylaws, and it does not exist in other collegiate contexts. Universities have not colluded together to ensure that talented young mathematicians or musicians only receive partial scholarships. Neither should schools be permitted to collude to ensure that talented baseball players and other athletes receive only partial scholarships.

**D.  College athletics programs have dramatically increased spending on coaching salaries and quality of facilities, and the compensation for the athletes would likewise increase in a competitive market.**

407.    Because the Power 5 schools compete with one another, they have increased their spending as their revenue has increased. That competition has resulted in higher coaches' salaries. In many states, the head football coach at the flagship college is the highest paid public employee in the state.

408.    Nick Saban, the former head football coach at the University of Alabama, earned $11.4 million per year as of 2023. All of the top-25 highest paid college football

**FOURTH AMENDED COMPLAINT**

coaches in 2023 earned more than $6 million annually. The highest paid men's college basketball coach that year, John Calipari (who was then at the University of Kentucky), earned $8.6 million annually. The highest paid coach in women's college basketball, Kim Mulkey of Louisiana State University, recently signed a 10-year, $36 million contract.

409.    On average, head football coaches at Power 5 schools now earn over $6 million per year, an increase of over 14% in just one year. The head men's basketball coach at those schools earns an average of over $3 million per year. Even many assistant coaches are now earning over $1 million annually. Meanwhile, the average salary for an athletic director at a Power 5 reportedly also exceeds $1 million.

410.    Many schools are in fact paying tens of millions of dollars to terminated coaches to not coach. In November 2023, Texas A&M University fired their football coach, Jimbo Fisher. They reportedly will be paying him $76 million to no longer lead their football team. If that type of money can go to a fired coach, then surely the players on the team can be fairly compensated.

411.    As coaching salaries have increased, so too have the schools' armies of "analysts" and "recruiters." Staffs have grown as fast as the revenue has grown, with little end in sight.

412.    The schools have also increased their spending on athletics facilities. San Diego State University recently opened a new $310 million football stadium. Vanderbilt University is undergoing $300 million in renovations of athletics facilities, including its football stadium. One study showed that in 2014, 48 schools spent a combined $772 million on athletics facilities.

413.    Why are schools paying so much for coaches and facilities? Because they compete with one another. And without the ability to pay players, they spend money in other areas to outcompete each other. Absent the restraints in place, they would be competing on athlete compensation as teams try to attract top talent.

**FOURTH AMENDED COMPLAINT**

414.    Absent Defendants' restraint on compensation for the athletes, Plaintiffs would be seeing their own compensation increase as well, as the competition for players is intense. The wage suppression has gone on for decades, and it is time for it to come to an end.

415.    Much has been written about the revenue generated by college basketball and football in recent decades, but other sports have flourished as well. Take college baseball. In 2022, the University of Arkansas drew an average of 10,376 fans to each home baseball game, for a total of 363,153 fans. That narrowly edged out Louisiana State University's baseball team, which drew an average of 10,365 fans per game and a total of 362,759.

416.    In 2024, Arkansas was no longer the attendance leader for baseball. Mississippi State instead took that crown by averaging 10,906 fans per game. Louisiana State was second at 10,834, and Arkansas third. Each of the three schools exceeded 370,000 attendees over the course of the 2024 season.

417.    At the end of each season, the NCAA hosts a baseball tournament that begins with 64 teams. Teams play the first round at 16 regional sites. The winner of each regional advances to one of eight super regional series. These super regionals are usually well attended; in 2021, one of the eight super-regional series drew 40,140 fans over three games, for an average of 13,380 fans per game. The games are also broadcast on television.

418.    The eight winners of the super regionals then advance to the College World Series, which is hosted by the NCAA. The 2024 event drew an average of 24,788 fans per game, with an overall attendance of 371,820 for the entire series. The games aired on ESPN's channels, with the decisive game averaging 3.34 million viewers. ESPN contracted for the right to air the College World Series games as part of a $500 million broadcast deal that also gives ESPN the broadcast rights for college softball and other NCAA championship events.

**FOURTH AMENDED COMPLAINT**

419.    The administrators and head coaches and nearly everyone else working in
college athletics have seen salaries rise along with revenue. In 2024, five SEC baseball
coaches made $1.5 million or more, with Vanderbilt's coach leading the way at nearly
$2 million. Meanwhile many of the players on these teams are on just partial
scholarships—having to pay much of the cost of college despite playing in front of
thousands of fans each game and even though their coaches are making hundreds of
thousands and sometimes millions of dollars. That is solely because of Defendants'
illegal restraint, which arbitrarily caps the scholarships in these sports in a way that
forces schools to offer partial scholarships to athletes.

420.    Given the amount of work performed by these athletes and the revenue
earned by NCAA member schools off their backs, a full scholarship is well earned.
Being a college athlete at the Division I level is akin to having a full-time job. The
athletes often work six days a week or more with long hours of travel when going to
away games, and frequently work over 40 hours per week. Even during the "off-
season," the work is substantial. The schools control much of the athletes' daily
activities from the moment the athletes wake up. Athletes give much of their collegiate
lives to these universities, and they should not be suffering financial losses and taking
out student loans as a result of an arbitrary, anticompetitive rule.

421.    Absent the restraint, the partial scholarship Plaintiffs would be receiving
more scholarship money. The schools in the relevant conferences compete with each
other for talented athletes, and in a truly competitive market, that competition would lead
to the schools increasing the scholarship money available to these athletes. The
baseball-playing Plaintiffs were among the best in the country at their sport. If given the
choice, the schools would have competed for them in a manner that would have led to
full scholarships. Instead, the schools were bound by the NCAA's cartel-like rules, and
Plaintiffs suffered as a result.

**FOURTH AMENDED COMPLAINT**

422.    In fact, in recent years, top college baseball players have begun receiving large amounts of third-party NIL money, often from schools' collectives, after the NCAA instituted its interim NIL policy in July 2021. Top baseball players at top baseball programs often now receive six figures in NIL money. They would receive more in total remuneration if the NCAA's artificial caps were removed, but this at least offers a glimpse of the value these players would receive if they were compensated their fair market value, whether in scholarships or otherwise.

**E.  In a competitive market, the Plaintiffs would be paid competitively for their labor.**

423.    To see the effect of this restraint, one need look no further than other sports leagues. In the NFL, players traditionally have received close to 50% of the revenue taken in by the league.[10] Players in the NBA receive a similar percentage, approximately 49-51%.[11]

424.    European soccer, with its strong emphasis on winning, is also an apt comparison. Elite soccer clubs often spend more than 60% of revenue on player compensation, because market forces place a premium on obtaining top players who can score goals and secure wins.

425.    In the absence of Defendants' restraints on compensation, Plaintiffs would be paid a significant percentage of revenue as well. That includes the revenue coming from Defendants' burgeoning television contracts and strong ticket sales.

---

[10] *Players' share of revenue can go as high as 48.8 percent*, NBCSports.com, March 1, 2020 *available at* https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/players-share-of-revenue-can-go-as-high-as-48-8-percent.

[11] Sam Quinn, *NBA players interested in negotiating for ownership stakes in teams in next CBA, says Michele Roberts*, CBSSports.com, Jan. 22, 2021, *available at* https://www.cbssports.com/nba/news/nba-players-interested-in-negotiating-for-ownership-stakes-in-teams-in-next-cba-says-michele-roberts/.

**FOURTH AMENDED COMPLAINT**

426.    Because of Defendants' horizontal restraint on compensation, Plaintiffs are being robbed of significant sums of money they deserve. The amount of money paid to Plaintiffs in the form of scholarships and similar education-related benefits is miniscule compared to the television and other revenue coming in, and the percentage pales in comparison to the percentage of revenue paid to athletes in leagues that lack such restraints.

**F.  The NCAA's prior antitrust losses.**

427.    This of course is not the first antitrust case brought against Defendants. Just four years ago, the Supreme Court ruled against the NCAA in a case brought by athletes seeking greater compensation. As the Court wrote, "Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2147 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n. 27 (1984)). The Court held that the NCAA could not limit education-related compensation paid to its athletes, such as "limiting scholarships for graduate school, payments for tutoring, and the like." *Id.* at 2164.

428.    In his concurrence, Justice Kavanaugh issued a warning to the NCAA regarding its "remaining compensation rules," like "rules [that] generally restrict student athletes from receiving compensation or benefits from their colleges for playing sports." *Id.* at 2166. Those "rules also raise serious questions under the antitrust laws." *Id.* at 2166-67. He wrote that the "NCAA's business model would be flatly illegal in almost any other industry in America." *Id.* at 2167. "Price-fixing labor is price-fixing labor," and that is a "textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167-68.

429.    "Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." Id. at 2168.

**FOURTH AMENDED COMPLAINT**

That the NCAA has done so for decades does not excuse the behavior. It simply makes it more egregious and makes change long overdue.

430.    The "remaining compensation rules" referenced by Justice Kavanaugh in his concurrence were not before the Court, and so the majority opinion did not address them. But those remaining rules are just as unlawful under the antitrust laws as the restrictions on scholarships that were struck down by the Court.

431.    Although this case differs in some key respects from *Alston*, Justice Kavanaugh's criticisms apply with equal force.

**G. The NCAA's supposed need to preserve "amateurism" is pretextual as evidenced by the fact that athletes are now being paid for their NILs, at least from third parties.**

432.    The NCAA's compensation rules have changed since Alston in a way that has revealed the fallacy of the NCAA's traditional and chief procompetitive argument: that amateurism must be preserved to maintain consumer demand. That fallacy both is factually untrue and rests on a false premise.

433.    In July 2021, the NCAA relaxed its prohibition against paying compensation to athletes by issuing a policy that allows athletes to be paid for their names, images, and likenesses (NILs), at least from third parties.[12]  Although it took a couple of years for the market to develop (and it may still not be at equilibrium), many athletes are now earning hundreds of thousands of dollars in NIL money each year, and some are earning over $1 million per year. The quarterback for the University of Colorado, Shedeur Sanders, reportedly earned several million dollars per year in NIL money in recent years, and had deals with Gatorade, Mercedes-Benz, and other companies. Caleb Williams, then the quarterback for USC, also reportedly earned

---

[12] NCAA Interim NIL Policy, *available at* https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf (last accessed Nov. 10, 2023).

**FOURTH AMENDED COMPLAINT**

several million dollars from NIL money, and had deals with United Airlines and Beats by Dre.

434.    On the women's side, Angel Reese, a former star basketball player at Louisiana State University, reportedly earned well over $1 million in NIL money and had deals with Pepsi and many others. And in baseball, the top athletes in today's world likewise are receiving well into the six figures in NIL money.

435.    Companies such as Pepsi and Mercedes are entering into these deals for a reason: the athletes enjoy immense popularity with fans, and that popularity has great value.

436.    That same athlete popularity has driven the record television deals signed by Defendants. Yet while the NCAA has relaxed its NIL rules, it still prohibits athletes from receiving NIL payments directly from schools and conferences, and still prohibits sharing any money tied to television or other revenue.

437.    In prior antitrust cases, the NCAA has warned that the sky would fall if athletes began receiving any money beyond that needed to pay for education-related expenses. The NCAA has cried out about a need to preserve "amateurism" to supposedly differentiate its product from professional sports. But the concept of "amateurism" has always been a moving target. Defendants have long allowed athletes to be paid in the form of scholarships in return for their labor. And Defendants have allowed other forms of remuneration as well, such as "athletic participation" awards in the form of Visa gift cards, disbursements from a "Student Assistance Fund" and an "Academic Enhancement Fund," graduation awards, tutoring, loss-of-value insurance policies, legal services, stipends of several thousands to cover the costs of attendance beyond tuition and room and board, and a variety of other payments. As the Ninth Circuit explained in *Alston*, "the NCAA does little to regulate or monitor the use of" some of these funds. 958 F.3d at 1244-45.

**FOURTH AMENDED COMPLAINT**

438.    "There is nothing amateur about a model that negotiates billion-dollar deals and pays its coaches and administrators millions while denying athletes the ability to share in the revenue or even have a voice in determining whether these deals are a good idea," as a trustee at a major university recently put it.[13] Defendants have turned college sports into a moneygrab for their own pockets in the name of amateurism.

439.    In any event, a purported desire to promote "amateurism" does not justify illegal price fixing. Defendants have no exemption from the antitrust laws, and nowhere does the law allow competitors to agree on input pricing (here, labor) to promote some purported non-efficiency justification that does nothing to further consumer welfare.

440.    College sports are as popular as ever even though athletes have long been compensated in various ways, including the recent NIL payments, which are substantial in some cases. As the Big Ten's commissioner testified to Congress recently, "student-athletes are frequently being induced by collectives to attend specific institutions and transfer from one school to another—without a true NIL deal. This has resulted in a 'pay-for-play' system, primarily driven by boosters and executed under the guise of NIL."[14]

441.    Despite this, there has been no corresponding reduction in consumer demand—to the contrary, NCAA football and basketball viewership remain strong and are ever-increasing. The entire college sports world has focused on the large sums of money going to college players through NIL deals in recent years. Attendance has not dipped. Ratings have increased, not decreased. Sports programs remain just as (or

---

[13] Jordan Acker, *The Only Way College Sports Can Begin to Make Sense Again*, N.Y. Times, Sep. 21, 2023, *available at* https://www.nytimes.com/2023/09/21/opinion/college-sports-broken.html (last visited November 10, 2023).

[14] Testimony of Tony Petitti, Commissioner of the Big Ten Conference, U.S. Senate Committee on the Judiciary, Oct. 17, 2023, *available at* https://www.judiciary.senate.gov/imo/media/doc/2023-10-17_-_testimony_-_petitti.pdf.

**FOURTH AMENDED COMPLAINT**

more) popular. College sports have not only survived in the era of athletes being paid third-party NIL money; they have thrived.

442.    Defendants have finally acknowledged the need to share revenue with athletes. Starting next year, the NCAA will permit schools to share up to 22% of revenue with athletes. While that is still below what the free market would bear, it shows that Defendants have never had a true procompetitive justification for preventing the sharing of revenue with the athletes who produce it.

443.    The need for "amateurism" was always a fallacy. But the current state of college athletics has put the proverbial nail in the coffin for the NCAA's amateurism argument. The anticompetitive effect of Defendants' wage-fixing was always evident. Now it is equally apparent that there is no even arguable procompetitive justification. Indeed, recent surveys show that the majority of Americans believe schools should in fact be able to directly pay their athletes.

444.    As demonstrated by the split of revenue in other leagues, the athletes' competitive share would be substantially higher. Over the relevant period, that amounts to millions of dollars that should belong to Plaintiffs.

445.    Defendants realize that there is no longer any defense for the concept of amateurism. They recently voted to move forward with a proposed settlement in the *House* case that would usher in a form of "revenue sharing." But even if that settlement is approved, it would simply usher in a new, artificially low cap that is far below the revenue sharing that a competitive market would yield.

446.    This case seeks to recover the full amount of remuneration that Plaintiffs would have received in a competitive market: from broadcast NIL, from video game NIL, from third-party NIL, from market-based scholarships, from payments for athletic services, and from revenue sharing from TV and other revenues.

**FOURTH AMENDED COMPLAINT**

**H.  The market at issue.**

447.    The NCAA's Division I promotes itself as the highest level of competition in college sports. That has created a nationwide labor market for college sports within the Division I segment. By creating a separate Division I with rules that are distinct from Divisions II and III, the NCAA has recognized that the lower divisions are not substitutes for Division I.

448.    Division I schools spend more on facilities and coaches and generally compete against each other for athletes. Meanwhile, the NCAA and its Division I members can control the price paid in this labor market for college athletes. They have in fact done so by passing the bylaws at issue in this case and strictly enforcing them. Those bylaws have had the very real effect of reducing compensation far below what would have been paid to these athletes in an unrestrained, competitive market.

449.    The district court in *Alston* defined the market as one "for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019). The court found:

> Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. This is reflected in the high degree of concentration found in the relevant market. Class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

*Id.*

450.    The district court remarked there that the NCAA did not challenge that market at summary judgment. *Id.* And as the Supreme Court stated, Defendants did "not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages

**FOURTH AMENDED COMPLAINT**

below competitive levels and restricting the quantity of student-athlete labor." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2154 (2021).

451.    In addition to sport-specific national markets for Plaintiffs' labor in FBS football, men's basketball, and women's basketball, there are also sport-specific national markets for Division I baseball, Division I softball, and Division I women's soccer. Courts have repeatedly held that there are relevant markets for the sport-specific athletic services of college athletes and that Defendants enjoy monopsony power in those markets. *Alston I*, at 1067–70; *O'Bannon I*, at 991–93. Those holdings have either been affirmed on appeal or Defendants have chosen not to challenge them. *See O'Bannon II*, at 1070; *Alston III*, at 86.

452.    That the athletes agree to these conditions shows the market power that the NCAA and its members collectively possess. For an elite athlete, there is no reasonable substitute that combines the educational and athletic opportunities offered in the labor market at the Division I level. The other divisions do not offer the same level of competition, do not offer the same number of scholarships, do not offer the same amount of television exposure, and generally do not have as highly regarded coaches or athletic facilities. The same can be said for the National Intercollegiate Athletic Association or junior colleges' athletic programs.

453.    There are differences between the NFL, NBA, MLB, and WNBA as compared to college sports; college sports offer different opportunities by allowing athletes to receive a college education while working at the schools.

454.    Many of these athletes are from disadvantaged backgrounds. They have only a limited window to earn money based on their athletic talents, and they risk serious injury to compete in the sports that they, and fans, love. Only a small percentage of the athletes in the labor market at issue will ever play in the NFL, NBA, MLB, or WNBA, so for many of these athletes, college is their only chance to be compensated for their athletics skills.

**FOURTH AMENDED COMPLAINT**

455.    The NCAA's rules have inflicted very serious and very great harm on the thousands of athletes that work so hard to make the NCAA's product possible.

**I.    The effect of Defendants' illegal conduct on each Plaintiff.**

456.    **The effect of Defendants' illegal conduct on Plaintiff Aaron Holiday.** Plaintiff Aaron Holiday worked as a college basketball player at UCLA from 2015 to 2018.

457.    The labor provided by Mr. Holiday was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

458.    Mr. Holiday was a highly recruited prospect out of high school who was named the 2015 co-Player of the Year by the *Los Angeles Daily News*. As a senior, he led his team to its first championship game appearance since 2008 and scored a team-leading 35 points in the regional semifinals to help his team upset the top-seeded team. Mr. Holiday was considered one of the best high school basketball players in the nation, ranked No. 40 by Scout.com, No. 60 by Rivals.com, and No. 88 by ESPN.com. His exemplary high school career earned him an offer from UCLA to play basketball.

459.    Mr. Holiday's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Mr. Holiday started all 32 games his freshman year, averaging 10.3 points, 3.0 rebounds, 4.0 assists and a team-leading 1.4 steals in 31.7 minutes per game. In his sophomore season, he played a crucial role for a team that reached the Sweet 16 of the NCAA Tournament and was named the nation's "Sixth Man of the Year" by BleacherReport.com. During his junior season, he started all 33 games and averaged 20.3 points and 5.8 assists per game, earning him First Team All-Pac-12 honors and a Third Team All-American recognition by *Sporting News*. He was also one of five players selected to the Pac-12 conference's All-Defensive Team.

**FOURTH AMENDED COMPLAINT**

460.    In the 2018 NBA Draft, Mr. Holiday was selected 23rd overall in the first round by the Indiana Pacers.

461.    During Mr. Holiday's time at UCLA, UCLA's games were carried on national television, often by either an ESPN network, Fox Sports, or the Pac-12 Network. UCLA frequently featured Mr. Holiday on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Millions of viewers watched UCLA games, and UCLA's matchups against top-ranked teams consistently drew significant national attention. For instance, the UCLA vs. Kentucky regular season matchup during Mr. Holiday's junior season drew approximately 2.3 million viewers. Additionally, the 2017 NCAA Tournament, where UCLA reached the Sweet 16 partly due to Mr. Holiday's efforts, averaged 9.8 million viewers. Furthermore, a total of 137,919 people attended UCLA home games during the 2017-2018 season, generating millions in ticket sales and other revenues. Also in 2018, the Pac-12 distributed $31 million in revenue to its member schools, which includes UCLA, from television contracts and other sources.

462.    Mr. Holiday received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at UCLA, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from UCLA. As a highly sought-after high school recruit who became an All-American at one of the nation's best basketball programs, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

463.    Defendants' conspiracy greatly harmed Mr. Holiday. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL.

**FOURTH AMENDED COMPLAINT**

464.    Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Holiday would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

465.    **The effect of Defendants' illegal conduct on Plaintiff Aaron Sabato.**
Plaintiff Aaron Sabato worked as a college baseball player at UNC from 2018 to 2020.

466.    The labor provided by Mr. Sabato was of great value to Defendants. And it
was a significant amount of labor. During the season, he often worked six days per
week or more and often more than 40 hours per week. Even during the offseason, he
worked a significant number of hours under the direction of the coaches at the school.

467.    Mr. Sabato was a standout shortstop from Rye Brook, New York. He
played at Brunswick School, where he was ranked the number two shortstop and
number four overall player in New York as well as the 35th overall shortstop in the
country by Perfect Game. After graduating high school, Mr. Sabato enrolled at UNC
where he played college baseball as a first baseman.

468.    Mr. Sabato's job as a college baseball player was essentially a full-time
one, and an important and valuable one at that. He set the Carolina freshman record for
home runs in a season with 18. He also led the team with a .343 batting average, 79
hits, 25 doubles, and 63 RBIs. That year, he was named Collegiate Baseball Co-
National Freshman of the Year and earned First Team All-America and Freshman All-
America honors. He was also named the NCBWA National Freshman Hitter of the Year,
the ACC Freshman of the Year, a ABCA/Rawlings First Team All-American, a Perfect
Game First Team Freshman All-American, and First Team All-ACC. Furthermore, Mr.
Sabato was ranked the third best batter in the NCAA after his freshman year according
to D1 Baseball.

469.    In his sophomore season, he smashed seven home runs, batted .292,
slugged .708, while drawing 22 walks, before the season was cut short due to Covid-19.

**FOURTH AMENDED COMPLAINT**

On March 9, Sabato was named ACC Player of the Week after he finished a five-game slate with a .333 batting average and a 1.133 slugging percentage. He also collected four home runs in 15 at-bats. That season, Mr. Sabato was named a Second Team All-American by *Collegiate Baseball Newspaper*.

470.    In the 2020 MLB draft, Mr. Sabato was selected 27th overall by the Minnesota Twins.

471.    During this time, UNC featured Mr. Sabato on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. And during this time, UNC's games were carried on national television, often by either an ESPN network or the ACC Network. Thousands of fans attended UNC baseball games during Mr. Sabato's collegiate career. In 2019, a total of 107,434 people attended UNC baseball games, generating significant revenue for UNC. Additionally, in 2019, the ACC distributed over $32.3 million in revenue to its member schools from television contracts and other sources.

472.    Mr. Sabato received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during all his time at UNC, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from UNC. As a standout player at UNC, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

473.    Defendants' conspiracy greatly harmed Mr. Sabato. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a

**FOURTH AMENDED COMPLAINT**

competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

474.    Mr. Sabato received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Sabato. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment.

475.    But for the illegal and unfair restraints put in place, Mr. Sabato would have received a greater amount of scholarship money than he received. As one of the best hitters in the nation at a top baseball program, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

476.    **The effect of Defendants' illegal conduct on Plaintiff Aaron Schunk.** Plaintiff Aaron Schunk worked as a college baseball player at the University of Georgia from 2016 to 2019.

477.    The labor provided by Mr. Schunk was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

478.    Mr. Schunk started his career at The Lovett School in Atlanta, Georgia, where he was a talented two-way baseball player. As a starting shortstop and pitcher, he was a four-year letterman and helped the team win state championships in both 2013 and 2016. In his senior year, he batted .402 with 10 home runs and 23 RBIs, and posted a 1.84 ERA in 68.1 innings pitched with 82 strikeouts and an 8-4 record. In the 2016 state finals—when the team won the AA division title—he went 5-for-8 with a home run, scored 4 runs, and drew 4 walks. In recognition of his performance, Mr. Schunk was named Perfect Game preseason Underclass All-American Third Team, Georgia Dugout Preview preseason All-State, and First Team All-Region. Even before

**FOURTH AMENDED COMPLAINT**

college, he was rated as a top-500 draft prospect for the 2016 MLB draft by Perfect Game.

479.    Mr. Schunk's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He was a starter all three years at Georgia, playing third-base and serving as the team's closer—and excelling in both positions. In his sophomore season in 2018, Mr. Schunk played all 60 games and had a 22-game hitting streak, ranking third best in school history. His standout performance that season earned him a Third Team All-American selection by the National Collegiate Baseball Writers Association.

480.    In his final season in 2019, Mr. Schunk played at an even higher level, batting .339 with a .973 OPS and recording 12 saves with a 2.49 ERA. He earned numerous accolades, including First Team All-American honors (by both Baseball America and the College Baseball Foundation), First All-South Region by ABCA/Rawlings, and Second Team All-SEC as third baseman. He also won the John Olerud Award, given annually to the best two-way player of the season by the College Baseball Foundation.

481.    Mr. Schunk's unique talent and standout performances were no doubt instrumental to the program's success, helping Georgia make an NCAA tournament appearance in 2018 for the first time in seven years, and propelling Georgia to the No. 4 seed nationally in 2019.

482.    After his junior season, Mr. Schunk was drafted by the Colorado Rockies in the second round of the 2019 MLB Draft, further demonstrating the value of his talent and labor.

483.    During Mr. Schunk's time at Georgia, the university was a member of the SEC and its baseball games were regularly carried by national television broadcasters such as ESPN, as well as by the SEC Network. For example, Georgia's 2019 NCAA Regionals game against Florida State, where Mr. Schunk drove in two runs with two

**FOURTH AMENDED COMPLAINT**

hits, was nationally broadcast on ESPN2. Georgia also frequently featured Mr. Schunk on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership.

484.    Mr. Schunk received none of the revenue generated during his time at Georgia, nor was he otherwise compensated by Defendants for his labor.

485.    In fact, Mr. Schunk did not receive a baseball scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Schunk. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Schunk—as an Underclass All-American Third Team selection who became a First Team All-American athlete in college—would have received a full athletic scholarship. Thus, Defendants' scheme directly injured him.

486.    Moreover, while at Georgia, Mr. Schunk was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his university. As a nationally recognized baseball player and Georgia native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

487.    Defendants' conspiracy greatly harmed Mr. Schunk. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and he also would have received money for his NIL from third parties.

488.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Schunk would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

489.    **The effect of Defendants' illegal conduct on Plaintiff Aashari Crosswell.** Plaintiff Aashari Crosswell worked as a college football player at Arizona State University from 2018 to 2020.

490.    The labor provided by Mr. Crosswell was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

491.    Mr. Crosswell was a highly recruited prospect out of high school who possessed unique talent. A four-star prospect by all major recruiting services, he was recognized as one of the top safeties in the nation by ESPN, 24/7, and Rivals. Multiple universities competed for his talent during the recruitment process, but he ultimately chose to play for ASU as a safety.

492.    Mr. Crosswell's job as a college football player was essentially a full-time one, and an important and valuable one at that. He was one of ASU's key defensive players. As a freshman, he played in all 13 games, recording 43 tackles and four interceptions, earning Pac-12 All-Conference Honorable Mention. In his sophomore season, he continued to excel, playing in 13 games, amassing 50 tackles, and two interceptions, earning Pro Football Focus Second Team All-Conference. Mr. Crosswell also played in part of the 2020 season, which was shortened due to COVID-19.

493.    During this time, ASU's games were carried on national television, often by networks such as ESPN, Fox Sports, and the Pac-12 Networks. The university often featured Mr. Crosswell on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. ASU games attracted millions of viewers during Mr. Crosswell's time there. For instance, the 2019 Sun Bowl between ASU and Florida State garnered 3.17 million viewers. Further, ASU games attracted tens of thousands of in-person

**FOURTH AMENDED COMPLAINT**

attendees, for an average of 49,166 attendees per game in 2019 and a total attendance of 344,161 that year, generating millions in revenue. In 2019, the Pac-12 Conference distributed $403 million in revenue to its member schools from television contracts and other sources, with over $33 million going to ASU.

494.    Mr. Crosswell received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at ASU, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from ASU. As a highly sought-after high school recruit who became an all-conference player at ASU, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

495.    Defendants' conspiracy greatly harmed Mr. Crosswell. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

496.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Crosswell would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

497.    **The effect of Defendants' illegal conduct on Plaintiff Addison Ooms.** Plaintiff Addison Ooms worked as a college football player at the University of California, Berkeley ("Cal") from 2014 to 2018.

498.    The labor provided by Mr. Ooms was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

499.    Before working at Cal, Mr. Ooms was a highly competitive football player and two-year starter for Mater Dei High School in Santa Ana, California. As a junior, he helped his team reach the division title game of the Southern Section Pac-5 Division, earning a selection to Second Team All-Trinity League. As a senior in 2013, he was named to first-team All-Pac 5 Division, All-Orange County, and All-Trinity League after propelling the team to an 11-3 record and a No. 10 national ranking. Mr. Ooms was ranked the No. 10 center/guard recruit to watch in Southern California.

500.    Mr. Ooms's job as a college football player was essentially a full-time one, and an important and valuable one at that. He started his career at Cal as a walk-on and earned a starting position as a center by the 2016 season. Starting all 12 games, Mr. Ooms was a key contributor that season, helping the team rank fourth nationally in passing offense and tenth in total offense, as well as recording the second-fewest sacks in the Pac-12. His performance earned him the Bob Tessier Award as the team's most improved lineman, as well as the Brick Muller Award, given to the team's most valuable offensive lineman. And for both his junior and senior seasons, he was on the watch list for the Rimington Trophy, an award given to the nation's top center. By the end of his college career, Mr. Ooms was the only active player on the 2018 roster to have started all 33 games in the two prior seasons.

501.    During Mr. Ooms's time at Cal, the program was part of the Pac-12 conference and its games were carried by the Pac-12 Network, as well as by national broadcasters such as ESPN and Fox Sports. Cal also frequently featured Mr. Ooms on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. From 2015 to 2019, Cal's football games drew a weekly average of 730,000 television viewers, with games against other top-ranked programs drawing millions of viewers. For example, Cal's 2018 games against TCU and USC totaled 2.7 million and 1.59 million in television viewers, respectively.

**FOURTH AMENDED COMPLAINT**

502.    Over the course of Mr. Ooms's collegiate career, Cal made a considerable amount of money from its football program, including from ticket sales and media rights. In 2018, for example, an average of 42,866 fans attended each football game—a 17% increase from the year before (the fourth largest increase in college football). The Pac-12 Conference also distributed an average of $31.3 million in revenues to each of its member schools for the 2018 fiscal year. In fact, for that same period, Cal recorded $35,401,081 in revenues from its football program alone.

503.    Mr. Ooms received none of that revenue, nor was he otherwise compensated by Defendants for his labor, other than receiving a scholarship and other education-related expenses beginning in 2017. And during his time at Cal, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his university. As a standout football player and California native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

504.    Defendants' conspiracy greatly harmed Mr. Ooms. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and he also would have received money for his NIL from third parties.

505.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Ooms would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

506.    **The effect of Defendants' illegal conduct on Plaintiff Adrian Del Castillo.** Plaintiff Adrian Del Castillo worked as a college baseball player at the University of Miami from 2018 to 2021.

**FOURTH AMENDED COMPLAINT**

507.    The labor provided by Mr. Del Castillo was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

508.    Mr. Del Castillo was a highly recruited prospect out of high school who possessed unique talent. A standout catcher and outfielder from Miami, Florida, he played at Gulliver Prep, where he earned Miami Herald First Team All-Dade honors after hitting .530 with 15 home runs and 39 RBI in 2018. Following his senior year of high school, he was selected in the 36th round of 2018 Major League Baseball First-Year Player Draft by the Chicago White Sox but did not sign and instead enrolled at Miami.

509.    Mr. Del Castillo's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Mr. Del Castillo was one of Miami's most consistent and productive hitters. As a freshman in 2019, he started in all 61 games, posting a .331 batting average with 12 home runs and 72 RBIs, earning Freshman All-American honors as well as being named Second Team All-ACC and ACC All-Freshman.

510.    Entering the 2020 season, he was on the 2020 USA Baseball Golden Spikes Award Preseason Watch List and was named 2020 Collegiate Baseball preseason First Team All-America. That year, he continued to excel, starting all 16 games, hitting .358 with two home runs and 15 RBIs in a season shortened due to the COVID-19 pandemic. In 2021, he started all 54 games and posted a .275 batting average with three home runs and 37 RBIs, helping lead Miami to an NCAA regional appearance. He was again honored with a selection on the 2021 USA Baseball Golden Spikes Award Preseason Watch list and recognition as a 2021 Collegiate Baseball Preseason First Team All-American.

**FOURTH AMENDED COMPLAINT**

511.    In the 2021 MLB Draft, Mr. Del Castillo was selected in the second round with 67th overall pick by the Arizona Diamondbacks, further demonstrating the value of his talent and labor.

512.    During this time, Miami's games were carried on national television, often by either an ESPN network or the ACC Network, earning substantial revenue for the ACC and Miami. Miami featured Mr. Del Castillo on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. In 2019, a total of 83,241 fans attended Miami games, generating significant revenue for the university. In the 2019-20 financial year, the ACC distributed around $32.3 million per school among its members, totaling $497.2 million, the highest gross revenue ever reported for the league at that time.

513.    Mr. Del Castillo received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at Miami, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Miami. As a highly sought-after high school recruit who became a standout player at Miami, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

514.    Defendants' conspiracy greatly harmed Mr. Del Castillo. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

515.    Mr. Del Castillo received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Del Castillo. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment.

516.    But for the illegal and unfair restraints put in place, Mr. Del Castillo would have received a greater amount of scholarship money than he received. As a highly recruited player out of high school that became an All-ACC athlete, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

517.    **The effect of Defendants' illegal conduct on Plaintiff Aidan Robbins.** Plaintiff Aidan Robbins worked as a college football player at three different institutions: the University of Louisville from 2019 to 2022, the University of Nevada, Las Vegas in 2022, and Brigham Young University in 2023.

518.    The labor provided by Mr. Robbins was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

519.    Mr. Robbins was a highly sought-after football player who played as a running back and linebacker for DuPont Manual High School in Louisville, Kentucky. Before his senior season was cut short by a labrum injury, Robbins had rushed for a total of 1320 yards over 144 attempts, scoring 13 rushing touchdowns from 2016 to 2018. Because of his elite performance, he was rated a three-star recruit by ESPN.com. As the No. 11 best football prospect from Kentucky, Mr. Robbins received 24 offers from competitive programs—including five Ivy League universities as well as Vanderbilt and Purdue—and ultimately committed to Louisville.

520.    Mr. Robbins's job as a college football player was essentially a full-time one, and an important and valuable one at that. After two seasons at Louisville, Mr.

**FOURTH AMENDED COMPLAINT**

Robbins transferred to UNLV in 2022 and quickly became the program's top running back. That season, Mr. Robbins started in 11 games, scored nine touchdowns, and led the UNLV team in rushing 209 carries for 1011 yards, earning an All-Mountain West honorable mention selection, as well as the Newcomer of the Year Award by Mountain West Wire.

521.    In 2023, Mr. Robbins transferred to BYU as a 4-star transfer and the second-highest rated running back in the transfer portal. He was named to the Phil Steele Preseason All-Big 12 First Team, the watch list for the Maxwell Award (presented annually to the most outstanding player in college football), and the watch list for the Doak Walker Award (presented annually to the country's top college running back). While at BYU, he started in 7 games and had 101 carries for 485 yards and 1 touchdown.

522.    Mr. Robbins signed with the Cleveland Browns in May 2024 as a free agent, further demonstrating the value of his talent and labor.

523.    Throughout his collegiate career, Mr. Robbins worked for football programs in the ACC, the Mountain West Conference, and the Big 12 Conference, playing in games that were broadcast on national television and watched by millions of viewers. For example, in the 2023 season, BYU games consistently drew over one million viewers, with matchups against other top-ranked programs such as Oklahoma State drawing over two million. All three universities Mr. Robbins attended made a considerable amount of money from their respective football programs. BYU, for instance, received approximately $18 million from the Big-12 conference for the 2023-2024 athletic year, and the Mountain West Conference, of which UNLV is a member, paid its member schools around $5 million each for the 2022-2023 season.

524.    Mr. Robbins received none of that revenue. For most of his time at Louisville, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his university. Even when he was permitted to earn

**FOURTH AMENDED COMPLAINT**

NIL compensation, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier. As one of the best high school football prospects from Kentucky who became one of the top running backs in the country, Mr. Robbins would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

525.    Defendants' conspiracy greatly harmed Mr. Robbins. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received.

526.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Robbins would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

527.    **The effect of Defendants' illegal conduct on Plaintiff Akayleb Evans.** Plaintiff Akayleb Evans worked as a college football player at the University of Tulsa from 2017 to 2020 and the University of Missouri from 2021 to 2022.

528.    The labor provided by Mr. Evans was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at Tulsa and then Missouri.

529.    Mr. Evans was a highly recruited prospect out of high school who possessed unique talent. A standout defensive back from McKinney, Texas, he was a two-year letterwinner and starter at McKinney High School. Multiple universities competed for his talent during the recruitment process, but he chose to play as a cornerback for Tulsa.

**FOURTH AMENDED COMPLAINT**

530.    Mr. Evans' job as a college football player was essentially a full-time one, and an important and valuable one at that. Mr. Evans was one of Tulsa's key defensive players. As a freshman in 2017, he played in nine games and started the first six of those games as a true freshman, recording 26 tackles and two pass break-ups. In 2018, he played in nine games with five starts, tallying 21 tackles and four pass breakups. After an injury limited his 2019 season, he returned in 2020 to start in all nine games, recording 29 tackles and three pass breakups, playing a pivotal role in Tulsa's defense. In 2021, Mr. Evans transferred to Missouri as a graduate transfer where he was a 2022 Senior Bowl invitee, appearing in 11 games and starting eight and racking up 30 tackles on the season.

531.    In the 2022 NFL Draft, Mr. Evans was drafted in the fourth round by the Minnesota Vikings.

532.    During his collegiate football career, Tulsa's games were carried on national television, often by networks such as ESPN and ABC Sports Network and Mizzou's games generally aired on ESPN or the SEC Network. Both Tulsa and Missouri featured Mr. Evans on their social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. And both schools generated significant revenue from his efforts on the football field. Millions of viewers watched Tulsa football games during Mr. Evans' career. For example, the 2020 Armed Forces Bowl against Mississippi State attracted approximately 2.25 million viewers on ESPN. The AAC distributed approximately $9 million in revenue annually to its member schools during the time that Mr. Evans played for Tulsa. Furthermore, the SEC distributed a total of $721.8 million among its member universities, including Missouri, in 2022, averaging approximately $50 million per school.

533.    Mr. Evans received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and

**FOURTH AMENDED COMPLAINT**

other education-related expenses. During most of his time in college, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his universities. Even for the time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Missouri and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a standout player at both Tulsa and Missouri, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

534.    Defendants' conspiracy greatly harmed Mr. Evans. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

535.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Evans would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

536.    **The effect of Defendants' illegal conduct on Plaintiff Alaric Jackson.** Plaintiff Alaric Jackson worked as a college football player at the University of Iowa from 2016 to 2020.

537.    The labor provided by Mr. Jackson was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

538.    Mr. Jackson was a highly recruited football player out of high school. As an offensive and defensive tackle at Renaissance High School in Detroit, Michigan, he

**FOURTH AMENDED COMPLAINT**

set the school record for sacks in a season and was named team captain and first-team all-state his senior season. Mr. Jackson was a nationally recognized three-star recruit and was ranked No. 12 overall in the state of Michigan. He received 18 offers from top-ranked programs, including Iowa State, Michigan State, and Nebraska, and ultimately committed to Iowa.

539.    Mr. Jackson's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his time at Iowa, he played left tackle and became a consistent starter in that position in the 2017 season. That season, he was named to the Big Ten Conference All-Freshman team and Freshman All-American by the Football Writers Association of America for the 2017 season. As a starter, he played a key role in Iowa's 2018 Outback Bowl win over No. 18 Mississippi State, as well as Iowa's 2019 Holiday Bowl win over No. 22 USC. He was also instrumental in important games against top-ranked teams such as Penn State, Wisconsin, and Michigan State.

540.    Mr. Jackson's outstanding collegiate performance, including 42 starts, earned him a number of honors, including selections to second-team All-Big Ten in 2018 and 2019 and first-team All-Big Ten and second-team All-America in 2020, as well as being listed on the preseason watchlist for the Outland Trophy, given to the best college football interior lineman in the country—to name a few.

541.    Mr. Jackson signed with the Los Angeles Rams as a free agent in 2021 and recently agreed to a three-year contract extension with the team, further demonstrating the value of his talent and labor.

542.    During Mr. Jackson's time at Iowa, the program was a part of the Big Ten Conference and its games were regularly carried by national broadcasters ESPN and Fox Sports, as well as by its own Big Ten Network. The program also frequently featured Mr. Jackson on its social media accounts, highlighting his contributions to the team and no doubt using him to boost game attendance and viewership. From 2015 to

**FOURTH AMENDED COMPLAINT**

2019, for example, Iowa football games drew a weekly average of 1.57 million television viewers, with games against other top-ranked programs drawing millions more. For example, Iowa's 2018 Outback Bowl win against Mississippi State totaled 3.664 million in television viewership.

543.    Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Iowa has made a considerable amount of money from its football program. For example, the Big Ten Conference distributed approximately $54 million to each member school for the 2020 fiscal year.

544.    Mr. Jackson received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Iowa, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from the university. As a nationally recognized football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

545.    Defendants' conspiracy greatly harmed Mr. Jackson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

546.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Jackson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

547.    **The effect of Defendants' illegal conduct on Plaintiff Alerick Soularie.** Plaintiff Alerick Soularie worked as a college baseball player at the University of Tennessee from 2018 to 2020.

**FOURTH AMENDED COMPLAINT**

548.    The labor provided by Mr. Soularie was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

549.    Mr. Soularie was a highly recruited baseball player out of Atascocita High School in Humble, Texas. Playing primarily as an outfielder, he made the All-State team all four years of his high school career. He was a three-time National WWBA Champion, a 2015 Perfect Game Underclass High Honorable Mention recipient, was named a 2016 Perfect Game Underclass Second Team selection, and was named to Rawlings-Perfect Game Honorable Mention All-American in 2017. For his position as an outfielder, he was ranked the No. 6 in Texas and No. 43 in the nation. He was also ranked the 17th overall prospect in Texas by Perfect Game.

550.    Mr. Soularie's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He played a total of 76 games during his two seasons at Tennessee (with the 2020 season being shortened due to the COVID-19 pandemic). In the 2019 season, he helped the team rank third in the SEC East division (up three spots from the previous year), and led the team in four important offensive statistics: batting average (.357), slugging percentage (.602), on-base percentage (.466), and runs scored (52). And before the 2020 season was cut short, he led the team with 5 home runs and was second on the team with 17 runs-batted-in. He earned multiple honors, including 2019 Third Team All-American by D1Baseball.com, 2019 Rawlings/Perfect Game All-America Honorable Mention, 2019 ABCA/Rawlings South All-Region Second Team, 2020 preseason All-SEC First Team, and 2020 Preseason First Team All-American by D1Baseball.com.

551.    He was rated the No. 46 overall prospect for the 2020 MLB Draft and was selected in the second round by the Minnesota Twins.

**FOURTH AMENDED COMPLAINT**

552.    During Mr. Soularie's time at Tennessee, the program was a member of the SEC and its games were regularly carried by national television broadcasters, including ESPN and the SEC Network. For example, the NCAA Chapel Hill Regional game in 2019 against North Carolina—in which Mr. Soularie went 2-for-3—was broadcast on ESPN3. Tennessee also frequently featured Mr. Soularie on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Between media rights, ticket sales, SEC distributions, and other sources, Tennessee's athletic department makes a significant amount of money from its various programs, including baseball. In 2020, for example, the SEC distributed approximately $45.5 million of revenue to each of its member schools.

553.    Mr. Soularie received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses. In fact, Mr. Soularie received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Soularie, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Soularie would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

554.    Moreover, during his time at Tennessee, Mr. Soularie was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his university. As a standout collegiate baseball player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

555.    Defendants' conspiracy greatly harmed Mr. Soularie. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

556.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Soularie would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

557.    **The effect of Defendants' illegal conduct on Plaintiff Alex Bachman.** Plaintiff Alex Bachman worked as a college football player at Wake Forest University from 2015 to 2019.

558.    The labor provided by Mr. Bachman was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

559.    Mr. Bachman was a highly competitive football player out of high school. As the team captain at Oaks Christian High School in Westlake Village, California, he played both as a safety and as a wide receiver. Leading up to his senior year he posted five interceptions and 95 tackles and had 12 catches and one touchdown before his season was cut short by an injury. He was a three-star recruit and was ranked No. 86 in the country in the safety position according to ESPN.

560.    Mr. Bachman's job as a college football player was essentially a full-time one, and an important and valuable one at that. He began contributing as a freshman, playing in 11 games and finishing the year with 101 snaps. He became a consistent starter in the wide receiver position during his sophomore season in 2016, when he led all wide receivers on the team with 720 snaps. In his 2017 junior season, he also assumed the kick return specialist role and notched notable performances against Notre Dame (8 catches for 116 yards with a touchdown) and NC State (2 kickoff returns for 38 yards).

**FOURTH AMENDED COMPLAINT**

561.    In his 2018 season, he featured in all 12 games and had a career-high
541 yards for 6 touchdowns, capping his college career with 10 total touchdowns. Mr.
Bachman's one-handed touchdown grab over Towson and his acrobatic move in the
endzone against No. 14 NC State that season were highlighted on SportsCenter's top
10 plays of the week. He laid it all out in his final collegiate game where he had a
career-high 7 catches for 171 yards in a tight 37-34 Birmingham Bowl victory over
Memphis.

562.    During Mr. Bachman's time at Wake Forest, the program was a part of the
ACC and its games were regularly broadcast on ABC, ESPN, and other national
networks. Wake Forest also frequently featured Mr. Bachman on its social media
accounts, highlighting his accomplishments and, no doubt, using him to boost game
attendance and viewership. From 2015 to 2019, Wake Forest football games drew a
weekly average of 398,000 television viewers, with games against top-ranked programs
drawing millions of viewers. For example, Wake Forest's 2017 game against No. 5
Notre Dame, where Mr. Bachman caught a 30-yard touchdown, totaled 1.903 million in
television viewership. Between media rights, ticket sales, ACC distributions, and other
sources, Wake Forest made a considerable amount of money from its football program.
For example, for 2018-2019, the ACC distributed approximately $29 million to each
member school, including Wake Forest.

563.    Mr. Bachman received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during his time at Wake Forest, he was not permitted
to receive money for use of his NIL, whether from third parties, from Defendants, or
from his university. As a standout collegiate football player, he would have earned
substantial NIL compensation if not for the NCAA's unlawful restrictions.

564.    Defendants' conspiracy greatly harmed Mr. Bachman. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an

**FOURTH AMENDED COMPLAINT**

open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

565.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Bachman would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

566.    **The effect of Defendants' illegal conduct on Plaintiff Alex Fontenot.** Plaintiff Alex Fontenot worked as a college football player at the University of Colorado from 2017 to 2022.

567.    The labor provided by Mr. Fontenot was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

568.    He was a highly recruited prospect out of high school who possessed unique talent. He was a top high school recruit in the Houston area and helped his team win a state title by rushing for three touchdowns in the state championship game. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he went to Colorado in the hopes that he would transfer to another school.

569.    His job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Fontenot was one of Colorado's key running backs. He played in every game during his freshman year for a team that was at times ranked as one of the top 25 teams in college football. During his sophomore season, he started in eleven games and rushed for 874 yards and five touchdowns. That included a win at home over a ranked Nebraska team in front of over 52,000 fans.

**FOURTH AMENDED COMPLAINT**

570.    After working his way back from an injury, he was named to the preseason watch list for the nation's Doak Walker Award in both 2021 and 2022, which is awarded annually to the country's best college running back. In a 2022 game against USC, ranked eighth in the country at the time, he rushed for over 100 yards. He continued to consistently contribute as a running back in those seasons, and finished his career with over 1,500 yards rushing and 13 touchdowns.

571.    During this time, Colorado's games were carried on national television, often by either an ESPN network or the Pac-12's own network. (Colorado was previously a member of the Pac-12 but joined the Big 12 in 2024.) Colorado frequently featured Mr. Fontenot on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. An average of nearly 1.3 million people watched Mr. Fontenot's games, and one game in 2021 that he played in had over 4.5 million viewers. The Pac-12 distributed $37 million in 2022 to each of its member schools from television revenue.

572.    Yet Mr. Fontenot received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time at Colorado, he was not permitted to receive money for his NIL, which also harmed him. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Colorado he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout collegiate football player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

573.    Mr. Fontenot was not drafted by the NFL. College football was his only opportunity to earn fair compensation for the immense work and all the sacrifices that went into being a highly skilled football player at a Power 5 conference school.

**FOURTH AMENDED COMPLAINT**

574.    Defendants' conspiracy greatly harmed Mr. Fontenot. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

575.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Fontenot would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

576.    **The effect of Defendants' illegal conduct on Plaintiff Alex Hornibrook.** Plaintiff Alex Hornibrook worked as a college football player at the University of Wisconsin - Madison from 2015 to 2019 and Florida State University in 2019.

577.    The labor provided by Mr. Hornibrook was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often close to 70 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

578.    Mr. Hornibrook was a highly recruited football player out of Malvern Preparatory School in Malvern, Pennsylvania. As the three-year team captain and quarterback, he completed 63 percent of his passes for a single-season school record of 2,156 yards and 26 touchdowns in his senior year, and also broke Malvern Prep's career records with 3,356 passing yards and 38 touchdowns. He was named to second-team All-Inter-Academic League and first-team All-City by the Philadelphia Daily News. As a consensus three-star recruit, Mr. Hornibrook received eight offers from competitive football programs and ultimately committed to Wisconsin.

579.    Mr. Hornibrook's job as a college football player was essentially a full-time one, and an important and valuable one at that. At Wisconsin, he became a consistent

**FOURTH AMENDED COMPLAINT**

starter for the team in the 2016 season, during which he passed for a total of 1,262 yards—the second-best record by a freshman in school history. He started all 14 games in his 2017 season and completed 25 touchdown passes, the second-best single-season total in school history, earning an All-Big Ten Honorable Mention. He also won the 2017 Orange Bowl MVP for his record-breaking performance against Miami.

580.    Mr. Hornibrook had an amazing start to his 2018 campaign and was the top-rated quarterback by Pro Football Focus after Week 6 before suffering from a concussion that permanently damaged his vision and affected his play.

581.    By the end of Mr. Hornibrook's time at Wisconsin, following the 2018 season, he was the all-time No. 3 in touchdown passes and No. 4 in passing efficiency at Wisconsin, and his 26-6 record was the highest winning percentage by a quarterback in Wisconsin history. He transferred to FSU in 2019 and notched several notable performances, including passing for a career-high 316 yards and three touchdowns in a victory over NC State, which earned him the ACC Quarterback of the Week award.

582.    Throughout his collegiate career, Mr. Hornibrook worked for programs in the Big Ten Conference and the ACC and participated in events that were broadcast on national television and watched by millions of viewers. Wisconsin games were regularly carried by national broadcasters such as Fox and ESPN and FSU games were often televised by ABC, CBS, and the conference's own ACC Network.

583.    From 2015 to 2019, Wisconsin football games drew a weekly average of 2.27 million television viewers while FSU games drew an average of 2.23 million per week. Important matchups against highly ranked opponents were especially popular. For example, Wisconsin's 2017 Orange Bowl game against Miami totaled 11.727 million in television viewership.

584.    Wisconsin also frequently featured Mr. Hornibrook on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership.

**FOURTH AMENDED COMPLAINT**

585.    Both Wisconsin and FSU made a considerable amount of money from their football programs. For example, the Big Ten Conference, of which Wisconsin is a member, distributed approximately $54 million to each member school for the 2018-2019 year, and the ACC distributed about $29 million to each school for the same period.

586.    Mr. Hornibrook received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at both Wisconsin and FSU, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his universities. As a standout quarterback at two popular football programs, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

587.    Defendants' conspiracy greatly harmed Mr. Hornibrook. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

588.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Hornibrook would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

589.    **The effect of Defendants' illegal conduct on Plaintiff Amani Oruwariye.** Plaintiff Amani Oruwariye worked as a college football player at Penn State University from 2014 to 2019.

590.    The labor provided by Mr. Oruwariye was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason,

**FOURTH AMENDED COMPLAINT**

he worked a significant number of hours under the direction of the coaches at the
school.

591.    Mr. Oruwariye was a highly recruited prospect out of high school who
possessed unique talent. Rated as a three-star recruit by all major recruiting services,
he was ranked as a Top 100 recruit in Florida by Rivals and 247Sports, and earned
First Team All-District honors as a senior. He received over 25 offers but ultimately
committed to play for Penn State.

592.    Mr. Oruwariye's job as a college football player was essentially a full-time
one, and an important and valuable one at that. As a cornerback, he was one of Penn
State's key defensive players. In his redshirt freshman and sophomore seasons, he was
a key contributor, appearing in 24 games during those seasons. During his junior
season, he finished 26th nationally and 4th in the Big Ten in interceptions per game and
his six passes defended at Michigan State tied for the most in the FBS in 2017. He
earned Second Team All-Big Ten honors, Second Team All-Big Ten from Phil Steele,
and First Team All-ECAC. In his senior season, he made 13 starts, recorded 51 tackles,
three interceptions, and 12 pass breakups, earning him First Team All-Big Ten
honors. He was also a semi-finalist for the Jim Thorpe Award, given to the nation's top
defensive back.

593.    In the 2019 NFL Draft, Mr. Oruwariye was selected in the fifth round by the
Detroit Lions.

594.    During his collegiate football career, Penn State's games were regularly
broadcast on major networks such as ESPN, Fox, ABC, and the Big Ten Network. Penn
State often featured Mr. Oruwariye on its social media accounts and other promotional
materials, highlighting his accomplishments and no doubt using him to boost game
attendance and viewership. Millions would watch Penn State games while Mr.
Oruwariye played there. For instance, in 2018, one game between Penn State and Iowa
amassed over 3.2 million viewers. Penn State also averaged 105,678 live attendees per

**FOURTH AMENDED COMPLAINT**

game in 2019, and was one of only six schools that averaged more than 100,000 per home game. During the 2019 season alone, Penn State made around $43 million in ticket sales. The Big Ten Conference distributed over $52 million to each of its member schools from television and media rights deals in 2018.

595.    Mr. Oruwariye received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Penn State, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Penn State. As a highly sought-after high school recruit who became an All-Big Ten player at Penn State, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

596.    Defendants' conspiracy greatly harmed Mr. Oruwariye. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

597.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Oruwariye would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

598.    **The effect of Defendants' illegal conduct on Plaintiff Amber Melgoza.** Plaintiff Amber Melgoza worked as a college basketball player at the University of Washington from 2016 to 2020.

599.    The labor provided by Ms. Melgoza was of great value to Defendants. And it was a significant amount of labor. During the season, she worked at least six days per week and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of her coaches.

**FOURTH AMENDED COMPLAINT**

600.    Ms. Melgoza was a highly recruited basketball player out of Santa Barbara High School in California. As a sophomore, she helped Santa Barbara win its first CIF-Southern Section title and advance to the CIF State Finals for the first time. She grew into a prolific scorer, averaging 33.5 points per game her junior year (2014-2015), including games with 50, 48, and 47 points, all breaking the school record. She competed with the California Storm—an elite Nike youth basketball program—the summer before her senior year, helping the team win the Nike Nationals.

601.    As a senior in 2015-2016, Ms. Melgoza averaged 26.3 points and 8.7 rebounds per game, and finished her high school career with 1,950 points, eclipsing the school record by nearly 150 points. Her outstanding high school performance earned her numerous accolades, including 2014 CIF Division III Player of the Year, Southern Section All-Class 2AA Team, 2015 MaxPreps All-State Division II First Team, 2015 Presidio Sports All-City Player of the Year, and 2015 MVP of the Presidio Sports All-City Girls Basketball Team. Ms. Melgoza was ranked No. 147 in the country by Prospects Nation and she was rated a three-star recruit by ESPN.

602.    Ms. Melgoza's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Playing as a guard at Washington, she contributed in 25 games as a freshman in the 2016-2017 season and became a consistent starter the following year as a sophomore. She had a standout sophomore season, earning All-Pac-12 honors after leading the Pac-12 in conference scoring, shooting 77.9 percent from the free-throw line (No. 3 in the Pac-12), and scoring an average of 19 points per game (No. 2 in the Pac-12). In a historic performance against No. 16 Stanford, she became the first Pac-12 player in the 2017-2018 season to score 40 or more points in a game, and only the third player in Washington program history to do so. She consistently performed at a high level, averaging 18.1 points per game over her final three seasons and scoring a total of 1,717 career points, putting her among Washington's top then all-time leading scorers. As the third Washington player to score

**FOURTH AMENDED COMPLAINT**

more than 500 points in three seasons, she was once again named to All-Pac-12 in
2020.

603.    During Ms. Melgoza's time at Washington, the program was part of the
Pac-12 Conference and its games were regularly broadcast by the conference's own
Pac-12 Network, as well as by national television networks like ESPN. Both Washington
and the Pac-12 also frequently featured Ms. Melgoza on their social media accounts,
highlighting her accomplishments and no doubt using her to boost game attendance
and viewership. In addition, Ms. Melgoza often participated in programs and events with
Seattle local news media and radio stations, no doubt helping boost the program's
profile.

604.    Between ticket sales, media rights, Pac-12 Conference disbursements,
and other sources, Washington has made a considerable amount of revenue from its
women's basketball program. For example, the Pac-12 Conference distributed an
average of $32.2 million in revenues to each of its member schools for the 2019 fiscal
year.

605.    Ms. Melgoza received none of that revenue, nor was she otherwise
compensated by Defendants for her labor other than receiving a scholarship and other
education-related expenses. And during her time at Washington, she was not permitted
to receive money for use of her NIL, whether from third parties, from Defendant, or from
the university. As a standout, record-setting basketball player, she would have earned
substantial NIL compensation if not for the NCAA's unlawful restrictions.

606.    Defendants' conspiracy greatly harmed Ms. Melgoza. It prevented her
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, she would have
received greater remuneration for her services as a college basketball player than she
received, and would have received money for her NIL from third parties.

**FOURTH AMENDED COMPLAINT**

607.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Ms. Melgoza would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

608.    **The effect of Defendants' illegal conduct on Plaintiff Andrew Abbott.** Plaintiff Andrew Abbott worked as a college baseball player at the University of Virginia from 2017 to 2021.

609.    The labor provided by Mr. Abbott was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

610.    Mr. Abbott was a highly recruited prospect out of high school who possessed unique talent. He was the 2017 Gatorade Virginia Player of the Year and PBR Player of the Year. He was also named First Team All-State, Piedmont District Player of the Year, and Conference 16 Player of Year in 2016 and 2017. A highly sought-after recruit, he was selected by the New York Yankees in the 36th round of the 2017 MLB Draft. Instead of going pro, he decided to play college baseball at UVA.

611.    Mr. Abbott's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. As one of UVA's premier pitchers, he made a significant impact on the program. Over the course of his career, he appeared in 76 games, evolving from a reliever into a dominant starting pitcher by his senior year. He became only the second pitcher in UVA history to surpass 300 career strikeouts.

612.    In 2018, Abbott pitched in 24 games, posting a 3.18 ERA with 71 strikeouts in 51 innings. His standout performance earned him Freshman All-American honors from Baseball America and Collegiate Baseball Newspaper, as well as selections to the ACC All-Freshman Team.

**FOURTH AMENDED COMPLAINT**

613.    The following year, he recorded 59 strikeouts in 44 innings with a 3.89 ERA. Mr. Abbott was also one of five UVA Cavaliers named to the ACC All-Academic Team and the ACC Academic Honor Roll. That summer, he represented Team USA on the Collegiate National Team, leading the pitching staff with seven appearances, contributing to two combined shutouts, and earning one save.

614.    In 2020, he was ranked 7th in D1Baseball's relief pitchers in college baseball. His 1.35 ERA was the lowest among UVA relievers and fifth lowest among ACC relievers with ten or more innings pitched.

615.    His senior season in 2021 was nothing short of extraordinary. Mr. Abbott was named a Second Team All-American and led the ACC in strikeouts with 162, playing a pivotal role in UVA's run to the College World Series. He was also named a First Team All-ACC selection as a starting pitcher, one of 25 semifinalists for the Golden Spikes Award, and made his third career appearance on the ACC All-Academic Team.

616.    That year, he ranked third in the NCAA in strikeouts, ninth in games started, and 11th in strikeouts per nine innings. Within the ACC, he led the conference in innings pitched, starts, and strikeouts while ranking second in wins, ERA, and strikeouts per nine innings.

617.    In the 2021 MLB Draft, Mr. Abbott was drafted in the second round (53rd overall) by the Cincinnati Reds, further demonstrating the value of his talent and labor.

618.    During his collegiate career, UVA's baseball games were broadcast on major networks such as ESPN, ACC Network, and regional sports channels. UVA often featured Mr. Abbott on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. An average of 755,000 viewers watched the College World Series in 2021, which UVA played in. In 2019, over 100,000 fans attended live UVA baseball games and UVA made $15.5 million in ticket revenues, including from baseball. In 2021,

**FOURTH AMENDED COMPLAINT**

the ACC distributed approximately $39.4 million to each of its member schools, including UVA, from television and media rights deals.

619.    Mr. Abbott received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at UVA, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from UVA. As a highly sought-after high school recruit who became a standout player at UVA, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

620.    Defendants' conspiracy greatly harmed Mr. Abbott. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

621.    Mr. Abbott received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint still greatly harmed Mr. Abbott. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment.

622.    But for the illegal and unfair restraints put in place, Mr. Abbott would have received a greater amount of scholarship money than he received. As a highly recruited player out of high school that became an All-American pitcher, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

623.    **The effect of Defendants' illegal conduct on Plaintiff Anthony Pandy.**
Plaintiff Anthony Pandy worked as a college football player at the University of Arizona
from 2017 to 2021.

624.    The labor provided by Mr. Pandy was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

625.    Mr. Pandy was a highly recruited football player and four-year letterman
out of Nathaniel Narbonne High School in Harbor City, California. He showed versatility
on the field, playing as a safety, linebacker and defensive end. As the team co-captain
in his senior season, he totaled 125 tackles and 12 sacks and led his team to a 14-1
record and a state championship. He earned All-Conference and All-City honors for his
outstanding performance. Mr. Pandy was a consensus three-star recruit and was
ranked No. 49 in the country for the outside linebacker position. He received eight offers
from competitive programs and ultimately committed to play for Arizona.

626.    Mr. Pandy's job as a college football player was essentially a full-time one,
and an important and valuable one at that. As a freshman, he contributed in 11 games
as a linebacker and on special teams, and was the top reserve linebacker the following
season in 2018, when he also served as the team captain for three games. He became
a consistent starter in the linebacker position in the 2019 season, registering 66 total
tackles and 2 sacks. In the shortened 2020 season, he started all five games and led
the team with 30 tackles. Mr. Pandy started all 12 games in his final collegiate season in
2021, including a nail-biter against USC for which he won MVP of the Game. He
registered a total of 82 tackles that season—the 8th highest in the Pac-12—and earned
All-Pac-12 Honorable Mention.

627.    During Mr. Pandy's time at Arizona, the program was a part of the Pac-12
Conference and its games were regularly carried by the conference's own network and

**FOURTH AMENDED COMPLAINT**

by national broadcasters such as ESPN. From 2015 to 2019, Arizona football games

drew a weekly average of 561,000 television viewers, with games against top-ranked

programs drawing millions of viewers. For example, Arizona's 2021 game against No. 3

Oregon—during which Mr. Pandy registered 4 tackles—totaled 1.656 million in

television viewership. Arizona also frequently featured Mr. Pandy on its social media

accounts, highlighting his accomplishments and no doubt using him to boost game

attendance and viewership.

628.    Between ticket sales, media rights, Pac-12 Conference disbursements,

and other sources, Arizona has made a considerable amount of revenue from its

football program. For example, the Pac-12 Conference distributed an average of $32.2

million in revenues to each of its member schools for the 2019 fiscal year.

629.     Mr. Pandy received none of that revenue, nor was he otherwise

compensated by Defendants for his labor other than receiving a scholarship and other

education-related expenses.

630.    And during most of his time at Arizona, he was not permitted to receive

money for use of his NIL, whether from third parties, from Defendants, or from the

university. Even for the time in which he was permitted to earn compensation from the

use of his NIL, he was still barred from receiving compensation from Defendants or

Arizona, and he did not receive the full amount from third parties he would have

received had the NCAA's unlawful restrictions been lifted earlier. As a highly recruited,

talented football player, he would have earned substantially more NIL compensation if

not for the NCAA's unlawful restrictions.

631.    Defendants' conspiracy greatly harmed Mr. Pandy. It prevented him from

enjoying the benefit of bargaining for competitive remuneration and benefits in an open

market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

632.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Pandy would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

633.    **The effect of Defendants' illegal conduct on Plaintiff Asa Edward Lacy.** Plaintiff Asa Edward Lacy worked as a college baseball player at Texas A&M University from 2017 to 2020.

634.    The labor provided by Mr. Lacy was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

635.     Mr. Lacy was a highly recruited prospect out of high school who possessed unique talent. A Class 5A First Team All-State selection as a senior in 2017, he was selected to pitch in the THSBCA All-Star Game, and was named First Team All-District 26-5A and District 26-5A MVP. He had significant interest from multiple MLB teams to be selected in the MLB draft and was ultimately drafted by the Cleveland Indians in the 31st round of the 2017 MLB draft. Rather than join an MLB team out of high school, he chose to play college baseball at Texas A&M.

636.    Mr. Lacy's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Mr. Lacy was one of Texas A&M's top pitchers. During his freshman year, he pitched 23 games, including two starts. In the summer after his freshman year, he pitched for the Matsu Miners of the Alaska Baseball League, posting a 3-1 record with a 2.16 ERA, 1.09 WHIP and 47 strikeouts in 33.1 innings. His standout performance earned him recognition as the Alaska Baseball League's Top Prospect by *Baseball America* and *Perfect Game*.

**FOURTH AMENDED COMPLAINT**

637.    As a sophomore, Mr. Lacy solidified his reputation as a dominant force on the mound. He started 15 games for Texas A&M, finishing the season with an 8-4 record, a 2.13 ERA, a .162 opponent batting average, and 130 strikeouts over 88.2 innings. His achievements earned him multiple accolades, including a spot as a 2019 Golden Spikes Award semifinalist, a Perfect Game Midseason All-American Second Team selection, and a Perfect Game/Rawlings College Honorable Mention All-American. He was also selected to play for the 2019 USA Baseball Collegiate National Team.

638.    Heading into the 2020 season, Mr. Lacy was a unanimous First Team Preseason All-American, earning honors from all five major outlets, including D1Baseball.com, Collegiate Baseball, Perfect Game/Rawlings, and Baseball America. He also received preseason All-SEC honors and was named to the Golden Spikes Award preseason watch list, recognizing the top amateur baseball player in the United States. Mr. Lacy's junior season in 2020 was off to a phenomenal start before being cut short by the COVID-19 pandemic. In just four starts, he compiled a .75 ERA with 46 strikeouts.

639.    Over his collegiate career, he appeared in 38 games, including 17 starts, posting a 2.32 ERA, a .174 opponent batting average, and 178 strikeouts in 128.0 innings of work.

640.    In the 2020 MLB Draft, Mr. Lacy was the 4th overall pick for the Kansas City Royals.

641.    During Mr. Lacy's collegiate career, Texas A&M's baseball games were regularly broadcast on major networks such as ESPN and SEC Networks. Texas A&M often featured Mr. Lacy on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. In 2019, a total of 172,401 people attended Texas A&M baseball games in person. During the 2018-2019 season, the Texas A&M athletics department

**FOURTH AMENDED COMPLAINT**

reported $212.7 million in total revenues, some of which was generated by baseball. In 2020, the SEC distributed approximately $45.5 million to each of its member schools, including Texas A&M, from television and media rights deals.

642.    Mr. Lacy received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at Texas A&M, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Texas A&M. As a highly sought-after high school recruit who became a standout player at Texas A&M, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

643.    Defendants' conspiracy greatly harmed Mr. Lacy. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

644.    Mr. Lacy received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Lacy. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As a highly sought-after high school recruit who became a standout player at Texas A&M, he would have received a full athletic scholarship absent Defendants' bylaws.

645.    But for the illegal and unfair restraints put in place, Mr. Lacy would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

646.    **The effect of Defendants' illegal conduct on Plaintiff Austin Seibert.**
Plaintiff Austin Seibert worked as a college football player at the University of Oklahoma
from 2015 to 2018.

647.    The labor provided by Mr. Seibert was of great value to Defendants. And
it was a significant amount of labor. During the season, he worked at least six days per
week and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches at the school.

648.    Mr. Seibert was a highly recruited football player out of Belleville West
High School in Belleville, Illinois. He was rated a three-star recruit by ESPN and ranked
as the No. 1 ranked punter and kicker of his graduating class. After being named to
Kohl's Kicking First Team All-American and becoming the first ever all-state kicker-
punter in Illinois high school history, Mr. Seibert received offers from eight competitive
programs, including Kentucky, Indiana, Miami, and Colorado, and ultimately committed
to Oklahoma.

649.    Mr. Seibert's job as a college football player was essentially a full-time
one, and an important and valuable one at that. As both an outstanding kicker and
punter, he helped propel Oklahoma to four straight Big 12 Conference championships
as well as three appearances in the College Football Playoff semifinals during his
collegiate career.

650.    Playing in all 13 games as a freshman, he quickly impressed, earning
selections to All-America Honorable Mention as a punter from Sports Illustrated, All-Big
12 Second Team as a punter by league coaches, AP, and Phil Steele, and All-Big 12
Second Team as a kicker by AP. He was also a semifinalist for the Ray Guy Award,
presented annually to the nation's best collegiate punter. He continued performing at a

**FOURTH AMENDED COMPLAINT**

high level as a sophomore, ranking third in Oklahoma single-season history with 72
points-after-touchdown on 74 attempts.

651.    Mr. Seibert's junior and senior seasons were particularly prolific. As a
junior, he played in all 14 games and made 17 of his 21 field goal attempts—a career
high 81% success rate—once again earning an All-Big 12 Second Team selection as a
kicker, as well as All-Big 12 Honorable Mention as a punter by league coaches and an
honorable mention for Big 12 Special Teams Player for the Year. He reached new
levels as a senior in the 2018 season. He led the Big 12 and broke the single-season
school record (which he himself previously set) with 138 points and made 17 of 19 field
goal attempts for an 89.5% success rate. He won Oklahoma's first-ever Big 12 Special
Teams Player of the Year award and earned selections to All-Big 12 First Team by
league coaches and the AP and to Academic All-Big 12 First Team. He ended his
record-breaking collegiate career as the leading scorer in Oklahoma and Big 12 history
and the first in career points among kickers in all of FBS history.

652.    In 2019, Mr. Seibert was selected by the Cleveland Browns in the fifth
round of the 2019 NFL Draft, becoming the first kicker to be drafted from the University
of Oklahoma.

653.    During Mr. Seibert's time at Oklahoma, the program was a part of the Big
12 Conference and its games were regularly carried by national television broadcasters
such as Fox Sports, ABC, and ESPN. From 2015 to 2019, Oklahoma football games
drew a weekly average of 2.9 million television viewers, with games against other top-
ranked programs drawing millions more. For example, Oklahoma's 2018 Orange Bowl
game against No. 1 Alabama, where Mr. Seibert went 2-2 on field goal attempts and
made all four extra point conversions, totaled over 19 million in television viewership.
Oklahoma also frequently featured Mr. Seibert on its social media accounts, highlighting

**FOURTH AMENDED COMPLAINT**

his accomplishments and, no doubt, using him to boost game viewership and
attendance.

654.    Between ticket sales, media rights, Big-12 Conference disbursements,
and other sources, Oklahoma has made a considerable amount of revenue from its
football program. For example, Oklahoma received $36.6 million in revenue distributions
from the Big 12 Conference for the 2018 fiscal year, for a total of over $177 million in
athletic revenues.

655.    Mr. Seibert received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during his time at Oklahoma, he was not permitted to
receive money for use of his NIL, whether from third parties, from Defendants, or from
the university. As a heavily recruited high school talent who became a record-setting
football star for the University of Oklahoma, he would have earned substantial NIL
compensation if not for the NCAA's unlawful restrictions.

656.    Defendants' conspiracy greatly harmed Mr. Seibert. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player than he received, and
would have received money for his NIL from third parties.

657.    Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Seibert would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

658.    **The effect of Defendants' illegal conduct on Plaintiff Azeez Ojulari.**
Plaintiff Azeez Ojulari, an individual, is a resident of New Jersey. He worked as a
college football player at the University of Georgia from 2018 to 2021.

**FOURTH AMENDED COMPLAINT**

659.    The labor provided by Mr. Ojulari was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

660.    Mr. Ojulari was a highly recruited prospect out of high school who possessed unique talent. A four-star recruit, he was considered one of the top defensive prospects in the country. Among other accolades, he was selected for the 2018 U.S. Army All-American Bowl, which features the nation's top high school football players. He received offers from multiple universities, but ultimately chose to play for Georgia.

661.    Mr. Ojulari's job as a college football player was essentially a full-time one, and an important and valuable one at that. As one of Georgia's standout defenders, he made a substantial impact on the field. In 2019, he played in every game, starting 13, and led the team in sacks. That same year, he was named one of three team captains for the Tennessee game, becoming the first freshman in the Coach Kirby Smart era to receive that honor. In 2020, his performance earned him Second Team All-SEC honors, as well as Fourth Team All-American by Phil Steel. He was also a semifinalist for the Chuck Bednarik Award, awarded annually to the nation's top defensive player.

662.    Mr. Ojulari played a crucial role in high-profile games, including Georgia's 2021 Peach Bowl victory over Cincinnati, in which he recorded three sacks and was named the game's defensive MVP.

663.    In the 2021 NFL Draft, Mr. Ojulari was the 50th overall pick by the New York Giants.

664.    During his collegiate football career, Georgia's football games were regularly broadcast on major networks such as ESPN, CBS, and the SEC Network. Georgia often featured Mr. Ojulari on its social media accounts and other promotional materials, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Millions of viewers watched Georgia games during Mr.

**FOURTH AMENDED COMPLAINT**

Ojulari's time there. For instance, Georgia's 2020 matchup against Alabama averaged 9.61 million viewers on CBS, easily ranking as one of the highest-rated and most-watched games of the season. Tens of thousands of people attend each Georgia football game in person, including Mr. Ojulari's games. In the 2021 reporting year, Georgia reported $37.1 million in total ticket sales, driven by football. In 2020, the SEC distributed approximately $45.5 million to each of its member schools, including Georgia, from television and media rights deals.

665.    Mr. Ojulari received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during all of his time at Georgia, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Georgia. As a highly sought-after high school recruit who became a standout player at Georgia, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

666.    Defendants' conspiracy greatly harmed Mr. Ojulari. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

667.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Ojulari would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

668.    **The effect of Defendants' illegal conduct on Plaintiff Ben Boulware.** Plaintiff Ben Boulware worked as a college football player at Clemson University from 2013 to 2016.

**FOURTH AMENDED COMPLAINT**

669.    The labor provided by Mr. Boulware was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

670.    Mr. Boulware was a highly recruited football player out of high school. As the team captain and linebacker at T.L. Hanna High School, he totaled 592 tackles, 6 interceptions, and 28 tackles throughout his high school career. In addition to being a four-star recruit, he was ranked as the No. 3 inside linebacker prospect in the nation and the No. 1 player from South Carolina by ESPN. He also played in the 76th Annual Shrine Bowl of the Carolinas in December 2012, taking home the defensive MVP award, and competed in the prestigious Under Armour All-American Game in 2013. As a finalist for South Carolina's Mr. Football title, the highest award for seniors in South Carolina, he received a total of 17 offers from highly competitive programs, including Georgia, Duke, and Louisville, and committed to play for Clemson.

671.    Mr. Boulware's job as a college football player was essentially a full-time one, and an important and valuable one at that. He began contributing his freshman season and started in multiple games in his sophomore year. He became a consistent starter in the linebacker position in his junior season in 2015. Starting all 15 games, he concluded the 2015 season with 138 tackles—the second highest on the team—and led the team with 29 quarterback pressures.

672.    Mr. Boulware started his senior season as the team captain and led the team with 131 tackles, winning the ACC Co-Defensive Player of the Year Award. He was selected to first-team All-ACC and Academic All-ACC, becoming the first Clemson defensive player since 1988 to be named to first-team All-ACC teams both on the field and in the classroom. He also played a major role in Clemson's win over Alabama in the 2017 College Football Playoff National Championship, earning the Defensive MVP award. Due to his outstanding senior season performance, he was selected to Second

**FOURTH AMENDED COMPLAINT**

Team All-America by the AFCA, Football Writers Association, Phil Steele, USA Today, and Walter Camp, and he also won the Jack Lambert Award, presented annually to nation's top collegiate linebacker.

673.    During Mr. Boulware's time at Clemson, the program was a part of the ACC and its games were regularly carried by national television broadcasters such as ABC and ESPN. From 2015-2019, Clemson football games drew a weekly average of 2.67 million television viewers, with games against other top-ranked programs drawing millions more. For example, Clemson's 2016 CFP Championship game against Alabama, where Mr. Boulware registered six tackles including two tackles for loss, totaled 25.266 million in television viewership. Clemson also frequently featured Mr. Boulware on its social media accounts, highlighting his contributions to the team and using him to promote game attendance and viewership. In fact, Mr. Boulware's name, image, and likeness was often used in advertisements on streaming services and in other marketing materials (including for years after he graduated), which no doubt boosted Clemson's profile.

674.    Between ticket sales, media rights, ACC disbursements, and other sources, Clemson has made a considerable amount of money from its football program. From 2012 to 2017, Clemson football generated at least $43 million in revenues each season, with a high of $54.2 million in 2016.

675.    Mr. Boulware received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Clemson, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Clemson. As a highly recruited high school prospect, a standout collegiate football player, and a South Carolina native who grew up just 35 minutes away from Clemson, Mr. Boulware would have earned considerable NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

676.    Defendants' conspiracy greatly harmed Mr. Boulware. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

677.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Boulware would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

678.    **The effect of Defendants' illegal conduct on Plaintiff Brady McConnell.** Plaintiff Brady McConnell is a resident of Florida. He worked as a college baseball player at the University of Florida from 2017 to 2019.

679.    The labor provided by Mr. McConnell was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

680.    Mr. McConnell was a highly recruited prospect out of high school who possessed unique talent. As a junior, he posted a batting average of .490 with three home runs, 32 RBI and 16 stolen bases. He also played in the 2016 Perfect Game All-American Classic and the Under Armour All-America game. Entering his senior season, he was named a Collegiate Baseball preseason First Team All-American and was named to the USA Today 20-member All-USA team. As a senior, he had a .372 batting average with three home runs, 24 RBIs, and 21 stolen bases. Further, he was named a MaxPreps Second Team All-American as a senior and to the National H.S. Coaches Association All-Southeast Team. In both his junior and senior years, he was named a preseason First Team All-American selection by Perfect Game.

**FOURTH AMENDED COMPLAINT**

681.    Mr. McConnell was drafted in the 33rd round of the 2017 MLB Draft by the Cincinnati Reds. Instead of signing with the Reds, he elected to play for Florida, which won the national championship his senior year of high school. He was rated the 29th overall player in the class of 2017 by Perfect Game and the 5th shortstop in the country, making him the highest ranked position player in his class to attend college.

682.    Mr. McConnell's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his baseball career, Mr. McConnell became one of Florida's top players. In his freshmen year, he was the starting shortstop for the first five games before a season-ending injury. In 2019, he became Florida's everyday shortstop with a .332 batting average, 15 home runs, and 48 RBIs, earning him NCBWA Third Team All-America and ABCA/Rawlings First Team South All-Region honors. That season, he posted a 15-game hitting streak from February 20 to March 12, the longest of that season for any Florida player. In that 15-game span, he hit .411 (23-56) with 10 RBIs.

683.    In the 2019 MLB draft, he was selected in the second round with the 44th overall pick by the Kansas City Royals.

684.    During Mr. McConnell's collegiate baseball career, the Florida's games were regularly broadcast on major networks such as ESPN and the SEC Network, attracting a substantial viewership. Florida frequently featured Mr. McConnell on its social media platforms and other promotional materials, showcasing his achievements and likely leveraging his presence to boost game attendance and viewership. Florida baseball games consistently drew large audiences during Mr. McConnell's tenure, including the 2018 Auburn-Florida matchup, which averaged 891,000 viewers and peaked at 1.3 million—the most-watched Super Regional game in nine seasons. In 2019, the total attendance for Florida baseball games was 141,491, generating significant revenue for the university. As a member of the SEC, Florida also benefited from the conference's lucrative television deals, which drew millions of viewers

**FOURTH AMENDED COMPLAINT**

throughout the season. That year, the SEC distributed over $45.5 million in television and media rights revenue to each of its member schools.

685.    Mr. McConnell received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at Florida, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Florida. As a highly sought-after high school recruit who became a standout player at Florida, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

686.    Defendants' conspiracy greatly harmed Mr. McConnell. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

687.    Mr. McConnell received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. McConnell. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As a highly sought-after high school recruit who became a standout player at Florida, he would have received a full athletic scholarship absent Defendants' bylaws.

688.    But for the illegal and unfair restraints put in place, Mr. McConnell would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

689.    **The effect of Defendants' illegal conduct on Plaintiff Brittany Brewer.**
Plaintiff Brittany Brewer worked as a college basketball player at Texas Tech University
from 2016 to 2020.

690.    The labor provided by Ms. Brewer was of great value to Defendants. And
it was a significant amount of labor. During the season, she worked at least six days per
week and often more than 40 hours per week. Even during the offseason, she worked a
significant number of hours under the direction of her coaches.

691.    Ms. Brewer was a highly recruited basketball player out of high school.
Playing for Wylie High School in Abilene, Texas, she averaged 13.8 points and 6.5
rebounds per game as a sophomore and averaged 16.7 points and 8.3 rebounds per
game as a junior, leading her team to the state championship final. Taking MVP honors
at three tournaments, including the Region I tournament, Ms. Brewer was the No. 97
prospect nationally for the class of 2016 according to ESPNU Hoopgurlz.

692.    Ms. Brewer's job as a college basketball player was essentially a full-time
one, and an important and valuable one at that. During her time at Texas Tech, she was
integral to the team's success. When she was only a freshman, she ranked No. 7 in the
Big 12 with a team-leading 53 blocks. She started a majority of games her sophomore
season, once again leading the team in blocks and ranking second with 150 rebounds.
As a junior and senior, she started every single game, averaged 16.6 points per game,
and had a NCAA-record-tying 16 blocks over the University of Louisiana Monroe. Her
senior year, she ultimately broke the school's record for blocks in a single season with
127.

693.    In recognition of her talent, Ms. Brewer was selected to the USA National
Team in 2019 and took home silver in the 2019 Pan-American games.

694.    Ms. Brewer concluded her collegiate career with 289 blocks, ranking
second in program history, and 907 rebounds, ranking sixth in program history. In
recognition of her talent and performance, she was selected to First Team All-Big 12;

**FOURTH AMENDED COMPLAINT**

earned AP All-American, USBWA All-American, and WBCA Coaches All-American
honorable mentions; was a top ten semifinalist for the Naismith Defensive Player of the
Year award; and was a top five finalist for the Lisa Leslie Award (an honor given to the
top collegiate center in the country).

695.    In 2020, Ms. Brewer was selected as the 17th overall pick by the Atlanta
Dream in the WNBA Draft, further demonstrating the value of her talent and labor.

696.    During Ms. Brewer's time at Texas Tech, the program was a part of the
Big-12 Conference and its games were regularly carried by national television
broadcasters such as Fox Sports. Texas Tech also frequently featured Ms. Brewer on
its social media accounts, highlighting her accomplishments and no doubt using her to
boost game attendance and viewership. Between ticket sales, media rights, Big 12
disbursements, and other sources, Texas Tech no doubt benefited from its women's
basketball program. In fact, in 2019, the Big 12 Conference distributed approximately
$55.6 million in revenues to each of its member schools.

697.    Ms. Brewer received none of that revenue, nor was she otherwise
compensated by Defendants for her labor other than receiving a scholarship and other
education-related expenses. And during her time at Texas Tech, she was not permitted
to receive money for use of her NIL, whether from third parties, from Defendants, or
from the university. As a nationally recognized college basketball player, she would
have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

698.    Defendants' conspiracy greatly harmed Ms. Brewer. It prevented her from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, she would have received
greater remuneration for her services as a college basketball player than she received,
and would have received money for her NIL from third parties.

699.    Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Ms. Brewer would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

700.    **The effect of Defendants' illegal conduct on Plaintiff Bryce Love.**

Plaintiff Bryce Love worked as a college football player at Stanford University from 2015 to 2019.

701.    The labor provided by Mr. Love was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

702.    Mr. Love was a highly recruited prospect out of high school who possessed unique talent. A four-star recruit, he was rated the 6th best all-purpose running back by Rivals and 11th by 247 Sports. Throughout his high school career, he amassed impressive statistics, totaling 6,425 all-purpose yards, 5,372 rushing yards, and 71 touchdowns, while averaging 114.3 yards per game and an astounding 10.5 yards per carry. His standout performances earned him numerous accolades, including 2014 All-State and All-Conference honors, as well as the 2014 Cap 8 Conference MVP and the Wake Forest Stallion Award. An exceptional track athlete too, he won the 2014 4x100 state championship.

703.    Mr. Love received offers from Clemson, East Carolina, Florida, Georgia, North Carolina, South Carolina, Tennessee, Virginia Tech, and Wisconsin, but ultimately committed to Stanford.

704.    Mr. Love's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Love became one of Stanford's most productive running backs. In 2016, he earned All-Pac-12 honorable mention honors and delivered a standout performance against Notre Dame, recording 161 all-purpose yards, including 130 rushing yards on 23 carries, a game-winning seven-yard touchdown run, and a two-point conversion. That season, he

**FOURTH AMENDED COMPLAINT**

and Christian McCaffrey set a school record for the most rushing yards by a tandem in a

single season (2,386 yards).

705.    In 2017, Mr. Love had a breakout season, rushing for 2,118 yards and 19

touchdowns. He earned unanimous All-American honors, won the Doak Walker Award

as the nation's top running back, and received the Lombardi Award and the Touchdown

Club of Columbus Jim Brown Award. He was also named Pac-12 Offensive Player of

the Year and finished as the Heisman Trophy runner-up. That season, he led all Power

5 running backs in multiple statistical categories, including total rushing yards, rushing

yards per game, rushing yards per attempt, and 100-yard rushing performances.

706.    Despite battling injuries in his senior season, Mr. Love served as a team

captain and remained a key contributor, starting 10 games. Entering his final year, he

was a consensus preseason First-Team All-American and, after the season, earned All-

Pac-12 honorable mention recognition. He finished his college career with 3,866 rushing

yards and 30 touchdowns in 49 games. His leadership and on-field success cemented

his legacy as one of the most valuable players in Stanford football history.

707.    In the 2019 NFL Draft, Mr. Love was selected in the fourth round by the

Washington Redskins—now the Washington Commanders.

708.     During his collegiate football career, Stanford's football games were

carried on national television, often by either an ESPN network, FOX, or the Pac-12

Network. The university frequently featured Love on its social media platforms and other

promotional materials, highlighting his achievements and likely leveraging his presence

to enhance game attendance and viewership. Millions of fans tuned in to watch Stanford

football while Mr. Love put on dominant performance there, including 2.6 million viewers

for the 2018 Stanford-Pittsburgh game. In 2019, Stanford's home games drew an

average of 37,018 attendees per game, totaling 259,123 for the season. Stanford was a

member of the Pac-12 Conference, which distributed millions in television revenue to its

member schools. As a Pac-12 member, Stanford benefited from the conference's

**FOURTH AMENDED COMPLAINT**

lucrative media deals, with each school receiving approximately $32 million in revenue in 2018—a significant portion stemming from television rights and broadcasting agreements.

709.    Mr. Love received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Stanford, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Stanford. As a highly sought-after high school recruit who became a Heisman runner-up, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

710.    Defendants' conspiracy greatly harmed Mr. Love. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Love would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

711.    **The effect of Defendants' illegal conduct on Plaintiff Cade McNamara.** Plaintiff Cade McNamara worked as a college football player at the University of Michigan from 2019 to 2023 and at the University of Iowa from 2023 to 2025. He has announced that he will play his final season at East Tennessee State University.

712.    The labor provided by Mr. McNamara was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

713.    Mr. McNamara was a highly recruited football player out of high school in Reno, Nevada. As the team's starting quarterback for all four years, he holds all of Damonte Ranch High School's quarterback records. With 12,804 career passing yards and 146 career touchdowns, he is also the Nevada state record holder in those categories. He was named the Nevada Gatorade Player of the Year in both 2017 and 2018, was a consensus four-star recruit and No. 1 football prospect from Nevada by ESPN and 247 Sports, and was ranked among the top ten quarterbacks of his graduating class of 2019. He received ten offers from elite football programs, including former national champions Alabama and Georgia, and ultimately committed to play for Michigan.

714.    Mr. McNamara's job as a college football player was essentially a full-time one, and an important and valuable one at that. Having completed high school in December 2018 and enrolled early at Michigan, he did not see a lot of action for the 2019 season. That changed in 2020, when Mr. McNamara recorded standout performances and his first career start as quarterback. On November 21, 2020, for example, Mr. McNamara led Michigan in a stunning triple-overtime comeback victory against Rutgers, completing 27 of 36 passes for 260 yards and four touchdowns, including a rushing touchdown—all after entering the game in the second quarter. The comeback from a 17-point deficit was the third largest in Michigan history.

715.    Mr. McNamara subsequently earned the starting quarterback position and became team captain in his 2021 season, throwing 2,576 yards with 15 touchdowns. His performances against Northern Illinois and Indiana won him the Player of the Week honor and he was selected to All-Big Ten Third Team by league coaches and media. In the Big Ten Championship Game on December 4, 2021—Michigan's first ever appearance in the College Football Playoff—Mr. McNamara threw for 169 yards in a 42–3 blowout of Iowa. In fact, under Mr. McNamara's leadership, Michigan

**FOURTH AMENDED COMPLAINT**

accomplished two major goals: winning a Big Ten title and beating longtime rival Ohio State for the first time since 2011.

716.    Mr. McNamara transferred to Iowa in December 2022, but his 2023 season was cut short due to injury. He bounced back in 2024 as the team captain, passing for over 1,000 yards and delivering game-winning performances against Illinois State, Minnesota, Washington, and Northwestern. His 2024 performance earned him the Johnny Unitas Golden Arm Award and the Comeback Player of the Year Award.

717.    During Mr. McNamara's collegiate career at Michigan and Iowa, the programs were part of the Big Ten Conference and their games were regularly carried by national television broadcasters such as Fox, ESPN, NBC, and ABC. Michigan and Iowa games regularly drew millions in television viewership. For example, Michigan's 2021 victory against Penn State, where Mr. McNamara threw over 200 yards with 3 touchdowns, totaled nearly 6 million in television viewership. Michigan and Iowa—as well as the Big Ten—frequently featured Mr. McNamara on their social media accounts, highlighting his contributions and no doubt using him to boost game attendance and viewership.

718.    Both Michigan and Iowa have made a considerable amount of money from their respective football programs—even before significant spikes in revenue from new TV agreements beginning in the 2024-2025 season—with the Big Ten Conference distributing as much as $60 million to its member schools in the 2023 fiscal year.

719.    Mr. McNamara received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving scholarships and other education-related expenses. And during most of his time at Michigan, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Michigan. Even when he was permitted to earn NIL compensation, beginning in the 2021 season, he was still barred from receiving compensation from Defendants or from either university, and he did not receive the full amount from third

**FOURTH AMENDED COMPLAINT**

parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout quarterback at two top-ranked programs, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

720. Defendants' conspiracy greatly harmed Mr. McNamara. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

721. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. McNamara would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

722. **The effect of Defendants' illegal conduct on Plaintiff Cameron Rising**. Plaintiff Cameron Rising worked as a college football player at the University of Texas in 2018 and the University of Utah from 2019 to 2024.

723. The labor provided by Mr. Rising was of great value to Defendants. During the season, he often worked six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

724. Mr. Rising was a highly recruited prospect out of high school who possessed unique talent. Rated a four-star quarterback by multiple services, he was considered the number 8 pro-style quarterback in the nation by Rivals. While at Newbury High School, Mr. Rising racked up numerous awards, including First Team All-CIF in 2015 and 2017, 2017 All-Camino League Offensive Back of the Year, First Team All-County and All-League, and MaxPreps Sophomore All-American and Cal-Hi Sports Sophomore of the Year in 2015. He also set a county record for attempts without an interception (324). Despite receiving offers from multiple top programs, including

**FOURTH AMENDED COMPLAINT**

Alabama, Michigan, LSU, and Oregon, Mr. Rising originally committed to Oklahoma before committing to Texas.

725.    Mr. Rising's job as a college football player was essentially a full-time one, and an important and valuable one at that. Over the course of his four playing seasons at Utah, he established himself as one of the top quarterbacks in the Pac-12, leading the Utes to back-to-back Pac-12 titles and consecutive Rose Bowl appearances.

726.    Mr. Rising redshirted his freshman year at Texas and was named to the Big 12 Commissioner's Honor Roll in Spring of 2018. After transferring from Texas in 2019, Mr. Rising redshirted and then suffered a season-ending injury early in 2020 after playing in just one game against USC. However, he earned the starting job in 2021, playing in 13 games and starting 11, leading Utah to a historic season. That year, he threw for 2,493 yards, 20 touchdowns, and just 5 interceptions, while also rushing for 499 yards and 6 rushing touchdowns. His leadership helped Utah win its first-ever Pac-12 Championship, defeating Oregon 38-10 in the title game. He was named First Team All-Pac-12 and led the Utes to the Rose Bowl, where he threw for 214 yards and 2 touchdowns against Ohio State. He was also named a Mayo Clinic Comeback Player of the Year semifinalist, Pac-12 Offensive Player of the Week, and received Davey O'Brien Award "Great 8" honors after recording then-career highs in completions (22-of-28), passing yards (306), passing completion (.786) and passing touchdowns (3) at USC.

727.    In 2022, Mr. Rising started 13 games, throwing for 3,034 yards, 26 touchdowns, and 8 interceptions, while rushing for 465 yards and 6 touchdowns. He threw for 310 yards and 3 touchdowns in the Pac-12 Championship Game, leading Utah to a victory over USC and earning him MVP of the Championship Game. He also recorded 95 passing yards and 56 rushing yards in the Rose Bowl against Penn State before leaving the game with an injury in the third quarter. His exemplary season earned him Pac-12 All-Conference honorable mention and he was named to the Davey O'Brien National Co-Quarterback and Pac-12 Offensive Player of the Week for his

**FOURTH AMENDED COMPLAINT**

performance against USC, while also being named to the Davey O'Brien Great 8 and the Manning Award Stars of the Week. ESPN ranked him the ninth-best quarterback in the country.

728. After a redshirt 2023 season, Mr. Rising started three games in 2024 prior to his season-ending injury against Arizona State, completing 34-of-66 passes for 555 yards and seven touchdowns on the season. In the season opener against Southern Utah, he completed 10-of-15 for 254 yards and five touchdowns, adding four rushes for 25 yards. His five passing touchdowns were a career-high and the most in a game by a FBS quarterback in week one.

729. During his career, Mr. Rising played in 30 games with 28 starts, ranking fourth all-time at Utah in career passing (53) and total (65) touchdowns as well as fifth all-time in career wins (20). He entered the 2024 campaign on the Preseason Watch Lists for the Maxwell Award (top college football player in nation), Davey O'Brien Award (best NCAA quarterback), Walter Camp Player of the Year, Johnny Unitas Golden Arm Award, and Comeback Player of the Year Award.

730. Mr. Rising's performances helped Utah football gain national recognition, with the team playing in high-profile, nationally televised games on ESPN, CBS, and Fox. Millions of viewers watched Utah football games during Mr. Rising's collegiate career, including 10.19 million viewers who watched the 2022 Rose Bowl against Penn State. Utah regularly showcased Mr. Rising on its social media channels and promotional materials—including the team's semitruck used for transporting equipment—to boost game attendance and viewership.

731. Tens of thousands of fans attended Utah football games to watch Mr. Rising; for example, in 2022 an average of 52,057 attended each Utah game. That year, Utah's athletic department reported "record revenues" totaling $115.7 million, to which the football team, where Mr. Rising made notable contributions, made significant contributions. Utah's Pac-12 Championship victories were key in driving conference

revenue, as the Pac-12 distributed an average of $37 million of revenue to each of its member schools, including Utah, in 2022.

732.    Mr. Rising received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During part of his time at Utah, he was restricted from receiving money for his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his universities he would have received had the NCAA's unlawful restrictions been lifted earlier. As a two-time Pac-12 Champion quarterback playing in major postseason games, he would have earned significantly more NIL compensation in an open market.

733.    Defendants' conspiracy greatly harmed Mr. Rising. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

734.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Rising would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

735.    **The effect of Defendants' illegal conduct on Plaintiff Cam Serigne.** Plaintiff Cam Serigne worked as a college football player at Wake Forest University from 2013 to 2017.

736.    The labor provided by Mr. Serigne was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

737.    Mr. Serigne was a highly recruited prospect out of high school who possessed unique talent. As a key player for Briar Woods, he helped lead the team to an impressive 15-0 record in 2012 and a combined 42-3 record from 2010 to 2012, securing three state championships. A standout on both sides of the ball, Mr. Serigne earned First-Team All-State honors as a tight end and All-Region recognition as a defensive end. Serving as team captain in 2012, he delivered a dominant season with 56 receptions for 937 yards and 11 touchdowns. His performance earned him a ranking as the 4th-best tight end in the Class of 2013 by Scout.com. Mr. Serigne received multiple offers, including from James Madison, Air Force, and Ohio, but ultimately chose to play for Wake Forest.

738.    Mr. Serigne's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Serigne became one of the most productive tight ends in ACC history. In 2014, he led Wake Forest in receiving with 54 receptions for 531 yards and five touchdowns, setting a school record for receptions in a season by a tight end. He earned honorable mention All-ACC honors from ACSMA, was named a Second-Team Freshman All-American by College Football News, a Third-Team All-American by Athlon, and was also selected to the ACC All-Academic Team. In 2015, he started 11 out of 12 games and earned honorable mention All-ACC pick by the ACC coaches and by the media. During his junior season, he led the team with a 14.2 yards per catch average and earned Academic All-ACC selection, preseason Third Team All-ACC, and preseason Third Team All-ACC.

739.    In Mr. Serigne's senior season, he earned First Team All-ACC and was invited to the East-West Shrine Game, a college football all-star game that features top draft-eligible players showcasing their talents in front of NFL scouts and executives. He finished his career with ACC records for receptions, receiving yards, and touchdown receptions by a tight end.

**FOURTH AMENDED COMPLAINT**

740.    During Mr. Serigne's collegiate football career, Wake Forest's football games were regularly broadcast on national television, including on ESPN and ACC Network. The university frequently featured Mr. Serigne on its social media platforms, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Wake Forest football games amassed millions of viewers while Mr. Serigne was there. For instance, 2.95 million viewers tuned into the Wake Forest v. Texas A&M game in December 2017. Tens of thousands of people attended each Wake Forest football game, with the total attendance reaching 185,192 in 2016. In 2018, the ACC, of which Wake Forest is a member, distributed approximately $29 million of revenue to Wake Forest.

741.    Mr. Serigne received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Wake Forest, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Wake Forest. As a highly sought-after high school recruit who became a standout player at Wake Forest, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

742.    Defendants' conspiracy greatly harmed Mr. Serigne. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

743.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Serigne would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

744.    **The effect of Defendants' illegal conduct on Plaintiff Carmen
Mlodzinski.** Plaintiff Carmen Mlodzinski, an individual, is a resident of Florida. He
worked as a college baseball player at the University of South Carolina from 2017 to
2020.

745.    The labor provided by Mr. Mlodzinski was of great value to Defendants.
And it was a significant amount of labor. During the season, he often worked at least six
days per week, and often more than 40 hours per week. Even during the offseason, he
worked a significant number of hours under the direction of his coaches.

746.    Mr. Mlodzinski was a highly recruited baseball player out of high school.
Playing for Hilton Head Island High School in South Carolina, he was ranked No. 106
among all prospects in the country for the class of 2017 by Perfect Game. That year, he
won the South Carolina 4A Player of the Year award, was ranked the top prospect in all
of South Carolina, and was named to All-South Carolina First Team. He was also
recognized nationally, earning Rawlings-Perfect Game All-American Honorable Mention
(2017), Perfect Game Underclass High Honorable Mention (2015 and 2016), and
Atlantic All-Region First Team (2017) selections. In recognition of his talent, Mr.
Mlodzinksi was chosen to compete in the North-South All-Star Game at Lexington High
School in 2017.

747.    Mr. Mlodzinski's job as a college baseball player was essentially a full-time
one, and an important and valuable one at that. Over the course of his collegiate career
at South Carolina, he appeared in 26 games and pitched a total of 81.2 innings. He
started in seven games his freshman year, including a seven-inning outing in a win
against Furman University. Although his 2019 season was cut short due to an early
injury, he bounced back that summer in the Cape Cod League, where he dominated
with six starts, 40 strikeouts over 29 1/3 innings, and a 2.15 ERA, attracting the
attention of MLB scouts. He continued excelling in the 2020 season at South Carolina,
recording a 2.84 ERA and striking out 22 batters in 25.1 innings. For his performance,

**FOURTH AMENDED COMPLAINT**

he was ranked as the No. 7 Top College Prospect by D1Baseball and was selected to Baseball America Second Team Preseason All-America.

748.    Mr. Mlodzinski was drafted by the Pittsburgh Pirates as the 31st overall pick in the first round of the 2020 MLB Draft, further demonstrating the value of his talent and labor.

749.    During Mr. Mlodzinski's time at South Carolina, the program was a part of SEC and its games were regularly carried by national television broadcasters, including ESPN and the SEC Network. In 2018, for example, Mr. Mlodzinski's games against Florida, Tennessee, and Kentucky were broadcast on ESPN. South Carolina also frequently featured Mr. Mlodzinski on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Interest in college baseball has grown in recent years; for example, the College World Series Finals drew more than 1.5 million television viewers per game in 2019.

750.    Between ticket sales, media rights, SEC disbursements, and other sources, South Carolina no doubt benefited from its baseball program. In 2019, for instance, the SEC distributed over $44.6 million of revenue to each of its member schools, including South Carolina.

751.    Mr. Mlodzinski received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

752.    In fact, Mr. Mlodzinski received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Mlodzinski, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Mlodzinski would have received a greater amount of scholarship money than he received. As a highly ranked and decorated high school baseball recruit,

**FOURTH AMENDED COMPLAINT**

he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

753.    Moreover, during his time at South Carolina, Mr. Mlodzinski was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from South Carolina. As a nationally recognized baseball talent, he would have likely earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

754.    Defendants' conspiracy greatly harmed Mr. Mlodzinski. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

755.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Mlodzinski would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

756.    **The effect of Defendants' illegal conduct on Plaintiff Carson Green.** Plaintiff Carson Green worked as a college football player at Texas A&M University from 2017 to 2020.

757.    The labor provided by Mr. Green was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

758.    Mr. Green was a highly recruited prospect out of high school who possessed unique talent. As a senior, he earned Class 6A First Team All-State honors by the Associated Press after grading out at 98 percent in 2016 with 81 knockdowns and no QB sacks allowed. Rated as a three-star recruit by multiple recruiting services,

**FOURTH AMENDED COMPLAINT**

he was considered the number 58 offensive tackle in the nation and the eighth best in Texas by Scout. Although Mr. Green received offers from multiple universities, he ultimately decided to play for Texas A&M.

759.    Mr. Green's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, he became a key player on Texas A&M's offensive line. He appeared in 48 games with 40 starts, predominantly at right tackle.

760.    In Mr. Green's freshman year, he appeared in 12 games and made four starts. In his sophomore season, he started all 13 games, helping Texas A&M gain 5,590 total yards on the season. In his junior season, Mr. Green again started all 13 games. His leadership and dominance earned him the Offensive Attitude and Offensive Strength Awards at the annual team banquet.

761.    During his senior season, Mr. Green started all 10 games at right tackle, playing a total of 691 snaps. He served as team captain in seven games and was also a member of the leadership council. Recognized for his outstanding performance, he earned Second Team All-SEC honors and was selected to the Preseason Coaches' Third Team All-SEC. The offensive line, known as the "Maroon Goons," was a finalist for the prestigious Joe Moore Award, which is given annually to the nation's top college football offensive line unit.

762.    Throughout Mr. Green's collegiate football career, Texas A&M's games were frequently broadcast on national television, including ESPN and the SEC Network. The university actively highlighted Mr. Green on its social media platforms to enhance the program's visibility and engagement. Additionally, the offensive line unit—the "Maroon Goons"—was a focal point of the team's promotional efforts and was frequently highlighted by TV networks such as ESPN.

**FOURTH AMENDED COMPLAINT**



763.    Millions of viewers watched Texas A&M football games during this period. For instance, 7.58 million viewers tuned into the January 2, 2021 Orange Bowl between Texas A&M and UNC. Hundreds of thousands of fans attended Texas A&M football games in 2019 with a total attendance of 711,258 and an average attendance of 101,608 per game. During the 2019-2020 season, Texas A&M's athletic department accrued $162.4 million in revenue, driven by football. In 2020, the SEC, of which Texas A&M is a member, distributed approximately $45.5 million of revenue to its member schools.

764.    Mr. Green received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Texas A&M, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Texas A&M. As a highly sought-after high school recruit who became a standout player at Texas A&M, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

765.    Defendants' conspiracy greatly harmed Mr. Green. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received and would have received money for his NIL.

766.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Green would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

767.    **The effect of Defendants' illegal conduct on Plaintiff Cassius Stanley.** Plaintiff Cassius Stanley worked as a college basketball player at Duke University from 2019 to 2020.

768.    The labor provided by Mr. Stanley was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

769.    Mr. Stanley was a highly recruited basketball player out of high school. As a sophomore playing for Harvard-Westlake School in Studio City, California, he averaged 17.9 points, 6.8 rebounds, and 3.5 assists per game. He then transferred to Sierra Canyon School in Chatsworth, California for his last two years of high school, helping Sierra Canyon beat Mater Dei for the Southern Section Championship in 2019. He averaged 17.7 points, 6.9 rebounds, and 2.9 assists as a senior, propelling the team to an outstanding 32-3 overall record, a No. 6 national ranking, and a second-straight California Open Division title.

770.    In recognition of his talent, Mr. Stanley won the 2019 Daily News Player of the Year and CIF Open Division Player of the Year awards and was chosen to compete in the 2019 Jordan Brand Classic, an annual high school all-star game. He was a consensus four-star recruit and was ranked No. 32 in the nation and No. 6 among shooting guards by ESPN. Mr. Stanley received 14 offers from highly competitive

**FOURTH AMENDED COMPLAINT**

programs, including Kansas, Gonzaga, and Georgetown, and ultimately committed to play for Duke.

771.    Mr. Stanley's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. As a freshman at Duke, he started in 29 games and averaged 12.6 points and 4.9 rebounds per game. He notched several standout performances, including scoring 20 points in a single half against Georgetown, recording a double-double with a career-high 24 points against Louisville, and scoring 19 points in the season finale against rival North Carolina. He earned an ACC All-Freshman Team selection and declared for the 2020 NBA Draft following his freshman season.

772.    During Mr. Stanley's time at Duke University, the program was a part of the ACC and its games were regularly carried by national television broadcasters such as ESPN. Duke men's basketball is among the most-watched programs of all NCAA sports and regularly drew millions of viewers per game. Both Duke-UNC matchups in the 2019-2020 season were among the top ten in television viewership, and the February 8th game where Mr. Stanley scored 22 points drew 2.67 million viewers, the highest of any game that season.

773.    Additionally, the Duke men's basketball program had—and continues to have—one of the largest social media followings of any collegiate program. In 2020, for example, it had over 4 million followers across Twitter, Instagram, and Facebook. Duke frequently featured Mr. Stanley on its social media accounts, highlighting his accomplishments (and elite dunking skills) and no doubt using him to boost game attendance and viewership. Mr. Stanley himself had hundreds of thousands of followers on Instagram alone, often drawing attention to Duke men's basketball and further raising its profile. In fact, according to a case study commissioned by Duke in 2020, Mr. Stanley's Instagram followers alone—numbering over 500,000—had an estimated annual value of $410,720.

**FOURTH AMENDED COMPLAINT**

774.    Between ticket sales, media rights, ACC disbursements, and other
sources, Duke men's basketball has generated a significant amount of revenue from its
men's basketball program. In fact, Duke men's basketball is among the most profitable
college basketball programs, earning an average of $14.6 million in annual profits from
2016 to 2019. For that same period, Duke men's basketball generated an average of
$35.4 million in annual revenues.

775.    Mr. Stanley received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. During his time at Duke, he was not permitted to receive
money for use of his NIL, whether from third parties, from Defendants, or from Duke. As
a nationally recognized basketball star with unique dunking and other talents, Mr.
Stanley would have earned substantial NIL compensation if not for the NCAA's unlawful
restrictions.

776.    Defendants' conspiracy greatly harmed Mr. Stanley. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college basketball player than he received,
and would have received money for his NIL from third parties.

777.    Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Stanley would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

778.    **The effect of Defendants' illegal conduct on Plaintiff Cayden Wallace.**
Plaintiff Cayden Wallace, an individual, is a resident of Arkansas. He worked as a
college baseball player at the University of Arkansas from 2020 to 2022.

779.    The labor provided by Mr. Wallace was of great value to Defendants. And
it was a significant amount of labor. During the season, he often worked six days per

**FOURTH AMENDED COMPLAINT**

week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

780.    Mr. Wallace was a highly recruited prospect out of high school who possessed unique talent. At Greenbrier High School, he was named the top prospect in Arkansas and the 25th best player in the nation according to Perfect Game. He had an outstanding junior year in 2019, hitting .514 with 22 RBIs, and 38 hits, including six home runs. He helped Greenbrier to back-to-back state semifinals appearances in 2017 and 2018 and was named a 2019 5A All-State player as a junior. He also earned 2019 Perfect Game All-American and Under Armor All-American honors as well as played in the 2019 PG National Showcase and the 2017 and 2018 Junior National Showcase. Additionally, he was named the Arkansas Democrat Gazette River Valley and Ozark Edition Player of the Year and First Team All-Arkansas Preps in 2019. He had offers from multiple universities, but ultimately decided to play for Arkansas.

781.    Mr. Wallace's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate baseball career, Mr. Wallace became one of Arkansas's key players. As a freshman, he started all 60 games, primarily splitting time between right field and third base. He posted an impressive slash line of .279/.369/.500, belting 14 home runs and driving in 44 RBIs. He led the team with 67 hits and crossed the plate 52 times, demonstrating his offensive prowess. Defensively, he was flawless his freshman season, recording a perfect 1.000 fielding percentage. His standout performance earned him several honors, including Baseball America Second Team Freshman All-American, Freshman All-SEC Team, and SEC Freshman of the Week.

782.    In his sophomore season, he continued to excel, contributing significantly to the team's success. He entered the season as a preseason All-SEC selection by the league's coaches and earned a spot on the preseason watch list for the USA Baseball Golden Spikes Award, presented annually to the nation's top amateur baseball player.

**FOURTH AMENDED COMPLAINT**

He was promoted to team captain and was the only Arkansas player to start all 67 games, slashing .298/.387/.553 with a team-leading 16 home runs and a team-best 60 RBIs. His dominance extended across multiple statistical categories, as he topped Arkansas in nine offensive metrics: slugging percentage (.553), runs scored (62), RBIs (60), doubles (20), home runs (16), total bases (152), stolen bases (12), total plate appearances (323), and at-bats (275). His stellar performance earned him numerous accolades, including Collegiate Baseball Newspaper National Player of the Week honors. He was also named to the ABCA/Rawlings South All-Region Team, the Karbach Round Rock Classic All-Tournament Team, and the NCAA Stillwater Regional All-Tournament Team.

783.    In the 2022 MLB draft, Mr. Wallace was selected in the second round (49th overall) by the Kansas City Royals.

784.    During his collegiate baseball career, Arkansas's baseball games were carried on national television, often by networks such as ESPN and the SEC Network. The university frequently featured Mr. Wallace on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Hundreds of thousands of viewers watched Arkansas baseball games during this period. For instance, the 2022 Arkansas-Oklahoma State finale averaged 531,000 viewers with a peak of 675,000. Furthermore, Arkansas's 2021 regional victory over Nebraska averaged 753,000 viewers. In the 2022 season, Arkansas led all of college baseball in home attendance with 363,153 tickets sold. In 2019, Arkansas saw 93,868 fans pack the stadium during the two postseason rounds that showcased Arkansas advancing to their tenth College World Series in program history, welcoming more fans than any other ballpark in the nation. In the 2021-2022 season, Arkansas made more than $3.3 million in ticket sales revenue from baseball ticket sales alone. In 2022, the Southeastern Conference, of which the

**FOURTH AMENDED COMPLAINT**

University of Arkansas is a member, distributed approximately $49.9 million of revenue to each of its member schools.

785.    Mr. Wallace received none of the revenue distributed to Arkansas by the SEC; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. Even for the time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Arkansas and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a standout player at Arkansas, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

786.    Defendants' conspiracy greatly harmed Mr. Wallace. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

787.    Mr. Wallace received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Wallace. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As a highly sought-after high school recruit who became a standout player at Arkansas, he would have received a full athletic scholarship absent Defendants' bylaws.

**FOURTH AMENDED COMPLAINT**

788.    But for the illegal and unfair restraints put in place, Mr. Wallace would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

789.    **The effect of Defendants' illegal conduct on Plaintiff Chad Hansen.** Plaintiff Chad Hansen worked as a college football player at Idaho State University from 2013 to 2014 and at the University of California, Berkeley from 2014 to 2017.

790.    The labor provided by Mr. Hansen was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

791.    Mr. Hansen was a highly competitive football player out of high school. As the team captain and starting wide receiver for Moorpark High School in California, he recorded 49 catches for 882 yards and 12 touchdowns in his senior season, earning the team MVP award and selections to first-team All-Marmonte League and All-Ventura County.

792.    Mr. Hansen's job as a college football player was essentially a full-time one, and an important and valuable one at that. At Idaho State, he started 11 of 12 games in 2013 as a true freshman and recorded three touchdowns, ranking third on the team, and 45 receptions for 501 yards, ranking fourth on the team in both categories. He subsequently transferred to Cal and, after sitting out in 2014 due to transfer rules, appeared in ten games in 2015, notching a season-high 51 yards against Stanford. He had a breakout season in 2016 after becoming one of Cal's starting wide receivers, averaging almost 125 yards per game and ranking third in the country. He was also ranked 12th nationally in receptions, 17th in receiving yards, and 22nd in touchdown receptions, and he led the Pac-12 in receiving yards per game, receptions per game, receptions, and receiving yards. His 2016 season performance earned him first-team All-Pac-12 honors from the Associated Press, ESPN, and Phil Steele.

**FOURTH AMENDED COMPLAINT**

793.    As a member of the Pac-12 Conference, Cal's games were regularly carried by national television broadcasters such as ESPN and CBS, as well as by the Pac-12 Network. In fact, during the 2016 season, the vast majority of UC Berkeley games were night games and were broadcast on either ESPN or CBS. During 2015-2019, Cal football games drew an average of 730,000 viewers per week, with games against other top-ranked programs drawing millions more. For example, Cal's 2016 upset victory against No.11 Texas, where Mr. Hansen had 12 receptions for 196 yards with two touchdowns, totaled over 2.4 million in viewership.

794.    Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources, Cal has made a considerable amount of money from its football program. For example, the Pac-12 Conference distributing as much as $28.7 million in revenue to member schools for the 2016 fiscal year. And notably, in the 2017 fiscal year, Cal made $45.30 million in revenue from its football program alone, including $9.37 million in ticket sales.

795.    Mr. Hansen received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving scholarships and other education-related expenses. During his time at Idaho State and Cal, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from either university. As a starting wide receiver and standout football talent, Mr. Hansen would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

796.    Defendants' conspiracy greatly harmed Mr. Hansen. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

**FOURTH AMENDED COMPLAINT**

797.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Hansen would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

798.    **The effect of Defendants' illegal conduct on Plaintiff Charles Matthews.** Plaintiff Charles Matthews worked as a college basketball player at the University of Kentucky during the 2015-2016 season and at the University of Michigan from 2016 to 2019.

799.    The labor provided by Mr. Matthews was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

800.    Mr. Matthews was a highly recruited prospect out of high school who possessed unique talent. He was ranked as ESPN's 42nd overall player in the 2015 recruiting class and the second-best player in Illinois. As a senior, he averaged 21.3 points and 6.2 rebounds per game, leading the Mustangs to a 26-4 record, a Chicago Catholic League South title, and a 4A Regional championship. In 2015, he earned multiple prestigious honors, including selections to the Illinois Basketball Coaches Association (IBCA) Class 4A First Team All-State, the Associated Press Class 4A First Team All-State, and the Chicago Tribune Class 4A First Team All-State. Additionally, he was awarded the Tony Lawless Award as the MVP of the Catholic League South Section. Matthews was also chosen to compete in the 2015 Jordan Brand Classic and was named to the 2014-15 MaxPreps All-American Team.

801.    Mr. Matthews' job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career, Mr. Matthews contributed to both Kentucky's and Michigan's basketball programs. As a

**FOURTH AMENDED COMPLAINT**

freshman at Kentucky, he played in all 36 games, making three starts, and played a
crucial role in Kentucky's success. He helped the team achieve a 27-9 record, secure a
share of the SEC regular-season title, win the SEC Tournament championship, and
advance to the second round of the NCAA Tournament.

802.    After transferring to Michigan, Matthews quickly became one of the
nation's top defenders, recognized for his length, athleticism, and defensive versatility.
During the 2017-2018 season, he played and started all 41 games, averaging 13.0
points and 5.5 rebounds per game, helping lead Michigan to the NCAA Championship
game. That season, he was the named the NCAA West Regional Most Outstanding
Player.

803.    In the 2018-2019 season, he remained a crucial player, starting 34 games
and averaging 12.2 points and 5.0 rebounds per game. In 2019, he earned All--Big Ten
honorable mention, Preseason All-Big Ten team, Academic All-Big Ten, and the title of
Michigan Captain.

804.    Throughout his collegiate basketball career, Mr. Matthews played in
multiple high-profile games that were broadcast on national television, including the
2018 NCAA Tournament, where Michigan's games aired on major networks such as
CBS and ESPN. The universities frequently featured Mr. Matthews on their social media
platforms and other promotional materials, highlighting his achievements and likely
leveraging his presence to enhance game attendance and viewership. Millions watched
Mr. Matthews' game during this time. For instance, Michigan's Final Four game against
Loyola in the 2018 NCAA National Semifinals delivered an average minute audience
across all platforms of 13.4 million viewers with a peak of 14.6 million viewers. In the
2018-2019 season, tens of thousands of fans attended Michigan basketball games with
a total of 225,079 for the year. In 2019, the Big Ten Conference distributed
approximately $55.6 million to each of its member schools, including Michigan.

**FOURTH AMENDED COMPLAINT**

805.    Mr. Matthews received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time in college basketball, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Kentucky or Michigan. As a highly sought-after high school recruit who became a standout player at Michigan, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

806.    Defendants' conspiracy greatly harmed Mr. Matthews. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL from third parties.

807.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Matthews would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

808.    **The effect of Defendants' illegal conduct on Plaintiff Charlie Woerner.** Plaintiff Charlie Woerner worked as a college football player at the University of Georgia from 2016 to 2020.

809.    The labor provided by Mr. Woerner was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

810.    Mr. Woerner was a highly recruited, versatile football player out of Rabun County High School in Tiger, Georgia. Even though he did not start playing in the wide receiver position until his senior year, he accumulated 2,696 receiving yards in four seasons of varsity football at both tight end and wide receiver positions. He caught 57

**FOURTH AMENDED COMPLAINT**

receptions for 15 touchdowns as a senior and was named to the Class AA All-State First Team by the Georgia Sports Writers Association. He also excelled in the defensive back position, winning the 2015 Class AA Defensive Player of the Year award and earning selections to Atlanta Journal-Constitution Super 11 and AA All-State. As a consensus four-star recruit, he was ranked No. 4 in his position of tight end and No.11 out of all prospects from Georgia by ESPN. He received nine offers from top-ranked programs, including Alabama, Clemson, and Florida, and ultimately committed to Georgia.

811.    Mr. Woerner's job as a college football player was essentially a full-time one, and an important and valuable one at that. Playing as a tight end and serving on special teams, he contributed consistently throughout his four years at Georgia, helping the team win three straight SEC Eastern Division titles. He made his mark as early as 2016, starting in two games in a highly stacked Georgia team. In 2017, after setting a career-high at the Rose Bowl with three receptions for 21 yards, he won the offensive Most Improved Award. In 2018, he played in all 14 games and started against highly ranked LSU and Florida, earning the Special Teams Most Improved Player award. Ahead of the 2019 season, he earned a spot on the preseason watchlist for the John Mackey Award, presented annual to the best collegiate tight end. He concluded his collegiate career by starting all 14 games in 2019 and serving as team captain in two games. He was also chosen to compete in the National Football League Players Association Collegiate Bowl in January 2020.

812.    During Mr. Woerner's collegiate career, Georgia was a member of the SEC and its games were regularly carried by national television broadcasters such as CBS and ESPN. Georgia frequently featured Mr. Woerner on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Georgia games drew a weekly average of 2.91 million viewers during 2015 to 2019, with games against other top-ranked programs drawing millions more.

**FOURTH AMENDED COMPLAINT**

For example, Georgia's 2018 Sugar Bowl matchup against Texas drew over 13 million in viewership.

813.    Between ticket sales, media rights, SEC disbursements, and other sources, Georgia has made a considerable amount of money from its football program. For example, for the 2019 fiscal year, Georgia made $44.26 million in revenue from its football program alone, with $34.56 million of that coming from ticket sales and $18.82 million from media rights. The university also received $44.6 million in revenue disbursements from the SEC for that same period.

814.    Mr. Woerner received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During his time at Georgia, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Georgia. As a top-ranked high school prospect, standout tight end, and Georgia native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

815.    Defendants' conspiracy greatly harmed Mr. Woerner. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

816.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Woerner would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

817.    **The effect of Defendants' illegal conduct on Plaintiff Chase Strumpf**. Plaintiff Chase Strumpf worked as a college baseball player at the University of California, Los Angeles from 2017 to 2019.

**FOURTH AMENDED COMPLAINT**

818.    The labor provided by Mr. Strumpf was of great value to Defendants. During the season, he often worked six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

819.    Mr. Strumpf was a highly recruited prospect out of high school who possessed unique talent. A native of Dana Point, California, he was a highly ranked infielder at JSerra Catholic High School where he was a four-year varsity baseball letterwinner. He was ranked 31 in the 2016 Perfect Game USA Top High School Prospects in the state of California, number 244 in the 2016 Perfect Game USA Top 500 High School Prospects, and 21 on MaxPreps list of Top 50 High School juniors. He was also a 2016 Rawlings/Perfect Game Honorable Mention All-American, 2016 Perfect Game preseason First Team All-Region selection, three-time First Team All-Trinity League selection, a 2015 Perfect Game USA First Team Underclass All-American, 2015 Second Team All-County selection, named to the 2015 PG/Evoshield National Championship All-Tournament team, and a 2014 Perfect Game USA Second Team Underclass All-American. He also led the U.S. 15U National Team to the Pan Am Championship in 2013, led team to three Trinity league titles, and led his team to the quarterfinals of the CIF Southern Selection Division I playoffs as a junior and the semifinals as a sophomore. Mr. Strumpf's stellar high school career earned him a spot on UCLA's baseball team.

820.    Mr. Strumpf's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Over the course of his three seasons at UCLA, he established himself as one of the best hitters in the Pac-12, receiving All-American honors and multiple All-Conference selections while leading the Bruins to an NCAA Tournament appearance in 2018.

821.    In 2017, Mr. Strumpf appeared in 55 games and started 54 games at second base. He hit .239 with 23 runs scored and 30 RBIs, totaling 16 extra-base hits

**FOURTH AMENDED COMPLAINT**

with seven home runs and nine doubles. He also slugged .399 and posted a .315 on-base percentage. He was top-10 during Pac-12 play in home runs and RBIs and was the first Bruin to drive in seven or more runs in a game since 2000. During the summer of 2017, he was named to the Northwoods League Postseason All-Star Team for Duluth where he batted .335 with six home runs, 15 doubles, 32 RBIs, and 25 runs scored. He also registered a .549 slugging percentage and a .425 on-base percentage with 19 walks and eight hit by pitches.

822.    In 2018, Mr. Strumpf had a breakout sophomore season, batting .363 with 59 runs scored, 12 home runs, 53 RBIs, and a .475 on-base percentage. His offensive production ranked among the best in the Pac-12 and his performance helped UCLA advance to the NCAA Regionals, further solidifying the program's status as a national contender. He was named a Second Team All-American by D1Baseball, Collegiate Baseball and Perfect Game; All-Pac-12 selection; and earned the All-Regional Team honors at the NCAA Minneapolis Regional. He was also a Dick Howser Award semifinalist, which is given to the most outstanding collegiate baseball player. He was the fourth Bruin since 2001 with 50-plus RBIs and 10-plus home runs in a season; first Bruin since 2012 to record double-digit home runs; and first Bruin since 2015 with 50 RBIs. He was also named Pac-12 Player of the Week on April 9 and recorded only two errors all season to help UCLA to the third-best fielding percentage in the NCAA.

823.    Mr. Strumpf ended his sophomore season ranked top-10 in the Pac-12 in batting average, slugging, on-base percentage, runs scored, hits, RBIs, doubles, home runs, total bases, walks, and assists. He furthermore finished top-100 in the NCAA in doubles (13th), on-base percentage (25th), total bases (36th), slugging percentage (49th), walks (51st), runs (57th), batting average (59th), and hits (60th). During the summer of 2018, he was invited to play on the United States Collegiate National Team (USCNT), but did not participate due to injury.

**FOURTH AMENDED COMPLAINT**

824.    Ahead of his junior season, Mr. Strumpf was named preseason First Team All-American by Baseball America, Collegiate Baseball, Perfect Game, and D1Baseball and was listed as the number 6 prospect in the Pac-12 for the 2019 MLB Draft by D1Baseball.

825.    Mr. Strumpf continued to be a key contributor during the 2019 season, batting .279 with 9 home runs and 44 RBIs. He was listed as the best second baseman prospect available just before the 2019 MLB Draft by MLB Pipeline and was named to the Pac-12 All-Conference Team. He was one of three Bruins to start all 63 of the team's games, leading the team in walks and ranking second in runs scored and third in home runs. He was named the Most Outstanding Player of the Los Angeles Regional after going 5-17 with four extra-base hits, two home runs, and six RBIs in five games. In the last two games of regionals, he was 4-8 with two home runs and six RBIs. His outstanding performance during the 2019 season was instrumental to UCLA's No. 1 ranking throughout much of the regular season, as well as its selection as No. 1 national seed in the 2019 NCAA Division I baseball tournament.

826.    During the 2019 MLB Draft, Mr. Strumpf was selected in the second round (64th overall) by the Chicago Cubs, further demonstrating the value of his talent and labor.

827.    Mr. Strumpf's performances helped UCLA baseball gain national exposure, as the team frequently played in highly televised games on ESPN, Pac-12 Network, and regional broadcasts. In 2018, UCLA made a total of $18.9 million of revenue from ticket sales, including baseball ticket sales. Furthermore, in 2019, the Pac-12 Conference distributed about $32.2 million of revenue to each of its member schools, including UCLA.

828.    Mr. Strumpf received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. During his time at UCLA, he was restricted from

**FOURTH AMENDED COMPLAINT**

receiving money for his NIL, whether from third parties or from Defendants or from his university. As a projected high-round MLB Draft pick, he would have been able to capitalize on endorsement opportunities, sponsorships, and other forms of NIL compensation had the NCAA not enforced its restrictive policies.

829.    Mr. Strumpf received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Strumpf. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment, forcing him to pay thousands of dollars that he would not have otherwise had to pay. In-state tuition and expenses, including room and board, at UCLA were around $33,900 in 2017-18; $34,620 in 2018-19; and $35,793 in 2019-2020. Thus, Defendants' scheme directly injured him.

830.    Defendants' conspiracy greatly harmed Mr. Strumpf. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL.

831.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Strumpf would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

832.    **The effect of Defendants' illegal conduct on Plaintiff Chazz Surratt.** Plaintiff Chazz Surratt worked as a college football player at the University of North Carolina from 2016 to 2020.

833.    The labor provided by Mr. Surratt was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

**FOURTH AMENDED COMPLAINT**

834.    Mr. Surratt was a highly recruited prospect out of high school who possessed unique talent. As a senior, he was named Parade All-America and honored as the Parade National Player of the Year. He also received recognition as the Associated Press Offensive Player of the Year in North Carolina and was named the Gatorade State Player of the Year. A two-time AP First Team All-State selection, he was also named the MaxPreps National Small Schools Player of the Year.

835.    Over the course of his high school career, Mr. Surrat shattered records, setting the state mark for career total yards with 16,593 and the record for total touchdowns responsible for, with 229 career scores. His senior season alone was outstanding—he passed for 3,536 yards and 51 touchdowns while throwing just ten interceptions, and he added 1,345 rushing yards along with 15 more touchdowns on the ground. Leading East Lincoln High School to an impressive 30 consecutive victories, he broke the state's total offense record, surpassing the previous mark set by Charlotte Independence quarterback and three-time state champion Chris Leak.

836.    He was the only two-time recipient of the North Carolina Prep Player of the Year award, winning in both 2014 and 2015. Additionally, he was named a Wendy's High School All-American and finished as the runner-up for the AP Player of the Year award as a junior. He played a crucial role in leading his team to two 2AA football state championships in 2012 and 2014, earning MVP honors in the 2014 title game.

837.    A four-time NC Preps All-State selection in football, he also excelled in basketball. He was a three-time NC Preps All-State selection in basketball, earning Conference Player of the Year and District Player of the Year honors as a junior. That same year, he was named the NCHSAA Male Athlete of the Year and was an AP All-State selection in basketball.

838.    Multiple universities competed for Mr. Surratt's talent during the recruitment process before he ultimately committed to UNC.

**FOURTH AMENDED COMPLAINT**

839.    Mr. Surratt's job as a college football player was essentially a full-time one, and an important and valuable one at that. Mr. Surratt began his career as a quarterback, playing in nine games and starting in seven as a redshirt freshman in 2017. After transitioning to linebacker before the 2019 season, he quickly became one of the top defensive players in the country. In 2019, he played in all 13 games, starting in 11 and recorded 115 total tackles, 15 tackles for loss, and 6.5 sacks, earning First Team All-ACC honors and Runner-up for ACC Defensive Player of the Year. He followed that performance with another standout season in 2020, where he started all 11 games as a linebacker and team captain, recording 91 tackles and 6 sacks, once again being named First Team All-ACC and defensive MVP.

840.    That season, he was named Sporting News First Team All-American and was recognized as a semifinalist for both the Butkus Award and the Lott Trophy. Additionally, he was a finalist for the Senior CLASS Award and was featured on the watch lists for the Bednarik Award and the Nagurski Trophy.

841.    His standout performances earned him numerous other accolades, including being named the Chuck Bednarik Award and ACC Linebacker of the Week after recording a game-high nine tackles, a career-best 2.5 tackles for loss, and two sacks against Syracuse. He received ACC Linebacker of the Week honors again after delivering a dominant performance against NC State, where he led the team with eight tackles, recorded a sack, grabbed an interception, and forced a fumble.

842.    In the 2021 NFL Draft, Mr. Surratt was selected in the third round with the 78th overall pick of the 2021 NFL Draft by the Minnesota Vikings.

843.    During Mr. Surratt's collegiate football career, UNC's games were carried on national television, often by either an ESPN network or the ACC Network. The university frequently featured Mr. Surratt on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Millions of viewers watched UNC football

**FOURTH AMENDED COMPLAINT**

games during Mr. Surratt's career. For instance, over 2.1 million viewers watched the 2019 Military Bowl where UNC beat Temple 55-13. In 2019, tens of thousands of fans attended UNC football games for a total of 303,000 and an average of 50,500 per game, bringing in millions in revenue from ticket sales and other revenues. In 2021, the ACC, of which UNC was a member, distributed approximately $33.6 million to each of its member schools.

844. Mr. Surratt received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at UNC, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from UNC. As a highly sought-after high school recruit who became an All-American, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

845. Defendants' conspiracy greatly harmed Mr. Surratt. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

846. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Surratt would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

847. **The effect of Defendants' illegal conduct on Plaintiff Chris McMahon.** Plaintiff Chris McMahon worked as a college baseball player at the University of Miami from 2017 to 2020.

848. The labor provided by Mr. McMahon was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days

**FOURTH AMENDED COMPLAINT**

per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

849.    Mr. McMahon was a highly recruited baseball player out of Rustin High School in West Chester, Pennsylvania. He helped lead his team to league championships all three seasons and earned First Team All-Conference recognition each year of his high school career. In his senior season in 2017, he had a record of 8-0 as a starting pitcher with an 0.77 ERA, winning the conference's Player of the Year award. He was ranked as the nation's No. 76 overall prospect by Baseball America in its list of top 500 MLB Draft prospects. Although Mr. McMahon was selected in the 33rd round of the 2017 MLB First-Year Player Draft, he decided to enroll at Miami.

850.    Mr. McMahon's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. After missing the first month of the season due to injury, he made six appearances and four starts as a freshman in 2018. In 2019, he made 12 starts with a 3.72 ERA, striking out 67 batters and walking 23 over 60.1 innings pitched. He had particularly notable performances against Florida, with 7 strikeouts over 6.2 innings, and Florida State, with 7 shutout innings. That summer, he made the USA Collegiate National Team and led the team with 16 strikeouts and ranked second on the team in ERA (2.25). Ahead of the 2020 season, he was named to the preseason watchlist for the Golden Spikes Award, presented annually to the best collegiate baseball player.

851.    Mr. McMahon continued to excel in the 2020 season, lowering his ERA to 1.05, striking out 38 batters, and walking only 5 over 25.2 innings pitched. He led the team in wins and strikeouts and held opponents to a .207 batting average. His performance that season earned him a selection to Second Team All-America by Collegiate Baseball.

852.    During Mr. McMahon's time at Miami, the program was a part of the ACC and its games were carried by its own ACC Network as well as by national television

**FOURTH AMENDED COMPLAINT**

broadcasters such as ESPN. Miami also frequently featured Mr. McMahon on its social media accounts, highlighting his accomplishments and using him to boost game attendance and viewership.

853.    Between ticket sales, media rights, ACC disbursements, and other sources, Miami no doubt benefited from its baseball program. For the 2019 fiscal year, for example, the ACC distributed an average of $29 million in revenues to each of its member schools.

854.    Mr. McMahon received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

855.    In fact, Mr. McMahon received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. McMahon, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. McMahon would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

856.    Moreover, during his time at Miami, Mr. McMahon was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a nationally recognized All-American athlete, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

857.    Defendants' conspiracy greatly harmed Mr. McMahon. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college baseball player than he received, and he also would have received money for his NIL from third parties.

858.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. McMahon would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

859.    **The effect of Defendants' illegal conduct on Plaintiff CJ Van Eyk.** Plaintiff CJ Van Eyk worked as a college baseball player at Florida State University from 2017 to 2020.

860.    The labor provided by Mr. Van Eyk was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

861.    Mr. Van Eyk was a highly recruited prospect out of high school who possessed unique talent. As a senior, he posted an impressive 5-1 record with a stellar 0.73 ERA, striking out 56 batters over 38.1 innings pitched. He earned First Team All-American honors in both his junior and senior seasons and was ranked 57th in the Perfect Game National Rankings. Additionally, he was named Florida Dairy Farmer Player of the Year and won a gold medal with the 18U USA National Team. His leadership and performance played a crucial role in guiding his high school to the 8A state championship in 2016.

862.    He was drafted by the New York Mets in the 19th round of the 2017 MLB Draft but ultimately chose to attend FSU.

863.    Mr. Van Eyk's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his baseball career, Mr. Van Eyk was one of FSU's key starting pitchers. As a freshman in 2018, he made 19 appearances, including five starts, and delivered an impressive 7-0 record with a 2.86

**FOURTH AMENDED COMPLAINT**

ERA. Over 56.2 innings pitched, he struck out 71 batters while allowing just 42 hits and issuing 30 walks.

864.    He also played a key role in postseason play, starting the ACC Tournament opener against Virginia and making an appearance in the NCAA Tournament against Samford. His standout freshman campaign earned him ACC All-Freshman Team honors, Second Team Freshman All-American recognition, and an invitation to join the Team USA Collegiate National Team, where he competed for two weeks during the summer.

865.    In Mr. Van Eyk's 2019 sophomore season, he started 18 games, recorded a 10-4 record with a 3.81 ERA, and struck out 129 batters in 99.1 innings. He helped lead FSU to the College World Series that year, and finished the season second in the ACC with 10 wins and 129 strikeouts, earning him ABCA Second Team All-Atlantic Region, All-Athens Regional Team, and Third Team All-ACC honors.

866.    In his junior season in 2020, he was regarded as one of the top pitchers in the ACC before the season was cut short due to the COVID-19 pandemic. That year, he was a preseason All-American and a semifinalist for the AAU Sullivan Award, given to the nation's top amateur athlete and the only baseball player to be recognized.

867.    Following his junior season, he was drafted in the 2nd round (42nd overall) by the Toronto Blue Jays.

868.    During Mr. Van Eyk's collegiate baseball career, FSU's baseball games were carried on national television, often by either an ESPN network or the ACC Network. The university frequently featured Mr. Van Eyk on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Some FSU games during this period attracted over one million viewers. For instance, the 2019 NCAA College World Series matchup against Michigan amassed 1.29 million viewers and the subsequent matchup against Texas Tech had 1.25 million. In 2019, over 140,000 attended FSU

**FOURTH AMENDED COMPLAINT**

games in person, generating significant revenue. The FSU baseball program was a member of the ACC during Mr. Van Eyk's tenure; in 2020, the ACC distributed approximately $32.3 million to each of its member schools.

869.    Mr. Van Eyk received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at FSU, he was not permitted to receive for his NIL whether from third parties or from Defendants or from FSU. As a highly sought-after high school recruit who became a standout player at FSU, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

870.    Defendants' conspiracy greatly harmed Mr. Van Eyk. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

871.    Mr. Van Eyk received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Van Eyk. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became one of the nation's best pitchers at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

872.    But for the illegal and unfair restraints put in place, Mr. Van Eyk would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

873.    **The effect of Defendants' illegal conduct on Plaintiff Colby**
**Parkinson.** Plaintiff Colby Parkinson worked as a college football player at Stanford
University from 2017 to 2020.

874.    The labor provided by Mr. Parkinson was of great value to Defendants.
And it was a significant amount of labor. During the season, he worked at least six days
per week, and often more than 40 hours per week. Even during the offseason, he
worked a significant number of hours under the direction of his coaches.

875.    Mr. Parkinson was a highly recruited football player out of Oaks Christian
High School in Westlake Village, California, where he also played varsity basketball.
Over the course of his high school football career, he totaled 1,280 career receiving
yards on 80 receptions for eight touchdowns and led his team to two league titles. He
also played in the U.S. Army All-American Bowl his senior year. He was rated a five-star
recruit by 247 Sports and a four-star recruit by ESPN, and was named to All-USA First
Team by USA Today. Additionally, Mr. Parkinson was ranked the top tight end prospect
in the country by 247 Sports. He received 14 offers from competitive programs,
including from top-ranked teams such as Alabama and Georgia, and committed to play
for Stanford.

876.    Mr. Parkinson's job as a college football player was essentially a full-time
one, and an important and valuable one at that. Starting his college career with two
touchdowns against Rice, he became Stanford's first true freshman with multiple
touchdown receptions in a season opener. In his sophomore year, he tied the Stanford
record for most touchdowns (four) in a single game for a tight end in a matchup against
Oregon State, where he also had six catches for 166 yards. He finished the 2018
season with 485 receiving yards and seven touchdowns, the third-most touchdowns in
the nation by a tight end, and earned All-Pac-12 Honorable Mention.

877.    In his 2019 season, Mr. Parkinson started all 12 games with 589 total
receiving yards, including a career-high seven receptions for 89 yards against the

**FOURTH AMENDED COMPLAINT**

University of Southern California. At the end of that season, he was named to All-Pac-12 Second Team and was a semifinalist for the John Mackey Award, presented annually to the most outstanding tight end in college football.

878.    Mr. Parkinson was selected by the Seattle Seahawks in the fourth round of the 2020 NFL Draft, and he now plays for the Los Angeles Rams.

879.    During Mr. Parkinson's collegiate career, Stanford was a member of the Pac-12 Conference and its games were regularly broadcast by Fox and ESPN. Stanford also frequently featured—and continues to feature—Mr. Parkinson on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Stanford games drew a weekly average of 1.43 million viewers on television during 2015 to 2019, with games against other top-ranked programs drawing millions more. For example, Stanford's 2018 matchup against Oregon, where Mr. Parkinson scored the game-winning 23-yard touchdown in overtime, drew over 4 million in television viewership.

880.    Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources, Stanford has made a considerable amount of money from its football program. Following the 2018 season, for example, the Pac-12 Conference distributed $29.5 million in revenues to each of its member schools, including Stanford.

881.    Mr. Parkinson received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Stanford, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Stanford. As a nationally recognized football talent and California native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

882.    Defendants' conspiracy greatly harmed Mr. Parkinson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

883.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Parkinson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

884.    **The effect of Defendants' illegal conduct on Plaintiff Colton Prater.** Plaintiff Colton Prater worked as a college football player at Texas A&M University from 2016 to 2019.

885.    The labor provided by Mr. Prater was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school. Mr. Prater also participated in numerous donor events while at Texas A&M to raise money for the school.

886.    Mr. Prater was a highly recruited prospect out of high school who possessed unique talent. Among other accolades, he earned 2015 First Team All-Louisiana honors from USA Today. Although he received offers from over 20 universities, including Georgia, Houston, Kansas, Mississippi State, Ole Miss, TCU, and Utah, he ultimately committed to Texas A&M.

887.    Mr. Prater's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Prater was a key offensive lineman for Texas A&M and played a career total of 48 games. In his freshman year, he started the first 12 games of the season before missing the bowl game due to injury. He helped clear the way for a balanced Texas A&M offense that gained 467.0 yards per game, with 211.8 rushing and 250.0 passing yards per game. In his sophomore year, he again was a key contributor at offensive line,

**FOURTH AMENDED COMPLAINT**

appearing in 10 games with three starts, helping the offense gain an average of 448

yards of total offense as a starter. His junior season he appeared in all 13 games and

helped Texas A&M gain 5,590 total yards on the season.

888.    He started all 13 games in his senior year in 2019, serving as team

captain in each game. He was instrumental in clearing the way for multiple 100-yard

rushing performances and contributed to the team's significant offensive outputs,

including over 600 yards against Lamar and over 500 yards against UTSA. He was

named SEC Offensive Lineman of the Week for his performance against South Carolina

and earned the Heart Award, Most Improved Lineman, Senior Academic Excellence,

and Top Conditioned Athlete Awards at the annual team banquet.

889.    During Mr. Prater's collegiate football career, Texas A&M's football games

were carried on national television, often by networks such as ESPN and the SEC

networks. The university frequently featured Mr. Prater on its social media platforms and

other promotional materials, highlighting his achievements and likely leveraging his

presence to enhance game attendance and viewership. Millions of viewers watched

Texas A&M football games during this period. For instance, the 2019 Texas Bowl

against Oklahoma State garnered 4.9 million viewers. Hundreds of thousands of fans

attended Texas A&M football games in 2019 with a total attendance of 711,258 with an

average of 101,608 per game. During the 2019-2020 season, Texas A&M's athletic

department accrued $162.4 million in revenue, 30% of which was attributed to ticket

sales. In 2019, the SEC distributed over $44.6 million of revenue to each of its member

schools, including Texas A&M.

890.    Mr. Prater received none of that revenue; nor was he otherwise

compensated by Defendants for his labor other than by receiving a scholarship and

other education-related expenses. And during his time at Texas A&M, he was not

permitted to receive money for his NIL whether from third parties or from Defendants or

from Texas A&M. As a highly sought-after high school recruit who became a standout

**FOURTH AMENDED COMPLAINT**

player at Texas A&M, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

891.    Defendants' conspiracy greatly harmed Mr. Prater. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

892.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Prater would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

893.    **The effect of Defendants' illegal conduct on Plaintiff Connor Prielipp**. Plaintiff Connor Prielipp worked as a college baseball player at the University of Alabama from 2019 to 2022.

894.    The labor provided by Mr. Prielipp was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

895.    Mr. Prielipp was a highly recruited baseball player out of Tomah High School in Wisconsin. As one of the country's best left-handed pitchers in the class of 2019, he was ranked as the No. 2 overall player in Wisconsin by Perfect Game. He posted an impressive 0.27 ERA with 97 strikeouts across 52 innings in his junior year, earning selections to Second Team All-USA Wisconsin Baseball from USA Today and Underclass Honorable Mention from Perfect Game, as well as winning the 2018 District III Player of the Year and Wisconsin Baseball Central Pitcher of the Year awards.

896.    Mr. Prielipp continued excelling in his senior year of high school, posting a 0.85 ERA and 118 strikeouts across 49.1 innings pitched. His performance that year

earned First Team All-American honors by Collegiate Baseball News and he was also selected as the 2019 Wisconsin Gatorade High School Player of the Year. Mr. Prielipp was selected by the Boston Red Sox organization in the 37th round of the 2019 MLB First-Year Player Draft but ultimately decided to enroll at Alabama.

897.    Mr. Prielipp's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. His dominant performance started in his freshman season, where he posted a perfect 0.00 ERA across 4 starts and struck out 35 batters, earning him Freshman All-American, First Team All-American, and National Freshman Player of the Year honors by Collegiate Baseball News. He was also selected by Perfect Game as the Impact Freshman of the Year.

898.    Ahead of the 2021 season, Mr. Prielipp was recognized on the preseason watch list for the Golden Spikes Award, was selected as a Preseason First Team All-American by Collegiate Baseball News, D1Baseball, the NCBWA, and Perfect Game, and was named to the Preseason All-SEC First Team. Despite suffering a season-ending injury halfway through the 2021 season, he posted a 3.86 ERA and recorded several outstanding performances, including pitching 5 scoreless innings and striking out 8 in a game against McNeese.

899.    Mr. Prielipp was listed as the No. 4 pitcher on Baseball America's College Top 150 list for 2021, and he was selected in the second round of the 2022 MLB Draft by the Minnesota Twins.

900.    During Mr. Prielipp's time at Alabama, the program was a part of the SEC, and its games were regularly carried by ESPN and the SEC Network. Alabama also frequently featured Mr. Prielipp on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership.

901.    Between ticket sales, media rights, SEC disbursements, and other sources, Alabama no doubt benefited from its baseball program. For the 2020 fiscal

year, for example, the SEC distributed an average of $45.5 million in revenues to each member school, including to Alabama.

902.    Mr. Prielipp received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

903.    In fact, Mr. Prielipp received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Prielipp, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Prielipp would have received a greater amount of scholarship money than he received. As the No. 2 baseball player from the state of Wisconsin, Mr. Prielipp would have received a full athletic scholarship absent Defendants' bylaws.

904.    Moreover, during most of his time at Alabama, Mr. Prielipp was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Alabama. Even for brief time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or from Alabama, and he did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a top-ranked pitcher in both high school and college, Mr. Prielipp would have likely earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

905.    Defendants' conspiracy greatly harmed Mr. Prielipp. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

906.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Prielipp would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

907.    **The effect of Defendants' illegal conduct on Plaintiff Curtis Weaver.** Plaintiff Curtis Weaver worked as a college football player at Boise State University from 2016 to 2019.

908.    The labor provided by Mr. Weaver was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

909.    Mr. Weaver was a highly recruited prospect out of high school who possessed unique talent. Ranked a three-start recruit, he was considered one of the top 10 defensive ends in California by Scout. He earned All-CIF Southern Section honors and was named an honorable mention of the Long Beach Dream Team. Universities competed for his talent during the recruitment process, including Power 5 powerhouses USC and Wisconsin, but he ultimately committed to Boise State.

910.    Mr. Weaver's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Weaver was one of Boise State's key defensive players. He played 41 games during his career, starting 23. After redshirting his first year, he developed into an immediate impact player as a redshirt freshman. In his debut season, he recorded 11 sacks, setting a new Mountain West Conference freshman record. That year, he earned multiple accolades, including Fourth Team All-American honors from Phil Steele and Honorable Mention All-American recognition from SB Nation. He was also named a Freshman All-American by both the FWAA and USA TODAY and was selected to the First Team All-Mountain West. In his redshirt sophomore season, he was named First Team All-Mountain West for a second-straight year.

**FOURTH AMENDED COMPLAINT**

911.    In his redshirt junior year in 2019, he earned First Team All-American honors from Walter Camp, CBS Sports, and The Sporting News, and Second Team All-American honors from AFCA, Associated Press, The Athletic, ESPN, FWAA, and USA TODAY. He was also named to the First Team All Mountain West for the third straight season and named Mountain West Defensive Player of the Year. That year he was also a semi-finalist for the Bednarik Award, presented annually to the defensive player of the year in college football, and was named an Athletic Midseason All-American. He set the Boise State career sack record with 34. Further, he was recognized by the Touchdown Club of Columbus Awards following his redshirt junior season as one of the top defensive players in college football.

912.    Following his collegiate career, Mr. Weaver was drafted by the Miami Dolphins in the fifth round (164th overall) of the 2020 NFL draft.

913.    During Mr. Weaver's collegiate football career, Boise State's games were carried on national television, often by either an ESPN network or CBS Sports Network. The university frequently featured Mr. Prater on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Millions of viewers watched Boise State football games during this period. For instance, the 2019 Las Vegas Bowl against Washington amassed 2.64 million viewers. In 2019, tens of thousands of fans attended Boise State football games for a total attendance of 224,490 with an average of 32,070 attendees per game, earning the university millions in ticket sales. Boise State was a member of the Mountain West Conference, which distributes millions of dollars to its member schools annually.

914.    Mr. Weaver received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Boise State, he was not permitted to receive money for his NIL whether from third parties or from Defendants or

**FOURTH AMENDED COMPLAINT**

from Boise State. As a highly sought-after high school recruit who became a standout player at Boise State, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

915.    Defendants' conspiracy greatly harmed Mr. Weaver. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

916.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Weaver would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

917.    **The effect of Defendants' illegal conduct on Plaintiff DaMarcus Fields.** Plaintiff DaMarcus Fields worked as a college football player at Texas Tech University from 2016 to 2021.

918.    The labor provided by Mr. Fields was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

919.    Mr. Fields was a highly recruited football player out of Taylor High School in Texas, where he also played basketball and track. Over the course of two varsity seasons as the team's cornerback, he registered 101 tackles, four interceptions, and eight forced fumbles. He was named to 14-4A All-District First Team and the Austin American-Statesman All-Central Texas Second Team. As a three-star recruit, Mr. Fields received offers from top programs like Baylor, Kansas, and TCU, and ultimately committed to Texas Tech.

**FOURTH AMENDED COMPLAINT**

920.    Mr. Fields's job as a college football player was essentially a full-time one, and an important and valuable one at that. He became a regular starter for the team in the 2017 season as a redshirt freshman, starting in 11 games, finishing fifth on the team with 51 tackles, and tying for first in the Big 12 Conference in fumble recoveries. He started the majority of games in the 2018 and 2019 seasons and earned Honorable Mention All-Big selections in both seasons. He finished the 2020 season with 31 tackles and 11 pass breakups, leading the Big 12 in passes defended per game. He also excelled in the 2021 season for his final year of eligibility, registering 50 tackles and leading the team again with 11 pass breakups. Mr. Fields ended his Texas Tech career with 224 tackles, 4 interceptions, and 13.5 tackles for loss and was ranked second among all FBS players for career passes defended (45). His performance that season earned him All-Big 12 Second Team honors, and he was one of only three players on the team to be invited to the 2022 NFL Scouting Combine.

921.    Mr. Fields subsequently signed with the New Orleans Saints as a free agent in 2022, further demonstrating the value of his talent and labor.

922.    As a member of the Big 12 Conference, Texas Tech football games were regularly carried by national television broadcasters such as Fox and ESPN. Texas Tech frequently featured Mr. Fields on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. From 2015 to 2019, Texas Tech football games drew a weekly average of 921,000 viewers, with games against other top-ranked programs drawing significantly more viewers. For example, Texas Tech's 2019 Thanksgiving matchup against Texas, where Mr. Fields led the team with 13 tackles, drew close to 3 million in viewership.

923.    Between ticket sales, media rights, Big 12 Conference disbursements, and other sources, Texas Tech has made a considerable amount of money from its football program. For example, for the 2022 fiscal year, the university reported $65.15 million in operating revenues for the football program alone, with $7.74 million of that from ticket

**FOURTH AMENDED COMPLAINT**

sales. Texas Tech also received approximately $44 million in revenues from the Big 12 Conference in 2022, including $11.38 million generated from post-season football bowl events.

924.    Mr. Fields received none of that TV revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During most of his time at Texas Tech, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Texas Tech. Even for the brief period in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Texas Tech, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. In fact, given the novelty of NIL compensation, Mr. Fields was unable to take advantage of any brand opportunities due to restrictions placed by coaching staff. As a top high school prospect and a standout cornerback at Texas Tech, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

925.    Defendants' conspiracy greatly harmed Mr. Fields. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

926.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Fields would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

927.    **The effect of Defendants' illegal conduct on Plaintiff Davis Wendzel.**
Plaintiff Davis Wendzel worked as a college baseball player at Baylor University from
2016 to 2019.

928.    The labor provided by Mr. Wendzel was of great value to Defendants. And
it was a significant amount of labor. During the season, he often worked six days per
week or more and often more than 40 hours per week. Even during the offseason, he
worked a significant number of hours under the direction of the coaches at the school.

929.    Mr. Wendzel was a highly recruited prospect out of high school who
possessed unique talent. Attending Jserra Catholic High School in San Juan
Capistrano, California, he quickly proved himself as a standout player. He was a three-
year letterwinner, a 2016 Rawlings/Perfect Game honorable mention All-American, and
a 2016 Perfect Game second-team All-California Region honoree.

930.    Mr. Wendzel's job as a college baseball player was essentially a full-time
one, and an important and valuable one at that. During his baseball career, Mr.
Wendzel was one of Baylor's key infielders. As a freshman in 2017, he played in 50
games, starting 47, and hit .301 with eight home runs and 30 RBIs, earning a spot on
the Big 12 All-Freshman Team and recognition as All Big-12 honorable mention.

931.    In his sophomore season, he started all 58 games, batted .310 with eight
home runs and 49 RBIs, and was named First Team All-Big 12. That year, he was also
on the Bragan Award watch list, an award given to the most outstanding offensive
baseball player in Division I college baseball. After the season, he was selected by the
Boston Red Sox in the 37th round of the 2018 MLB draft, but did not sign.

932.    In 2019, as a junior, he hit .367 with eight home runs, 42 RBIs, and 11
stolen bases in 46 games and was named the 2019 Big 12 Co-Player of the Year and
earned All Big 12 First Team honors.

933.    He was also named to Baylor's First Team All-Decade Team.

**FOURTH AMENDED COMPLAINT**

934.    Mr. Wendzel was selected in the first round of the 2019 MLB draft by the Texas Rangers.

935.    During Mr. Wendzel's collegiate baseball career, Baylor's baseball games were carried on national and regional television, often on networks such as ESPN and SEC Networks. The university frequently featured Mr. Wendzel on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Thousands of fans attended Baylor baseball games in 2019 for a total attendance of 61,414 with an average of 1,981 per game, generating significant revenue for the university. In 2019, the Big 12 Conference distributed a combined $377 million of revenue to its member schools, including Baylor.

936.    Mr. Wendzel received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. And during his time at Baylor, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Baylor. As a highly sought-after high school recruit who became a standout player at Baylor, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

937.    Defendants' conspiracy greatly harmed Mr. Wendzel. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

938.    Mr. Wendzel received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Wendzel. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became a Big 12 Co-Player of the Year, he would have received a full athletic scholarship absent Defendants' bylaws.

939.    But for the illegal and unfair restraints put in place, Mr. Wendzel would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

940.    **The effect of Defendants' illegal conduct on Plaintiff Dax Milne.** Plaintiff Dax Milne worked as a college football player at Brigham Young University from 2018 to 2020.

941.    The labor provided by Mr. Milne was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

942.    Mr. Milne was a highly competitive football player out of Bingham High School in South Jordan, Utah, where he also played basketball. As the football team's starting wide receiver, he was instrumental to Bingham's three state championships. In his senior season, he caught 23 passes for 408 receiving yards and eight touchdowns and was named to Second Team 6A All-State by the Salt Lake Tribune, as well as to the All-Region Team. He received offers from the Air Force, Army, and Weber State and ultimately committed to BYU, where he was initially a preferred walk-on.

943.    Mr. Milne's job as a college football player was essentially a full-time one, and an important and valuable one at that. He appeared in 10 games his freshman season and started in three, totaling 10 receptions for 69 yards. He saw action in all 13

**FOURTH AMENDED COMPLAINT**

games in 2019, receiving 285 yards for two touchdowns while also returning for 57 yards as a punt returner.

944.    As a junior in 2019-2020, he became one of the most important players on the team, concluding the season with 70 catches for 1,188 yards (top ten in the nation), and eight touchdowns, including a three-touchdown game against Houston. He earned him Second Team All-American recognition by Pro Football Focus and Third Team All-American from Phil Steele. He was also a finalist for the Burlsworth Trophy, an award given to the most outstanding FBS college football player who began his career as a walk-on, as well as semifinalist for the Biletnikoff Award, honoring the best collegiate receiver.

945.    Mr. Milne subsequently declared for the 2021 NFL Draft and was selected by the Washington Football Team—now the Washington Commanders—in the 7th round.

946.    During Mr. Milne's collegiate career, BYU games were regularly carried by national television broadcasters such as ABC and ESPN. In fact, based on a seven-year deal between ESPN and BYU, ESPN televises nationally a minimum of four BYU games per season, and carries a minimum of three games on ESPN2 or ABC. As one of the more popular programs in the country, BYU games drew a weekly average of 714,000 viewers from 2015 to 2019, with games against other top-ranked programs drawing significantly more viewers. For example, BYU's 2020 matchup against Houston, where Mr. Milne grabbed three touchdowns for 184 yards, drew over 1.16 million in viewership. BYU also frequently featured Mr. Milne on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

947.    Between ticket sales, media rights, and other sources of funding, BYU has made a considerable amount of money from its football program. For example, BYU's

**FOURTH AMENDED COMPLAINT**

contract with ESPN brought in an estimated $6 million in revenues per season, including the seasons in which Mr. Milne worked for the program.

948.   Mr. Milne received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at BYU, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, from BYU. As a Utah native and a standout player at BYU, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

949.   Defendants' conspiracy greatly harmed Mr. Milne. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

950.   Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Milne would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

951.   **The effect of Defendants' illegal conduct on Plaintiff Denzel Mims**. Plaintiff Denzel Mims worked as a college football player at Baylor University from 2016 to 2020.

952.   The labor provided by Mr. Mims was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

953.   Mr. Mims was a highly recruited prospect out of high school who possessed unique talent. A nationally ranked recruit and standout three-sport athlete from Daingerfield High School, he excelled as both a football player and a state-

**FOURTH AMENDED COMPLAINT**

champion sprinter. Ranked No. 287 on the ESPN300, he was one of Texas' top wide receiver prospects and earned 2015 Class 3A All-State honorable mention, as well as District 7-3A MVP honors. As a senior, he recorded 721 receiving yards and ten touchdowns while also contributing 256 rushing yards and five scores. In track, he won the 2015 Class 3A state championship in the 200 meters with a time of 21.30 seconds. Universities competed for his talent during the recruitment process, but he ultimately committed to playing football for Baylor.

954.    Mr. Mims' job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Mims was one of Baylor's key wide receivers, playing a total of 49 games and starting in 35. In his freshman season, he played in 11 of 13 games, including one start against SMU.

955.    During his sophomore season, he emerged as one of the top wide receivers in the country, recording a career-high 61 catches for 1,087 yards and eight touchdowns. He was one of just 15 Power 5 receivers to surpass 1,000 yards in 2017, ranking 13th in the FBS and third in the Big 12 in receiving yards. His standout performance earned him Second-Team All-Big 12 honors from Athlon Sports, the conference coaches, and Phil Steele. Additionally, he was named to the midseason watch list for the prestigious Biletnikoff Award.

956.    In 2018, he remained a key offensive weapon for Baylor, leading the team with eight touchdown receptions while totaling 794 yards on 55 catches. Entering the season, he earned widespread recognition for his talents, including First-Team Preseason All-Big 12 honors from the media, Athlon Sports, Phil Steele, and Lindy's. He was also named to the First-Team Preseason All-Texas list by Dave Campbell's Texas Football and was a preseason watch list selection for the Biletnikoff Award.

957.    His senior season in 2019 was not only the best of his career but also one of the most impressive by a wide receiver in Baylor history. He recorded 66 receptions

**FOURTH AMENDED COMPLAINT**

for 1,020 yards and 12 touchdowns, playing a pivotal role in Baylor's run to the Big 12 Championship game and a Sugar Bowl appearance. His outstanding performance earned him First-Team All-Big 12 honors from the coaches, as well as Second-Team All-Big 12 recognition from the AP and Waco Tribune-Herald, along with a spot on the Postseason All-Texas Team. By the end of his collegiate career, he had cemented his legacy at Baylor, ranking sixth all-time in career receiving yards (2,925), fifth in career receptions (186), and third in receiving touchdowns (28).

958.    In the 2020 NFL Draft, Mr. Mims was selected in the second round (59th overall) by the New York Jets.[72]

959.    During Mr. Mims' collegiate football career, Baylor's games were carried on national television, often by ESPN, Fox Sports, or ABC. The university frequently featured Mr. Mims on its social media platforms and other promotional materials, highlighting his achievements and likely leveraging his presence to enhance game attendance and viewership. Millions of viewers watched Baylor football games during Mr. Mims' tenure. For instance, the 2019 Oklahoma v. Baylor game amassed 6.78 million views. In 2019, tens of thousands of fans attended Baylor football games for a total attendance of 318,621 with an average of 45,517 per game.[71] In 2019, the Big 12 Conference distributed approximately $55.6 million to each of its member schools, including Baylor.

960.    Mr. Mims received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during all of his time at Baylor, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Baylor. As a highly sought-after high school recruit who became an all-conference player at Baylor, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

961.    Defendants' conspiracy greatly harmed Mr. Mims. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

962.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Mims would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

963.    **The effect of Defendants' illegal conduct on Plaintiff Deontay Anderson.** Plaintiff Deontay Anderson worked as a college football player at the University of Mississippi from 2016 to 2017, and the University of Houston from 2018 to 2021.

964.    The labor provided by Mr. Anderson was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

965.    Mr. Anderson was a highly recruited prospect out of Manvel High School in Texas. He recorded 40 tackles his senior season and earned selections to Under Armour All-America and to First Team All-State by USA Today. He was a consensus 4-star recruit and ESPN ranked him as best safety in the country in the class of 2016, as well as the number 41 overall recruit in the country. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he was in college in the hopes that he would transfer to another school. He received a total of 43 offers from the most competitive programs in the country, including Alabama, Texas, and LSU, and ultimately committed to play for Ole Miss.

**FOURTH AMENDED COMPLAINT**

966.    Mr. Anderson's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a true freshman, he saw action in every game and earned a selection to Second Team Freshman All-SEC by Athlon.

967.    After transferring to Houston, he continued to make a valuable impact. He started all 13 games in the 2018 season and finished with a career-high 72 tackles. In the 2019 season, he started in 11 games and led the team with nine pass breakups. He was subsequently selected to the Phil Steele Magazine Preseason AAC Fourth Team ahead of the 2020 season, when he started in six games and recorded 26 tackles. Mr. Anderson then transitioned to the linebacker position, and he subsequently contributed in all 14 games of the 2021 season, finishing second on the team in total tackles.

968.    During this time, Ole Miss was a member of the SEC and Houston was a member of the Big 12 Conference. Both universities' games were regularly broadcast by ESPN and CBS, and both schools received large sums of money from their respective conferences' television contracts.

969.    On a weekly basis, Ole Miss games drew an average of 1.61 million television viewers, and Houston games drew an average of 689,000, with games against other top-ranked programs drawing significantly more viewers. For example, Houston's 2021 Birmingham Bowl matchup against Auburn, where Mr. Anderson had a season-high eight tackles and recorded a quarterback hit, drew close to 2.3 million television viewers. Houston also frequently featured Mr. Anderson on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

970.    Between ticket sales, media rights, conference disbursements, and other sources, both Ole Miss and Houston have made a considerable amount of money from their respective football programs. For example, Ole Miss received $40.9 million in revenues from the SEC for the 2017 fiscal year, and the Big 12 Conference distributed

**FOURTH AMENDED COMPLAINT**

an average of $38.8 million in revenues to each of its member schools for the 2018 fiscal year.

971.    Yet Mr. Anderson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time in college, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from either Ole Miss or Houston. Even for the brief period in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Houston, and he did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a top defensive player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

972.    Defendants' conspiracy greatly harmed Mr. Anderson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

973.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Anderson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

974.    **The effect of Defendants' illegal conduct on Plaintiff Destiny Slocum.** Plaintiff Destiny Slocum worked as a college basketball player at the University of Maryland (2016-17), Oregon State University (2017-20), and the University of Arkansas (2020-21).

975.    The labor provided by Ms. Slocum was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days per

**FOURTH AMENDED COMPLAINT**

week and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

976.   Ms. Slocum was a highly recruited prospect out of high school who possessed unique talent. She was a McDonald's All-American and a WBCA High School All-American, earning First Team All-State honors all four years of her career. As both a junior and senior, she was named Idaho's Gatorade Player of the Year. She led her team to consecutive 5A state titles during her junior and senior seasons and was ranked the 47th overall women's basketball recruit in the country by ESPN. Additionally, she was named Idaho Player of the Year as a junior and earned Conference Player of the Year honors as both a freshman and junior. Additionally, she was a point guard for U.S. Under-19 team and helped lead Team USA to a gold medal in Moscow in the FIBA World Championships in the summer of 2015. In 2016, she was selected to participate in the Jordan Brand Classic, an annual all-star game that features some of the best and most heavily recruited players in the country. Universities competed for her talent during the recruitment process and continued to compete for her talent even after she went to Maryland, hoping she would transfer to another school.

977.   Ms. Slocum's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During her collegiate basketball career, Ms. Slocum was a key player at each of her schools. As a freshman at Maryland, she was named the WBCA National Freshman of the Year, Big Ten-All Tournament Team, Big Ten All-Freshman Team, Second Team All-Big Ten, and Big Ten Freshman of the Year, averaging 11.5 points and 6.0 assists per game. That year, Ms. Slocum helped Maryland reach the Sweet 16, and after the season concluded, she took part in trials for the 2017 USA U23 National Team.

978.   After transferring to Oregon State, she was a two-time All-Pac-12 selection and led the team to multiple NCAA Tournament appearances. She averaged 15.2 points per game, 4.6 assists per game, and 3.2 rebounds per game, earning

**FOURTH AMENDED COMPLAINT**

WBCA All-America Honorable Mention honors her redshirt sophomore and junior seasons and AP All-America Honorable Mention honors her redshirt sophomore seasons. She helped lead Oregon State to a combined 49-17 record during her time there, including a run to the Sweet 16 during the 2018-19 season. In the 2019-20 season, Ms. Slocum led Oregon State to a 23-9 record and a top-15 ranking in the AP Poll.

979.    During her time at Oregon State, she was listed on the Wooden Award Watch list, which is given annually to the most outstanding women's college basketball player; the Naismith Award Watch List (2019, 2020), which recognizes the top players in women's college basketball; and was a Lieberman Award Top 10 in 2020 and Finalist in 2019, which recognizes the top point guard in women's NCAA Division I college basketball. In 2019, she participated in the Red Bull USA Basketball 3×3 Nationals in Las Vegas and finished in second place. In 2019, she was also announced as a trials participant for the 2019 U.S. Pan American Games Women's Basketball Team.

980.    Ms. Slocum transferred to Arkansas for her final collegiate season, where she averaged 15.0 points, 3.3 rebounds, and 3.9 assists, earning her Second Team All-SEC honors and helping lead the Razorbacks to the NCAA Tournament. During this time, she again earned spots on the Wooden Award Watch List, the Naismith Player of the Year Watch List, and the Nancy Lieberman Midseason Watch List. She was also a WBCA All-American Regional Finalist.

981.    In the 2021 WNBA draft, she was drafted by Las Vegas in the second round (No. 14 overall).

982.    During Ms. Slocum's collegiate basketball career, her games were often carried on national television, often by either an ESPN network or conference-affiliated networks such as the SEC Network. Her schools frequently featured Ms. Slocum on their social media platforms and other promotional materials, highlighting her achievements to enhance game attendance and viewership. And all three universities

**FOURTH AMENDED COMPLAINT**

made significant revenue off of Ms. Slocum's efforts. For example, thousands of fans
attended Maryland women's basketball games in 2017 for a total attendance of 97,497
with an average of 5,735 per game, generating significant revenue. Thousands of fans
also attended Oregon State women's basketball games in 2019-2020 for a total
attendance of 100,337 with an average of 5,902 per game, also generating significant
revenue. In 2021, the SEC distributed approximately $49.9 million to each of its member
schools, including Arkansas.

983.    Ms. Slocum received none of that revenue; nor was she otherwise
compensated by Defendants for her labor other than by receiving a scholarship and
other education-related expenses. And during her time in college basketball, she was
not permitted to receive money for her NIL whether from third parties or from
Defendants or from her universities. As a highly sought-after high school recruit who
became one of the nation's best players, she would have earned substantial NIL
compensation if not for the NCAA's unlawful restrictions.

984.    Defendants' conspiracy greatly harmed Ms. Slocum. It prevented her from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, she would have received
greater remuneration for her services as a college basketball player than she received
and would have received money for her NIL. Absent Defendants' agreement to adopt,
enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a
competitive share of the television and other revenue being brought in by Defendants
and their member schools. Thus, Defendants' scheme directly injured her.

985.    **The effect of Defendants' illegal conduct on Plaintiff Donovan
Peoples-Jones.** Plaintiff Donovan Peoples-Jones worked as a college football player at
the University of Michigan from 2017 to 2019.

986.    The labor provided by Mr. Peoples-Jones was of great value to
Defendants. And it was a significant amount of labor. During the season, he worked at

**FOURTH AMENDED COMPLAINT**

least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

987.    Mr. Peoples-Jones was a highly recruited football player out of high school. Playing for Cass Technical High School in Detroit, he was the team's No.1 wide receiver and led the team to the 2016 Michigan Division 1 State Championship with a perfect 14-0 record. In his senior year, he had 60 receptions for 1,071 yards and 17 touchdowns while making four interceptions playing on defense. He was named the 2016 Michigan High School Football Player of the Year, was ranked second in the nation as a wide receiver by 247 Sports, and was the 22nd best overall prospect by ESPN. His high school performance earned him many other accolades, including the Michigan Gatorade Player of the Year award, Associated Press First Team All-State, and 2016 Associated Press Michigan Division 1-2 Player of the Year. He received a total of 24 offers, including from top-ranked programs such as Ohio State and Florida, and ultimately committed to Michigan.

988.    Mr. Peoples-Jones's job as a college football player was essentially a full-time one, and an important and valuable one at that. He served primarily as a punt returner his freshman year and won the team's Rookie of the Year award. In his sophomore season, he totaled 47 receptions for 612 yards with eight touchdowns and had a career-high eight receptions against Florida in the year-end Chick-Fil-A Peach Bowl matchup. His performance won him the team's Offensive Skill Player of the Year Award and he was named to Third Team All-Big Ten. Appearing in 11 games in his 2019 season, he totaled 438 yards and 6 touchdowns, including touchdowns against top programs such as Ohio State, Notre Dame, and Michigan State. Mr. Peoples-Jones was subsequently selected in the 6th round of the 2020 NFL Draft by the Cleveland Browns.

989.    During Mr. Peoples-Jones's collegiate career, Michigan was a member of the Big Ten Conference and its games were regularly carried by national television

**FOURTH AMENDED COMPLAINT**

broadcasters such as Fox, ABC, and ESPN. Michigan frequently featured Mr. Peoples-Jones on its social media accounts, highlighting his accomplishments and no doubt using him to promote game attendance and viewership. Mr. Peoples-Jones was also prominently featured as the team's quarterback in the Apple TV and Amazon Prime 2018 mini-series All or Nothing: The Michigan Wolverines, which no doubt boosted the program's profile and brand.

990.    Michigan home games regularly sold out with over 110,000 fans attending each game in 2019. And from 2015 to 2019, Michigan games drew a weekly average of 4.18 million television viewers, with games against other top-ranked programs drawing millions more. For example, Michigan's 2019 Citrus Bowl matchup against Alabama drew 14 million in viewership.

991.    Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Michigan has made a considerable amount of money from its football program. For example, the football program generated close to $125 million in total revenue, including $39.81 million in ticket sales, for the 2017 season. Michigan also received $54 million in revenue disbursements from the Big Ten Conference in 2018.

992.    Mr. Peoples-Jones received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During his time at Michigan, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a standout player at Michigan, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

993.    Defendants' conspiracy greatly harmed Mr. Peoples-Jones. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

994.    Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Peoples-Jones would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

995.    **The effect of Defendants' illegal conduct on Plaintiff Dorian O'Daniel.** Plaintiff Dorian O'Daniel worked as a college football player at Clemson University from 2013 to 2018.

996.    The labor provided by Mr. O'Daniel was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

997.    Mr. O'Daniel was a highly recruited prospect out of high school who possessed unique talent. Rivals.com ranked him as the No. 40 overall player in the nation, while PrepStar placed him at No. 46, and ESPN at No. 112. At his position, he was ranked as the No. 6 outside linebacker by Rivals.com, No. 8 by ESPN, No. 11 by Scout.com, and No. 13 by 247Sports.com. Additionally, 247Sports.com and ESPN rated him as the third-best overall player in Maryland. Recognized as one of the top outside linebackers in the country, he earned a spot in the prestigious U.S. Army All-American Game.

998.    A standout running back as well, he tallied 1,307 yards on 190 carries and 18 touchdowns in 10 games as a senior, leading his high school to an 11-1 record and a number 1 ranking in the Washington, D.C. area. His performance earned numerous accolades, including Montgomery Sentinel Offensive Player-of-the-Year and Gazette Montgomery County Player-of -the-Year as a senior. He was recruited by multiple universities, but ultimately chose to play for Clemson.

**FOURTH AMENDED COMPLAINT**

999.    Mr. O'Daniel's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. O'Daniel was a key contributor to Clemson's defense and special teams. He played in all four years of his eligibility, and recorded a career total of 206 tackles, 28 tackles for loss, and 8.5 sacks in 56 career games with 27 starts. After redshirting his freshman year, in 2014, he had 31 tackles, one tackle for loss, one sack and one forced fumble in 87 snaps over 12 games. He also had a team-high 13 special team tackles and had a team-high four special teams tackles against South Carolina State on September 6th. That year, he was named team special teams player-of-the-game for his performance in a bowl game against No. 24 Oklahoma.

1000.  During Mr. O'Daniel's 2015 season, he had 32 tackles, including 5.5 tackles for loss, in 181 snaps over 15 games. He was a team leader with 19 special team tackles and notched a pair of special team stops against Appalachian State. He earned a share of defensive player-of-the-game honors in the win over Georgia Tech and was named special teams player-of-the-game by Clemson coaches at Miami as well as special teams player-of-the-game against Wake Forest. He further tallied three total tackles, including two on special teams, in the Orange Bowl win over Oklahoma.

1001.  In his 2016 season, Mr. O'Daniel recorded 60 tackles in 479 snaps over 15 games, including nine tackles for loss and 2.5 sacks. He made a significant impact in key matchups, securing a crucial sack and tackle for loss against Georgia Tech, helping limit them to just 124 total yards. He also posted seven tackles, including one for loss, in a road win over No. 12 Florida State and delivered a strip sack against Pittsburgh. That season, Mr. O'Daniel helped lead Clemson to a national championship over Alabama.

1002.  In his final season with the Tigers, Mr. O'Daniel started all 14 games and finished his senior season with 104 tackles, 11.5 tackles for loss and five sacks, earning him All-American (Sports Illustrated) and Second-team All-ACC honors.

**FOURTH AMENDED COMPLAINT**

1003.  In the 2018 NFL Draft, Mr. O'Daniel was selected in the third round by the Kansas City Chiefs.

1004.  During Mr. O'Daniel's collegiate football career, Clemson's games were carried on national television, often by either an ESPN or SEC Network. Clemson frequently featured Mr. O'Daniel on its social media platforms and other promotional materials, highlighting his achievements likely enhancing game attendance and viewership. Clemson's football program was among the most-watched in college football during Mr. O'Daniel's tenure, with its playoff games drawing millions of viewers. For instance, over 25 million people watched the national championship games against Alabama in 2016 and 2017. In 2018, the ACC distributed $29.8 million to Clemson. In 2017, Clemson was one of 12 universities that eclipsed over 1 million attendees at their home football games, garnering millions of dollars for Clemson.

1005.  Mr. O'Daniel received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Clemson, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Clemson. As a highly sought-after high school recruit who became an All-American at Clemson, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1006.  Defendants' conspiracy greatly harmed Mr. O'Daniel. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1007.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. O'Daniel would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1008.  **The effect of Defendants' illegal conduct on Plaintiff Drew Lock.** Plaintiff Drew Lock worked as a college football player at the University of Missouri from 2015 to 2018.

1009.  The labor provided by Mr. Lock was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1010.  Mr. Lock was a highly sought-after football player out of high school. As the quarterback for Lee's Summit High School in Missouri, he threw for an impressive 3060 yards and 35 touchdowns in his junior season and had 28 touchdowns over 2,731 yards as a senior, winning the Kansas City Star All-Metro Player of the Year award. His 63 touchdowns with only 12 interceptions over his junior and senior seasons also won him the Simone Award, honoring the best high school player in the Kansas City metro area. He was the top recruit in the state of Missouri according to 247 Sports, and the 6th best quarterback prospect in his graduating class per ESPN. Mr. Lock received over 30 offers, including from top-ranked programs such as Florida, Michigan, and Ohio State, and ultimately committed to play for Mizzou.

1011.  Mr. Lock's job as a college football player was essentially a full-time one, and an important and valuable one at that. He took over as the team's starting quarterback in the second half of the 2015 season, throwing over 1,300 yards, and becoming the program's first true freshman to start in the quarterback position since 1995. As a regular starter in 2016, he threw for 3,399 yards with 23 touchdowns and was ranked first in the SEC in passing yards and second in passing yards per game and yards per completion. He continued to impress in 2017, ending the season with 3,964 yards and setting the school and SEC records with 44 passing touchdowns, including a

**FOURTH AMENDED COMPLAINT**

seven-touchdown game against Missouri State. Mr. Lock also led the conference in passing efficiency, passing yards, and total offense, and led the entire FBS in touchdown passes. Having served as team captain from 2016-2018, Mr. Lock concluded his collegiate career with 12,193 passing yards (the second most in SEC history) and 99 touchdown passes (the third most in SEC history).

1012.  In addition to setting multiple school and conference records, Mr. Lock also earned numerous accolades over the course of his collegiate career. He was selected to First Team All-SEC in 2017, and was also named the Walter Camp National Offensive Player of the Week in September 2017, and was twice-named the SEC Offensive Player of the Week that season. He was selected to 2018 Preseason All-SEC First Team, the 2018 Maxwell Award Preseason Watch List, and the 2018 Davey O'Brien Award Preseason Watch List. His performance in the 2018 season earned him a Second Team All-SEC selection, as well as the 2018 Team Bob Jeffries Kansas City Metro Player of the Year Award.

1013.  Mr. Lock was selected by the Denver Broncos in the second round of the 2019 NFL draft.

1014.  During Mr. Lock's collegiate career, Mizzou was a member of the SEC and its games were regularly carried by national television broadcasters such as CBS and ESPN. Mizzou also frequently featured Mr. Lock on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. From 2015 to 2019, Mizzou games drew a weekly average of 611,000 television viewers, with games against other top-ranked programs drawing significantly more viewers. For example, Mizzou's 2017 Texas Bowl matchup against Texas, where Mr. Lock threw for 269 yards, drew close to 3.5 million in viewership. Mizzou home games are also regularly sold out, averaging 51,465 per game in attendance for the 2018 season.

**FOURTH AMENDED COMPLAINT**

1015.  Between ticket sales, media rights, SEC disbursements, and other sources, Mizzou has made a considerable amount of money from its football program. For example, the football program brought in $36.2 million revenues from the 2017 season alone, including $10.56 million in ticket sales. Missouri also received $44.6 million in revenue distributions from the SEC in 2018.

1016.  Mr. Lock received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During his time at Mizzou, he was not permitted to receive money for the use of his NIL, whether from third parties, from Defendants, or from his school. As a standout player at Mizzou, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1017.  Defendants' conspiracy greatly harmed Mr. Lock. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1018.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Lock would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1019.  **The effect of Defendants' illegal conduct on Plaintiff Duncan Robinson.** Plaintiff Duncan Robinson worked as a college basketball player at Williams College from 2013 to 2014 and the University of Michigan from 2014 to 2018.

1020.  The labor provided by Mr. Robinson was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason,

**FOURTH AMENDED COMPLAINT**

he worked a significant number of hours under the direction of the coaches at the school.

1021.  In high school, Mr. Robinson played at Philips Exeter Academy where he was on the New England Preparatory School Athletic Council (NEPSAC) Class A All-League First Team in 2013. He helped Exeter to a 28-1 overall record, including a closing with an 18-game winning streak. He also guided Exeter to the school's first ever NEPSAC Class A title, scoring 24 points with 10 rebounds in the title game, earning him Tournament MVP honors. Mr. Robinson enrolled at Williams after head coach Mike Maker reportedly "recruited him hard."

1022.  Mr. Robinson's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. After beginning his college basketball career at Williams, a division III school, he transferred to Michigan, where he became an impact player for one of the most successful programs in the nation.

1023.  During his freshman season at Williams, he played in all 32 games with 31 starts and became the first Williams freshman to score over 500 points in a season, averaging 17.1 points a game. He posted 29 double figure games with eleven 20-plus point games, including a career-best 30 points against Amherst in the NCAA III semifinal. He also averaged 6.5 rebounds per game and averaged 34.7 minutes per game and set the Williams record for minutes played in a season. His exemplary freshman season led his team to the NCAA Division III national championship game and earned him NCAA III Final Four All-Tournament Team, D3Hoops.com All-America Fourth Team as well as a Rookie of the Year and All-Northeast Region Third Team honors.

1024.  After sitting out the 2014-15 season due to the NCAA transfer rules, Mr. Robinson played in every game for Michigan over three seasons, for a total of 115 games, and became a key contributor who helped Michigan to three straight NCAA Tournament appearances and back-to-back Big Ten Tournament titles. As a junior, he

**FOURTH AMENDED COMPLAINT**

played in all 36 games, starting in the Wolverines' final 27 games, averaging 11.2 points per game. He finished his junior season as second in the Big Ten and ninth in the nation with a 45.0 3-point field goal percentage. In his senior season, he again was a key contributor, playing in all 38 games, averaging 7.7 points per game. As a fifth-year senior, he was the team captain and played a critical role in helping Michigan reach the NCAA Tournament championship game, appearing in all 41 games and averaging 9.2 points per game. In his career at Michigan, he racked up numerous awards, including Big Ten Sixth Man of the Year (2018), U-M's Sixth Man Award (2017, 2018), and U-M's Award for Outstanding Free Throw Shooting (2016, 2018).

1025.  After going undrafted in the 2018 NBA draft, Mr. Robinson signed with the Miami Heat.

1026.  During his time at Michigan, Michigan's games were carried on national television, often by either an ESPN network, CBS, or Fox. Michigan frequently featured Mr. Robinson on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. While Mr. Robinson played there, Michigan basketball was one of the most-watched programs in college basketball, with its NCAA Tournament games drawing millions of viewers. For instance, the 2018 NCAA men's basketball championship game between Michigan and Villanova averaged 16.5 million viewers. Tens of thousands of fans attended Michigan basketball games for a total attendance of 173,948 with an average of 10,872 per game. During this season, Michigan made millions in revenue from ticket sales. In 2018, the Big Ten Conference distributed approximately $54 million to each of its member schools, including Michigan.

1027.  Mr. Robinson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Michigan, he was not permitted to receive money for his NIL whether from third parties or from Defendants or

**FOURTH AMENDED COMPLAINT**

from Michigan. As a standout player at Michigan, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1028.  Defendants' conspiracy greatly harmed Mr. Robinson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL.

1029.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Robinson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1030.  **The effect of Defendants' illegal conduct on Plaintiff Dylan Smith.** Plaintiff Dylan Smith worked as a college baseball player at the University of Alabama from 2018 to 2021.

1031.  The labor provided by Mr. Smith was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1032.  Mr. Smith was a highly recruited baseball player out of high school. He attended Stafford High School in Texas for his junior and senior years and was rated as the No. 25 right-handed pitcher in the state and the No. 46 overall player in Texas by Perfect Game USA. His performance also earned him a 2018 Rawlings Perfect Game All-America Honorable Mention, as well as a selection to the Texas All-Regions First Team by Perfect Game. On top of his baseball accomplishments, he also excelled in football and received offers from several programs. Notably, he was drafted in the 18th round of the 2018 MLB Draft by the San Diego Padres—becoming the first Stafford baseball player drafted out of high school—but ultimately decided to enroll at Alabama.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

1033.  Mr. Smith's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He made 13 appearances during his first season at Alabama, striking out 12 across 16.2 innings. Throughout his time at Alabama, he pitched in 33 games and became a reliable starter, finishing with 17 starts total. He had a particularly dominant junior year, leading Alabama in innings pitched with 98.1, and in strikeouts with 113. That year, he also ranked sixth in the SEC for innings pitched, tied eighth in the league and 30th nationally in strikeouts, and was named to the NCAA All-Tournament Team for the Ruston Regional in 2021.

1034.  Mr. Smith was widely considered to be Alabama's best pitching prospect since 2014 and was selected in the third round of the 2021 MLB Draft by the Detroit Tigers, further demonstrating the value of his talent and labor.

1035.  During Mr. Smith's time at Alabama, the program was a part of the SEC, and its games were regularly broadcast on ESPN and the SEC Network. Alabama also frequently featured Mr. Smith on its social media accounts, highlighting his accomplishments and no doubt using him to boost game attendance and viewership. Between ticket sales, media rights, SEC disbursements, and other sources, Alabama no doubt benefited from its baseball program. For example, for the 2021 fiscal year, the SEC distributed an average of $54.6 million in revenues per member school, including Alabama.

1036.  Mr. Smith received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses.

1037.  In fact, Mr. Smith received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Smith, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Smith would have received a greater amount of scholarship money than he received. As

**FOURTH AMENDED COMPLAINT**

a top-ranked high school baseball recruit, he would have received a full athletic
scholarship absent Defendants' bylaws.

1038.  Moreover, during his time at Alabama, Mr. Smith was not permitted to
receive money for use of his NIL, whether from third parties, from Defendants, or from
Alabama. As a nationally recognized baseball player, he would have earned substantial
NIL compensation throughout his college career if not for the NCAA's unlawful
restrictions.

1039.  Defendants' conspiracy greatly harmed Mr. Smith. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college baseball player than he received, and
would have received money for his NIL from third parties.

1040.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Smith would have received a competitive share of
the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1041.  **The effect of Defendants' illegal conduct on Plaintiff Erick Hallett II.**
Plaintiff Erick Hallett II worked as a college football player at the University of Pittsburgh
from 2018 to 2022.

1042.  The labor provided by Mr. Hallett was of great value to Defendants. And it
was a significant amount of labor. During the season, he often worked six days per
week and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of the coaches at the school.

1043.  Mr. Hallett was a highly recruited prospect out of high school who
possessed unique talent. He was one of the Houston area's top prospects who helped
lead Cy-Fair to the Texas Class 6A Division II championship with a 15-0 record and
totaled 38 tackles, six interceptions and eight passes defended as a senior. He was

**FOURTH AMENDED COMPLAINT**

named a *Houston Chronicle* All-Greater Houston and two-time First Team All-District 17-6A. He drew interest from multiple programs before committing to the University of Pittsburgh.

1044.  Mr. Hallett's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Hallett developed into a vital player in Pittsburgh's secondary. After redshirting his true freshman year in 2018, he played in 12 games in 2019, making one start, totaling 14 tackles and two pass breakups on the year. In 2020, he played in 10 games and started four of them, totaling 30 tackles, two tackles for loss, four pass breakups and two interceptions for the season. In 2021, he started all 14 games, and led Pitt in multiple categories with three interceptions (tied), nine pass breakups, two forced fumbles and one fumble recovery (tied). His stellar performance also led Pittsburgh to an ACC Championship, earning Mr. Hallett MVP honors in the title game after recording two interceptions, one of which was returned for a touchdown. That year, he also earned Honorable Mention All-ACC honors.

1045.  In 2022, he started all 13 games at free safety and was named a Second-Team All-ACC selection, a Football Writers Association of America All-American (Second Team), and a semifinalist for the Paycom Jim Thorpe Award, awarded annually to the best defensive back in college football. He totaled 54 tackles, four tackles for loss, nine pass breakups, and two forced fumbles for the year.

1046.  Following his collegiate career, Mr. Hallett entered the NFL draft, and was selected in the sixth round by the Jacksonville Jaguars.

1047.  During this time, the University of Pittsburgh's games were carried on national television, often by either an ESPN network, ABC, or the ACC Network. Pitt frequently featured Mr. Hallett on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Pittsburgh football games drew millions of viewers during this time. For instance, the

**FOURTH AMENDED COMPLAINT**

2021 ACC Championship Game against Wake Forest amassed 2.6 million viewers. In 2022, the ACC distributed $41.3 million to the University of Pittsburgh, which took home the largest payout of all ACC schools that year because of its 2021 ACC Championship.

1048.  Mr. Hallett received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Pittsburgh, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Pittsburgh. Even for the time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Pittsburgh and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a standout player at Pittsburgh, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1049.  Defendants' conspiracy greatly harmed Mr. Hallett. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1050.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Hallett would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1051.  **The effect of Defendants' illegal conduct on Plaintiff Frank Mason III.** Plaintiff Frank Mason III worked as a college basketball player at the University of Kansas from 2013 to 2017.

**FOURTH AMENDED COMPLAINT**

1052.  The labor provided by Mr. Mason was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1053.  Mr. Mason was a highly recruited basketball player out of high school. Playing as a point guard for Petersburg High School in Virginia, he totaled 1901 points during his four-year career and led the team to a combined 78-4 record. He also led the state with an average of 27.4 points per game in 2011 and again in 2012 with 27.1 points per game. His outstanding senior-year performance earned him a First Team All-State selection, as well as the 2012 Metro Player of the Year award. He was also chosen to compete in the 804 All-Star Game in June 2012, where he broke the All-Star Game scoring record with 50 points and earned co-MVP honors. He was rated as a four-star recruit and ranked 11th among all point guards and 6th overall in the state of Virginia by 247 Sports. After an extra season at the Massanutten Military Academy, Mr. Mason received six offers from competitive programs and ultimately chose to enroll at Kansas.

1054.  Mr. Mason's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Over the course of his basketball career at Kansas, Mr. Mason helped the team win four consecutive Big 12 regular season championships (2014-2017), as well as the 2016 Big 12 tournament championship.

1055.  Mr. Mason contributed from the very beginning, appearing in all 35 games as a freshman, scoring a season-high 15 points against No. 4 Duke, and leading the team in assists in nine games and steals in four games. As a sophomore, he started all 36 games and earned All-Big 12 Second Team Honors. That season, he was the team's second leading scorer at 12.6 points per game and also ranked fifth in the Big 12 in assists and third in minutes. He was received an All-Big 12 Honorable Mention by league coaches ahead of the 2016 season.

**FOURTH AMENDED COMPLAINT**

1056.  Mr. Mason continued excelling as a junior, starting all 38 games, earning a selection to the Big 12 All-Defensive Team, and once again getting named to the All-Big 12 Second Team. That season, he led Kansas to the 2015 Maui Jim Maui Invitational title, averaging 13.3 points and 5.6 assists and winning the co-MVP award.

1057.  As a senior in 2016-2017, Mr. Mason was named the Big 12 Player of the Year after becoming the only player in Kansas and Big 12 history to average more than 20 points and five assists in a single season. He was selected to All-Big 12 First Team and was a unanimous All-American First Team selection. He capped off his collegiate career by winning the prestigious James A. Naismith Trophy, awarded annually to the nation's most outstanding college basketball player.

1058.  During Mr. Mason's time at the University of Kansas, the program was a part of the Big 12 Conference and its games were regularly carried by national television broadcasters such as ESPN and CBS. Kansas men's basketball is among the most-watched programs of all NCAA sports and regularly drew millions of viewers per game. For example, Kansas's 2017 State Farm Champions Classic upset victory against No.1 Duke, where Mr. Mason scored a team-high of 21 points, drew close to 2.5 million in television viewership.

1059.  Between ticket and jersey sales, media rights, Big 12 Conference disbursements, and other sources, Kansas has made a considerable amount of money from its men's basketball program. In fact, Kansas men's basketball is among the most profitable college basketball programs. From the 2014-15 season through the 2016-17 one, for example, Kansas basketball averaged $32.2 million in annual revenues and $18.5 million in annual profits.

1060.  Mr. Mason received none of those profits, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Kansas, he was not permitted to receive money for use of his NIL, whether from third parties, from

**FOURTH AMENDED COMPLAINT**

Defendants, or from his school. Widely considered the most decorated player in Kansas basketball history, Mr. Mason would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1061.  Defendants' conspiracy greatly harmed Mr. Mason. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1062.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Mason would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1063.  **The effect of Defendants' illegal conduct on Plaintiff Franz Wagner.** Plaintiff Franz Wagner worked as a college basketball player at the University of Michigan from 2019 to 2021.

1064.  The labor provided by Mr. Wagner was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six to seven days per week or more and frequently more than 40 hours per week. Even during the offseason, he dedicated substantial time under the direction of the coaching staff at the university.

1065.  A native of Germany, he was considered one of the top international prospects in his class and was ranked among the top European recruits. At 16 years old, he became the youngest player to ever play for Alba Berlin's professional team. In 2017-2018, he split time with the Alba Berlin and Alba's Junior Team and helped the Junior Team finish third in the Munich Tournament, averaging 16.5 points, 3.8 rebounds, 2.2 assists, and 2.2 steals in the four tournament games. From 2018-2019, he played with Alba Berlin (BBL) and SSV lok Bernau (ProB) and helped Alba to a

**FOURTH AMENDED COMPLAINT**

runner-up finish in the BBL, playing 35 games with six starts. With SSV lok Bernau, Mr. Wagner played nine games with six starts, averaging 16.3 points, 4.3 rebounds, 1.5 assists, and 2.0 steals, while shooting 50 percent from the field and 38.8 percent from long range. In 2019, he was awarded the BBL Best Young Player Award, which goes to the league's most valuable player who is under the age of 22 and has German nationality.

1066.  Mr. Wagner has also represented Germany in various youth national teams, including the U-16 and U-18 European Championships, and won a gold medal at the 2018 Albert Schweitzer Tournament.

1067.  In 2018, Mr. Wagner attended the NBPA Top 100 Camp, a premier camp hosted by the National Basketball Players Association that invites the best high school basketball players in the country—and was one of only a handful of international athletes invited.

1068.  Multiple universities competed for Mr. Wagner's talent. Mr. Wagner was reportedly choosing between Michigan and signing a professional contract with Alba Berlin of the Basketball Bundesliga, Germany's top professional basketball league, before deciding to play at Michigan.

1069.  Mr. Wagner's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career at Michigan, Mr. Wagner established himself as one of the most versatile and skilled players in the Big Ten Conference. During his freshman season, he started 27 games, missing the first four due to a wrist injury and having the season cut short due to the coronavirus pandemic. As a freshman, he was third on Michigan with 11.6 points per game, posting 17 double figure games and two 20+ point games. He was also second on Michigan with 41 3-pointers and second with 5.6 rebounds per game, having two 10+ rebound games. That year, he also led U-M with 34 steals. Mr. Wagner's exemplary

**FOURTH AMENDED COMPLAINT**

freshman season earned him Big Ten All-Freshman team and 3x Big Ten Freshman of the Week honors.

1070.  As a sophomore, Mr. Wagner started all 28 games. He was third on U-M with 12.5 points per game, second on U-M with 6.5 rebounds for game, and also second on U-M with 29 blocks. He also led U-M with 35 steals. That season, he was named to the All-Big Ten Second Team and helped U-M earn a regular season title and advance to the Elite Eight. His 2021 season also earned him a spot as a semifinalist for the Basketball Hall of Fame's Jerry West Award, which is awarded to the top shooting guard in men's college basketball. He was also an Academic All-American.

1071.  In the 2021 NBA Draft, Mr. Wagner was selected in the first round with the 8th overall pick by the Orlando Magic.

1072.  During Mr. Wagner's collegiate basketball career, the University of Michigan's games were carried on national television, often by networks such as ESPN, CBS, Fox, and the Big Ten Network. Michigan frequently featured Mr. Wagner on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched U-M basketball games during this period. For instance, the 2021 Elite Eight matchup between Michigan and UCLA was watched by nearly 7 million viewers. Tens of thousands of fans attended Michigan basketball games in 2019 for a total attendance of 200,621 with an average of 12,539 per game, generating significant revenue for the university. In 2021, the Big Ten distributed an estimated $54.3 million to each of its member schools, including Michigan.

1073.  Mr. Wagner received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Michigan, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Michigan. As a highly sought-after high school recruit who became a standout

**FOURTH AMENDED COMPLAINT**

player at Michigan, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1074.  Defendants' conspiracy greatly harmed Mr. Wagner. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL.

1075.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Wagner would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1076.  **The effect of Defendants' illegal conduct on Plaintiff Gabe Brkic.** Plaintiff Gabe Brkic worked as a college football player at the University of Oklahoma from 2018 to 2021.

1077.  The labor provided by Mr. Brkic was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1078.  Mr. Brkic was a highly recruited football player for Notre Dame-Cathedral Latin High School in Chardon, OH as the team's kicker and punter. In his senior year, he made 10 of 15 field goal attempts and 22 of 23 extra-point tries--with seven of those ten field goals coming from over 40 yards. He was the runner-up in a competition to make the Under Armour All-American Game and was rated by Kohl's Kicking as the nation's No. 7 kicker and No. 22 punter in the 2018 graduating class. Mr. Brkic received 7 offers from competitive programs and chose Oklahoma over the Air Force, Maryland, and UCF.

**FOURTH AMENDED COMPLAINT**

1079.  Mr. Brkic's job as a college football player was essentially a full-time one, and an important and valuable one at that. Over the course of his collegiate career at Oklahoma, Mr. Brkic was a finalist for the Lou Groza Award—an award given to the nation's top collegiate placekicker—in 2021, and twice a semifinalist in 2019 and 2020.

1080.  Mr. Brkic took over the team's kicking duties in his 2019 season, going a perfect 17 for 17 on field goal attempts and 52 for 52 on extra-point tries (the only placekicker nationally who made all of his field goal and extra-point tries). His performance that season earned him a First Team All-American selection by CBS Sports, Freshman All-American honors by The Athletic and FWAA, and Second Team All-Big 12 selection by coaches and media.

1081.  In the 2020 season, Mr. Brkic made 20 field goals and ranked second in Oklahoma single season history with eight multi-field goal games, earning a selection to All-Big 12 First Team by league coaches and media.

1082.  Mr. Brkic continued excelling in the 2021 season, making two of the nation's nine field-goal makes of at least 56 yards, and tying a FBS single-game record with three field goal makes of at least 50 yards in the season opener against Tulane. He was named to All-Big 12 Second Team by league coaches and media.

1083.  During Mr. Brkic's collegiate career, the University of Oklahoma was a member of the Big 12 Conference and its games were regularly carried by national television broadcasters such as ABC and ESPN. Oklahoma regularly featured Mr. Brkic on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Oklahoma games drew a weekly average of 2.9 million viewers from 2015 to 2019, ranking 8th in the nation, with games against other top-ranked programs drawing millions more. For example, Oklahoma's 2021 Alamo Bowl victory over No.14 Oregon, where Mr. Brkic made two field goals including a 40-yarder, drew over 4.7 million in viewership.

**FOURTH AMENDED COMPLAINT**

1084.  Between ticket sales, media rights, Big 12 Conference disbursements, and
other sources, Oklahoma has made a considerable amount of money from its football
program. For example, in the 2020 season, Oklahoma made $89 million in total
revenue, including $9.2 million in ticket sales, from football alone. The university also
received $34.5 million in revenue disbursements from the Big 12 Conference following
the 2020-2021 fiscal year.

1085.  Mr. Brkic received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during most of his time at the University of Oklahoma,
he was not permitted to receive money for use of his NIL, whether from third parties,
from Defendants, or from his school. As a standout football player at Oklahoma and an
All-American, he would have earned substantially more NIL compensation if not for the
NCAA's unlawful restrictions.

1086.  Defendants' conspiracy greatly harmed Mr. Brkic. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player than he received, and
would have received money for his NIL from third parties.

1087.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Brkic would have received a competitive share of
the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1088.  **The effect of Defendants' illegal conduct on Plaintiff Gavin Cross.**
Plaintiff Gavin Cross worked as a college baseball player at Virginia Tech from 2019 to
2022.

1089.  The labor provided by Mr. Cross was of great value to Defendants. And it
was a significant amount of labor. During the season, he often worked six days per

**FOURTH AMENDED COMPLAINT**

week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1090.  Mr. Cross was a highly recruited prospect out of high school who possessed unique talent. He was a two-time First Team All-State player, a three-time All-Region Honoree, and a four-time First Team All-Conference selection. He was named to the Tennessee Ultimate Nine team in 2019 and named a Perfect Game Preseason All-American. He set the Tennessee state record for stolen bases with 41 in 2018. Mr. Cross's exemplary high school career earned him a spot as a Virginia Tech Hokie.

1091.  Mr. Cross's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Cross became one of Virginia Tech's most dominant hitters. In his freshman season, he was one of four Hokies to start all 16 games and during the season, he was tied for a team-best with seven multi-hit games. In the NCAA, he was ranked 74th in stolen bases, 76th in hits, 89th in hits per game, 103rd in stolen bases per game, and 190th in batting average. He was also named to the Freshman All-American team after batting .369 in the shortened 2020 season.

1092.  During his redshirt freshman season, Mr. Cross became the first Tech freshman to be named to the All-ACC First Team. He was also named the Hokies' first-ever ACC All-Freshman selection, leading his team in multiple categories, including batting average (.345), slugging percentage (.621), runs (48), hits (70), doubles (13), triples (five), home runs (11) and stolen bases (nine). That season, he was named a College Baseball Nation Second Team All-American and was selected to Team USA's Collegiate National Team.

1093.  Representing Team USA in the summer of 2021, Mr. Cross led USA Baseball's 2021 Collegiate National Team in batting (.455), slugging (.879) and home runs (4).

**FOURTH AMENDED COMPLAINT**

1094.  Entering his redshirt sophomore season, Mr. Cross was a five-time 2022 Preseason All-American, earning *Baseball American* First-Team, *D1Baseball* First Team, *Perfect Game/Rawlings* First Team, *Collegiate Baseball Second Team*, and NCBWA Second Team. That season, Mr. Cross continued to excel, posting a .328 batting average and drilling 17 home runs, earning him First Team All-ACC honors.

1095.  As a 2022 MLB Draft College Prospect, he was ranked 3rd by *Perfect Game*, 5th by *D1Baseball*, 10th by *MLB Pipeline*, and 14th by *Baseball America*. Mr. Cross also appeared on the 2022 Golden Spikes Award watch list, which is bestowed annually to the best amateur baseball player in the United States.

1096.  Mr. Cross was selected in the 2022 MLB Draft, where he was taken in the first round with the ninth overall pick by the Kansas City Royals.

1097.  During his collegiate baseball career, Virginia Tech's baseball games were broadcast on national television, primarily through ACC and SEC Networks and ESPN. Thousands of fans attended Virginia Tech baseball games in 2022 for a total attendance of 43,615 with an average of 1,090 per game. During the 2022 season, Virginia Tech made over $21 million in ticket sales. In 2022, the ACC distributed approximately $39.4 million to each of its member schools, including Virginia Tech.

1098.  Mr. Cross received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time at Virginia Tech, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Virginia tech. Even for the time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Virginia Tech and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a standout player at Virginia Tech,

**FOURTH AMENDED COMPLAINT**

he would have likely earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1099.  Defendants' conspiracy greatly harmed Mr. Cross. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1100.  Mr. Cross received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Cross. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an all-conference player, he would have received a full athletic scholarship absent Defendants' bylaws.

1101.  But for the illegal and unfair restraints put in place, Mr. Cross would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1102.  **The effect of Defendants' illegal conduct on Plaintiff Grant Haley.** Plaintiff Grant Haley worked as a college football player at Pennsylvania State University from 2014 to 2017.

1103.  The labor provided by Mr. Haley was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

1104.  Mr. Haley was a highly recruited two-way football player for The Lovett School in Atlanta, Georgia. As the team captain, running back, and cornerback, he led the team in a 14-7 win against Lamar County in the 2013 Georgia Class AA State Championship, going on a 41-yard touchdown run in the third quarter to break a 7-7 tie. In his senior year, he also registered more than 1,500 rushing yards and 27 touchdowns as a running back, as well as six interceptions as a cornerback. For his performance, he was named the Georgia Class 2A Offensive Player of the Year by the Associated Press and South Fulton All-Area Offensive Player of the Year. He was rated a three-star recruit by ESPN and ranked the 43rd best cornerback prospect in the nation by 247 Sports. He received eight offers from competitive programs, including the University of Florida and Duke, and committed to play for Penn State.

1105.  Mr. Haley's job as a college football player was essentially a full-time one, and an important and valuable one at that. In addition to his defensive position as a cornerback, he also served on special teams as a kickoff and punt returner. He appeared in all 13 games as a true freshman in 2014 and broke the school's single season record with 32 kickoff returns. His 659 kickoff return yards ranked second in school history, and he scored the first defensive touchdown by a true freshman since 2003 by returning an interception against Temple. His performance that season earned him a Big Ten All-Freshman Team Honorable Mention selection.

1106.  Mr. Haley started 11 games in 2015 and earned an All-Big Ten Honorable Mention from the media. And in 2016, Mr. Haley earned the Rose Bowl Game Big Ten Player of the Week after returning a blocked field goal for the game-winning touchdown against then-undefeated Ohio State. He was also instrumental in Penn State's come-from-behind 38-31 win over Wisconsin in the Big Ten Championship game where he completed three tackles on Wisconsin's final drive and made the final stop of the game to prevent Wisconsin from advancing.

**FOURTH AMENDED COMPLAINT**

1107.  In his final collegiate season, Mr. Haley started all 13 games and served as the team captain, ranking tenth in the conference in pass deflections per game. He earned Midseason All-America honors from The All-Athletic and USA Today, as well as another All-Big Ten Honorable Mention. He was also a semifinalist for the Jim Thorpe Award, an award given annually to the best defensive back in college football.

1108.  Mr. Haley signed with the New York Giants as a free agent in 2018, further demonstrating the value of his talent and labor.

1109.  During Mr. Haley's collegiate career, Penn State was a member of the Big Ten Conference and its games were regularly carried by national television broadcasters such as ABC and ESPN. Penn State also frequently featured Mr. Haley on its social media accounts, highlighting his contributions to the team and, no doubt, using him to boost game attendance and viewership. Penn State games drew a weekly average of 2.55 million viewers from 2015 to 2019, ranking 10th in the nation, with games against other top-ranked programs drawing millions more. For example, Penn State's 2016 upset over No. 2 Ohio State saw close to 6.5 million in viewership. Penn State home games are also regularly sold out, averaging 100,257 in attendance per game and ranking 7th in the nation in total home attendance in the 2016 season.

1110.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Penn State has made a significant amount of money from its football program. For example, Penn State generated $81.1 million in revenue from its football program alone in the 2016 season. The university also received about $52 million in revenue disbursements from the Big Ten Conference in 2016.

1111.  Mr. Haley received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Penn State, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from

**FOURTH AMENDED COMPLAINT**

his school. As a nationally recognized football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1112.  Defendants' conspiracy greatly harmed Mr. Haley. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1113.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Haley would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1114.  **The effect of Defendants' illegal conduct on Plaintiff Griffin Conine**. Plaintiff Griffin Conine worked as a college baseball player at Duke University from 2015 to 2018.

1115.  The labor provided by Mr. Conine was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1116.  Mr. Conine was a highly recruited prospect out of high school who possessed unique talent. He was named Broward High School Hitter of the year in 2014 after posting a .468 batting average with eight home runs and 33 RBI to go along with a .873 slugging percentage and .587 on-base percentage. During his senior year, he hit .341 with eight home runs and 27 RBIs, collecting Sun Sentinel and Miami Herald First Team All-County honors. During his high school career, he netted All-District and All-Country accolades, played for the South Florida Elite travel team, was named to the Perfect Game All-Tournament Team at the Florida State Finals, and participated in the prestigious Perfect Game National Showcase. He was also tabbed the 402nd overall

**FOURTH AMENDED COMPLAINT**

prospect in the 2015 class by Perfect Game and earned 2015 Perfect Game Honorable Mention All-America honors as well as Florida Second Team All-Region distinction. Despite being selected by the Miami Marlins in the 31st round of the 2015 MLB draft, he decided to play for Duke.

1117.  His job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate baseball career, Mr. Conine was one of Duke University's most impactful players. During his freshman season, he appeared in 35 games, starting 20. He registered a .205 batting average with three doubles, six RBI and nine runs scored. The summer after his freshman year, he was tabbed 2016 Perfect Game/Rawlings Second Team Collegiate All-American after leading the Northwoods League with 16 home runs in 58 games.

1118.  In his sophomore season, he was one of three Blue Devils to start all 58 games and led the team in slugging percentage (.546), on base percentage (.425), RBI (56), home runs (13), total bases (119), and walks (41), earning him Second Team All-ACC honors. He was tabbed the number 7 outfielder in D1Baseball's Position Power Rankings, Second Team Perfect Game/Rawlings Midseason All-American, and the number 28 ACC prospect in the 2018 draft class by D1Baseball.com. The summer after his sophomore year, he was named to the Cape Cod League All-Star Game and earned the CCBL's Robert A. McNeece Award, which is given to the league's top pro prospect as voted on by Major League Baseball scouts.

1119.  During his junior season, he earned Second Team All-ACC for the second straight season and hit 18 home runs, one of which went 497 feet, the longest in college baseball that season. He was named to the NCAA Athens Regional All-Tournament Team; named the preseason First Team All-American by Collegiate Baseball, Perfect Game/Rawlings, D1Baseball, and Baseball America; selected number 10 on D1Baseball's Top 100 College Prospects List; tabbed number 11 on Baseball America's

**FOURTH AMENDED COMPLAINT**

list of Top 100 College prospects for the 2018 draft; and rated number 19 on MLB
Pipeline's Top 50 MLB Draft Prospects list.

1120.  In the 2018 MLB Draft, Mr. Conine was selected in the second round with
the 52nd overall pick by the Toronto Blue Jays, further demonstrating the value of his
talent and labor.

1121.  During this time, Duke University's baseball games were broadcast on
national television, primarily through SEC and ACC networks and ESPN. Duke
frequently featured Mr. Conine on its social media platforms and other promotional
materials, highlighting his achievements to enhance game attendance and viewership.
Thousands watched Mr. Conine's games in person as well, generating revenue for the
university. In 2017, the ACC distributed between $25.3 million and $30.7 million to its
membership schools, including Duke.

1122.  Mr. Conine received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. And during his time at Duke, he was not permitted to
receive money for his NIL whether from third parties or from Defendants or from Duke.
As a highly sought-after high school recruit who became a standout player at Duke, he
would have earned substantial NIL compensation if not for the NCAA's unlawful
restrictions.

1123.  Defendants' conspiracy greatly harmed Mr. Conine. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college baseball player than he received and
would have received money for his NIL. Absent Defendants' agreement to adopt,
enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a
competitive share of the television and other revenue being brought in by Defendants
and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

1124.  Mr. Conine received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Conine. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an all-conference player, he would have received a full athletic scholarship absent Defendants' bylaws.

1125.  But for the illegal and unfair restraints put in place, Mr. Conine would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1126.  **The effect of Defendants' illegal conduct on Plaintiff Hayden Howerton.** Plaintiff Hayden Howerton worked as a college football player at Southern Methodist University from 2017 to 2021.

1127.  The labor provided by Mr. Howerton was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1128.  Mr. Howerton was a highly recruited football player out of Katy High School in Texas. As the offensive lineman and center, he led the team to the UIL Class 6A Division I Region III semifinal with a 10-3 record in his senior year after winning the state championship his junior year. He was named to First Team All-Greater Houston in both his junior and senior seasons and was rated as a three-star recruit by ESPN. As a top 20 center in the nation, Mr. Howerton received a total of 28 offers, and chose SMU over competitive programs like Baylor, Wake Forest, and Nebraska.

1129.  Mr. Howerton's job as a college football player was essentially a full-time one, and an important and valuable one at that. Serving primarily as the team's left

**FOURTH AMENDED COMPLAINT**

guard, he made six starts as a true freshman in 2017. The following season, he started in every single game as a center and was named to the AAC All-Academic Team.

1130.  Ahead of the 2019 season, Mr. Howerton earned a spot on the preseason watch list for the Rimington Trophy, awarded annually to the best college football center in the country. That season, he helped the SMU offensive rank seventh nationally in scoring and ninth in total offense. The following season, he served as team captain and helped propel SMU to No. 8 in the nation in red zone conversion, earning selections to All-AAC Second Team, PFF First-Team All-AAC, and Dave Campbell's All-Texas College First Team.

1131.  In his final collegiate season in 2021, Mr. Howerton broke SMU's record for most career starts, with 53, and helped SMU achieve the No. 9 ranking nationally in scoring. He was once again named to All-AAC Second Team, as well as Senior CLASS Award Second Team All-American, PFF All-AAC First Team, and Phil Steele All-AAC Second Team. He was also a nominee for the William V. Campbell Trophy, an award given to the collegiate football player with the best combination of academics, community service, and on-field performance.

1132.  During Mr. Howerton's collegiate career, Southern Methodist University was a member of the American Athletic Conference (AAC) and its games were regularly broadcast on CBS and ESPN. SMU also frequently featured Mr. Howerton on its social media accounts, highlighting his contributions to the team and, no doubt, using him to boost game attendance and viewership. SMU games drew a weekly average of over 230,000 television viewers from 2015 to 2019. And SMU home games also saw strong local support from fans, averaging 23,171 in per-game attendance (72% total capacity) in the 2021 season.

1133.  Between ticket sales, media rights, conference disbursements, and other sources, SMU has made a considerable amount of money from its football program. For

**FOURTH AMENDED COMPLAINT**

example, SMU received close to $9 million in revenue disbursements from the AAC for the 2023 fiscal year.

1134. Mr. Howerton received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during most of his time at SMU, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a standout collegiate football player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1135. Defendants' conspiracy greatly harmed Mr. Howerton. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1136. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Howerton would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1137. **The effect of Defendants' illegal conduct on Plaintiff Hayden Hurst**. Plaintiff Hayden Hurst worked as a college football player at the University of South Carolina from 2015 to 2018.

1138. The labor provided by Mr. Hurst was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1139. Mr. Hurst was a highly recruited prospect out of high school who possessed unique talent. Though he played football in high school, Mr. Hurst was also a standout baseball player at The Bolles School in Jacksonville, Florida. He was a Florida

**FOURTH AMENDED COMPLAINT**

All-Region first-team selection for baseball, a 2012 Rawlings Second Team All American as a righthanded pitcher, and pitched in the 2011 Under Armor All-America baseball Game. He was selected in the 17th round of the 2012 MLB Draft by the Pittsburgh Pirates as a pitcher and turned down a baseball scholarship at Florida State to sign with the Pirates. After spending two years with the Pirates, he transitioned to football and walked on at South Carolina. Despite limited football experience at the time, his elite athletic ability and work ethic allowed him to quickly rise through the ranks.

1140.  Mr. Hurst's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Hurst was one of the University of South Carolina's most impactful offensive players. After appearing in all 12 games as a freshman and being named to the First-Year SEC Honor Roll in 2015, he became a key contributor in 2016, leading all SEC tight ends with 48 receptions for 616 yards. He broke records for catches and receiving yards by a tight end at South Carolina and was ranked among the nation's top dozen tight ends in both receptions and yards receiving. That year he was named one of four permanent team captains.

1141.  He also served as the Gamecock's punt returner against Georgia, becoming the biggest punt returner in Division I football in recent memory, and was nominated for the Burlsworth Trophy, which is an annual award given to the nation's most outstanding college football player who started as a walk-on. His exemplary performance earned him scholarship in the spring.

1142.  During his junior season, Mr. Hurst was again named a team captain and earned First Team All-SEC honors after catching 44 passes for 559 yards and two touchdowns. His performance made him a finalist for the John Mackey Award, given annually to the nation's top tight end, and a finalist for the Burlsworth Trophy once again. He was named 2017 preseason First Team All-SEC by the league's coaches and Athlon, a second-team selection by the media, and a midseason First Team All-SEC

pick by The Athletic. He was ranked seventh nationally among tight ends in receiving yards and tied for 10th in receptions. He finished his college career with 100 receptions for 1,281 yards and three touchdowns, setting the school record for career receptions by a tight end.

1143.  In the 2018 NFL Draft, Mr. Hurst was selected in the first round with the 25th overall pick by the Baltimore Ravens, further demonstrating the value of his talent and labor.

1144.  During Mr. Hurst's collegiate football career, the University of South Carolina's football games were carried on national television, often by either an SEC network, ESPN network, or CBS Sports. South Carolina frequently featured Mr. Hurst on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Mr. Hurst played in high-profile games with large audiences, including the Outback Bowl against Michigan, which drew over 5 million viewers. In 2017, the South Carolina Gamecocks had an average attendance of 78,586 people at each of its seven home games and almost 1 million fans attending Gamecock games overall. In 2017, the SEC distributed over $40.9 million in television revenue to each of its member schools.

1145.  Mr. Hurst received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at South Carolina, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from South Carolina. As a highly talented multi-sport athlete who became one of the best tight ends in the nation, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1146.  Defendants' conspiracy greatly harmed Mr. Hurst. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received, and would have received money for his NIL.

1147.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Hurst would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1148.  **The effect of Defendants' illegal conduct on Plaintiff Hunter Barco.** Plaintiff Hunter Barco worked as a college baseball player at the University of Florida from 2019 to 2022.

1149.  The labor provided by Mr. Barco was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1150.  Mr. Barco was a highly recruited baseball player out of high school. Playing both as a starting pitcher and an outfielder for The Bolles School in Jacksonville, Florida, he posted a 1.84 ERA and a 5-0 record with 67 strikeouts in 38 innings while hitting .355 with 14 runs-batted-in in his senior season. With a fast-ball averaging 94 mph, he was ranked as the best left-handed starting pitcher prospect in the nation and the 14th overall prospect by Perfect Game. He was named to First Team Senior Preseason All-America and Florida Region All-High School Senior First Team by Perfect Game and was selected to the 2019 All-First Coast Team by Florida Times-Union. He ended his high school career with a 35-4 record, a 1.53 ERA, and 336 strikeouts alongside a .299 batting average and 13 home runs. Mr. Barco had discussions with the Milwaukee Brewers about possibly being drafted in the first round of the 2019 MLB Draft and was ultimately selected by the New York Mets in the 24th round, but decided to enroll at the University of Florida instead.

**FOURTH AMENDED COMPLAINT**

1151.  Mr. Barco's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his time at the University of Florida, he pitched a total of 152.2 innings across 29 starts in three seasons and had a career ERA of 3.18. In his freshman season, which was cut short due to the COVID-19 pandemic, he posted a 1.40 ERA and a .162 opponent batting average across four starts, both of which were the lowest among Florida's weekend rotation. In 2021, he registered 94 strikeouts and held opponents to a .239 batting average across 16 starts in 2021, and had a streak of nine consecutive starts without receiving a loss, including victories against three top-10 teams. His 10-win record also ranked sixth in the SEC and 11th nationally, and he was named to the 2021 SEC All-Newcomer Team. In his junior season, he went 5-2 with a 2.50 ERA and 69 strikeouts across 50 1/3 innings pitched, including striking out a career-high 12 batters against Georgia State and tossing seven scoreless innings against LSU.

1152.  Despite ending his junior season prematurely around week 10 due to an injury that required Tommy John surgery, Mr. Barco was named the No. 1 pitcher in college baseball by D1Baseball.

1153.  In 2022, Mr. Barco was drafted in the second round of the MLB Draft by the Pittsburgh Pirates, further demonstrating the value of his talent and labor.

1154.  During Mr. Barco's time at the University of Florida, the program was a part of the SEC and its games were regularly broadcast on the SEC Network and on ESPN. Florida also frequently featured Mr. Barco on its social media accounts, highlighting his accomplishments to the team and, no doubt, using him to boost game attendance and viewership. As one of the more popular baseball programs in the country, Florida home games draw an average of 5,000 fans in attendance, which is significant given a stadium capacity of 7,000.

1155.  Between ticket sales, media rights, SEC disbursements, and other sources, Florida has no doubt benefited from its baseball program. For example, Florida

**FOURTH AMENDED COMPLAINT**

made about $5 million in revenue from its baseball program in 2022, including over $2 million in ticket sales. In addition, Florida received approximately $49.9 million in SEC revenue distributions for the 2022 fiscal year.

1156.  Mr. Barco received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial baseball scholarship and other education-related expenses. Mr. Barco received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Barco, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Barco would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1157.  Moreover, during most of his time at the University of Florida, Mr. Barco was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. Even when he was permitted to earn compensation from the use of his NIL in the 2022 season, he was still barred from receiving compensation from Defendants or Florida and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a nationally recognized standout player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions. Thus, Defendants' scheme directly injured him.

1158.  Defendants' conspiracy greatly harmed Mr. Barco. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

**FOURTH AMENDED COMPLAINT**

1159.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Barco would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1160.  **The effect of Defendants' illegal conduct on Plaintiff Hunter Dickinson.** Plaintiff Hunter Dickinson worked as a college basketball player at the University of Michigan from 2020 to 2023 and at the University of Kansas from 2023 to 2025.

1161.  The labor provided by Mr. Dickinson was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

1162.  Mr. Dickinson was a highly recruited prospect out of high school who possessed unique talent. He attended DeMatha Catholic High School in Hyattsville, Maryland, where he averaged 18.1 points, 10.3 rebounds and 2.1 blocked shots per game as a senior, leading his team to a 31-3 record, winning the WCAC regular season and tournament titles and achieving the rank of third-best team in the country. A consensus four-star recruit, he earned numerous accolades, including being named Maryland Gatorade Player of the Year, Max Preps All-America Second team, and 2020 Maryland Player of the Year. He was ranked the 36th best high school player in the country by ESPN100 in the 2020 class, and was invited to play in the 2020 Jordan Brand Classic. His exceptional performance attracted interest from top basketball programs across the country.

1163.  Mr. Dickinson's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career, Mr. Dickinson was one of the most impactful players for both the University of Michigan and the University of Kansas. During his freshman year at Michigan, he

**FOURTH AMENDED COMPLAINT**

started 23 of 28 games and led Michigan in scoring, rebounding, and blocked shots. He was named the Big Ten Freshman of the Year, Big Ten Newcomer of the Year, Consensus All-American Second Team, Big Ten All-Freshman Team, First Team All-Big Ten (media), and Second Team All-Big Ten (coaches), and was a seven-time Big Ten Freshman of the Week honoree. He was also second in the Big Ten and 11th nationally with a 59.8 field goal percentage. That year, Mr. Dickinson led his team to a 23–5 record, including a 14–3 conference record, to win its first Big Ten championship since 2014. In the NCAA March Madness tournament, Michigan earned a one seed, and Mr. Dickinson led them to the Elite Eight, earning NCAA Tournament All-East Region Team honors.

1164.  During his sophomore season, he started 32 games and again led Michigan in scoring, rebounding, and blocked shots. This earned him an All-Big Ten First Team selection. He was also ranked fifth in the Big Ten and 28th nationally with a 56.3 field goal percentage and again led his team to a Sweet Sixteen appearance in the NCAA tournament. During his junior season, he also earned All-Big Ten First Team honors and was ranked fourth in the conference with 18.5 points and fourth with 9.0 rebounds per game.

1165.  In 2023, he transferred to Kansas, where he continued his outstanding play, and was named consensus All-America Second Team, Wooden All-American, 2024 Big 12 Newcomer of the Year, and All-Big 12 First Team. He was also a six-time Big 12 Weekly Award honoree. He was also one of five finalists for the Kareem Abdul-Jabbar Center of the Year Award—an annual award given to the top men's college basketball center. He ranked eighth nationally in rebounds per game at 10.8, 12th nationally for 17 double-doubles, and second nationally with 17.9 ppg. He also led the Big 12 with 14 games of 20-plus points and 18 games of 10-plus rebounds.

1166.  In the 2024-2025 season, Mr. Dickinson earned Preseason All-Big 12 (unanimous selection), Big 12 Preseason Player of the Year, Blue Ribbon College

**FOURTH AMENDED COMPLAINT**

Basketball Yearbook Preseason All-America, CBS Sports Preseason All-America, Fox

Sports Preseason All-America, Associated Press Preseason All-America, Naismith

Trophy Player of the Year Watch List, Kareem Abdul-Jabbar Center of the Year Watch

List, NABC Player of the Year Preseason Watch List, and Wooden Award Preseason

Top 50 Watch List.

1167.  In his career, Mr. Dickinson has been one of the most accomplished

athletes in the history of college basketball. Among other eyepopping statistics, he is

only one of two players in NCAA history to record 2,500 points, 1,350 rebounds, 250

assists in his career.

1168.  During his collegiate career, the basketball games of both universities

were broadcast on national television networks, including ESPN and CBS Sports.

Millions of people watch KU and Michigan basketball games on TV and tens of

thousands pack the arenas to watch in-person. For example, the 2021 Elite Eight

matchup between Michigan and UCLA drew over 6 million viewers, and the 2024 Vegas

Showdown where Kansas beat Duke averaged 2 million viewers. Both Michigan and

Kansas also frequently featured Mr. Dickinson on their social media accounts,

highlighting his accomplishments and, no doubt, using him to boost game attendance

and viewership. Each program also made millions of dollars. For instance, Michigan's

basketball team generated over $11 million in revenue in 2021 and in 2024, Kansas

Athletics reportedly made $26 million from ticket sales, driven by men's basketball and

football. In 2021-22, the Big Ten distributed over $60 million to Michigan; in 2024, the

Big 12 Conference distributed an estimated $470 million to its member schools, of

which Kansas is one.

1169.  Mr. Dickinson received none of that revenue. During part of his time in

college, he was completely barred from receiving money for use of his NIL, whether

from third parties or from Defendants or from his university. Even for the time in which

he was permitted to earn compensation from the use of his NIL, he did not receive the

**FOURTH AMENDED COMPLAINT**

full amount from third parties, Defendants, or his universities that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became one of the most decorated college basketball players of all time, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1170.  Defendants' conspiracy greatly harmed Mr. Dickinson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received.

1171.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Dickinson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1172.  **The effect of Defendants' illegal conduct on Plaintiff Hunter Long.** Plaintiff Hunter Long worked as a college football player at Boston College from 2017 to 2020.

1173.  The labor provided by Mr. Long was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1174.  Mr. Long was a highly recruited football player out of high school. After graduating from Exeter High School in New Hampshire, he spent a postgraduate year at Deerfield Academy in Deerfield, Massachusetts as the team's tight end and defensive lineman. As a senior, he totaled 30 receptions for 508 yards and two touchdowns and contributed seven sacks on defense. He was rated a three-star recruit by 247 Sports; the 4th best player in the state of Massachusetts by Rivals.com; and the No. 49 tight

**FOURTH AMENDED COMPLAINT**

end nationally—as well as the No. 1 tight end from Massachusetts and the fourth-best tight end prospect in the East—by Scout.com. He was a two-time All-Conference pick, earned ALL-SNE Second Team honors, and was named to All-State Second Team by USA Today. He received seven offers and ultimately chose Boston College over other competitive programs like UMass, UConn, and Fordham.

1175.  Mr. Long's job as a college football player was essentially a full-time one, and an important and valuable one at that. After being redshirted in 2017, he appeared in all 12 games in 2018 at the tight end position and had two touchdowns. In 2019, he recorded a team-high of 509 receiving yards on 28 catches with two touchdowns, including a 72-yard touchdown against Louisville, earning All-ACC Third Team accolades. He concluded his collegiate career in 2020 with an outstanding season, leading all tight ends nationally with 57 receptions and ranking second overall with 685 receiving yards. He was the first Boston College player since Luke Kuechly in 2011 to earn All-American honors by the Football Writers Association of America, Associated Press, and Sporting News in the same year. He was also a semifinalist for the John Mackey Award, an award given annually to the most outstanding collegiate tight end. Mr. Long was subsequently selected by the Miami Dolphins in the third round of the 2021 NFL Draft.

1176.  During Mr. Long's collegiate career, Boston College was a member of the Atlantic Coast Conference and its games were regularly carried by national television broadcasters such as ABC and ESPN. Boston College also frequently featured Mr. Long on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. From 2015 to 2019, Boston College games drew a weekly average of over 400,000 television viewers, with games against top-ranked programs drawing significantly more viewers. For example, Boston College's 2020 matchup against No. 12 North Carolina, where Mr. Long tied for a career-high of 9 receptions for 96 yards, drew close to 2 million in viewership. Boston

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

College home games are also well-attended, averaging 34,185 per game or 77% capacity in the 2019 season.

1177.   Between ticket sales, media rights, ACC disbursements, and other sources, Boston College has made a considerable amount of money from its football program. For example, Boston College football generated $32.4 million in total revenue and made $8.9 million in profits in the 2017 season. The university also received $29.5 million in revenue disbursements from the ACC in 2018.

1178.  Mr. Long received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Boston College, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a standout football tight end and All-American athlete, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1179.  Defendants' conspiracy greatly harmed Mr. Long. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1180.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Long would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1181.  **The effect of Defendants' illegal conduct on Plaintiff Isaac Rex**. Plaintiff Isaac Rex worked as a college football player at Brigham Young University from 2019 to 2023.

**FOURTH AMENDED COMPLAINT**

1182.  The labor provided by Mr. Rex was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1183.  Mr. Rex was a highly recruited prospect out of high school who possessed unique talent. He attended San Clemente High School in California, where he was a standout tight end. A consensus three-star prospect by Scout, 247Sports, Rivals, and ESPN, he was considered one of the top tight ends in the nation, ranked 54th by Scout, 47th by 247Sports, and 61st by Rivals as well as a top-100 recruit in the state of California. He was a two-time All-South Coast League and All-CIF performer at both linebacker as a junior and tight end as a senior. As a senior, he was selected to play in the Polynesian Bowl in Hawaii and helped lead his team to win a California state championship as a leading receiver in the playoffs. His exceptional performance attracted many collegiate offers to play basketball as well as football. Despite being recruited by numerous universities, Mr. Rex ultimately chose to play for BYU.

1184.  Mr. Rex's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Rex became one of BYU's most impactful offensive players. After redshirting in 2019, he emerged as a key contributor in 2020, playing 12 games and starting 8. He tied for first in the nation with 12 touchdown receptions and 72 points scored by a tight end. He was also ranked third nationally in receiving touchdowns among all positions, earning Freshman All-American honors for his exemplary performance.

1185.  During the 2021 season, Mr. Rex suffered a season-ending ankle injury during a game against USC that required multiple surgeries and over a year of rehabilitation. Although doctors said he would never play football again, Mr. Rex refused to give up—he not only returned to the game but also became one of the nation's top tight ends and set the BYU record for receiving touchdowns at his position.

**FOURTH AMENDED COMPLAINT**

1186.  In 2022, he recorded 22 grabs for 320 yards and six touchdowns despite recovering from an injury. He was named First Team Phil Steele All-Independent and to College Football Network's Second Team All-Independent. In 2023, his junior season, Mr. Rex surpassed College Football Hall of Famer Gordon Hudson (1982-1983) to become BYU's all-time leader in tight end receiving touchdowns with his 23rd on November 11th against Iowa State. That season, he received multiple accolades, including Phil Steele Preseason Fourth Team All-Big 12, All-Big 12 Tight End honorable mention, and selected to the John Mackey Award watch list, which is an award given to the top college football tight end in the nation.

1187.  During his college career, Mr. Rex played 52 career games and recorded 1,385 receiving yards, 24 touchdowns, and 112 receptions.

1188.  Mr. Rex signed with the Detroit Lions following the conclusion of the 2024 NFL Draft.

1189.  During Mr. Rex's collegiate football career, BYU's football games were carried on national television, often by networks such as ESPN, NBC, and Fox. BYU frequently featured Mr. Rex on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of people tuned in to BYU football games during this period. For instance, the New Mexico Bowl in 2022 against SMU amassed over 2 million viewers. Furthermore, in 2022, live attendance at BYU home games averaged at 59,674 fans per game, bringing in millions for the university. For the 2023-2024 season, the Big 12 Conference distributed $18 million to BYU as a first-year member.

1190.  Mr. Rex received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn

**FOURTH AMENDED COMPLAINT**

compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his universities that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became an all-conference tight end at a top program, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1191.  Defendants' conspiracy greatly harmed Mr. Rex. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received.

1192.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Rex would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1193.  **The effect of Defendants' illegal conduct on Plaintiff Jacob Eason**. Plaintiff Jacob Eason worked as a college football player at the University of Georgia from 2016 to 2018 and at the University of Washington from 2018 to 2019.

1194.  The labor provided by Mr. Eason was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1195.  Mr. Eason was a highly recruited prospect out of high school who possessed unique talent. He attended Lake Stevens High School in Washington, where he passed for 3,585 yards and 43 touchdowns with just six interceptions as a senior, earning Hunter Herald All-Area Offensive MVP honors. In his career, he racked up numerous accolades, including Gatorade National Football Player of the Year, a Maxwell Football Club National Back of the Year, a Bobby Dodd National Back of the Year, USA Today All-USA Offensive Player of the Year, American Family Insurance

**FOURTH AMENDED COMPLAINT**

2015 USA Today All-USA First Team offense, MaxPreps 2016 All-America Second Team offense, Seattle Times 2015 Offensive Player of the Year, and Associated Press 2015 All-State 4A First Team offense. Mr. Eason was also selected to represent the East in the 2016 U.S. Army All-America Bowl.

1196.  Rated as a five-star recruit, he was considered the No. 4 overall prospect in the nation by 247sports.com and the No. 1 quarterback by Rivals.com.

1197.  During his senior year, he led Lake Stevens to a 12-1 record and a trip to the 4A State semifinals. In his high school career, he passed for 9,813 yards, completing 662 out of 1,025 passes for 102 touchdowns and only 18 interceptions. Numerous universities competed to recruit Mr. Eason, but he ultimately committed to the University of Georgia.

1198.  Mr. Eason's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his freshman year at Georgia in 2016, Mr. Eason played in 13 games, starting 12 of them. He passed for 2,430 yards and 16 touchdowns. He led the Bulldogs to a victory over No. 22 North Carolina in his debut and orchestrated a comeback win against Missouri with a game-winning touchdown pass on 4th and 10. In 2017, he started the season as Georgia's quarterback but suffered a knee injury in the opener, which limited his playing time that year. He appeared in five games, making one start and was named to Maxwell watch list, which is an award given to the most outstanding college football player overall nationally, and the Davey O'Brien and Manning Award preseason watch lists, which are given to the nation's best college quarterback. Following the 2017 season, he transferred to the University of Washington, where he redshirted the 2018 season and won the Bob Jarvis Offensive Scout Squad MVP at the UW postseason awards banquet. In 2019, he started 13 games, passing for 3,132 yards and 23 touchdowns. He led the Huskies to a 47–14 victory over Eastern Washington in his debut, throwing for 349 yards and four touchdowns.

**FOURTH AMENDED COMPLAINT**

1199.  In the 2020 NFL Draft, Mr. Eason was selected in the fourth round with the 122nd overall pick by the Indianapolis Colts, further demonstrating the value of his talent and labor.

1200.  During Mr. Eason's collegiate football career, Georgia and Washington's football games were carried on national television, often by networks such as ESPN and CBS. Both schools frequently featured Mr. Eason on their social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. And millions of people watched both Georgia and Washington games during this period. For example, 28.4 million viewers watched the 2017 national championship between Georgia and Alabama. Furthermore, 2.6 million people watched the Mitsubishi Motors Las Vegas Bowl between Washington and Boise State in 2019. In 2017, Georgia's football team had a total attendance of 1,246,201 fans. Georgia also brought in $28 million in ticket sales for football games during the 2017 fiscal year. In the 2017–2018 fiscal year, the SEC distributed approximately $43.1 million to each of its member institutions, including Georgia. In 2019, the Pac-12 Conference distributed around $33 million to each of its member schools, including the University of Washington.

1201.  Mr. Eason received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Georgia and Washington, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Georgia or Washington. As the top-rated quarterback in the country who became a starting quarterback at two major college football programs, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1202.  Defendants' conspiracy greatly harmed Mr. Eason. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received, and would have received money for his NIL.

1203.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Eason would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1204.  **The effect of Defendants' illegal conduct on Plaintiff Jacob Huff.** Plaintiff Jacob Huff worked as a college football player at the University of Minnesota from 2015 to 2018.

1205.  The labor provided by Mr. Huff was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1206.  Mr. Huff was a highly recruited high school football player from the Chicagoland area—a particularly competitive landscape for high school athletes. Playing as a cornerback and tailback for Bolingbrook High School, he received Herald News All-Area honors as well as Class A All-State Honorable Mention accolades. In his senior season, he recorded 67 tackles, including seven stops for a loss, and rushed for 466 yards and eight touchdowns on offense. He was rated a three-star recruit and was ranked the 23rd best prospect from the state of Illinois by ESPN. He received six offers and ultimately chose Minnesota over programs like Central Michigan and Illinois State.

1207.  Mr. Huff's job as a college football player was essentially a full-time one, and an important and valuable one at that. After serving on special teams and gaining valuable experience his first two seasons, Mr. Huff became a regular starter in the 2018 season, recording 65 tackles and three interceptions. He notably earned the Big Ten Defensive Player of the Week award after returning a 67-yard interception for a touchdown against Middle Tennessee. He started all 13 games in his final season and

**FOURTH AMENDED COMPLAINT**

recorded 93 tackles and two interceptions while breaking up seven passes. He also played a major role in Minnesota's Quick Lane Bowl victory over Georgia Tech, registering eight tackles. His performance that season earned him an All-Big Ten Honorable Mention.

1208.  During Mr. Huff's collegiate career, the University of Minnesota was a member of the Big Ten Conference and its games were regularly carried by national television broadcasters such as Fox and ESPN. Minnesota also frequently featured Mr. Huff on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Minnesota games drew a weekly average of 803,000 television viewers from 2015 to 2019, with games against other top-ranked programs drawing significantly more viewers. For example, Minnesota's 2018 Quick Lane Bowl win over Georgia Tech drew close to 2.7 million in viewership. Minnesota also enjoys tremendous home support, averaging 37,915 per game, or 75% capacity, in the 2018 season.

1209.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, the University of Minnesota has made a considerable amount of money from its football program. For example, Minnesota's football program generated $62.92 million in total revenues, including $9.4 million in ticket sales, for the 2018 season alone. The university also received $54 million in revenue disbursements from the Big Ten Conference for the 2018 fiscal year.

1210.  Mr. Huff received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Minnesota, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Minnesota. As a standout football player at Minnesota, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

1211.  Defendants' conspiracy greatly harmed Mr. Huff. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1212.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Huff would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1213.  **The effect of Defendants' illegal conduct on Plaintiff Jaime Jaquez Jr.** Plaintiff Jaime Jaquez worked as a college basketball player at the University of California, Los Angeles from 2019 to 2023.

1214.  The labor provided by Mr. Jaquez was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1215.  Mr. Jaquez was a highly recruited basketball player out of high school. Playing for Camarillo High School in California, he earned all-Ventura County second-team honors in his sophomore year, averaging 24.1 points, 10.9 rebounds, and 2.6 steals per game. As a junior, he averaged 31 points, 12.8 rebounds, and 2.8 assists per game, establishing his school's single-season scoring record of 838 points before eclipsing that mark as a senior. In fact, as a senior, he averaged 31.7 points, 11.7 rebounds, and 3.7 assists per game, helping the team finish with a 25-4 record and win its first Coastal Canyon League title. He broke the school's single-game scoring record with 54 points against Royal High School and earned first-team All-CIF Southern Section honors, scoring 2,653 points over his high school career. As a four-star recruit

**FOURTH AMENDED COMPLAINT**

and the top-10 overall basketball player from California, he received offers from 15 competitive programs and ultimately chose to enroll at UCLA.

1216.  The summer before his freshman year, Mr. Jaquez was selected to play on the Mexican National Team and competed in the 2019 Pan American Games in Peru.

1217.  Mr. Jaquez's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He became a consistent starter his freshman season, where he appeared in all 31 games and made 23 starts and also received the Pac-12 All-Freshman Team honorable mention. He started all 32 games his sophomore year, averaging 12.3 points and 6.1 rebounds per game while leading the team in rebounding, steals, and minutes. He was a particularly valuable contributor to UCLA's six NCAA tournament games that season, averaging 15 points, 6.3 rebounds, and 3 assists per game, and shooting 47.8% from the field and 45% percent from 3-point range. He was subsequently named to the five-man East Regional All-NCAA Tournament Team and selected to the Pac-12 All-Defensive Team. As a junior, Mr. Jaquez once again led the team in rebounding and steals, as well as finished second in assists and third in overall field goal percentage. His performance in the 2021-2022 season earned him first-team All-Pac-12, Pac-12 All-Defensive Team, All-Pac-12 Tournament Team, and NABC All-District 19 honors.

1218.  Starting all 37 games in his final collegiate season (2022-2023), Mr. Jaquez averaged a team-best 17.8 points and 8.2 rebounds per game. He earned countless accolades that season, including receiving NCAA Tournament All-West Region honors; selections to All-Pac-12 Tournament Team, first-team All-Pac-12, and second-team All-America; winning the 2023 Pac-12 Player of the Year award; and winning the Lute Olson National Player of the Year by College Insider (honoring the most outstanding men's college basketball player). For both his junior and senior seasons, he was a finalist for the Julius Erving Small Forward of the Year Award, given

**FOURTH AMENDED COMPLAINT**

by the Naismith Memorial Basketball Hall of Fame to the top men's collegiate small forward. Concluding his college career ranking 8th in the program's history in total points scored, Mr. Jaquez was subsequently selected by the Miami Heat as the 18th overall pick in the first round of the 2023 NBA Draft.

1219.  During Mr. Jaquez's time at UCLA, the program was a part of the Pac-12 Conference and its games were regularly carried by national television broadcasters such as Fox and ESPN. UCLA also frequently featured Mr. Jaquez on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. For example, UCLA's 2022 matchup against Kentucky, where Mr. Jaquez played 37 minutes and scored 19 points, drew almost 2 million in viewership and was among the top 10 games in terms of viewership in the regular season. Additionally, UCLA had close to 111,150 in total in-game attendance in 2021-2022, averaging close to 7,500 per game. UCLA men's basketball is among the most profitable programs in the country, bringing in about $26 million in annual revenue and earning about $16.4 million in annual profit from 2017 to 2020.

1220.  Mr. Jaquez received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during most of his time at UCLA, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. Even for the time in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or UCLA and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a nationally recognized, star basketball player and California native, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1221.  Defendants' conspiracy greatly harmed Mr. Jaquez. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1222.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Jaquez would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1223.  **The effect of Defendants' illegal conduct on Plaintiff Jake Browning.** Plaintiff Jake Browning worked as a college football player at the University of Washington from 2015 to 2018.

1224.  The labor provided by Mr. Browning was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1225.  Mr. Browning was a highly recruited football player who set national and state high school records. Playing for Folsom High School as a quarterback, he broke the California record in passing yards by throwing a total of 5,790 yards in his junior year and set the national record for single-season touchdown passes with 91 touchdowns as a senior. Across 46 games in his high school career, he completed 1,191 of 1,708 attempts for 16,775 yards and 229 touchdowns. His total touchdowns also broke the national record previously set by Maty Mauk. He was selected to All-USA First Team by USA Today and was named the Gatorade Player of the Year for California as a junior and a senior. As a four-star recruit and the 5th best quarterback in the country, Mr. Browning received at least seven competitive offers and ultimately chose Washington over other top programs like Alabama.

1226.  Mr. Browning's job as a college football player was essentially a full-time one, and an important and valuable one at that. He started 12 games in 2015—the

**FOURTH AMENDED COMPLAINT**

second time in school history that a true freshman had started at the quarterback position. His 2,955 passing yards that season were the fifth-most in Washington history. He had an even more impressive 2016 season, throwing a record-setting 43 touchdown passes, breaking the program record and tying the Pac-12 record. He was named the Pac-12 Offensive Player of the Year, was selected to First-Team All-Pac-12, and finished sixth in Heisman Trophy voting. He was also a semifinalist for the Maxwell Award, an honor given to the most outstanding college football player, as well as a finalist for the Manning Award, presented annually to the best college quarterback.

1227.  Mr. Browning continued to have outstanding performances in the following seasons. In 2017, he broke Washington's record in career-touchdown passes and completed 230 of his attempted 336 throws, which was also his highest throwing percentage thus far. He then became the program's all-time passing leader in a 2018 game against BYU. And he ultimately led the team to win their second Pac-12 title in three years by defeating Utah in the 2018 Pac-12 Football Championship Game.

1228.  Mr. Browning finished his collegiate career with 53 starts, winning 39 of them—the most ever by a Pac-12 quarterback. He also set numerous school records, including career yards (12,296, also 4th most in Pac-12 history), season (43) and career (94) touchdown passes, career completions, career attempts, career total offense (also 4th in Pac-12 history), and career pass efficiency rating.

1229.  Mr. Browning signed with the Minnesota Vikings as a free agent in 2019 and he currently plays for the Cincinnati Bengals, further demonstrating the value of his talent and labor.

1230.  Mr. Browning's unique talent and stellar work ethic left a lasting mark on Washington football. His biggest legacy perhaps was turning Washington from a mediocre program that never won the Pac-12 title into a dominant player in the league.

1231.  During Mr. Browning's collegiate career, the University of Washington was a member of the Pac-12 Conference and its games were regularly broadcast on Fox

**FOURTH AMENDED COMPLAINT**

and ESPN. Both Washington and the Pac-12 Conference frequently featured Mr. Browning on their social media accounts, highlighting his accomplishments and using him boost game attendance and viewership. As one of the most popular programs in the nation, Washington games drew a weekly average of 1.32 million viewers during 2015 to 2019, with games against other top-ranked programs drawing millions more. For example, Washington's 2016 Peach Bowl matchup against No.1 Alabama, where Mr. Browning threw his record-setting 43rd touchdown pass of the season, drew over 19 million in viewership.

1232.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources of revenue, Washington has made a considerable amount of money from its football program. For example, the Pac-12 Conference distributed an average of $29.5 million to each of its member schools in 2018. Washington football also generated $81.13 million in revenues for the 2018 fiscal year alone, including $25.27 million in ticket sales. In fact, over the course of Mr. Browning's record-breaking three seasons at Washington, ticket prices increased, no doubt due in large part to Mr. Browning's contributions to the team's success and popularity.

1233.  Mr. Browning received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Washington, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Washington. As a nationally recognized, record-setting football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1234.  Defendants' conspiracy greatly harmed Mr. Browning. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1235.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Browning would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1236.  **The effect of Defendants' illegal conduct on Plaintiff Jake Fromm.** Plaintiff Jake Fromm worked as a college football player at the University of Georgia from 2017 to 2019.

1237.  The labor provided by Mr. Fromm was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1238.  Mr. Fromm was a highly sought-after football player out of high school. As the starting quarterback for Houston County High School, he passed over 4,000 yards with 36 touchdowns in his junior season, and completed 244 of 383 attempted passes for 3,910 yards in his senior season while leading the team in rushing yards with four rushing touchdowns. He was the 2016 Georgia Sports Writers Class 6A Offensive Player of the Year, the 2015-2016 Gatorade Georgia Player of the Year, and was selected to represent the East in the 2016 U.S. Army All-America Bowl. Mr. Fromm was also featured in season 1 of the Netflix docu-series QB1: Beyond the Lights, which showcased his leadership on the field and personal growth off the field. With 116 touchdowns over 46 career games, he was a four-star recruit and was ranked the 7th best quarterback prospect in the country by ESPN. He received 14 offers and chose Georgia over top programs such as Alabama and Kentucky.

1239.  Mr. Fromm's job as a college football player was essentially a full-time one, and an important and valuable one at that. He took over the starting quarterback

**FOURTH AMENDED COMPLAINT**

role his first season at Georgia, making 14 starts as a freshman and ranking ninth
nationally in passing efficiency. His 2,615 passing yards were the third-most in a single
season by a Georgia freshman, and he was named to Freshman All-America by ESPN
and USA Today, and also was the SEC Freshman of the Year. Starting all 14 games in
2018, he was ranked 5th in the nation in passing efficiency and ninth in yards per pass
attempt. He was a finalist for the 2018 Manning Award, an honor given annually to the
nation's top collegiate quarterback, and was a semifinalist for the Davey O'Brien
National Quarterback Award, given to the best NCAA quarterback. As the team captain
in 2019, he passed for 2,860 yards and had 24 touchdowns, including a four-touchdown
game against Georgia Tech. His 78 career touchdown passes put him in second place
on Georgia's all-time list.

1240.  In 2020, Mr. Fromm was drafted by the Buffalo Bills in the fifth round of the
NFL Draft, further demonstrating the value of his talent and labor.

1241.  During Mr. Fromm's collegiate career, the University of Georgia was a
member of the SEC and its games were regularly carried by national television
broadcasters such as CBS and ESPN. Both Georgia and the SEC also frequently
featured Mr. Fromm on their social media accounts, highlighting his accomplishments
and, no doubt, using him to boost game attendance and viewership. As one of the most
popular programs in the nation, Georgia games drew a weekly average of 2.91 million
viewers from 2015 to 2019, ranking 7th in the nation. Games against other top-ranked
programs drew significantly more viewers. For example, Georgia's 2017 College
Football Playoff National Championship matchup against Alabama--where Mr. Fromm
threw for 232 yards (including a career-high 80-yard pass)--was watched by over 28
million viewers. In fact, Mr. Fromm is no stranger to national primetime television,
having played in 3 SEC championship games, one Rose Bowl, and one National

**FOURTH AMENDED COMPLAINT**

Championship game. Georgia home games are also regularly sold out, ranking seventh in the nation with an average of 92,746 fans per game for the 2018 season.

1242.  Between ticket sales, media rights, SEC disbursements, and other sources, Georgia has made a considerable amount of money from its football program. For example, Georgia football generated $123 million in revenue, including $34.56 million from ticket sales, in the 2018-2019 season alone. The university also received approximately $44.6 million in revenue disbursements from the SEC in 2018.

1243.  Mr. Fromm received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Georgia, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a standout player at Georgia and a Georgia native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1244.  Defendants' conspiracy greatly harmed Mr. Fromm. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1245.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Fromm would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1246.  **The effect of Defendants' illegal conduct on Plaintiff Jake McCarthy.** Plaintiff Jake McCarthy worked as a college baseball player at the University of Virginia from 2015 to 2018.

**FOURTH AMENDED COMPLAINT**

1247.  The labor provided by Mr. McCarthy was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1248.  Mr. McCarthy was a highly recruited multi-sport prospect out of high school who possessed unique talent. He was a three-time all-league selection and 2015 all-region honoree in baseball as well as a three-time all-region and all-league pick in football and named First-Team All-State running back in 2014. In 2015, he was named Times-Tribune Male Athlete of the Year, batting .442 with three home runs, 19 hits, and 20 runs in 15 games. He also played travel team baseball with Baseball U. Mr. McCarthy was a highly touted prep prospect, selected in the 23rd round of the 2015 MLB Draft as a high school senior, but ultimately chose to play for UVA.

1249.  Mr. McCarthy's job as a collegiate baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate baseball career, Mr. McCarthy was one of the University of Virginia's most impactful players. In 2016, he played in six games, making five starts and was forced to miss the rest of the season due to torn ligaments. In 2017, he played in all 59 games, and was tied for second on his team with 80 hits. That year he also stole 27 bases, making him first in the ACC and ninth nationally. He was also ranked seventh nationally and first in ACC with seven triples. Mr. McCarthy helped UVA advance to the College World Series, where he batted 4-for-13. That summer, he played collegiate summer baseball with the Harwich Mariners in the prestigious Cape Cod Baseball League, posting a .387 batting average. He also competed with the U.S. Collegiate National Team that summer.

1250.  In 2018, he was limited to 20 games, starting in center field in all of them. He batted .329 (27-for-82) with seven doubles and 12 RBI and was a perfect 9-for-9 in stolen bases. He was listed on the Golden Spikes Award Watch list, which is given

**FOURTH AMENDED COMPLAINT**

annually to the top amateur baseball player in the United States, and garnered Preseason All-America honors from multiple organizations.

1251.  In the 2018 MLB Draft, Mr. McCarthy was selected in the first round with the 39th overall pick by the Arizona Diamondbacks, further demonstrating the value of his talent and labor.

1252.  UVA games were often featured on television, including on ESPNU and the ACC Network. UVA frequently featured Mr. McCarthy on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. The 2017 College World Series averaged over 1 million viewers per game. In addition to numerous viewers on TV, tens of thousands attended UVA baseball games in person while Mr. McCarthy was there. For example, in 2018, over 100,000 attendees saw UVA home games in person, with an average of over 3,200 per game. During the 2017 season, UVA made approximately $13.8 million of revenue on ticket sales. The ACC distributed approximately $29.7 million to the University of Virginia in 2018.

1253.  Mr. McCarthy received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Virginia, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from UVA. As a highly sought-after high school recruit who became a key player at UVA, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1254.  Defendants' conspiracy greatly harmed Mr. McCarthy. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have

**FOURTH AMENDED COMPLAINT**

received a competitive share of the revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1255.  Mr. McCarthy received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. McCarthy. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became a star player at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

1256.  But for the illegal and unfair restraints put in place, Mr. McCarthy would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1257.  **The effect of Defendants' illegal conduct on Plaintiff Jake Benzinger.** Plaintiff Jake Benzinger worked as a college football player at Wake Forest University from 2015 to 2019.

1258.  The labor provided by Mr. Benzinger was of great value to Defendants, involving a significant amount of work. During the season, he often worked six days per week or more and frequently more than 40 hours per week. Even during the offseason, he dedicated substantial hours under the direction of the coaching staff.

1259.  Mr. Benzinger was a highly recruited prospect out of high school, possessing unique talent. At Mt. Greylock High School in Williamstown, Massachusetts, he was a three-year starter on the offensive line who served as a team captain his senior year. He won three consecutive Western Massachusetts Super Bowl titles from 2010-2012. He also earned First Team All-Berkshire and All-Western Massachusetts honors as a senior. Beyond football, he excelled in basketball and baseball, leading his basketball team to the state quarterfinals during his junior year. His stellar high school achievements earned him an offer from Wake Forest to play football.

**FOURTH AMENDED COMPLAINT**

1260.  Mr. Benzinger's role as a college football player was essentially a full-time job, and an important and valuable one at that. Throughout his collegiate career, Mr. Benzinger was a cornerstone of Wake Forest's offensive line. He started 40 games, including the final 39 consecutively. Following a redshirt freshman season in 2015, he saw his first college action with 13 snaps at left tackle and was a starter on multiple special teams units during his 2016 freshman season, earning him his first varsity letter. During his redshirt sophomore season, he started all 13 games at right tackle and was an instrumental part of the line that allowed Wake Forest to set school records for total offense yards, passing yards, and points in a season while finishing 33rd in the country in sacks allowed. He was also instrumental in helping the Deacon rushing attack average a school record of 4.57 yards per carry.

1261.  As a redshirt junior, Mr. Benzinger started 13 games, starting the season at right tackle but becoming the starter at left tackle in the second week of the season. A fixture of the offensive line, he led the team in snaps against Notre Dame (99), Duke (83) and Memphis (101) and was second on the team with 1,116 snaps on the season. In his redshirt senior year (2019), a year in which Wake Forest was consistently ranked in the AP top 25, he started all 13 games at right tackle, earning honorable mention All-ACC honors as an offensive tackle and a spot on the All-ACC Academic Team. He participated in the East-West Shrine Game and was second on the team with 1,111 plays that season. His consistent performance contributed to Wake Forest's qualification to four consecutive bowl games from 2016 to 2019, securing victories over Temple (Military Bowl), Texas A&M (Belk Bowl), and Memphis (Birmingham Bowl).

1262.  After completing his college career, Mr. Benzinger signed with the Arizona Cardinals in 2020 and later joined the Indianapolis Colts in 2021.

1263.  During Mr. Benzinger's collegiate career, Wake Forest University's football games were broadcast on national television, often featured on ESPN networks and the ACC Network. Wake Forest frequently featured Mr. Benzinger on its social media

**FOURTH AMENDED COMPLAINT**

platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers tuned into Wake Forest football games during this period. For instance, in 2018, 2.53 million viewers watched Wake Forest beat Memphis in the Jared Birmingham Bowl. Furthermore, tens of thousands of fans attended Wake Forest football games with a total attendance of 187,892 for the 2018 season and an average attendance of 26,842 per game. Wake Forest's football team brings in millions in annual revenues, including from ticket sales. The ACC distributed $29.10 million to Wake Forest in 2018.

1264.  Mr. Benzinger received none of that revenue; nor was he otherwise compensated by Defendants for his labor, other than through a scholarship and other education-related expenses. During his tenure at Wake Forest, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Wake Forest. As a highly sought-after high school recruit who became a starting player at Wake Forest, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1265.  Defendants' conspiracy greatly harmed Mr. Benzinger. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player and would have been able to earn money for his NIL.

1266.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Benzinger would have received a competitive share of the television and other revenue generated by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1267.  **The effect of Defendants' illegal conduct on Plaintiff Jake Curhan.**
Plaintiff Jake Curhan worked as a college football player at the University of California, Berkeley, from 2016 to 2020.

**FOURTH AMENDED COMPLAINT**

1268.  The labor provided by Mr. Curhan was of great value to Defendants, constituting a significant amount of work. He often worked six days per week or more, frequently exceeding 40 hours weekly. Even during the offseason, he dedicated substantial hours under the direction of the university's coaching staff.

1269.  Mr. Curhan was a highly recruited prospect out of high school, possessing unique talent. A three-star recruit according to multiple services, he was ranked as the 54th best offensive tackle in the nation by Rivals. He earned first-team All-State Medium School honors from Cal-Hi Sports, San Francisco All-Metro honors, and was named the Marin County Athletic League Lineman of the Year as a 2015 senior after moving to left tackle and anchoring the offensive line for a team that averaged 212.9 yards per game on the ground. He earned preseason All-Northern California honors by SportStars while he was also listed at number 8 among players to watch by the San Francisco Chronicle and the number 2 player in the North Bay Area according to North Bay Preps prior to his senior season. He furthermore picked up honorable mention All-MCAL honors on both the offensive and defensive lines as junior. Although Mr. Curhan received offers from multiple universities, he ultimately chose to play at the University of California, Berkeley.

1270.  Mr. Curhan's role as a college football player was essentially a full-time job, and an important and valuable one at that. Throughout his collegiate career, Mr. Curhan was a cornerstone of Cal's offensive line, starting in 39 consecutive games. His leadership and reliability were instrumental in the team's offensive strategies and overall success.

1271.  Mr. Curhan redshirted his 2016 freshman season where he earned a Jonathan and Judy Hoff Football Scholar-Athlete of the Week and was one of nine players who were mid-year enrollees in January. During his 2017 freshman season, he started all 12 games with each of his starts at right tackle. He was also the winner of Cal's Andy Smith Award for the most Big "C" time (awarded to whoever plays the most

**FOURTH AMENDED COMPLAINT**

snaps for the team), was a second-team Pac-12 All-Academic selection, and was named Cal's Most Outstanding Offensive Player against Ole Miss. During his sophomore season, he started all 13 games with all his starts at right tackle. That year, he helped the offensive improve by an average of 32.3 yards per contest in total offense from its final 2017 number including a season-best 305 yards rushing at Oregon State that was its most since a 2016 contest against Oregon.

1272.  During Mr. Curhan's junior season, he also started all 13 games as a captain, with each start at right tackle, earning him third-team All-Pac-12 recognition from Phil Steele and Pro Football Focus while he was an honorable mention selection of the league's coaches. He also earned a spot on the Pac-12 Honor Roll, was named Cal's winner of the Brick Muller Award as its most valuable lineman on offense, Cal's Co-Offensive Player of the Week for his performance in a win at UCLA, a first-team midseason All-Pac-12 selection of SB Nation and a second-team pick of the Bay Area News Group, a nominee for CoSIDA Academic All-American honors, and earned fourth-team preseason All-Pac-12 honors from Athlon and Phil Steele while he was an honorable mention choice of Pro Football Focus. He played a key role on an offense that committed a school-record low 13 turnovers in 13 games, two less than 15 miscues in 2016 that were the fewest in school history with Cal committing only nine turnovers in its final 12 contests after a season-high four in the opener against UC Davis including five games in which the Golden Bears did not turn the ball over a single time.

1273.  During Mr. Curhan's senior season, he started two games and earned honorable mention All-Pac-12 honors from the league's coaches before the season was cut short due to the COVID-19 pandemic. He was also a member of the preseason Outland Trophy Watch List, named Second team (BANG/Jon Wilner, Pac-12 Media, Phil Steele) and Third Team (Athlon, Lindy's, Pick Six Previews) preseason All-Pac-12, and preseason All-California Region selection by SportsPac12. Following his senior

**FOURTH AMENDED COMPLAINT**

season, he was invited to the Senior Bowl, which is a post-season college football all-star game that showcases top NFL draft prospects.

1274.  After his collegiate career, Mr. Curhan signed with the Seattle Seahawks in 2021, underscoring the value of his talent and labor.

1275.  During Mr. Curhan's collegiate football career, the University of California's football games were broadcast on national television, often through networks such as ESPN and the Pac-12 Network. Cal frequently featured Mr. Curhan on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers tuned into Cal football games during Mr. Curhan's tenure. For instance, 2.73 million viewers watched the Cheez-It Bowl between TCU and Cal in 2018. Furthermore, tens of thousands of fans attended California football games during the 2018 season for a total attendance of 254,597 with an average of 42,433 per game, generating millions in ticket sales and other revenue. In 2019, the Pac-12 conference distributed approximately $32.2 million of revenue per member school, including Cal.

1276.  Despite generating substantial revenue and viewership, Mr. Curhan did not receive any share of this income; his compensation was limited to a scholarship and other education-related expenses. During his tenure at California, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from the University of California. As a highly sought-after high school recruit who became a starting player at Cal, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1277.  Defendants' conspiracy significantly harmed Mr. Curhan by preventing him from negotiating for competitive remuneration and benefits in an open market. Absent the illegal and unfair restraints imposed, he would have received greater compensation for his services as a college football player and could have profited from his NIL. Without Defendants' agreement to enforce the NCAA's anti-competitive bylaws, he

**FOURTH AMENDED COMPLAINT**

would have obtained a fair share of the substantial television and other revenues generated by Defendants and their member institutions. Thus, Defendants' scheme directly injured him.

1278.  **The effect of Defendants' illegal conduct on Plaintiff Jamal Shead.** Plaintiff Jamal Shead worked as a college basketball player at the University of Houston from 2020 to 2024.

1279.  The labor provided by Mr. Shead was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1280.  Mr. Shead was a highly recruited prospect out of high school who possessed unique talent. At Manor High School in Texas, he was a standout player, averaging 19.3 points and 4.3 assists per game during his senior year. A 4-star recruit by Rivals, he was named to Texas All-State Third Team, and was selected to the Class 5A All-Region III Team during his senior year. During his junior year, he was recognized as District 18-5A Most Valuable Player, earned a place on TABC Class 5A-All Region III, and was a finalist for the American Statesman Player of the Year. His exceptional performance garnered attention from universities like Texas A&M, SMU, and Colorado State, but he ultimately committed to the University of Houston.

1281.  Mr. Shead's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career, Mr. Shead became one of the most decorated players in Houston history. In his freshman season (2020-2021), he was an impactful player for the Cougars, leading his team to the NCAA tournament, and in one regular-season matchup, he nearly completed a quadruple double with 20 points, nine rebounds, 11 assists, and 8 steals in a win over Our Lady of the Lake.

**FOURTH AMENDED COMPLAINT**

1282.  During his sophomore season (2021-2022), Mr. Shead became the third sophomore in school history to be named to NCAA Tournament All-Regional Team and competed in all 38 games, setting a school single-season record. He dished out 221 assists for the second-highest total in Houston single-season history and led Houston and the American Athletic Conference with 5.8 assists per game and a 2.91 assist-turnover ratio. He was ranked among the nation's Top-10 leaders in both assists per game (10th) and assist-turnover ratio (9th) and was the only NCAA Division I student athlete to rank among the Top 10 national leaders in both categories. He led his team to victory in the Title Game over Memphis in the American Championship with 10 points with four rebounds, six assists, and a steal. He also led his team to the Sweet 16 in the NCAA Tournament with 21 points and an added game-high six assists with four rebounds and two steals for a win over Arizona. That season, he earned All-Texas Honorable Mention and NCAA South Region All-Tournament Team.

1283.  During Mr. Shead's junior season (2022-2023), he started all 37 games, averaging 10.5 points, 3.0 rebounds, and 5.4 assists per game. He finished the season ranked seventh in Houston career history with 460 assists, led Houston and ranked second in The American with 5.4 assists per game, led Houston and ranked sixth in The American with 1.70 steals per game, and became 20th player in Houston history with multiple 100+ assist seasons during his career. He again led his team to The American Championship and totaled a team-high 16 points with four assists and two steals in the Title Game against Memphis. He also led his team to the Sweet 16 in the NCAA Tournament and scored 15 points on 6-of-11 shooting and grabbed three rebounds with a game-high five assists. His performance earned him NABC All-District 24 Second Team, American Athletic Conference All-Tournament Team, Jersey Mike's Naismith Player of the Year Finalist, Bob Cousy Point Guard of the Year Award Finalist, and Shriners Children's Charleston Classic All-Tournament Team.

**FOURTH AMENDED COMPLAINT**

1284.  In Mr. Shead's senior season (2023-24), he started all 37 games, leading the team with an average of 6.3 assists and 2.2 steals per game. He also contributed 15.0 points per game, showcasing his all-around skills on the court. He finished his career as the second-winningest player in Houston history with a 120-18 record and was the first player in Big 12 history to be named Player of the Year and Defensive Player of the Year in the same season. He was named Conference Defensive Player of the Year and the only player in Houston history with 100+ wins, 1,300+ points, 600+ assists, and 200+ steals in his career. He led his team to the Big 12 Championship, where he scored 12 points and dished out a game-high 10 assists for his fourth double-double of the season in a Semifinal win over Texas Tech. He also led his team to the Sweet 16 in the NCAA Tournament leading all players with 10 assists and added 21 points with five rebounds while playing all but 18 seconds in an overtime win against Texas A&M. His defensive and offensive prowess earned him multiple accolades, including the 2023-24 Naismith National Defensive Player of the Year; Big 12 Conference Player of the Year; National Defensive Player of the Year according to NABC, Field of 68, and Andy Katz; the Nolan Richardson Award, awarded to the Division I player at the heart and soul of his team; and Unanimous First-Team All-American.

1285.  In the 2024 NBA Draft, Mr. Shead was selected in the second round, 45th overall, to play with the Toronto Raptors.

1286.  During this time, the University of Houston's basketball games were broadcast on national television networks such as ESPN and CBS. Houston and the Big 12 frequently featured Mr. Shead on their social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers tuned into University of Houston basketball games during this period. For instance, Houston's Sweet 16 clash with Duke drew 7.33 million viewers. Furthermore, the team's home games saw substantial attendance, with a total of

**FOURTH AMENDED COMPLAINT**

134,093 attendees in the 2022-23 season, averaging 7,450 spectators per game, earning Houston substantial revenue. In 2024, the Big 12 Conference distributed $18 million to Houston as a first-year member.

1287.  Mr. Shead received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. Even though he was permitted to earn compensation from the use of his NIL for part of his collegiate career, he did not receive the full amount from third parties, Defendants, or Houston he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a highly decorated college basketball player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1288.  Defendants' conspiracy greatly harmed Mr. Shead. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received.

1289.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Shead would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1290.  **The effect of Defendants' illegal conduct on Plaintiff James Blackmon Jr.** Plaintiff James Blackmon Jr. worked as a college basketball player at Indiana University from 2014 to 2017.

1291.  The labor provided by Mr. Blackmon was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

1292.  Mr. Blackmon was a highly recruited basketball player out of high school. He played for Bishop Luers High School in Fort Wayne, Indiana, for the first three years, averaging 33.3 points per game as a junior, and appeared in the Nike Hoop Summit for Team USA. He transferred to Marion High School—also in Indiana—his senior season, where he averaged 33.4 points, 4.4 rebounds, and 2.3 steals per game. Throughout his high school career, he scored 2,387 points, making him the eighth all-time in total points scored in Indiana high school history. Mr. Blackmon also left his mark on Indiana high school basketball history by dropping 41 points in the Indiana vs. Kentucky All-Stars game, tying for third place on all-time scoring list.

1293.  Mr. Blackmon was rated a five-star recruit and was ranked the best player from Indiana by 247 Sports and the 20th best prospect nationally by ESPN. He received 20 offers from competitive programs, including Michigan and Kentucky, and ultimately committed to play for Indiana. Notably, his final verbal commitment to Indiana was broadcast live on ESPNU.

1294.  Mr. Blackmon's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He made immediate impact as a freshman and was ranked sixth among all freshman in the nation scoring 15.7 points per game. He had a 25-point game in the Big Ten tournament against Northwestern and earned honorable mention All-Big Ten. Despite missing the latter half of the season due to an injury, he averaged 15.8 points and 4.2 rebounds per game out of his 12 starts in his sophomore season. In his 2016-2017 season, he played in 30 games and led the team in scoring—and his 91 three-pointers ranked second all-time in program history. He was named National Player of the Week on two occasions after dropping 26 points against Kansas and scoring a career-high of 33 points against Michigan State. In addition to being selected to Third Team All-Big Ten by media, he was a finalist for the Jerry West Award, an honor given to the top collegiate shooting guard in the country.

**FOURTH AMENDED COMPLAINT**

1295.  During Mr. Blackmon's time at Indiana University, the program was a part of the Big Ten Conference, and its games were regularly carried by national television broadcasters such as ESPN. Indiana men's basketball is among the most-watched programs of NCAA men's basketball and games against top opponents regularly drew millions of viewers per game. For example, Indiana's matchup against Maryland in 2015 was the most-watched college basketball game of that week with 2.1 million watching on television. Additionally, Indiana led the Big Ten Conference and ranked 9th in the nation with an 16,363 average in home game attendance during the 2016-2017 season. Indiana men's basketball is also among the most profitable programs, earning about $17.1 million in annual profit from 2017 to 2020.

1296.  Mr. Blackmon received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the Indiana University, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Indiana. As a nationally recognized college basketball player and Indiana native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1297.  Defendants' conspiracy greatly harmed Mr. Blackmon. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1298.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Blackmon would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

1299.  **The effect of Defendants' illegal conduct on Plaintiff James Lynch.**
Plaintiff James Lynch worked as a college football player at Baylor University from 2017
to 2020.

1300.  The labor provided by Mr. Lynch was of great value to Defendants. During
the season, he often worked six days per week or more and often more than 40 hours
per week. Even during the offseason, he worked a significant number of hours under
the direction of the coaches at the school.

1301.  Mr. Lynch was a highly sought-after prospect coming out of high school,
recognized for his exceptional talent. During his time at Round Rock High School in
Texas, he was a three-time all-district defensive lineman, consistently standing out for
his impressive performances on the field. In the 2017 recruiting class, 247Sports ranked
him as the nation's 31st-best defensive tackle prospect, while ESPN and Scout placed
him at 47th. His accolades included being named the 2016 District 13-6A Defensive
Lineman of the Year, a member of the 2016 Subway Super Team by Dave Campbell's
Texas Football, and a first-team selection for the 2016 All-District 13-6A. He concluded
his high school career tied for the best record in school history, ultimately earning a
scholarship offer from Baylor.

1302.  Mr. Lynch's job as a college football player was essentially a full-time one,
and an important and valuable one at that. During his collegiate football career, Mr.
Lynch was one of Baylor University's most impactful players. As a freshman in 2017, he
played in all 11 games as a second-string defensive tackle and recorded 20 tackles,
including three sacks. That season, he led the Big 12 in sacks by a freshman and
earned Freshman All-American honors.

1303.  During his sophomore season, he started all 13 games, leading the team
with 5.5 sacks and recording 40 tackles. He earned multiple accolades, including 2018
All-Big 12 First Team honors (AP), All-Big 12 Second Team recognition (coaches),

**FOURTH AMENDED COMPLAINT**

Academic All-Big 12 Second Team honors, and a spot on the 2018 Postseason All-Texas Team (DCTF).

1304.  Mr. Lynch's junior year in 2019 was particularly remarkable. He started all 14 games and set a Baylor single-season record with 13.5 sacks, recording 19.5 tackles for loss among his 41 total tackles. Additionally, he forced three fumbles, recovered two, and blocked two kicks. His outstanding performance earned him numerous accolades, including unanimous All-American honors, 2019 First Team All-American recognition (Football Writers Association, Walter Camp Football Foundation, ESPN, AP, Sporting News, AFCA, The Athletic), and 2019 Second Team All-American honors (Sports Illustrated). He was also named the 2019 Big 12 Defensive Player of the Year (Coaches, AP, Waco Tribune), Big 12 Defensive Lineman of the Year (Coaches), First Team All-Big 12 (Coaches, AP, Waco Tribune), Texas College Player of the Year (DCTF), and a finalist for the Hendricks Award, given to college football's top defensive end. His 13.5 sacks in the 2019 season remain the most in Baylor history.

1305.  In total, Mr. Lynch concluded his Baylor career with 101 tackles, 33.5 tackles for loss, 22 sacks (setting the school's career sack record), three forced fumbles, three fumble recoveries, and three blocked kicks.

1306.  In the 2020 NFL Draft, Mr. Lynch was selected in the fourth round as the 120th overall pick by the Minnesota Vikings.

1307.  During Mr. Lynch's collegiate football career, Baylor University's football games were broadcast on national television networks such as ESPN and CBS. Baylor frequently featured Mr. Lynch on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. ESPN's College GameDay showcased the Baylor vs. Oklahoma matchup, highlighting the duel between Baylor's defensive standout James Lynch and Oklahoma's quarterback Jalen Hurts.

**FOURTH AMENDED COMPLAINT**

1308.  Millions of people watched Baylor football games during this period. For instance, the 2019 Baylor-Oklahoma game reached the top ten for viewership with 8.7 million viewers. Furthermore, tens of thousands of fans attended Baylor football games in 2019 with a total of 318,621 attendees at an average of 45,517 attendees per game, bringing in millions for the school. Also, the Big 12 distributed an average of $37.7 million to each of its member schools in 2019.

1309.  Mr. Lynch received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Baylor, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Baylor. As a highly sought-after high school recruit who became a starting player at Baylor, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions

1310.  Defendants' conspiracy greatly harmed Mr. Lynch. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL.

1311.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Lynch would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1312.  **The effect of Defendants' illegal conduct on Plaintiff Jack Cichy.** Plaintiff Jack Cichy worked as a college football player at the University of Wisconsin from 2013 to 2017.

1313.  The labor provided by Mr. Cichy was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per

**FOURTH AMENDED COMPLAINT**

week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1314.  Mr. Cichy recorded an impressive high school football career at the Hill-Murray School in Maplewood, Minnesota, where he was a two-time team captain. As a linebacker, he recorded 111 tackles, three interceptions, and four blocked punts in his junior year. In his senior season, he recorded 107 tackles, four sacks, six forced humbles, and four pass breakups, ultimately winning team MVP. His senior performance also earned him an All-Conference selection, as well as an All-Twin Cities Honorable Mention.

1315.  Mr. Cichy's job as a college football player was essentially a full-time one, and an important and valuable one at that. He saw action in four games in his freshman 2013 season and was redshirted the following year. He was a key contributor in the 2015 season, playing in all 13 games that season and finishing with 60 tackles to rank fifth on the team. He was also named Defensive MVP of the Holiday Bowl after recording a team-high nine tackles and three sacks against USC. He served as team captain for the 2016 season and made seven starts at the inside linebacker position. Despite missing UW's final seven games of the season due to a torn pectoral muscle, he still registered 60 tackles (including a career-high 15-tackle game against No. 2 Ohio State), tying for fourth on the team. His performance in the 2016 season earned him an All-Big Ten Honorable Mention, and he was also named a semifinalist for the Butkus Award—given annually to the best college linebacker—and a quarterfinalist for the Lott IMPACT Trophy, an award given to a defensive player who demonstrates exceptional character and athletic ability.

1316.  Mr. Cichy was named on the 2017 preseason watch lists for the Bednarik Award, Nagursky Trophy, and Lott IMPACT Trophy. Although he did not play that season due to a knee injury, Mr. Cichy still worked for a significant number of hours

**FOURTH AMENDED COMPLAINT**

every week, participating in practices, going to workouts, and contributing as a player-coach.

1317.  Mr. Cichy was instrumental to the UW football program's success. Over the course of his collegiate career at UW, he helped the program rank No. 2 nationally in scoring defense, No. 2 in rushing defense, No. 2 in pass efficiency defense, and No. 3 in total defense.

1318.  As a member of the Big Ten Conference, UW's football were regularly carried by national television broadcasters such as ABC and ESPN. Both UW and the Big Ten frequently featured Mr. Cichy on their social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

1319.  From 2015 to 2019, Wisconsin games drew a weekly average of 2.27 million television viewers, ranking 11th in the nation, with games against other top-ranked programs drawing millions more. For example, Wisconsin's 2016 matchup against Ohio State totaled almost nine million in television viewership. Wisconsin home games are also well-attended, averaging 78,824 fans per game (99% total capacity) in the 2017 season, and ranking 15th in the nation with over 551,000 in total home attendance that year.

1320.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Wisconsin has made a considerable amount of money from its football program. For example, Wisconsin football brought in $82.44 million in total revenue from the 2017 season alone, including $22.67 million from ticket sales. The university also received $45 million in revenue disbursements from the Big Ten Conference in 2018.

1321.  Mr. Cichy received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses starting in the 2015-2016 season (having paid out-of-pocket the preceding two years). And during his time at the University of Wisconsin, he was not

**FOURTH AMENDED COMPLAINT**

permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a standout college football player at Wisconsin, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1322.  Defendants' conspiracy greatly harmed Mr. Cichy. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1323.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Cichy would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1324.  **The effect of Defendants' illegal conduct on Plaintiff Jared Hocker.** Plaintiff Jared Hocker worked as a college football player at Texas A&M University from 2017 to 2021.

1325.  The labor provided by Mr. Hocker was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1326.  Mr. Hocker was a highly recruited prospect out of high school who possessed unique talent. At Birdville High School in North Richland Hills, Texas, he was a standout offensive lineman, earning first-team All-District honors and being recognized as a three-star recruit by PrepStar, Rivals, ESPN, and 247Sports. He was also named Dave Campbell's Third Team Texas Football Super Team and PrepStar All-Southeast Region Team. He was rated the nation's number 62 offensive tackle prospect

**FOURTH AMENDED COMPLAINT**

and number 93 recruit in the state of Texas. Despite receiving offers from multiple other universities, Mr. Hocker ultimately chose to play for Texas A&M.

1327.  Mr. Hocker's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Hocker was a key player on Texas A&M's offensive line. During his freshman season, Mr. Hocker appeared in six games with a start against Louisiana and Wake Forest and helped the Aggie offense rack up 547.5 yards per game across his two starts. During his sophomore season, he started the first eight games of the year before suffering a season-ending injury at Mississippi State. Mr. Hocker started all 13 games in his junior season and made the start in the season-opening win over Texas State, clearing the way for two 100-yard rushers. During his senior season, Mr. Hocker started all 10 games at right guard, logging 667 snaps on offense. His performance earned him a spot as a finalist for the Joe Moore Award, which is given to the most outstanding offensive line unit in college football. He was a key part of one of the SEC's best offensive lines in the nation as the unit also led the SEC in sacks allowed (0.7), tackles for loss allowed (3.8), and yards per carry (5.45). He also helped the Aggies tally 457 yards of total offense in the 41-27 Orange Bowl victory over North Carolina. Following his senior year, he was invited to the Reese's Senior Bowl, an all-star game that features the top players in college football.

1328.  During Mr. Hocker's collegiate football career, Texas A&M University's football games were broadcast on national television networks such as ESPN and ABC. Texas A&M frequently featured Mr. Hocker on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. During this period, millions of people watched Texas A&M football games. For instance, 4.95 million people watched the 2019 Academy Sports and Outdoors Texas Bowl between Texas A&M and Oklahoma State. Furthermore, hundreds of thousands of fans attended Texas A&M football games in 2019 with a total of 711,258

**FOURTH AMENDED COMPLAINT**

attendees with an average of 101,608 attendees per game, making the school tens of
millions of dollars from ticket sales and other revenues. For the 2019-2020 fiscal year,
the SEC distributed an average of $45.5 million of revenue to each of its member
schools, including Texas A&M.

1329.  Mr. Hocker received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During his time at Texas A&M, he was not permitted
to receive money for his NIL whether from third parties or from Defendants or from
Texas A&M. As a highly sought-after high school recruit who became a starting player
at Texas A&M, he would have earned substantial NIL compensation if not for the
NCAA's unlawful restrictions.

1330.  Defendants' conspiracy greatly harmed Mr. Hocker. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player than he received, and
would have received money for his NIL.

1331.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Hocker would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1332.  **The effect of Defendants' illegal conduct on Plaintiff Jason Cabinda.**
Plaintiff Jason Cabinda worked as a college football player at Pennsylvania State
University from 2014 to 2017.

1333.  The labor provided by Mr. Cabinda was of great value to Defendants. And
it was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

1334.  Mr. Cabinda was a highly recruited football player out of Hunterdon Central High School in Flemington, New Jersey. As the team's starting linebacker and rushing back, he rushed for 1,793 yards and scored 24 touchdowns as a junior. In his senior year, he led the team to the NJSIAA Group IV State Championship, and recorded 1,258 yards and 17 touchdowns in eight games. He was named to First Team All-Metro and Second Team All-State and was the MSG Varsity Tri-State Player of the Year. Setting the school record with 50 career rushing touchdowns, he was a three-star recruit according to ESPN was ranked the 23rd best player from New Jersey by 247 Sports. He received 17 offers from competitive programs including Boston College and Maryland and committed to enroll at Penn State.

1335.  Mr. Cabinda's job as a college football player was essentially a full-time one, and an important and valuable one at that. In 2014, he appeared in nine games and was one of the three true freshmen to start on defense. He took over the starting linebacker role his sophomore season, leading the team with 7.7 tackles per game, including a 13-tackle game against Michigan State. He continued his impressive performance in 2016, posting eight or more tackles in eight of the nine games he played, including a 13-tackle game against Ohio State. As the team captain, he started all 13 games in his senior season and was the Lott IMPACT Trophy Player of the Week following another 13-tackle performance against Indiana. He was named to Second Team All-Big Ten by league coaches in both 2016 and 2017, garnered second-team All-America honors from SB Nation, and left No. 9 on Penn State's career tackle all-time list.

1336.  Mr. Cabinda signed with the Oakland Raiders as a free agent in 2018, further demonstrating the value of his talent and labor.

1337.  During Mr. Cabinda's collegiate career, Penn State was a member of the Big Ten Conference and its games were regularly broadcast on ABC and ESPN. The program also frequently featured Mr. Cabinda on its social media pages, highlighting his

**FOURTH AMENDED COMPLAINT**

accomplishments and, no doubt, using him to boost game attendance and viewership. As one of the most popular programs in the nation, Penn State games drew a weekly average of 2.55 million viewers from 2015 to 2019, ranking 10th in the nation, with games against other top-ranked programs drawing millions more. For example, Penn State's 2016 upset over No. 2 Ohio State—where Mr. Cabinda led the game with 13 tackles—saw close to 6.5 million in viewership. Penn State also has the third highest attendance in the nation with an average home crowd of 106,707 per game in the 2017 season.

1338.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Penn State made a considerable amount of money from its college football program. For example, for the 2018 season, the football program brought Penn State over $100 million in revenue, including $36.83 million in ticket sales. The university also received $51 million in revenue disbursements from the Big Ten Conference in 2018.

1339.  Mr. Cabinda received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Penn State, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a standout player at Penn State, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1340.  Defendants' conspiracy greatly harmed Mr. Cabinda. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1341.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Cabinda would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1342.  **The effect of Defendants' illegal conduct on Plaintiff Jason Preston.** Plaintiff Jason Preston worked as a college basketball player at Ohio University from 2018 to 2021.

1343.  The labor provided by Mr. Preston was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1344.  Mr. Preston was a highly competitive basketball player out of high school. After two years at the William R. Boone High School in Orlando, Florida, he transferred before the 2017-2018 season to Believe Prep Academy, a boarding prep school, in Athens, Tennessee. There, he gained experience as a point guard and averaged 12 points, nine assists, and seven rebounds per game, helping his team achieve an impressive 31-8 record. Despite not being on the radar of traditional college scouts, Mr. Preston gained traction after posting his highlights on Twitter and received offers from Ohio University and Longwood University before committing to play for Ohio.

1345.  Mr. Preston's job as a college basketball player was essentially a full-time one, and an important and valuable one at that.

1346.  Mr. Preston contributed from the very beginning, making 22 starts in 30 appearances as a freshman, averaging 6 points per game and leading the team with 3.4 assists per game. He recorded several standout performances, including a season-high nine assists over Western Michigan, as well as nine points, seven assists, and six rebounds in an overtime victory over Bowling Green, earning Mid-American Conference (MAC) All-Freshman Team honors at the end of season. As a sophomore, he started all 32 games and averaged 16.8 points and 7.4 assists per game. With 13 assists at St. Bonaventure, 27 points against Iona and Toledo, a triple double against Miami as well

**FOURTH AMENDED COMPLAINT**

as scoring over 20 points in ten games, he was named the MAC East Player of the Week five times. That season, he led the MAC in assists, and led the team in total points, total assists, assists per game, and field goal percentage, earning All-MAC Second Team and National Association of Basketball Coaches (NABC) All-District Second Team honors.

1347.  Mr. Preston continued excelling as a junior. Leading the team with 15.7 points and 7.3 assists per game over 20 starts. He garnered national attention in November of 2020 after recording a career-high 31 points, eight assists, and six rebounds against Illinois. He followed up with a triple double against Ball State and was named the MVP of the MAC tournament after leading Ohio to the title. Mr. Preston again made national news after helping Ohio achieve a 62-58 upset over No. 4 defending champion Virginia in the program's first NCAA Tournament appearance since 2012. In recognition of his performance, he was named to First Team All-MAC and Academic All-MAC, and earned a spot on NABC District 14 First Team.

1348.  In 2021, Mr. Preston was selected 33rd overall in the NBA Draft by the Orlando Magic, further demonstrating the value of his talent and labor.

1349.  During Mr. Preston's time at Ohio University, the program was a member of the Mid-American Conference (MAC) and its games were regularly carried by national television broadcasters such as ESPN and CBS. Regular season matchups against top programs like Illinois drew around 500,000 viewers with the NCAA Tournament attracting even more interest. For example, the first round of the 2021 NCAA Tournament, featuring Ohio's upset over Virginia, averaged 8.5 million viewers across CBS, TBS, TNT, and truTV.

1350.  Ohio University not only frequently featured Mr. Preston on its social media accounts, but it also used him in national commercials promoting the university. Moreover, Mr. Preston's compelling backstory and perseverance made for a viral moment in 2020 after he dropped 31 points against Illinois. Capitalizing on that moment,

**FOURTH AMENDED COMPLAINT**

Ohio University had Mr. Preston sit for multiple national interviews with major outlets. Mr. Preston drew so much attention that AT&T featured his story in a national ad that ran during a future NCAA tournament, further raising Ohio University's profile.

1351.  Between ticket and jersey sales, media rights, NCAA and conference distributions, and other sources of revenue, Ohio University has made a considerable amount of money from its men's basketball program. In fact, from the 2018-2019 season, the basketball program made nearly $3 million in total revenue.

1352.  Mr. Preston received none of those revenues, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. Even though he was effectively the face of the program, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. With a unique basketball journey and an inspiring story, Mr. Preston would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

1353.  Defendants' conspiracy greatly harmed Mr. Preston. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1354.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Preston would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1355.  **The effect of Defendants' illegal conduct on Plaintiff Jaxson Kirkland.** Plaintiff Jaxson Kirkland, an individual, is a resident of Washington. He worked as a college football player at the University of Washington from 2017 to 2022.

**FOURTH AMENDED COMPLAINT**

1356.  The labor provided by Mr. Kirkland was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1357.  Mr. Kirkland was a highly recruited prospect out of high school who possessed unique talent. At Jesuit High School in Portland, Oregon, he was a standout offensive lineman, earning numerous accolades for his performance on the field. He was class 6A first-team all-state, first-team All-Metro League, and USA Today First Team All-Oregon as a senior. He led the Crusaders to a 12-1 record and the quarterfinals of the state's 6A playoffs. As a junior, he was named First Team 6A all-state and First Team All-Metro League. As a sophomore, he helped his high school team to a 9-3 overall record and the 6A state quarterfinals. Multiple recruiting services recognized his talent; he was ranked the number 53 offensive tackle in the nation by Scout.com, the number 60 tackle in the country according to 247sports.com, the number 59 tackle in the country by Rivals.com, number 48 ranked tackle by ESPN, and the number 5 overall player in Oregon by ESPN. Initially committing to UCLA, he later decommitted and chose to play for the University of Washington, turning down offers from numerous other programs, including Oregon.

1358.  Mr. Kirkland's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Kirkland was one of the University of Washington's key offensive linemen. After redshirting his true freshman year in 2017, he became the starting right guard in 2018, starting all 14 games, and won the Travis Spring Most Outstanding Freshman Award at the UW postseason awards banquet. He also earned Freshman All-American honors from TheAthletic.com. In 2019, he started the first 11 games before sustaining an injury. He earned a spot on the 2020 Pac-12 Honor Roll, earned honorable mention on the

**FOURTH AMENDED COMPLAINT**

preseason All-Pac-12 Team, and won the John P. Angel Offensive Lineman of the Year Award at the team's postseason banquet.

1359.  Transitioning to left tackle in 2020, he started at left tackle in every game and earned First Team All-Pac-12 honors from Phil Steele as well as second-team honors from the Associated Press. He was also named to Pac-12 media and Athlon's preseason All-Pac-12 First Teams as well as earned a spot on the 2020 Pac-12 Academic Honor Roll. He served as captain for the Oregon State game, and for the second year in a row, won the John P. Angel Lineman of the Year Award at the team's postseason awards banquet.

1360.  In 2021, he started each of the first six games of the season before missing the Arizona and Stanford games due to an injury. He was named to the CoSIDA Academic All-District 8 team, first-team All-Pac-12 for the second season in a row, and won the Husky Excellence Award at the UW's postseason awards banquet.

1361.  Entering the 2022 season, he was named to the Preseason First Team All-Pac-12 and the Outland Trophy Preseason Watch List, which is awarded to the best college football interior lineman. That year, he started 10 games, was voted captain for the season, and racked up numerous awards, including Second Team All-America (USA Today), Third Team All-America (Associated Press, Pro Football Focus), All-America Honorable Mention (Phil Steele), First Team All-Pac-12, First Team All-Pac-12 (Associated Press, Phil Steele), and Second Team PFF All-Pac-12.

1362.  During this time, the University of Washington's football games were broadcast on national television networks such as the Pac-12 Networks, ABC, and Fox. Washington frequently featured Mr. Kirkland on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Mr. Kirkland's football. For instance, 4.7 million viewers watched the 2021 Washington versus Michigan game. Tens of thousands also packed the Huskies stadium for each game, generating millions for the university.

**FOURTH AMENDED COMPLAINT**

During the 2021-2022 financial year, the Pac-12 Conference distributed an average of $37 million per member university, including the University of Washington.

1363.  Mr. Kirkland received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Washington, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Washington. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Washington he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became an All-American player at Washington, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1364.  Defendants' conspiracy greatly harmed Mr. Kirkland. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1365.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Kirkland would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1366.  **The effect of Defendants' illegal conduct on Plaintiff Jaydon Grant.** Plaintiff Jaydon Grant, an individual, is a resident of Nevada. He worked as a college football player at Oregon State University from 2016 to 2022.

1367.  The labor provided by Mr. Grant was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per

**FOURTH AMENDED COMPLAINT**

week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1368.  Mr. Grant was a talented football and basketball player for West Linn High School in Oregon. He was a two-time team captain for the basketball team and earned All-Three Rivers League honors as a basketball player. He joined the football team as a senior and—despite playing for only one season—recorded an impressive 54 tackles and had four interceptions. Ultimately choosing a career in football, Mr. Grant joined the Oregon State football program as a walk-on in 2016.

1369.  Mr. Grant's job as a college football player was essentially a full-time one, and an important and valuable one at that. Despite missing most games in 2016 and 2017 due to injury, he made key contributions to the team the next year—playing in 10 games and making 16 tackles with two pass deflections—and was awarded a scholarship at the conclusion of the 2018 season. He subsequently earned the starting defensive back position for the 2019 season, when he recorded 40 tackles with two interceptions, including intercepting a pass and returning it 36 yards for a touchdown against Washington. He had five-tackle games against Stanford, Arizona State, and Washington in a shortened 2020 season and recorded 71 tackles, six pass breakups, and two interceptions in 2021, where he was named to Phil Steele All-Pac-12 Third Team. He served as one of the team captains from 2020 to 2022.

1370.  In his final season in 2022, Mr. Grant had eight-tackle games against Utah, Washington State, and Oregon, and was named to All-Pac-12 Second Team as well as Pro Football Focus All-Pac-12 First Team. He was also nominated for the Burlsworth Trophy, an honor given to the best college football athlete who started their career as a walk-on, in both 2021 and 2022, and won the 2022-2023 male Tom Hansen Medal, awarded annually by the Pac-12 Conference to recognize players with an elite combination of scholarship, athletics, and leadership.

**FOURTH AMENDED COMPLAINT**

1371.  During Mr. Grant's collegiate career, Oregon State was a member of the
Pac-12 Conference and its games were regularly broadcast on ABC and ESPN. Oregon
State also frequently featured Mr. Grant on its social media accounts, showcasing his
accomplishments and, no doubt, using him to boost game attendance and viewership.
As one of the more popular programs in the nation, Oregon State football games drew a
weekly average of over 1.34 million viewers from 2015 to 2019. Games against other
top-ranked programs drew significantly more viewers. For example, Oregon State's
2021 Jimmy Kimmel LA Bowl matchup against Utah State, during which Mr. Grant
recorded eight tackles, drew close to 3 million in television viewership. Oregon State
home games are also well-attended, averaging 31,498 close to 37,000 per game, or
89% capacity, for the 2022 season.

1372.  Between ticket sales, media rights, Pac-12 Conference disbursements,
and other sources, Oregon State made a considerable amount of money from its
football program. For example, for the 2022 season, the football program alone brought
Oregon State $42.86 million in revenue, including 5.9 million in ticket sales. The
university also received $33.6 million in revenue disbursements from the Pac-12
conference following the 2022-2023 season.

1373.  Mr. Grant received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses after the 2018 season. And during most of his time at
Oregon State, he was not permitted to receive money for use of his NIL, whether from
third parties or from Defendants or from his school. Even for the time when he was
permitted to earn NIL compensation, he was still barred from receiving compensation
from Defendants or from Oregon State, and he did not receive the full amount from third
parties that he would have received had the NCAA's unlawful restrictions been lifted
earlier. As a standout player at Oregon State, and as an Oregon native especially, he

**FOURTH AMENDED COMPLAINT**

would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1374.  Defendants' conspiracy greatly harmed Mr. Grant. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1375.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Grant would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1376.  **The effect of Defendants' illegal conduct on Plaintiff Jeremiah Ledbetter.** Plaintiff Jeremiah Ledbetter worked as a college football player at Hutchinson Community College from 2012 to 2014 and at the University of Arkansas from 2015 to 2016.

1377.  The labor provided by Mr. Ledbetter was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1378.  Mr. Ledbetter was a highly recruited prospect out of high school who possessed unique talent. Originally from Orlando, Florida, he played high school football at Gainesville High School in Georgia, where he showcased tremendous ability on the defensive line. He helped his team finish 12-2, including a regional championship and also led them to the Georgia class AAA semifinals. Following high school, he attended Hutchinson Community College, where he quickly established himself as one of the best junior college defensive linemen in the nation.

**FOURTH AMENDED COMPLAINT**

1379.  During his time at Hutchinson, Mr. Ledbetter dominated the junior college level. After he redshirted his 2012 freshman season, he helped lead the Blue Dragons to an 8-4 record, a second-place finish in the Jayhawk Conference, and a victory in the Salt City Bowl as a redshirt Freshman in 2013. This performance earned him First Team All-Conference Honors at defensive end. He finished his freshman season second on the team with 73 tackles, adding 13.0 tackles for loss, seven sacks, and 13 quarterback hurries. During his sophomore season at Hutchinson, he posted 15.5 sacks, the second-highest single-season total in school history, earning him Second Team NJCAA All-America honors and First Team All-Conference recognition. He was a force on the defensive line, leading Hutchinson to national prominence and earning a four-star rating as a recruit from ESPN, Scout, and Rivals. He was ranked as the No. 1 strong-side defensive end in junior college by JUCO 100 and the number 4 junior college defensive tackle in the country. He also earned defensive MVP honors in the 2014 Salt City Bowl with 10 total tackles and three sacks. Mr. Ledbetter finished his junior college career with 144 total tackles and 22.5 career sacks. Due to his standout play, he received offers from several Power Five programs before committing to the University of Arkansas.

1380.  Mr. Ledbetter's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career at Arkansas, Mr. Ledbetter became one of the Razorbacks' most impactful defensive linemen. In his first season at Arkansas in 2015, he played in 13 games with 12 starts, finishing the year with 55 total tackles, 7.5 tackles for loss, and 2 sacks. He led the team with a career-high eight tackles, including 0.5 for loss, in his debut against Auburn.

1381.  In his senior season in 2016, he continued to showcase his dominance. Starting in all 13 games, he recorded 49 tackles. His versatility allowed him to play both defensive tackle and defensive end, making him one of the most valuable players on the Razorbacks' defensive unit. He was once named "Freak of the Week" on an SEC

**FOURTH AMENDED COMPLAINT**

Nation pre-game broadcast. His performance that year earned him a spot in the prestigious East-West Shrine Game, further proving his professional potential. During his two-season career with Arkansas, Mr. Ledbetter started 25 of 26 games played, compiling 104 tackles, including 15 for loss and 7.5 sacks.

1382.  In the 2017 NFL Draft, Mr. Ledbetter was selected in the sixth round by the Detroit Lions, further demonstrating the value of his talent and labor.

1383.  During Mr. Ledbetter's collegiate football career, the University of Arkansas football games were broadcast on national television, primarily through ESPN and the SEC Network. Arkansas frequently featured Mr. Ledbetter on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Arkansas football games during this period. For instance, over 7 million viewers tuned into the Liberty Bowl between Arkansas and KSU. Furthermore, tens of thousands of fans attended Arkansas football games for a total of 471,279 attendees with an average of 67,326 attendees per game during the 2015 season. During the 2015-16 season, Arkansas made total revenue of over $37 million from ticket sales. In 2015, the SEC distributed an average of $31.2 million to each of its member schools, including Arkansas.

1384.  Mr. Ledbetter received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Arkansas, he was not permitted to receive money for his NIL whether from third parties, from Defendants, or from Arkansas. As a highly sought-after JUCO recruit who became a standout SEC player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1385.  Defendants' conspiracy greatly harmed Mr. Ledbetter. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1386.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Ledbetter would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1387.  **The effect of Defendants' illegal conduct on Plaintiff Jimmy Morrissey.** Plaintiff Jimmy Morrissey worked as a college football player at the University of Pittsburgh from 2016 to 2020.

1388.  The labor provided by Mr. Morrissey was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1389.  Mr. Morrissey was an accomplished football player for La Salle College High School in Huntingdon Valley, Pennsylvania. As an offensive lineman, he helped the team achieve a 25-7 record during his varsity career, including a Philadelphia Catholic League title, and was named to All-Philadelphia Catholic League twice. He was also named to All-City by the Philadelphia Daily News, and was selected to play in the Big 33 Football Classic, an all-star game in Pennsylvania commonly known as the "super bowl" of high school football. Mr. Morrissey ultimately enrolled at the University of Pittsburgh as a preferred walk-on over offers from Lehigh, Bucknell, and Colgate.

1390.  Mr. Morrissey's job as a college football player was essentially a full-time one, and an important and valuable one at that. After being redshirted in 2016, he was awarded a scholarship in August 2017 and earned the starting center position during training camp, starting all 12 games that season. In 2018, he was honored as the ACC Offensive Lineman of the Week for his performance against Virginia Tech, and he was named to Third Team All-ACC, the first Pittsburgh player at the center position to earn

**FOURTH AMENDED COMPLAINT**

such a distinction. In 2019, he established himself as the top center in the conference and as the team's leading run blocker by not surrendering a sack in the entire season, earning a selection to First Team All-ACC. By the end of his 2020 season, he had notched 47 career starts as a four-year starting player and a two-time team captain, and he was once again named to First Team All-ACC. He was awarded the 2020 Burlsworth Trophy, an honor given annually to the most outstanding college football player who started his career as a walk-on. He was also a recipient of Pittsburgh's prestigious Blue-Gold Award, honoring seniors who best embody the student-athlete ideal based on academic scholarship, athletic achievement, leadership qualities, and citizenship.

1391.  During Mr. Morrissey's collegiate career, the University of Pittsburgh was a member of the Atlantic Coast Conference and its games were regularly carried by national television broadcasters such as ABC and ESPN. Pittsburgh also frequently featured Mr. Morrissey on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. As one of the more popular programs in the nation, Pittsburgh games drew a weekly average of over 781,000 viewers from 2015 to 2019. Games against other top-ranked programs drew significantly more viewers. For example, Pittsburgh's 2020 matchups against Notre Dame and Clemson both drew more than 2 million in viewership. Pittsburgh home games are also well-attended, averaging 43,372 per game for the 2019 season.

1392.  Between ticket sales, media rights, ACC disbursements, and other sources, Pittsburgh has made a considerable amount of money from its football program. Pittsburgh football generated over $12 million in ticket sales for the 2018 season alone, and the university also received $29.5 million in revenue disbursements from the ACC in 2018.

1393.  Mr. Morrissey received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses (beginning in 2017). And during his time at the University of

**FOURTH AMENDED COMPLAINT**

Pittsburgh, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a standout player at Pittsburgh, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1394.  Defendants' conspiracy greatly harmed Mr. Morrissey. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1395.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Morrissey would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1396.  **The effect of Defendants' illegal conduct on Plaintiff John Michael Schmitz Jr.** Plaintiff John Michael Schmitz Jr., an individual, is a resident of New Jersey. He worked as a college football player at the University of Minnesota from 2017 to 2023.

1397.  The labor provided by Mr. Schmitz was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1398.  Mr. Schmitz was a highly recruited prospect out of high school who possessed unique talent. He played at Homewood-Flossmoor High School in Illinois, where he was a dominant offensive lineman. Rated as a three-star recruit by major recruiting services, he was ranked among the top offensive linemen in the Midwest with Scout ranking him the number one center in the Midwest and the number 8 center in the nation. During his high school career, his team averaged more than 40 points a game

**FOURTH AMENDED COMPLAINT**

and he was named IHSFCA 8A All-State, Southwestern Suburban All-Conference.
Additionally, he earned Champaign-Urbana News-Gazette IHSA Football All-State
honors, and was named to the Chicago Tribune All-State Team his senior season.
Despite multiple offers, he committed to the University of Minnesota.

1399.  Mr. Schmitz's job as a college football player was essentially a full-time
one, and an important and valuable one at that. After a redshirted 2017 season, Mr.
Schmitz played in all 13 games during his 2018 freshman season and made Academic
All-Big Ten. In 2019, he played in 13 games, starting four at center. He blocked for an
offense that totaled 5,616 yards, 3,293 passing yards, 294 first downs, 443 points, and
a scoring average of 34.1 points per game. That year, he won the RTB Trust Award and
was again selected as an Academic All-Big Ten. In 2020, he started six games at center
and blocked for an offense that totaled 2,738 yards and averaged 27.3 points per game.
His performance earned him All-Big Ten Honorable Mention and Academic All-Big Ten.

1400.  During Mr. Schmitz's 2021 senior season, he started all 13 games at
center and blocked for an offensive that totaled 4,681 yards and averaged 25.46 points
per game. He earned Academic All-Big Ten, Third Team All-Big Ten (media) and
Second Team All-Big Ten (coaches). During the 2022 season, he started all 12 regular-
season games at center and blocked for an offense that rushed for 2,698 yards and 33
touchdowns and one that passed for 2,369 yards and 12 touchdowns. He earned
Academic All-Big Ten, First Team All-Big Ten from the coaches and the media, Walter
Camp Second Team All-America, FWAA First Team All-America, AP First Team All-
America, and was invited to the 2023 Senior Bowl.

1401.  In the 2023 NFL Draft, Mr. Schmitz was selected in the second round with
the 57th overall pick by the New York Giants, further demonstrating the value of his
talent and labor.

1402.  During Mr. Schmitz's collegiate football career, the University of
Minnesota's games were carried on national television, often by either an ESPN

**FOURTH AMENDED COMPLAINT**

network, Fox, or the Big Ten Network. Minnesota frequently featured Mr. Schmitz on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Minnesota football games during this period. For instance, 2.4 million people tuned into the 2021 Cactus Bowl between West Virginia and Minnesota. Furthermore, tens of thousands of fans attended Minnesota's football games during Mr. Schmitz's collegiate career with a total attendance of 323,330 and an average of 46,190 attendees per game in 2019. That same year, Minnesota made over $21 million in ticket sales, including football ticket sales. Minnesota's football program thus generated millions in revenue, with the Big Ten Conference distributing an estimated $58.8 million per school in 2022 from television contracts and media rights.

1403.  Mr. Schmitz received none of that revenue. During part of his time at Minnesota, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Minnesota he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a starting player at Minnesota, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1404.  Defendants' conspiracy greatly harmed Mr. Schmitz. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1405.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Schmitz would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1406.  **The effect of Defendants' illegal conduct on Plaintiff Johnny Juzang.** Plaintiff Johnny Juzang, an individual, is a resident of Utah. He worked as a college basketball player at the University of Kentucky from 2019 to 2020 and at the University of California, Los Angeles from 2020 to 2022.

1407.  The labor provided by Mr. Juzang was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1408.  Mr. Juzang was a highly recruited basketball player out of the Harvard-Westlake School in Los Angeles, California. As a freshman, he averaged 16.2 points and 7.5 rebounds per game, leading the team to win the CIF Southern Section Division 1A championship. The next year, he led the team to a 22-6 record, averaging an impressive 22.8 points and 9.5 rebounds per game. As a junior year in 2019, he was named the most valuable player in the Mission League after averaging 23 points and 8.5 rebounds per game and guiding his team to their first league title since 2011. Mr. Juzang was a five-star recruit for most of his high school career and remained a top-10 small forward prospect in the country after being re-classed. He received offers from 16 competitive programs before ultimately committing to the University Kentucky.

1409.  Mr. Juzang's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He appeared in 28 games for Kentucky as a freshman—starting in two—and shot 50% from the three-point line on his final 20 attempts before transferring to UCLA during the COVID-19 pandemic.

1410.  Mr. Juzang was immediately a consistent starting shooting guard for UCLA, starting 26 games with a team-leading average of 16 points per game his sophomore season. He was especially prolific in NCAA tournament games, averaging

22.8 points per game in UCLA's six NCAA tournament contests, including 28 points against Michigan in the Elite Eight and 29 points against Gonzaga in the Final Four. Also in 2021, he joined Reggie Miller and Kareem Abdul-Jabbar to become the third player in UCLA's history to score at least 20 points in each of his first two NCAA tournament games, earning a selection to the NCAA All-Tournament Team.

1411.  Mr. Juzang went on to have an outstanding junior year, leading the team in scoring and averaging a Pac-12 third-best 15.6 points per game over 29 starts. He led UCLA to the NCAA Tournament's Sweet 16 in 2022 and ended his collegiate career with a No. 10 ranking on UCLA's all-time scoring list in the NCAA Tournament. He was named to First Team All-Pac-12, earned third-team All-American honors, and was a finalist for the Jerry West Shooting Guard of the Year Award. Mr. Juzang now plays in the NBA for the Utah Jazz, where he has been since 2022.

1412.  During Mr. Juzang's college career, Kentucky and UCLA were members of the SEC and the Pac-12 Conference, respectively, and their games were regularly broadcast on CBS and ESPN. Both Kentucky and UCLA—along with the SEC and Pac-12—frequently featured Mr. Juzang on their social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

1413.  Kentucky and UCLA are among the most-watched NCAA basketball programs on television, and games against top opponents regularly drew millions of viewers per game for each school. For example, UCLA's 2021 Final Four matchup against Gonzaga, where Mr. Juzang scored a game-leading 29 points, drew as many as 18.8 million in television viewership. Kentucky's basketball team, meanwhile, routinely sells out home games, pulling in about $1.2 million per game. Both Kentucky and UCLA are among the most profitable college basketball programs in the country. Between 2016 and 2019, for example, Kentucky's program recorded average annual revenues of $56 million, and UCLA recorded over $26 million.

**FOURTH AMENDED COMPLAINT**

1414.  Mr. Juzang received none of that revenue. During part of his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties, from Defendants, or from either of his universities. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his universities that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a top high school recruit who became a highly decorated college basketball player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1415.  Defendants' conspiracy greatly harmed Mr. Juzang. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1416.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Juzang would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1417.  **The effect of Defendants' illegal conduct on Plaintiff John Rhodes**. Plaintiff John Rhodes worked as a college baseball player at the University of Kentucky from 2019 to 2021.

1418.  The labor provided by Mr. Rhodes was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1419.  Mr. Rhodes was an exceptionally talented high school baseball player. Playing every position on the field, he led Chattanooga Christian School in Tennessee to district titles in both 2018 and 2019. In 2019, he hit .560 with 51 runs, 10 doubles, 12

**FOURTH AMENDED COMPLAINT**

home runs, and 43 runs-batted-in, and was named MaxPrep Second-Team Medium Schools All-American and to the All-State team by Tennessee Baseball Coaches Association and Tennessee Baseball Report. Mr. Rhodes committed to the University of Kentucky after his freshman year, though as a Top 500 overall player—and the 4th best outfielder and the 16th overall prospect from Tennessee—he continued to receive interest from top programs, including Tennessee and Georgia.

1420.  Mr. Rhodes's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He had a prolific freshman year in 2020 despite a shortened season, batting a "video-game-like" average of .426, as well as leading the SEC and ranking second in the nation with 10 doubles. He led *all* SEC freshmen in batting average, hits, on-base percentage, doubles, and total bases, and his .426 batting average was the highest for any Kentucky player with at least 50 at-bats since 1994. He was named to Third Team All-America, earned Collegiate Baseball News' National Co-Freshman of the Year award, and was named the SEC Freshman of the Year.

1421.  He continued his hot streak into the summer playing for the Fond Du Lac Dock Spider in the Northwoods League where he led the team with a .378 batting average, and followed up with an outstanding 2021 season, leading the team in runs, doubles, walks, and hit by pitch over 52 games. He also clubbed 11 home runs and drove in 36 runs—both second-best on the team—and had 12 multi-hit and 10 multi-RBI games. He declared for the MLB Draft after the 2021 season and was selected by the Baltimore Orioles in the third round of the 2021 MLB Draft.

1422.  During Mr. Rhodes's time at the University of Kentucky, the program was a part of the SEC and its games were regularly carried by the SEC Network and by national television broadcaster ESPN. For example, Kentucky's 2020 win over Murray State, where Mr. Rhodes hit his first career home run and a walk-off home run, was broadcasted on ESPN. Kentucky also frequently featured Mr. Rhodes on its social

**FOURTH AMENDED COMPLAINT**

media accounts, highlighting his accomplishments and using him to boost game attendance and viewership.

1423.  Between ticket sales, media rights, SEC distributions, and other sources of revenue, the University of Kentucky has no doubt benefited from its baseball program. In fact, the program generated over $2 million in revenue for the 2019 season alone.

1424.  Mr. Rhodes received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

1425.  In fact, Mr. Rhodes received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Rhodes, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Rhodes would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1426.  Moreover, during his time at the University of Kentucky, Mr. Rhodes was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a standout baseball player at Kentucky, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1427.  Defendants' conspiracy greatly harmed Mr. Rhodes. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

**FOURTH AMENDED COMPLAINT**

1428.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Rhodes would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1429.  **The effect of Defendants' illegal conduct on Plaintiff John Wolford.**
Plaintiff John Wolford worked as a college football player at Wake Forest University
from 2014 to 2017.

1430.  The labor provided by Mr. Wolford was of great value to Defendants.
During the season, he often worked six days per week or more and often more than 40
hours per week. Even during the offseason, he worked a significant number of hours
under the direction of the coaches at the school.

1431.  Mr. Wolford was a highly recruited prospect out of high school who
possessed unique talent. He played at Bishop Kenny High School in Jacksonville,
Florida, where he was a dominant quarterback and served as a team captain. He was
an honorable mention selection to the Parade All-America team, named the Florida
Times-Union's Offensive Player of the Year in 2013, and First Team All-State in
Florida's Class 5A. He threw 3,317 yards and 38 touchdowns and just seven
interceptions while rushing for 931 yards and 14 scores as a senior. He also helped
Bishop Kenny to a 10-0 record in 2011, the Class 5A Regional Finals in 2012, and a 10-
1 record and the regional semifinals in 2013. In his high school career, he threw for a
state record 126 touchdowns. He also set state records for career passing yardage
(10,621), total touchdowns responsible for (162), total offense (13,403), and
completions (706). He was ranked the country's 33rd best pro-style quarterback by
247Sports and the number 63 overall quarterback in the nation by Scout.com. Despite
multiple offers, he committed to Wake Forest University, where he became an integral
part of their football program.

**FOURTH AMENDED COMPLAINT**

1432.  Mr. Wolford's job as a college football player was essentially a full-time one, and an important and valuable one at that. He started all 12 games as a true freshman in 2014, setting school records for a freshman in attempts, completions, passing yards, touchdowns, and completion percentage by a true freshman quarterback. That season, he earned a spot on the ACC All-Academic team, secured a place on the ACC Academic Honor Roll, and was named the team's Player of the Week after the Gardner-Webb game. In 2015, during his sophomore year, he once again took the helm as Wake Forest's starting quarterback, finishing the season ranked in the top 10 in school history with 356 career completions, a 59.3% completion percentage, and a passing efficiency of 116.14, while also ranking 13th in career passing yards with 3,828. He also was named to the Academic All-ACC team.

1433.  As a junior in 2016, Mr. Wolford started 11 games and appeared in 12 contests. He finished third on the team with 521 rushing yards, and tied the school bowl record with two touchdown passes against Temple. Once again, he was honored with an Academic All-ACC selection.

1434.  As a senior in 2017, he set multiple school records, including a 157.98 efficiency rating, 3,192 passing yards, 29 touchdown passes, 3,875 total offense yards, and 39 touchdowns responsible for in a season. He also set a school record by recording multiple touchdowns in seven consecutive games. His performance earned him Second Team All-ACC honors, Two-time CFPA National Player of the Week, Two-time ACC Offensive Back of the Week, Two-time Peyton Manning Star of the Week, All-ACC Academic Football Team, First Team All-American All-Bowl by Max Emfinger, and the Belk Bowl MVP award. He was also named a Davey O'Brien "Great 8" honoree and named ACC Player of the Week by Athlon Sports, for his effort against Louisville. Overall, Mr. Wolford's performance placed him along the nation's elite: he ranked 21st in completion percentage and 32nd in completions per game, 10th in passing efficiency and 13th in passing touchdowns, 25th in passing yards, 23rd in passing yards per

**FOURTH AMENDED COMPLAINT**

game, 27th in yards per completion, and 9th in points responsible for. Remarkably, he became the only player in FBS since 2000 with 400 or more passing yards, 65 or more rushing yards and no interceptions in a bowl game. Further, he was just the eighth quarterback in ACC history to amass 8,000 yards passing and 1,000 yards rushing.

1435.  In 2018, Mr. Wolford signed with the New York Jets, further demonstrating the value of his talent and labor.

1436.  During Mr. Wolford's collegiate football career, Wake Forest football games were broadcast on national television, primarily through ESPN. Wake Forest frequently featured Mr. Wolford on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Wake Forest football games during this period. For instance, 2.95 million viewers tuned into the 2017 Belk Bowl between Wake Forest and Texas A&M. Furthermore, tens of thousands of fans attended Wake Forest football games in 2017 with a total of 170,614 attendees and an average of 28,436 attendees per game, generating millions in revenue. The Atlantic Coast Conference distributed an average of $26.6 million to each of its member schools, including Wake Forest, in 2017.

1437.  Mr. Wolford received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during his time at Wake Forest, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Wake Forest. As a highly sought-after high school recruit who started at quarterback for multiple years at an ACC school, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1438.  Defendants' conspiracy greatly harmed Mr. Wolford. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received and
would have received money for his NIL.

1439.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Wolford would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1440.  **The effect of Defendants' illegal conduct on Plaintiff Jordan Beck.**
Plaintiff Jordan Beck worked as a college baseball player at the University of
Tennessee from 2019 to 2022.

1441.  The labor provided by Mr. Beck was of great value to Defendants. During
the season, he often worked six days per week or more and often more than 40 hours
per week. Even during the offseason, he worked a significant number of hours under
the direction of the coaches at the school.

1442.  Mr. Beck was a highly recruited prospect out of high school who
possessed unique talent. He played at Hazel Green High School in Alabama, where he
was a dominant outfielder. He was rated as the number 1 outfielder in Alabama and a
top 500 player by Perfect Game. He was a two-time Perfect Game Preseason All-
American, three-time Alabama Sports Writers Association All-State selection, named
Class 6A Hitter of the Year in 2019, and named to ASWA Super All-State Team in 2019.
As a junior, he led his team to their first-ever state championship in baseball. As a
senior, he batted .500 with 16 doubles, 13 homers, and 52 RBI while scoring 60 runs to
earn Super 10 Player of the Year. Despite being selected in the 14th round of the 2019
MLB Draft by the Boston Red Sox, he chose to play for the University of Tennessee.

1443.  Mr. Beck's job as a college baseball player was essentially a full-time one,
and an important and valuable one at that. During his collegiate career, Mr. Beck
developed into one of the most impactful players on the team. During his freshman
season, he played 16 games and made 10 starts as a true freshman. He was on the

**FOURTH AMENDED COMPLAINT**

SEC First-Year Academic Honor Roll and the 2020 Round Rock Classic All-Tournament Team. In the 2021 season, he played in 67 games, making 66 starts primarily in the outfield. He finished tied for the team lead with 15 home runs and led the team with 64 RBIs, which ranked 15th nationally and third in the SEC. He also finished second on the team with 16 doubles and fourth with 70 hits. His performance was instrumental in leading the Volunteers to the College World Series, where he went 2-for-3 with an RBI double and a run scored against Texas on June 22, 2021. He earned Spring SEC Academic Honor Roll and ABCA/Rawlings Second Team Southeast All-Region.

1444.  Entering the 2022 season, Mr. Beck was selected as Preseason Second Team All-SEC and a preseason All-American. He was also listed on the Golden Spikes watch list. During Mr. Beck's 2022 junior season, he posted single-season career bests in runs scored (70), triples (3), home runs (18), and walks (34). His performance that season earned him selection to the ABCA/Rawlings Second Team Southeast All-Region. That year, he also helped lead his team to a SEC championship.

1445.  Mr. Beck was selected by the Colorado Rockies with the 38th overall pick in the first round of the 2022 MLB Draft.

1446.  During this time, the University of Tennessee's baseball games were broadcast on national television, primarily through ESPN and the SEC Network. Tennessee frequently featured Mr. Beck on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2022, the University of Tennessee made over $35 million in ticket sales, including from baseball. Furthermore, the SEC distributed about $49.9 million of revenue to each of its member schools, including the University of Tennessee, from television contracts and media rights.

1447.  Mr. Beck received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time at Tennessee, he was

**FOURTH AMENDED COMPLAINT**

not permitted to receive money for his NIL whether from third parties or from Defendants or from Tennessee. Even for the time in which he was permitted to earn compensation from the use of his NIL, he was still barred from receiving compensation from Defendants or Tennessee and did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became one of the best players on one of the best teams in the country, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1448.  Defendants' conspiracy greatly harmed Mr. Beck. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1449.  Mr. Beck received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Beck. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became a top player at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

1450.  But for the illegal and unfair restraints put in place, Mr. Beck would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1451.  **The effect of Defendants' illegal conduct on Plaintiff Jordan McCabe.** Plaintiff Jordan McCabe worked as a college basketball player at West Virginia

**FOURTH AMENDED COMPLAINT**

University from 2018 to 2021 and at the University of Nevada, Las Vegas from 2021 to 2023.

1452.  The labor provided by Mr. McCabe was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1453.  Mr. McCabe gained nationwide recognition for his basketball talent—and his dribbling skills, specifically—in middle school. He showcased his skills on The Ellen DeGeneres Show, was featured in an ABC News Segment, and even performed at halftime at the NBA All-Star Game, as well as in other professional basketball games. In June 2011—when he was only 12 years old—he was even drafted by the Harlem Globetrotters (who intended to sign him after he graduated from college).

1454.  Unsurprisingly, Mr. McCabe became a highly recruited basketball player out of high school. As a sophomore at Kaukauna High School in Wisconsin, he was named Fox Valley Association Player of the Year and led his team to the Wisconsin Interscholastic Athletic Association Division 2 state championship, scoring 24 points in the title game. He received inquiries from interested colleges before his junior season, and committed to play for West Virginia over competitive offers from DePaul, Minnesota, and Missouri, among others. He averaged 25.1 points per game in his junior season, and 26.7 points and 7.8 assists per game as a senior. He led his team to another Division 2 state championship, scoring 32 points in the title game and sealing the victory with a game-winning shot with 3.5 seconds left. He was named Wisconsin Mr. Basketball and won the Fox Valley Association Co-Player of the Year award alongside Tyrese Haliburton.

1455.  Mr. McCabe's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. As a freshman, he led his team with 88 total assists, averaging 5.8 points and 2.5 assists per game. He scored 25 points and

**FOURTH AMENDED COMPLAINT**

had 11 assists and six steals in a win over Texas Christian University, becoming the first college player to record at least those numbers in one game since 2010. He started 29 games as a sophomore and scored a season-high ten points on two occasions. For his senior season, he transferred to UNLV, where he started all 31 games and averaged a career-high 6.4 points and 4.8 assists per game. Mr. McCabe opted in to his fifth year of eligibility, returning to UNLV for the 2022-23 season, averaging 5.5 points and 18.6 minutes per game.

1456.  During Mr. McCabe's college career, he played for teams that were members of major conferences such as the Big 12 and the Mountain West Conference, and their games were regularly carried by national television broadcasters such as CBS and ESPN. West Virginia had two games with over a million in television viewership in the 2021-22 regular season, and UNLV's 2023 matchup against Michigan drew nearly three million in viewership. Additionally, for the 2022-23 season, West Virginia ranked 26th in the nation in attendance with over 12,000 fans per game for home games.

1457.  Both West Virginia and UNLV frequently featured Mr. McCabe on their social media accounts, highlighting his accomplishments, capitalizing on his popularity, and using him to boost game attendance and viewership. After all, Mr. McCabe was already a high-profile basketball player before he began working at either university. In fact, well before he began his collegiate career, Mr. McCabe was approached with movie deals and other valuable opportunities, but was forced to turn them down to maintain NCAA eligibility.

1458.  Between ticket sales, media rights, conference disbursements, and other sources of revenue, West Virginia and UNLV made a considerable amount of money from their respective basketball programs. In the 2022 fiscal year, for instance, West Virginia received over $26 million in media rights distribution.

1459.  Mr. McCabe received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other

**FOURTH AMENDED COMPLAINT**

education-related expenses. And during most of his time at West Virginia and UNLV, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his schools. Even for the time when he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from UNLV, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a talented college basketball player who had garnered national attention for his dribbling skills, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1460.  Defendants' conspiracy greatly harmed Mr. McCabe. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

1461.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. McCabe would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1462.  **The effect of Defendants' illegal conduct on Plaintiff JJ Arcega-Whiteside.** Plaintiff JJ Arcega-Whiteside worked as a college football player at Stanford University from 2015 to 2018.

1463.  The labor provided by Mr. Arcega-Whiteside was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1464.  Mr. Arcega-Whiteside was a highly recruited football player for Dorman High School in Roebuck, South Carolina. As the team's primary wide receiver, he had

**FOURTH AMENDED COMPLAINT**

1,500 receiving yards and 16 touchdowns as a junior. In his senior year, he set a school record with 108 receptions and also caught for 1,824 yards with 20 touchdowns. As the 2014 South Carolina Gatorade Player of the Year and a finalist for South Carolina Mr. Football, he had 207 receptions for 3,779 yards and 38 touchdowns over his high school career, setting school records in all three categories. He was a three-star recruit, the top-10 overall recruit from South Carolina, and one of only two players from the state to be selected as a Parade All-American. Mr. Arcega-Whiteside received 18 offers from competitive programs and ultimately committed to Stanford.

1465.  Mr. Arcega-Whiteside's job as a college football player was essentially a full-time one, and an important and valuable one at that. Despite not seeing action in 2015, he played in all 12 games his sophomore season and had a team-leading five receiving touchdowns, including a 61-yard touchdown catch against Oregon. In 2017, he led the team again in multiple key categories, including receptions (48), receiving yards (781), receiving touchdowns (9), and receiving yards per game (65.1). He had an impressive three-touchdown performance in the Alamo Bowl against Texas Christian University, tying Stanford's bowl game record, and his nine receiving touchdowns also ranked second in the Pac-12. As the team captain in 2018, he led the team with 63 catches for 1,059 yards and led the league with 14 touchdowns, ranking third in the nation. His 226-yard, three-touchdown game against San Diego State won him the Pac-12 Offensive Player of the Week. And in addition to being named to Second Team All-Pac-12 and becoming the team MVP, he was a semifinalist for the 2018 Biletnikoff Award, an honor given annually to the most outstanding collegiate football receiver.

1466.  In 2019, Mr. Arcega-Whiteside was drafted by the Philadelphia Eagles in the second round of the NFL Draft, further demonstrating the value of his talent and labor.

1467.  During Mr. Arcega-Whiteside's collegiate career, Stanford University was a member of the Pac-12 Conference and its games were regularly carried by national

**FOURTH AMENDED COMPLAINT**

television broadcasters such as Fox and ESPN. Stanford also frequently featured Mr.
Arcega-Whiteside on its social media accounts, highlighting accomplishments and, no
doubt, using him to boost game attendance and viewership. Stanford games drew a
weekly average of 1.43 million viewers from 2015 to 2019, ranking 25th in the nation,
with games against other top-ranked programs drawing millions more. For example,
Stanford's 2017 Alamo Bowl matchup against Texas Christian University—where Mr.
Arcega-Whiteside led the game with three touchdowns—saw over 4.3 million in
television viewership. Stanford also enjoys tremendous home support, averaging
47,398 in attendance per game for the 2017 season.

1468.  Between ticket sales, media rights, Pac-12 Conference disbursements,
and other sources, Stanford has made a considerable amount of money from its football
program. For the 2018 fiscal year, for example, the Pac-12 distributed an average of
$29.5 million in revenues to each of its member schools, including Stanford.

1469.  Mr. Arcega-Whiteside received none of that revenue, nor was he
otherwise compensated by Defendants for his labor other than receiving a scholarship
and other education-related expenses. And during his time at Stanford University, he
was not permitted to receive money for use of his NIL, whether from third parties, from
Defendants, or from his school. As a standout player at Stanford, he would have earned
substantial NIL compensation if not for the NCAA's unlawful restrictions.

1470.  Defendants' conspiracy greatly harmed Mr. Arcega-Whiteside. It
prevented him from enjoying the benefit of bargaining for competitive remuneration and
benefits in an open market. But for the illegal and unfair restraints put in place, he would
have received greater remuneration for his services as a college football player than he
received, and would have received money for his NIL from third parties.

1471.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Arcega-Whiteside would have received a

**FOURTH AMENDED COMPLAINT**

competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1472.  **The effect of Defendants' illegal conduct on Plaintiff Josh Ali.** Plaintiff Josh Ali worked as a college football player at the University of Kentucky from 2017 to 2021.

1473.  The labor provided by Mr. Ali was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1474.  Mr. Ali was a highly recruited prospect out of high school who possessed unique talent. He played at Chaminade-Madonna High School in Hollywood, Florida, where he was a dominant wide receiver. Recognized as a three-star recruit by major recruiting services—and ranked by Scout.com as the 32nd best wide receiver in Florida—he earned First Team All-County and All-State honors. In 2016, he recorded 43 receptions for 805 yards and five touchdowns, propelling the Lions to the Class 3A state championship game. In 2015, he was named to First Team Class 4A All-State Elite Team after a season with 56 catches for 896 yards and 15 touchdowns. His impressive performance garnered multiple offers, and he ultimately committed to the University of Kentucky, where he became an integral part of their football program.

1475.  Mr. Ali's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Ali developed into one of the team's leading receivers. He appeared in 55 games, making 34 starts, and recorded 131 receptions for 1,447 yards and eight touchdowns. During his 2017 season, he saw action in nine games and caught three passes for 25 yards. In his 2018 season, he saw action in 12 of 13 games and had 10 catches for 115 yards and one touchdown. He also caught a season-high three passes and his first collegiate

**FOURTH AMENDED COMPLAINT**

touchdown with a season-long 32-yard reception at Louisville. In his 2019 season, he had 23 catches for 233 yards and 3 touchdowns.

1476.  Entering the 2020 season, Mr. Ali was named preseason Fourth Team All-SEC by Phil Steele. In his 2020 season, he had 54 catches for 473 yards and one touchdown. Prior to the 2021 season, Mr. Ali was named preseason Second Team All-SEC by Phil Steele and Fourth Team All-SEC by Athlon Sports. In his 2021 season, he had 41 catches for 601 yards and 3 touchdowns, along with 133 yards and a touchdown from punt and kickoff returns. That year, he was named Second Team All-SEC (PR) and Third Team All-SEC (WR) by Pro Football Focus.

1477.  In 2022, Mr. Ali signed with the Atlanta Falcons, further demonstrating the value of his talent and labor.

1478.  During Mr. Ali's collegiate football career, the University of Kentucky's football games were broadcast on national television, primarily through the SEC Network. Kentucky frequently featured Mr. Ali on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Kentucky football games during this period. For instance, 4.3 million viewers tuned into the 2022 Kentucky-Florida match-up. Furthermore, tens of thousands of fans attended Kentucky football games in 2019 for a total of 425,023 attendees with an average of 53,128 attendees per game, generating millions in revenue. That same year, the University of Kentucky made $38.7 million in total revenue for ticket sales, driven by football and basketball. The SEC distributed about $49.9 million of revenue to each of its member schools in 2022, including Kentucky.

1479.  Mr. Ali received none of that revenue. During most of his time at Kentucky, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Kentucky. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third

**FOURTH AMENDED COMPLAINT**

parties, Defendants, or his universities he would have received had the NCAA's
unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who
became an All-SEC receiver and punt returner at Kentucky, he would have earned
substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1480.  Defendants' conspiracy greatly harmed Mr. Ali. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player than he received and
would have received money for his NIL.

1481.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Ali would have received a competitive share of the
television and other revenue being brought in by Defendants and their member schools.
Thus, Defendants' scheme directly injured him.

1482.  **The effect of Defendants' illegal conduct on Plaintiff Josh Smith.**
Plaintiff Josh Smith worked as a college baseball player at Louisiana State University
from 2016 to 2019.

1483.  The labor provided by Mr. Smith was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

1484.  Mr. Smith was a highly recruited baseball player out of high school. As the
starting third baseman for Catholic High School in Baton Rouge, Louisiana since his
freshman season, he helped his team to the 2013 state championship and was rated
among the nation's Top 400 prospects by Baseball America. In his senior year, he
batted .379 with six home runs and 28 runs-batted-in, earning him the 2016 Class 5A
first-team all-state recognition. As the 4th overall prospect from Louisiana, he was

**FOURTH AMENDED COMPLAINT**

drafted by the Detroit Tigers in the 38th round of the 2016 MLB Draft but did not sign,

ultimately choosing to attend Louisiana State University.

1485.  Mr. Smith's job as a college baseball player was essentially a full-time

one, and an important and valuable one at that. With 71 starts at third base, he

impressed in his freshman season batting .281 with 16 doubles, five home runs, 52

runs, and 48 runs-batted-in. He was integral to LSU's outstanding runner-up

performance in the 2017 College World Series, collecting five hits, including a home run

that increased LSU's lead over Oregon State in the seventh inning. Due to injury, he

registered only six appearances in the 2018 season, but transitioned to become the

team's starting shortstop in 2019. He ended up leading the team with a .346 batting

average along with 17 doubles, two triples, nine home runs, and 41 runs-batted-in. That

same season, he finished 4th in runs scored, 6th in batting average, and 8th in total hits

among all SEC players. He was named to Freshman All-American, Freshman All-SEC,

and SEC All-Defensive Team in 2017, and earned SEC All-Tournament and NCAA

Regional All-Tournament recognition in 2019.

1486.  Mr. Smith was subsequently selected in the second round of the 2019

MLB Draft by the New York Yankees organization and currently plays for Texas

Rangers.

1487.  During Mr. Smith's time at Louisiana State, the program was a part of the

SEC and its games were regularly carried by the SEC Network, with important

tournaments broadcast on ESPN. Louisiana State also frequently featured Mr. Smith on

its social media accounts, highlighting his contributions and, no doubt, using him to

boost game attendance and viewership. For example, the 2017 College World Series

was broadcasted on ESPN and LSU's finals appearance against Florida averaged

nearly 2 million viewers per game, up 72% from the 2016 College World Series Finals.

The university benefits substantially from the baseball program. According to recent

**FOURTH AMENDED COMPLAINT**

revenue-sharing projections, LSU is expected to receive more than $5 million in total ad revenue from its baseball program.

1488.  Mr. Smith received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial athletic scholarship and other education-related expenses.

1489.  In fact, Mr. Smith received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Smith, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Smith would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws.

1490.  Moreover, during his time at Louisiana State, Mr. Smith was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a Louisiana native and All-American athlete, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1491.  Defendants' conspiracy greatly harmed Mr. Smith. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

1492.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Smith would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

1493. **The effect of Defendants' illegal conduct on Plaintiff Josh Whyle.**
Plaintiff Josh Whyle worked as a college football player at the University of Cincinnati
from 2018 to 2022.

1494. The labor provided by Mr. Whyle was of great value to Defendants. During
the season, he often worked six days per week or more and frequently more than 40
hours per week. Even during the offseason, he worked a significant number of hours
under the direction of the coaches at the school.

1495. Mr. Whyle was a highly recruited prospect out of high school who
possessed unique talent. At La Salle High School in Cincinnati, Ohio, he was a standout
tight end, earning numerous accolades for his performance on the field. A three-star
prospect, he earned multiple accolades including Division II First Team All-Ohio and
First Team All-Southwest District Division II honors by the Ohio Prep Association, as
well as First Team All-GCL South honors. As a junior, he caught 40 passes for 546
yards and six touchdowns, leading his team to their third-consecutive state title. As a
senior in 2017, he led the Lancers with 37 receptions for 442 yards and three
touchdowns. Ranked as one of the Top-10 tight ends in the 2018 class and a top 14
player in Ohio, he ultimately chose to play for the University of Cincinnati, turning down
offers from over 30 other NCAA FBS programs, including Georgia, Auburn, and
Tennessee.

1496. Mr. Whyle's job as a college football player was essentially a full-time one,
and an important and valuable one at that. During his collegiate career, he developed
into one of the top tight ends in the country and helped elevate Cincinnati into national
prominence. After redshirting his true freshman season in 2018, he saw action in 12
games during the 2019 season, making a pair of catches for 51 yards. During the 2020
season, he played in all 10 games and led all AAC tight ends with 353 receiving yards
and six touchdowns, earning second-team All-AAC honors and Third Team All-America
honors. That year—in which he led Cincinnati to a conference championship—he

**FOURTH AMENDED COMPLAINT**

generated a 92.9 receiving grade and 2.94 yards per route run, both of which trailed only UF's Kyle Pitts for the best among NCAA FBS tight ends, according to PFF.

1497.  In 2021, he made eight starts and played in all 14 games. That season, he recorded 26 catches for 332 yards and six touchdowns, earning First Team All-AAC honors and leading his team to a 13-1 record and a college football playoff berth— the first time a Group of Five conference was selected for the College Football Playoff. He entered his final season as one of the nation's top tight ends with 56 receptions, 736 yards, and 12 touchdowns in his career.

1498.  Mr. Whyle returned for a fifth season in 2022, catching 32 passes for 326 yards and three touchdowns while earning First Team All-AAC honors for the second consecutive season. He was team captain and appeared in 12 games with 10 starts. He finished his career with 88 receptions for 1,062 yards and 15 touchdowns, ranking among the top tight ends in program history. During his career, he broke the Cincinnati record for career touchdown receptions by a tight end (15) with his scoring grab at UCF, breaking Brent Celek's mark. His fifteen receiving touchdowns also surpassed another well-known Bearcat tight end, Travis Kelce, who posted ten touchdowns in his collegiate career. He was also on the 2022 Bruce Feldman's Freaks list, which ranks the top 101 players in college football by their athletic feats, and was a 2023 Senior Bowl Participant.

1499.  During the 2023 NFL Draft, the Tennessee Titans selected Mr. Whyle with the number 147th overall pick in the 5th round.

1500.  During this time, the University of Cincinnati's football games were broadcast on national television networks such as ESPN and ESPN+. Cincinnati frequently featured Mr. Whyle on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Mr. Whyle's football games. For instance, the 2021 College Football Playoff semifinal between Cincinnati and Alabama peaked at 18.2 million

**FOURTH AMENDED COMPLAINT**

viewers. Tens of thousands also packed Nippert Stadium for each home game, with an average of 37,338 attendees per game, including multiple sell-outs in 2021 and 2022, generating millions for the university. The AAC distributed an estimated $6 million per member university in 2021, and Cincinnati saw even greater financial gains upon its move to the Big 12 in 2023.

1501.  Mr. Whyle received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Cincinnati, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Cincinnati. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became an All-American tight end, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1502.  Defendants' conspiracy greatly harmed Mr. Whyle. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1503.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Whyle would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1504.  **The effect of Defendants' illegal conduct on Plaintiff Julius Brents.** Plaintiff Julius Brents worked as a college football player at the University of Iowa from 2018 to 2020 and at Kansas State University from 2021 to 2022.

**FOURTH AMENDED COMPLAINT**

1505.  The labor provided by Mr. Brents was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1506.  Mr. Brents was a highly competitive football player for Warren Central High School in Indianapolis, Indiana. As a defensive back, he registered 20 tackles, two sacks, and three pass breakups as a junior and collected 18 tackles and one interception in his senior year, after which he was selected to the 2017 Central Indiana Super Team by the Indianapolis Star. He earned First-Team All-Conference honors for three straight years and was named to First Team All-County in his junior and senior seasons. As a three-star recruit and the fifth best prospect from the state of Indiana, he received 12 offers from top programs, including Indiana and Michigan State, and ultimately committed to Iowa.

1507.  Mr. Brents's job as a college football player was essentially a full-time one, and an important and valuable one at that. In the 2018 season, he played in 11 games as a true freshman, starting in five games and recording a total of eight solo tackles and five assists. In 2021—after an injury in 2019 and a shortened 2020 season due to the COVID-19 pandemic—Mr. Brents transferred to Kansas State, starting in all 13 games that season in the cornerback position. He helped Kansas State beat LSU in the Texas Bowl, recording a career high of eight tackles and earning honorable mention All-Big 12 honors. He had a particularly impressive final season, coming away with 45 tackles and four interceptions over 14 starts in 2022, ranking third in the league in total interceptions. For his performance, he was named to First Team All-Big 12 by league coaches and Second Team All-Big 12 by the Associated Press, and he was also on the watch list for the Jim Thorpe Award, given annually to the best defensive back in college football. Mr. Brents was subsequently selected in the second round of the 2023 NFL Draft by the Indianapolis Colts.

**FOURTH AMENDED COMPLAINT**

1508.  During Mr. Brents's collegiate career, Iowa and Kansas State were members of the Big Ten and Big 12 Conferences, respectively, and their games were regularly carried by national television broadcasters such as Fox and ESPN. From 2015 to 2019, Iowa games drew a weekly average of 1.57 million viewers while Kansas State saw close to 700,00 in average weekly viewership. Games against other top-ranked programs drew significantly more viewers. For example, Kansas State's 2022 Big 12 Championship overtime win against Texas Christian University, where Mr. Brents caught an interception that halted a potential TCU scoring drive, drew over 9.4 million in television viewership. Kansas State home games are also regularly sold out, averaging 51,165 per game, which is over 100% capacity, for the 2022 season. In addition, Kansas State frequently featured Mr. Brents on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

1509.  Between ticket sales, media rights, conference disbursements, and other sources of revenue, both Iowa and Kansas State made a considerable amount of money from their respective football programs. The Big 12 Conference, for example, distributed an average of $38.8 million in revenues to each of its member schools—including Kansas State—following the 2018-2019 academic year.

1510.  Mr. Brents received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During most of his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his schools. Even for the time when he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or Kansas State, and he did not receive the full amount from third parties he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout college football player, he

**FOURTH AMENDED COMPLAINT**

would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1511. Defendants' conspiracy greatly harmed Mr. Brents. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1512. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Brents would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1513. **The effect of Defendants' illegal conduct on Plaintiff Kathleen Doyle.** Plaintiff Kathleen Doyle worked as a college basketball player at the University of Iowa from 2016 to 2020.

1514. The labor provided by Ms. Doyle was of great value to Defendants. During the season, she often worked six days per week or more and frequently more than 40 hours per week. Even during the offseason, she dedicated a significant number of hours to training and team-related activities under the direction of the Iowa coaching staff.

1515. Ms. Doyle was a highly recruited prospect out of high school who possessed unique talent. At Benet Academy in Lisle, Illinois, she was a standout guard, earning numerous accolades for her performance on the court. Ms. Doyle led Benet to consecutive Illinois Class 4A state championships in 2015 and 2016, capping off her high school career by being named Illinois Ms. Basketball in 2016.

1516. Ms. Doyle's impressive stats included 516 rebounds, 442 assists, 297 steals, and 119 blocks during her high school career. Ranked among the nation's top recruits by multiple services—including a No. 20 ranking by Blue Star—she was a two-time First Team All-State selection by the Illinois Basketball Coaches Association and

**FOURTH AMENDED COMPLAINT**

the Champaign News Gazette, a 2016 McDonald's All-American nominee, a 2016

Esmark and MaxPreps All-American, East Suburban Catholic Conference Player of the

Year and Champaign News-Gazette Player of the Year in 2016, and a three-time all-

conference selection. She also earned First Team All-State honors from the Associated

Press, Chicago Tribune, and News-Gazette in 2016, and Second Team All-State

recognition from the Associated Press in 2015. Despite interest from multiple top

programs, she committed to play for the University of Iowa.

1517.  Ms. Doyle's role as a college basketball player was essentially a full-time

job, and an important and valuable one at that. She made an immediate impact at Iowa,

playing in all 34 games and starting in 29 as a freshman in 2016-17, earning Big Ten

All-Freshman Team honors. Leading the team with 148 assists, averaging 4.4 per

game, she also set a program record for most steals by a freshman with 71 in a single

season. In her sophomore year, Ms. Doyle continued to shine, starting 28 of 30 games

and finishing second in the Big Ten in assists per game. Her efforts earned her Second

Team All-Big Ten honors from the league's coaches and an honorable mention from the

league media. Nationally, she ranked 12th in assists per game (6.6) and 21st in total

assists (199), while also leading the Big Ten with a 7.5 assists per game in conference

play. She also led the Hawkeyes in both assists and steals per game, showcasing her

all-around playmaking ability. Her standout season included recognition on the

Hawkeye Challenge All-Tournament Team, as well as earning Academic All-Big Ten

honors for her excellence off the court and CoSIDA All-District Academic.

1518.  In her junior season, Ms. Doyle appeared in 29 games with 27 starts after

missing the first seven games of the season with a hand injury. She played a pivotal

role in Iowa's remarkable 2019 season, playing a critical role in the Hawkeyes' run to

the 2019 NCAA Elite Eight. She led the team in assists, averaging 5.9 per game —a

stat that topped the Big Ten and ranked 15th nationally. She also led the team in steals,

averaging 2.3 per contest—the second-best mark in the conference. Her performance

NO. 1:23-cv-03076-CNS-STV

earned her Academic All-Big Ten honors, as well as recognition as a First Team All-Big Ten selection by coaches and a Second Team pick by the media.

1519.  As a senior in the 2019-20 season, Ms. Doyle elevated her game even further. She was named the 2020 Big Ten Player of the Year by both coaches and media, thanks to a career-high 18.1 points, 4.6 rebounds, 6.3 assists, and 33.8 minutes per game while starting all 30 games. She was ranked in the Top 50 Nationally in five categories, including 6th in assists (189), 7th in assists per game (6.3), 19th in free-throws (147), 37th in total points (544), and 49th in points per game (18.1). Her stellar season garnered national attention, earning her spots on three All-American teams, including Associated Press (Third Team), United States Basketball Writers Association (Third Team), and Women's Basketball Coaches Association. She earned CoSIDA Second Team Academic All-American this year as well. She was also a finalist for the Ann Meyers Drysdale Shooting Guard of the Year Award.

1520.  On the international stage, Doyle represented the United States at the 2019 Pan American Games, contributing to Team USA's silver medal performance.

1521.  During the 2020 WNBA Draft, Ms. Doyle was the 14th overall pick for the Indiana Fever.

1522.  During Ms. Doyle's tenure, the University of Iowa's women's basketball games were broadcast on major networks such as the Big Ten Network. Iowa frequently featured Ms. Doyle on its social media platforms and other promotional materials, highlighting her achievements to enhance game attendance and viewership. For example, the Iowa Women's basketball Facebook account congratulated Ms. Doyle for achieving Big Ten Player of the Year.

**FOURTH AMENDED COMPLAINT**



Source:https://www.facebook.com/photo.php?fbid=3497460903604559&id=155734001110616&set=a.175716412445708

1523.  Thousands of fans attended Iowa women's basketball games during Ms. Doyle's tenure for a total of 106,533 attendees with an average of 7,102 fans per game in 2019, generating significant revenue for the university. During the 2018 financial year, the Big Ten Conference distributed an average of $54 million per member university, including the University of Iowa.

1524.  Ms. Doyle received none of that revenue; nor was she otherwise compensated by Defendants for her labor beyond receiving a scholarship and other education-related expenses. During her time at Iowa, she was completely barred from receiving money for the use of her NIL, whether it be from third parties or Defendants or Iowa. As a highly recruited athlete that became an All-American and Big Ten Player of the Year, she would have earned substantial NIL compensation if not for the NCAA's unlawful rules.

1525.  Defendants' conspiracy greatly harmed Ms. Doyle. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and would have received money for her NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being generated by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

1526.  **The effect of Defendants' illegal conduct on Plaintiff Kathryn Westbeld.** Plaintiff Kathryn Westbeld worked as a college basketball player at the University of Notre Dame from 2014 to 2018.

1527.  The labor provided by Ms. Westbeld was of great value to Defendants. During the season, she often worked six days per week or more and frequently more than 40 hours per week. Even during the offseason, she committed a significant number of hours to training, conditioning, and preparation under the direction of the coaching staff at the university.

1528.  Ms. Westbeld was a highly recruited prospect out of high school, possessing exceptional talent. At Fairmont High School in Kettering, Ohio, she excelled as a forward, leading her team to three straight state title game appearances, including securing the state championship her junior year. That year, her team earned the No. 21 national ranking by MaxPreps.

1529.  Nationally recognized for her on-court abilities, Ms. Westbeld was ranked No. 16 by Blue Star Basketball and No. 21 by ESPNW HoopGurlz. Her accolades included prestigious honors such as being named a McDonald's All-American, solidifying her status among the top high school players in the nation. She also earned a 2013 MaxPreps third-team All-American nod, was a four-time all-state selection from 2011-2014, and collected numerous local honors, including the 2014 Dayton Daily News All-Area Player of the Year and three-time Greater Western Ohio Conference Player of the Year. She was a four-time district all-star and all-conference selection.

**FOURTH AMENDED COMPLAINT**

1530.  Her success extended to AAU competition, where she thrived with All Ohio under head coach John Bethea in 2013, helping her team achieve a national runner-up finish while winning the Nike Orlando Super Showcase and Peach State Invitational. The previous year, playing for Sports City U and head coach Tom Jenkins, she contributed to another national runner-up squad, earning championships at the Las Vegas Nike Invitational and USJN Nationals in Washington, D.C. She was also part of the AAU national championship team the summer before her freshman year of high school.

1531.  Heavily recruited by multiple elite programs, including UConn and Ohio State, Ms. Westbeld chose to attend Notre Dame, drawn by the university's strong academic and athletic reputation.

1532.  Ms. Westbeld's role as a college basketball player was essentially a full-time job, and an important one at that. Throughout her time with the Fighting Irish, she proved to be a cornerstone of the team, driving Notre Dame to several deep NCAA Tournament runs, including two national title game appearances and a national championship in 2018.

1533.  As a freshman during the 2014-2015 season, Ms. Westbeld made an immediate impact, appearing in 39 games and tying the school record for the most games played by a freshman. She averaged 6.7 points and 4.4 rebounds per game, helping propel Notre Dame to the NCAA Championship game. Her impact was evident during ACC play, where she ranked third in the conference with a .573 field goal percentage.

1534.  Ms. Westbeld continued to shine in her sophomore season, starting 33 games and maintaining a strong .528 shooting percentage—good for 11th in the ACC. She also ranked 18th in rebounding during conference play. In the ACC tournament championship game against Syracuse, she delivered a standout performance, scoring

**FOURTH AMENDED COMPLAINT**

eight points in the opening 4:28 to help secure another ACC Championship. That
season, she led her team to an NCAA Tournament Elite Eight appearance.

1535.  Her junior season saw continued success, as she started in 27 out of 32
games played, leading her team to a 33-4 record and 15-1 in conference play to win
both the ACC regular season and tournament for the fourth year in a row. In the NCAA
tournament, she again helped her team reach the Elite Eight.

1536.  Ms. Westbeld's senior season in 2017-2018 was nothing short of
remarkable. Despite battling an ankle injury for much of the year, she remained a critical
force on the court, playing in 37 of 38 game—and was named team captain. She also
played a major role in the Irish's title run that year. In the second round of the NCAA
tournament, 9th seeded Villanova was tied with the top-ranked Irish at halftime. After
sitting out the first half with an ankle sprain, Ms. Westbeld inspired her team in the
second half, according to reporting from ESPN and the Indy Star. Led by Ms.
Westbeld—who left the floor with 4:02 remaining to a standing ovation—Notre Dame
ran away with the lead, outscoring Villanova 28-8 in the third quarter. In the regional
final game against Oregon, she delivered another outstanding performance—leading
her team with 20 points, on 9/12 shooting from the field and 2/2 from the free throw line.
The Fighting Irish ultimately won a national championship against Mississippi State, with
Ms. Westbeld playing a key role in the title game. Coach McGraw aptly dubbed her "The
Glue" of the team, as she finished the season ranked second in the ACC with a .592
overall shooting percentage and .600 during conference play. That season, she also
reached a career milestone of 1,000 points in her career at Notre Dame.

1537.  During Ms. Westbeld's collegiate basketball career, the University of Notre
Dame's basketball games were broadcast on national television networks such as
ESPN and the ACC Network. Millions of viewers watched Ms. Westbeld's games. For
instance, the 2018 NCAA Championship games, in which Ms. Westbeld played a crucial
role, drew over 3.5 million viewers. Notre Dame frequently featured Ms. Westbeld on its

**FOURTH AMENDED COMPLAINT**

social media platforms and other promotional materials, highlighting her achievements to enhance game attendance and viewership. Tens of thousands of fans also watched Notre Dame's games during this time, generating significant revenue for the university. For example, 20,127 people attended the 2019 Baylor vs Notre Dame game. In 2018, the ACC, which Notre Dame competes in for women's basketball, distributed $7 million to Notre Dame. During her collegiate career, the Notre Dame Women's Basketball Instagram account, which has 68.1K followers, posted Ms. Westbeld, which contributed to the team's image and garnered attention and revenue for the university.

1538.  Ms. Westbeld received none of that revenue; nor was she otherwise compensated by Defendants for her labor beyond receiving a scholarship and other education-related expenses. During her time at Notre Dame, she was not permitted to receive money for use of her NIL, whether from third parties, the Defendants, or Notre Dame. As a highly sought-after recruit who captained a national championship team, she would have been able to secure substantial NIL compensation in a competitive market free from NCAA-imposed constraints.

1539.  Defendants' conspiracy significantly harmed Ms. Westbeld. It prevented her from benefiting from fair market compensation for her contributions to Notre Dame's success. But for the NCAA's restrictive policies, she would have received greater remuneration and had opportunities to capitalize on her NIL rights. The NCAA's anticompetitive bylaws directly harmed her by denying her the compensation and financial opportunities she rightfully deserved.

1540.  **The effect of Defendants' illegal conduct on Plaintiff Keaton Sutherland.** Plaintiff Keaton Sutherland worked as a college football player at Texas A&M University from 2015 to 2018.

1541.  The labor provided by Mr. Sutherland was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days

**FOURTH AMENDED COMPLAINT**

per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1542.  Mr. Sutherland was a highly recruited, versatile football player for Edward S. Marcus High School in Flower Mound, Texas, where he played multiple positions. He was named the District 5-6A Defensive Newcomer of the Year after playing defensive end as a sophomore in 2012 and made the 2015 U.S. Army All-American Bowl selection. Following the end of his senior year, he also earned first-team District 5-6A honors and All-Area honors by Dallas Morning News. As a four-star recruit, he was the 4th best offensive tackle nationally in his graduating class and a top ten overall prospect from Texas. He received 17 offers and chose Texas A&M over programs like Arkansas, Miami, Oklahoma, and Texas.

1543.  Mr. Sutherland's job as a college football player was essentially a full-time one, and an important and valuable one at that. He started in seven games as a freshman, becoming the team's full-time starter at right guard, and helping the team's offense gain an average of 424.7 total yards per game. In fact, that year, the team's offense was only the seventh in the program's history to gain more than 5,000 total yards, 3,000 passing yards, and 2,000 rushing yards in the same season. In the 2016 season, Mr. Sutherland contributed to the team at both left and right guard positions as a key member of an offense that rushed for more than 200 yards in seven of his eight starts.

1544.  Starting all 12 games in 2017, Mr. Sutherland assisted the team in gaining more than 500 offensive yards against New Mexico, Arkansas, and Wake Forest, and was the starting right tackle in the game against UCLA where the team registered nearly 400 rushing yards. He appeared in 11 games in his final season (2018)—starting in nine—and helped the team gain 5,590 total yards. He was instrumental in propelling the team to a 9-4 record and a No. 16 end-of-season ranking, and his standout

**FOURTH AMENDED COMPLAINT**

performance that year earned him the team's Most Improved Offensive Lineman
Award.

1545.  Mr. Sutherland signed with the Cincinnati Bengals as a free agent in 2019
and he currently plays for Birmingham Stallions in the United Football League, further
demonstrating the value of his talent and labor.

1546.  During Mr. Sutherland's collegiate career, Texas A&M was a member of
the SEC and the vast majority of their games were broadcasted on ESPN. Texas A&M
also frequently featured Mr. Sutherland on its social media accounts, highlighting his
accomplishments and, no doubt, using him to boost game attendance and viewership.
As one of the more popular programs in the nation, Texas A&M games drew a weekly
average of 1.85 million viewers from 2015 to 2019, ranking 17th in the nation. Games
against other top-ranked programs drew significantly more viewers. For example, Texas
A&M's 2018 Gator Bowl matchup against NC State—where Mr. Sutherland made his
final start of his collegiate career and contributed to a decisive 52-13 showdown—saw
over 5.1 million in viewership. Texas A&M also enjoys tremendous home support,
ranking fifth in the nation with an average home crowd of 98,802 per game for the 2017
season.

1547.  Between ticket sales, media rights, SEC distributions, and other sources
of revenue, Texas A&M has made a considerable amount of money from its football
program. For example, Texas A&M's football program brought in $98.15 million in
revenue, including $43.53 million in ticket sales, from the 2018 season alone. The
university also received approximately $43.7 million in revenue disbursements from the
SEC in 2018.

1548.  Mr. Sutherland received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during his time at Texas A&M University, he was not
permitted to receive money for use of his NIL, whether from third parties or from

**FOURTH AMENDED COMPLAINT**

Defendants or from his school. As a standout and highly versatile player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1549.  Defendants' conspiracy greatly harmed Mr. Sutherland. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1550.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Sutherland would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1551.  **The effect of Defendants' illegal conduct on Plaintiff Keir Thomas.** Plaintiff Keir Thomas worked as a college football player for the University of South Carolina from 2016 to 2021 and Florida State University in 2021.

1552.  The labor provided by Mr. Thomas was of great value to Defendants. During the season, he often worked six days per week or more and more than 40 hours per week. Even in the offseason, he dedicated significant hours under the direction of his coaching staff at both South Carolina and Florida State.

1553.  Mr. Thomas was a highly recruited prospect out of Miami Central High School in Florida, possessing exceptional talent. He played multiple positions, including nose guard, defensive tackle, defensive end and linebacker. He earned Class 6A First Team All-State honors and was recognized as the 8A-6A Defensive Player of the Year as part of the Miami Herald's All-Dade Awards event. As a senior, he racked up 22 sacks among his 83 tackles and was regarded as the 23rd-best strongside defensive end in the country and the 49th-best player in Florida. Ranked as a top player in the nation by multiple recruiting services, he ultimately committed to South Carolina over offers from numerous programs such as Tennessee, Auburn, and Miami.

**FOURTH AMENDED COMPLAINT**

1554.  During his collegiate career, Mr. Thomas was a key contributor on the defensive line for both South Carolina and Florida State. As a freshman in 2016, he played in all 13 games with two starts, recording 24 tackles and 4.0 tackles for loss. In 2017, he played in all 13 games making 11 starts, tallying 38 tackles, 4.5 tackles for loss, and 2 sacks. He continued to develop in 2018, finishing with 44 tackles, 3.5 tackles for loss, and 1.5 sacks. After missing most of the 2019 season due to an ankle injury, he returned in 2020 as a senior leader, appearing in 40 games with 25 starts. He owns 110 career tackles with 13 tackles for loss, 5.5 sacks, and eight quarterback hurries. He also won the 2019 Dr. Harris Pastides Outstanding Student-Athlete award.

1555.  Transferring to Florida State after he graduated from South Carolina, Mr. Thomas immediately became one of the Seminoles' top defensive players and team captain. He started all 12 games, finishing with 42 tackles, 12.0 tackles for loss, and 6.5 sacks, earning Third Team All-ACC honors. He had an average of .54 sacks per game, ranking ninth in the ACC, and had a tackle for loss total that ranked 10th in conference. He won the Monk Bonasorte Award, which is given to a defensive player at Florida State who, as voted by his teammates, exhibits great qualities on and off of the field. His standout performances that season included a two-sack game against North Carolina State and a dominant showing against Miami.

1556.  In 2022, Mr. Thomas signed with the Los Angeles Rams, further demonstrating the value of his talent and labor.

1557.  Mr. Thomas's games at South Carolina and Florida State were nationally televised on networks such as ESPN, ABC, and SEC Network, drawing millions of viewers. For example, Florida State's 2021 game against Notre Dame drew over 7.75 million viewers. Additionally, tens of thousands of fans attended each of his games, generating millions in revenue for both universities. For example, in 2019, a total of 545,737 fans attended South Carolina football games with an average attendance of 77,962 fans per game. In 2019, South Carolina made a total revenue of $30.9 million

**FOURTH AMENDED COMPLAINT**

from ticket sales that included Mr. Thomas's football games. In 2021, Florida State made a total revenue of $3.5 million in football ticket sales alone. The SEC distributed approximately $49.9 million to South Carolina in 2021, while the ACC, which includes Florida State, distributed around $39.5 million per member school in the same period.

1558.  Both schools frequently featured Mr. Thomas on their social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. And both schools earned enormous revenue from Mr. Thomas's efforts.

1559.  Mr. Thomas received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time in college, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or his universities. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a highly productive defensive lineman playing at top programs in two major conferences, Mr. Thomas would have likely earned substantially more NIL compensation if not for these restrictions.

1560.  The NCAA's system of restrictions harmed Mr. Thomas by preventing him from earning fair compensation for his labor and denying him the opportunity to profit from his NIL rights earlier in his career. It prevented him from benefiting from competitive remuneration and opportunities in an open market. Without the NCAA's anti-competitive bylaws, he would have earned a fair share of the television and other revenue generated by his universities and their conferences. Had he been allowed to participate in a competitive marketplace for his services, he would have received far greater financial benefits as a college football player.

**FOURTH AMENDED COMPLAINT**

1561.  **The effect of Defendants' illegal conduct on Plaintiff Kevin Abel**.
Plaintiff Kevin Abel worked as a college baseball player at Oregon State University from
2017 to 2021.

1562.  The labor provided by Mr. Abel was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

1563.  Mr. Abel was a highly recruited baseball player out of high school. As the
starting pitcher for Madison High School in San Diego, California, he recorded a 9-2
record with an impressive 0.36 ERA over 77 2/3 innings in his junior season. His 2016
campaign included one no hitter, seven complete games, and 103 strikeouts, which
earned him the 2015-2016 Madison Cy Young Award and 2016 Western League
Pitcher of the Year honors. He continued his hot streak in 2017, finishing his final high
school season going 9-1 with a 1.30 ERA and 120 strikeouts over 81 innings pitched.
As the 2017 San Diego CIF Pitcher of the Year, he threw five complete games,
including three complete game shutouts. He was ranked the 46th best right-handed
pitcher prospect nationally and the 23rd overall prospect from California by Perfect
Game. He was selected in the 35th round of the 2017 MLB Draft by the San Diego
Padres but ultimately committed to Oregon State.

1564.  Mr. Abel's job as a college baseball player was essentially a full-time one,
and an important and valuable one at that. As a freshman, he was a pivotal member of
the team, contributing to Oregon State's third ever College World Series title. He earned
a starting position after several standout long-relief performances and finished the
season with an 8-1 record and a 2.88 ERA. In the NCAA Regional decider against LSU,
he tossed eight clean innings and allowed only three hits to help Oregon State advance
to the Super Regionals. His best performances culminated at the College World Series,
where he recorded wins against No. 7 Washington, No. 8 Mississippi State, and 2 wins

**FOURTH AMENDED COMPLAINT**

over No. 4 Arkansas. Mr. Abel became the first pitcher ever to win four games in the
College World Series and two games in the College World Series Finals. He pitched
only the 4th complete game shutout in a championship game—and had the lowest hit
total of those games by allowing only 2 hits. In addition to being named to the College
World Series All-Tournament Team, he also won the D1Baseball and Baseball
American Freshman of the Year awards.

1565.  For the 2019 season, and despite being injured and starting in only three
games, Mr. Abel posted two games with over 10 strikeouts and ended the season with a
3.86 ERA. He tied his career-best with 11 strikeouts against West Virginia and was
named Collegiate Baseball National Player of the Week. He bounced back after a
cancelled 2020 season and posted a 3.62 ERA with 109 strikeouts over 82 innings in
2021, becoming the third pitcher in the program's history with two 100-strikeout
seasons. His 11-strikeout game against Grand Canyon and his scoreless six inning start
against Washington that led to a combined no-hitter both won him Pac-12 Pitcher of the
Week honors.

1566.  Mr. Abel was subsequently selected by the Cincinnati Reds organization
in the seventh round of the 2021 MLB Draft, further demonstrating the value of his talent
and labor.

1567.  During Mr. Abel's time at Oregon State, the program was a part of the
Pac-12 Conference and its games were regularly broadcast on the Pac-12 Network and
on ESPN. The three-game 2018 College World Series Finals, during which Mr. Abel
pitched for two wins to bring Oregon State back to defeat Arkansas, were broadcasted
on ESPN and averaged a total live audience of 1.9 million viewers—the most watched
three-game series since 2014. Oregon State also frequently featured Mr. Abel on its
social media accounts, highlighting his accomplishments and using him to boost game
attendance and viewership.

**FOURTH AMENDED COMPLAINT**

1568.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources of revenue, Oregon State has no doubt benefited from its baseball program. In fact, the Pac-12 Conference distributed as much as $29.5 million to each of its member schools in the 2018 fiscal year, including Oregon State.

1569.  Mr. Abel received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial athletic scholarship and other education-related expenses.

1570.  In fact, Mr. Abel received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Abel, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Abel would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1571.  Moreover, during his time at Oregon State, Mr. Abel was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a nationally recognized baseball pitcher, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1572.  Defendants' conspiracy greatly harmed Mr. Abel. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, Mr. Abel would have received greater remuneration for his services as a college baseball player than he received, and he would have also received money for his NIL from third parties.

1573.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Abel would have received a competitive share of

**FOURTH AMENDED COMPLAINT**

the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1574.  **The effect of Defendants' illegal conduct on Plaintiff KJ Costello.** Plaintiff KJ Costello worked as a college football player at Stanford University from 2016 to 2019 and at Mississippi State University in 2020.

1575.  The labor provided by Mr. Costello was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1576.  Mr. Costello was a highly recruited football player for Santa Margarita Catholic High School in California. As one of the best quarterback prospects in the nation at the time, he holds 19 school records, including in career passing yards (8,222), career passing touchdowns (62), and single-game passing yards (452). He was named to the all-state team in both 2015 and 2016 and was an Elite 11 finalist, a competition featuring the nation's elite quarterback prospects. Mr. Costello was rated a four-star recruit by 247 Sports and was also ranked as the No. 2 quarterback prospect of his recruiting class and the No. 40 overall player in the country. He received at least 16 offers from competitive programs, including powerhouse programs such as Stanford, Alabama, Michigan, and USC. His recruitment by such programs was closely covered by sports media, and major outlets such as ESPN, Sports Illustrated, and the Los Angeles Times all reported his final decision to commit to Stanford.

1577.  Mr. Costello's job as a college football player was essentially a full-time one, and an important and valuable one at that. Despite not seeing action in 2016, he started 7 games in 2017 and passed for 1,573 yards with 14 touchdowns and four interceptions. He had his best performances in the final stretch of the season, passing for over 200 yards for the first time in his career in a major win against No. 9 Washington, and recording four touchdowns over No. 8 Notre Dame. These wins

**FOURTH AMENDED COMPLAINT**

against top-10 programs were critical to the team's Pac-12 Northern Division title that season.

1578.  As team captain in 2018, Mr. Costello started all 13 games and earned All-Pac-12 Second Team honors in the process. His 3,540 passing yards were the second-most in a season in program history and his 29 touchdowns were the third-most in a season. In addition, Mr. Costello led the Pac-12 in both passing efficiency and yards per attempt, and was second in the league in completion percentage, total offense per game, passing touchdowns, and passing yards. In 2019, when he again led the team as captain, Mr. Costello became only the ninth player in program history to eclipse 6,000 career passing yards in a game against Colorado.

1579.  Mr. Costello continued to impress as a graduate transfer to Mississippi State. There, he broke both the program's and the SEC's record in single-game passing yards, throwing 623 yards and recording five touchdowns against No. 6 LSU, and becoming the first ever SEC quarterback to throw over 600 yards in a game. That performance earned him the SEC Offensive Player of the Week award and the Maxwell and Walter Camp FBS National Offensive Player of the Week awards, among others.

1580.  During Mr. Costello's collegiate career, he played for programs that were members of the Pac-12 Conference and the Southeastern Conference, and their games were regularly broadcast on Fox and ESPN. Both Stanford and Mississippi State frequently featured Mr. Costello on their social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

1581.  From 2015 to 2019, Stanford and Mississippi State were among the top 30 most popular teams in the country, with their games drawing a weekly average of 1.43 million and 1.31 million viewers, respectively. Games against other top-ranked programs drew significantly more viewers. For example, Mr. Costello's four-touchdown game against No. 8 Notre Dame in 2017 saw over 5 million in television viewership, and his record-breaking 623-yard win over No. 6 LSU in 2020 was the most popular game of

**FOURTH AMENDED COMPLAINT**

that week with more than 4.4 million watching. Meanwhile, Stanford home games are very well-attended, averaging 37,018 per game for the 2019 season.

1582.  Between ticket sales, media rights, conference disbursements, and other sources of revenue, Stanford and Mississippi State made a considerable amount of money from their respective football programs. For example, the Pac-12 Conference distributed as much as $29.5 million in revenue disbursements to each of its member schools, including Stanford.

1583.  Mr. Costello received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his schools. As a standout football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1584.  Defendants' conspiracy greatly harmed Mr. Costello. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1585.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Costello would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1586.  **The effect of Defendants' illegal conduct on Plaintiff Khalil Tate.** Plaintiff Khalil Tate worked as a college football player at the University of Arizona from 2016 to 2019.

1587.  The labor provided by Mr. Tate was of great value to Defendants. During the season, he often worked six days per week or more and frequently more than 40

**FOURTH AMENDED COMPLAINT**

hours per week. Even during the offseason, he dedicated a significant number of hours under the direction of the coaching staff at Arizona.

1588.  Mr. Tate was a highly recruited prospect out of high school, possessing unique athletic talent. At Junipero Serra High School he was an elite dual-threat quarterback who earned numerous accolades for his performance on the field. He was a consensus four-star recruit, ranking as the number 10 dual-threat quarterback in the nation by ESPN and number 4 by Rivals. As a senior, he gained over 4,000 total yards—over 2,000 passing and over 2,000 rushing—and 43 touchdowns. He was the Los Angeles Times Quarterback of the Year and earned USA Today First Team Offense Honors, California High School Sports Mr. California State Football Finalist, and Blue-Grey All American. He was also nominated a MaxPreps Player of the Year Finalist. He also played on a prestigious 7 on 7 team, coached by NFL greats Antonio Pierce and Keyshawn Johnson. His dynamic playmaking ability attracted offers from multiple programs before he ultimately committed to Arizona where he began playing January 2016 after graduating high school a semester early.

1589.  Mr. Tate's job as a college football player was essentially a full-time one and a crucially valuable one at that. During his collegiate career, he became one of the most electrifying players in college football. As a freshman in 2016, he played in seven games, making one start, rushing for 237 yards with one touchdown along with 243 passing yards and three scoring throws. In his first start, he was just 17 years old, becoming the youngest starting quarterback in Arizona history and one of the youngest in college football history.

1590.  In 2017, he broke out as one of the most dynamic quarterbacks in the nation, playing in 11 games and starting the final eight. He became the first player in Pac-12 Conference history to win the offensive player of the week award four consecutive weeks. That season, he finished with 1,411 yards and 14 touchdowns, earning numerous accolades, including semifinalist for the Maxwell Award, given to the

**FOURTH AMENDED COMPLAINT**

nation's top player; a semifinalist for the Davey O'Brien award, given to the nation's best

college quarterback; finalist for the Manning Award, which is presented to the top

college football quarterback, Walter Camp National Player of the Week, Maxwell Award

National Player of the Week, Athlon National Offensive Player of the Week, CFPA

National Performer of the Week, two-time Manning Award Star of the Week, and three-

time Davey O'Brien Great 8. He led the FBS in yards per rush average (9.22) and was

ranked second in FBS in total QBR and third nationally in total offense average (9.04

yds per play). He was also AP Pac-12 Newcomer Player of the Year and earned All-

Pac-12 Honorable Mention honors.

     1591.  Entering the 2018 season, he was included on multiple award watch lists,

including Walter Camp, Davey O'Brien, Maxwell, and Manning. He was also considered

a candidate for the Heisman Trophy, college football's top honor. That season, Mr. Tate

battled injuries but still passed for 2,530 yards and 26 touchdowns. He led Arizona to

several high-profile wins, including an upset of number 19 Oregon, in which he threw for

three touchdowns. He posted a pass efficiency rating of 149.77, which was the number

23 mark in FBS, number 2 in the Pac-12, and fifth-best in Arizona single-season history.

He also ranked ninth in school single-season history for passing yards and fifth for

passing touchdowns. Mr. Tate was also a member of his team's leadership council and

was game captain against BYU, California, and Colorado.

     1592.  In Mr. Tate's senior season in 2019, he started all 11 games and entered

the season with 4,364 passing yards (12th in school history), 43 passing touchdowns

(6th in school history), and ranked 7th all-time at UA with 6,236 total offensive yards. He

finished his senior season with 1,954 passing yards, 14 passing touchdowns, and 413

rushing yards with three rushing touchdowns.

     1593.  In 2020, Mr. Tate signed with the Philadelphia Eagles, further

demonstrating the value of his talent and labor.

**FOURTH AMENDED COMPLAINT**

1594.  During Mr. Tate's collegiate football career, Arizona's football games were broadcast on major television networks such as ESPN, Fox, and the Pac-12 Network. Arizona frequently featured Mr. Tate on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Mr. Tate's performances, including Arizona's matchup against Purdue in 2017, which drew over 2.8 million viewers. In addition to television viewership, tens of thousands of fans packed Arizona Stadium for each home game, with a total attendance of 318,051 and an average of 45,436 attendees per game in 2018. This generated substantial revenue for the university. In 2018, Arizona made total revenue of $14.6 million in ticket sales, driven by football sales. During the 2018-2019 financial year, the Pac-12 Conference distributed an average of $29 million per member school, including the University of Arizona.

1595.  Mr. Tate received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. Throughout his career, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Arizona. Given that he emerged as one of the top quarterbacks in the country, he would have earned substantial NIL compensation but for the NCAA's unlawful restraints.

1596.  Defendants' conspiracy greatly harmed Mr. Tate. It prevented him from benefiting from competitive remuneration and opportunities in an open market. Without the NCAA's anti-competitive bylaws, he would have earned a fair share of the television and other revenue generated by the university and the Pac-12 Conference. Therefore, Defendants' actions directly injured him financially, limiting his ability to profit from his own talents and efforts during his time at Arizona.

1597.  **The effect of Defendants' illegal conduct on Plaintiff Landon Young.**
Plaintiff Landon Young worked as a college football player at the University of Kentucky from 2016 to 2021.

**FOURTH AMENDED COMPLAINT**

1598.  The labor provided by Mr. Young was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1599.  Mr. Young was a highly recruited prospect out of high school who possessed unique talent. At Lafayette High School in Lexington, Kentucky, he was a dominant offensive lineman, earning numerous accolades for his performance on the field. A five-star recruit, he was a number 1 prospect in Kentucky and number 12 overall prospect in the nation by 247sports. He was also named the top offensive lineman in the U.S. Army All-American Game for the West squad who won 37-9. He helped Lafayette average 36.7 points per game and led them to the Class 6A state title game. He was a two-time First Team All-State selection by the Courier-Journal and The Associated Press.

1600.  Mr. Young's athletic achievements extended beyond the gridiron. In 2016, he won the Kentucky state wrestling title, finishing his senior year with a 19-0 record on the mat. He also won the 2015 state shot put title, finished second in 2016, and was named the 2014 Gatorade Kentucky Boys Track and Field Athlete of the Year. At the 2013 USATF National Junior Olympics Track and Field Championships, he was the runner-up in both the shot put and discus. He was furthermore a three-time Class 3-A track and field champion in the discus.

1601.  Mr. Young received offers from numerous football programs, including Auburn and Alabama, but ultimately committed to the University of Kentucky.

1602.  Mr. Young's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Young was one of the University of Kentucky's key offensive linemen. As a true freshman in 2016, he was an integral part of the offensive line that was named semifinalist for the Joe Moore Award, which recognizes the nation's Most Outstanding Offensive Line. He was

**FOURTH AMENDED COMPLAINT**

also named to the SEC First-Year Academic Honor Role. During his 2017 sophomore season, he played in all 13 games with six starting assignments at left tackle and helped running back Benny Snell Jr. become the first player in school history to rush for 1,000 yards in back-to-back seasons.

1603.  Mr. Young had a redshirt season his junior year due to a left knee injury and thus did not play that season. In 2019, he started all 13 games and totaled 64 knockdown blocks with only one missed assignment in 754 plays. He was named to the SEC Academic Honor Roll, Third Team All-SEC by Athlon, SEC Offensive Lineman of the Week for his performance over Eastern Michigan, Athlon Sports' Preseason All-SEC, Fourth Team Offense, and was on the Wuerffel Trophy Watch list, which is awarded to players who demonstrate community service and leadership. He was also named captain of the 2019 Allstate AFCA Good Works Team—the first in school history— which recognizes just 11 college football players in the country for the impact they make off the field. Furthermore, Mr. Young was inducted into the Frank G. Ham Society of Character which honors Wildcats who have shown an extraordinary commitment to academic excellence, athletic participation, personal development, career preparation, and serving as a role model.

1604.  Entering his senior year, Mr. Young was named preseason First Team All-SEC by Pick Six Previews and Second Team All-SEC by Athlon Sports, Coaches, and Phil Steele. That year, he was a team captain and started in every game, earning First Team All-SEC honors from the league's coaches, Second Team All-SEC from the Associated Press and Phil Steele, Third Team All-SEC from PFF, and All-Bowl Team from Associated Press and ESPN. He was a two-time SEC Offensive Lineman of the Week, named to the Wuerffel Trophy Watch List, and was a finalist for the Pop Warner College Football Award, which recognizes a senior football player who has shown leadership in the field, the classroom, and the community. During his career, he appeared in 49 games, with 26 starts, including 24 in a row at left tackle.

**FOURTH AMENDED COMPLAINT**

1605.  In the 2021 NFL draft, Mr. Young was selected in the 6th round as the 206th overall pick for the New Orleans Saints, further demonstrating the value of his talent and labor.

1606.  During his collegiate career, the University of Kentucky's football games were broadcast on national television networks such as ESPN and the SEC Network. Kentucky frequently featured Mr. Young on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Mr. Young's football games, including the Citrus Bowl between Kentucky and Penn State which drew 7.71 million viewers. Furthermore, tens of thousands of fans attended Kentucky football games during Mr. Young's collegiate career for a total of 425,023 fans in 2019 with an average of 53,128 attendees per game, making tens of millions for the university. The SEC distributed an average of $54.6 million per member university in the 2020-2021 fiscal year, including the University of Kentucky.

1607.  Mr. Young received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Kentucky, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Kentucky. As a five-star recruit who became an All-SEC lineman, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1608.  Defendants' conspiracy greatly harmed Mr. Young. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1609.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Young would have received a competitive share of

**FOURTH AMENDED COMPLAINT**

the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1610.  **The effect of Defendants' illegal conduct on Plaintiff Lauren Cox.** Plaintiff Lauren Cox worked as a college basketball player at Baylor University from 2016 to 2020.

1611.  The labor provided by Ms. Cox was of great value to Defendants. And it was a significant amount of labor. During the season, she worked at least six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of her coaches.

1612.  Ms. Cox was a highly recruited basketball player for Flower Mound High School in Flower Mound, Texas. She was the 2013 District 5-5A Newcomer of the Year as a freshman and won District Offensive Player of the Year in both her sophomore and junior years. She was also selected to the Texas Association of Basketball Coaches All-State First Team in 2014 and 2015, and was named to All-Region in 2013, 2014, and 2015. Starting 29 of 30 games her senior year, she averaged 21.8 points, 12.7 rebounds, and 3.4 blocks per game, leading her team to a 23-7 record and to the playoffs. Her performance that season earned her numerous accolades. In addition to becoming the 2016 WBCA High School Player of the Year, she earned District MVP honors; received McDonald's All-American, Jordan Brand Classics All-American, and USA Today All-Texas First Team selections; and was named the 2016 USA Today Texas Player of the Year. She was also the Texas Gatorade State Player of the Year (for both 2015 and 2016), as well as a finalist for the 2016 Naismith High School Player of the Year award. She was ranked the No. 1 overall player in the country by ESPN HoopGurlz and the No. 1 player at her position by Prospects Nation. Ms. Cox received multiple offers and ultimately committed to Baylor over other top programs, including three-time defending champion Connecticut.

**FOURTH AMENDED COMPLAINT**

1613.  Ms. Cox's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Averaging 7.6 points, 4.1 rebounds, and 1.4 blocks per game as a freshman, she was the fourth-best freshman shot blocker in program history and earned unanimous Big 12 All-Freshman Team selections. That season, she registered her first 20-point performance in a win over Southeastern Louisiana; was instrumental in scoring six points off the bench to secure a comeback win at No. 6 Texas; and tallied 17 points against Texas Southern in her first NCAA Tournament game. In her sophomore season, she recorded 15.3 points, 9.7 rebounds, and 2.7 blocks per game over 34 starts, leading the team and the Big 12 in blocked shots, and ranking third in the Big 12 in rebounds per game. She was especially prolific in high-stakes tournament matchups, averaging 21 points and 13.3 rebounds in three NCAA Tournament games, including a career-high 30-point game in the first round against Grambling State.

1614.  In the 2018-2019 season, as a junior, Ms. Cox was instrumental to the team's impressive 37-1 record, helping the team secure the Big 12 title as well as the national championship. She led the Big 12 in total rebounds, total blocked shots, and blocks per game, and recorded 10 double-doubles (including three-straight in the Sweet 16, Elite 8 and the Final Four semifinals). In addition to being named to the NCAA Final Four All-Tournament team, she was the Big 12 Defensive Player of the Year and earned First-Team All-Big 12 and All-Big 12 Defensive Team honors.

1615.  In her senior season, Ms. Cox became only the fourth player in program history to earn four All-American selections in the same season, with unanimous first-team selections by the Associated Press, USBWA, WBCA, and John Wooden Award. Despite missing a portion of the season due to injury, she still had nine double-double games and finished her career with three-straight double-doubles. She won the Big 12 Player of the Year Award; was a finalist for the Wooden Award, honoring the best

**FOURTH AMENDED COMPLAINT**

overall college basketball player; and was a semifinalist for the Naismith Defensive

Player of the Year Award, given to the most outstanding defensive player.

1616.  Following her college career, Ms. Cox was selected No. 3 overall in the

2020 WNBA Draft by the Indiana Fever.

1617.  During Ms. Cox's collegiate career, Baylor was a member of the Big 12

Conference and its games were regularly carried by national television broadcasters

such as ESPN. The program frequently featured Ms. Cox on its social media accounts,

highlighting her contributions to the team and, no doubt, using her to boost game

attendance and viewership. In the 2019 NCAA Tournament, Baylor's Final Four

matchup over Oregon averaged close to 1.5 million viewers, and the championship

game against Notre Dame totaled nearly 3.7 million on ESPN. The university made—

and continues to make—a considerable amount of money from its women's basketball

program, recording $8.3 million in revenue in 2022 alone.

1618.  Ms. Cox received none of that revenue, nor was she otherwise

compensated by Defendants for her labor other than receiving a scholarship and other

education-related expenses. And during her collegiate career, she was not permitted to

receive money for use of her NIL, whether from third parties or from Defendants or from

Baylor. As a nationally recognized basketball player, she would have earned substantial

NIL compensation if not for the NCAA's unlawful restrictions.

1619.  Defendants' conspiracy greatly harmed Ms. Cox. It prevented her from

enjoying the benefit of bargaining for competitive remuneration and benefits in an open

market. But for the illegal and unfair restraints put in place, she would have received

greater remuneration for her services as a college basketball player than she received,

and would have received money for her NIL from third parties.

1620.  Absent Defendants' agreement to adopt, enforce, and abide by the

NCAA's anti-competitive bylaws, she would have received a competitive share of the

**FOURTH AMENDED COMPLAINT**

television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

1621.  **The effect of Defendants' illegal conduct on Plaintiff Marcus Allen.** Plaintiff Marcus Allen worked as a college football player at Pennsylvania State University from 2014 to 2018.

1622.  The labor provided by Mr. Allen was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1623.  Mr. Allen was a highly recruited prospect out of high school who possessed unique talent. At Dr. Henry A. Wise Jr. High School in Maryland, he was a standout defensive back, helping lead his team to the Maryland 4A State Championship as a junior. Nationally recognized for his skill set, he was rated as a four-star recruit by Scout and 247Sports, ranked as the number 6 player in Maryland, and considered a top 30 safety in the nation by multiple recruiting services. He ultimately committed to Penn State, choosing the Nittany Lions over offers from schools such as Pittsburgh, and Virginia.

1624.  Mr. Allen's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Allen was one of Penn State's premier defensive players. As a true freshman in 2014, he appeared in all 13 games, starting seven, tied for third on the team with 58 stops (35 solo), posting three pass breakups and accounting for one sack. His performance that year earned him multiple accolades, including Athlon Sports Third Team Freshman All-American, and Big Ten All-Freshman honors according to BTN.com, ESPN.com, and 247Sports. In his sophomore season in 2015, he started 12 games and ranked second on the team with 81 tackles. He was named All-Big Ten honorable mention by both the coaches and media.

**FOURTH AMENDED COMPLAINT**

1625.  Mr. Allen's junior year in 2016 was one of his most impressive seasons, as he started all 14 games, posting three games with 10-plus tackles and finishing with a career-high 110 tackles. A defining moment of his career came in a nationally televised game against number 2 Ohio State, where he blocked a field goal that was returned for a game-winning touchdown, a play that became known as the "Block Six." That season, he ranked number 16 in the Big Ten with 7.9 tackles per game and tied for number 30 in the FBS with two fumble recoveries. His 22-tackle effort against Minnesota ranked third for most tackles in a single game in college football that year. His exemplary season earned him Third Team All-Big Ten selection by the conference coaches, All-Big Ten honorable mention from the media panel, Phil Steele and Athlon Sports' Third Team All-Big Ten, Big Ten Co-Defensive Player of the Week on October 3 for his efforts against the Golden Gophers, and Co-Big Ten Special Teams Player of the Week for his blocked field goal attempt against Ohio State.

1626.  Entering his senior year, Mr. Allen was named to the preseason watch lists for the Bednarik Award and Nagurski Trophy and selected as a preseason First Team All-American by Sporting News. Mr. Allen's senior season in 2017 saw him record 72 tackles, four tackles for loss, one sack, and his first career interception, which he returned for 50 yards. He started all 13 games and was selected team captain prior to the season. During this season, he earned numerous accolades, including Defensive Most Valuable Player at the PlayStation Fiesta Bowl, Third Team All-America defensive back by Phil Steele, honorable-mention All-America at safety by SB Nation, First Team All-Big Ten from the AP, coaches, and Phil Steel, Second Team All-Big Ten from the media and Pro Football Focus, and Second Team All-ECAC honors at defensive back. He was also a semifinalist for the Jim Thorpe Award, which is awarded to the top defensive back in college football, and selected as a quarterfinalist for the Lott IMPACT Trophy, which is presented annually to a defensive college football player of the year for their personal character and athletic abilities. He was named the Lott IMPACT Trophy

**FOURTH AMENDED COMPLAINT**

Player of the Week on September 12 after recording 13 tackles against Pittsburgh, a performance that also earned him Paycom Jim Thorpe Award weekly honors. Additionally, he was recognized on the Pro Football Focus Big Ten Team of the Week for his efforts against Indiana. At the end of the season, he received the Captain's Award, was honored as Penn State's Most Valuable Defensive Player at the annual team banquet, and was chosen to compete in the Reese's Senior Bowl.

1627.  During the 2018 NFL Draft, Mr. Allen was selected by the Pittsburgh Steelers in the 5th round as the 148th overall pick, further demonstrating the value of his talent and labor.

1628.  During Mr. Allen's collegiate football career, Penn State football games were broadcast on national television networks such as ABC, ESPN, and Big Ten Networks. Penn State frequently featured Mr. Allen on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Mr. Allen's games. For example, the 2018 Citrus Bowl between Penn State and University of Kentucky amassed over 7.7 million viewers. Penn State's Beaver Stadium regularly hosted over 100,000 fans per game, generating tens of millions of dollars in revenue for the university. For example, in 2018, a total of 738,396 fans attended Penn State home games with an average attendance of 105,485 per game. That year, Penn State made $40.9 million in total revenue from ticket sales, driven by football ticket sales. The Big Ten Conference, of which Penn State is a member, distributed an average of over $54 million per school in media rights revenue for the 2018-2019 fiscal year.

1629.  Mr. Allen received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Penn State, he was not permitted to receive money for his NIL from third parties, Defendants, or Penn State. As a highly

**FOURTH AMENDED COMPLAINT**

sought-after high school recruit who became an All-American, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1630.  Defendants' conspiracy greatly harmed Mr. Allen. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1631.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Allen would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1632.  **The effect of Defendants' illegal conduct on Plaintiff Max Borghi.** Plaintiff Max Borghi worked as a college football player at Washington State University from 2018 to 2021.

1633.  The labor provided by Mr. Borghi was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1634.  Mr. Borghi was a highly recruited football player for Pomona High School in Arvada, Colorado. As a versatile all-purpose running back, he rushed for 998 yards and eight touchdowns as a sophomore and was named to the All-Colorado Team after rushing for 824 yards and 15 touchdowns in his junior year. He concluded his senior year rushing for 1,690 yards with 27 touchdowns, earning the 5A State Player of the Year recognition and All-State First Team honors. That same year, he returned a 92-yard kickoff for a touchdown and returned a punt for a touchdown, and led the team to their first state title since 1988. With 3,512 yards and 50 touchdowns over his high school career, he was a four-star recruit and the second-best overall prospect from

**FOURTH AMENDED COMPLAINT**

Colorado. He received 12 offers from competitive programs like Stanford, North Carolina, and Utah, and ultimately committed to Washington State.

1635. Mr. Borghi's job as a college football player was essentially a full-time one, and an important and valuable one at that. He saw action in all 13 games as a freshman and had 12 total touchdowns, setting Washington State's single-season record for total touchdowns by a freshman. Earning the Pac-12 Freshman of the Year honorable mention honors, he had a season-high 115 all-purpose yards against Arizona and rushed for a 10-yard touchdown to seal the win over Iowa State in the end-of-season Alamo Bowl. In 2019, with 817 rushing yards, 597 receiving yards, and 16 combined touchdowns, he was the only Power-5 player with more than 800 rushing yards, over 550 receiving yards and 16 touchdowns, and became the first player in program history with more than ten touchdowns in his first two seasons. He led all Pac-12 running backs, averaging 6.4 yards-per-carry, and led all running backs nationally with 86 receptions, the most by a running back in program history and second-most ever by any player in the Pac-12. After his first career three-touchdown game against Northern Colorado, he followed up with a 47-yard touchdown run against Colorado and a career-high 15 carries for 11 yards and two touchdowns against Stanford.

1636. Although he saw only limited action in 2020 due to a back injury, he bounced back in 2021, rushing for 880 yards with 12 touchdowns in 12 starts. Notably, he was the only player in the country to be named to the preseason watch lists for both the Doak Walker Award (honoring the top college running back) and the Biletnikoff Award (honoring the top college receiver) for two years in a row, He had a career-long 64-yard touchdown against Utah State, led the Pac-12 with eight missed tackles forced against Portland State, and rushed for three touchdowns against BYU. He finished his collegiate career on a high note, carrying for a career-high 22 times for 129 yards and

**FOURTH AMENDED COMPLAINT**

two touchdowns against rival Washington. Mr. Borghi's 41 total collegiate touchdowns are tied for the most in Washington State history.

1637.  During Mr. Borghi's collegiate career, Washington State University was a member of the Pac-12 Conference and its games were regularly carried by national television broadcasters such as Fox and ESPN. As the team's star running back, the program also frequently featured Mr. Borghi on its social media accounts, highlighting his contributions to the team and, no doubt, using him to boost game attendance and viewership. As one of the more popular programs in the nation, Washington State games drew a weekly average of over 900,000 viewers from 2015 to 2019. Games against other top-ranked programs drew significantly more viewers. For example, more than 5.5 million people watched the 2018 Alamo Bow, during which Mr. Borghi scored the winning touchdown over Iowa State, and his 129-yard rushing performance over Washington in the 2021 Apple Cup totaled over 1.2 million in television viewership. Washington State home games are also well-attended, averaging 28,541 in home support, or over 85% capacity, for the 2019 season.

1638.  Between ticket sales, media rights, and other sources, the university made—and continues to make—a considerable amount of money from its football program. For example, from the 2018 season, Washington State made $44.46 million in revenue, including $9 million in ticket sales, from football alone. The university also received approximately $29.5 million in revenue disbursements from the Pac-12 Conference in 2018.

1639.  Mr. Borghi received none of that revenue. During part of his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from Washington State. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Washington State that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a star

**FOURTH AMENDED COMPLAINT**

running back for a popular football program, he would have earned substantial NIL
compensation if not for the NCAA's unlawful restrictions.

1640.  Defendants' conspiracy greatly harmed Mr. Borghi. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player than he received, and
would have received money for his NIL from third parties.

1641.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Borghi would have received a competitive share of
the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1642.  **The effect of Defendants' illegal conduct on Plaintiff Mat Nelson**.
Plaintiff Mat Nelson worked as a college baseball player at Florida State University from
2018 to 2021.

1643.  The labor provided by Mr. Nelson was of great value to Defendants.
During the season, he dedicated substantial time to practices, games, and travel, often
exceeding 40 hours per week. Even in the offseason, he trained rigorously under the
direction of FSU's coaching staff to maintain peak performance.

1644.  Mr. Nelson was a highly recruited prospect out of high school who
possessed exceptional talent. At Calvary Christian High School in Clearwater, Florida,
he was a standout catcher and leader on his team. He was ranked as number 144
overall and the 13th-best catcher in the country by Perfect Game, number 260 overall
by Baseball America, and number 2 catcher in the state of Florida by Perfect Game. He
earned Rawlings and Perfect Game Third Team All-American and First Team All-Florida
as a senior. During his high school career, he led his school to 60 consecutive wins, a
Florida high school record, a number 1 national ranking, and the 2017 4A state title. He
was also the Pinellas Player of the Year by the Tampa Bay Times after hitting .465 with

**FOURTH AMENDED COMPLAINT**

Case No. 1:23-cv-03076-CNS-STV    Document 163    filed 06/06/25    USDC Colorado
pg 349 of 841

five home runs, 14 doubles, 45 RBI, seven stolen bases, and a .996 fielding percentage as a senior. He was also selected to play in the Pinellas County All Star game, but was unable to play due to a state tournament. Despite being drafted in the 2018 MLB draft by the Philadelphia Phillies, he chose to play for Florida State University.

1645.  During Mr. Nelson's time at Florida State, he quickly emerged as one of the top catchers in college baseball. As a freshman in 2019, he played in 57 games, making 54 starts, and hit .282 with six home runs and 29 RBIs. He also drew 31 walks and was hit by 17 pitches, second most in the ACC. That year, he earned ACC Academic Honor Roll and All-ACC Academic Team honors. He helped guide the Seminoles to the College World Series, in which Mr. Nelson's three hits led the team. Following his freshman year, he played summer ball for the Falmouth Commodores in the Cape Cod League.

1646.  In his sophomore season, which was shortened due to the COVID-19 pandemic, Mr. Nelson batted .250 with a home run in 17 games. He was ranked 23rd nationally in hit by pitches and was on the national watch list for the Buster Posey Award, which is named after the former Seminole and given to the nation's best catcher.

1647.  Mr. Nelson's redshirt sophomore season in 2021 was nothing short of extraordinary. He started 53 of FSU's 55 games, with 52 starts behind the plate and hit .330 with 64 hits, 17 doubles, 50 runs, and 23 home runs, which was the best in the nation. He earned recognition as the nation's top catcher and was a unanimous All-American. He was honored as the ACC Player of the Year, selected to First Team All-ACC, named to the ABCA/Rawlings First Team All-Region, and chosen as the NCBWA District Player of the Year. Additionally, he received the prestigious Perfect Game/Rawlings National Player of the Year title and claimed the Buster Posey and Johnny Bench Award, presented to the best catcher in the country. He was a finalist for the Dick Howser Trophy and semifinalist for the Golden Spikes Award, both given to the nation's best player. He led the ACC in multiple categories, including home runs, total

**FOURTH AMENDED COMPLAINT**

bases, slugging percentage and RBI. After going 5-for-10 with three home runs and a pair of doubles at Georgia Tech, he earned ACC Player of the Week honors. More impressive still is that he played most of this season battling through injury.

1648.  During the 2021 MLB Draft, Mr. Nelson was selected Balance Round A (35) for the Cincinnati Reds.

1649.  During Mr. Nelson's collegiate baseball career, Florida State's baseball games were broadcast on major networks such as the ACC Network, ESPN, and regional sports affiliates. FSU frequently featured Mr. Nelson on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Hundreds of thousands watched Mr. Nelson play in the 2019 NCAA College World Series with the Florida State vs. Michigan game amassing over 1.28 million viewers. Thousands of fans attend each game at Dick Howser Stadium, generating significant revenue for the university. In 2021, Florida State made $18.7 million of revenue from ticket sales, including baseball ticket sales. The ACC distributed an average of $39.4 million per member institution, including Florida State, in the 2020-2021 financial year.

1650.  Mr. Nelson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. During his time at Florida State, he was not permitted to receive money for his NIL from third parties, Defendants, or Florida State. Had the NCAA permitted NIL compensation earlier, he would have earned significant financial opportunities as one of the top catchers in the country.

1651.  Defendants' conspiracy greatly harmed Mr. Nelson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt,

**FOURTH AMENDED COMPLAINT**

enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1652.  Mr. Nelson received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Nelson. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an All-American at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

1653.  But for the illegal and unfair restraints put in place, Mr. Nelson would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1654.  **The effect of Defendants' illegal conduct on Plaintiff Matthew Butler.** Plaintiff Matthew Butler, an individual, is a resident of Nevada. He worked as a college football player at the University of Tennessee from 2017 to 2022.

1655.  The labor provided by Mr. Butler was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1656.  Mr. Butler was a highly recruited prospect out of high school who possessed unique talent. At Garner Senior High School in North Carolina, he was a dominant defensive lineman, earning numerous accolades for his performance on the field. Considered a four-star prospect, he was named to the 2016 North Carolina Associated Press All-State Class 4A Team. He starred in the Shrine Bowl of the Carolinas and finished his senior season with 96 tackles, including 44 TFLs and 26 sacks, leading Garner Senior to a 12-2 record and an appearance in the regional semifinals. That season, he also earned First Team Parade All-America honors. Mr.

**FOURTH AMENDED COMPLAINT**

Butler received offers from several major programs, including Texas A&M, Rutgers, and West Virginia, before committing to Tennessee.

1657. Mr. Butler's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Butler was a key member of Tennessee's defensive line. As a freshman in 2017, he played in eight games and recorded four tackles. He also earned First Year SEC Academic Honor Roll. In 2018, he appeared in 9 games and made 13 tackles, including one tackle for loss. He earned Fall SEC Academic Honor Roll. He also volunteered with VOLeaders Academy program, through which he went to Rwanda to perform humanitarian aid. He volunteered all around Knoxville, helping out with community service events 1-2 times per month.

1658. His role on the gridiron expanded significantly in 2019 when he started 4 games and appeared in all 13 contests as a major contributor, leading all Tennessee defensive linemen with 45 tackles. That season, he was selected to the CoSIDA First Team Academic All-District 3 and Fall SEC Academic Honor Roll, along with the SEC Community Service Team.

1659. In 2020, Mr. Butler solidified his status as one of Tennessee's most dependable defensive linemen, starting all 10 games in a COVID-19-shortened season. He tallied 43 tackles, two sacks, and 3 tackles for loss. That year, he earned Fall SEC Academic Honor Roll, was a SEC McWhorter Award Nominee, and CoSIDA First Team Academic All-District 3.

1660. Entering his fifth season in 2021, Butler delivered his best collegiate season, playing in all 13 games with 12 starts and recording career-highs in tackles (47), tackles for loss (8.5), and sacks (5). He also saw action on 726 snaps on the year, which was the most among all SEC players. He was rated among the top 10 SEC defensive linemen in rush defense according to PFF. He was named to the Fall SEC Academic Honor Roll, was a William V. Campbell Trophy Semifinalist, CoSIDA Second

**FOURTH AMENDED COMPLAINT**

Team Academic All-America, an East-West Shrine Game Invitee, and an NFL Combine Invitee. During his collegiate football career, Mr. Butler appeared in 53 games with 26 starts in five seasons.

1661.  During the 2022 NFL Draft, Mr. Butler was selected as the 175th overall pick by the Las Vegas Raiders.

1662.  During Mr. Butler's collegiate football career, the University of Tennessee's football games were broadcast on national television networks such as ESPN and the SEC Network. Millions of viewers watched Mr. Butler's football games. For instance, the Music City Bowl between Tennessee and Purdue in 2021 drew over 5.5 million viewers. Furthermore, tens of thousands also attended Tennessee football games during Mr. Butler's tenure with an average of more than 86,000 fans filling Neyland Stadium for each game, generating millions for the university. In 2021, Tennessee made a total of $35.1 million in revenue from ticket sales, including football ticket sales. The SEC Conference, to which Tennessee belongs, distributed an average of $49.9 million per member university for the 2021-2022 financial year.

1663.  Mr. Butler received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Tennessee, he was not permitted to receive money for his NIL whether from third parties or from Defendants or from Tennessee. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Tennessee he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became one of Tennessee's top defensive players, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1664.  Defendants' conspiracy greatly harmed Mr. Butler. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1665.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Butler would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1666.  **The effect of Defendants' illegal conduct on Plaintiff Matt McLain.** Plaintiff Matt McLain worked as a college baseball player at the University of California, Los Angeles from 2018 to 2021.

1667.  The labor provided by Mr. McLain was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1668.  Mr. McLain was a highly recruited baseball player out of Beckman High School in Irvine, California. He hit .471 with 33 runs as a junior and batted .369 with a .604 slugging percentage in his senior season, leading his team to two league championships. In addition to being a two-time league MVP, he was twice named First Team All-American and made First-Team All-State three times. As the 4th overall prospect from California and a top ten shortstop prospect nationally, he was selected by the Arizona Diamondbacks in the first round of the 2018 MLB Draft but ultimately decided to enroll at UCLA.

1669.  Mr. McLain's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. As a freshman at UCLA in 2019, he made 60 starts out of 61 appearances, scoring 28 runs and hitting nine doubles, six triples, and four home runs. His six triples ranked third in the Pac-12 and tied a single-season freshman program record. In 2020, he started all 13 games at shortstop and

**FOURTH AMENDED COMPLAINT**

was hitting an impressive .397 before the season ended prematurely due to the COVID-19 pandemic. He nevertheless led the team in runs-batted in, batting average, slugging percentage, total hits, home runs, and total bases, and he was named to Second Team All-American by Collegiate Baseball. As a unanimous Preseason First Team All-American selection going into the 2021 season, he ended up hitting .333 and slugging .579 with 14 doubles, nine home runs, and 36 runs-batted-in. Mr. McLain was selected in the first round of the 2021 MLB Draft by the Cincinnati Reds.

1670.  During Mr. McLain's time at UCLA, the program was part of the Pac-12 Conference and its games were regularly carried by the conference's own Pac-12 Network, with NCAA tournament games being broadcasted by ESPN. For example, UCLA's appearances in the 2021 NCAA Lubbock Regionals were carried on ESPN, and regional games on average receive over 260,000 viewers across ESPN networks. The university benefited—and continues to benefit—financially from its baseball program, with the program recording close to $4 million in total annual revenue.

1671.  Mr. McLain received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial athletic scholarship and other education-related expenses. And during his time at UCLA, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a nationally recognized standout player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1672.  Moreover, Mr. McLain received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. McLain, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. McLain would have received a greater amount of scholarship money than he received. As a highly decorated high school baseball player and collegiate All-American, he would have received a full athletic scholarship absent Defendants' bylaws.

**FOURTH AMENDED COMPLAINT**

1673.  Defendants' conspiracy greatly harmed Mr. McLain. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

1674.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. McLain would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1675.  **The effect of Defendants' illegal conduct on Plaintiff Michael Jordan.** Plaintiff Michael Jordan worked as a college football player at Ohio State University from 2016 to 2019.

1676.  The labor provided by Mr. Jordan was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1677.  Mr. Jordan was a highly recruited football player out of Plymouth High School in Canton, Michigan. He began playing football his sophomore year and showed his commitment to the game by spending significant time in the weight room, as well as joining wrestling and track and field for cross training and conditioning. Due to his outstanding senior performance—in which he averaged six pancake blocks a game and did not allow a sack—Mr. Jordan was named an Associated Press Division 1-2 Michigan all-state pick, a first-team Detroit Free Press all-state selection, and a USA Today All-USA Second Team Offense. A consensus four-star recruit and a top-10 offensive tackle prospect, Mr. Jordan chose Ohio State over offers from 9 other top programs, including Michigan and Iowa.

**FOURTH AMENDED COMPLAINT**

1678.  Mr. Jordan's job as a college football player was essentially a full-time one, and an important and valuable one at that. He started every single game—41 total—over his three-year career at Ohio State. Starting in 2016, he became the first true freshman to start on the Ohio State offensive line in 23 years. He was named a freshman All-American after starting all 13 games at right guard, helping the team rush 245.2 yards per game to rank 11th nationally and first in the Big Ten. He was instrumental to Ohio State back-to-back Big Ten Championship wins in 2017 and 2018, and—especially after moving to the center position in 2018—helped propel the team to a No. 1 ranking in defense, No. 2 in total offense, No. 2 in passing yards per game, and No. 8 in points per game. He earned a first-team all-Big Ten selection in 2017 and first-team All-American by Sports Illustrated and second-team All-Big Ten honors in 2018. Notably, he was also a finalist for the Rimington Award in 2018, given annually to the best center in college football. In 2019, in his final season, he helped lead Ohio State to its first appearance in the Rose Bowl since 2010, securing a 28-23 victory over Washington.

1679.  In 2019, Mr. Jordan was selected by the Cincinnati Bengals in the fourth round of the NFL Draft, further demonstrating the value of his talent and labor.

1680.  During Mr. Jordan's collegiate career, Ohio State was a member of the Big Ten Conference and its games were regularly carried by national television broadcasters such as Fox and ABC. Ohio State also frequently featured Mr. Jordan on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. As one of the most popular programs in the nation, Ohio State games drew a weekly average of almost 5.2 million viewers from 2015 to 2019. Games against other top-ranked programs drew significantly more viewers. For example, four of Ohio State's 14 games were among the ten most-watched games in 2018, with over 13 million watching Ohio State's matchup against longtime rival Michigan, and 8.6 million watching the Big Ten championship game against

**FOURTH AMENDED COMPLAINT**

Northwestern. Moreover, Ohio State enjoys tremendous local support and averaged third in the nation with a home crowd of 103,383 per game for the 2019 season.

1681.  Between ticket sales, media rights, conference disbursements, and other revenue sources, Ohio State has made a considerable amount of money from its football program. For example, the football program brought Ohio State $115 million in revenues, including $50 million in ticket sales, from the 2018-2019 season alone. The university also received approximately $54 million in revenue disbursements from the Big Ten Conference in 2018.

1682.  Mr. Jordan received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Ohio State, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from the university. As the country's top college football center, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1683.  Defendants' conspiracy greatly harmed Mr. Jordan. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1684.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Jordan would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1685.  **The effect of Defendants' illegal conduct on Plaintiff Michael Wiley.** Plaintiff Michael Wiley worked as a college football player at the University of Arizona from 2019 through 2024.

**FOURTH AMENDED COMPLAINT**

1686.  The labor provided by Mr. Wiley was of great value to Defendants. During
the season, he often worked six days per week or more and often more than 40 hours
per week. Even during the offseason, he worked a significant number of hours under
the direction of the coaches at the school.

1687.  Mr. Wiley was a highly regarded prospect out of Strake Jesuit College
Prep in Texas. During his high school career, he demonstrated exceptional versatility,
excelling as both a running back and receiver. He totaled 2,632 rushing yards on 340
carries with 29 touchdowns over his junior and senior seasons. As a senior, he
averaged 8.4 yards per carry and 142.6 yards per game while gaining 1,569 yards and
19 touchdowns on the ground. He earned First Team All-District honors in 2018 and
Second Team All-District honors in 2017. A three-star recruit, his performance drew
interest from multiple universities, before he ultimately committed to Arizona.

1688.  During his collegiate career at Arizona, Mr. Wiley developed into a
dynamic offensive weapon for the Wildcats. As a freshman in 2019, he appeared in 12
games and finished the season with 31 carries for 106 yards with a long run of 17 yards,
along with 18 catches for 165 yards. In the 2020 season, Mr. Wiley saw increased
usage despite the shortened schedule due to the COVID-19 pandemic. He finished as
Arizona's leading rusher with 222 yards on 31 carries and three touchdowns while
playing in all five of Arizona's games.

1689.  Mr. Wiley emerged as Arizona's primary running back in 2021, playing in
11 games with 5 starts and finishing with 327 rushing yards, two rushing touchdowns,
and 33 receptions for 297 yards for a team-leading four receiving touchdowns. His
ability to contribute in both the rushing and passing game made him a crucial piece of
Arizona's offense. His performance earned him a spot on the Doak Walker Award
Preseason Watch list, which is a list of the top college running backs at the start of the
season.

**FOURTH AMENDED COMPLAINT**

1690.  In 2022, he had a breakout season, appearing in 11 games and making 10 starts, with season totals of 771 rushing yards and eight touchdowns while adding 36 receptions for 349 yards and three receiving touchdowns. His all-purpose ability was highlighted in a dominant 214-yard, three-touchdown performance against Arizona State, helping the Wildcats reclaim the Territorial Cup. He was named to the Bob Moran Award as MVP of the Territorial Cup, becoming the first running back to win the award since 2014. That season, he also earned All-Pac-12 Honorable Mention honors.

1691.  In his final season in 2023, Wiley continued to be a key contributor for Arizona, playing an essential role in the Wildcats' offense. He appeared in 10 games making seven starts. Despite an injury-plagued season, he carried the ball 70 times for 311 yards and three touchdowns. Overall, he accumulated 617 total yards and eight touchdowns, recording 28 receptions for 306 yards and five touchdown catches. He earned Preseason All-Pac-12 Honorable Mention honors, was once again named to the Doak Walker Award Preseason Watch List, and was invited to the Reese's Senior Bowl where he was named player of the week.

1692.  In 2024, Mr. Wiley signed with the Washington Commanders as a free agent, further demonstrating the value of his talent and labor.

1693.  During Mr. Wiley's tenure, Arizona's football games were frequently broadcast on major television networks, including ESPN and the Pac-12 Network. Arizona frequently featured Mr. Wiley on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Arizona's home games at Arizona Stadium routinely attracted tens of thousands of fans, further contributing to the athletic department's revenue. For example, in 2023, an average of 47,320 fans attended each Arizona football game. During Mr. Wiley's time at Arizona, the Pac-12 Conference distributed $404 million in revenue to its member institutions, including the University of Arizona.

**FOURTH AMENDED COMPLAINT**

1694.  Mr. Wiley received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. Even though he was permitted to earn compensation from the use of his NIL for part of his time in college, he did not receive the full amount from third parties, Defendants, or Arizona he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a crucial player at Arizona, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1695.  Defendants' conspiracy greatly harmed Mr. Wiley. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1696.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Wiley would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1697.  **The effect of Defendants' illegal conduct on Plaintiff Michael Wilson.** Plaintiff Michael Wilson worked as a college football player at Stanford University from 2018 to 2022.

1698.  The labor provided by Mr. Wilson was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1699.  Mr. Wilson was a highly recruited football player for Chaminade High School in San Fernando Valley, California. He made the all-state team as a wide receiver in his junior year after catching 70 passes for 1,280 yards and 12 touchdowns.

**FOURTH AMENDED COMPLAINT**

After leading his team to a Mission League title with 1,157 yards and 12 touchdowns, he was named the 2017 Mission League MVP. As the school's all-time leading receiver with 2,900 career yards, Mr. Wilson was a four-star recruit and the No. 40 receiver in the entire class of 2018. He received 14 offers from competitive programs and ultimately chose to enroll at Stanford.

1700.  Mr. Wilson's job as a college football player was essentially a full-time one, and an important and valuable one at that. After grabbing his first career touchdown against Utah in his freshman season, he emerged as a starter the following year, leading the team with 56 catches for 672 yards and five touchdowns, the second most on the team. He also had games with over 100 all-purpose yards against Oregon State and Washington State and caught a career-best 10 passes for 96 yards and a touchdown against No. 11 Notre Dame. After suffering from a serious injury that prevented him from playing in most of the 2020 and 2021 seasons, Mr. Wilson decided to opt in for a fifth year in 2022, during which he was team captain for the second year in a row. He made an impressive comeback that season, totaling 418 receiving yards and four touchdowns in six starts. He had a two-touchdown game in the season opener against Colgate and a career-high 176 receiving yards against Washington.

1701.  Over the course of his collegiate career, Mr. Wilson twice-earned the Jim Reynolds Award (2021 and 2022), given annually to the Special Teams MVP, the Frank Rehm Award (2019 and 2020), for outstanding performance in the "Big Game" against California, and All-Pac-12 honorable mentions (2020 and 2022).

1702.  In 2023, Mr. Wilson was selected by the Arizona Cardinals in the third round of the 2023 NFL Draft, further demonstrating the value of his talent and labor.

1703.  During Mr. Wilson's collegiate career, Stanford University was a member of the Pac-12 Conference and its games were regularly carried by national television broadcasters such as Fox and ESPN. Stanford also frequently featured Mr. Wilson on its social media pages, highlighting his contributions to the team and, no doubt, using

**FOURTH AMENDED COMPLAINT**

him to boost game attendance and viewership. As one of the more popular teams in the nation, Stanford games saw a weekly average of 1.43 million television viewers from 2015 to 2019. Games against other top-ranked programs drew significantly more viewers. For example, Stanford's 2020 "Big Game" win against rival UC Berkeley-- during which Mr. Wilson had a team-high 7 catches for 88 yards plus a touchdown— saw 1.75 million in viewership. Stanford home games were—and continue to be—well-attended, averaging 35,684 per game in attendance for the 2021 season.

1704.  Between ticket sales, media rights, and other sources, the university has made a considerable amount of money from its football program. For example, the university received $29.5 million in revenue disbursements from the Pac-12 Conference in 2018.

1705.  Mr. Wilson received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during most of his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Stanford. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Stanford that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout player at a top football program, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1706.  Defendants' conspiracy greatly harmed Mr. Wilson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

**FOURTH AMENDED COMPLAINT**

1707.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Wilson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1708.  **The effect of Defendants' illegal conduct on Plaintiff Michaela Onyenwere**. Plaintiff Michaela Onyenwere worked as a college basketball player at the University of California, Los Angeles from 2017 to 2021.

1709.  The labor provided by Ms. Onyenwere was of great value to Defendants. During the season, she often worked six days per week or more and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

1710.  Ms. Onyenwere was a highly recruited prospect out of high school who possessed unique talent. At Grandview High School in Aurora, Colorado, she was a dominant force on the basketball court, earning numerous accolades for her performance. She was named Ms. Colorado Basketball, the 5A Girls' Basketball Player of the Year, a McDonald's All-American, a three-time Gatorade Colorado Player of the Year, and a Naismith Trophy National Player of the Year semifinalist. She was also named a First Team All-American by MaxPreps and a Second Team All-American by the Naismith Trophy and garnered First Team All-State and First Team All-Centennial League honors as a senior. She led Grandview to its first-ever state championship in 2017 and was ranked as the No. 10 overall recruit in the country by ESPN HoopGurlz and the third-rated forward in the country. As a senior, she averaged 20.8 points, 8.9 rebounds, 3.4 steals, 2.5 assists, and 1.0 blocks per game. At the state track meet in May of 2016, Ms. Onyenwere, with very little training in the sport, finished second in the 100 meters, third in the 200 meters, fifth in the 400 meters and fifth in the long jump. The following year, Ms. Onyenwere finished second in the 100 meter dash and third in the 200 meter, helping her team secure a state title. Multiple recruiting services

**FOURTH AMENDED COMPLAINT**

recognized her talent, and she received offers from several elite programs, including Arizona State, Tennessee, Louisville, and Duke, before committing to UCLA.

1711.  Ms. Onyenwere's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During her collegiate career, Ms. Onyenwere was one of UCLA's most impactful players. As a freshman in 2017-18, she played in all 35 games, averaging 6.9 points and 4.7 rebounds per game, leading her team to the Elite Eight. She was named to the Pac-12 All-Freshman Team for her contributions and two-time Pac-12 Freshman of the Week.

1712.  Ms. Onyenwere's sophomore season saw a significant leap in production, as she played and started in all 35 games, leading UCLA in scoring with an average of 18.3 points per game and 8.5 rebounds per game, earning All-Pac-12 honors and leading UCLA to the Sweet 16. Her statistics that year were among the best in the nation, as she ranked 11th nationally in offensive rebounds per game; she ranked second in the Pac-12 in offensive rebounds per game, fourth in free throw percentage, and fifth in field goals made and double-doubles. Her exemplary performance earned her a spot on the watch list for the Cheryl Miller Award, which recognizes the top small forwards in women's NCAA Division I college basketball.

1713.  She also earned a spot on the 2019 U.S. Pan American Games Women's Basketball Team where she won a Silver Medal for Team USA. She also competed at the 2019 USA Basketball Women's 3x3 Minicamp in Colorado Springs as well as participated in training camp for the USA Basketball Women's National Team in Miami ahead of the 2019 FIBA AmeriCup.

1714.  In Ms. Onyenwere's junior season, she continued to excel, playing in and starting 30 games and averaging 18.9 points and 8.1 rebounds per game, making her the Bruins' lead scorer and rebounder. She totaled 567 points for her second-consecutive 500+ point season and scored 26 points and grabbed 15 rebounds in UCLA's victory over USC in the second round of the Pac-12 Tournament. In the Pac-12,

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

she was ranked 2nd in points per game (18), 5th in total points (567), 4th in rebounds per game (8.5), 3rd in offensive rebounds (90), and 6th in free throws (107). Her performance that season earned numerous accolades, including All-Pac-12, AP Third Team All-American, USBWA Third Team All-American, WBCA Coaches All-American Honorable Mention, Pac-12 All-Tournament Team. Additionally, she was a top-5 finalist for the Cheryl Miller Award for the nation's best small forward.

1715.  During Ms. Onyenwere's senior season in 2020-21, she cemented herself as one of the best players in the country, starting in each of UCLA's 23 games and averaging 19.1 points per game, making her the Bruins' lead scorer for the third-straight season. She was named a Third Team All-American by the Associated Press and USBWA and earned honorable mention All-American honors by the WBCA. She was ranked 2nd in points per game, 3rd in free throws (96), and 4th in field goals (160) in the Pac-12 Statistical ranks. She was again All Pac-12 and named to the Pac-12 All-Tournament Team, along with being a top five finalist for the Cheryl Miller Award. She concluded her UCLA career as the fourth all-time leading scorer in program history with 1,888 career points and was third all-time in career rebounds with 885.

1716.  In the 2021 WNBA Draft, Ms. Onyenwere was selected by the New York Liberty with sixth overall pick.

1717.  During Ms. Onyenwere's collegiate basketball career, UCLA's basketball games were broadcast on national television networks such as ESPN, Pac-12 Networks, and the WCC Network. UCLA frequently featured Ms. Onyenwere on its social media platforms and other promotional materials, highlighting her achievements to enhance game attendance and viewership. UCLA home games regularly drew thousands of fans during this period, generating substantial revenue for the university. In 2021, UCLA made a total of $17.5 million in revenue from ticket sales, including tickets for women's basketball games. The Pac-12 Conference distributed an average

**FOURTH AMENDED COMPLAINT**

of $33.6 million per member university during the 2019-2020 financial year, including UCLA.

1718.  Ms. Onyenwere received none of that revenue; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. Throughout her time at UCLA, she was not permitted to receive money for her NIL, whether from third parties or from Defendants or from UCLA. As a nationally recognized talent and multi-time All-American, she would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1719.  Defendants' conspiracy greatly harmed Ms. Onyenwere. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and would have received money for her NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

1720.  **The effect of Defendants' illegal conduct on Plaintiff Mikayla Pivec.** Plaintiff Mikayla Pivec worked as a college basketball player at Oregon State University from 2016 to 2020.

1721.  The labor provided by Ms. Pivec was of great value to Defendants. And it was a significant amount of labor. During the season, she worked at least six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of her coaches.

1722.  Ms. Pivec was a highly recruited basketball player out of Lynnwood High School in Bothell, Washington, where she also excelled in cross country and track and field—and served as team captain in all three sports. Notably, she led Lynnwood to its first ever state basketball championship in 2015—her junior year—with 31 points and 17

**FOURTH AMENDED COMPLAINT**

rebounds. That year, Ms. Pivec averaged 20.4 points, 12 rebounds, 3.4 steals and 3.3 assists per game, earning Gatorade Washington Player of the Year and AP Player of the Year honors. She recorded even better numbers as a senior, averaging an impressive 21.7 points, 14.1 rebounds, 4.4 steals, and 4.1 assists while shooting 53% from the floor, and helping the team achieve a 26-1 record.

1723.  Ms. Pivec earned countless accolades as a high school basketball star, including Seattle Times Athlete of the Year, Max Preps Athlete of the Year, and First Team All-State, to name a few. She was also named the MVP of both the Washington 3A/4A All-Star Game and the Northwest Shootout All-Star Game. As a five-star recruit, the No. 24 prospect in the country, and a highly sought-after track and field athlete, Ms. Pivec ultimately chose to enroll at Oregon State, becoming the highest-rated recruit in that program's history, declining offers from other top programs like Stanford, Oregon, and Nebraska.

1724.  Ms. Pivec's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. She was a starter all four years while at Oregon State. As a freshman, she averaged 7.5 points and 5 rebounds a game, with notable performances against top rivals, including 15 points and eight rebounds against UCLA, and 17 points and eight rebounds against California, both during the Pac-12 Tournament. She was twice-named the Pac-12 Freshman of the Week, helping her team finish first in the Pac-12 in the regular season and then reach the Sweet 16 in the NCAA Tournament. Her performance that season earned her a selection to the Pac-12 All-Freshman Team.

1725.  The following season, Ms. Pivec averaged 11.1 points and 7.1 rebounds per game, leading all Pac-12 guards in rebounding, propelling her team to the Elite Eight, and earning an All-Pac-12 Honorable Mention. Her game only kept improving: as a junior, she averaged 15.2 points and 9.2 rebounds per game while shooting 52.6%

**FOURTH AMENDED COMPLAINT**

from the floor, the second-best percentage in the Pac-12. She earned All-Pac-12 honors and WBCA All-America Honorable Mention.

1726.  Ms. Pivec had a standout senior season, setting Oregon State's career record for rebounds, and receiving numerous honors, including All-Pac-12, Pac-12 All-Defense, AP All-America Honorable Mention, WBCA All-America Finalist, Naismith Trophy Defensive Semifinalist, and USBWA All-America Honorable Mention. Ms. Pivec was subsequently drafted by the Atlanta Dream with the 25th overall pick of the 2020 WNBA draft.

1727.  During Ms. Pivec's time at Oregon State, the program was a part of the Pac-12 Conference and its games were regularly broadcast on the Pac-12 Network and on ESPN. Oregon State also frequently featured Ms. Pivec on its social media accounts, highlighting her accomplishments and, no doubt, using her to boost game attendance and viewership.

1728.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other revenue sources, Oregon State has made a considerable amount of money from its women's basketball program. For example, thousands of fans attended Oregon State women's basketball games in 2019-2020 for a total attendance of 100,337 with an average of 5,902 per game. generating significant revenue. Moreover, in 2019, the Pac-12 Conference distributed approximately $32.2 million of revenue per member school, including to Oregon State.

1729.  Ms. Pivec received none of that revenue, nor was she otherwise compensated by Defendants for her labor other than receiving a scholarship and other education-related expenses. And during her time at Oregon State, she was not permitted to receive money for use of her NIL, whether from third parties, from Defendants, or from the university. As a nationally recognized, highly decorated basketball player, she would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

1730.  Defendants' conspiracy greatly harmed Ms. Pivec. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received, and would have received money for her NIL from third parties.

1731.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Ms. Pivec would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

1732.  **The effect of Defendants' illegal conduct on Plaintiff Mo Osling III.** Plaintiff Mo Osling III worked as a college football player at the University of California, Los Angeles from 2017 to 2022.

1733.  The labor provided by Mr. Osling was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1734.  Mr. Osling was a highly recruited prospect out of high school who possessed unique talent. At Antelope Valley High School, he was a standout defensive back and wide receiver, earning numerous accolades for his performance on the field. He was rated as a three-star recruit by both Scout.com and Rivals.com. Scout.com ranked him as the No. 18 cornerback prospect in the West, No. 144 on its West 150 list, and No. 88 on its California 100 list, while Rivals.com placed him at No. 80 on its California 100 list. A PrepStar All-West selection, he recorded 14 tackles and hauled in eight receptions for 125 yards and three touchdowns as a junior.

1735.  Beyond football, Mr. Osling also excelled in track and field, earning national recognition as a triple jumper. He was the 2016 state high school triple jump champion his junior year and a First Team All-CIF selection.

**FOURTH AMENDED COMPLAINT**

1736.  Despite receiving offers from multiple universities, Mr. Osling ultimately chose to play for UCLA.

1737.  Mr. Osling's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Osling was a key player in UCLA's secondary. During his 2017 freshman year, he saw action in 13 games as a reserve in the secondary and on special teams. In 2018, he played in 10 games in the defensive secondary and on special teams, recording multiple tackles against Oklahoma and Cal. He continued his development in 2019, appearing in the first four games of the season and making 3 tackles. In 2020, he played in all seven games of the shortened season, tying for the team lead with 4 pass break ups and fourth on the team in tackles (39), third on the team with 3.0 sacks, and fifth on the squad with 4.0 tackles for loss. He also posted a season-high 12 tackles against USC.

1738.  In 2021, Mr. Osling played in seven games at safety and cornerback. He made a start against Fresno State and was credited with a season-best six tackles in that contest. He returned for the 2022 season, starting all 13 games at safety and leading the team in total tackles with 89, solidifying himself as one of the top defensive players on the roster. His strong play earned him Second Team All-Pac-12 honors by the Associated Press.

1739.  In 2023, Mr. Osling signed with the Seahawks as a priority free agent, further demonstrating the value of his talent and labor.

1740.  During his collegiate career, UCLA football games were broadcast on national television networks such as ESPN, Fox, and the Pac-12 Network, drawing millions of viewers and generating millions of dollars. UCLA frequently featured Mr. Osling on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Tens of thousands of fans attended UCLA football games during this period. For instance, a total of 320,729 fans attended games in 2021 with an average of 45,818 attendees per game. That year,

**FOURTH AMENDED COMPLAINT**

UCLA made over $103 million in revenue, including over $17 million in ticket sales. During the 2021-2022 financial year, the Pac-12 Conference distributed an average of $37 million per member university, including UCLA.

1741.  Mr. Osling received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at UCLA, he was not permitted to receive money for his NIL whether from third parties, Defendants, or UCLA. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or UCLA that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a key contributor at UCLA, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1742.  Defendants' conspiracy greatly harmed Mr. Osling. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1743.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Osling would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1744.  **The effect of Defendants' illegal conduct on Plaintiff Mya Hollingshed.** Plaintiff Mya Hollingshed worked as college basketball player at the University of Colorado from 2017 to 2022.

1745.  The labor provided by Ms. Hollingshed was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days

**FOURTH AMENDED COMPLAINT**

per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

1746.  She was a highly recruited prospect out of high school who possessed elite talent. She was a top high school recruit and was named an Adidas All-American and Under Armour All-American, and was a McDonald's All-American nominee. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to the University of Colorado in the hopes that she would transfer to another school.

1747.  Her job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During her basketball career, Ms. Hollingshed was one of the University of Colorado's key players. By her sophomore season, she became a full-time starter and averaged over 10 points a game. Her junior season, she led Colorado in scoring and rebounding. In her fourth season, she finished sixth in the Pac-12 in points per game and second in rebounds per game. In her fifth season, she again led Colorado in scoring, and also led them to their first NCAA Tournament appearance since 2013. She finished her career ranked sixth on Colorado's all-time scoring and rebounding lists.

1748.  In 2022, Ms. Hollingshed was drafted 8th overall in the WNBA's annual draft.

1749.  During this time, the University of Colorado was a member of the Pac-12 Conference and its women's basketball games were generally televised by either the Pac-12 Conference's own network or by a streaming platform. Colorado also frequently featured Ms. Hollingshed on its social media accounts, highlighting her accomplishments and using her to boost game attendance and viewership.

1750.  Between ticket sales, media rights, Pac-12 distributions, and other sources of revenue, the University of Colorado has no doubt benefited from its women's

**FOURTH AMENDED COMPLAINT**

basketball program. In fact, the Pac-12 Conference distributed $37 million in revenues to each of its member schools in 2022.

1751.  Yet Ms. Hollingshed received none of that revenue, nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. During most of her time at Colorado, she was not permitted to receive money for her NIL, whether from third parties, from Defendants, or from Colorado. Even for the time in which she was permitted to earn NIL compensation, she did not receive the full amount from third parties, Defendants, or Colorado that she would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly recruited high school basketball prospect who became a key contributor at Colorado, she would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1752.  Defendants' conspiracy greatly harmed Ms. Hollingshed. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and she would have received money for her NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

1753.  **The effect of Defendants' illegal conduct on Plaintiff Mykel Jones.**
Plaintiff Mykel Jones worked as a college football player at the University of Oklahoma from 2016 to 2019 and at Tulane University in 2020.

1754.  The labor provided by Mr. Jones was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours

**FOURTH AMENDED COMPLAINT**

per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1755.  Mr. Jones was a highly recruited prospect out of high school who possessed unique talent. At Patterson High School in Louisiana, he was a standout wide receiver, earning numerous accolades for his performance on the field. A four-star recruit according to ESPN, he was considered one of the top wide receivers in the state of Louisiana, ranked 4th by Rivals, 18th by ESPN and 27th by 247Sports. He was also rated the 94th overall recruit nationally in the 2016 recruiting cycle by Rivals and considered by multiple recruiting services as a top 20 wide receiver in the country. Mr. Jones initially committed to Alabama, but ultimately chose Oklahoma over multiples offers, including from Alabama, Tennessee, Ole Miss, and others.

1756.  Mr. Jones's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Jones competed at the highest level of college football, making significant contributions at both Oklahoma and Tulane. At Oklahoma, he appeared in 12 games in 2016 and registered 13 catches for 106 yards. In 2017, he played in all 14 games with one start and made 16 catches for 310 yards for a team-high 19.4 average. He finished with 67 yards and his first career touchdown (55-yarder) on three receptions at Oklahoma State. His excellence was not limited to the gridiron, as he earned Second Team Academic All-Big 12 honors that year. In 2018, he played in three games with two catches coming in the season opener versus Florida Atlantic. In 2019, he played in eight games, but his production was hindered by hamstring and other injuries.

1757.  After the 2019 season, Mr. Jones transferred to Tulane University, where he played in 2020. Although injuries impacted his time with the Green Wave, he added depth and veteran leadership to the wide receiver corps. Mr. Jones appeared in all 11 games and made six starts during the regular season, finishing finished fifth on the team in receiving yards with 154 and averaged 14 yards per catch.

**FOURTH AMENDED COMPLAINT**

1758.  During this time, Oklahoma and Tulane football games were broadcast on major national television networks such as ESPN, ABC, and Fox. The Oklahoma Sooners, in particular, were among the most-watched teams in college football, consistently drawing millions of viewers per game. For example, nearly 27 million watched the 2018 Rose Bowl game between Oklahoma and Georgia. Oklahoma's home games routinely attracted an average of 86,520 fans per game in 2017 with the total attendance consisting of 519,119 fans. In 2017, Oklahoma generated $42.2 million in revenue from ticket sales, driven by football. Tulane also attracted hundreds of thousands of viewers during its 2020 season with over 1.7 million people watching the Lockheed Martin Armed Forces Bowl between Tulane and Southern Mississippi. The Big 12 Conference distributed approximately $36.6 million to Oklahoma in 2018. The AAC, of which Tulane is a member, is currently in the middle of a 12-year, $1 billion deal with ESPN for its media rights. The deal began in the 2020 season and runs through the 2031-32 academic year.

1759.  Mr. Jones received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time in college football, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or his universities. As a four-star recruit who competed for a College Football Playoff contender (Oklahoma) and an AAC bowl-winning program (Tulane), he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1760.  Defendants' conspiracy greatly harmed Mr. Jones. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

**FOURTH AMENDED COMPLAINT**

1761.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Jones would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1762.  **The effect of Defendants' illegal conduct on Plaintiff Nakobe Dean.** Plaintiff Nakobe Dean worked as a college football player at the University of Georgia from 2019 to 2022.

1763.  The labor provided by Mr. Dean was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1764.  Mr. Dean was a highly recruited football player for Horn Lake High School in Mississippi. In his senior year, he led the team to a perfect 15-0 record and Class 6A State title with 175 tackles, seven sacks, and three interceptions as a linebacker and nine touchdowns as a running back. In addition to receiving the 2018-2019 Mississippi Gatorade High School Football Player of the Year award, he was the winner of the 2018 High School Butkus Award, an honor given annually to the top linebacker. As a five-star recruit and the second-best inside linebacker prospect in the country, Mr. Dean chose to enroll at Georgia over 60 offers, including from top-ranked programs like Alabama and Mississippi.

1765.  Mr. Dean's job as a college football player was essentially a full-time one, and an important and valuable one at that. He played in all 14 games as a freshman, recorded a tackle for loss in an impressive Sugar Bowl win over Baylor, and was named the co-winner of the team's Defensive Newcomer of the Year Award. He reached new heights in his second season, becoming Georgia's leading tackler with 71 total stops and 13 quarterback pressures. He registered a career-high 15 tackles against Florida and recorded a team-high seven top in Georgia's Peach Bowl victory over Cincinnati.

**FOURTH AMENDED COMPLAINT**

1766.  In 2021-2022, Mr. Dean was instrumental to Georgia's national championship title, finishing the final season of his college career with 72 total tackles and leading the team with 10.5 tackles for loss. His outstanding performance that season included two sacks against No. 3 Clemson, returning an interception for a 50-yard touchdown against Florida, and recording career-high quarterback pressures in an Orange Bowl win over Michigan. He ultimately earned the 2021 Butkus Award, honoring the top collegiate linebacker and was a unanimous All-America First Team selection, as well as a semifinalist for the 2021 Chuck Bednarik Award, given to the outstanding defensive player of the year. Coming off a major championship win, Mr. Dean was subsequently selected by the Philadelphia Eagles in the 2022 NFL Draft and became a Super Bowl champion in 2025.

1767.  During Mr. Dean's collegiate career, the University of Georgia was a member of the SEC and the vast majority of its football games were broadcast on ESPN and CBS. Both Georgia and the SEC also frequently featured Mr. Dean on their social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. As one of the most popular programs in the nation, Georgia games drew a weekly average of 3.61 million viewers in 2021, ranking fifth in the country. Key matchups against other top-ranked programs drew significantly more viewers. For example, Mr. Dean's final two games with Georgia—the Orange Bowl win over Michigan and the national championship victory over Alabama—saw 17.2 and 22.5 million in viewership, respectively. Georgia also consistently ranks among the top in the country in home-game attendance, enjoying a sold-out home crowd of 92,746 per game for the 2021 season.

1768.  Between ticket sales, media rights, conference disbursements, and other sources, the university makes a considerable amount of money from its football program. For example, from the 2020-2021 season alone the football program made Georgia $155.9 million in revenue, including $35.40 million in ticket sales. The university

**FOURTH AMENDED COMPLAINT**

also received about $54.6 million in revenue disbursements from the SEC following the 2020-2021 fiscal year.

1769.  Mr. Dean received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during most of his time at the University of Georgia, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from the university. Even for the one year in 2021 in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from Georgia, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout linebacker at one of the top football programs in the country, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1770.  Defendants' conspiracy greatly harmed Mr. Dean. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1771.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Dean would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1772.  **The effect of Defendants' illegal conduct on Plaintiff Nate Savino.** Plaintiff Nate Savino worked as a college baseball player at the University of Virginia from 2020 to 2022.

1773.  The labor provided by Mr. Savino was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40

**FOURTH AMENDED COMPLAINT**

hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1774.  Mr. Savino was a highly recruited prospect out of high school who possessed unique talent. At Potomac Falls High School in Virginia, he was one of the most dominant pitchers in the nation, earning numerous accolades for his performance on the mound. In three seasons, he went 13-4 with a 1.25 ERA and 220 strikeouts to 45 walks in 112.1 innings. He was rated the number 4 prospect in the nation by Perfect Game and Baseball America. He earned 2019 Virginia Gatorade Player of the Year, was a member of the USA Baseball 18U National Team, and was named the Conference Player of the Year and Region Player of the Year as a junior. He also pitched in the 2019 Under Armor All-American Game at Wrigley Field in Chicago and the 2019 Perfect Game All-American Classic at Petco Park in San Diego. Mr. Savino committed to UVA the fall of his sophomore year of high school and then enrolled early at UVA in January of 2020.

1775.  Mr. Savino's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, Mr. Savino developed into one of the top pitchers in the ACC and played a key role in Virginia's success on the national stage. As a true freshman in 2020, he made an immediate impact, bypassing his senior year of high school to enroll early at Virginia. He started three out of the four games in which he appeared, compiling a 3.38 ERA with 10 strikeouts in 10.2 innings pitched before the COVID-19 pandemic cut the season short.

1776.  In 2021, Mr. Savino emerged as one of the Cavaliers' most reliable starting pitchers. He made 16 appearances and 10 starts, posting a 3.79 ERA with 34 strikeouts in 54.2 innings pitched, earning Sunday pitcher duties for the Cavalier's final six ACC series. As a reliever, he sported a 2.03 ERA in 13.1 innings, allowed three earned runs and struck out six batters in six appearances. He was one of four Cavaliers

**FOURTH AMENDED COMPLAINT**

included on the ACC All-Academic Team and was also listed on the ACC Academic
Honor Roll. That summer, he played on the USA Baseball Collegiate National Team.

1777.  Ranked number 66 on Perfect Game's Top-100 junior list prior to the
season, in 2022, Mr. Savino elevated his game even further, serving as Virginia's Friday
night starter, the most prestigious pitching role on a college team. He posted a 3.69
ERA in 15 starts, striking out 79 batters in 78 innings, earning Golden Spikes Award
Midseason Watch list honors. He was also named ACC Pitcher of the week after
tossing a complete game shutout in the ACC opener against Duke on March 11.

1778.  Mr. Savino raised his game to the next level when it mattered most. In four
NCAA Tournament appearances, including two starts, he posted a 1.76 ERA over 15.1
innings pitched and totaled eight strikeouts.

1779.  In the 2022 MLB Draft, Mr. Savino was selected in the third round (82nd
overall) by the Arizona Diamondbacks.

1780.  During Mr. Savino's collegiate baseball career, the University of Virginia's
baseball games were broadcast on national television networks such as ESPN, ACC
Network, and regional sports networks. UVA frequently featured Mr. Savino on its social
media platforms and other promotional materials, highlighting his achievements to
enhance game attendance and viewership. Virginia's home games consistently drew
strong attendance during his time there, generating significant revenue for the
university. In 2022, total attendance was 112,522 with an average of 3,309 attendees
per game. For the 2021-22 season, the ACC distributed $39.5 million of revenue per
member school, including UVA.

1781.  Mr. Savino received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During most of his time at Virginia, he was not
permitted to receive money for his NIL, whether from third parties, Defendants, or
Virginia. Even for the time in which he was permitted to earn compensation from the use

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

of his NIL, he did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a consensus top high school prospect, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1782.  Defendants' conspiracy greatly harmed Mr. Savino. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL.

1783.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Savino would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1784.  **The effect of Defendants' illegal conduct on Plaintiff Nick Loftin.** Plaintiff Nick Loftin worked as a college baseball player at Baylor University from 2017 to 2020.

1785.  The labor provided by Mr. Loftin was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1786.  Mr. Loftin was a highly recruited versatile baseball player out of high school. Playing both as a pitcher and an infield for W. B. Ray High School in Corpus Christi, Texas, he helped the team win a district championship in his junior year. He batted .465 with three home runs as well as going 11-4 with a 1.10 ERA in his senior year, and throughout his four-year high school career, he recorded a .454 batting average, 88 hits, and 29 stolen bases. He earned numerous accolades, including MaxPreps Underclass All-American Team, All-District First Team shortstop (twice), USA

**FOURTH AMENDED COMPLAINT**

Today All-USA Texas Second Team (2016), THSBCA All-State First Team shortstop
(2016), and 2016 Perfect Game Underclassman Honorable Mention. As a top 25
shortstop from Texas, Mr. Loftin received multiple offers and ultimately committed to
Baylor University over other programs like Texas Tech.

1787.  Mr. Loftin's job as a college baseball player was essentially a full-time one,
and an important and valuable one at that. In his freshman season in 2018, he made 53
starts in 55 games and batted .302 with six home runs and 36 runs-batted-in, earning
Freshman All-American honors and a selection to Second Team All-Big 12. The
following year, in 2019, he was named to First Team All-Big 12, hitting .323 with six
home runs and 18 doubles.

1788.  The summer following his sophomore season, he represented Team USA
on the Collegiate National Team and had a four-RBI game, including a homer, against
Chinese Taipei to help the U.S. clinch the series. Prior to his 2020 junior season, he
was also named the Big 12 Conference Preseason Player of the Year. In 2020, after
batting .298 with 15 runs-batted-in over 14 games in a shortened season, he was
drafted by the Kansas City Royals as the 32nd overall pick in the 2020 MLB Draft.

1789.  During Mr. Loftin's time at Baylor University, the program was a member
of the Big 12 Conference and its games were regularly carried by the conference's own
Big-12 Network, whereas NCAA tournament games were usually broadcasted on
ESPN. For example, Baylor's 2019 NCAA Regionals matchup against No. 4 Omaha—
where Mr. Loftin hit a RBI double after back-to-back walks—was carried on ESPN3.
Baylor also frequently featured Mr. Loftin on its social media accounts, highlighting his
accomplishments and using him to boost game attendance and viewership. In fact,
interest in college baseball has grown in recent years. In 2019, for example, the College
World Series Finals on ESPN drew in more than 1.5M viewers per game. Between at-
home ticket sales and TV revenues, Baylor has no doubt benefited—and continues to
benefit—financially from its baseball program.

**FOURTH AMENDED COMPLAINT**

1790.  Mr. Loftin received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

1791.  In fact, Mr. Loftin received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Loftin, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Loftin would have received a greater amount of scholarship money than he received. As a highly decorated high school baseball player and collegiate All-American, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1792.  Moreover, during his time at Baylor University, Mr. Loftin was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from the university. As a nationally recognized baseball player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1793.  Defendants' conspiracy greatly harmed Mr. Loftin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

1794.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Loftin would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1795.  **The effect of Defendants' illegal conduct on Plaintiff Nick Swiney.** Plaintiff Nick Swiney worked as a college baseball player at North Carolina State University from 2018 to 2020.

**FOURTH AMENDED COMPLAINT**

1796.  The labor provided by Mr. Swiney was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1797.  Mr. Swiney was a highly recruited prospect out of high school who possessed unique talent. At William Amos Hough High School, he was regarded as one of the top pitching prospects in the state. As a junior, he went 10-1 with a 0.76 ERA, which earned him All-State and conference pitcher of the year honors. As a senior, he posted a stellar 7-1 record with a 0.80 ERA, and again was recognized as All-State and conference pitcher of the year. In his high school career, he set school records for career wins (24), strikeouts (235), and ERA (1.03). Mr. Swiney committed to NC State, choosing to play in the highly competitive ACC.

1798.  Mr. Swiney's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he became one of NC State's top pitchers and developed into a high-level MLB prospect. As a true freshman in 2018, he made 20 appearances, including one start, posting a 4-0 record with a 3.52 ERA. He threw 30.2 innings and struck out 37 batters, while walking only 18.

1799.  In 2019, Mr. Swiney took on a larger role, making 26 appearances, including three starts on the mound, and finishing the season with a 7-1 record, a 4.61 ERA, and leading the team with 95 strikeouts in 56.2 innings pitched. He tallied a career-high eight strikeouts on April 23 against Tennessee Tech and on May 23 against Wake Forest in the ACC Tournament.

1800.  Mr. Swiney's breakout season came in 2020, where he was one of the most dominant pitchers in the country before the season was cut short due to the COVID-19 pandemic. He posted an undefeated 4-0 record with a 1.29 ERA and 42 strikeouts in just 28 innings pitched. His 42 strikeouts ranked 10th in the NCAA. His exemplary performance earned him Collegiate Baseball Second Team All-America

**FOURTH AMENDED COMPLAINT**

honors and he was named ACC Pitcher of the Week and Collegiate Baseball National Player of the Week on March 2 after his dominant performance against Purdue where he went a career-long eight innings pitched.

1801.  In the 2020 MLB Draft, Mr. Swiney was drafted by the San Francisco Giants in the 2nd round as the 67th overall pick.

1802.  During Mr. Swiney's collegiate baseball career, NC State baseball games were broadcast on national television networks such as ESPN, ACC Network, and regional sports networks. NC State frequently featured Mr. Swiney on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2019, thousands of fans attended NC State baseball games with a total of 80,463 attendees that year and an average of 2,682 per game. That year, NC State made over $22 million in revenue from ticket sales, including baseball ticket sales. The ACC distributed over $30 million to each of its member schools, including NC State, during the 2019-2020 fiscal year.

1803.  Mr. Swiney received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. During his time at NC State, he was not permitted to receive money for NIL, whether from third parties, Defendants, or NC State. As a highly sought-after high school recruit who became an All-American and one of the nation's top pitchers, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1804.  Defendants' conspiracy greatly harmed Mr. Swiney. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a

**FOURTH AMENDED COMPLAINT**

competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1805.  Mr. Swiney received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Swiney. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an All-American at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

1806.  But for the illegal and unfair restraints put in place, Mr. Swiney would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1807.  **The effect of Defendants' illegal conduct on Plaintiff Parker Messick.** Plaintiff Parker Messick worked as a college baseball player at Florida State University from 2019 to 2022.

1808.  The labor provided by Mr. Messick was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1809.  Mr. Messick was a uniquely talented two-way baseball player out of Plant City High School in Florida, where he was a two-year team captain. As a freshman, he played in the Hillsborough County East-West All-Star game and was named 2016 All-Hillsborough County by the Tampa Bay Times. In 2018, he won the Wade Boggs Athletic Achievement Award, given to Hillsborough County's most outstanding baseball player, after batting .298 with four home runs at first base and going 6-3 with a 1.58 ERA and 45 strikeouts on the mound. He also earned the team MVP honor, and was named First Team pitcher and Second Team first baseman on the 2018 All-Western Conference Federal Division Team.

**FOURTH AMENDED COMPLAINT**

1810.  As a senior he led all pitchers in Florida with 125 strikeouts over 86 innings pitched, with a 1.06 ERA and 8 complete game wins in a row, including a complete game shutout in the Class 8A Region Final. That year, he earned a 2019 MaxPreps All-American First Team pitcher selection, was named to 2019 All-Hillsborough County and won All-Tampa Bay Pitcher of the Year, was voted the 2019 Florida Mr. Baseball, and was named 2019 All-Western Conference First Team pitcher for the second year in a row. After graduation, Mr. Messick enrolled at Florida State University.

1811.  Mr. Messick's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He had six relief appearances as a true freshman in 2020, posting a 0.77 ERA and registering one save before the season was cut short due to the COVID-19 pandemic. He transitioned to become a starter the following season in 2021, posting an 8-2 record with 126 strikeouts and a 3.10 ERA over 90 innings pitched. He quickly established himself as one of the best pitchers in college baseball, winning the ACC Pitcher of the Year and ACC Freshman of the Year awards, and earning Third Team All-American, First Team Freshman All-American, first-team All-ACC, and Freshman All-ACC selections. In June 2021, Mr. Messick was also selected to the USA Baseball Collegiate National Team.

1812.  Mr. Messick was again named the team's Friday night starter going into his redshirt sophomore season in 2022, in which he made a team-high 16 starts and led the rotation with 144 strikeouts in 98.2 innings. He had eight outings with double-digit strikeouts, including back-to-back games of 14 strikeouts over scoreless 7 innings against Duke and 11 strikeouts over immaculate 8 innings against Notre Dame. In addition to First-Team All-ACC and First Team All-America recognitions, he was the only ACC starting pitcher to become a finalist for the Golden Spikes Award, honoring the best "non-professional" baseball player in America, and the Dick Howser Trophy, bestowed annually to the best college baseball player.

**FOURTH AMENDED COMPLAINT**

1813.  Mr. Messick declared for the 2022 MLB Draft and was selected in the second round by the Cleveland Guardians.

1814.  During Mr. Messick's time at Florida State University, the program was a member of the Atlantic Coast Conference and its games were regularly carried by the conference's own ACC Network, with key matchups and NCAA tournament games broadcasted on ESPN. For example, Florida State's 2021 NCAA Oxford Regionals Game 1 victory over Southern Mississippi, in which Mr. Messick went six innings with no earned runs, was on both ESPN3 and the ACC Network. Florida State also frequently featured Mr. Messick on its social media accounts, highlighting his accomplishments and using him to boost game attendance and viewership.

1815.  Between ticket sales, media rights, ACC disbursements, and other sources, Florida State has no doubt benefited from its baseball program. For example, the ACC distributed an average of nearly $39.5 million per member school for the 2022 fiscal year.

1816.  Mr. Messick received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

1817.  In fact, Mr. Messick received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Messick, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Messick would have received a greater amount of scholarship money than he received. As a highly decorated high school baseball player and collegiate All-American, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1818.  Moreover, during most of his time at Florida State University, Mr. Messick was not permitted to receive money for use of his NIL, whether from third parties, from

**FOURTH AMENDED COMPLAINT**

Defendants, or from his school. Even for the time in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from Florida State, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As an All-American, a Florida native, and one of the country's best collegiate pitchers, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1819.  Defendants' conspiracy greatly harmed Mr. Messick. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

1820.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Messick would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1821.  **The effect of Defendants' illegal conduct on Plaintiff Quinn Nordin.** Plaintiff Quinn Nordin worked as a college football player at the University of Michigan from 2016 to 2020.

1822.  The labor provided by Mr. Nordin was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1823.  At Rockford High School, he was the top-ranked kicker in the nation according to multiple recruiting services. He punted 10 times as a senior, with seven going 50+ yards, including a 67-yard career long and had six punts downed inside the opponent's 20-yard line. He was ranked as a four-star prospect by Scout.com as well as

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

the 19th-best player in Michigan according to ESPN. He was also ranked the number 1 kicker in the country by the Kornblue Kicking Fab 50 rankings, and the nation's and Michigan's top-rated kicker by Scout.com. He earned USA Today High School First Team All-American and was recognized as an All-American kicker / punter by Parade. Mr. Nordin initially committed to Penn State.

1824.  Saying Mr. Nordin was heavily recruited would be an understatement. Top programs across the country vied for his talent, with Michigan making an especially determined push. Then-head coach Jim Harbaugh personally visited Mr. Nordin, even spending the night at his family's home to make his case. The recruitment efforts extended beyond the coaching staff—supporters went as far as putting up billboards around Michigan, urging him to stay in his home state. In the end, the pressure campaign paid off, as Mr. Nordin flipped his commitment from Penn State to Michigan.



1825.  The labor provided by Mr. Nordin was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40

**FOURTH AMENDED COMPLAINT**

hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1826.  Mr. Nordin's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was one of Michigan's most reliable and prolific kickers, setting multiple program records and helping the Wolverines to numerous victories. After a redshirt freshman year, Mr. Nordin immediately made an impact during his sophomore season, playing in all 13 games and making 19 of 24 field goals (79.2%), including six field goals made beyond forty yards. He was an All-Big Ten honoree, an Academic All-Big Ten Honoree, a two-time Big Ten Special Teams Player of the Week. He made history in his collegiate debut and was named co-Big Ten Special Teams Player of the Week after hitting 4-of-6 field goal attempts in the win over Florida at the AdvoCare Classic and was also a perfect 3-of-3 on extra point tries. That game, he also broke the Michigan record for 50-yard field goals made in a game with two going over 50 yards, prompting Barstool Sports' Dave Portnoy to suggest that Mr. Nordin should be a Heisman contender. Further, he was recognized as a midseason All-American by the Athletic, and named one of three Lou Groza Award Stars of the Week, which is given to the best placekicker in college football.

1827.  In 2018, Mr. Nordin continued his role as Michigan's primary kicker, appearing in 12 games and making 11 field goals. He was named the team's Special Teams Player of the Week for his performance against Maryland in which he drilled two field goals and four PAT conversions.

1828.  During Mr. Nordin's 2019 senior season, he started and handled field goal and PAT duties in 11 games, making 10-of-13 field goal tries to earn his third varsity letter. He was named co-Special Teams Player of the Game for his performance against Michigan State where he successfully converted three field goals and hit five extra points for a 14-point afternoon. He finished the year with 34 total points scored. He

**FOURTH AMENDED COMPLAINT**

also tied a program record with a 57-yard field goal against Alabama in the Citrus Bowl and also converted 36 and 42-yard field goals with an extra point.

1829.  During his fifth-year senior season, which was shortened due to the COVID-19 pandemic, he appeared in four games, handling field goal kicking duties and converting 2-of-5 field goal tries to earn his fourth varsity letter. He became Michigan's career record-holder for most 40-yard field goals made in a career (14) with a 46-yard conversion against Wisconsin and against Penn State. That season, he was named an Academic All-Big Ten honoree.

1830.  During his collegiate career, Mr. Nordin appeared in 41 games with 38 contests handling field goal and PAT duties. He finished as Michigan's 10th all-time leading scorer with 246 points, was an all-time leader in career 40-plus yard field goals (14) and tied for the all-time lead in 50-plus yard field goals (4), and set the Citrus Bowl record for longest field goal, matching a U-M program record long (57 yards).

1831.  In 2021, Mr. Nordin signed with the New England Patriots, further demonstrating the value of his talent and labor.

1832.  During this time, Michigan football games were broadcast on national television networks, including ESPN, Fox, ABC, and the Big Ten Network. Frequently Michigan featured Mr. Nordin on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2019, Michigan's football program was the third-most watched team in the nation with over 50 million TV viewers. One game that season, Michigan's October game against Notre Dame, attracted 6.75 million viewers. The Wolverines played in front of massive crowds at Michigan Stadium ("The Big House"), which consistently drew over 100,000 fans per game, generating tens of millions of dollars in revenue for the university. In 2019, a total of 780,215 fans attended Michigan football games with an average of 111,459 attendees per game. That year, Michigan reported $47.5 million in revenue

**FOURTH AMENDED COMPLAINT**

from football sales. The Big Ten Conference also distributed $44.8 million to Michigan for the 2020 fiscal year.

1833.  Mr. Nordin received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Michigan, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Michigan. As a nationally recognized recruit and a multi-year starter at one of college football's most prominent programs, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1834.  Defendants' conspiracy greatly harmed Mr. Nordin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1835.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Nordin would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1836.  **The effect of Defendants' illegal conduct on Plaintiff Rashan Gary.**
Plaintiff Rashan Gary worked as a college football player at the University of Michigan from 2016 to 2018.

1837.  The labor provided by Mr. Gary was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1838.  Mr. Gary was one of the top high school football prospects in the nation. He attended Scotch Plains-Fanwood High School in Scotch Plains, New Jersey and

**FOURTH AMENDED COMPLAINT**

then Paramus Catholic High School in Paramus, New Jersey for his junior and senior years. As a senior, he recorded 13.5 sacks, 55 tackles, including 29 tackles for loss, four forced fumbles, and returned a blocked punt for a touchdown. Following that season, he was named USA Today Defensive Player of the Year and High School All-American. He also participated in the 2016 Under Armour All-America Game, where he recorded six tackles and three sacks, and was named the MVP of the event. As the third player in history to be named the top prospect in the country unanimously by all four major recruiting networks (247 Sports, ESPN, Rivals.com, and Scout.com), he committed to play for Michigan after visits to Auburn, Clemson, USC, and Ole Miss.

1839.  Mr. Gary's job as a college football player was essentially a full-time one, and an important and valuable one at that. In the 2016 season, he started all 13 games as a freshman at defensive end, totaling 23 tackles, 5 tackles for loss, and one sack. He was named to the Big Ten Conference Defensive Team of the Week following a performance against UCF in which he had 6 tackles and one sack. During the 2017 season, he set career highs with 58 tackles, 11.5 tackles for loss, and 5.5 sacks, earning a First Team All-Big Ten selection by league coaches. He was named the Defensive Lineman of the Game for a particularly stellar performance against Indiana, and he also won the team's Richard Katcher Award, an honor given to the most outstanding defensive lineman or outside linebacker. Despite struggling with a shoulder injury throughout the 2018 season, he recorded 38 tackles, including 6.5 tackles for a loss, and 3.5 sacks and was again named to All-Big Ten defensive first-team by league coaches.

1840.  Following the end of the 2018 season, Mr. Gary declared for the 2019 NFL Draft and was selected as the 12th overall pick by the Green Bay Packers.

1841.  During Mr. Gary's collegiate career, the University of Michigan was a member of Big Ten Conference and the vast majority of its football games were broadcasted on Fox and ABC. Michigan also frequently featured Mr. Gary on its social

**FOURTH AMENDED COMPLAINT**

media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Michigan football games drew a weekly average of 4.18 million viewers from 2015 to 2019, ranking 3rd in the nation, with key matchups against other top-ranked programs drawing millions more. For example, the November 2017 Michigan-Ohio State game where Mr. Gary registered his first career multi-sack game and had 11 tackles, saw over 10 million television viewers and was the fifth most-watched game of 2017 NCAA football. Michigan also enjoys strong local support from fans. In fact, Michigan led all Football Bowl Subdivision schools in 2017 with an average attendance of 111,589 fans per home game in 2017, and as of 2018, had led the country in attendance in 41 of the previous 43 seasons. In addition to ticket sales, Michigan also makes a significant amount of money from TV and media, with the Big Ten Conference distributing an average of $54 million to each member school for the 2018 fiscal year.

1842.  Mr. Gary received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Michigan, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a top high school prospect and highly decorated collegiate athlete, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1843.  Defendants' conspiracy greatly harmed Mr. Gary. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1844.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Gary would have received a competitive share of

**FOURTH AMENDED COMPLAINT**

the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1845. **The effect of Defendants' illegal conduct on Plaintiff Riley Cornelio**. Plaintiff Riley Cornelio worked as a college baseball player at Texas Christian University from 2020 to 2022.

1846. The labor provided by Mr. Cornelio was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1847. Mr. Cornelio was a highly recruited prospect out of high school who possessed unique talent. At Pine Creek High School, he was recognized as the top Colorado prospect in the 2019 class. He earned four varsity letters and was ranked as the number 1 draft prospect in the state of Colorado by Baseball America and the number 46 overall draft prospect in 2019. He was named the Perfect Game and Gatorade Colorado Player of the year as a senior, earned First Team Perfect Game and Collegiate Baseball All-American honors, won gold with USA Baseball at the COPABE U-18 Pan American championships where he was a starter, was tabbed a Perfect Game underclassman All-American as a sophomore and junior, participated in the Under Armor All-American Game, and was named USA Today Second Team All-USA Colorado as a junior. His impressive skills led him to commit to Texas Christian University, a university that prides itself on having a top baseball program.

1848. Mr. Cornelio's job as a college baseball player was essentially a full-time one, and it had great value. During his career, Mr. Cornelio was a key member of TCU's team. He started several games in his first two years at TCU. By his third year, in 2022, he led TCU in games started as a pitcher and tallied a team-high 77 strikeouts. He was named a Second Team All-Big 12 selection and First Team Academic All-Big 12

selection in 2022. Following that season, he was selected in the seventh round of Major League Baseball's draft by the Washington Nationals.

1849.  During his time at TCU, the games he played in were usually televised, often by either an ESPN network or another network. An average of around 4,000 fans per game attended TCU's home games. In 2021 and 2022, TCU baseball was one of 64 teams selected to compete in an NCAA regional—the postseason event that allows teams to attempt to advance to the College World Series. In 2021, they were selected to host one of the 16 regionals. In 2021, the Big 12 Conference distributed $42.6 million of revenue to each of its member institutions, including TCU.

1850.  Mr. Cornelio received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship. During most of his time at TCU, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or TCU. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a highly regarded recruit and a pivotal starting pitcher for a major collegiate program, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1851.  Defendants' conspiracy greatly harmed Mr. Cornelio. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

1852.  Mr. Cornelio received only a partial scholarship due to the NCAA's
baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr.
Cornelio. It prevented him from enjoying the benefit of bargaining for scholarship money
in a competitive environment, forcing him to pay thousands of dollars that he would not
have otherwise had to pay. Tuition and fees at TCU were around $60,000 in 2021-22,
and the full cost of attendance was much more when taking into account room and
board and other costs. The costs during other years that he attended were also very
high.

1853.  But for the illegal and unfair restraints put in place, Mr. Cornelio would
have received a greater amount of scholarship money than he received. Thus,
Defendants' scheme directly injured him.

1854.  **The effect of Defendants' illegal conduct on Plaintiff Ryan Miller.**
Plaintiff Ryan Miller, an individual, is a resident of Texas. He worked as a college
football player at Baylor University from 2017 to 2020.

1855.  The labor provided by Mr. Miller was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

1856.  Mr. Miller was a highly recruited football player out of Carroll High School
in Southlake, Texas. After making 53 tackles and five sacks as a junior defensive
lineman, he made the switch to the center position on the offensive line in his senior
season. He totaled 101 knockdowns and allowed zero sacks, and helped his team to a
10-2 record as well as DII area finals. In addition to earning First Team All-Area Super
Team honors from Fort Worth Star-Telegram and All District 5-6A First Team honors, he
was named to First Team Class 6A All-State. As a top-40 center prospect in the nation,
he received 7 offers from competitive programs and ultimately committed to Baylor.

**FOURTH AMENDED COMPLAINT**

1857.  Mr. Miller's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a 247Sports preseason True Freshman All-American selection going into his 2017 season, he appeared in 10 games and started at the center position against Liberty and UTSA. Appearing in all 13 games in 2018, he served primarily on special teams and contributed in tight victories against Kansas State, Oklahoma State, and Vanderbilt in the Texas Bowl. After transitioning to the defensive line, he played all nine games in 2020, making six starts and recording 12 tackles. As a member of Baylor football's leadership council, he took on leadership responsibilities in scheduling meetings regarding team culture and standards and was especially involved in decision-making about practices on the defensive side. He saw his first start on the defensive line in game against Texas and registered a career-best three tackles, and followed up a week later with his first career sack in a game against TCU and was instrumental in Baylor's 32-31 win over Kansas State. Mr. Miller also earned First Team Academic All-Big 12 honors in both 2018 and 2020.

1858.  During Mr. Miller's collegiate career, Baylor University was a member of Big 12 Conference and the vast majority of its games were broadcasted on Fox and ESPN. As one of the more popular programs in the nation, Baylor games drew a weekly average of 1.12 million viewers on TV from 2015 to 2019. Key matchups against other top-ranked programs drew significantly more viewers. For example, Baylor's 2018 Texas Bowl 45-38 victory over Vanderbilt saw over 3.3 million in viewership. Baylor games also attract tremendous local support, enjoying an average home crowd of 45,517 per game, or over 100% capacity, for the 2019 season. Between ticket sales, media rights, and other sources, the university has made a considerable amount of money from its football program. For example, Baylor made $45.58 million in revenue from the football program alone in the 2018-2019 season. The university also received $38.8 million in revenue disbursements in 2018.

**FOURTH AMENDED COMPLAINT**

1859.  Mr. Miller received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Baylor University, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As a valuable player at Baylor University—not to mention a Texas local—he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1860.  Defendants' conspiracy greatly harmed Mr. Miller. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1861.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Miller would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1862.  **The effect of Defendants' illegal conduct on Plaintiff Ryan Rolison**. Plaintiff Ryan Rolison worked as a college baseball player at the University of Mississippi from 2016 to 2018.

1863.  The labor provided by Mr. Rolison was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1864.  Mr. Rolison was a highly recruited prospect out of high school who possessed unique talent. At the University School of Jackson, he was recognized as the top player in the state and one of the top prospects nationally. Among college and high school players, he was rated the number 51 draft prospect by D1Baseball.com and the

**FOURTH AMENDED COMPLAINT**

number 76 prospect by MLB.com. In his senior year, he achieved a remarkable 9-0 record with a 0.12 ERA, recording 108 strikeouts in 58.0 innings, which earned him the honor of USA TODAY's Mr. Baseball in Tennessee and First Team All-USA honors. He earned 2016 Rawlings-Perfect Game Second Team All-America and Southeast First Team All-Region honors. He was also a member of the USA Baseball 18U National Team, winning a gold medal at the 18-and-under World Cup. He was an all-state, all-region and all-district honoree in 2016, made the 2016 Top Prospects list, and was tabbed as pitcher of the year by the Jackson Sun. As a junior, he posted a 0.72 ERA with 104 strikeouts, collecting Perfect Game Underclass All-America high honorable mention accolades. His exceptional performance led to his selection by the San Diego Padres in the 37th round of the 2016 MLB Draft; however, he chose to attend Ole Miss to further develop his skills and pursue higher education.

1865.  Mr. Rolison's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he developed into a premier left-handed pitcher, earning multiple accolades and significantly contributing to the team's success. In the 2017 season, as a freshman, Mr. Rolison made 19 appearances, including 10 starts, the most by an Ole Miss freshman pitcher. He achieved a 6-3 record with a 3.06 ERA, striking out 64 batters over 61.2 innings. He allowed the third-fewest runs (23) among stat-eligible (1.0 inning/game) SEC pitchers and his ERA ranked 13th in the SEC. His outstanding performance earned him a spot on the SEC All-Freshman Team, and he was recognized as a Freshman All-American by Collegiate Baseball. Notably, he delivered a career-high nine strikeouts over six scoreless innings in a victory over Missouri, earning him SEC Freshman of the Week honors and showcasing his potential as a dominant force on the mound.

1866.  During the summer after his freshman year, Mr. Rolison played in the Cape Cod league, which features some of the best collegiate baseball players in the

**FOURTH AMENDED COMPLAINT**

country. He was named a league all-star and was rated the number 3 prospect in the

entire league after achieving a 4-0 record with a 1.92 ERA and only seven runs allowed

all summer.

1867.  In his sophomore year in 2018, Mr. Rolison solidified his role as the ace of

the Rebels' pitching staff, making 16 starts and one relief appearance. He posted a 10-4

record with a 3.70 ERA over 97.1 innings, striking out 120 batters, tying for the sixth-

most in program history. His performance was instrumental in leading Ole Miss to the

SEC Tournament Championship, where he delivered a crucial two-inning relief

appearance, allowing no runs and no hits, and striking out three in the championship

game against LSU. His excellence on the field earned him a place on the 2018 NCAA

Oxford Regional All-Tournament Team; recognition as the SEC Pitcher of the Week

following a standout performance against Winthrop, where he struck out 12 batters in

five innings, allowing just one hit; and the 2018 SEC Spring Academic Honor Roll. He

was also named to the Golden Spikes Award watch list, which recognizes the nation's

top college baseball player.

1868.  In the 2018 MLB draft, Mr. Rolison was selected 22nd overall in the first

round by the Colorado Rockies, further demonstrating the value of his talent and labor.

1869.  During Mr. Rolison's collegiate baseball career, Ole Miss baseball games

were broadcast on national television networks, including ESPN and the SEC Network,

attracting substantial viewership. Ole Miss frequently featured Mr. Rolison on its social

media platforms and other promotional materials, highlighting his achievements to

enhance game attendance and viewership. Thousands of fans attended Ole Miss

baseball games during this period with a total attendance of 273,448 in 2017 with an

average of 8,545 attendees per game. The success of the baseball program contributed

significant revenue for the university. In 2018, the SEC distributed $43.1 million of

revenue to each of its member institutions, including Ole Miss.

**FOURTH AMENDED COMPLAINT**

1870.  Mr. Rolison received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. During his time at Ole Miss, he was not permitted to receive money for his NIL whether from third parties, Defendants, or the university. As a highly regarded recruit and a pivotal starting pitcher for a major collegiate program, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1871.  Defendants' conspiracy greatly harmed Mr. Rolison. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1872.  Mr. Rolison received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Rolison. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became a top pitcher at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

1873.  But for the illegal and unfair restraints put in place, Mr. Rolison would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

1874.  **The effect of Defendants' illegal conduct on Plaintiff Sean Clifford.**
Plaintiff Sean Clifford worked as a college football player at Penn State University from 2017 to 2023.

**FOURTH AMENDED COMPLAINT**

1875.  The labor provided by Mr. Clifford was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1876.  At St. Xavier High School, he set a school record with 4,004 passing yards while also rushing for 1,100 yards and 20 touchdowns as a quarterback. A consensus four-star prospect, he was ranked as the No. 1 player in Ohio and the No. 3 pro-style quarterback in the nation by ESPN, which also listed him as the No. 80 overall prospect and No. 4 player in the region.

1877.  His rankings across other major recruiting services were equally impressive. 247Sports placed him as the No. 11 pro-style quarterback and the No. 18 player in Ohio, while Scout ranked him as the No. 24 overall quarterback and the No. 2 quarterback in the Midwest. Rivals listed him as the No. 161 overall recruit, the No. 8 quarterback, and the No. 5 prospect in Ohio.

1878.  As a senior, he led his team to the Division I Ohio State Championship with a thrilling double-overtime victory over St. Ignatius. He earned invitations to both the Under Armour All-American Game and the Army All-American Game and was selected for the 2017 Under Armour Game, though an injury prevented him from playing. His accolades include being a 2016 Elite 11 Finalist, where he was named the competition's Most Accurate Passer. He was also a MaxPreps/JJHuddle First Team All-State selection in 2016, earned All-Greater Catholic League honors as a junior, received all-city and First Team All-District recognition as a senior, and was named team MVP in his final season.

1879.  Despite receiving offers from multiple universities, Mr. Clifford ultimately decided to play for Penn State.

1880.  Mr. Clifford's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he

**FOURTH AMENDED COMPLAINT**

developed into a record-setting quarterback, earning multiple accolades and significantly contributing to the team's success. After redshirting his first year in 2017, Mr. Clifford served as the backup quarterback in 2018, appearing in four games, completing five passes for 195 yards, and achieving a career-long and school-record 95-yard touchdown during the fourth quarter of the match against Kent State. He earned an Academic All-Big Ten selection that year.

1881.  In 2019, Mr. Clifford made 12 starts and was selected as a team captain. He completed 39 passes of 20 or more yards, had four multi-touchdown pass quarters, and had four halves with three passing touchdowns. He was ranked third in the Big Ten in passing touchdowns (23), yards per completion (14.04), and yards per pass attempt (8.32); and was fourth in passing efficiency (148.54). He was also third in the conference in points responsible for per game (14.3), fourth in total yards per game (254.7), and third among Big Ten quarterbacks with 33.5 rushing yards per contest. Mr. Clifford led the Nittany Lions to a victory over Memphis in the Cotton Bowl, contributing both a passing touchdown and 28 rushing yards. His performance that season earned him All-Big Ten honorable mention recognition from the coaches and media, as well as Academic All-Big Ten honors. At the team's awards banquet, he was presented with the Captain's Award. Throughout the season, he received several prestigious nominations, including spots on the CFPA National Performer of the Year Midseason Watch List, the Manning Award Midseason Watch List, and the Maxwell Award Watch List. He also earned multiple weekly honors, including a place on the Davey O'Brien Award's Great 8 List and First Team Pro Football Focus Big Ten Team of the Week following the Purdue game. Additionally, he was named the Rose Bowl Game Big Ten Player of the Week, the Manning Award Star of the Week, and the Big Ten Co-Offensive Player of the Week after his standout performance against Maryland.

1882.  During his 2020 junior season, Mr. Clifford played in all nine games, making eight starts and was selected again as team captain. He was 152-for-251 (60.6

**FOURTH AMENDED COMPLAINT**

percent) for 1,883 yards with 16 touchdowns. He was the second on the team with 335 rushing yards and had three scores. As a junior, he ranked second in the Big Ten in passing yardage (1,883), touchdowns (16), and attempts (251); and third in passing efficiency (137). He was second in the league in total offense (2,218) and points responsible for (118). He also led the Big Ten in 70-plus and 60-plus yard passing plays. That year, he earned Academic All-Big Ten honors and the team's Public Service Award. He was also named to the Davey O'Brien Award, Manning Award, Johnny Unitas Golden Arm Award, and Wuerffel Trophy watch lists.

1883. In Mr. Clifford's 2021 senior season, he started all 13 games and was voted as a team captain for the third time in his career. He joined Jonathan Sutherland as the first three-time captains in program history and finished with 3,107 yards, and 21 touchdowns. He also gained 163 yards rushing with two rushing touchdowns. Mr. Clifford was ranked fourth in the Big Ten in completions per game (20.1), fifth in passing touchdowns (21) and yards (3,107), and sixth in the Big Ten in total offense (251.5). His outstanding performance—both on and off the gridiron—earned him numerous accolades in 2021, including a place in the NFF National Scholar-Athlete Class, selection to the Allstate AFCA Good Works Team, and a spot on the First Team Senior CLASS Award. He was named All-Big Ten honorable mention by both the coaches and media and recognized as Penn State's Big Ten Sportsmanship Award honoree. Additionally, he earned Academic All-Big Ten honors, the team's Public Service Award, and the Lion's Pride Outstanding Senior Player Award. Further highlighting his achievements, he was a finalist for the NFF's William V. Campbell Trophy and the Pop Warner College Football Award, a semifinalist for the Wuerffel Trophy, and was named to both the Johnny Unitas Golden Arm Award Top 25 and the Davey O'Brien Award 2021 Quarterback Class.

1884. Mr. Clifford played for an additional senior season in 2022 in which he started 13 games at quarterback and was voted team captain for the fourth time, joining

**FOURTH AMENDED COMPLAINT**

Jonathan Sutherland as the only four-time captains in team history. He completed 226-of-351 passes for 2,822 yards and 24 touchdowns. He also posted eight, 200-plus yard passing games and earned the coaching staff's offensive Player of the Week twice. He led Penn State to victory in the Rose Bowl where he completed 16-of-21 passes for 279 yards and two touchdowns, earning him Rose Bowl Game Offensive MVP honors.

1885.  Mr. Clifford's performance during this final season earned him a plethora of accolades. He earned a spot as a finalist for the Jason Witten Collegiate Man of the Year Award, Academic All-Big Ten honors, All-Big Ten honorable mention from the coaches and media, and the team's Lion's Pride Outstanding Senior Player Award. He was a semifinalist for the Wuerffel Trophy, named to the Davey O'Brien Award, Manning Award, Maxwell Award, Walter Camp Player of the Year, and Senior Bowl watch lists. He also received the 2022 Brian Westbrook College Player of the Year Award, which recognizes the top college football player in the region. Notably, Mr. Clifford was a recipient of the prestigious Penn State Big Ten Medal of Honor for the 2022-2023 season, which is awarded to one male and one female student from the graduating class of each member institution who has demonstrated excellence on and off the field throughout their college career, recognizing both academic and athletic excellence.

1886.  By the end of his collegiate career, Mr. Clifford cemented himself as among the best quarterbacks in Penn State and Big Ten history. He finished his career as Penn State's all-time leader in wins as a starting quarterback (32), completion percentage (.614), completions (833), passing yards (10,661), total yards (11,734), passing touchdowns (86) and pass attempts (1,356). He also finished fourth in Big Ten history in career touchdown passes (86), fifth in passing yardage (10,661), and seventh in completions (833) and attempts.

1887.  During his time at Penn State, he also devoted his time to volunteer work. He was both on the board and President of Penn State's Uplifting Athletes Chapter, which raised nearly $1.4 million for kidney cancer treatment and research since the first

**FOURTH AMENDED COMPLAINT**

Penn State lift for life was held in 2003. He was also highly active in the Reading
Rewards program at Penn State, in which he would regularly go to local elementary
schools to read stories to classes and encourage the youth to read. Mr. Clifford was
Penn State Football's leadership liaison for volunteer activities and was responsible for
leading the team and encouraging the team's student-athletes to participate in volunteer
activities around the Penn State community and throughout Pennsylvania.

1888.  During the 2023 NFL draft, Mr. Clifford was selected in fifth round as the
149th overall pick by the Green Bay Packers.

1889.  During Mr. Clifford's collegiate football career, Penn State football games
were broadcast on national television networks, including ESPN, ABC, CBS, and FOX
Sports. Penn State frequently featured Mr. Clifford on its social media platforms and
other promotional materials, highlighting his achievements to enhance game attendance
and viewership. Millions of viewers watched Penn State football games during Mr.
Clifford's collegiate career. For instance, the 2022 Rose Bowl against Utah attracted
over 10 million viewers. The Nittany Lions played in front of enthusiastic crowds at
Beaver Stadium, with attendance figures often exceeding 100,000 spectators. For
example, the 2022 game against Michigan had an attendance of 105,154 fans. In 2022,
Penn State made a total of $44.7 million of revenue from ticket sales, including football
ticket sales. The Big Ten Conference also distributed $58.8 million of revenue to each of
its member institutions, including Penn State, during the 2022 fiscal year.

1890.  Mr. Clifford received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During most of his time at Penn State, he was not
permitted to receive money for his NIL whether from third parties, Defendants, or Penn
State. Even when permitted to earn compensation from the use of his NIL, he did not
receive the full amount from Defendants, Penn State, or third parties he would have
earned had the NCAA's unlawful restrictions been lifted earlier. As one of the country's

**FOURTH AMENDED COMPLAINT**

top quarterback recruits out of high school and a record-setting quarterback at a storied collegiate program, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1891.  Defendants' conspiracy greatly harmed Mr. Clifford. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1892.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Clifford would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1893.  **The effect of Defendants' illegal conduct on Plaintiff Sarah Fuller.** Plaintiff Sarah Fuller worked as college soccer player at Vanderbilt University from 2017 to 2020, and as a college football player at Vanderbilt in 2020.

1894.  The labor provided by Ms. Fuller was of great value to Defendants. And it was a significant amount of labor. During the season, she worked at least six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of her coaches.

1895.  Ms. Fuller was a highly recruited prospect out of high school who possessed sought-after talent. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to Vanderbilt University in the hopes that she would transfer to another school.

1896.  Her job as a college athlete was essentially a full-time one, and an important and valuable one at that. During her senior year of her soccer career, Ms. Fuller was one of Vanderbilt's key players. She started twelve games that season as a goalie, posting three clean sheets, and started all four games during Vanderbilt's 2020

**FOURTH AMENDED COMPLAINT**

SEC Tournament championship run. At one point, she had a shutout streak of over 300 minutes.

1897.  As good as she was as a goalie, however, Ms. Fuller will forever be remembered for her impact on American college football. After the 2020 soccer season, Ms. Fuller joined the Vanderbilt football team as place kicker. On November 28, 2020, with a kickoff to start the second half of a game against the University of Missouri, she became the first woman to play football in a Power Five conference. The moment went viral, with her kickoff producing the SEC Network's most viewed tweet and most-liked Instagram post in the network's history. Her name trended in the top two on Twitter for much of that day, and the video of her kick was the top clip on ESPN's digital platform that week. She was named SEC Co-Special Teams Player of the Week.

1898.  On December 12, Ms. Fuller entered a game against the University of Tennessee to kick an extra point. She succeeded, becoming the first woman to score in a Power Five football game. She finished the game 2 for 2 on extra points, and again went viral.

1899.  During Ms. Fuller's collegiate career, Vanderbilt was a member of the SEC and its soccer and football games were generally televised by the SEC Network. Vanderbilt also frequently featured Ms. Fuller on its social media accounts, highlighting her accomplishments and, no doubt, using her to boost game attendance and viewership.

1900.  Between ticket sales, media rights, SEC distributions, and other sources of revenue, Vanderbilt has made a considerable amount of money from its soccer and football programs. For example, for the 2021 fiscal year, the SEC distributed an average of over $54.6 million in revenues to each of its member schools, including Vanderbilt.

1901.  Ms. Fuller received none of that revenue, nor was she otherwise compensated by Defendants for her labor other than receiving a scholarship and other education-related expenses. During her time at Vanderbilt, she was not permitted to

**FOURTH AMENDED COMPLAINT**

receive money for use of her NIL, whether from third parties, from Defendants, or from
the university. She made history, and those historical and viral moments had great
value. As a nationally recognized soccer and football player, she would have earned
substantial NIL compensation if not for the NCAA's unlawful restrictions.

1902.  Defendants' conspiracy greatly harmed Ms. Fuller. It prevented her from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, she would have received
greater remuneration for her services as a college soccer and football player than she
received, and she would have received money for her NIL from third parties.

1903.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Ms. Fuller would have received a competitive share of
the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured her.

1904.  **The effect of Defendants' illegal conduct on Plaintiff Sean Hjelle.**
Plaintiff Sean Hjelle worked as a college baseball player at the University of Kentucky
from 2015 to 2018.

1905.  The labor provided by Mr. Hjelle was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

1906.  Mr. Hjelle was a highly recruited baseball player out of Mahtomedi High
School in Minnesota, where he also played varsity basketball. As the baseball team's
starting pitcher, he led the team to two Section 4 Championships. He went 8-2 with a
1.23 ERA as a junior and was ranked the 28th best prospect in the country ahead of his
senior year by Prep Baseball Report. He was then named to First Team All-State after
his senior season and also won the 2015 Pioneer Press East Metro Baseball Player of

**FOURTH AMENDED COMPLAINT**

the Year award. He ultimately enrolled at the University of Kentucky as the second overall prospect and the best right-handed pitcher from the state of Minnesota.

1907.  Mr. Hjelle's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He served primarily as the team's closer in 2016 and recorded eight saves, which tied for third in single-season saves and were the most by a freshman in Kentucky history. Over 21 games, he registered 29 strikeouts in just 21 2/3 innings and did not yield an earned run in 16 appearances. Notably, he was named the SEC Freshman of the Week after entering in the ninth and tossing four scoreless innings in a 5-4 series-clinching win over No. 2 South Carolina.

1908.  Mr. Hjelle became a member of the starting rotation in 2017 and went 11-4 over 17 starts with a 3.89 ERA. Over 108.2 innings of work, he struck out 102 batters and was ranked fifth nationally in wins. In addition to striking out 10 batters against a strong LSU team and tossing a complete game shutout over Texas A&M, his biggest win of the season came in a relief appearance where he struck out five in 3.1 perfect innings as Kentucky defeated NC State to advance to the NCAA Super Regionals for the first time in program history. Especially dominant in SEC games, he went 7-1 with a 1.90 ERA in 10 starts against SEC opponents, becoming the first player in the University of Kentucky's history to be named SEC Pitcher of the Year.

1909.  Mr. Hjelle earned a number of other accolades ahead of the 2018 season, including selections to 2018 Preseason First-Team All-America and 2018 Preseason Second-Team Coaches All-SEC. He continued on to have another prolific season, striking out 91 batters over 99.1 innings pitched and lowering his ERA to 3.44. Over his 15 appearances in 2018, he had nine starts going seven or more innings, including tossing seven scoreless innings against South Carolina and a complete game with no earned runs over Missouri. Mr. Hjelle was subsequently selected in the second round of the 2018 MLB Draft by the San Francisco Giants.

**FOURTH AMENDED COMPLAINT**

1910.  During Mr. Hjelle's time at Kentucky, the program was a member of the SEC and its games were regularly carried by the SEC Network, with tournament games broadcast on ESPN. For example, while Mr. Hjelle's complete game over Missouri was on SEC Network, his seven-inning outing against Mississippi State was carried on ESPNU. Kentucky also frequently featured Mr. Hjelle on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Between ticket sales, media rights, NCAA distributions, the university has benefited—and continues to benefit—substantially from its baseball program. For example, Kentucky's financial reports submitted to NCAA from 2021-2023 indicate that the baseball program alone contributes around $2-3 million in annual revenue.

1911.  Mr. Hjelle received none of the revenue that Kentucky collects from its baseball program, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

1912.  In fact, Mr. Hjelle received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Hjelle, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Hjelle would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1913.  Moreover, during his time at the University of Kentucky, Mr. Hjelle was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a nationally recognized standout pitcher, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1914.  Defendants' conspiracy greatly harmed Mr. Hjelle. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college baseball player than he received, and
would have received money for his NIL from third parties.

1915.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Hjelle would have received a competitive share of
the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

1916.  **The effect of Defendants' illegal conduct on Plaintiff Seth Henigan**.
Plaintiff Seth Henigan worked as a college football player at the University of Memphis
from 2021 to 2024.

1917.  The labor provided by Mr. Henigan was of great value to Defendants.
During the season, he often worked six days per week and often more than 40 hours
per week. Even during the offseason, he worked a significant number of hours under
the direction of the coaches at the school.

1918.  Mr. Henigan was a highly recruited prospect out of high school who
possessed unique talent. At Denton Ryan High School, he was a three-year starting
quarterback, leading his team to a 44–2 record from 2018 to 2020—the only two losses
being in the state title game in 2019 and the semifinals in 2018. During his career, Mr.
Henigan amassed 7,234 passing yards and 79 passing touchdowns with only 14
interceptions. In his senior year, he guided the team to a Class 5A Division I State
Championship. A three-star prospect, he garnered offers from top collegiate programs,
but he ultimately committed to the University of Memphis.

1919.  Mr. Henigan's job as a college football player was essentially a full-time
one, and an important and valuable one at that. During his collegiate career, he
developed into a record-setting quarterback, earning multiple accolades and
significantly contributing to the team's success.

1920.  In the 2021 season, Mr. Henigan became the first true freshman in
program history to start a season opener. He started 11 games in total. He completed

**FOURTH AMENDED COMPLAINT**

235-of-393 passes for 3,322 yards and 25 touchdowns, leading all true freshmen quarterbacks in the country in completions, attempts, yards, and touchdowns. After his 22-of-33 for 417 yards and five touchdown performance at Arkansas State, Mr. Henigan was named to the Davey O'Brien Award's Great 8 and to the Davey O'Brien Midseason Watch List, which is presented to the nation's best college quarterback. Based on his performance against Tulane, he earned AAC Offensive Player of the Week and the Earl Campbell Tyler Rose Award Player of the Week Honorable Mention. He was named Earl Campbell Tyler Rose Award Player of the Week for his performance against Arkansas State, along with capturing 247Sports' True Freshman of the Week honors. His impressive performance that season earned him a place on the FWAA Freshman All-America Team, Fourth Team All-AAC honors from Phil Steele, and recognition on the AAC All-Academic Team. He was also named to the Shaun Alexander Freshman of the Year Award Watchlist, an honor given to the nation's top freshman.

1921.  In the 2022 season, Mr. Henigan started all 13 games, completing 286-of-446 passes for 3,571 yards and 22 touchdowns, while also rushing 146 times for 289 yards and four scores. He was named MVP of the SERVPRO First Responder Bowl after leading the team to victory over Utah State, completing 20-of-29 passes for 284 yards and three touchdowns. He ranked 16th in the NCAA in passing yards, 18th in total offense (295.8), 21st in passing yards per game (273.8), and 26th in completions per game (21.92). He earned AAC Weekly Honor Roll recognition twice and was honored with the Capital One Orange Bowl Performance of the Week. Additionally, he was named the Earl Campbell Tyler Rose Award National Player of the Week and placed on the award's watchlist. He also received preseason Third Team All-AAC honors and was named to the Manning Award Watchlist, which recognizes the top quarterback in college football.

1922.  The 2023 season saw Mr. Henigan lead the Tigers to a 10-3 record, culminating in a win over Iowa State in the AutoZone Liberty Bowl, where he was

**FOURTH AMENDED COMPLAINT**

named MVP after passing for 364 yards and four touchdowns. He started all 13 games that season, completing 318-of-476 passes for 3,883 yards and 32 touchdowns. His 318 completions set a single-season school record. By season's end, he was ranked fourth in the NCAA in passing yards, fifth in passing touchdowns, seventh in total offense (319.8), seventh in points responsible for (226), eighth in points responsible for per game (17.4), eighth in completions per game (24.46), ninth in passing yards per game (298.7), 19th in completion percentage (.668), and 22nd in passing efficiency (153.7). His outstanding performance earned him AAC Weekly Honor Roll recognition three times, Earl Campbell Tyler Rose Player of the Week honors twice, and AAC Offensive Player of the Week. He was also named to the Davey O'Brien Award's Great 8 List, the Manning Award Stars of the Week, and several prestigious watchlists, including the Manning Award Preseason Watch List, Maxwell Award Watch List, Davey O'Brien Award Preseason Watch List, and the Earl Campbell Tyler Rose Award Watch List, which is given annually to the nation's top Division I offensive player. Additionally, Phil Steele recognized him as a preseason Fourth Team All-AAC selection. His accomplishments were further highlighted by being named TSWA Player of the Year and earning Second-Team All-AAC honors.

1923.  In his senior year in 2024, Mr. Henigan continued to excel. He was named to several preseason watchlists, including the Maxwell Award, which is presented to the most outstanding football player in the nation; Walter Camp Player of the Year; Davey O'Brien Award; Manning Award; Earl Campbell Tyler Rose Award; Reese's Senior Bowl; and Johnny Unitas Golden Arm Award, which is given to the nation's top quarterback who best exemplifies character, scholastic, and athletic achievement. He also earned preseason First Team All-AAC from Phil Steele, College Football Network Preseason AAC Offensive Player of the Year, Honorable Mention All-American, and was named to the NFF Hampshire Honor Society. In Week 3 of the 2024 season, Mr. Henigan led the Tigers to a victory over Florida State, completing 25 of 38 pass

**FOURTH AMENDED COMPLAINT**

attempts for 272 yards with two touchdowns. With this game, he extended his streak of throwing a touchdown pass in every game of his career to 40, tying him for the third-longest streak in NCAA history alongside former Heisman Trophy winner Baker Mayfield. His outstanding play earned him AAC Offensive Player of the Week honors.

1924.  Mr. Henigan extended his streak to 41 games the following week with a touchdown pass in a loss to Navy, moving into a tie with former Heisman Trophy winner Marcus Mariota for the second-longest streak in FBS history. In a dramatic finish against Charlotte, Mr. Henigan threw a game-winning touchdown in the final minute, solidifying his place in Memphis history by becoming the program's all-time leader in touchdown passes, surpassing Brady White's mark of 90. Later, in Week 11, he threw four touchdown passes in a victory over UAB, pushing his career total past the 100-touchdown milestone. In the 2024 Frisco Bowl, Mr. Henigan led his team to victory over West Virginia, earning Offensive MVP honors. That year, he was named Third Team All-AAC and earned a spot on the 2025 Senior Bowl.

1925.  By the end of his final season, Mr. Henigan ranked 13th in the NCAA Division I history with 14,266 passing yards and was tied for 26th with 104 passing touchdowns.

1926.  During Mr. Henigan's collegiate football career, Memphis football games were broadcast on national television networks, including ESPN and CBS. Memphis frequently featured Mr. Henigan on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Memphis football games during this period. For instance, the game against West Virginia on December 17, 2024 attracted 1.2 million viewers. The Tigers played in front of enthusiastic crowds at the Liberty Bowl Memorial Stadium, with attendance figures often reaching into the tens of thousands. In 2024, average attendance was around 24,552 fans per game, generating millions in ticket sales and other revenues.

**FOURTH AMENDED COMPLAINT**

1927.  Mr. Henigan received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. Even though he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Memphis he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly regarded recruit and a record-setting starting quarterback for a major collegiate program, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

1928.  Defendants' conspiracy greatly harmed Mr. Henigan. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received more money for his NIL.

1929.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Henigan would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1930.  **The effect of Defendants' illegal conduct on Plaintiff Shaquem Griffin.** Plaintiff Shaquem Griffin worked as a college football player at the University of Central Florida from 2013 to 2018.

1931.  The labor provided by Mr. Griffin was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1932.  Mr. Griffin was one of the top high school football prospects in the country. Despite losing his left hand to a rare condition when he was four, he became a versatile athlete excelling in football and track and field. As the starting safety for Lakewood High

**FOURTH AMENDED COMPLAINT**

School in St. Petersburg, Florida, he recorded 61 tackles, two forced fumbles, and one interception as a junior, helping his team reach the 2012 Florida 5A regional semifinals. He was also chosen to play in the 2011 Under Armour Combine, a national college football recruiting event; competed in the 2012 Florida Athletic Coaches Association North-South All-Star Game; and was named to Second Team 5A All-State and Tampa Bay Times Second Team All-Suncoast.

1933.  Mr. Griffin's impressive performance continued in his senior year, when he had 72 tackles with 12 pass breakups and one sack. He was selected by USA Football to the 2013 U.S. Under-19 National Team to compete in the Team USA v. The World International Bowl, and his interception during that game was No. 2 on ESPN's top 10 plays that week, right behind Kobe Bryant. Rated a three-star recruit by both ESPN and Rivals, Mr. Griffin ultimately chose to enroll at UCF over a number of other offers from competitive programs, including Minnesota, Houston, and Toledo.

1934.  Mr. Griffin's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a redshirt freshman, he played in 12 games in the 2015 season on special teams and as a safety. He had a breakout season in 2016, starting all 13 games at the outside linebacker position and leading the team with 20 tackles for loss, which is tied for the third-most in a single season in UCF history. Over the course of the 2016 season, he also led the team with 11.5 sacks and 57 unassisted tackles, earning ACC Defensive Player of the Year and First Team All-Conference honors.

1935.  Named to four preseason watchlists for national awards—including the Butkus Award for the nation's best collegiate linebacker and the Nagurski Trophy for Defensive Player of the Year—Mr. Griffin recorded 74 tackles with 13 tackles for loss and seven sacks over his 13 starts in the 2017 season. He was instrumental to the team's perfect 12-0 record that season and 2017 AAC Championship win. He then capped off his collegiate career with a season-high 12 tackles—and Defensive MVP

**FOURTH AMENDED COMPLAINT**

honors—in the Peach Bowl win over No. 7 Auburn. He once again earned First Team
All-Conference honors, plus ESPN All-Bowl Team accolades and the 2018 Uplifting
Athletes Rare Disease Champion award. Mr. Griffin was subsequently selected in the
fifth round of the 2018 NFL Draft by the Seattle Seahawks.

1936.  Throughout his collegiate career, Mr. Griffin was effectively the face of
UCF's football program, and the university benefited immensely from his NIL. Among
his many media appearances as a UCF athlete, Mr. Griffin was featured on Sports
Illustrated in 2017, appeared on The Jim Rome sports radio show in both 2016 and
2018, and had his own features on College GameDay during his junior and senior
years. UCF not only frequently featured Mr. Griffin on its own social media accounts, but
it also curated his social media pages, including on Facebook and Instagram. Mr.
Griffin's media appearances and social media following no doubt boosted UCF's brand
and promoted UCF athletics.

1937.  Moreover, during Mr. Griffin's collegiate career, the University of Central
Florida was a member of the AAC and the vast majority of its football games were
broadcasted on CBS and ESPN. As one of the more popular programs in the nation,
UCF games drew a weekly average of 566,000 television viewers from 2015 to 2019,
with key matchups against other top-ranked programs drawing significantly more
viewers. For example, UCF's 2018 Peach Bowl victory over Auburn saw over 8.3 million
in viewership and was one of the most-watched games of 2017 NCAA football. UCF
games are also consistently sold out, enjoying an average home crowd of 44,019 per
game (over 97% capacity) for the 2018 season.

1938.  Between ticket sales, media rights, AAC distributions, and other revenue
sources, UCF university has no doubt made a considerable amount of money from its
football program. For example, after the football program's perfect 2017 season, UCF
Athletics recorded $62 million in revenue, a 10% jump.

**FOURTH AMENDED COMPLAINT**

1939.  Mr. Griffin received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at UCF, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his university. As a highly decorated football player and Florida native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1940.  Defendants' conspiracy greatly harmed Mr. Griffin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

1941.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Griffin would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1942.  **The effect of Defendants' illegal conduct on Plaintiff Shaquill Griffin.** Plaintiff Shaquill Griffin worked as a college football player at the University of Central Florida from 2013 to 2016.

1943.  The labor provided by Mr. Griffin was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

1944.  Mr. Griffin was a highly recruited prospect out of high school who possessed unique talent. At Lakewood High School, he excelled as a cornerback, earning recognition for his speed and defensive skills. A three-star prospect from Rivals and ESPN, he was ranked as the number 57 cornerback in the nation by Rivals and number 104 by ESPN. In 2012, he earned a spot on the 2012 class 5A all-state First

**FOURTH AMENDED COMPLAINT**

Team, was named to the Tampa Bay Times All-Suncoast First Team, and competed in the Florida Athletic Coaches Association North-South All-Star Game. In 2013, he was selected to the US Under-19 National Team, assembled by USA Football. He was a member of the 7-on-7 Team Tampa undefeated and state championship squad, two-time selection to the all-county team, and was presented the On Top of Your Game Award as well as the key to the city, both of which were presented to him by the mayor.

1945.  In 2013, Mr. Griffin, also a track star, won the state championship in the triple jump, narrowly defeating his twin brother, Shaquem Griffin, who took the silver medal. That same year, Mr. Griffin placed second in the long jump, with Shaquem securing first place. Their combined achievements led their high school to a state track championship.

1946.  His exceptional performance garnered attention from numerous top collegiate programs, but he ultimately chose to play for the University of Central Florida to further develop his skills and pursue higher education.

1947.  Mr. Griffin's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he developed into a standout cornerback, earning multiple accolades and significantly contributing to the team's success.

1948.  In his freshman year (2013), Mr. Griffin participated in eight games with a start at Temple. As a sophomore in 2014, he posted 17 tackles, including 13 solo tackles and one interception on the year. During his junior year (2015), he played in 12 games with 11 starts, totaling 50 tackles with two interceptions and 13 break-ups for 15 overall passes defended. Notably, he broke up two passes and ran back an interception 81 yards for a touchdown against Temple. He ended the year with three tackles in each of the final three games, highlighted by two break-ups against Tulsa and one against USF. In his senior season (2016), Mr. Griffin broke up a team-best 15 passes, tying for the second most in a single season at UCF, and grabbed a team-high four

**FOURTH AMENDED COMPLAINT**

interceptions. He recorded 50 tackles, including three for a loss. With a combination of pass breakups and interceptions, he defended a total of 19 passes, ranking fifth in the nation and first in the AAC. His four interceptions placed him 31st nationally and fifth in the AAC. His outstanding performance earned him All-AAC Second Team honors.

1949.  During the 2017 NFL Draft, Mr. Griffin was selected 90th overall in the 3rd round by the Seattle Seahawks, further demonstrating the value of his talent and labor.

1950.  During Mr. Griffin's collegiate football career, UCF football games were broadcast on national television networks, including ESPN, CBS, and ABC. UCF frequently featured Mr. Griffin on its social media accounts—especially with his twin brother Shaquem Griffin, also a star player at UCF—no doubt using him to boost game attendance and viewership. Millions of viewers watched UCF football games during this period. For instance, the 2016 game against Michigan in the American Big Ten Bowl amassed over 2.8 million viewers. The Knights played in front of enthusiastic crowds with attendance figures often exceeding 35,000 spectators. In 2016, a total of 214,814 fans attended UCF home games with an average of 35,802 attendees per game, generating millions in revenue. In the 2016-17 fiscal year, the AAC reported $74.47 million in total revenue.

1951.  Mr. Griffin received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at UCF, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or UCF. As a highly regarded recruit and an all-conference player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1952.  Defendants' conspiracy greatly harmed Mr. Griffin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received and would have received money for his NIL.

1953.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Griffin would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1954.  **The effect of Defendants' illegal conduct on Plaintiff Shea Langeliers.** Plaintiff Shea Langeliers worked as a college baseball player at Baylor University from 2016 to 2019.

1955.  The labor provided by Mr. Langeliers was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1956.  Mr. Langeliers was a highly recruited baseball player out of Keller High School in Texas. He joined the baseball team as a sophomore—earning District MVP and All-District Choice that season—and helped propel the team to number one in the district in his junior and senior years. In the summer of 2015, he played on Texas Rangers, New York Mets, and New York Yankees scout teams. He followed that up with a senior campaign in which he batted .369 with six home runs and 31 runs-batted-in, winning Defensive District MVP and First Team All-State accolades. He was also named to the Perfect Game All-Tournament Team multiple times and received the 2015 Perfect Game Underclass High Honorable Mention. Over the course of his high school career, Mr. Langeliers recorded a .327 average with 31 doubles, three triples, nine home runs, and 74 RBIs. He was drafted by the Toronto Blue Jays in the 34th round of the 2016 MLB Draft but did not sign, ultimately enrolling at Baylor University.

1957.  Mr. Langeliers's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. As a freshman in 2017, he batted .313

**FOURTH AMENDED COMPLAINT**

with ten home runs and 38 runs-batted-in in 55 games, earning a unanimous selection
to the All-Big 12 Conference Freshman Team as well as being named to All-Big 12
Second Team and 2017 Freshman All-American. He caught 26 base runners, setting
the Baylor single-season record for most runners caught stealing and was one home
run short of tying the overall Baylor freshman record. His freshman campaign also
included a 13-game hitting streak, an 18-game on-base streak, and 12 multi-RBI
games.

1958.  In 2018, Mr. Langeliers batted .252 with 11 home runs and 44 runs-batted-
in in 58 games and was named to the All-Big 12 First Team He also won the
Rawlings/ABCA Division I Gold Glove in recognition of his defensive capabilities,
becoming the first player in program history to win that award. He had particularly
impressive performances—with timely homers—against Kansas in the Big 12
Championships Tournament and against Stanford in the NCAA Stanford Regional. He
won the 2018 Co-MVP of the Big 12 Tournament award and was named to the 2018
Stanford Regional All-Tournament Team and the 2018 U.S. Collegiate National Team.

1959.  In 2019, despite missing time at the start of the season due to a wrist
injury, Mr. Langeliers returned to hit .308 with 10 home runs and 42 runs-batted-in and
was named to All-Big 12 First Team for the second consecutive year. He had a career-
best performance in an elimination game against the University of Nebraska-Omaha
during the 2019 NCAA Division I baseball tournament, where he hit three home runs
and had a record-breaking 11 runs-batted-in for a 24-6 win.

1960.  Considered one of the top prospects for the 2019 MLB Draft, Mr.
Langeliers was selected as the ninth overall pick by the Atlanta Braves, and he currently
plays for the Athletics.

1961.  During Mr. Langeliers's time at Baylor University, the program was a
member of the Big 12 Conference and its games were regularly carried by the
conference's own Big 12 Network and NCAA tournament games were broadcasted by

**FOURTH AMENDED COMPLAINT**

ESPN. For example, the 2019 NCAA regional matchup against Omaha—where Mr.
Langeliers set the NCAA tournament single-game RBI record with 11 runs-batted-in
after three home runs—was carried on ESPN3. Baylor also frequently featured Mr.
Langeliers on its social media accounts, highlighting his accomplishments and using
him to boost game attendance and viewership.

1962.  Baylor has no doubt benefited financially from its baseball program. Over
the course of Mr. Langeliers's collegiate career, for example, Baylor's revenues from
men's sports other than football and basketball increased by more than 16%, from $7.7
million in 2016-2017 to $8.9 million in 2018-2019.

1963.  Mr. Langeliers received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a partial scholarship and
other education-related expenses.

1964.  In fact, Mr. Langeliers received only a partial athletic scholarship due to
the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly
harmed Mr. Langeliers, preventing him from enjoying the benefit of bargaining for
scholarship money in a competitive environment. But for the illegal and unfair restraints
put in place, Mr. Langeliers would have received a greater amount of scholarship
money than he received. As a top-ranked high school baseball recruit, he would have
received a full athletic scholarship absent Defendants' bylaws.

1965.  Moreover, during his time at Baylor University, he was not permitted to
receive money for use of his NIL, whether from third parties, from Defendants, or from
his school. As a nationally recognized collegiate baseball player, he would have earned
substantial NIL compensation if not for the NCAA's unlawful restrictions.

1966.  Defendants' conspiracy greatly harmed Mr. Langeliers. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college baseball player than he
received, and would have received money for his NIL from third parties.

1967.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Langeliers would have received a competitive
share of the television and other revenue being brought in by Defendants and their
member schools. Thus, Defendants' scheme directly injured him.

1968.  **The effect of Defendants' illegal conduct on Plaintiff Shea Patterson.**
Plaintiff Shea Patterson worked as a college football player at the University of
Mississippi from 2016 to 2017 and the University of Michigan from 2018 to 2020.

1969.  The labor provided by Mr. Patterson was of great value to Defendants.
During the season, he often worked six days per week and often more than 40 hours
per week. Even during the offseason, he worked a significant number of hours under
the direction of the coaches at the school.

1970.  Mr. Patterson was a highly recruited prospect out of high school who
possessed unique talent. At IMG Academy, he was ranked as the number 1
quarterback in the 2016 recruiting class, a five-star recruit according to multiple
recruiting services, and a top overall recruit with Rivals.com ranking him number 3. He
was named the MVP of the U.S. Army All-American Bowl after completing 6-of-9 passes
for 90 yards with two touchdowns. He was also a USA Today All-American, participated
in and named the MVP of the Elite 11 quarterback competition, and was named the
Louisiana Sports Writers Association All-State Quarterback for two seasons. He led
IMG Academy to its first undefeated season in school history as a senior, was a team
captain and named Offensive Player of the Year at IMG, and prior to joining IMG, led
Calvary Baptist to back-to-back Louisiana Division III state championships during his
sophomore and junior seasons. Despite receiving offers from numerous programs,
including LSU, USC, and Texas A&M, he ultimately chose to play for Mississippi.

**FOURTH AMENDED COMPLAINT**

1971.  Mr. Patterson's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was one of the nation's best quarterbacks.

1972.  In his freshman year (2016), Mr. Patterson played in and started three games, taking over the starting role late in the season following an injury to Chad Kelly. In his debut, he led Ole Miss to an upset victory over Texas A&M, throwing for 338 passing yards and 402 total yards—setting SEC freshman records for passing and total yards. This earned him SEC Freshman of the Week. He averaged 293.3 passing yards per game in his three games, totaling 880 yards and six touchdowns on 72 of 132 passing. That season, he earned NFF Freshman Scholar-Athlete, U.M.A.A. Honor Roll, SEC Academic Honor Roll, and SEC Football Student-Athlete Leadership Council honors.

1973.  As a sophomore in 2017, Mr. Patterson started the first seven games of the year before suffering a season-ending knee injury against LSU. Before the injury, he completed 166-of-260 passes for 2,259 yards and 17 touchdowns. He set the Ole Miss single-game passing record with 489 yards against Auburn and threw for four touchdowns against South Alabama. In the first two games of the season, Mr. Patterson threw for a jaw-dropping 918 yards—over 450 yards per contest. He was named SEC Offensive Player of the Week and was listed on the preseason watch lists for the Maxwell Award (top college player) and the Davey O'Brien Award (top quarterback).

**FOURTH AMENDED COMPLAINT**

1974.  After his sophomore season, Mr. Patterson received numerous transfer offers before ultimately choosing Michigan. As the most high-profile transfer of the year, his decision was prominently featured in Michigan's promotional materials, generating excitement ahead of the 2018 season.



Source: https://mgoblue.com/news/2017/12/19/michigan-football-announces-addition-of-quarterback-shea-patterson

1975.  During his junior year at Michigan, he started all 13 games at quarterback, completed 210-of-325 passes for 2,600 yards with 22 touchdowns and rushed 76 times for 273 yards and two touchdowns. A standout baseball player, Mr. Patterson was selected in the 39th round of the 2018 MLB Draft by the Texas Rangers, despite having not played baseball since his junior year of high school, and signed a contract with the Rangers that allowed him to play out his final two years of eligibility at Michigan. He was a finalist for the Johnny Unitas Golden Arm Award (top upperclassman quarterback), a semifinalist for the Davey O'Brien Award (best collegiate quarterback) and Maxwell Award (most outstanding college football player). Further, he was selected as All-Big Ten (Third Team, coaches; honorable mention, media), and was named the team's

**FOURTH AMENDED COMPLAINT**

Offensive Player of the Year. On three occasions, he was named Offensive Player of the Week for his performances at Northwestern, against Wisconsin, and at Rutgers. Among other standout performances, he threw for two touchdowns and connected on 14-of-25 pass attempts at Michigan State, totaling 236 yards of offense including 24 on the ground. He was also recognized as Pro Football Focus College's All-Big Ten Offensive team (quarterback) after his games against Maryland.

1976.  During Mr. Patterson's senior year at Michigan, he started 13 games at quarterback, completed 241-of-381 passes for 3,061 yards with 23 touchdowns, and rushed for another five scores. Despite playing through injury nearly the entire season, he earned a Third Team All-Big Ten selection, was named the team's Bo Schembechler Most Valuable Player, and was selected the Rose Bowl Offensive Player of the Week after the Michigan State Game. He earned his first career Big Ten Co-Offensive Player of the Week honor after the Michigan State game and secured another the following week after defeating Indiana. Additionally, he was named one of the Manning Stars of the Week twice, recognized twice as part of the Pro Football Focus College Big Ten Offensive Team, and honored as a three-time Co-Offensive Player of the Week. Pro Football Focus—a sports analytics company that offers advanced analytics and grades players on a per-position basis—rated Mr. Patterson as the best quarterback in the Big Ten, ahead of Ohio State's Dwayne Haskins.

1977.  In 2020, Mr. Patterson signed with the Kansas City Chiefs, further demonstrating the value of his talent and labor.

1978.  During Mr. Patterson's collegiate football career, the University of Mississippi's and Michigan's football games were broadcast on national television networks, including ESPN, ABC, and the SEC Network. Both schools featured Mr. Patterson on their social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. And millions watched both program's games during Mr. Patterson's tenure. For instance, Ole Miss's 2016

**FOURTH AMENDED COMPLAINT**

game against Florida State set an ESPN streaming record with more than 8 million
viewers. Tens of thousands of fans attended Ole Miss football games in 2016 for a total
attendance of 454,368 for the year with an average of 64,910 attendees per game,
generating millions of dollars in revenue. Millions of people also watched Michigan
football games once Mr. Patterson transferred there, with the Ohio State at Michigan
game in 2019 amassing over 12 million viewers and the Michigan vs. Alabama Citrus
Bowl drawing over 14 million. Hundreds of thousands of fans attended Michigan football
games during this time. In 2019, a total of 780,215 fans attended Michigan home games
with an average of 111,459 attendees per game. That same year, ticket sales made up
$53.79 million of Michigan's total revenue for the year, driven by Michigan football. The
SEC distributed an average of over $43.1 million per member school, including Ole
Miss, in the 2017 fiscal year. Furthermore, the Big Ten Conference distributed $55.6
million to each of its member schools, including Michigan, in the 2019 fiscal year.

1979.  Mr. Patterson received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During his time at Ole Miss and Michigan, he was not
permitted to receive money for his NIL, whether from third parties, Defendants, or the
universities. As a five-star recruit and SEC and Big Ten starting quarterback, he would
have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1980.  Defendants' conspiracy greatly harmed Mr. Patterson. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, he would have
received greater remuneration for his services as a college football player than he
received and would have received money for his NIL.

1981.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Patterson would have received a competitive share

**FOURTH AMENDED COMPLAINT**

of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1982.  **The effect of Defendants' illegal conduct on Plaintiff Slade Cecconi.** Plaintiff Slade Cecconi worked as a college baseball player at the University of Miami from 2018 to 2020.

1983.  The labor provided by Mr. Cecconi was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

1984.  Mr. Cecconi was a highly recruited baseball player out of high school. As a pitcher for Trinity Preparatory School in Winter Park, Florida, he went 6-1 with a 0.70 ERA and 70 strikeouts over 40 innings in his junior year, winning the team's MVP award. Focusing mostly on the offensive side of the game his senior season, he batted .388 while leading the team with six total home runs, earning Perfect Game All-American and Under Armour All-American honors. That year, he was also a member of the Team USA's development program and 40-man roster. As a top 15 right-handed pitcher in the country and a top 10 overall prospect from Florida, Mr. Cecconi was drafted in the 38th round of the 2018 MLB Draft by the Baltimore Orioles but ultimately decided to enroll at the University of Miami.

1985.  Mr. Cecconi's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Over the course of 17 appearances (including 13 starts) in his 2019 freshman season, he had a 4.16 ERA and struck out 89 batters over 80 innings pitched, making Collegiate Baseball Newspaper's Freshman All-America team. He excelled in key matchups, tossing two scoreless innings of relief against Virginia at the ACC tournament and going seven innings over Mississippi State in the NCAA Starkville Regional final. As a sophomore in 2020, he had a 3.80 ERA in four starts and held opponents to a .190 batting average before the season ended

**FOURTH AMENDED COMPLAINT**

prematurely due to the COVID-19 pandemic. In his limited outings that season, he struck out seven over five innings against No. 2 Florida and fanned seven batters over six innings in a win over Pittsburgh.

1986.  Mr. Cecconi was subsequently selected as the 33rd overall pick by the Arizona Diamondbacks in the 2020 MLB Draft, and he currently plays for the Cleveland Guardians.

1987.  During Mr. Cecconi's time at the University of Miami, the program was a member of the Atlantic Coast Conference and its games were regularly carried by the conference's own ACC Network, with key matchups and NCAA tournament games broadcasted by ESPN. For example, University of Miami's games against Central Michigan and Mississippi State NCAA Starkville Regionals games against were carried on ESPN3. The University of Miami also frequently featured Mr. Cecconi on its social media accounts, highlighting his accomplishments and using him to boost game attendance and viewership.

1988.  Between ticket sales, media rights, ACC disbursements, and other sources, the University of Miami has no doubt benefited from its baseball program. For example, the ACC distributed an average of about $29 million per member school for the 2019 fiscal year.

1989.  Mr. Cecconi received none of the revenue that the University of Miami gains from its baseball program, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses. In fact, it was due to the NCAA's baseball scholarship bylaws that Mr. Cecconi received only a partial athletic scholarship. That collusive, artificial restraint greatly harmed Mr. Cecconi, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Cecconi would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball prospect and an All-American,

**FOURTH AMENDED COMPLAINT**

he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

1990.  Moreover, during his time at the University of Miami, Mr. Cecconi was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a nationally recognized baseball player and Florida native, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

1991.  Defendants' conspiracy greatly harmed Mr. Cecconi. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

1992.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Cecconi would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

1993.  **The effect of Defendants' illegal conduct on Plaintiff Sophie Cunningham.** Plaintiff Sophie Cunningham worked as a college basketball player at the University of Missouri from 2015 to 2019.

1994.  The labor provided by Ms. Cunningham was of great value to Defendants. During the season, she often worked six days per week or more and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

1995.  Ms. Cunningham was a highly recruited prospect out of high school who possessed unique talent. At Rock Bridge High School in Columbia, Missouri, she was ranked as the number 14 prospect in the country by Blue Star Report and the number 20 recruit by ESPN HoopGurlz. She led her team to four Class 5 state titles and had her

**FOURTH AMENDED COMPLAINT**

number 3 jersey retired following her senior season in which she averaged 21.1 points,
7.3 rebounds, 4.3 assists, and 2.9 steals. She was selected to the 2015 Jordan Brand
Classic in New York, was invited to the 2015 USA Basketball Women's U19 World
Championship National Tournament, and was chosen for the 2014 USA Basketball
Women's U18 National Team Trials as well as the 2013 USA Basketball 3x3 U18
National Tournament. She was recognized as a McDonald's All-American, the 2014
USA Today Gatorade Missouri Girls Basketball Player of the Year, was a Class 5 Player
of the Year as a junior and senior, 2015 Co-Miss Show-Me Basketball, Missouri
Basketball Coaches Associations Player of the Year in 2014 and 2015, named the co-
recipient of the 2015 Kiwanis Club of Columbia Don Faurot Sportsperson of the Year,
was a 2013-14 MaxPreps Fourth Team All-American, and a three-time Columbia Daily
Tribune Player of the Year. She was also a four-time All-State, All-Region, All-District,
and All-Conference honoree. Despite having her choice of virtually any program in the
country, she ultimately chose to play basketball for Mizzou.

1996.  Ms. Cunningham's job as a college basketball player was essentially a
full-time one, and an important and valuable one at that. During her collegiate career,
she was one of the best players in Missouri history and a nationally recognized star in
women's college basketball. In her freshman year (2015-16), Ms. Cunningham started
all 32 games at shooting guard and averaged 14.0 points, 5.8 rebounds, 3.0 assists per
game, and 1.1 steals per contest. She set a school record with 42 points against Wake
Forest in only her fourth career game, which tied for the 12th-highest scoring output in
the nation and the most by an SEC player by six points. She was named SEC
Freshman of the Year, earned a spot on the All-SEC Freshman Team, and was named
Second-Team All-SEC (Coaches) and honorable mention All-SEC (Associated Press).
She was also one of eight finalists for the USBWA National Freshman of the Year and
set an SEC record with six Freshman of the week awards. She was voted Inside

**FOURTH AMENDED COMPLAINT**

Columbia Magazine 2016 Athlete of the Year, finishing ahead of NASCAR driver Carl
Edwards and national champion wrestler J'Den Cox.

1997.  Entering her sophomore season, Ms. Cunningham was listed on the
Naismith Trophy Women's Preseason Watch List, awarded to the country's best
collegiate basketball player. That season, Ms. Cunningham started all 31 games she
appeared in and led Missouri in total points, points per game, assists per game, free
throw percentage, field goal percentage and total field goals made in 2016-17. During
Mizzou's NCAA Tournament run, she averaged 14.5 points, including a team-high 17
points against Florida State. Her exemplary performance earned a pair of National
Player of the Week Awards (USBWA Ann Meyers Drysdale, ESPNW), SEC Player of
the Week recognition, First Team All-SEC, and AP All-American Honorable mention.

1998.  In her junior season (2017-18), Ms. Cunningham continued to dominate,
starting all 31 games she appeared in and averaging 15.8 points, 4.7 rebounds, and 3.0
assists in 32.7 minutes per game. She was the only player in the nation to shoot better
than 54 percent from the field, 45 percent from three, and 83 percent from the free
throw line. Among SEC season leaders, she ranked second in three-point percentage
(45 percent), fourth in the SEC in points per game (18.5 ppg), fourth in field goal
percentage (54.2 percent), fifth in total points scored (574), and fifth in three-pointers
(69). She was also ranked fourth in the NCAA in three-point percentage (45 percent)
and set a program record for points in an NCAA Tournament game with 35 points on
10-for-16 shooting from the field and a career-high 14-for-16 from the free throw line
against Florida Gulf Coast. Her outstanding junior year earned her First Team All-SEC
and All-America Honorable Mention honors for the second consecutive season. She
was also named SEC Player of the Week, selected for the SEC Community Service
Team, and secured spots on three prestigious national award watch lists: the Cheryl
Miller Small Forward of the Year, the John R. Wooden National Player of the Year, and
the Naismith National Player of the Year.

**FOURTH AMENDED COMPLAINT**

1999.  As a senior (2018-19), Ms. Cunningham cemented her legacy as one of the greatest players in Missouri history. She started all 35 games her senior year and finished her career as the school's all-time leading scorer in the SEC era with 2,187 career points and all-time leader in free throws made (537). She averaged 17.8 points, 5.9 rebounds, and 2.8 assists per game and was the only player in the nation to average 17 points per game, make 80 three-pointers, make 150 free throws, and record 200 rebounds.

2000.  Among program career records, she ranks second in three-pointers made (238), second in three-point percentage (.403), second in free throw percentage (.839), third in points per game (17.0), fourth in assists (390), fourth in field goals made (706), and eighth in field goal percentage (.501). Ms. Cunningham was the first student-athlete in program history to be named to an All-American team, earning Third Team honors from the Associated Press, USBWA Honorable Mention honors from the WBCA, and USBWA Third Team All-America. She was also named First Team All-SEC for the third consecutive season, becoming the first player in program history to earn three All-Conference First Team honors; was named to the SEC Player of the Week twice; and was named All-SEC Tournament Team. In the SEC, she ranked fifth in scoring (17.8 ppg), second in free throw percentage (83.9%), third in three-point percentage (40.3%), third in three-pointers made per game (2.4), and seventh in field goal percentage (48.1%). She also earned spots as a Cheryl Miller Small Forward of the Year finalist, John R. Wooden Award National Ballot Top-15 Finalist, and the Naismith Trophy Midseason Watch List. By the end of her senior year, Ms. Cunningham had led her team to the NCAA tournament all four consecutive years.

2001.  During the 2019 WNBA Draft, Ms. Cunningham was selected by the Phoenix Mercury with the first pick in the second round with a 13th overall selection, which is the highest a Mizzou player had ever been drafted in the WNBA Draft.

**FOURTH AMENDED COMPLAINT**

2002.  During Ms. Cunningham's collegiate basketball career, the University of

Missouri's basketball games were broadcast on national television networks, including

ESPN and the SEC Network. Mizzou frequently featured Ms. Cunningham on its social

media platforms and other promotional materials, highlighting her achievements to

enhance game attendance and viewership.





Source: https://www.facebook.com/MizzouWBB/posts/news-sophie-cunningham-named-
to-the-naismith-trophy-midseason-teamcunningham-is-/10156775244822349/

**FOURTH AMENDED COMPLAINT**

2003.  Before Ms. Cunningham's arrival, Mizzou women's basketball drew fewer than 1,700 attendees per game. By her final season, she was filling Mizzou Arena, with an average of nearly 5,000 fans per game. That same year, Mizzou made a total of $16.2 million in ticket sales to athletic events, including women's basketball games where Ms. Cunningham was their star player. In 2020, the SEC Conference distributed an average of over $45.5 million per member school, including Mizzou.

2004.  Ms. Cunningham received none of that revenue; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. During her time at Missouri, she was not permitted to receive money for her NIL, whether from third parties, Defendants, or the university. As a nationally recognized star and All-American player, she would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2005.  Defendants' conspiracy greatly harmed Ms. Cunningham. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and would have received money for her NIL.

2006.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Ms. Cunningham would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

2007.  **The effect of Defendants' illegal conduct on Plaintiff Spencer Jones**. Plaintiff Spencer Jones worked as a college baseball player at Vanderbilt University from 2019 to 2022.

2008.  The labor provided by Mr. Jones was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per

**FOURTH AMENDED COMPLAINT**

week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2009.  Mr. Jones was a highly recruited two-way baseball player out of La Costa Canyon High School in Carlsbad, California. He contributed early, helping the team achieve the No. 1 ranking in the Avocado West league as a freshman and sophomore (2016 and 2017). As a junior in 2018, he had a 4.09 ERA with 33 strikeouts over 17 innings pitched while batting .414 with five home runs, and as the MLB/SiriusXM Radio Two-Way High School Player of the Year, he played in the Perfect Game All-American Classic and the Under Armour All-America Baseball Game that summer. Despite fracturing his elbow and missing much of the 2019 season, Mr. Jones was ranked as a top 5 left-handed pitching prospect. He was selected by the Los Angeles Angels in the 31st round of the 2019 MLB Draft but did not sign, choosing instead to enroll at Vanderbilt University.

2010.  Mr. Jones's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. He appeared in 14 games (and started in eight) in 2020 before the season was cancelled due to the COVID-19 pandemic. Despite not being able to pitch in 2021 due to an elbow surgery, he still appeared in 34 games as a designated hitter, batting .274 with three home runs and ten runs-batted-in. He tallied a season-high four hits against a strong LSU team and scored the winning run to help Vanderbilt walk it off against Stanford in the College World Series. That summer, he played in the Cape Code Baseball League with the Brewster Whitecaps, batting .309 with twenty RBIs over 29 games, winning the league championship, and making the Cape Code League All-Star Team.

2011.  After returning fully healthy in 2022, Mr. Jones had a standout season as Vanderbilt's starting right fielder, batting .370 and slugging .644 with 12 home runs and 60 runs-batted-in over 61 games. He tied the program record for most hits in a single game, going 6-for-6 with a walk-off single in the 11th inning against Indiana State. He led

**FOURTH AMENDED COMPLAINT**

the SEC with 21 doubles and was named to All-SEC Second Team, Perfect Game All-America Third Team, and ABCA/Rawlings Southeast All Region Second Team.

2012.  Mr. Jones was selected by the New York Yankees as the 25th overall pick of the 2022 MLB Draft, further demonstrating the value of his talent and labor.

2013.  During Mr. Jones's time at Vanderbilt University, the program was a member of the SEC and its games were regularly carried by the SEC Network, with key matchups and NCAA tournament games broadcast on ESPN. For example, Vanderbilt's 6-5 walk-off win over Stanford in the 2021 College World Series was carried on ESPN and had over 750,000 in television viewership. Vanderbilt also frequently featured Mr. Jones on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. Vanderbilt has benefited—and continues to benefit—financially from its baseball program. According to a revenue sharing estimate for SEC schools, for example, peer baseball programs like Tennessee and Arkansas are projected to bring in as much as $2 to $5 million in revenue for the 2025-2026 academic year.

2014.  Mr. Jones received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a need-based scholarship and other education-related expenses. In fact, Mr. Jones did not receive an athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Jones, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Jones would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws.

2015.  Moreover, during most of his time at Vanderbilt University, Mr. Jones was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. Even for the one season in 2022 in which he was

**FOURTH AMENDED COMPLAINT**

permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from Vanderbilt, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a nationally recognized baseball player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2016.  Defendants' conspiracy greatly harmed Mr. Jones. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

2017.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Jones would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2018.  **The effect of Defendants' illegal conduct on Plaintiff Stephan Blaylock.** Plaintiff Stephan Blaylock worked as a college football player at the University of California, Los Angeles from 2018 to 2022.

2019.  The labor provided by Mr. Blaylock was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2020.  Mr. Blaylock was a highly recruited prospect out of high school who possessed unique talent. At St. John Bosco High School, he was listed as a four-star prospect by Rivals.com, 247 Sports, and ESPN. He was also the number 26 cornerback recruit in the nation and number 38 overall recruit in the state of California according to Rivals.com, the number 33 prospect in California and number 158 in the nation according to 247 Sports, and the number 25 safety prospect in the nation according to

**FOURTH AMENDED COMPLAINT**

ESPN. In the summer of 2017, Mr. Blaylock was invited and played in the Nike

Opening, which is a premier high school football showcase where a total of 166 of the

best players from around the country participate in drills, training, coaching, and

competitions, including the popular 7-on-7 tournament. In 2018, he played in the

Polynesian Bowl All-Star game. Mr. Blaylock chose UCLA over multiple programs,

committing to play for the Bruins as part of their 2018 recruiting class.

2021.  Mr. Blaylock's job as a college football player was essentially a full-time

one, and an important and valuable one at that. During his collegiate career, he was a

key leader in UCLA's secondary, starting multiple seasons and playing a crucial role in

the team's defensive success. In his freshman season (2018), he appeared in 12

games, contributing as a reserve safety and as a member of special teams, recording

multiple tackles in four games. His role expanded in 2019, when he started all 12 games

at safety. He led the team with 86 tackles and ranked 18th in the NCAA for solo tackles

per game (5.4) during the regular season. Demonstrating his dominance on defense, he

led the team in tackles in five of the last six games, recorded a season-high 11 tackles

against USC, and finished 10th in the Pac-12 in tackles per game (7.2). He also

recorded 7 total tackles and one forced fumble against Arizona State.

2022.  As a junior in 2020, Mr. Blaylock continued to be a star on defense,

starting all 7 games at safety in the Covid-shortened season. He was second on the

team in tackles (42) and tied his career best with 11 stops at Colorado. He picked off

the first two passes of his career against USC and Stanford and added 7 tackles each in

games against Arizona and Arizona State. His performance earned him honorable

mention All-Pac-12 selection by the league's coaches.

2023.  During his 2021 season, Mr. Blaylock again earned starting safety duties,

starting all 12 games. He delivered several standout performances, including a season-

high 11 tackles against Colorado, eight against Arizona, and six in matchups at Utah

and against Fresno State.

**FOURTH AMENDED COMPLAINT**

2024.  In his final season (2022), he continued his streak of reliability, starting all 13 games at safety and extending his consecutive starts to 44. Team captain his senior year—his third consecutive year as captain—he capped off his career with 56 games played, tying the school record. His impact on the field was highlighted by a season-high 11 tackles against USC and seven tackles against Washington as well as a pass breakup. That game he also picked off a pass thrown by Washington's Michael Penix—who was runner-up for the Heisman the following season—and returned the ball for 29 yards. His performance that season earned honorable mention All-Pac-12 recognition from the league's coaches.

2025.  During Mr. Blaylock's collegiate football career, UCLA's football games were broadcast on major national television networks, including Fox, ESPN, and the Pac-12 Network. UCLA frequently featured Mr. Blaylock on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2022, UCLA led the Pac-12 in average TV viewership with an average of 2.4 million viewers per conference game and 4.5 million viewers during a game against USC. During Mr. Blaylock's tenure, UCLA participated in numerous high-profile matchups, including its games against Oregon in 2021 and 2022, which were featured on ESPN's College GameDay, the premier showcase for the biggest college football game of the week. Tens of thousands of fans attended UCLA football games during Mr. Blaylock's time there. For instance, in 2022, an average of 41,593 fans attended each game. Ticket sales from these games garnered significant revenue for the university and contributed to the $17.4 million in total revenue that UCLA made from ticket sales in 2022. In 2022, the Pac-12 Conference distributed an average of over $37 million per member school, including UCLA.

2026.  Mr. Blaylock received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at UCLA, he was not

**FOURTH AMENDED COMPLAINT**

permitted to receive money for his NIL, whether from third parties, Defendants, or UCLA. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or UCLA that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a multi-year starter at a top football program and All-Pac-12 defensive back, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2027.  Defendants' conspiracy greatly harmed Mr. Blaylock. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received more money for his NIL.

2028.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Blaylock would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2029.  **The effect of Defendants' illegal conduct on Plaintiff Tanner Morgan.** Plaintiff Tanner Morgan worked as a college football player at the University of Minnesota from 2017 to 2022.

2030.  The labor provided by Mr. Morgan was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2031.  Mr. Morgan was a highly recruited football player out of Ryle High School in Union, Kentucky. As a freshman and sophomore, he played for Hazard High School in Hazard, Kentucky, passing a total of 4,990 yards and 56 touchdowns. As a junior at Ryle, he threw for 2,674 yards and 21 touchdowns, and as a senior, for 2,747 yards with

**FOURTH AMENDED COMPLAINT**

27 touchdowns. Notably, in his senior year, he helped Ryle achieve a 12-1 record and reach the 6-A state quarterfinals. He threw over 10,000 yards over the course of his high school career—one of only a few Kentucky high school quarterbacks to have ever done so. A consensus three-star recruit and a top-10 prospect from Kentucky, Mr. Morgan ultimately chose Minnesota over competitive programs like Cincinnati, Louisville, and Wake Forest.

2032.  Mr. Morgan's job as a college football player was essentially a full-time one, and an important and valuable one at that. After redshirting his first year at Minnesota, he played in nine games for the 2018 season and earned the starting position for the final six, recording the program's longest passing play since 2003 with an 86-yard touchdown against Illinois. In 2019, Mr. Morgan set several school records, including for single-season passing yards and touchdowns, and his 95.45 completion percentage set a Big Ten Conference record as the highest for any player who attempted more than 15 passes. His performance that season earned him Second Team All-Big Ten honors, and he was also a finalist for the Manning Award, given to the best collegiate quarterback in the country.

2033.  Despite a shortened 2020 season, Mr. Morgan earned All-Big Ten Honorable Mention, starting all seven games and completing 106 passes for 1,374 yards and seven touchdowns. In the 2021 season, he set a school record with 16 straight completions against Nebraska (also tied for the third longest streak in a conference game in Big Ten history) and earned his 26th career win, the most by a quarterback in Minnesota program history. And in his eight starts in 2022, Mr. Morgan set yet another single-season school record by completing 66.9% of his passes. He concluded his collegiate career ranking first in school history in wins and completion percentage, and second in passes completed, total passing yards, and total touchdown passes.

**FOURTH AMENDED COMPLAINT**

2034.  Among his countless accolades, Mr. Morgan was also named Big Ten Offensive Player of the Week three times; was selected to compete in the East-West Shrine Bowl and the Hula Bowl; and was a semifinalist for the Davey O'Brien Award (recognizing outstanding student-athletes), a finalist for the Wuerffel Trophy (for exemplary community service and leadership), and twice a semifinalist for the Jason Witten Collegiate Man of the Year award (for exceptional courage, integrity, and sportsmanship).

2035.  As the winningest quarterback in University of Minnesota history, Mr. Morgan was essentially the face of the program for five years. Both Minnesota and the Big Ten Conference frequently featured Mr. Morgan on their social media accounts, highlighting his contributions to the team and, no doubt, using him to boost game attendance and viewership. In fact, while Mr. Morgan was at Minnesota, attendance at football games increased by 21.8% from 2018 to 2019, from an average of 37,915 per game to an average of 46,190.

2036.  As a member of the Big Ten Conference, University of Minnesota football games were regularly carried by national television broadcasters such as Fox, ABC, and ESPN. Minnesota games saw a weekly average of over 800,000 television viewers from 2015 to 2019, with games against other top-ranked programs drawing significantly more viewers. For example, Minnesota's 2019 season Outback Bowl win over Auburn— where Mr. Morgan tossed two touchdowns and set the program bowl-game record with 278 passing yards—saw nearly 4 million in viewership.

2037.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Minnesota has made a considerable amount of money from its football program. For example, the Big Ten Conference distributed approximately $58.8 million in revenues to each member school for the 2022 fiscal year.

2038.  Mr. Morgan received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other

**FOURTH AMENDED COMPLAINT**

education-related expenses. And during most of his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Minnesota. Even for the short time in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from Minnesota, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a star football player and the winningest quarterback in Minnesota program history, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2039.  Defendants' conspiracy greatly harmed Mr. Morgan. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2040.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Morgan would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2041.  **The effect of Defendants' illegal conduct on Plaintiff Taylor Rapp.** Plaintiff Taylor Rapp worked as a college football player at the University of Washington from 2016 to 2018.

2042.  The labor provided by Mr. Rapp was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2043.  Mr. Rapp was a highly recruited prospect out of high school who possessed unique talent. At Sehome High School, he earned USA Today First Team

**FOURTH AMENDED COMPLAINT**

All-State (all levels), Associated Press 2A First Team All-State, First Team All-Whatcom County, First Team All-NWC honors, and was a PrepStar All-West Region Pick. He also earned a spot on the First Team All-USA Western Washington as a defensive back, played on the USA National Teams at the youth level, and was invited to play in the U.S. Army All-American Bowl following his senior season. He was named to the Tacoma News Tribune's "Western 100" and recognized as the top safety prospect in Washington. Scout.com ranked him as the No. 49 safety in the nation, while ESPN listed him as the No. 4 overall prospect in the state and the No. 25 safety in the country. According to 247 Sports, he was the No. 5 overall prospect in Washington and the No. 28 safety nationally. Rivals.com rated him as the state's No. 6 recruit and the No. 51 safety in the country. He chose to play for the University of Washington, turning down offers from Oregon, Stanford, and Arizona States, among others.

2044.  Mr. Rapp's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was a key defensive player for Washington's secondary, becoming one of the most decorated safeties in the Pac-12 Conference. In his freshman season (2016), he played in all 14 games, starting 10, and recorded 53 tackles. He made significant contributions to the Apple Cup victory at Washington State with four tackles and a crucial pass break up. He was named MVP of the Pac-12 Championship Game after intercepting two passes, including a 35-yard pick-six on the first play of the second half. At the team's postseason awards banquet, he received the Travis Spring Most Outstanding Freshman Award. His standout season also earned him First-Team Freshman All-American honors from FWAA and USA Today, as well as the title of Pac-12 Freshman Defensive Player of the Year.

2045.  As a sophomore in 2017, Mr. Rapp solidified his status as one of the top safeties in college football, playing in all 13 games, starting 12, and recording 59 tackles, two sacks, and an interception, earning First Team All-Pac-12 honors. He was

**FOURTH AMENDED COMPLAINT**

also named to the First Team Academic All-Pac-12. In his junior season (2018), Mr.
Rapp solidified his role as the leader of Washington's defense, tallying 59 tackles, five
sacks, and two interceptions, leading his team to a Rose Bowl appearance, though he
was sidelined for the game due to injury. He was once again named First-Team All-Pac-
12 and received First Team All-America honors from multiple outlets, including The
Athletic, PFF, ESPN, and USA Today. He also earned Second-Team All-America
recognition from the Associated Press, Sports Illustrated, The Sporting News, CBS
Sports, and Athlon's. Academically, he was a First-Team Academic All-Pac-12 selection
and a CoSIDA Academic All-District 8 honoree. At the UW postseason awards banquet,
he was honored with the Husky Excellence Award.

2046.  After the 2018 season, Mr. Rapp declared for the NFL Draft, where he
was selected in the second round (No. 61 overall) of the 2019 NFL Draft by the Los
Angeles Rams.

2047.  During Mr. Rapp's collegiate football career, the University of
Washington's football games were broadcast on major national television networks,
including Fox, ESPN, ABC, and Pac-12 Networks. Washington frequently featured Mr.
Rapp on its social media platforms and other promotional materials, highlighting his
achievements to enhance game attendance and viewership. Millions of viewers
watched Washington football games during Mr. Rapp's collegiate career. For instance,
over 10.1 million people watched the 2017 Fiesta Bowl between Washington and Penn
State where Mr. Rapp made four tackles. Furthermore, tens of thousands of fans
attended Washington home games during the 2018 season for a total attendance of
414,405 with an average of 69,068 attendees per game, generating millions of dollars of
revenue for the university in ticket sales. In 2018, the Pac-12 Conference distributed an
average of over $29.5 million per member school, including Washington. During his
collegiate career, Mr. Rapp helped lead the Huskies to three straight New Year's Six

**FOURTH AMENDED COMPLAINT**

Bowl appearances—including the college football playoff semifinal in 2016—each of which drew millions of TV viewers, generating significant revenue.

2048.  Mr. Rapp received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Washington, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Washington. As an All-American safety at a top program, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2049.  Defendants' conspiracy greatly harmed Mr. Rapp. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

2050.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Rapp would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2051.  **The effect of Defendants' illegal conduct on Plaintiff Trace McSorley.** Plaintiff Trace McSorley worked as a college football player at Pennsylvania State University from 2014 to 2018.

2052.  The labor provided by Mr. McSorley was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2053.  Mr. McSorley was a highly recruited football player out of high school. As the starting quarterback for Briar Woods High School in Ashburn, Virginia, he led the team to three consecutive state titles, including a 15-0 perfect record as a junior. He

**FOURTH AMENDED COMPLAINT**

was also named Dulles District Offensive Player of the Year and selected to All-Dulles

District First Team and Second Team All-Region quarterback his junior year. As a

senior, he threw for 3,252 yards and 36 touchdowns, earning Virginia Class 5A First-

team All-State honors and winning Potomac District Offensive Player of the Year. With

150 touchdowns and more than 12,000 yards of total offense over his high school

career, he was a consensus three-star recruit and a top 20 prospect from Virginia. Mr.

McSorley received 12 offers from competitive programs and ultimately committed to

Penn State.

2054.  Mr. McSorley's job as a college football player was essentially a full-time

one, and an important and valuable one at that. After redshirting in 2014 and appearing

in seven games in 2015, he was named the team's starting quarterback for the 2016

season, in which he passed for 3,614 yards and scored 29 touchdowns. After an upset

over No. 2 Ohio State, he threw for 376 yards and four touchdowns against rival

Michigan State, earning a berth to the Big Ten Championship game in which he led the

comeback from a 28-07 deficit in the second quarter with 384 passing yards and four

touchdowns to defeat Wisconsin 38-31. By the end of the season, he led the Big Ten in

total offensive yards and all FBS in yards per competition, earning Second Team All-Big

Ten honors and becoming the first Penn State quarterback to be on a Heisman Trophy

ballot in over ten years.

2055.  In the 2017 season, Mr. McSorley served as team captain, starting in all

13 games and leading Penn State to a remarkable 7-0 start and an 11-2 record. He was

second in the Big Ten in passing touchdowns, earning a selection to first-team All-Big

Ten by Pro Football Focus and to second-team All-Big Ten from league coaches and

media voters. He also won the Offensive MVP award at the Fiesta Bowl in a 35-28 win

over Washington. For his final 2018 season, Mr. McSorley finished with 2,530 yards and

18 passing touchdowns and became the program's first player to complete a pass in

four straight bowl games. Additionally, he set the program record for rushing

**FOURTH AMENDED COMPLAINT**

touchdowns by a quarterback with 12 rushing touchdowns and became the only Penn State quarterback to throw for more than 9,000 career yards. In the postseason, he was named to second-team All-Big Ten by both the Associated Press and the league's coaches, and was selected to compete in the Reese's Senior Bowl. He was also a finalist for the Campbell Trophy, awarded annually to the college football player with the best combination of academic, community, and on-field performance, and a semifinalist for the Walter Camp Award, recognizing the most outstanding college football player. Mr. McSorley was subsequently selected by the Baltimore Ravens in the sixth round of the 2019 NFL Draft.

2056.  During Mr. McSorley's collegiate career, Penn State was a member of the Big Ten Conference and its games were regularly carried by national television broadcasters such as ABC and Fox. Penn State also frequently featured Mr. McSorley on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. In fact, as one of the most popular college football teams in the country, Penn State ranks 10th in the nation in television viewership, attracting an average of 2.55 million viewers per game from 2015 to 2019. Important contests against key rivals drew significantly more viewers. For example, the 2017 Fiesta Bowl—in which Mr. McSorley was selected the offensive MVP—saw over 10 million viewers. Penn State also attracts one of the largest home crowds in all of college football, ranking second in the nation with an average attendance of 105,485 per game during the 2018 season.

2057.  Between ticket sales, media rights, conference disbursements, and other revenue sources, Penn State made a considerable amount of money from its football program. For example, Penn State made $100 million in revenue, including $34 million in ticket sales, from the football team in the 2017-2018 season. The university also received approximately $54 million in TV revenues from the Big Ten Conference.

**FOURTH AMENDED COMPLAINT**

2058.  Mr. McSorley received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Penn State. As a top collegiate football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2059.  Defendants' conspiracy greatly harmed Mr. McSorley. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2060.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. McSorley would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2061.  **The effect of Defendants' illegal conduct on Plaintiff Trenton Simpson.** Plaintiff Trenton Simpson, an individual, is a resident of Maryland. He worked as a college football player at Clemson University from 2020 to 2022.

2062.  The labor provided by Mr. Simpson was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2063.  Mr. Simpson was a highly recruited prospect out of high school who possessed unique talent. At Mallard Creek High School, he helped his team to a 10-1 record and number 3 ranking in the state of North Carolina according to MaxPreps. He started his high school career as a running back, playing both running back and linebacker in 2019. As a running back in high school, he recorded 97 carries for 799

**FOURTH AMENDED COMPLAINT**

yards and seven touchdowns with 8.2-yard average per carry. As a linebacker, he was also dominant: leading his team with 20 sacks in his senior year. He was named postseason First Team All-American by Sports Illustrated, won the Arnold R. Solomon Award for the North Carolina High School Football Player of the Year from NCPreps.com, and was selected to Under Armour All-America Game.

2064.  Rated a five-star recruit by 247Sports and Rivals and a four-star recruit by ESPN, he was widely considered one of the top recruits in the country. He was ranked the number 13 overall player in the nation by 247Sports, which also listed him as the second-best linebacker and top player in North Carolina; ESPN.com ranked him number 107 overall, the 11th best linebacker, and fourth-best player in North Carolina; and he was listed as the top player in North Carolina by the Charlotte Observer. Numerous top football programs competed for his talent. He ultimately chose to play for Clemson.

2065.  Mr. Simpson's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was a key defensive player for Clemson. In his freshman season (2020), he was credited with 32 tackles (6.5 for loss), 4.0 sacks, and a forced fumble in 271 snaps over 12 games (three starts). His four sacks were tied for third-best by a freshman in Clemson history and helped lead his team to an ACC championship and a berth in the college football playoff.

2066.  As a sophomore in 2021, Mr. Simpson was ranked third on the team with 78 tackles and finished second in both tackles for loss (12) and sacks (6), while also adding three pass breakups over 556 snaps in 13 games with 12 starts. He earned Second Team All-Conference selections from PFF and Third Team from Phil Steele as well as an All-ACC Academic Team selection. Against Florida State, he delivered a standout performance, tallying eight tackles, including 2.5 for loss, and adding a half-sack. He followed that with a dominant showing at Louisville, where he had a career-

**FOURTH AMENDED COMPLAINT**

high 13 tackles (3.0 for loss) and 2.0 sacks, earning Defensive Player of the Game

honors. Facing No. 13 Wake Forest, he recorded 10 tackles (1.5 for loss) and a sack,

once again earning team Defensive Player of the Game honors.

2067.  During his junior season in 2022, Mr. Simpson continued to excel, tallying

77 tackles, 4 tackles for loss, 2.5 sacks, three pass breakups, and two forced fumbles

across 616 defensive snaps in 12 starts. His impact was instrumental in leading his

team to an undefeated 8-0 ACC record, an ACC championship, and a berth in the

Orange Bowl. Unfortunately, an injury sidelined him from competing in the bowl game.

That season, he was named a semifinalist for the Butkus Award and the Lott IMPACT

Trophy, solidifying his status as one of the top linebackers in the nation. He also earned

a Third Team All-ACC selection, Third Team All-ACC honors from Phil Steele, and an

All-ACC Academic Team selection. He was furthermore a P.A.W Journey ambassador

his junior year, which is a leadership role where scholar-athletes at Clemson are elected

by their peers to lead in personal growth, life skills, and professional development,

acting as a leadership committee for the team.

2068.  During his collegiate career, Mr. Simpson was credited with 187 tackles

(22.5 for loss), 12.5 sacks, six pass breakups, and three forced fumbles in 1,443 snaps

over 37 games (27 starts) from 2020-22, earning him two-time Academic All-ACC Team

selection.

2069.  After the 2022 season, and after graduating in only three years, Mr.

Simpson declared for the NFL Draft, where he was selected in the third round (No. 86

overall) of the 2023 NFL Draft by the Baltimore Ravens.

2070.  During Mr. Simpson's collegiate football career, Clemson University's

football games were broadcast on major national television networks, including ESPN

and the ACC Network. Clemson frequently featured Mr. Simpson on its social media

platforms and other promotional materials, highlighting his achievements to enhance

game attendance and viewership. Millions of viewers watched Clemson football games

**FOURTH AMENDED COMPLAINT**

during this period. For instance, over 19 million people watched the 2021 Sugar Bowl against Ohio State. Tens of thousands of fans attended Clemson home games during this period, with an average of 80,694 attendees per home game in 2022. This high attendance average contributed significantly to the $31.9 million in total revenue that Clemson made from ticket sales in 2022. In 2022, the ACC distributed between $37.9 million and $41.3 million in revenue to each of its member schools, including Clemson.

2071.  Mr. Simpson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During part of his time at Clemson, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Clemson. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or Clemson that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a multi-year starter and one of the best linebackers in the country, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2072.  Defendants' conspiracy greatly harmed Mr. Simpson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

2073.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Simpson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2074.  **The effect of Defendants' illegal conduct on Plaintiff Trey Lance.**
Plaintiff Trey Lance worked as a college football player at North Dakota State University
from 2018 to 2020.

2075.  The labor provided by Mr. Lance was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

2076.  Mr. Lance was a highly recruited football player out of Marshall Senior
High School in Marshall, Minnesota, where he also played varsity basketball. As the
team's quarterback and safety, he passed for 1,386 yards and 14 touchdowns while
recording 54 tackles and three interceptions on defense in his senior year. Over the
course of his high school career, he served as team captain in both 2016 and 2017, was
a three-time all-district performer, was named to the 2017 Minnesota Viking All-State
Team, and was selected to compete in the 2017 Minnesota all-star game. As a three-
star recruit and the best quarterback prospect from the state of Minnesota, Mr. Lance
received multiple offers from competitive programs before ultimately committing to North
Dakota State.

2077.  Mr. Lance's job as a college football player was essentially a full-time one,
and an important and valuable one at that. After redshirting his first year, he entered the
2019 season as the team's starting quarterback, leading the team to a perfect 16-0
record—the first Division I football program to do so since Yale in 1894—and a Division
I Football Championship Subdivision (FCS) Championship. Not only was Mr. Lance
named the FCS National Performer of the Year, but he also won the Walter Payton
Award as the FCS's best offensive player (the first freshman ever to do so), and the
Jerry Rice Award as the FCS's most outstanding freshman player. He was
subsequently named on the preseason watch list for the Manning Award, given annually
to the top quarterback in college football.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

2078.  In the fall of 2020, Mr. Lance declared for the 2021 NFL Draft and was subsequently selected as the third overall pick by the San Francisco 49ers, becoming the second-highest drafted FCS player in history.

2079.  During Mr. Lance's collegiate career, North Dakota State was a member of the Missouri Valley Football Conference—which is part of the Football Championship Subdivision—and its games were regularly carried by national television broadcasters such as NBC and ESPN. North Dakota State frequently featured Mr. Lance on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership. For example, the 2019-2020 FCS Championship game where Mr. Lance won the MVP to beat James Madison 28-20 saw nearly 2.7 million in television viewership. North Dakota State also attracts strong local support, averaging close to 17,500 per game, or 92% capacity, in the 2019 season.

2080.  Between ticket sales, media rights, conference disbursements, and other sources, North Dakota State has made a considerable amount of money from its football program. For example, the university generated over $27 million in total athletic revenues in 2019, of which more than $4 million came from media rights and licensing fees.

2081.  Mr. Lance received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from North Dakota State. As a nationally recognized quarterback, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2082.  Defendants' conspiracy greatly harmed Mr. Lance. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2083.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Lance would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2084.  **The effect of Defendants' illegal conduct on Plaintiff Troy Fumagalli.** Plaintiff Troy Fumagalli worked as a college football player at the University of Wisconsin from 2013 to 2017.

2085.  The labor provided by Mr. Fumagalli was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2086.  Mr. Fumagalli was a highly recruited prospect out of high school who possessed unique talent. At Waubonsie Valley High School, he excelled as a tight end, showcasing his skills and athleticism. He was a three-star recruit by ESPN, Rivals and Scout and was ranked as the number 32 tight end in his class by ESPN. A standout defensive player as well, he finished his high school career with 172 tackles, four sacks, and six deflected passes as well as 64 receptions for 1,770 yards. Despite receiving offers from multiple universities, Mr. Fumagalli ultimately chose to play for the Wisconsin Badgers.

2087.  Mr. Fumagalli's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was a key offensive player for Wisconsin's football team, becoming one of the most decorated tight ends in the Big Ten Conference. After redshirting the 2013 season, he appeared in all 14 games in 2014, with two starts, recording14 catches for 187 yards. That year, he earned Academic All-Big Ten honors.

**FOURTH AMENDED COMPLAINT**

2088.  As a sophomore in 2015, he played in 11 games with four starts and caught 28 passes for 313 yards and one touchdown. He also caught six passes for 60 yards, both career highs, and scored his first career touchdown at Nebraska. His performance during the 2015 season earned him consensus All-Big Ten honorable mention honors.

2089.  In his junior season (2016), Mr. Fumagalli had a breakout year starting all 14 games at tight end and recording 47 receptions for 580 yards and two touchdowns. He was named the Offensive MVP of the 2017 Cotton Bowl Classic after recording six receptions for 83 yards and a touchdown. He also earned Second Team All-Big Ten (coaches) and Third Team All-Big Ten (media).

2090.  As a senior in 2017, he continued his stellar performance, playing in 13 games and starting 12 at tight end, posting 46 receptions for 547 yards and 4 touchdowns. His performance earned him recognition as a John Mackey Award finalist, which is awarded to the nation's top tight end, and a Burlsworth Trophy finalist, an award given to the most outstanding football player who began his career as a walk-on. He shared the Jimmy Demetral Team MVP award with fellow senior teammates and was named Second Team All-America (AFCA, AP, FWAA, Walter Camp), Kwalick-Clark Big Ten Tight End of the Year, First Team All-Big Ten (coaches), Second Team All-Big Ten (media), and John Mackey Tight End of the Week. Notably, Mr. Fumagalli was also invited to the 2018 Senior Bowl.

2091.  During the 2018 NFL Draft, the Denver Broncos selected Mr. Fumagalli with the number 156 overall pick in the 5th round.

2092.  During Mr. Fumagalli's collegiate football career, the University of Wisconsin's football games were broadcast on major national television networks, including Fox and ESPN. Wisconsin frequently featured Mr. Fumagalli on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Wisconsin

**FOURTH AMENDED COMPLAINT**

Case No. 1:23-cv-03076-CNS-STV    Document 163    filed 06/06/25    USDC Colorado
pg 463 of 841

football games during his tenure. For instance, 5.2 million viewers watched the 2017 Michigan-Wisconsin game where Mr. Fumagalli had 3 catches for 38 yards. Furthermore, tens of thousands of fans attended Wisconsin home-games with an average of 78,824 attendees per game in 2017 for a total attendance of 551,766 fans that year, contributing to over $32 million in ticket sales that year. The Big Ten Conference distributed a base payout of $54 million to each of its member schools, including Wisconsin, in 2017. For Wisconsin's berth in the 2017 Orange Bowl, the Big Ten received $27.5 million.

2093.  Mr. Fumagalli received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Wisconsin, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Wisconsin. As a multi-year starter and one of the best tight ends in the country, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2094.  Defendants' conspiracy greatly harmed Mr. Fumagalli. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

2095.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Fumagalli would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2096.  **The effect of Defendants' illegal conduct on Plaintiff Tyler Baum.** Plaintiff Tyler Baum worked as a college baseball player at the University of North Carolina from 2016 to 2019.

**FOURTH AMENDED COMPLAINT**

2097.  The labor provided by Mr. Baum was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2098.  Mr. Baum was a highly recruited baseball player out of high school. As a pitcher for West Orange High School in Winter Garden, Florida, he went 6-1 with a 0.70 ERA and 70 strikeouts over 40 innings in his junior year. Focusing mostly on the offensive side of the game his senior year, he batted .388 while leading the team with six total home runs, earning 2016 Rawlings-Perfect Game first-team All-American selection. He was ranked the No. 7 right-handed pitcher in the country by PBR, the No. 2 right-handed pitcher and the No. 7 overall player in Florida by Perfect Game, and he was named a 2016 Rawlings-Perfect Game first-team All-American. As one of the top pitching prospects in the country, he decided to enroll at the University of North Carolina.

2099.  Mr. Baum's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. In his freshman season, he went a perfect 7-0 with a 2.57 ERA through 63 innings, becoming the eighth pitcher in program history to win at least seven decisions without a loss in a single season. After securing a win with three scoreless innings against Boston College in the ACC tournament, he allowed only one run over 5.1 innings to best Florida Gulf Coast University in the 2017 NCAA Chapel Hill Regional. The following summer, he impressed in the Cape Cod League with the Harwich Mariners, earning all-league honors.

2100.  In his sophomore 2018 season, Mr. Baum played in 18 games and started in 12; set several personal records, including striking out a career-high 10 batters against South Florida and throwing a career-high seven innings against Pittsburgh; and helped the team advance to the College World Series with a shutout relief appearance over North Carolina A&T. Mr. Baum finished his collegiate career with new career-highs

**FOURTH AMENDED COMPLAINT**

in strikeouts and innings pitched in 2019 where he struck out 99 batters in 93 innings with a 3.87 ERA. His performance that season earned him NCAA Division I Atlantic All-Region Second Team and 2019 All-ACC honors. Mr. Baum was subsequently drafted in the second round of the 2019 MLB Draft by the Athletics.

2101.  During Mr. Baum's time at the University of North Carolina, the program was a member of the Atlantic Coast Conference and its games were regularly carried by the conference's own ACC Network, with key matchups and NCAA tournament games broadcasted by ESPN. For example, Mr. Baum's win over North Carolina-Wilmington in the Regional round was on ESPN3, while his Super Regional start against Auburn was broadcasted on ESPN2. In fact, in 2018, the NCAA Super Regional games averaged close to 450,000 viewers on ESPN and the College World Series games averaged over 1.1 million in television viewership. Moreover, North Carolina frequently featured Mr. Baum on its social media accounts, highlighting his accomplishments and using him to boost game attendance and viewership. North Carolina has no doubt benefited financially from its baseball program, especially considering that roughly 6.7% of an ACC institution's entire revenue comes from non-football and non-basketball sports.

2102.  Mr. Baum received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a partial scholarship and other education-related expenses.

2103.  In fact, Mr. Baum received only a partial athletic scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Baum, preventing him from enjoying the benefit of bargaining for scholarship money in a competitive environment. But for the illegal and unfair restraints put in place, Mr. Baum would have received a greater amount of scholarship money than he received. As a top-ranked high school baseball recruit, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2104.  Moreover, during his time at the University of North Carolina, Mr. Baum was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. As a standout baseball player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2105.  Defendants' conspiracy greatly harmed Mr. Baum. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received, and would have received money for his NIL from third parties.

2106.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Baum would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2107.  **The effect of Defendants' illegal conduct on Plaintiff Tyree St. Louis**. Plaintiff Tyree St. Louis worked as a college football player at the University of Miami from 2015 to 2018.

2108.  The labor provided by Mr. St. Louis was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2109.  Mr. St. Louis was a highly recruited prospect out of high school who possessed unique talent. A consensus four-star recruit at IMG Academy, he was widely considered one of the top offensive linemen in the country. He was rated as an ESPN Top 300 prospect and ranked ninth-best offensive lineman in the state of Florida by ESPN. During his high school career, he attended the Nike Football Training Camp in Orlando and was honored as the MVP of the offensive line group at the Rivals Camp Series in Orlando. He was also selected to the Under Armour All-American team.

**FOURTH AMENDED COMPLAINT**

Despite receiving offers from Florida, Kentucky, Tennessee and USC, Mr. St. Louis chose to play for Miami.

2110.  Mr. St. Louis's job as a college football player was essentially a full-time one, and an important and valuable one at that. In his freshman season (2015), he saw action largely on special teams. During his sophomore season in 2016, Mr. St. Louis became a full-time starter at right tackle, playing in all games that season and starting the final eight, propelling the Hurricanes offense to average 425.9 yards per game. During his junior season in 2017, he started all 13 games at right tackle, helping lead his team to the ACC Championship game and the Orange Bowl.

2111.  In his senior season (2018), Mr. St. Louis transitioned to left tackle, starting all 13 games at the position. He finished his career with 34 consecutive starts, the longest streak on offense. His impressive senior season earned him All-ACC Honorable Mention recognition.

2112.  In 2019, Mr. St. Louis signed with the New England Patriots and shortly thereafter signed with the Indianapolis Colts, further demonstrating the value of his talent and labor.

2113.  During Mr. St. Louis's collegiate football career, his performances helped the Hurricanes achieve national recognition, with the team frequently appearing on ESPN and the ACC Network. Miami frequently featured Mr. St. Louis on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of people watched Miami football during Mr. St. Louis's career. For instance, over 11 million people watched the Orange Bowl between Wisconsin and Miami. Furthermore, tens of thousands of fans attended Miami football home games with an average of 61,469 attendees per game for a total attendance of 368,814 in 2018, generating millions of dollars in revenue. In 2018, the ACC distributed a median of $31.1 million to each its member schools, including Miami.

**FOURTH AMENDED COMPLAINT**

2114.  Mr. St. Louis received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Miami, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Miami. As a multi-year starting offensive lineman in a Power Five conference, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2115.  Defendants' conspiracy greatly harmed Mr. St. Louis. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

2116.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. St. Louis would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2117.  **The effect of Defendants' illegal conduct on Plaintiff Valentino Daltoso**. Plaintiff Valentino Daltoso worked as a college football player at the University of Oregon from 2016 to 2017 and at the University of California, Berkeley from 2017 to 2021.

2118.  The labor provided by Mr. Daltoso was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2119.  Mr. Daltoso was a highly competitive football player coming out of high school. Playing on both the offensive and defensive line at Boise High School in Idaho, he was an offensive second-team All-State and First Team All-Southern Idaho Conference selection in 2015, as well as a second-team all-league selection as a

**FOURTH AMENDED COMPLAINT**

defensive lineman. After starting every game in his final three high school seasons, Mr. Daltoso chose to enroll at the University of Oregon.

2120.  Mr. Daltoso's job as a college football player was essentially a full-time one, and an important and valuable one at that. After redshirting his first year at Oregon, he transferred to Berkeley in 2017, where he started nine games at right guard and helped the offense rank third in the Pac-12 in completions per game and sixth in program history in total passing yards. He started all 13 games in 2018, when he switched to play left guard and left tackle, helping the offense improve by an average of 32.3 yards per game compared to the previous season. Ahead of the 2019 season, he earned an honorable mention preseason All-Pac-12 selection by Pro Football Focus. In 2019, he demonstrated his versatility and understanding of the game by starting 11 games at three different offensive line positions.

2121.  After a shortened 2020 season, Mr. Daltoso earned All-Pac-12 Fourth Team Preseason honors. He returned in 2021 to start in all 12 games, helping the offense to break the program record for least turnovers in a season. His performance that season earned him the team's Brick Muller Award, presented to the most valuable offensive lineman at UC Berkeley.

2122.  During Mr. Daltoso's collegiate career, UC Berkeley was a member of the Pac-12 Conference and its games were regularly carried by national television broadcasters such as Fox and ESPN. UC Berkeley also frequently featured Mr. Daltoso on its social media accounts, highlighting his contributions to the team and, no doubt, using him to boost game viewership and attendance. From 2015 to 2019, for example, UC Berkeley football games saw a weekly average of 730,000 television viewers, with games against other top-ranked programs drawing significantly more viewers. For instance, Berkeley's 2019 San Francisco Bowl victory over the University of Illinois saw 1.87 million in TV viewership. UC Berkeley games also attract considerable local support, averaging around 42,433 fans in attendance per game in 2019.

**FOURTH AMENDED COMPLAINT**

2123.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources, UC Berkeley has made a significant amount of money from its football program. For example, the Pac-12 Conference distributed an average of $32.2 million in revenues to each of its member schools for the 2019 fiscal year. In fact, for that same period, UC Berkeley recorded $38.1 million in revenues from its football program alone.

2124.  Mr. Daltoso received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses at UC Berkeley. And during most of his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his schools. Even for the time in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from UC Berkeley, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout football player, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2125.  Defendants' conspiracy greatly harmed Mr. Daltoso. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2126.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Daltoso would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2127.  **The effect of Defendants' illegal conduct on Plaintiff Will Levis.**
Plaintiff Will Levis worked as a college football player at Pennsylvania State University
from 2018 to 2020 and at the University of Kentucky from 2021 to 2022.

2128.  The labor provided by Mr. Levis was of great value to Defendants. And it
was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

2129.  Mr. Levis was a highly recruited football player out of Xavier High School
in Middletown, Connecticut. In his junior year, he registered 1,972 passing yards with 19
passing touchdowns alongside six rushing touchdowns. As the team captain, he set
school records with 27 passing touchdowns and 2,793 passing yards in his senior year.
That year, he was also named to All-Courant First Team and All-Connecticut Second
Team, won the Hartford Courant's Offensive Player of the Year award, and earned All-
Southern Connecticut Conference Tier 1 accolades. As a consensus three star-recruit
and the second-best overall prospect from Connecticut, Mr. Levis received 24 offers
from competitive programs and ultimately committed to Penn State.

2130.  Mr. Levis's job as a college football player was essentially a full-time one,
and an important and valuable one at that. After redshirting his first year at Penn State,
he earned his first start in 2019 against Rutgers, where he had one touchdown and
rushed for 108 yards—the tenth most in program history by a quarterback. Despite
limited action over his Penn State career, he amassed 473 rushing yards, good for 10th
all-time by a Penn State quarterback. He immediately impressed after transferring to the
University of Kentucky in 2021 as a junior, earning the starting position and getting
elected as one of the team captains. Over his 13 starts that season, he completed 233
of 353 passes for 2,827 yards and 24 touchdown passes while running for 376 yards
and a team-high nine rushing touchdowns. His 3,202 total offensive yards made him the
seventh player in school history to reach 3,000 total yards in a season. Over the course

**FOURTH AMENDED COMPLAINT**

of the 2021 season, he was a two-time FBS National Offensive Player of the Week, a two-time Manning Award Quarterback of the Week, and twice earned honorable mentions by the College Football Performance Awards for Performer of the Week. He was also named the Walter Camp Connecticut Player of the Year, awarded to the top college football player in the state.

2131.  In the 2022 season—the final season of his collegiate career—Mr. Levis scored 19 touchdowns in 11 starts and was a Top 10 nominee to the Johnny Unitas Golden Arm Award, honoring the best upperclassman collegiate quarterback in the nation. He had a number of standout performances, leading Kentucky to a comeback victory against No. 12 Florida, passing for a season-high 377 yards against Youngstown State, tossing four touchdowns over Northern Illinois, and becoming only the third starting quarterback in Kentucky history to defeat Louisville in back-to-back games. In recognition of his academic and athletic excellence, he was named the Academic All-America Division I Football Team Member of the Year by the College Sports Communicators, becoming the first Kentucky football player and the second ever Kentucky student-athlete to be awarded this honor.

2132.  Mr. Levis was subsequently drafted by the Tennessee Titans in the second round of the 2023 NFL Draft, further demonstrating the value of his talent and labor.

2133.  During Mr. Levis's collegiate career, Penn State and Kentucky were members of the Big Ten Conference and the SEC, respectively, and their games were regularly broadcast on ABC and ESPN. Both universities frequently featured Mr. Levis on their social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

2134.  From 2015 to 2019, Penn State games saw a weekly average of 2.55 million television viewers from 2015 to 2019, and Kentucky games in 2022 enjoyed an average of 1.35 million viewers per game. Important matchups against key opponents

**FOURTH AMENDED COMPLAINT**

drew significantly more viewers. For example, Kentucky's 2022 Citrus Bowl matchup against Iowa—where Mr. Levis passed for 233 yards and one touchdown to secure a school-record fourth-straight bowl win—saw nearly 6.5 million in viewership. While Penn State boasts having one of the largest home crowds in the nation, ranking second in 2019 with 105,678 in attendance per home game, Kentucky home games are also regularly sold out, averaging 60,289, or 99% capacity, per game during the 2022 season.

2135.  Between ticket sales, media rights, conference distribution, and other sources, Penn State and Kentucky made a considerable amount of money from their football programs. For example, while Penn State made $100 million in revenue from its football team in 2018, Kentucky's football program brought in $50.39 million in revenue of which $19.23 million came from ticket sales. Moreover, Penn State received $54 million from the Big Ten Conference in revenue distribution in 2018 and Kentucky received $49.9 million in revenue disbursements from the SEC in 2022.

2136.  Mr. Levis received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during most of his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his schools. Even for the two seasons at Kentucky in which he was permitted to earn NIL compensation, he was still barred from receiving compensation from Defendants or from Kentucky, and he did not receive the full amount from third parties that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a standout starting quarterback, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2137.  Defendants' conspiracy greatly harmed Mr. Levis. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2138.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Levis would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2139.  **The effect of Defendants' illegal conduct on Plaintiff Moritz Wagner.** Plaintiff Moritz Wagner worked as a college basketball player at the University of Michigan from 2015 to 2018.

2140.  The labor provided by Mr. Wagner was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2141.  A native of Berlin, Germany, he played for Alba Berlin, one of the top professional basketball clubs in Europe, before choosing to play college basketball in the United States. Although he played for the pro team Alba Berlin, he was not paid for his contributions in light of the NCAA's restrictions. He played 18 games with ALBA Berlin II, averaging 16.8 points per game and posting 15 double figure scoring games including a career best 25 against RSV Eintracht. He played in the 2015 Belgrade adidas Next Generations Tournament, averaging 9.6 points, 5.4 rebounds, 1.6 assists, and 2.0 steals per game. He also played with the German National Team at the 2014 European Under 18 Division B Championships, helping Germany to a 9-0 record and winning the gold medal, averaging 5.2 points. He also played in the 2015 NBBL All-Star game, helping North team to a 67-63 win and helped Alba Berlin win the 2014 NBBL German Championship. As a skilled 6-foot-11 forward with perimeter shooting ability and strong post play, he was widely regarded as one of the most promising international prospects of his class and chose to play at Michigan.

**FOURTH AMENDED COMPLAINT**

2142.  Mr. Wagner's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Over the course of his three seasons at Michigan, he developed into one of the team's most impactful players, helping lead the Wolverines to two Big Ten Tournament championships, three straight NCAA Tournament appearances, and an NCAA National Championship Game appearance. As a freshman in 2015-16, Mr. Wagner played in 30 games, and posted a dominant performance against Charlotte in the Battle 4 Atlantis scoring 19 points going 8-for-9 from the field, including making his first career three-pointer and adding two blocks. He grabbed a season-best eight rebounds in NCAA First Four win over Tulsa and finished the 2016 postseason going 9-for-9 from the field.

2143.  During Mr. Wagner's sophomore season in 2016-17, he became a full-time starter, starting all 38 games. He averaged 12.1 points and 4.2 rebounds per game, emerging as a key offensive weapon for Michigan. He scored a season-high 26 points in the NCAA Tournament second-round win over Louisville. He earned Academic All-Big Ten, All-Big Ten honorable mention, U-M's Rudy Tomjanovich Most Improved Player, U-M's Morgan/Bodnar Award for Academic Achievement, and CoSIDA Academic All-District.

2144.  As a junior in 2017-18, Mr. Wagner had a breakout year. He was named team captain and started all 39 games, averaging 14.6 points and 7.1 rebounds per game, leading Michigan to 33 wins, the most in program history. He delivered a career-defining performance in the 2018 NCAA Tournament, scoring 24 points and grabbing 15 rebounds in the Final Four victory over Loyola Chicago. His dominant play helped lead Michigan to the National Championship Game. For his efforts, he earned Second Team All-Big Ten, Big Ten Tournament Most Outstanding Player, All-Big Ten Tournament Team, preseason All-Big Ten Team, Academic All-Big Ten, NCAA Final Four All-Tournament Team, NCAA West Region All-Tournament Team, U-M's Bill Buntin Most Valuable Player, U-M's Loy Vaught Rebounding Award, U-M's Morgan/Bodnar Award,

**FOURTH AMENDED COMPLAINT**

Associated Press Second Team All-Big Ten, USBWA All-District V, and NABC Second
Team All-District.

2145.  During the 2018 NBA draft, Mr. Wagner was selected in the first round,
25th overall, by the Los Angeles Lakers.

2146.  During Mr. Wagner's collegiate basketball career, his performances were
regularly aired on ESPN, Fox, TBS, CBS, and the Big Ten Network, drawing millions of
viewers. For example, the NCAA Tournament national championship against Villanova
amassed 16 million viewers. Michigan frequently featured Mr. Wagner on its social
media platforms and other promotional materials, highlighting his achievements to
enhance game attendance and viewership. Tens of thousands of fans attended
Michigan basketball games during Mr. Wagner's tenure. In 2018, for example, Mr.
Wagner and his teammates drew an average of 10,871 attendees per game for a total
attendance of 173,948 on the year, generating millions in ticket sales. In 2018, the Big
Ten distributed $51.1 million to Michigan largely thanks to a huge rights deal with ESPN
and Fox and the success of the Big Ten Network.

2147.  Mr. Wagner received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During his time at Michigan, he was not permitted to
receive money for his NIL, whether from third parties, Defendants, or Michigan. As an
international prospect who became a key player on a national runner-up team, he would
have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2148.  Defendants' conspiracy greatly harmed Mr. Wagner. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college basketball player than he received
and would have received money for his NIL.

**FOURTH AMENDED COMPLAINT**

2149.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Wagner would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2150.  **The effect of Defendants' illegal conduct on Plaintiff Yetur Gross-Matos.** Plaintiff Yetur Gross-Matos worked as a college football player at Pennsylvania State University from 2017 to 2019.

2151.  The labor provided by Mr. Gross-Matos was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2152.  Mr. Gross-Matos was a highly recruited football player out of Chancellor High School in Fredericksburg, Virginia. A First Team All-Conference selection in both 2015 and 2016, he logged 272 tackles, forced six fumbles, and broke up five passes over three seasons. In his senior year, he became the school's all-time leader in sacks with 37 total and was selected to second-team All-State by USA Today. As a four-star recruit and a top-five prospect from Virginia, he received 20 offers and ultimately chose Penn State over competitive programs such as Alabama and Clemson.

2153.  Mr. Gross-Matos's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a true freshman in 2017, he appeared in all 13 games and registered 17 tackles and 1.5 sacks. He had his first career fumble recovery against Georgia State and registered a sack in the fourth quarter of the year-end Fiesta Bowl over Washington. In his first season as a starter in 2018, he tallied 54 tackles and eight sacks, including recording at least a half-sack in five straight games. After a career-high 10-tackle game at Indiana, he followed up a week later with nine tackles, four tackles for loss and two sacks against Iowa, earning himself the Defensive Player of the Week award. He finished the season ranking

**FOURTH AMENDED COMPLAINT**

second in the Big Ten with 1.5 tackles for loss per game and was voted first-team All-Big Ten by media and league coaches.

2154.  In 2019, he was instrumental to Penn State's 11-2 record with his 40 tackles and 9.5 sacks. In addition to being selected again by league coaches and media to first-team All-Big Ten, he was named to Phil Steele All-America Third Team and was a semifinalist for the Lombardi Award, honoring the most outstanding collegiate football lineman, and a finalist for the Ted Hendricks Award, given annually to the nation's top collegiate defensive end. He was also named second-team Midseason AP All-American and earned All-ECAC Defensive honors. By the end of his last season at Penn State, Mr. Gross Matos ranked 10th all-time in program history with 19 career sacks, and he was subsequently selected in the second round of the 2020 NFL Draft by the Carolina Panthers.

2155.  During Mr. Gross-Matos's collegiate career, Penn State was a member of the Big Ten Conference and its games were regularly carried by national television broadcasters such as ABC and Fox. As one of the most popular college football teams in the country, Penn State ranked 10th in the nation in television viewership, attracting an average of 2.55 million viewers per game from 2015 to 2019. And important contests against key rivals drew significantly more viewers. For example, the 2017 Fiesta Bowl in which Mr. Gross-Matos took down Washington's quarterback in the fourth quarter to help deliver the win saw over 10 million in viewership.

2156.  Penn State frequently featured Mr. Gross-Matos on its social media accounts, highlighting his accomplishments and using him to boost game viewership and attendance. Mr. Gross-Matos also participated in interviews and media events that no doubt boosted the program's profile, including an ESPN special about his life that was shown on College GameDay.

2157.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Penn State has made a significant amount of revenue from its

**FOURTH AMENDED COMPLAINT**

football program. Penn State's athletic department as a whole received approximately $52.5 million in revenue distributions from the Big Ten Conference for the 2018 fiscal year. Penn State also attracts one of the largest home crowds in all of college football, making about $38 million in ticket sales in 2018. Most notably, Penn State's football program alone made $54.26 million in profits in 2018-2019.

2158.  Mr. Gross-Matos received none of those profits, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his collegiate career, he was not permitted to receive money for use of his NIL, whether from third parties or from Defendants or from Penn State. As a top collegiate football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2159.  Defendants' conspiracy greatly harmed Mr. Gross-Matos. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

2160.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Gross-Matos would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2161.  **The effect of Defendants' illegal conduct on Plaintiff Zak Irvin.** Plaintiff Zak Irvin worked as a college basketball player at the University of Michigan from 2013 to 2017.

2162.  The labor provided by Mr. Irvin was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

**FOURTH AMENDED COMPLAINT**

2163.  Mr. Irvin was a highly recruited basketball player out of Hamilton Southeastern High School in Fishers, Indiana, where he helped the team win three straight Hoosier Crossroad League titles and reach a perfect 27-0 record over three years. As a junior, he averaged 18.8 points and 6.2 rebounds and made the Indiana "Core" Junior All-State team. He had an even more impressive senior year in 2013, averaging 26.4 points and 7.3 rebounds per game, earning Indiana All-State First Team honors by Associated Press, and becoming Indiana's Mr. Basketball and Indiana's Gatorade Player of the Year. As a Rivals.com five-star recruit and the top prospect from Indiana, he received interest from Michigan as early as his sophomore year in 2011 and chose Michigan over Illinois, Purdue, and Indiana.

2164.  Mr. Irvin's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He played in all 37 games as a freshman and helped Michigan win its outright first Big Ten Championship in 28 years. He was also recognized as the Big Ten Conference Freshman of the Week following a strong 24-point performance against Coppin State. As a sophomore in 2014-2015, he ranked second in the Big Ten with 36.2 minutes per game and led the team with 14.3 points per game and 33 total steals. Notably, he posted three double-double performances that season, including a career-high 28 points against Northwestern, and made a team-best 77 three-pointers.

2165.  After recovering from an injury, Mr. Irvin returned in fall of 2015 and started 34 games. In addition to being second on the team in rebounding, assists, and steals, he scored 17 points to help Michigan advance to the Big Ten Tournament semifinal after beating No. 1 Indiana.

2166.  In his final season at Michigan (2016-2017), Mr. Irvin started all 38 games—one of only three players on the team to do so—and scored double figures in 31 games. In the Big Ten Tournament, he averaged 15.43 points and 5.5 rebounds to help deliver the championship. After upsetting No. 2 seed Louisville to advance to the

**FOURTH AMENDED COMPLAINT**

Sweet 16 in the NCAA Tournament, he capped off his collegiate career by scoring 19 points against Oregon.

2167.  Unsurprisingly, Mr. Irvin won numerous accolades over the course of his collegiate career, including the 2016 2K Classic Most Valuable Player, All-Big Ten Honorable Mention (2016, 2017), All-Big Ten Tournament Team (2016, 2017), UM's Bill Buntin Most Valuable Player Award (2015, 2016), UM's Loy Vaught Rebounding Award (2015), and UM's Wayman Britt Outstanding Defensive Player (2015, 2017)—to name a few.

2168.  During Mr. Irvin's time at the University of Michigan, the program was a member of the Big Ten Conference and its games were regularly carried by the conference's own Big Ten Network, with key matchups broadcasted nationally by Fox and ESPN. NCAA Tournament games were especially popular; for instance, Michigan's 2017 March Madness win over Oklahoma State saw 4.2 million in viewership. Michigan also frequently featured Mr. Irvin on its social media accounts, highlighting his accomplishments and, no doubt, using him to boost game attendance and viewership.

2169.  Between ticket sales, media rights, Big Ten Conference disbursements, and other sources, Michigan has made a considerable amount of money from its basketball program. For example, in 2016 alone, Michigan made $16.9 million in revenue from its men's basketball program, amounting to nearly $1 million per player. Michigan also received $36.3 million in revenue disbursements from the Big Ten Conference in 2017.

2170.  Mr. Irvin received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at the University of Michigan, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Michigan. As a highly decorated college basketball star, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

2171.  Defendants' conspiracy greatly harmed Mr. Irvin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

2172.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Irvin would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2173.  **The effect of Defendants' illegal conduct on Plaintiff Zavier Simpson.** Plaintiff Zavier Simpson worked as a college basketball player at the University of Michigan from 2016 to 2020.

2174.  The labor provided by Mr. Simpson was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2175.  Mr. Simpson was a highly sought-after prospect coming out of high school, recognized for his exceptional talent. A native of Lima, Ohio, he was ranked No. 48 overall in ESPN's 2016 recruiting class and the No. 3 player in the state.

2176.  Throughout his high school career, he amassed an impressive list of accolades, including the 2016 Ohio Gatorade Player of the Year, Ohio Mr. Basketball, and Division I Player of the Year. He was named to First Team All-Ohio in both 2015 and 2016, and earned Division III All-Ohio Honorable Mention in 2014. Additionally, he was recognized as the Three Rivers Conference Player of the Year (2016), All-Northwest Ohio Player of the Year (2015, 2016), All-District 8 Player of the Year (2015, 2016), and Lima News Dream Team Player of the Year (2015, 2016), while also securing First Team All-City honors in 2015 and 2016.

**FOURTH AMENDED COMPLAINT**

2177.  On the court, Simpson played a pivotal role in Lima's success. In 2016, he helped lead his team to the OHSAA Division I state championship game, scoring 17 points and dishing out seven assists in a hard-fought 57-55 loss to Westerville South. Two years earlier, he guided Lima Catholic Central to victory in the 2014 OHSAA Division III state championship with a 64-62 win over Cleveland Villa Angela-St. Joseph. Mr. Simpson received offers from multiple universities, but ultimately chose to play for Michigan.

2178.  Mr. Simpson's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Over the course of his four seasons at Michigan, he became one of the most decorated point guards in school history, known for his elite defense, leadership, and signature hook shot. He helped lead the Wolverines to a Big Ten Tournament championship, an NCAA National Championship Game appearance, and multiple deep NCAA Tournament runs.

2179.  As a freshman in 2016-17, Mr. Simpson played in all 38 games, one of only eight Wolverines to do so. That year, he earned the U-M's Steve Grote Hustle Award and helped U-M to a Big Ten Tournament title, a NCAA Sweet 16 appearance, and the 2017 2K Classic title.

2180.  During his sophomore season in 2017-18, he appeared in 41 games and started 29. He led Michigan to another Big Ten Tournament championship and a Michigan record 33 wins, and helped guide his team to the national championship game. He played a crucial role in Michigan's Final Four run, helping shut down opposing guards and running the offense efficiently. That season, he averaged 7.3 points per game, posting 18 double figure scoring games with a season-high 16 points, twice – at No. 4 Michigan State and No. 3 Purdue. He led U-M with 150 assists and with 53 steals, posting a career-high six steals against Texas A&M. His performance earned him U-M's Wayman Britt Outstanding Defensive Player, U-M's Rudy Tomjanovich Most

**FOURTH AMENDED COMPLAINT**

Improved Player, U-M's Gar Grant Award for Most Assists, and U-M's Steve Grote
Hustle Award.

2181.  As a junior in 2018-19, Mr. Simpson started all 37 games as team captain
and averaged 8.8 points per game, posting 17 double figure games and one 20+ game.
He led Michigan and was second in the Big Ten and ranked fifth nationally with 244
assists (6.6 per game). Additionally, his 244 assists were the second best total all-time
in a single season and set the U-M junior season record. He also led Michigan with 53
steals, posting a season-high five steals at Villanova. His performance earned him
Second Team All-Big Ten, Big Ten All-Defensive Team, Big Ten All-Tournament Team,
Associated Press First Team All-Big Ten, NABC Second Team All-District, USBWA All-
District V, a spot on the Basketball Hall of Fame Tip-Off All-Tournament team, U-M's Bill
Buntin Most Valuable Player, U-M's Gary Grant Award for Most Assists, and U-M's
Steve Grote Hustle Award. He was also a semifinalist for the Naismith Defensive Player
of the Year Award and helped U-M to another NCAA Sweet 16 appearance and another
30-win season.

2182.  During his senior season in 2019-20, Mr. Simpson started 30 games as
team captain. Although the season cut short due to Covid-19, he still managed to tie for
U-M lead with 12.9 points per game, posting 18 double figure scoring games, three 20+
point games, and one 30+ point game. He led U-M and Big Ten and ranked third
nationally with 7.9 assists per game; his 236 assists were the third best total all-time in a
single season, setting the U-M senior season record. That year, he earned Second
Team All-Big Ten, Preseason All-Big Ten, Associated Press Second Team All-Big Ten,
NABC Second Team All-District, USBWA All-District V, and a spot on the Battle 4
Atlantis All-Tournament team. He also helped U-M to the 2020 Battle 4 Atlantis title,
winning three straight games. Mr. Simpson finished his career as the all-time winningest
Wolverine along with classmate Jon Teske.

**FOURTH AMENDED COMPLAINT**

2183.  During his collegiate basketball career, Mr. Simpson's performances regularly appeared in primetime matchups on ESPN, CBS, Fox Sports, and the Big Ten Network. Michigan frequently featured Mr. Simpson on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Millions of viewers watched Michigan basketball games during this period. For example, the 2018 NCAA Tournament national championship against Villanova amassed 16 million viewers. Furthermore, tens of thousands of fans attended Michigan basketball games in 2018 with an average of 10,871 attendees per game for a total attendance of 173,948 for the year, generating millions in ticket sales. In 2018, the Big Ten distributed $51.1 million to Michigan largely thanks to a huge rights deal with ESPN and Fox and the success of the Big Ten Network.

2184.  Mr. Simpson garnered significant attention for his devastating hook shots that made him a "college basketball cult hero at Michigan." Recordings of this shot garnered over 1.3 million views on ESPN's TikTok account, and the NCAA published an article about his "lethal skyhook". His signature shot earned him the nickname "Captain Hook".



Source: https://www.ncaa.com/news/basketball-men/article/2019-01-10/how-michigan-basketballs-zavier-simpson-developed-lethal

**FOURTH AMENDED COMPLAINT**

2185.  Mr. Simpson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Michigan, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Michigan. As a high-profile starting point guard for a national powerhouse, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2186.  Defendants' conspiracy greatly harmed Mr. Simpson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL.

2187.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Simpson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2188.  **The effect of Defendants' illegal conduct on Plaintiff Zachary Gelof.** Plaintiff Zachary ("Zack") Gelof worked as a college baseball player at the University of Virginia from 2018 to 2021.

2189.  The labor provided by Mr. Gelof was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2190.  Mr. Gelof was a highly recruited prospect out of high school who possessed unique talent. A standout at Cape Henlopen High School, he was named Delaware's Gatorade Player of the Year. As a senior, he dominated at the plate, batting .465 while leading the state in hits (35), runs (37), home runs (7), and was 28-for-28 in stolen bases. He added 17 RBI and sported a .613 OBP. Equally dominant on the

**FOURTH AMENDED COMPLAINT**

mound, he finished his senior season with a 4-0 record, a 1.30 ERA, and 34 strikeouts over 26 innings pitched. His outstanding performance earned him First Team All-State honors from the *Delaware News Journal*, and he graduated as the state's all-time leader in runs scored (103) and stolen bases (81-for-81), while ranking second in career hits (105).

2191.  A four-year full-time starter, Gelof was voted Team MVP three times by his teammates and earned Henlopen Conference honors all four years as both a shortstop and right-handed pitcher. He was also a two-time Conference Player of the Year. In 2018, he played a pivotal role in leading Cape Henlopen to its first-ever baseball state championship. His remarkable high school career earned him national recognition, including Perfect Game/Rawlings 2018 Honorable Mention All-American honors, First Team Northeast All-Region honors, and a ranking as the No. 73 Top-100 freshman in the ACC before the 2019 season.

2192.  In addition to his baseball success, Gelof was an elite soccer player. He finished his high school career as Delaware's all-time leading goal scorer over a four-year span, earning three-time All-State honors and All-American recognition from the United Soccer Coaches Association.

2193.  Ultimately, he chose to pursue baseball at the next level. His combination of power, speed, and defensive versatility made him one of the most sought-after infielders in his recruiting class, and he committed to Virginia, one of the top programs in college baseball.

2194.  Mr. Gelof's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Over the course of his three seasons at Virginia, he became one of the most productive hitters in program history, playing a key role in the Cavaliers' College World Series run in 2021.

2195.  As a freshman in 2019, Mr. Gelof started all 56 games at third base, finishing the season with a .313 batting average, 13 doubles, two home runs, and 32

**FOURTH AMENDED COMPLAINT**

RBIs. He ranked second on the team and tied for 11th in the ACC with 16 stolen bases while also leading the team and tying for third in the conference in sacrifice flies. He reached base in his first 28 games of his career, the second longest streak by a freshman in school history. In his collegiate debut against then-No. 2 Vanderbilt, the eventual National Champion, he went 4-for-5 with three doubles and four RBIs, matching a school record for most doubles in a single game. That summer, he played for the Kalamazoo Growlers in the Northwoods League, where he excelled, hitting .349/.426/.490 with three triples (sixth in the league) and 22 stolen bases (ninth) in 24 attempts.

2196.  During Mr. Gelof's sophomore season in 2020, which was cut short due to the COVID-19 pandemic, he played in 18 games at third base and batted third in 17 of the 18 games. He posted a .349 batting average with six doubles, two triples, five home runs, and 18 RBIs. He earned a Second Team All-America selection by *Collegiate Baseball Newspaper* and was named the third-best third baseman in 2020 D1Baseball's Top 30 Power Rankings. He led the ACC in total bases (47), slugging percentage (.746), and runs scored (24), while ranking in the top-15 in the NCAA in runs (4th) and total bases (11th). He also led the Cavaliers in home runs (5), tying for sixth in the ACC, which included a two-homer game against NC State.

2197.  As a junior in 2021, Mr. Gelof started all 63 games, hitting .312 with 9 home runs, 18 doubles, and 41 RBIs, while also stealing 12 bases, tying for 14th most in the ACC. He led the ACC with 81 hits, ranking 31st nationally, and was the team leader in multiple offensive categories, including runs (50), hits (81), doubles (18), home runs (9), total bases (126), walks (32), multi-hit games (24), and multi-RBI games (12). His postseason performance earned him ACC All-Tournament honors after hitting .308 (4-for-13) with a double, a home run, and a team-high five RBIs. He was also named to the NCAA All-Columbia Regional Team after batting .348 (8-for-23) with five runs scored, a home run, and two RBIs. Mr. Gelof was the only Cavalier selected to the

**FOURTH AMENDED COMPLAINT**

College World Series All-Tournament Team, where he reached base nine times and went 7-for-12 with three runs scored, a home run, and two RBIs.

2198.  His performance that year earned Mr. Gelof Second Team All-ACC honors. He also received multiple preseason accolades, including preseason First Team All-American selection by *Collegiate Baseball Newspaper* and NCBWA, preseason Second Team All-American according to Baseball America and Perfect Game, and ranked the number 5 third baseman in D1Baseball's preseason position rankings.

2199.  In 2021 MLB Draft, Mr. Gelof was drafted in the second round (60th overall) by the Oakland Athletics.

2200.  Mr. Gelof's performances helped Virginia baseball gain national recognition, with the team's games being broadcasted on networks such as The ACC Network. UVA frequently featured Mr. Gelof on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Thousands of fans attended Virginia baseball games during his tenure, generating significant revenue for Virginia. Furthermore, in 2021, the ACC distributed around $36.1 million in revenue to each of its member schools, including Virginia.

2201.  Mr. Gelof received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his time at Virginia, he was not permitted to receive money for his NIL, whether from third parties, Defendants, or Virginia. As a star infielder for a nationally competitive program, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

2202.  Defendants' conspiracy greatly harmed Mr. Gelof. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and

**FOURTH AMENDED COMPLAINT**

would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2203.  Mr. Gelof received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Gelof. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an All-American at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

2204.  But for the illegal and unfair restraints put in place, Mr. Gelof would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

2205.  Mr. Gelof received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Gelof. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment. As one of the nation's best high school baseball players that became an All-American at a top program, he would have received a full athletic scholarship absent Defendants' bylaws.

2206.  But for the illegal and unfair restraints put in place, Mr. Gelof would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

2207.  **The effect of Defendants' illegal conduct on Plaintiff Aleva Hifo.**
Plaintiff Aleva Hifo worked as a college football player at Brigham Young University from 2016 to 2019.

2208.  The labor provided by Mr. Hifo was of great value to Defendants. Mr. Hifo committed extensive time and effort year-round. His schedule demanded 60-80 hours

per week in-season, with practices, meetings, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Hifo was expected to participate in media appearances, community events and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2209.  Mr. Hifo was a highly competitive football player coming out of high school. As a standout player at Heritage High School in Menifee, California, he led Heritage to a 13-1 overall and perfect 5-0 regional record in 2015. As a senior, he carried the ball 63 times for 488 yards and nine touchdowns along with 548 yards receiving and nine scores on 22 receptions. He also guided the team to the CIF Southern Section Inland Division Championship game in 2015, adding to his legacy after leading them to the semifinals in 2014 and a Central Division Championship in 2013. In addition to football, Mr. Hifo was a multi-sport athlete, also competing in baseball. He was also recruited by Nevada before ultimately choosing to continue his football career at BYU.

2210.  Mr. Hifo's job as a college football player was essentially a full-time one, and an important and valuable one at that. In his freshman season (2016), Mr. Hifo played in all 13 games, starting two, and served as the primary kick returner with 440 return yards on 21 kick returns for an average of 21 yards. In his sophomore season, Mr. Hifo had a career-high of 148 receiving yards against East Carolina. In his junior season (2018), Mr. Hifo played in all 13 games, starting nine, and led the team with seven punt returns for 135 yards. Throughout his four years at BYU, Mr. Hifo consistently displayed consistent skill and leadership, particularly as a wide receiver and primary kick-return specialist.

2211.  In his senior season (2019), Mr. Hifo played in 12 games, starting seven. He posted 42 receptions for 483 yards and three touchdowns, while also rushing 23

**FOURTH AMENDED COMPLAINT**

times for 104 yards and two touchdowns. Mr. Hifo led the team in punt returns,
recording 14 returns for 222 yards (average of 15.9 yards per return). His standout
performances included six receptions for 87 yards against Washington and a season-
high 111 receiving yards with two touchdowns at Toledo, including a 75-yard touchdown
reception. Mr. Hifo finished his career with at least one reception in 47 of 51 games.
Notable highlights also included three punt returns for 97 yards at Hawaiʻi, including a
career-long 52-yard return. He was named Offensive Player of the Game at Toledo and
was a nominee for the 2019 Polynesian College Football Player of the Year Award.

2212.  During Mr. Hifo's career at BYU, his reputation and popularity soared, and
with it, so too did BYU's. BYU frequently featured Mr. Hifo on its social media accounts
and in promotions on campus, highlighting his contributions to the team and using his
name, image, and likeness to boost game viewership and attendance. The success of
the football program translated into financial gains for the university and Defendants.
These earnings were bolstered by BYU's exclusive media rights partnership with ESPN
to televise home games, the first of its kind in FBS football, which brought in millions in
revenue per year.

2213.  Mr. Hifo received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. Nor was he permitted to receive money for use of his NIL,
whether from third parties or from Defendants or from his school. Mr. Hifo, like many
other college athletes, was denied the opportunity to receive fair compensation for his
work. Despite playing a pivotal role in BYU football's success and helping generate
millions of dollars in revenue for the university and Defendants, Mr. Hifo was prevented
from sharing in those profits. The NCAA's anticompetitive rules deprived him of his
rightful place in an open and competitive market. Had those restrictions not been in
place, Mr. Hifo would have received competitive remuneration for his services and the

**FOURTH AMENDED COMPLAINT**

use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

2214.  Following his four years at BYU, Mr. Hifo signed as an undrafted free agent with the Kansas City Chiefs, further expanding his brand and visibility. He also later signed with the Arizona Cardinals. His professional success underscored the commercial potential and value that was stifled during his time at BYU—value that he was unfairly prevented from realizing due to the NCAA's anti-competitive restraints.

2215.  Defendants' actions caused direct and substantial harm to Mr. Hifo. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the significant revenue he helped generate for BYU and other member schools. This unlawful scheme directly injured Mr. Hifo, depriving him of the benefits and compensation he rightfully earned.

2216.  **The effect of Defendants' illegal conduct on Plaintiff Ammon Hannemann.** Plaintiff Ammon Hannemann worked as a college football player at Brigham Young University from 2019 to 2023.

2217.  The labor provided by Mr. Hannemann was of great value to Defendants. Mr. Hannemann committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Hannemann was expected to participate in media appearances, community events and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2218.  Mr. Hannemann emerged as a standout football talent at Lone Peak High School in Highland, Utah, where he helped lead the team to back-to-back state title

**FOURTH AMENDED COMPLAINT**

game appearances. As a senior, he recorded 61 tackles, two interceptions (including a pick-six), four pass breakups, and a fumble recovery. In his junior year, he totaled 56 tackles, two interceptions, two pass breakups, and two forced fumbles. Mr. Hannemann was named to the Salt Lake Tribune 5A All-State Team and Deseret News 5A All-State Second Team. He was also recruited by Oregon State and Southern Utah before committing to play football for BYU.

2219. Mr. Hannemann's job as a college football player was essentially a full-time one, and an important and valuable one at that. Following a redshirt season in 2019, Mr. Hannemann became a key contributor to BYU's defense. In 2022, Mr. Hannemann recorded a career-high eight tackles in BYU's 26-20 double overtime victory over No. 9 Baylor. In 2021, he played in 10 games, starting four against South Florida, Utah State, Boise State, and Baylor. He had three games with five or more tackles, including back-to-back career-high six-tackle performances in wins over South Florida and Utah State, with all six tackles against Utah State being solo stops.

2220. Throughout his time at BYU, Mr. Hannemann's name, image, likeness, and performance were leveraged by the university, including in social media and marketing efforts. His contributions helped drive significant revenue for BYU and Defendants through ticket sales, merchandise, and lucrative television contracts. The success of the football program translated into financial gains for the university and Defendants. These earnings were bolstered by the larger independent TV deals BYU signed, which brought in additional revenue. BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue for the athletic department. When BYU joined the Big 12 on July 1, 2023, it increased each university's share of revenue by $4 million per team, per year, including BYU, and generated over $2 billion for the Big 12.

**FOURTH AMENDED COMPLAINT**

2221.  Mr. Hannemann received none of that revenue. For a substantial portion of his college career, Mr. Hannemann was entirely barred from monetizing his NIL due to the NCAA's illegal, anticompetitive restrictions—whether through third-party endorsements, compensation from his university, or any other means. Even after NIL restrictions were partially lifted, he was still deprived of the full opportunities and compensation he would have received in a competitive, unrestricted market.

2222.  Mr. Hannemann was denied fair compensation for his labor, talent, and marketability. Despite his pivotal role in BYU football's success and the substantial revenue he helped generate, the NCAA's anticompetitive rules prevented him from participating in an open and competitive market. But for these restrictions, Mr. Hannemann would have received greater remuneration for his services and NIL rights.

2223.  Defendants' conduct caused direct and substantial harm to Mr. Hannemann. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This unlawful scheme directly injured Mr. Hannemann, depriving him of the benefits and compensation he rightfully earned.

2224.  **The effect of Defendants' illegal conduct on Plaintiff Baylor Romney.** Plaintiff Baylor Romney worked as a college football player at Brigham Young University from 2018 to 2021.

2225.  The labor provided by Mr. Romney was of great value to Defendants. Mr. Romney committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14 hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Romney was expected to participate in media appearances, and community events

**FOURTH AMENDED COMPLAINT**

and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2226.  Mr. Romney was a highly recruited quarterback out of Franklin High School in El Paso, Texas. As a high school senior, he passed for nearly 3,000 yards and threw for 29 touchdowns with only three interceptions while completing over 70 percent of his passes. His exceptional performance attracted interest from top football programs across the country. In addition to BYU, Romney had offers from Nevada, Hawaii, and Arizona State. After a competitive recruiting process, Mr. Romney committed to play quarterback at BYU.

2227.  Mr. Romney's job as a college football player was essentially a full-time one, and an important and valuable one at that. After redshirting in 2018, Mr. Romney quickly became an important member of BYU's quarterback rotation. Notably, Mr. Romney led BYU to an upset victory over Boise State in 2019. Over the course of his career, he appeared in 16 games and started five, totaling 1,787 passing yards and 14 touchdowns. Known by teammates and coaches alike for being "poised," "even-keeled," "cool under pressure," and "not easily rattled," coveted qualities in a quarterback, whether as a starter or off the bench, Romney's contributions helped BYU's offense succeed. With one year of eligibility remaining, Mr. Romney entered the transfer portal as a graduate transfer following the 2021 season. He ultimately decided not to pursue transfer opportunities because the NIL offerings available at the time were not as open, lucrative, or accessible as they currently are. The earning potential was more available in the private market because the NIL market was restrained from openly offering money for players in the transfer portal.

2228.  During Mr. Romney's collegiate career from 2018 to 2021, BYU football games were regularly broadcast on national television networks, including ESPN, ABC, and CBS Sports. Millions of viewers tuned in to watch BYU games each season, and LaVell Edwards Stadium consistently hosted tens of thousands of fans for home games.

**FOURTH AMENDED COMPLAINT**

For example, BYU's 2020 game against Boise State, where Mr. Romney played a pivotal role, drew over 1.5 million viewers on Fox Sports. BYU frequently featured Mr. Romney on its official social media accounts, highlighting his performances and leveraging his visibility and name, image, and likeness to engage fans, increase game attendance, and drive television viewership. During Mr. Romney's time at BYU, the university was an independent in football, but it maintained highly profitable scheduling agreements with major conferences and networks, helping BYU Athletics distribute millions across its programs and benefit Defendants. These earnings were bolstered by BYU's exclusive media rights partnership with ESPN to televise home games, the first of its kind in FBS football, which brought in millions in revenue per year.

2229.  Mr. Romney received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During part of his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, or Defendants, that he would have received had the NCAA's unlawful restrictions been lifted earlier in his career. In fact, Mr. Romney's only NIL compensation was $1,000 from Built Bar. If not for the NCAA's unlawful rules, Mr. Romney would have had ample opportunities to capitalize on his name, image, and likeness (NIL), earning fair compensation that reflected his value as a valuable starting and backup quarterback with name recognition on BYU's football program.

2230.  Defendants' conduct caused direct and substantial harm to Mr. Romney. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This

**FOURTH AMENDED COMPLAINT**

unlawful scheme directly injured Mr. Romney, depriving him of the benefits and
compensation he rightfully earned.

2231.  **The effect of Defendants' illegal conduct on Plaintiff Ben Bywater.**
Plaintiff Ben Bywater worked as a college football player at Brigham Young University
from 2019 to 2024.

2232.  The labor provided by Mr. Bywater was of great value to Defendants. Mr.
Bywater committed extensive time and effort year-round. His schedule demanded 60-80
hours per week in-season, with practices, meetings, workouts, academic classes, and
travel, often working 12–14-hour days. Off-season training still required 40-50 hours
weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr.
Bywater was expected to participate in media appearances, community events and
activities, with very limited time off, all under the direction and/or supervision, implicitly
or explicitly, of his coaches or others in the athletic department.

2233.  Mr. Bywater emerged as a standout football talent at Olympus High
School in Holladay, Utah, where he was selected to the Salt Lake Tribune and Deseret
News 4A All-State First Team as a senior. He was named Region 6 MVP in 2016 and
played both linebacker and running back. That year, he led the team in rushing with 766
yards and nine touchdowns and totaled 95 tackles with 10 tackles for loss. He helped
lead Olympus High School to regional championships in 2015 and 2016. He was
recruited by Stanford, Washington, Utah, Arizona State, and Washington State before
ultimately choosing to continue his football career at BYU, where he fully dedicated
himself to the team.

2234.  Mr. Bywater's job as a college football player was essentially a full-time
one, and an important and valuable one at that. Following a redshirt season in 2019, Mr.
Bywater became a key contributor to BYU's defense. In 2021, he was named
Independent Defensive Rookie of the Year by Pro Football Network and led BYU in
tackles in both the 2021 and 2022 seasons. He recorded 7 career games with 10+

**FOURTH AMENDED COMPLAINT**

tackles and 15 games with 9 or more tackles. He was named to the National Football Foundation Hampshire Honor Society (2024), the Academic All-Big 12 First Team (2023), and the Phil Steele All-Independent Second Team (2022). In 2024, Mr. Bywater was a redshirt senior and was BYU's active career leader in tackles with 247 and ranks seventh in career tackles among active Power Five players (Pro Football Focus).

2235.  Throughout his time at BYU, Mr. Bywater's, name, image, likeness, performance, and visibility were heavily leveraged by the university, including in social media and marketing efforts. His contributions helped drive significant revenue for BYU and Defendants, through ticket sales, merchandise, and lucrative television contracts. The success of the football program translated into financial gains for the university and Defendants, as BYU saw tens of millions in revenue. These earnings were bolstered by the larger independent TV deals BYU signed, which brought in additional revenue. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating millions of dollars in revenue for the athletic department. When BYU joined the Big 12 on July 1, 2023, it increased each university's share of revenue by $4 million per team, per year, including BYU, and generated over $2 billion for the Big 12.

2236.  Mr. Bywater received none of that revenue. For a substantial portion of his college career, Mr. Bywater was entirely barred from monetizing his NIL due to the NCAA's illegal, anticompetitive restrictions—whether through third-party endorsements, compensation from his university, or any other means. Even after NIL restrictions were partially lifted, he was still deprived of the full opportunities and compensation he would have received in a competitive, unrestricted market. Mr. Bywater was denied fair compensation for his labor, talent, and marketability. Despite his pivotal role in BYU football's success and the substantial revenue he helped generate, the NCAA's anticompetitive rules prevented him from participating in an open and competitive

**FOURTH AMENDED COMPLAINT**

market. But for these restrictions, Mr. Bywater would have received greater remuneration for his services and NIL rights.

2237. Defendants' conduct caused direct and substantial harm to Mr. Bywater. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This unlawful scheme directly injured Mr. Bywater, depriving him of the benefits and compensation he rightfully earned.

2238. **The effect of Defendants' illegal conduct on Plaintiff Blake Freeland.** Plaintiff Blake Freeland worked as a college football player at Brigham Young University from 2019 to 2022.

2239. The labor provided by Mr. Freeland was of great value to Defendants. Mr. Freeland committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Freeland was expected to participate in media duties, community events and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2240. Mr. Freeland was a highly competitive football player coming out of high school. As a standout player at Herriman High School, in Herriman, Utah, under Mr. Freeland was a state champion in 2015, three-time team captain, and two-time all-region selection. Mr. Freeland was also a Principal's Honor Roll student and received the UHSAA Spirit of Sport Award. In addition to football, Mr. Freeland was a multi-sport athlete, going six-time all-state in track and field, winning state championships in shot put and javelin. In basketball, he earned all-state honors in 2018 and was a two-time

**FOURTH AMENDED COMPLAINT**

team captain. Mr. Freeland also holds the 6A state record in javelin. He was recruited

by Utah, UCLA, USC, Washington, and Vanderbilt before ultimately choosing to

continue his football career at BYU, where he fully dedicated himself to the team.

2241.  Mr. Freeland's job as a college football player was essentially a full-time

one, and an important and valuable one at that. Over the course of his career, he

became one of the key contributors to the offense. As a true freshman in 2019, he

started the final seven games at right tackle, with the offensive line ranked No. 12 by

Pro Football Focus. In 2020, he started eight games, tallying two solo stops while

helping the BYU offense rank No. 8 in the nation for the fewest sacks allowed (12 sacks

in 12 games) and only allowing two pressures on 293 pass-blocking regular season

snaps. The offense also ranked No. 4 in scoring (43.5) and No. 7 in total offense

(522.2). In his junior season, he started all thirteen games, helping lead BYU's offense

to score 33 points per game, average 452 yards of total offense per game and achieve

a 46% third-down conversion rate with 89% scoring efficiency (49 of 55) on red zone

trips. The offense allowed just 15 sacks on the season. He similarly started all thirteen

games in his final season at BYU. Throughout his four years at BYU, Mr. Freeland was

a four-year starter on the offensive line, playing in 44 games with 41 starts. His notable

achievements include Third Team AP All-American (2022), Phil Steele All-Independent

First Team (2021, 2022), College Football Network Independent Offensive Lineman of

the Year & All-Independent First Team (2022), and Pro Football Network All-

Independent First Team Offense (2021).

2242.  Throughout his time at BYU, Mr. Freeland's name, image, likeness,

performance, and visibility were heavily leveraged by the university, including in social

media and marketing efforts. This is especially so because Mr. Freeland is a double

legacy player at BYU, as his father, James Freeland, played linebacker at BYU from

1994-1995, and his mother, Debbie Dimond, was an honorable mention All-American

BYU women's basketball, where she played from 1991-1995, and is the eighth-highest

**FOURTH AMENDED COMPLAINT**

scorer in BYU women's basketball history. His sister, Sierra, was a thrower with BYU women's track and field from 2017-2022. And, of course, Mr. Freeland's performance on the field helped bring attention to BYU's football program. BYU frequently featured Mr. Freeland on its social media accounts and in promotions on campus, no doubt, using him to boost game viewership and attendance. The success of the football program translated into financial gains for the university and Defendants, as BYU and Defendants saw tens of millions in revenue. These earnings were bolstered by the larger independent TV deals BYU signed, which brought in additional revenue. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue for BYU and the Defendants.

2243.  Mr. Freeland received none of that revenue. During part of his time in college, Mr. Freeland, like many other college athletes, was completely denied the opportunity to receive fair compensation for use of his NIL due to the NCAA's illegal, anticompetitive restrictions, whether from third parties or Defendants or from his university. Despite playing a pivotal role in BYU football's success and helping generate tens of millions of dollars in revenue for the university, its athletic department and defendants, for most of his career, Mr. Freeland was prevented from sharing in those profits. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his university that he would have received had the NCAA's unlawful restrictions been lifted earlier and in full. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Freeland would have received substantially greater remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

**FOURTH AMENDED COMPLAINT**

2244.  Following his four years at BYU, Mr. Freeland was selected by the Indianapolis Colts with the fourth pick in the fourth round, 106th overall, in the 2023 NFL Draft, further expanding his brand and visibility. His professional success underscores the commercial potential that was stifled during his time at BYU due to the NCAA's anticompetitive restrictions.

2245.  Defendants' actions caused direct and substantial harm to Mr. Freeland. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the significant revenue he helped generate for BYU and other member schools. This unlawful scheme directly injured Mr. Freeland, depriving him of the benefits and compensation he rightfully earned.

2246.  **The effect of Defendants' illegal conduct on Plaintiff Bracken El-Bakri.** Plaintiff Bracken El-Bakri worked as a college football player at Brigham Young University from 2014 to 2015 and from 2017 to 2020.

2247.  The labor provided by Mr. El-Bakri was of great value to Defendants. Mr. El-Bakri committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. El-Bakri was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2248.  Mr. El-Bakri first emerged as a standout football player at Brighton High School in Cottonwood Heights, Utah, where he played both defensive and offensive line.

**FOURTH AMENDED COMPLAINT**

2249.  Mr. El-Bakri's job as a college football player was effectively a full-time one, and an important and valuable one at that. Playing defensive line at BYU, his role was demanding, time-consuming, and vital to the team's success. After walking on in 2014 and redshirting that year, Mr. El-Bakri returned from his mission years in 2017, earned a scholarship as a redshirt freshman, was nominated for the Burlsworth Trophy, awarded to the best walk-on player in the NCAA, that year, and never looked back. He played significant snaps in every—and started in nearly every—game for the next three seasons, 2018-2020. Known for shutting down opposing teams' first-string running backs, over his three years as a starter, Mr. El-Bakri racked up over 100 tackles (109), nearly 50 (48) solo, 8 tackles for loss, and 3.5 sacks. In 2020, his senior season, Mr. El-Bakri was nominated for the Wuerffel Trophy, known as "College Football's Premier Award for Community Service."

2250.  During his time at BYU, Mr. El-Bakri's contributions on the field were leveraged by the university to promote and enhance its football program. He was frequently featured in BYU football's social media campaigns, highlight reels, and promotional materials—efforts that helped drive fan engagement, increase game attendance, and boost television viewership. During Mr. El-Bakri's career, BYU operated as an independent football program and secured favorable scheduling agreements alongside a national television contract with ESPN, reportedly worth between $6 million and $10 million per year. These nationally televised games attracted millions of viewers and generated significant revenue for BYU and the NCAA.

2251.  Mr. El-Bakri received none of this revenue. For the entirety of his college career, due to anticompetitive rules imposed by the NCAA, he was completely prohibited from receiving compensation for the use of his name, image, and likeness (NIL), whether from third parties, Defendants, or BYU. Mr. El-Bakri would have had substantial NIL opportunities in a competitive market.

**FOURTH AMENDED COMPLAINT**

2252.  The NCAA's anticompetitive rules also severely restricted Mr. El-Bakri's rights and ability to pursue entrepreneurial opportunities. He was prohibited from using crowdfunding platforms, accepting financial support from sources affiliated with BYU, or using his personal social media accounts to promote his founding of a new business. These anticompetitive restrictions imposed by the NCAA ultimately severely limited his income and prevented Mr. El-Bakri from successfully launching his business while maintaining his NCAA eligibility.

2253.  Defendants' conduct caused direct and substantial harm to Mr. El-Bakri. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a competitive market for his services and NIL rights. As a result, Mr. El-Bakri was denied the opportunity to earn a fair share of the revenues his labor helped generate for BYU and its athletic partners. This unlawful scheme directly injured Mr. El-Bakri, depriving him of the compensation, business opportunities, and recognition he rightfully earned.

2254.  **The effect of Defendants' illegal conduct on Plaintiff Brady Christensen.** Plaintiff Brady Christensen, a resident of South Carolina, worked as a college football player at Brigham Young University from 2017 to 2020.

2255.  The labor provided by Mr. Christensen was of great value to Defendants. Mr. Christensen committed extensive time and effort year-round. His schedule demanded 60–80 hours per week during the season, including practices, meetings, film study, workouts, academic classes, and travel—often requiring him to work 12–14-hour days. Off-season training still consumed 40–50 hours per week, while fall camp ramped up to over 75 hours weekly. In addition to these demands, Mr. Christensen was expected to participate in media appearances and community events, all while having very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

**FOURTH AMENDED COMPLAINT**

2256.  Mr. Christensen was a highly competitive football player coming out of high school. At Bountiful High School in Utah, he was a two-way player, excelling on both the offensive and defensive lines. Ultimately, he chose to commit to BYU over the United States Air Force Academy and other schools, where he dedicated nearly every waking minute to the football program.

2257.  Mr. Christensen's job as a college football player was essentially a full-time one—and an important and valuable one at that. After redshirting in 2017, Mr. Christensen emerged as a starter at left tackle in 2018 and quickly proved himself as a foundational piece of BYU's offensive line. He started all 13 games that season, playing more than 97% of the team's offensive snaps and allowing just three sacks. His performance helped stabilize an offensive line that paved the way for BYU's running backs to rush for over 1,700 yards on the season.

2258.  Over the course of his collegiate career, Mr. Christensen's skill and leadership became evident. In 2019, again he started every game at left tackle, playing nearly every offensive snap for the Cougars. His consistency and technical ability helped BYU produce one of the most effective offensive units in the NCAA. By 2020, Mr. Christensen was widely recognized as one of the top offensive linemen in the country. During his junior season, he started all 12 games, protecting #2 overall draft pick quarterback Zach Wilson, and helping BYU finish with an 11-1 record and an offense that ranked in the top 10 nationally in scoring, total offense, and passing yards per game. He earned a 96.0 overall grade in 2020—the highest grade for an offensive lineman in the country that year and one of the highest ever recorded at his position. He allowed only three pressures and zero sacks on over 400 pass-blocking snaps. His run-blocking grade was similarly elite, helping BYU average over 5.4 yards per carry as a team.

2259.  During Mr. Christensen's career at BYU, his reputation and popularity grew substantially. He was named a Consensus All-American in 2020, the first BYU

**FOURTH AMENDED COMPLAINT**

offensive lineman to receive such honors in decades. He was also a finalist for the
Outland Trophy, awarded to the nation's best interior lineman. These accolades brought
increased attention and prestige to BYU football, helping elevate the program's national
profile. Games featuring BYU's dynamic offense and dominant offensive line, anchored
by Mr. Christensen, drew significant television audiences, including over 2 million
viewers for BYU's 2020 matchup against Boise State. BYU frequently featured Mr.
Christensen in social media promotions, highlight reels, and press coverage to attract
more fans and increase game viewership and attendance. Despite his immense
marketability and the substantial revenue he helped generate for BYU and the
Defendants, Mr. Christensen was prevented from receiving any share of that revenue or
benefiting from his name, image, and likeness (NIL) during his college career.

2260.  The success of BYU football translated into significant financial gains for
the university and the Defendants. In 2020, BYU's athletic department saw millions in
revenue, with football games contributing substantially through ticket sales,
merchandise, and broadcast deals. These revenues were further bolstered by BYU's
independent television agreements, which brought in additional funds. During Mr.
Christensen's career, BYU operated as an independent football program and secured
favorable scheduling agreements alongside a national television contract with ESPN,
reportedly worth between $6 million and $10 million per year. These nationally televised
games attracted millions of viewers and generated significant revenue for BYU and the
Defendants.

2261.  Mr. Christensen received none of that revenue. During his career at BYU,
he was completely prohibited from profiting from his NIL due to the NCAA's unlawful,
anticompetitive restrictions. Had those unlawful NCAA restrictions not been in place, Mr.
Christensen would have capitalized significantly on his success and popularity as a
Consensus All-American and national award finalist.

**FOURTH AMENDED COMPLAINT**

2262.  Mr. Christensen declared for the 2021 NFL Draft and was selected in the third round by the Carolina Panthers. Since entering the NFL, he has continued to demonstrate his elite abilities, earning a starting role on Carolina's offensive line and further expanding his visibility and endorsement opportunities. These opportunities underscore the significant commercial value Mr. Christensen brought both during and after his collegiate career—value he was unfairly and unlawfully prevented from realizing while at BYU due to the NCAA's anti-competitive restraints.

2263.  Mr. Christensen, like many other college athletes, was denied the opportunity to receive fair compensation for his work and NIL. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and the Defendants, Mr. Christensen was prevented from sharing in those profits. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market.

2264.  Defendants' conspiracy greatly harmed Mr. Christensen. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits of an open market. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2265.  **The effect of Defendants' illegal conduct on Plaintiff Brayden El-Bakri.** Plaintiff Brayden El-Bakri worked as a college football player at Brigham Young University from 2012 to 2018.

2266.  The labor provided by Mr. El-Bakri was of great value to Defendants. Mr. El-Bakri committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14- hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of

**FOURTH AMENDED COMPLAINT**

this, Mr. El-Bakri was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2267.  Mr. El-Bakri first emerged as a standout football player at Brighton High School in Cottonwood Heights, Utah, where he played all over the field—playing both offense and defense. He was named to the Deseret News 5A all-state second team as a defensive back. He was also a multi-sport athlete, playing both baseball and lacrosse in addition to football. He joined BYU as a preferred walk-on in 2013. After serving a two-year religious mission, he returned to BYU in 2015 as a walk-on to continue his football career. Mr. El-Bakri earned a scholarship after a standout 2016 Sophomore Season as the team's starting fullback

2268.  Mr. El-Bakri's job as a college football player was effectively a full-time one, and an important and valuable one at that. Playing primarily at fullback and on special teams, his role was demanding, time-consuming, and vital to the team's success. In 2017, he was a Burlsworth Trophy nominee, given annually to the most outstanding football player who began his career as a walk-on and has shown outstanding performance on the field. Mr. El-Bakri was named Team Captain for the 2018 season and became a respected leader on and off the field. By the time of his senior year, he had developed into one of the top players at his position in the nation, ranked as the No. 10 fullback in his NFL draft class. Mr. El-Bakri also received recognition at BYU's annual Y Awards, celebrating his contributions to the football program and the university community. During his BYU career, he played in 32 games, starting many of them, and contributed as a lead blocker, runner, receiver, and key special teams player. Along with his heavy involvement in special teams, including 12 tackles, a forced fumble, and fumble recovery, Mr. El-Bakri contributed significantly and visibly to the offense's successes, including scoring 4 touchdowns—two of which were receiving touchdowns. His performance helped BYU maintain its competitive standing

**FOURTH AMENDED COMPLAINT**

as an independent football program, securing favorable scheduling agreements and national television contracts that significantly bolstered the revenue of BYU and the Defendants.

2269.  During his time at BYU, Mr. El-Bakri's contributions on the field were heavily leveraged by the university to promote and enhance its football program. As a team captain and key player, even as a walk-on, he was frequently featured in BYU football's social media campaigns, highlight reels, and promotional materials, and on ESPN—efforts that helped drive fan engagement, increase game attendance, and boost television viewership. Notably, one of his plays—a high-profile, fumble-inducing, legal hit that ESPN ranked as one of the fifth hardest hit in college football history—has consistently garnered 10 million views surrounded by paid commercial content annually across social media platforms. To this day, Mr. El-Bakri has been told by Defendants that he is prohibited from monetizing the hit or using footage of the hit on his own platform. During Mr. El-Bakri's career, BYU operated as an independent football program and secured favorable scheduling agreements alongside a national television contract with ESPN, reportedly worth between $6 million and $10 million per year. These nationally televised games attracted millions of viewers and generated significant revenue for BYU and the Defendants.

2270.  Mr. El-Bakri received none of the revenue generated by his labor and name, image, and likeness (NIL). For the entirety of his college career, he was prohibited from receiving compensation for the use of his NIL, whether from third parties, Defendants, or BYU. As a respected team captain, one of the nation's top fullbacks, and a social media presence with viral content, Mr. El-Bakri would have had substantial NIL opportunities in a competitive market.

2271.  Off the field, Mr. El-Bakri was recognized as BYU's Entrepreneur of the Year and won two business showcase competitions for his startup business concept. Despite these accolades and interest in his business, NCAA rules severely restricted his

**FOURTH AMENDED COMPLAINT**

ability to pursue entrepreneurial opportunities. He was prohibited from using crowdfunding platforms, accepting financial support from sources affiliated with BYU, or using his personal social media accounts to promote his business venture. These restrictions ultimately prevented Mr. El-Bakri from successfully launching his business while maintaining his NCAA eligibility.

2272.  Defendants' conduct caused direct and substantial harm to Mr. El-Bakri. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a competitive market for his services and NIL rights. As a result, Mr. El-Bakri was denied the opportunity to earn a fair share of the revenue his labor and NIL helped generate for BYU and the Defendants. This unlawful scheme directly injured Mr. El-Bakri, depriving him of the compensation, business opportunities, and recognition he rightfully earned.

2273.  **The effect of Defendants' illegal conduct on Plaintiff Caden Haws.** Plaintiff Caden Haws worked as a college football player at Brigham Young University from 2019 to 2023.

2274.  The labor provided by Mr. Haws was of great value to Defendants. Mr. Haws committed extensive time and effort year-round. His schedule demanded 60–80 hours per week in-season, including practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Even in the off-season, he spent 40–50 hours per week training and preparing for the upcoming season, with fall camp ramping up to over 75 hours weekly. On top of these obligations, Mr. Haws was required to participate in media appearances and community events, all while being afforded very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2275.  Mr. Haws was a highly competitive football player coming out of high school. At Pulaski Academy in Little Rock, Arkansas, he was a key contributor to

**FOURTH AMENDED COMPLAINT**

multiple state championship teams, earned all-state honors, and was named the best offensive lineman in the state. He was a well-regarded recruit who attracted attention from several elite college football programs, including Auburn University, the United States Naval Academy, and the United States Air Force Academy. He ultimately committed to BYU, where he dedicated almost every waking minute to the school's football program.

2276.  Mr. Haws' job as a college football player was essentially a full-time one, and an important and valuable one at that. Over the course of his career at BYU, he played in 46games as a defensive tackle. He became a consistent presence on the defensive front, known for his strength and effort in stopping the run and anchoring the defensive line. In 2021, he played in 12 games and had five or more tackles in three different games, helping lead BYU to a 13th ranked finish in the College Football Playoff rankings and an appearance in the Independence Bowl. In 2022, he was one of just three BYU players to play in and start all 13 games, totaling 40 tackles (12 solo), two tackles-for-loss, one sack, one pass breakup, and one fumble recovery. He also registered a career-high five tackles, including one sack, in BYU's 26-20 (2OT) win over 9th ranked Baylor that season.

2277.  Throughout his career at BYU, Mr. Haws' name, image, likeness, and performance were prominently featured in the university's promotional materials, social media campaigns, and broadcasts. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. BYU and the Defendants, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating millions of dollars in revenue for BYU and the Defendants. When BYU joined the Big 12 on July 1, 2023, it increased each university's share of revenue by $4 million per team, per year, including BYU, and generated over $2 billion for the Big 12.

**FOURTH AMENDED COMPLAINT**

2278.  Mr. Haws received none of that revenue. During part of his time in college, due to the NCAA's anticompetitive rules, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his university that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who was known for stuffing the opposing team's run game at BYU, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2279.  Defendants' conduct caused direct and substantial harm to Mr. Haws. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. Haws, depriving him of the benefits and compensation he rightfully earned.

2280.  **The effect of Defendants' illegal conduct on Plaintiff Chaz Ah You.** Plaintiff Chaz Ah You worked as a college football player at Brigham Young University in 2017 and from 2019 to 2023.

2281.  The labor provided by Mr. Ah You was of great value to Defendants. Mr. Ah You committed extensive time and effort year-round. His schedule demanded 60-80 hours per week during the season, including practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. In addition to these responsibilities, Mr. Ah You was expected to participate in media appearances, community events, and other activities with very limited time off, all under

**FOURTH AMENDED COMPLAINT**

the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2282.  Coming out of high school, Mr. Ah You was a consensus four-star recruit, ranked among the nation's top defensive prospects by Scout, 247Sports, Rivals, and ESPN. He was nationally ranked in the Scout Top 300 (No. 121), 247Sports Top 247 (No. 152), Rivals 250 (No. 174), and ESPN Top 300 (No. 233). He was rated the No. 1 safety and the No. 2 overall recruit in Utah. A versatile athlete, Mr. Ah You was a four-year varsity starter, playing multiple positions including safety, quarterback, receiver, returner, and punter. He began his high school career at Westlake before transferring to Timpview for his senior season, where he was selected to play in the prestigious Polynesian Bowl. Throughout his high school career, he earned numerous accolades, including Salt Lake Tribune 5A and 4A First-Team All-State honors, Deseret News 5A First-Team All-State, and Daily Herald All-Valley Team recognition. In addition to football, Mr. Ah You also lettered in basketball and track. He was highly recruited and received offers from a prestigious list of schools, including Notre Dame, Michigan, Oregon, Wisconsin, Utah, Missouri, Mississippi State, Vanderbilt, Washington, Stanford, UCLA, California, Washington State, Oregon State, Virginia, Kansas, Arizona State, Iowa, Louisville, Oklahoma State, and Duke. After a competitive recruiting process, Mr. Ah You committed to play for BYU, joining the football program in 2017.

2283.  Mr. Ah You's job as a college football player was essentially a full-time one and an important and valuable one at that. Over his career at BYU, Mr. Ah You developed into one of the defense's most versatile and impactful players. He consistently contributed as a starting linebacker and hybrid defensive back, earning accolades for his athleticism, leadership, and playmaking ability. His 2019 season was particularly notable, as he recorded 31 tackles, including 5.5 tackles for loss, one sack, one interception, and one forced. In 2022, he was named to the Polynesian College Football Player of the Year Award Watch List. Coaches and teammates praised Mr. Ah

**FOURTH AMENDED COMPLAINT**

You for his intelligence on the field, physicality, and leadership—qualities that made him a key figure in BYU's defense during his tenure.

2284.  Throughout his career at BYU, Mr. Ah You's name, image, likeness (NIL), performance, and visibility were heavily leveraged by the university and the Defendants, including in social media and marketing efforts. This is especially so because Mr. Ah You is a legacy player—his uncles, C.J. and Matt, both played football at BYU. During Mr. Ah You's collegiate career, BYU football games were regularly broadcast on national television networks, including ESPN, ABC, and CBS Sports. Millions of viewers tuned in to watch BYU games each season, and LaVell Edwards Stadium consistently hosted tens of thousands of fans for home games. BYU frequently featured Mr. Ah You on its official social media accounts, highlighting his performances and leveraging his visibility and NIL to engage fans, increase game attendance, and drive television viewership. During Mr. Ah You's time at BYU, the university was independent in football but maintained highly profitable scheduling agreements with major conferences and networks, helping BYU Athletics distribute millions across its programs and benefit Defendants. These earnings were bolstered by BYU's exclusive media rights partnership with ESPN to televise home games, which brought in tens of millions in revenue per year. When BYU joined the Big 12 on July 1, 2023, it increased each university's share of revenue by $4 million per team, per year, including BYU, and generated over $2 billion for the Big 12.

2285.  Mr. Ah You received none of that revenue, nor was he otherwise compensated by Defendants for his labor, other than receiving a scholarship and other education-related expenses. During much of his time in college, due to the NCAA's anticompetitive rules, he was completely barred from receiving money for use of his NIL, whether from third parties, Defendants, or his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties or Defendants that he would have received had the

**FOURTH AMENDED COMPLAINT**

NCAA's unlawful restrictions been lifted earlier in his career. If not for the NCAA's unlawful rules, Mr. Ah You would have had opportunities to capitalize on his NIL, earning fair compensation that reflected his value as a highly touted recruit out of high school who lived up to his billing and became a visible and versatile defensive player with national recognition on BYU's football program.

2286.  As evidence of Mr. Ah You's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, in the immediate wake of the murder of George Floyd, with plaintiff Malik Moore, Mr. Ah You spearheaded the Black Lives Matter movement at BYU. In the summer, he and several of his teammates, including Mr. Moore, initiated a social and racial justice campaign under the rallying cry they created, "Be the Change," and produced a video that ran on the BYU Football social media accounts under the hashtag #BlackLivesMatter and on YouTube, https://youtu.be/bwNcsErlW0c?si=P5xIDqso8o5RlCqH.

2287.  On YouTube, for example, the "Be the Change" video has almost 10,000 views, https://www.youtube.com/watch?v=7Qqr4X4KQdY. On Facebook, it has 67,000 views, https://www.facebook.com/watch/?v=304450473890426. The video was also posted and then removed on BYU Football's X account , https://x.com/BYUfootball/status/1270868280232689664; https://kslsports.com/ncaa/byu/byu-football-players-say-be-the-change-in-black-lives-matter-social-media-video-post/435913. However, on information and belief, the post on X would have had the most views, as X is generally known as the platform that is the most active social media platform for college football fans. It also garnered attention in the media more broadly, including on Fox News. In the video, Mr. Moore, Mr. Ah You, and other teammates encourage people to "be the change" they wish to see in the world. Mr. Moore, Mr. Ah You, and others said in the video, "This is for George Floyd," and Moore added, "And the countless others who have died from the hands of injustices." Teammates from different cultural and racial backgrounds emphasized

**FOURTH AMENDED COMPLAINT**

brotherhood across differences, declaring, "My brother bleeds the same color," and "My brother embraces my differences," and "My brother stands with me, not against me," and Mr. Ah You declared, "My brother stands for justice."

2288.  Had Mr. Ah You been permitted to create and market similar concepts on his own behalf, he would have employed the same entrepreneurial skills and dedication to market his NIL successfully to support himself, his family, and charitable causes of his personal choosing.

2289.  Defendants' conduct caused direct and substantial harm to Mr. Ah You. By agreeing to adopt, enforce, and abide by the NCAA's anticompetitive bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. Ah You, depriving him of the benefits and compensation he rightfully earned.

2290.  **The effect of Defendants' illegal conduct on Plaintiff Earl Tuioti-Mariner.** Plaintiff Earl Tuioti-Mariner worked as a college football player at Brigham Young University from 2017 to 2022.

2291.  The labor provided by Mr. Tuioti-Mariner was of great value to Defendants. Mr. Tuioti-Mariner committed extensive time and effort year-round. His schedule demanded 60–80 hours per week in-season, including practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Even in the off-season, he spent 40–50 hours per week training and preparing for the upcoming season, with fall camp ramping up to over 75 hours weekly. On top of these obligations, Mr. Tuioti-Mariner was required to participate in media appearances and community events, all while being afforded very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

**FOURTH AMENDED COMPLAINT**

2292.  Mr. Tuioti-Mariner was a highly competitive football player coming out of high school. At Washburn Rural High School in Kansas, he was ranked a No. 15 overall prospect by ESPN and a first team all-state selection. Ultimately, he chose to commit to Brigham Young University, where he would dedicate almost every waking minute to the school's team.

2293.  Mr. Tuioti-Mariner's job as a college football player was essentially a full-time one, and an important and valuable one at that. In 2018, as a redshirt freshman, he played in all 13 games, starting in two, and racked up nine tackles, including five solo stops. In 2019, while only playing in six games, in those games, Mr. Tuioti-Mariner saw action against Utah, Tennessee, USC, and Washington, among others. In 2020, he played in 10 games, including games against Navy, Houston, Boise State, and UCF, racking up 11 tackles, seven solo, and two sacks. In 2021, he played in 10games, starting 9, and recorded a career-high 15 tackles (3 solo) on the season. His success continued in 2022 when he played in 11 games, amassing 12 tackles (4 solo), and was on the Polynesian Player of the Year Watch List. Over the course of his career with BYU from 2018-2022, he played in 50 games, amassing 51 tackles, 22 solo, and three sacks.

2294.  Throughout his time at BYU, Mr. Tuioti-Mariner's name, image, likeness (NIL), and performance were prominently featured in the university's promotional materials, social media campaigns, and broadcasts. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue. Mr. Tuioti-Mariner was a key figure in many of these nationally televised games.

2295.  Mr. Tuioti-Mariner received none of that revenue. During part of his time in college, he was barred from receiving money for use of his NIL, whether from third

**FOURTH AMENDED COMPLAINT**

parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his universities that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who lived up to his billing, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2296.  Defendants' conduct caused direct and substantial harm to Mr. Tuioti-Mariner. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. Tuioti-Mariner, depriving him of the benefits and compensation he rightfully earned.

2297.  **The effect of Defendants' illegal conduct on Plaintiff Gabe Summers.** Plaintiff Gabe Summers worked as a college football player at Brigham Young University from 2018 to 2022.

2298.  The labor provided by Mr. Summers was of great value to Defendants. Mr. Summers committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Summers was expected to participate in media appearances, and community events and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2299.  Mr. Summers emerged as a standout football talent at Westlake High School in Dallas, Texas, where he earned all-state honors in 2014 and 2015. He was recruited by Utah State University, Weber State, and Southern Utah University before

**FOURTH AMENDED COMPLAINT**

ultimately choosing to continue his football career at BYU, where he fully dedicated
himself to the team.

2300.  Mr. Summers' job as a college football player was essentially a full-time
one, and an important and valuable one at that. Following a redshirt season in 2018, Mr.
Summers became a key contributor to BYU's defensive line. From the 2019 to 2021
season, Mr. Summers played in 31 games, starting 12. He appeared in every game
during the 2020 and 2021 seasons, with his best performance in 2021, recording 24
tackles (12 solo) and three quarterback hurries.

2301.  Throughout his time at BYU, Mr. Summers' name, image, likeness,
performance, and visibility were leveraged by the university, including in social media
and marketing efforts. This is especially so because Mr. Summers is a legacy player at
BYU, as his father, Hyrum Summers, played on BYU's defensive line from 1996-1998.
Mr. Summers' contributions helped drive significant revenue for BYU's athletic
department and Defendants through ticket sales, merchandise, and lucrative television
contracts. The Defendants and BYU, during this period, profited substantially from
national television contracts, including a lucrative agreement with ESPN, generating
tens of millions of dollars in revenue for BYU and over $2 billion for the Big 12. Mr.
Summers was a key figure in many of these nationally televised games.

2302.  Mr. Summers received none of that revenue. For a substantial portion of
his college career, Mr. Summers was entirely barred from monetizing his NIL—whether
through third-party endorsements, compensation from his university, or any other
means. Even after NIL restrictions were partially lifted, he was still deprived of the full
opportunities and compensation he would have received in a competitive, unrestricted
market.

2303.  Mr. Summers was denied fair compensation for his labor, talent, and
marketability. Despite his pivotal role in BYU football's success and the substantial
revenue he helped generate, the NCAA's rules prevented him from participating in an

**FOURTH AMENDED COMPLAINT**

open and competitive market. But for these restrictions, Mr. Summers would have
received greater remuneration for his services and NIL rights.

2304.  Defendants' conduct caused direct and substantial harm to Mr. Summers.
By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL
compensation and athlete mobility, Defendants prevented him from accessing a fair and
competitive market for his services. As a result, he was denied the opportunity to earn a
competitive share of the revenue generated by BYU and other member schools. This
unlawful scheme directly injured Mr. Summers, depriving him of the benefits and
compensation he rightfully earned.

2305.  **The effect of Defendants' illegal conduct on Plaintiff Gunner
Romney.** Plaintiff Gunner Romney worked as a college football player at Brigham
Young University from 2018 to 2022.

2306.  The labor provided by Mr. Romney was of significant value to Defendants.
Mr. Romney committed extensive time and effort year-round. His schedule demanded
60-80 hours per week in-season, with practices, meetings, film study, workouts,
academic classes, and travel, often working 12–14-hour days. Off-season training still
required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On
top of this, Mr. Romney was expected to participate in media appearances and
community events, with very limited time off, all under the direction and/or supervision,
implicitly or explicitly, of his coaches or others in the athletic department.

2307.  Mr. Romney began his football career at Chandler High School in
Chandler, Arizona, where he was recognized as one of the top wide receivers in the
state. A 247 Sports 4-star prospect, he committed to BYU over schools like Arizona,
Arizona State, and Boise State. Mr. Romney lived up to his status as a highly sought-
after prospect, as he quickly became a key figure in BYU's receiver corps.

2308.  Mr. Romney's job as a college football player was essentially a full-time
one, and an important and valuable one at that. Over his career, he played in 44 games,

**FOURTH AMENDED COMPLAINT**

including 27 starts while amassing 1,959 career yards receiving. He started each game
he played from 2020-2022. In 2020, he was one of quarterback Zach Wilson's favorite
targets, second on the team in receiving yards (767 on 38 catches) with two
touchdowns. He was a leader on BYU's 11-1 team that finished No. 11 in the AP poll. In
BYU's 48-7 win against Troy in 2020, he achieved a career-high 138 yards receiving. In
2021, he played in and started 10 games, finishing the season as the team's third-
leading receiver with 34 grabs for 594 yards and three touchdowns. He averaged 17.5
yards per catch and 59.4 yards per game and was named to Pro Football Network's
First Team All-Independent Offense.

2309.  Throughout his time at BYU, Mr. Romney's image and performance were
prominently featured in the university's promotional materials, social media campaigns,
and broadcasts. His work directly helped increase fan engagement, drive ticket sales,
and boost television viewership. The Defendants and BYU, during this period, profited
substantially from national television contracts, including a lucrative agreement with
ESPN, generating millions of dollars in revenue for BYU and the Defendants. Mr.
Romney was a key figure in many of these nationally televised games.

2310.  Mr. Romney received none of that revenue. During part of his time in
college, due to the NCAA's anticompetitive rules, he was completely barred from
receiving money for use of his NIL, whether from third parties or from Defendants or
from his university. Even for the time in which he was permitted to earn compensation
from the use of his NIL, he did not receive the full amount from third parties,
Defendants, or his university that he would have received had the NCAA's unlawful
restrictions been lifted earlier. As a highly sought-after high school recruit who was a top
target of No.2 Draft Pick Zach Wilson, he would have earned substantially more NIL
compensation if not for the NCAA's unlawful restrictions.

2311.  Defendants' conduct caused direct and substantial harm to Mr. Romney.
By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that

**FOURTH AMENDED COMPLAINT**

restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. Romney, depriving him of the benefits and compensation he rightfully earned.

2312.  **The effect of Defendants' illegal conduct on Plaintiff Harris LaChance.** Plaintiff Harris LaChance, worked as a college football player at Brigham Young University from 2018 to 2022.

2313.  The labor provided by Mr. LaChance was of great value to Defendants. Mr. LaChance committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. LaChance was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2314.  Mr. LaChance emerged as a standout football talent at Herriman High School in Utah, where he recorded 60 tackles and helped lead his team to all-region and all-state honors in 2014. He received offers from several top football programs, including Texas Christian University, the University of Utah, and Washington. After completing a mission for the Church of Jesus Christ of Latter-day Saints, Mr. LaChance committed to BYU, where he dedicated himself to the football program as an offensive lineman.

2315.  Following a redshirt season in 2018, Mr. LaChance became a key contributor to BYU's offensive line. His role was effectively a full-time job—demanding, valuable, and essential to the program's success. By 2022, he was a consistent starter, starting 12 games and helping BYU's offense rank 10th nationally in fewest sacks

**FOURTH AMENDED COMPLAINT**

allowed and 36th in total yards per game. Over his collegiate career, Mr. LaChance played in 45 games, starting 17, and played a significant role in the football program's success on the field.

2316.  Throughout his time at BYU, Mr. LaChance's name, image, likeness (NIL), performance, and visibility were heavily leveraged by the university, including in social media and marketing efforts. His contributions helped drive significant revenue for Defendants and BYU's athletic department through ticket sales, merchandise, and lucrative television contracts. Yet, despite his impact, he was prohibited from receiving any share of that revenue due to anticompetitive NCAA restrictions. If not for these unlawful NCAA rules, Mr. LaChance would have had opportunities to capitalize on his NIL, earning fair compensation that reflected his value to Defendants and BYU's football program.

2317.  For a substantial portion of his college career, due to the NCAA's anticompetitive rules, Mr. LaChance was entirely barred from monetizing his NIL—whether through third-party endorsements, compensation from his university, or any other means. Even after the NCAA's NIL restrictions were partially lifted, he was still deprived of the full opportunities and compensation he would have received in a competitive, unrestricted market.

2318.  Mr. LaChance's NIL activities after 2021 illustrate just how undercapitalized his earlier years were. In nearly four years of working with student-athletes across various schools and divisions of college football, it was rare to find a player as marketable and charismatic as Harris LaChance. Once permitted, he quickly became a sought-after partner—making appearances at events, joining podcasts, promoting brands on social media, and even hosting his own sponsored segment on the YouTube sports show *The Monty Show*. These opportunities underscore the significant financial benefits he was denied during his peak playing years.

**FOURTH AMENDED COMPLAINT**

2319.  Mr. LaChance was denied fair compensation for his labor, talent, and marketability. Despite his pivotal role in Defendants' and BYU football's success and the substantial revenue he helped generate, the NCAA's unlawful rules prevented him from participating in an open and competitive market. But for these anticompetitive restrictions, Mr. LaChance would have received greater remuneration for his services and NIL rights.

2320.  Defendants' conduct caused direct and substantial harm to Mr. LaChance. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. LaChance, depriving him of the benefits and compensation he rightfully earned.

2321.  **The effect of Defendants' illegal conduct on Plaintiff Hayden Livingston.** Plaintiff Hayden Livingston worked as a college football player at Brigham Young University in 2016 and from 2019 to 2022.

2322.  The labor provided by Mr. Livingston was of significant value to Defendants. Mr. Livingston committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12-14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Livingston was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2323.  Mr. Livingston began his football career at Rigby High School, where he was named the 2015 Post Register Player of the Year and East Idaho Player of the

**FOURTH AMENDED COMPLAINT**

Year. He set school records with 6,351 passing yards and 59 passing touchdowns, also

rushing for 1,900 yards. In his junior year, he passed for 2,594 yards and 22

touchdowns and rushed for 633 yards and seven touchdowns. As a senior, he threw for

1,787 yards, 18 touchdowns, and seven interceptions, while rushing for 1,126 yards and

17 touchdowns. Livingston led his high school to two conference championships, made

the playoffs every season, and reached the state semifinals in both his junior and senior

years. He also excelled in basketball, golf, and track, winning a state championship in

the 4x100 and a conference golf title. A highly-sought-after quarterback prospect, Mr.

Livingston committed to BYU over schools like Boise State and the Air Force Academy.

2324.  Mr. Livingston's job as a college football player was essentially a full-time

one, and an important and valuable one at that. As a redshirt freshman in 2019, he

played in 12 games for the Cougars as a defensive back, including one start against

Utah, and registered eight total tackles and one fumble recovery. During his redshirt

sophomore year in 2020, he appeared in seven games, posting seven total tackles, six

of which were solo. In 2021, he played in all 13 games, recording a career-best 13

tackles (10 solo), two pass break-ups, and two interceptions. Mr. Livingston tied a

career high with four tackles in a 38-24 win over Wyoming in 2022. Mr. Livingston was

so valuable to the Cougars that he was hired as a Defensive Graduate Assistant Coach

in 2023.

2325.  Throughout his time at BYU, Mr. Livingston's image and performance

were prominently featured in the university's promotional materials, social media

campaigns, and broadcasts. His work directly helped increase fan engagement, drive

ticket sales, and boost television viewership. The Defendants and BYU, during this

period, profited substantially from national television contracts, including a lucrative

agreement with ESPN, generating millions of dollars in revenue for the Defendants and

BYU. Mr. Livingston was a key figure in many of these nationally televised games,

including matchups against teams like USC, Boise State, and Utah.

**FOURTH AMENDED COMPLAINT**

2326.  Mr. Livingston received none of that revenue. During part of his time in college, due to anticompetitive NCAA rules, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his university that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who lived up to his billing, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2327.  As evidence of Mr. Livingston's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Livingston and his some of his 2020 teammates, including Isaiah Kaufusi, Jake Oldroyd, Lopini Katoa, Malik Moore, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Livingston and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-day Saints, "As I have loved you, love one another."

2328.  In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXlfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Livingston and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Livingston was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The

**FOURTH AMENDED COMPLAINT**

shirts were sold to the general public and ultimately raised over $150,000 to fund

approximately 63 scholarships in the multicultural department at BYU.



2329.  Had Mr. Livingston been permitted to create and market similar concepts

on his own behalf, he would have employed the same entrepreneurial skills and

dedication to market his NIL successfully to support himself, his family, and charitable

causes of his personal choosing.

2330.  Defendants' conduct caused direct and substantial harm to Mr. Livingston.

By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL

compensation and athlete mobility, Defendants prevented him from accessing a fair and

competitive market for his services. As a result, he was denied the opportunity to earn a

competitive share of the revenue generated by BYU and the Defendants. This unlawful

scheme directly injured Mr. Livingston, depriving him of the benefits and compensation

he rightfully earned.

**FOURTH AMENDED COMPLAINT**

2331.  **The effect of Defendants' illegal conduct on Plaintiff Jackson
Kaufusi.** Plaintiff Jackson Kaufusi worked as a college football player at Brigham Young
University from 2018 to 2022.

2332.  The labor provided by Mr. Kaufusi was of significant value to the
Defendants. Mr. Kaufusi committed extensive time and effort year-round, dedicating 60-
80 hours per week in-season, balancing practices, meetings, film study, workouts,
academic responsibilities, and travel. These obligations often required 12–14-hour days.
During the off-season, training still demanded 40-50 hours weekly, with fall camp
demanding upwards of 75 hours per week. Additionally, Mr. Kaufusi participated in
media appearances and community events, with very limited time off, all under the
direction and/or supervision, implicitly or explicitly, of his coaches or others in the
athletic department.

2333.  Mr. Kaufusi began his football career at Brighton High School, where, in
2015, Mr. Kaufusi's junior season, he was named to the Deseret News All-State second
team. He helped Brighton High School achieve a 10-2 record and a trip to the 5A state
semifinals and was a three-time Max Preps Player of the Game that season. A
247Sports Composite 2-star recruit out of high school, Mr. Kaufusi committed to BYU
over Utah, California, Washington State, and Weber State.

2334.  Mr. Kaufusi's job as a college football player was essentially a full-time
one, and an important and valuable one at that. In his freshman year as linebacker, Mr.
Kaufusi had a 13-yeard interception against Boise State. In his sophomore year in 2021,
he recorded a career-high and team-leading six tackles (five solo) in a 59-14 win over
Idaho State. Additionally, Mr. Kaufusi played on the team with his brother, Isaiah, from
2018-2020. He is the cousin of former BYU defensive linemen Bronson, Corbin, and
Devin Kaufusi.

2335.  Throughout his time at BYU, Mr. Kaufusi's name, image, likeness (NIL),
and performance were prominently featured in the university's promotional materials,

**FOURTH AMENDED COMPLAINT**

social media campaigns, and broadcasts. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue for BYU and the Defendants. Mr. Kaufusi was a key figure in many of these nationally televised games, including matchups against teams like USC, Boise State, and Utah.

2336.  Mr. Kaufusi received none of that revenue. During part of his time in college, due to the NCAA's anticompetitive regulations, he was completely barred from receiving money for use of his NIL. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who experienced success on a team with his brother at a nationally ranked program with a lucrative ESPN contract, Mr. Kaufusi would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2337.  Defendants' conduct caused direct and substantial harm to Mr. Kaufusi. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. This unlawful scheme directly injured Mr. Kaufusi, depriving him of the benefits and compensation he rightfully earned.

2338.  **The effect of Defendants' illegal conduct on Plaintiff Jake Oldroyd.**
Plaintiff Jake Oldroyd worked as a college football player at Brigham Young University in 2016 and from 2019 to 2022.

2339.  The labor provided by Mr. Oldroyd was of significant value to Defendants. Mr. Oldroyd committed extensive time and effort year-round. His schedule demanded

**FOURTH AMENDED COMPLAINT**

60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14- hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Oldroyd was expected to participate in media appearances, and community events and activities, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2340.  Mr. Oldroyd began his football career at Carroll High School in South Lake Texas, where he was recognized as one of the top kickers in the state. He was a perfect 60 for 60 in PATs and 8 for 8 in field goal attempts in two high school seasons and placed 25 punts inside the 20. His impressive high school performance made him a highly recruited prospect. As one of the nation's top kickers, he committed to BYU over other top programs.

2341.  Mr. Oldroyd's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a college kicker and punter, Mr. Oldroyd appeared in 50 games over five seasons (2016, 2019–2022). As a redshirt freshman in 2016, Mr. Oldroyd came in for his first career field goal attempt against Arizona with eight seconds remaining, knocking in the 33-yard game-winner as BYU won 18-16. In 2019, he played in all 13 games, recording 42 punts for 1,813 yards with an average of 43.17 yards per punt and nine more than 50 yards. He made BYU's first 50+ yard field goal since 2006 with a 54-yarder vs. Washington. Oldroyd also went 40 of 41 in PATs. His standout 2020 season included a perfect 13-of-13 on field goals, the second-most by an FBS kicker without a miss that year. More than half of those makes came from at least 40 yards out, including three from beyond 50 yards—a feat unmatched by any FBS kicker since at least 2004. That season, he was named a Lou Groza Award finalist and earned All-America honors (Second Team by Walter Camp and The Athletic; Third Team by AP and Phil Steele).

**FOURTH AMENDED COMPLAINT**

2342.  In 2022, he was a perfect 45-of-45 on PATs and handled 69 kickoffs, including 37 touchbacks. He also set a school record with 16 consecutive field goals made between 2020 and 2021. He finished his career as BYU's all-time leader in career scoring with 338 points and holds the program's records for PAT percentage (97.9%) and consecutive PATs made (72). He ranks No. 2 in career PATs made (188) and No. 3 in career field goals made (50). Mr. Oldroyd's contributions were crucial to BYU's sustained success, which included multiple bowl appearances and nationally ranked seasons.

2343.  Throughout his time at BYU, Mr. Oldroyd's name, image, likeness, and performance were prominently featured in the university's promotional materials, social media campaigns, and broadcasts. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. BYU and the Defendants, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue for BYU and the Defendants. Mr. Oldroyd was a key figure in many of these nationally televised games, including matchups against teams like Oregon, University of Southern California, Tennessee, Utah, and Boise State.

2344.  Mr. Oldroyd received none of that revenue. During part of his time in college, he was completely barred from receiving money for use of his NIL due to the NCAA's illegal, anticompetitive restrictions, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his university that he would have received had the NCAA's unlawful restrictions been lifted earlier and in full. As a highly sought-after high school recruit who became one of the most successful college football specialists in BYU history, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

2345.  As evidence of Mr. Oldroyd's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Oldroyd and his some of his 2020 teammates, including Isaiah Kaufusi, Hayden Livingston, Lopini Katoa, Malik Moore, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Oldroyd and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another." In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXlfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Oldroyd and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Oldroyd was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.

**FOURTH AMENDED COMPLAINT**



2346.  Had Mr. Oldroyd been permitted to create and market similar concepts on his own behalf, he would have employed the same entrepreneurial skills and dedication to market his NIL successfully to support himself, his family, and charitable causes of his personal choosing.

2347.  Defendants' conduct caused direct and substantial harm to Mr. Oldroyd. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This unlawful scheme directly injured Mr. Oldroyd, depriving him of the benefits and compensation he rightfully earned.

**FOURTH AMENDED COMPLAINT**

2348.  **The effect of Defendants' illegal conduct on Plaintiff James Empey.**
Plaintiff James Empey worked as a college football player at Brigham Young University
from 2017 to 2021.

2349.  Mr. Empey committed immense time and energy year-round. His in-
season schedule demanded 60-80 hours per week, balancing practices, meetings,
workouts, academic classes, and travel, often leading to 12–14-hour days. Even in the
off-season, he dedicated 40-50 hours weekly to training, while fall camp pushed his
hours to over 75 per week. Beyond these demands, Mr. Empey was also required to
participate in media appearances, community events, and various activities, with limited
time off, all under the direction and supervision, implicit or explicit, of his coaches and
athletic department.

2350.  Mr. Empey's football journey began as a highly competitive and promising
athlete. A standout player from American Fork High School in Utah, he was a three-year
starter and team captain. He helped lead the school to a region championship and
earned 5A all-state honors as an offensive guard from both Deseret News and the Salt
Lake Tribune in 2014. On defense, he recorded 62 tackles and 3.5 sacks during his
senior year. He was ranked as the No. 11 overall player in Utah by Rivals.com and
committed to BYU over Utah, Washington, Washington State, and Oregon State.

2351.  Mr. Empey's job as a college football player was essentially a full-time
one, and an important and valuable one at that. After redshirting in 2017, Mr. Empey
ended 2018, his redshirt freshman season, named Freshman All-America by the
Football Writers' Association of America and was recognized as the No. 1 freshman
center by Pro Football Focus. He played and started all 13 games, earning recognition
as the best freshman lineman in the country by Pro Football Focus after the New
Mexico State game. In the 2019 season, he started in all 13 games at center,
contributing to an offensive line ranked No. 12 by Pro Football Focus. He played a key
role in an offense that averaged 284.7 passing yards per game (No. 26 nationally) and

**FOURTH AMENDED COMPLAINT**

snapped for three different starting quarterbacks. He was also nominated for the 2019 Rimington Trophy watch list.

2352.  In 2020, Mr. Empey played and started eight games, earning All-Indy center honors and anchoring BYU's offensive line, which was a Joe Moore Semifinalist in 2020. He helped the BYU offense rank No. 4 in scoring (43.5 points per game) and No. 6 in total offense (522.2 yards per game). He called protections and blocking for an offense that ranked No. 8 nationally in passing yards (322.1 per game) and No. 1 in explosive plays, while also helping the rushing attack average 190.1 yards per game. Additionally, he was named CoSIDA Academic All-District.

2353.  In his final BYU season, Mr. Empey started six games, leading BYU's offense to score 33 points per game and average 452 yards of total offense. The offense converted 46% of third downs and scored on 89% of red zone trips, with 75% of those being touchdowns. The offensive line allowed just 15 sacks on the season. He was a finalist for several prestigious awards, including the Pop Warner College Football Award, and received multiple honors, such as Preseason All-American selections and semifinalist nominations for the Jason Witten Collegiate Man of the Year Award, the Wuerffel Trophy, and NFF William V. Campbell Trophy. Mr. Empey was also part of the Pro Football Network Offensive Line of the Year and earned CoSIDA Academic All-District recognition. He started all 41 games in his BYU career and was named to the Rimington and Outland Trophy Watch Lists multiple times.

2354.  Throughout his time at BYU, Mr. Empey's name, image, and likeness (NIL) were heavily leveraged by the university in social media, marketing campaigns, and promotions aimed at increasing viewership and game attendance. The success of the football program translated into financial gains for the university and Defendants, as BYU and the Defendants saw tens of millions in revenue. These earnings were bolstered by the larger independent TV deals BYU signed with ESPN, which brought in millions in additional revenue to the school and the Defendants.

**FOURTH AMENDED COMPLAINT**

2355.  Mr. Empey received none of that revenue. During part of his time in college, due to the NCAA's anticompetitive regulations, Mr. Empey, like many other college athletes, was completely denied the opportunity to receive fair compensation for use of his NIL. Despite playing a pivotal role in BYU football's success and helping generate tens of millions of dollars in revenue for the university and the Defendants, for most of his career, Mr. Empey was prevented from sharing in those profits. Even for the time in which he was permitted to earn compensation from the use of his NIL, while he was able to benefit minimally from the relaxed NIL policy after July 1, 2021, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier and in full. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Empey would have received substantially greater remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

2356.  After his collegiate career, Mr. Empey's potential was recognized at the professional level when he signed as an undrafted free agent with the Dallas Cowboys and played in the NFL for two years, after the Cowboys, with the Miami Dolphins, then the Tennessee Titans, and the Green Bay Packers, before returning to finish his career with the Tennessee Titans, further solidifying the commercial opportunities that were stifled during his college years. His professional success exemplifies the vast commercial potential that was unjustly restricted by the NCAA's unlawful rules during his time at BYU.

2357.  Defendants' actions, by enforcing and adhering to the NCAA's unlawful and anti-competitive NIL restrictions, caused substantial harm to Mr. Empey. By denying him access to a fair and competitive market, they prevented him from receiving a portion of the revenue he helped generate for BYU and the Defendants. This unlawful

**FOURTH AMENDED COMPLAINT**

scheme deprived Mr. Empey of the compensation he rightfully earned, causing direct and significant financial harm.

2358.  **The effect of Defendants' illegal conduct on Plaintiff Jonah Trinnaman.** Plaintiff Jonah Trinnaman worked as a college football player at Brigham Young University from 2016 to 2017

2359.  The labor provided by Mr. Trinnaman was of great value to Defendants. Mr. Trinnaman committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Trinnaman was expected to participate in media and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2360.  Mr. Trinnaman was an exceptional football player coming out of American Fork High School in Utah and Snow College. After a standout high school career, he went on to become one of the top junior college receivers in the nation. At Snow College, Mr. Trinnaman earned NJCAA First Team All-America honors and was rated the No. 5 wide receiver in the country. In his final season at Snow College, he totaled 47 receptions for 803 yards and 8 touchdowns while also excelling as a return specialist. His elite speed—clocking a reported 4.3-second 40-yard dash—made him one of the most sought-after recruits in the junior college ranks. Mr. Trinnaman to BYU over prominent programs, including Utah and Oregon State.

2361.  Mr. Trinnaman's job as a college football player was essentially a full-time one, and an important and valuable one at that. After transferring to BYU as a starting wide receiver, as soon as the stepped on the field, Mr. Trinnaman's speed and playmaking ability stretched defenses and created opportunities for his teammates. Over his two-year BYU career, Mr. Trinnaman played in 26 career games, starting in 20.

**FOURTH AMENDED COMPLAINT**

He totaled 52 receptions for 626 yards, while also making significant contributions on special teams, and averaged 11.5 yards per reception, best among all BYU receivers with at least 25 receptions in 2016.

2362.  Mr. Trinnaman's athleticism and playmaking ability brought a dynamic element to BYU's offense and helped elevate the program's national profile. His contributions were vital in key victories, including BYU's win over Michigan State and a double-overtime victory against Mississippi State in 2016. BYU's social media platforms frequently highlighted Mr. Trinnaman's speed and explosive plays, using his name, image, likeness (NIL), and performance to promote the program and attract fans, donors, and recruits. He was featured in promotional materials, highlight videos, and interviews that helped enhance BYU football's visibility and marketability.

2363.  The success of BYU football during Mr. Trinnaman's time translated directly into financial gains for the university and the Defendants. BYU's athletic department and the Defendants earned millions in revenue from ticket sales, broadcast deals, and merchandise—revenue driven in part by Mr. Trinnaman's contributions on the field and his status as one of the team's most explosive athletes. Games featuring Mr. Trinnaman often drew large television audiences. For example, the 2016 BYU vs. Utah game, in which Mr. Trinnaman played a key role, was one of the most-watched games of the season for BYU, attracting hundreds of thousands of viewers. These earnings were further bolstered by BYU's independent television contract with ESPN and bowl game appearances, which brought additional income to the university and to the Defendants.

2364.  Mr. Trinnaman received none of that revenue. Despite his considerable marketability and the substantial revenue he helped generate for BYU and the Defendants, Mr. Trinnaman was denied any share of that revenue and was prohibited from profiting from his NIL due to anticompetitive NCAA restrictions. During his tenure at BYU, he was prevented from securing endorsement deals or other opportunities that

**FOURTH AMENDED COMPLAINT**

would have been available in a competitive, open market. Had those unlawful restrictions not been in place, Mr. Trinnaman could have capitalized significantly on his status as a starting wide receiver and one of the fastest players in college football.

2365.  Following his BYU career, Mr. Trinnaman signed with the New York Jets as an undrafted free agent. His professional opportunities demonstrated the marketability and value he possessed even during his college years—value he was unfairly prevented from realizing while playing under the NCAA's anti-competitive rules.

2366.  Defendants' conspiracy greatly harmed Mr. Trinnaman. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received remuneration for his services as a college football player and for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2367.  **The effect of Defendants' illegal conduct on Plaintiff Jonny Linehan.** Plaintiff Jonny Linehan worked as a college football player at Brigham Young University from 2015 to 2017.

2368.  The labor provided by Mr. Linehan was of great value to Defendants. Mr. Linehan committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Linehan was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

**FOURTH AMENDED COMPLAINT**

2369.  Mr. Linehan, originally from Auckland, New Zealand, came to the United States to attend BYU and play rugby after his mission in Adelaide, Australia. Mr. Linehan was a highly competitive two-sport athlete at BYU, joining BYU football after winning three consecutive national championships with BYU's rugby team, being named game championship game MVP and a rugby All-American.

2370.  As such, Mr. Linehan's job as a college football player, was more than a full-time one, and an important and valuable one at that. Over the course of his football career, Mr. Linehan played in 38 games as BYU's starting punter. He averaged 42.71 yards per punt and recorded 30 kicks of 50 yards or more and 76 inside the 20-yard line. Linehan was a two-time Ray Guy Award watch list honoree and was named to the Wuerffel Trophy watch list in 2016. He also received the Special Teams Player of the Year award at the annual team banquet in 2018.

2371.  Mr. Linehan's work directly helped increase fan engagement, drive ticket sales, and boost television viewership. Mr. Linehan's impact on BYU's football program extended beyond the field, significantly contributing to the team's visibility and fan engagement. While at BYU, he grew his Twitter following from 0 to 20,000, consistently driving high levels of engagement, and he was a key factor in boosting the team's online presence. He also created a parody music video that gained over 60,000 views on YouTube and was featured on major sports websites and blogs, further expanding BYU's and Defendants' media reach and exposure. Additionally, Mr. Linehan's background as a three-time rugby national champion and All-American made him a notable figure in media engagements and events, with the football team, the broader university community, and the NCAA more broadly.

2372.  BYU and the Defendants, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue. These nationally televised games attracted millions of viewers and generated significant revenue for BYU and the Defendants.

**FOURTH AMENDED COMPLAINT**

2373.  Mr. Linehan received none of that revenue. For the entirety of his college career, he was completely prohibited from receiving compensation for the use of his NIL. Due to the NCAA's anticompetitive regulations, Mr. Linehan, like many other college athletes, was denied the opportunity to receive fair compensation for his work. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and the Defendants, Mr. Linehan was prevented from sharing in those profits resulting from his visibility and success. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Linehan would have received remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, prohibiting him from profiting from his extraordinary talent and popularity during his time as a college athlete.

2374.  Defendants' conspiracy greatly harmed Mr. Linehan. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place by the NCAA, he would have received remuneration for his services as a college football player and for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2375.  **The effect of Defendants' illegal conduct on Plaintiff Justen Smith.** Plaintiff Justen Smith worked as a college football player at Brigham Young University from 2020 to 2022.

2376.  The labor provided by Mr. Smith was of substantial value to Defendants. He committed extensive time and effort year-round to the football program. In-season, his schedule demanded 60-80 hours per week, including practices, meetings, film study, workouts, travel, and academic responsibilities, often working 12-14-hour days. Off-

**FOURTH AMENDED COMPLAINT**

season training still required 40-50 hours per week, with fall camp demanding upwards of 75 hours a week. Beyond football, Mr. Smith was expected to participate in media obligations and community events, leaving him with very little personal time, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2377.  Mr. Smith was a star recruit from Brighton High School, where he was named Academic All-Region in football, basketball, and soccer, and earned a spot on the honor roll all four years. He was recognized as First Team All-State and All-Region, and was named Special Teams 5A Player of the Year, along with being a two-time Region 7 Special Teams Player of the Year. He received offers from several other college football programs, but he ultimately committed to play for BYU, where his father, Courtney Smith, had been a kicker in 1995-1996.

2378.  Mr. Smith's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a kicker, Mr. Smith's contributions were crucial to BYU's success during his career. In 2021, Mr. Smith played in four games (vs. Arizona, vs. No. 19 Arizona State, vs. South Florida, vs. Idaho State). Over his career at BYU, Mr. Smith started in multiple games over three seasons. He made two of three attempted field goals on the season, recording 18 kickoffs for 1,123 yards (avg. 63.4) with six touchbacks and zero kicks out of bounds. Over his career, he had a 75% career average in field goals and an 85% career average in extra points.

2379.  Throughout his time at BYU, Mr. Smith's image and performance were prominently featured in the university's promotional campaigns, social media, and broadcasts. His contributions directly contributed to increasing fan engagement, ticket sales, and television viewership for BYU. The university and the Defendants profited substantially from national television contracts, including lucrative deals with networks like ESPN, generating tens of millions in revenue. Specifically, over his career at BYU, Mr. Smith played in games on all of the major networks—ESPN, NBC, ABC, CBS, FOX,

**FOURTH AMENDED COMPLAINT**

etc.)—against other marquee schools such as Notre Dame, also an independent school, Arkansas, Oregon, Arizona, Arizona State, Utah, UCF, USF, Boise State, and Wyoming. Mr. Smith was a key figure in many of these nationally televised games, including those against high-profile teams, helping BYU secure a strong national presence.

2380.  Mr. Smith did not receive any of that revenue. During part of his college career, due to the NCAA's anticompetitive rules, he was completely barred from receiving compensation for the use of his NIL. Even during the period in which he was permitted to earn NIL compensation, the amount he was able to earn was substantially limited due to the NCAA's unlawful restrictions. As a unique college player in a niche market, Mr. Smith would have likely had considerable opportunities to earn NIL compensation had he not been subject to the NCAA's unlawful restrictions.

2381.  Defendants' actions directly harmed Mr. Smith by adopting and enforcing anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility. By doing so, they prevented him from accessing a fair and competitive market for his talents. This unlawful scheme deprived Mr. Smith of the opportunity to earn a competitive share of the revenue generated by BYU and the Defendants. As a result, Mr. Smith was unjustly denied the full financial benefits and compensation he rightfully earned during his college football career.

2382.  **The effect of Defendants' illegal conduct on Plaintiff Isaiah Kaufusi.** Plaintiff Isaiah Kaufusi as a college football player at Brigham Young University from 2016 to 2020.

2383.  The labor provided by Mr. Kaufusi was of great value to Defendants. Mr. Kaufusi committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this,

**FOURTH AMENDED COMPLAINT**

Mr. Kaufusi was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2384.  Mr. Kaufusi was an exceptional football player coming out of Brighton High School in Utah. In high school, he was a three-star recruit according to ESPN.com and Scout.com. He earned First Team All-State honors from both the *Deseret News*, *Salt Lake Tribune*, and *USA Today*, as well as First Team All-Region recognition in his junior and senior seasons. Ranked the No. 11 overall recruit in Utah and the No. 99 outside linebacker nationally by ESPN.com, Kaufusi was a standout at Brighton High School. He helped lead his team to a 12-2 record and a No. 4 state ranking by MaxPreps in 2013. A versatile three-year starter at both receiver and defensive back, Kaufusi tallied 92 tackles, 4 sacks, and 3 interceptions as a senior, following a junior season with 39.5 tackles, 2 sacks, and 4 interceptions. Offensively, he averaged 18.5 yards per catch in 2013, totaling 609 receiving yards and 6 touchdowns on 33 receptions. He committed to BYU over Utah, Hawaii, and Utah State.

2385.  Mr. Kaufusi's job as a college football player was essentially a full-time one, and an important and valuable one at that. After redshirting his first year, he steadily developed into one of the team's top defensive leaders. By his junior and senior seasons, he was a team captain, starting linebacker, and a standout performer. In 2020, Mr. Kaufusi led BYU in tackles with 66, including four sacks. His defensive prowess helped BYU achieve an impressive 11–1 record, finishing the season ranked No. 11 in the nation, including victories over Navy, No.22 ranked Army, No.21 ranked Boise State, No.18 ranked Coastal Carolina, and UCF in the Boca Raton Bowl. Mr. Kaufusi played on the team with his brother, Jackson from 2018-2020. He is the cousin of former BYU defensive linemen Bronson, Corbin, and Devin Kaufusi.

2386.  Under Mr. Kaufusi's leadership, BYU's defense became one of the most formidable units in the country. His contributions were vital in key victories against high-

**FOURTH AMENDED COMPLAINT**

profile opponents. As a result of Mr. Kaufusi's play and the team's success, BYU football enjoyed increased media attention, heightened fan engagement, and expanded its national profile. Games featuring Mr. Kaufusi drew large television audiences, such as the primetime matchup against Boise State on Fox Sports 1. During the 2020 season, BYU's games averaged approximately 744,555 viewers per game. BYU's social media platforms frequently highlighted Mr. Kaufusi, promoting his accomplishments and using his name, image, and likeness (NIL) to enhance the program's visibility and appeal to fans, donors, and recruits. For instance, he was often featured in promotional content, interviews, and highlight reels that helped drive attendance, viewership, and merchandise sales.

**FOURTH AMENDED COMPLAINT**

2387.  For example, this advertisement for season tickets prominently featured Mr. Kaufusi:



2388.  And this is a photo that was similarly used by BYU to market season tickets outside the Provo mall that was put up in 2019. On information and belief, it is still there today.

**FOURTH AMENDED COMPLAINT**



2389.  Despite his considerable marketability and the substantial revenue he helped generate for BYU and the Defendants, due to the NCAA's anticompetitive restrictions, Mr. Kaufusi was denied any share of that revenue and was prohibited from profiting from his NIL. During his tenure at BYU, he was prevented from securing endorsement deals or other opportunities that would have been available in a competitive, open market. Had the NCAA's unlawful restrictions not been in place, Mr. Kaufusi could have capitalized significantly on his status as a star player and key leader within a nationally recognized football program.

2390.  The success of the BYU football during Mr. Kaufusi's time translated directly into financial gains for the university and the Defendants. BYU and the Defendants earned tens of millions in revenue from ticket sales, broadcast deals, and merchandise—revenue driven in part by Mr. Kaufusi's contributions on the field and his leadership both on and off the field. These earnings were further bolstered by BYU's

**FOURTH AMENDED COMPLAINT**

independent TV contract the ESPN and bowl game appearances, which brought millions in additional income to BYU and the Defendants. Yet, due to the NCAA's unlawful restrictions, Mr. Kaufusi received none of that revenue, despite his pivotal role in generating it.

2391.  Following his BYU career, Mr. Kaufusi signed with the Indianapolis Colts as a free agent and later joined the San Francisco 49ers. He has since pursued additional professional and business opportunities, demonstrating the marketability and value he possessed even during his college years—value he was unfairly prevented from realizing while playing under the NCAA's anti-competitive rules.

2392.  As evidence of Mr. Kaufusi's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Kaufusi and his some of his 2020 teammates, including Jake Oldroyd, Hayden Livingston, Lopini Katoa, Malik Moore, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Kaufusi and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another."

2393.  In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXIfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Kaufusi and his 2020 teammates said they "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Kaufusi said in the video, "If you go into our locker room right now, you will find guys from different backgrounds, different

**FOURTH AMENDED COMPLAINT**

cultures, different beliefs, we decided that we wanted to be united together and we do that through love. In a world full of confusion, misinterpretation, inequality and injustice, we have chosen to love and that unites us." Mr. Kaufsi was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.

2394.  Had Mr. Kaufusi been permitted to create and market similar concepts on his own behalf, he would have employed the same entrepreneurial skills and dedication to market his NIL successfully to support himself, his family, and charitable causes of his personal choosing.

2395.  Mr. Kaufisi, like many other college athletes, was denied the opportunity to receive fair compensation for his work and NIL by the NCAA's anticompetitive rules and conduct. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and the Defendants, the NCAA's unlawful restrictions prevented Mr. Kaufisi from sharing in those profits. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Kaufisi would have received substantially greater remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

2396.  Defendants' conspiracy greatly harmed Mr. Kaufisi. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received remuneration for his services as a college football player and his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and

**FOURTH AMENDED COMPLAINT**

other revenue being brought in by Defendants and their member schools. Thus,
Defendants' scheme directly injured him.

2397. **The effect of Defendants' illegal conduct on Plaintiff Keenan Ellis.**
Plaintiff Keenan Ellis worked as a college football player at Brigham Young University
from 2017 to 2021.

2398. The labor provided by Mr. Ellis was of significant value to Defendants. Mr.
Ellis dedicated extensive time and effort year-round. During the football season, his
schedule demanded 60–80 hours per week, which included practices, meetings, film
study, workouts, academic commitments, and travel. Often, this involved 12-14-hour
days. Even in the off-season, Mr. Ellis committed 40–50 hours per week to training and
preparing for the next season, with fall camp requiring over 75 hours a week. Alongside
these physical demands, he was required to participate in media appearances and
community events, leaving him with very limited time for rest, all under the direction
and/or supervision, implicitly or explicitly, of his coaches or others in the athletic
department.

2399. Mr. Ellis was a highly regarded athlete coming out of high school. At
Bonita Vista High School, he helped lead the team to a CIF Championship and a state
championship runner-up finish. He was an all-league performer, recording 972 receiving
yards and nine touchdowns during his senior season, along with 235 kick return yards.
He committed to BYU over Washington State.

2400. Mr. Ellis' job as a college football player was essentially a full-time one,
and an important and valuable one at that. After redshirting in 2017, Mr. Ellis played in
12 games in 2018 at defensive back, starting one, and racking up eight solo tackles and
two pass breakups as a redshirt freshman. In 2020, he played in eight games, starting
in six, tallied 13 tackles, including six solo stops, and three pass break-ups.

2401. Tragically, Mr. Ellis was forced to medically retire from football after
suffering a serious neck injury in the Cougars 2021 season opener against Arizona. In

**FOURTH AMENDED COMPLAINT**

February 2022, Mr. Ellis reported that he did not remember the collision with an Arizona player, that he was still dealing with "a little brain fog and a little bit of memory loss," but that he was "doing way better" and was working toward recovering and rejoining the team in an off-the-field capacity in spring 2022. The hardest day for Mr. Ellis came in January 2022 when the BYU head trainer and team physician told him he would never play football again. He recalls he could not bring himself to tell his mother because telling her would make it real. After two days of trying to come to terms with the reality, he broke down and told his mother and the rest of his family. He was devastated.

2402.  Mr. Ellis told the Salt Lake Tribune, "Football was always my dream because of the opportunities." "It gave me a free education and my parents didn't have to worry. I always saw the NFL as an opportunity to help support my family financially. So just telling my mom felt like, 'Man, that is all cut off.'" Without the ability to earn money from his NIL in high school or college, with his NFL career cut short before it could begin, Mr. Ellis was forced to search for his calling elsewhere. And, demonstrating his true championship mentality, Mr. Ellis is now a first-year law student at the University of Tennessee.

2403.  During his short time at BYU, Mr. Ellis' contributions and tragedy on the field were heavily covered in the media and on social media, helping boost fan engagement, increase game attendance, and drive television viewership. During Mr. Ellis' tenure, BYU operated as an independent football program, securing favorable scheduling agreements and national television contracts, including an agreement with ESPN worth millions per year, that significantly bolstered its and Defendants'' revenue. These games attracted millions of viewers nationwide.

2404.  Mr. Ellis received none of that revenue. During part of his time in college, due to the NCAA's anticompetitive regulations, he was completely barred from receiving money for use of his NIL. Even for the time in which he was permitted to earn compensation from the use of his NIL, which only amounted to preseason, training

**FOURTH AMENDED COMPLAINT**

camp, and game 1 of the 2021 season before his life-changing injury, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier. He would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

2405.  As evidence of Mr. Ellis's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Ellis and some of his 2020 teammates, including Isaiah Kaufusi, Hayden Livingston, Lopini Katoa, Jake Oldroyd, and Malik Moore, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in Fall 2020. The campaign was a response to the social and racial injustice Mr. Ellis and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another."

2406.  In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXlfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Ellis and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Ellis was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.

**FOURTH AMENDED COMPLAINT**



2407.  Had Mr. Ellis been permitted to create and market similar concepts on his own behalf, he would have employed the same entrepreneurial skills and dedication to market his NIL successfully to support himself, his family, and charitable causes of his personal choosing.

2408.  Defendants' conduct directly harmed Mr. Ellis. By enforcing and abiding by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants effectively blocked Mr. Ellis from accessing a fair and competitive market for his talents. This deprived him of the opportunity to earn a fair share of the revenue generated by BYU and the Defendants, which he rightfully earned through his hard work, dedication, and performance on the field. As a result, he was unjustly denied the full financial benefits of his labor, causing him substantial financial harm, especially since his football career was tragically cut short before he or his family had the chance to benefit from it financially, while the Defendants benefited from his hard work all along.

**FOURTH AMENDED COMPLAINT**

2409.  **The effect of Defendants' illegal conduct on Plaintiff Lopini Katoa.**
Plaintiff Lopini Katoa worked as a college football player at Brigham Young University
from 2017 to 2022.

2410.  The labor provided by Mr. Katoa was of significant value to Defendants.
Mr. Katoa committed extensive time and effort year-round. His schedule demanded 60-
80 hours per week in-season, with practices, meetings, film study, workouts, academic
classes, and travel, often working 12–14-hour days. Off-season training still required 40-
50 hours weekly, while fall camp ramped up to over 75 hours per week. In addition to
his athletic commitments, Mr. Katoa was expected to participate in media appearances
and community events, with very limited time off, all under the direction and/or
supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2411.  Lopini Katoa was a standout player at American Fork High School,
earning a 2014 all-state selection and being named Region 4 MVP. He helped lead the
team to the state title game that year, finishing with an impressive 1,653 rushing yards,
25 touchdowns, 44 receptions, 576 receiving yards, and five scores as a senior. His
performance attracted interest from other prominent programs, and Mr. Katoa ultimately
committed to BYU over Oregon State, the Army, and Utah State.

2412.  Mr. Katoa's job as a college football player was essentially a full-time one,
and an important and valuable one at that. Even as a redshirt freshman on the scout
team, Mr. Katoa shined, receiving the Offensive Developmental Player of the Year
award at the annual team banquet in 2017. But once he stepped foot on the field, Mr.
Katoa never looked back. As a redshirt freshman, he played in 11 games, starting in 2,
and led the team in rushing with 423 yards on 76 attempts and scoring (non-kicker) with
eight touchdowns. He was third on the team in all-purpose yards that year and fifth on
the team in receiving yards as well. He rushed for a season-high 155 yards and a team-
long 50 yards, as well as a career-high and team-high four rushing touchdowns in a
single game against New Mexico State. As a sophomore, Mr. Katoa was a preseason

**FOURTH AMENDED COMPLAINT**

Doak Walker Award nominee. That year, he played in 12 games, starting in 4. He led the team in rushing attempts and was second in rushing yards, while leading the team in all-purpose yards with 853. In the 2020 Covid year, he played in 11 games, starting 4, was named Second Team All-Independent, and helped lead the BYU offense to finish No. 3 in scoring, No. 6 in total offense, and No. 8 in passing offense.

2413.  As a junior in 2021, Mr. Katoa played in all 13 games, was the team's third-leading rusher, averaging 4 yards per carry, and led the Cougars in kickoff return average. In 2022, his senior year, Mr. Katoa played in 10 games, starting in 4. On September 10, he scored the game-winning touchdown, sealing the game for BYU over the No.9 ranked Baylor Bears. In the Cougars' October 27 game against East Carolina, he achieved several program-record milestones. Specifically, Mr. Katoa (1) surpassed Eldon "The Phantom" Fortie for No. 14 all-time at BYU in career rushing attempts (368); (2) tied Jeff Blanc and Eric Lane for No. 13 all-time at BYU in career rushing touchdowns (21); and (3) surpassed Todd Christensen and Scott Phillips for No. 24 all-time at BYU in career all-purpose yards (2,814) - just six shy of passing Taysom Hill. As a running back at BYU, Mr. Katoa finished his career at with 27 total touchdowns, 21 rushing touchdowns, 1,799 rushing yards, and 2,889 all-purpose yards.

2414.  Throughout his time at BYU, Mr. Katoa's name, image, and likeness (NIL), and performance were prominently featured in the university's promotional materials, social media campaigns, and broadcasts, and he participated in numerous interviews and ESPN stories, raising the visibility of BYU and the Defendants. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue. Mr. Katoa was a key figure in many of these nationally televised games.

**FOURTH AMENDED COMPLAINT**

2415.  Mr. Katoa received none of that revenue. During part of his time in college, he was completely barred from receiving money for the use of his NIL. Even when the NCAA eventually allowed limited NIL compensation, Mr. Katoa was not provided with the full amount he could have earned if the anticompetitive restrictions on NIL had been lifted earlier. As a highly talented and nationally recognized player, Mr. Katoa would have earned substantially more NIL compensation had the NCAA's unlawful restrictions not existed.

2416.  As evidence of Mr. Katoa's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Katoa and his some of his 2020 teammates, including Isaiah Kaufusi, Hayden Livingston, Malik Moore, Jake Oldroyd, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Katoa and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-day Saints, "As I have loved you, love one another."

2417.  In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXlfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Katoa and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Katoa was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.

**FOURTH AMENDED COMPLAINT**

2418. **The effect of Defendants' illegal conduct on Plaintiff Malik Moore.**
Plaintiff Malik Moore worked as a college football player at Brigham Young University
from 2018 to 2023.

2419.  The labor provided by Mr. Moore was of great value to Defendants. Mr.
Moore committed extensive time and effort year-round. His schedule demanded 60-80
hours per week in-season, with practices, meetings, film study, workouts, academic
classes, and travel, often working 12–14-hour days. Off-season training still required 40-
50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this,
Mr. Moore was expected to participate in media appearances and community events,
with very limited time off, all under the direction and/or supervision, implicitly or
explicitly, of his coaches or others in the athletic department.

2420.  Mr. Moore, a two-sport athlete in football and track, first emerged as a
standout football player at Point Loma High School in San Diego, California, where he
was an all-league performer at both defensive back and wide receiver and recognized
as a 247Sports top 300 player in California. His exceptional play earned him first-team
all-conference honors and recognition as one of the top defensive backs in his region.
As a highly regarded prospect, he committed to BYU to continue his football career.

2421.  Mr. Moore's job as a college football player was essentially a full-time one,
and an important and valuable one at that. Playing safety, often the last line of defense
between opposing teams' wide receivers and the endzone, his role was physically and
mentally demanding, time-intensive, and critical to the team's defensive success on the
field. As a true freshman, Mr. Moore played in all 13 games for the Cougars, tallying his
first career solo tackle against Northern Illinois and his first career interception against
New Mexico State. As a sophomore, he played in 12 games, starting in 4, and had the
propensity to shine when the lights were brightest, tallying a career-best three tackles in
two marquee games that season against USC and Washington. In 2021, he was one of
just 3 defensive players to start in all 13 games. He was tied for team lead in

**FOURTH AMENDED COMPLAINT**

interceptions at three. His interceptions came in key moments against No. 19 Arizona State, Utah State, and Washington State—including an opening drive one-handed circus catch that enjoyed high rotation in the media and online—helping BYU to high-profile victories. That year, he was named to the Pro Football Network All-Independent First Team Defense and Phil Steele All-Independent Second Team Defense, and he was part of Pro Football Network's All-Independent Defensive Secondary of the Year.

2422.  In 2022, Mr. Moore started and played in four games before suffering a season-ending injury. The Cougars went 3-1 in those games and, not coincidentally, 3-5 the rest of the season, when they could not replace Mr. Moore's range and instincts on the back end, which allowed them to play more press coverage, instead causing them to drop into zone more often. Mr. Moore returned for BYU's first season in the Big 12 and make the most of the season under a new coaching staff who had a different defensive philosophy than the staff who recruited him, earning his degree, but the lost opportunities to set himself and his family up financially that he should have been allowed to maximize earlier in his career were looming large.

2423.  Overall, over the course of his career, Mr. Moore appeared in 53 games for BYU, recording 68 total tackles, five interceptions, and numerous pass breakups. His contributions were instrumental in BYU's sustained success, including back-to-back double-digit win seasons in 2020 and 2021, and national rankings in both years.

2424.  During his time at BYU, Mr. Moore's contributions on the field were heavily leveraged by the university to promote its football program. He was frequently featured in BYU football's social media campaigns, promotional materials, and public-facing media, helping boost fan engagement, increase game attendance, and drive television viewership. During most of Mr. Moore's tenure, BYU operated as an independent football program and capitalized on national television contracts, including a reported $6-10 million annual broadcast agreement with ESPN. These nationally televised games regularly drew millions of viewers and generated substantial revenue for the

**FOURTH AMENDED COMPLAINT**

university and the Defendants. In 2022 alone, BYU's football program generated an estimated $23 million in football-related revenue from ticket sales, media rights, and merchandise. Mr. Moore played a key role in high-profile games during this time, including nationally televised matchups against programs such as Baylor, Utah, and USC.

2425.  Mr. Moore received none of that revenue. During part of his college career, due to anticompetitive NCAA rules, he was completely barred from receiving money for the use of his NIL. Even when restrictions on NIL compensation were partially lifted, he did not receive the full amount of compensation he would have earned had the NCAA's unlawful restrictions not been in place for much of his career. As a highly recruited athlete who became a multi-year starter and leader on one of the top college football teams in the country, Mr. Moore would have earned substantially more NIL compensation if not for Defendants' unlawful conduct.

2426.  In stark contrast to the limited and belated NIL opportunities Mr. Moore was able to secure—less than $5,000 in total—today's well-known college athletes routinely command NIL deals worth millions of dollars annually. For example, the top-ranked safety on On3's NIL rankings is Ohio State's Caleb Downs, worth an estimated $2.4 million with deals with Beats by Dre, Panini America, EA Sports, American Eagle, and others. Quarterbacks such as Arch Manning (University of Texas) and DJ Lagway (University of Florida) have NIL valuations of $6.5 million and $3.8 million, respectively, after signing deals with companies like Uber, Red Bull, Nintendo, and university collectives. Athletes like Livvy Dunne and Bronny James are earning between $3 million and $5 million through major national endorsements and equity partnerships with global brands like Nike and American Eagle, as well as monetizing their social media influence. These athletes benefit from an open NIL marketplace that was unavailable to Mr. Moore—and all the former college athletes who have opted out of the *House v.*

**FOURTH AMENDED COMPLAINT**

*NCAA* settlement—during the prime of his career, when anticompetitive NCAA-imposed restrictions barred him from monetizing his NIL.

2427.  Even after the partial lifting of those anticompetitive restrictions, the lingering effects of the NCAA's unlawful policies severely curtailed Mr. Moore's earning potential. During the short window when he was permitted to receive NIL compensation, Mr. Moore received comparatively modest deals. Had these restrictions been lifted earlier, Mr. Moore could have capitalized on more lucrative partnerships and endorsements commensurate with his athletic performance and public profile, proportionate to with what comparable athletes are earning today.

2428.  As evidence of Mr. Moore's entrepreneurial instincts and ability to conceptualize and successfully execute a marketing campaign, Mr. Moore and his some of his 2020 teammates, including Isaiah Kaufusi, Hayden Livingston, Lopini Katoa, Jake Oldroyd, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Moore and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another."

2429.  In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXlfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Moore and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Moore was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to

**FOURTH AMENDED COMPLAINT**

the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.



2430.  Even prior to the "Love One Another" campaign, in June 2020, in the immediate wake of the murder of George Floyd, Mr. Moore spearheaded the Black Lives Matter movement at BYU. In the summer, he and several of his teammates, including Plaintiff Chaz Ah You, initiated a social and racial justice campaign under the rallying cry they created, "Be the Change." They produced a video that ran on the BYU Football social media accounts under the hashtag #BlackLivesMatter and on YouTube, and that garnered an over 12-minute interview on BYU Sports Nation, https://youtu.be/bwNcsErlW0c?si=P5xIDqso8o5RlCqH.

2431.  On YouTube, for example, the "Be the Change" video has almost 10,000 views, https://www.youtube.com/watch?v=7Qqr4X4KQdY. On Facebook, it has 67,000

**FOURTH AMENDED COMPLAINT**

views, https://www.facebook.com/watch/?v=304450473890426. The video was also

posted on BYU Football's social media account on the platform formerly known as

Twitter, but it has since been removed from that platform,

https://x.com/BYUfootball/status/1270868280232689664;

https://kslsports.com/ncaa/byu/byu-football-players-say-be-the-change-in-black-lives-

matter-social-media-video-post/435913. However, on information and belief, the post on

Twitter would have had the most views, as Twitter is generally known as the platform

that is the most active social media platform for college football fans. It also garnered

attention in the media more broadly, including on Fox News. In the video, Mr. Moore,

Mr. Ah You, and other teammates encourage people to "be the change" they wish to

see in the world. Mr. Moore, Mr. Ah You, and others said in the video, "This is for

George Floyd," and Moore added, "And the countless others who have died from the

hands of injustices." Teammates from different cultural and racial backgrounds

emphasized brotherhood across differences, declaring, "My brother bleeds the same

color," and "My brother embraces my differences," and "My brother stands with me, not

against me," and Mr. Ah You declared, "My brother stands for justice."

2432. Had Mr. Moore been permitted to create and market similar concepts on

his own behalf, he would have employed the same entrepreneurial skills and dedication

to market his NIL successfully to support himself, his family, and charitable causes of

his personal choosing.

2433. Defendants' actions caused direct and substantial harm to Mr. Moore. By

agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted

NIL compensation and athlete mobility, Defendants prevented him from accessing a fair

and competitive market for his services. As a result, he was denied the opportunity to

earn a competitive share of the significant revenue he helped generate for BYU and the

Defendants. This unlawful scheme directly injured Mr. Moore, depriving him of the

benefits and compensation he rightfully earned.

**FOURTH AMENDED COMPLAINT**

2434.  **The effect of Defendants' illegal conduct on Plaintiff Masen Wake.**
Plaintiff Masen Wake worked as a college football player at Brigham Young University
from 2019 to 2022.

2435.  The labor provided by Mr. Wake was of great value to Defendants. Mr.
Wake committed extensive time and effort year-round. His schedule demanded 60-80
hours per week in-season, with practices, meetings, film study, workouts, academic
classes, and travel, often working 12–14-hour days. Off-season training still required 40–
50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this,
Mr. Wake was expected to participate in media appearances and community events,
with very limited time off, all under the direction and/or supervision, implicitly or
explicitly, of his coaches or others in the athletic department.

2436.  Mr. Wake emerged as a standout football talent at Lone Peak High School
in Highland, Utah, where he played both sides of the ball, amassing 1,263 rushing yards
his senior year as a running back, ranking 11th in the state, and 1,142 as a junior,
posting back-to-back 1,000+ yard rushing seasons, while also playing linebacker.

2437.  Mr. Wake's job as a college football player was essentially a full-time one,
and an important and valuable one at that. In 2019, Mr. Wake joined BYU in the unique
role of tight end/fullback, quickly becoming an integral part of the team's offense. As a
true freshman, he played in 12 games, starting 2. As a sophomore, in 2020, he started 6
of the 12 games in which he played amassing 129 all-purpose yards and three
touchdowns. In the 2021 season, he recorded a career-best 14 receptions for 148 yards
and a touchdown, averaging 10.6 yards per catch. His contributions were instrumental
in key victories, including a pivotal 36-yard rumble to the goal line that set up a
touchdown in a 35-31 win against USC. Over four seasons in his BYU career, Mr. Wake
appeared in 46 games, starting in 17. He was a fan favorite who put his body on the
line. Tellingly, he was known as the player who would hurdle players in the open field
following a viral moment in the 2020 victory over Houston when he hurdled not one by

**FOURTH AMENDED COMPLAINT**

two defenders and trucked others in the third quarter, earning him the moniker, Masen 'Air' Wake. Unfortunately, the reckless abandon with which he played and that made him a fan favorite also took a toll on his body, and Mr. Wake was forced into early retirement in August 2023 before he could bring his no-holds-barred style of play to the NFL. Mr. Wake's uncle, Tyler Nelson, also played safety at BYU from 1995-1996.

2438.  Mr. Wake was frequently featured in BYU football's social media campaigns and promotional materials, helping boost fan engagement, increase game attendance, and drive television viewership. BYU football games were regularly broadcast on national television, including ESPN, ABC, and CBS Sports Network, attracting millions of viewers each season. For example, BYU's 2020 victory over Houston in which Mr. Wake hurdled two defenders, and the 2021 matchup against Baylor, in which Mr. Wake played a key role, were both aired on ESPN and drew large national audiences.

2439.  BYU football was one of the university's primary sources of revenue, generating an estimated $23 million in football-related income in 2022 alone from ticket sales, merchandise, and lucrative media rights deals. During Mr. Wake's tenure, BYU operated as an independent football program, securing favorable scheduling agreements and national television contracts that significantly bolstered its athletic department's revenue. In fact, BYU and ESPN had an agreement to broadcast the university's games, which was reportedly worth between $6-10 million per year.

2440.  Mr. Wake received none of that revenue. The Defendants and BYU have made a significant amount of money from BYU's football program and the contributions of Mr. Wake and his teammates, and despite Mr. Wake's substantial contributions, anticompetitive NCAA regulations at the time prohibited him from monetizing his name, image, and likeness (NIL), preventing him from receiving any share of the revenue he helped generate.

**FOURTH AMENDED COMPLAINT**

2441.  Following the NCAA's policy change on July 1, 2021, allowing limited NIL compensation, Mr. Wake engaged in promotional activities, including offering personalized social media posts, event appearances, and autographs through platforms like Opendorse. He also participated in fan engagement events, such as autograph signings, further demonstrating his appeal and marketability. These opportunities highlight the previously untapped potential of his NIL value during the restrictive unlawful NCAA policies.

2442.  However, Mr. Wake's earning capacity while at BYU was short lived as he was forced to retire from football in August 2023. The delayed opportunity to monetize his NIL due to the Defendants' unlawful conduct limited his personal earnings during his peak athletic years. Had the NCAA's anticompetitive restrictions been lifted earlier, Mr. Wake could have capitalized on more lucrative partnerships and endorsements commensurate with his athletic performance and public profile, proportionate to what comparable athletes are earning today.

2443.  Defendants' unlawful conduct caused direct and substantial harm to Mr. Wake. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This unlawful scheme directly injured Mr. Wake, depriving him of the benefits and compensation he rightfully earned.

2444.  **The effect of Defendants' illegal conduct on Plaintiff Payton Wilgar.**
Plaintiff Payton Wilgar worked as a college football player at Brigham Young University from 2018 to 2022.

2445.  The labor provided by Mr. Wilgar was of great value to Defendants. Mr. Wilgar committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic

**FOURTH AMENDED COMPLAINT**

classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Wilgar was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2446.  Coming out of Dixie high school, Payton Wilgar was not ranked because he did not have the financial means to attend football camps, and was not allowed to monetize his NIL in high school or even crowdsource to raise funds to attend camps at that time, so although he needed a scholarship more than many in his situation, Mr. Wilgar remained unknown to college coaches in Utah and across the country, and at graduation, though he was a two-sport athlete, also playing basketball, and had earned 4A Deseret news All-State Honorable Mention at linebacker as a senior in 2017, he had no Division I scholarship offers. While he had offers from Southern Utah University, Utah Tech University, and Utah State University, Mr. Wilgar chose to come to BYU, his dream school, as a preferred walk on, where his father, Dana, had played defensive back from 1973-1976. Once there, Mr. Wilgar's hard work and dedication quickly paid off. After his first semester, he earned a scholarship and was named to the Pro Football Focus All-Freshman Team, Mr. Wilgar eventually became a team captain, a role he held for three of his four years as a starter. Suffice to say, Mr. Wilgar's contributions on and off the football field were highly valuable to Defendants.

2447.  Mr. Wilgar's job as a college football player was essentially a full-time one, and an important and valuable one at that. Mr. Wilgar redshirted in 2018, but he still appeared in 3 games. Believing his dreams of playing football at BYU were over after that year because he could not afford to stay without a scholarship, Mr. Wilgar packed his belongings and returned home. But, believing they saw something special in him, the coaching staff at BYU decided to award Mr. Wilgar a full scholarship so he could return to BYU and the team. This was a lifechanging opportunity for Mr. Wilgar, and he

**FOURTH AMENDED COMPLAINT**

was determined to prove the coaching staff right. And that he did. His redshirt freshman

season, 2019, was truly special. Mr. Wilgar started in 12 of 13 games, amassed 54

tackles (36 solo), including 4.5 tackles for loss, 1 pass break up, a team-leading 3

interceptions (tied for 2nd nationally among linebackers), and 4 passes defended. He

had at least 5 tackles in 5 games and was named player of the game in a marquee

victory over No. 24 USC and at Utah State.

2448.  Capping what was a remarkable season, Mr. Wilgar was named to the Pro

Football Focus All-Freshman Team. Also during this seemingly magical season, Mr.

Wilgar and his new wife faced a family crisis that would have broken many seasoned

adults. Having grown up and born witness to the devastation that the disease of

addiction can wreak on a family, Mr. Wilgar and his wife became foster parents to his

older brother's two children, 3yo and 1 yo. While thankfully, the young children were

soon reunited with their parents, Mr. Wilgar's actions in a moment of crisis speak

volumes about who he is on and off the football field.

2449.  In 2020, Mr. Wilgar was named Second Team All-Independent, registering

57 tackles (5 for loss) and a team-best 5 quarterback hurries, 4 pass breakups, and one

forced fumble, leading BYU's defense to finish 4th in scoring defense and 12th in total

defense, while finishing the season ranked No. 11 overall. Over the next few years, he

continued to excel, earning multiple honors and accolades. In 2021, Mr. Wilgar played

in and started 10 games before suffering a season-ending injury. He finished as BYU's

third-leading tackler with 56 (29 solo, six for loss), 1.5 sacks, two quarterback hurries,

two interceptions and a forced fumble. He also had six games with five or more tackles

and a career-high 11 tackles in BYU's 66-49 win over Virginia. In recognition of his

accomplishments, he was named the Independent Linebacker of the Year and was

selected for the All-Independent First Team Defense. His performance also earned him

spots on the watchlists for the prestigious Nagurski Trophy and Butkus Award,

underscoring his status as one of the top linebackers in college football.

**FOURTH AMENDED COMPLAINT**

2450.  In 2022, Mr. Wilgar played in and started seven games, tallying 30 tackles (9 solo) and one pass breakup, and he was a semifinalist for the prestigious Burlsworth Trophy, awarded annually to the most outstanding football player in America who began his career as a walk-on. Throughout his career, Mr. Wilgar's leadership and skill were instrumental in BYU's defensive success with Wilgar appearing in 45 games with 40 starts and amassing a remarkable 197 tackles (104 solo), 16.5 tackles for loss, 10 pass breakups, and 5 interceptions.  Indeed, BYU frequently featured Mr. Wilgar on its social media accounts and in promotions across campus, using him to boost game viewership and attendance.

2451.  Despite his significant contributions to BYU's football program, Mr. Wilgar, like many other college athletes, was restricted by the NCAA's anticompetitive rules from profiting from his name, image, and likeness (NIL) during the height of his college career. These restrictions prevented him from fully capitalizing on his marketability and the substantial revenue he generated for BYU and the Defendants. The NCAA's anti-competitive restraints meant that Mr. Wilgar was unable to receive fair compensation for his work and the use of his NIL during his career as an athlete at BYU.

2452.  During part of his time in college, due to the Defendants' unlawful conduct, Mr. Wilgar was completely barred from receiving money for use of his NIL. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier.

2453.  In stark contrast to the limited and belated NIL opportunities Mr. Wilgar was able to secure—totaling roughly $36,000 in cash and in-kind benefits—today's well-known college athletes routinely command NIL deals worth hundreds of thousands to millions of dollars annually. For example, the top-ranked edge rusher on On3's NIL rankings is South Carolina's Dylan Stewart, worth an estimated $1.8 million with a confirmed deal from porkrinds.com. Linebackers in the transfer portal reportedly make

**FOURTH AMENDED COMPLAINT**

an average of $100,000 to $300,000 per year NCAA-wide. Quarterbacks such as Arch
Manning (University of Texas) and DJ Lagway (University of Florida) have NIL
valuations of $6.5 million and $3.8 million, respectively, after signing deals with
companies like Uber, Red Bull, Nintendo, and university collectives. Athletes like Livvy
Dunne and Bronny James are earning between $3 million and $5 million through major
national endorsements and equity partnerships with global brands like Nike and
American Eagle, as well as monetizing their social media influence. These athletes
benefit from an open NIL marketplace that was unavailable to Mr. Wilgar—and all the
former college athletes who have opted out of the *House v. NCAA* settlement—during
the prime of his career, when anticompetitive NCAA-imposed restrictions barred him
from monetizing his NIL.

2454.  Even after the partial lifting of those restrictions, the lingering effects of the
NCAA's unlawful policies severely curtailed his earning potential. During the short
window when he was permitted to receive NIL compensation, Mr. Wilgar received
comparatively modest deals, including $7,000 for a leadership video, $5,000 for a
promotional campaign with a regional bank, and non-cash benefits such as a free
weight rack and the removal of his wisdom teeth. Had these restrictions been lifted
earlier, Mr. Wilgar could have capitalized on more lucrative partnerships and
endorsements commensurate with his athletic performance and public profile, in line
with what comparable athletes are earning today.

2455.  Defendants' conspiracy greatly harmed Mr. Wilgar. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college football player and for his NIL than he
received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's
anti-competitive bylaws, he would have received a competitive share of the television

**FOURTH AMENDED COMPLAINT**

and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2456. **The effect of Defendants' illegal conduct on Plaintiff Pepe Tanuvasa.** Plaintiff Pepe Tanuvasa worked as a college football player at Brigham Young University from 2020-2022 and the Naval Academy from 2017-2019.

2457. The labor provided by Mr. Tanuvasa was of great value to Defendants. Mr. Tanuvasa committed extensive time and effort year-round. His schedule demanded 60-80 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12–14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this, Mr. Tanuvasa was expected to participate in media appearances and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2458. Mr. Tanuvasa first emerged as a standout football player at Tigard High School in Oregon, where he was recognized as an all-conference linebacker and helped lead his team to consecutive appearances in the Oregon state semifinals. In addition to lettering in football, Mr. Tanuvasa also lettered in rugby. As a highly recruited prospect, he committed to the United States Naval Academy, where he played in 13 games during the 2018 season, recording 32 tackles. After the 2018 season, he transferred to BYU to continue his football career. Due to anticompetitive NCAA transfer restrictions in place at the time, he was forced to sit out the 2019 season.

2459. Mr. Tanuvasa's job as a college football player was essentially a full-time one, and an important and valuable one at that. Playing linebacker, his role was physically and mentally demanding, time-intensive, and central to the team's success on the field. In the 2020 season, Mr. Tanuvasa played in all 12 games, helping BYU achieve an 11-1 record and a No. 11 national ranking. In 2021 and 2022, he emerged as a defensive leader. He finished the 2021 season as BYU's fifth-leading tackler and

**FOURTH AMENDED COMPLAINT**

was one of just 26 players on the roster to appear in all 13 games. In 2022, he started 12 games at linebacker, recording 45 total tackles, five tackles for loss, and two passes defended. Over the course of his career at BYU, he played in 38 games and was instrumental in maintaining BYU's reputation as one of the top football programs in the country.

2460.  During his time at BYU, Mr. Tanuvasa's contributions on the field were heavily leveraged by the university to promote its football program. He was frequently featured in BYU football's social media campaigns and promotional materials, helping boost fan engagement, increase game attendance, and drive television viewership. During Mr. Tanuvasa's tenure, BYU operated as an independent football program, securing favorable scheduling agreements and national television contracts that significantly bolstered its athletic department's revenue. In fact, BYU and ESPN had an agreement to broadcast the university's games, which was reportedly worth between $6-10 million per year. These games attracted millions of viewers. BYU football was one of the university's primary sources of revenue, generating an estimated $23 million in football-related income in 2022 alone from ticket sales, merchandise, and lucrative media rights deals. Indeed, BYU's 2021 matchup against Baylor, in which Mr. Tanuvasa played a key role, was aired on ESPN and drew a large national audience, benefiting BYU and the Defendants, alike.

2461.  Mr. Tanuvasa received none of that revenue. During part of his time in college, due to the Defendants' unlawful conduct, he was completely barred from receiving money for use of his NIL. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who transferred to BYU from the Naval Academy, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions on monetizing NIL and transfer restrictions.

**FOURTH AMENDED COMPLAINT**

2462.  Defendants' conduct caused direct and substantial harm to Mr. Tanuvasa. By agreeing to adopt, enforce, and abide by anticompetitive NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a competitive share of the revenue generated by BYU and other member schools. This unlawful scheme directly injured Mr. Tanuvasa, depriving him of the benefits and compensation he rightfully earned.

2463.  **The effect of Defendants' illegal conduct on Plaintiff Trajan Pili.** Plaintiff Trajan Pili worked as a college football player at Brigham Young University in 2013 and from 2016-2019.

2464.  The labor provided by Mr. Pili was of great value to Defendants. Mr. Pili dedicated significant time and effort to football year-round, balancing intense in-season demands with rigorous off-season training. His in-season schedule often required 60-80 hours per week, including practices, meetings, workouts, academic responsibilities, and travel, with days extending up to 12-14 hours. During the off-season, he still worked 40-50 hours weekly, with fall camp demanding upwards of 75 hours per week. In addition to these commitments, Mr. Pili was expected to engage in media appearances, community events, and other promotional activities, all under the direction and supervision, either implicitly or explicitly, of his coaches or the athletic department.

2465.  Mr. Pili was a highly accomplished football player coming out of high school. As a standout linebacker at Centennial High School in Las Vegas, he earned 1st Team All-State and 1st Team All-League honors as a defensive end (DE) and tight end (TE). He recorded 63 tackles, 7.5 sacks, two forced fumbles, and two fumble recoveries as a DE, while totaling 13 receptions for 212 yards and two touchdowns as a TE. Mr. Pili committed to BYU over Oregon, Nebraska, Utah, and Stanford.

2466.  Mr. Pili's job as a college football player was essentially a full-time one, and an important and valuable one at that. Throughout his career, he contributed

**FOURTH AMENDED COMPLAINT**

significantly to the defense, both as a starter and as a key player in critical moments. In his redshirt freshman season, in 2016, Mr. Pili was on the two-deep roster and played in 6 games, tallying 8 tackles (5 solo), 5 tackles for loss, and 2.5 sacks. From 2017-2019, Mr. Pili was in the starting lineup for the Cougars. In 2017, he played in 8 games, more than doubling his total tackles with 17 (8 solo), 2 tackles for loss, and 1 sack. In 2018, he played in 7 games but had a career high 27 total tackles (19 solo), 2 tackles for loss, and 2 sacks. In 2019, he played in 9 games, tallying 6 solo tackles, 2 tackles for loss, and 1 sack. Known for his versatility, Mr. Pili could play just about anywhere on the defensive side of the ball, which he discussed with Gunther and Ben on ESPN 700 Radio in June 2019. Mr. Pili's brother, Logan, signed with BYU in 2020, and his other brother, Keenan, was a linebacker at BYU. Additionally, Mr. Pili got married his redshirt freshman year, and he and his wife had their first child, their oldest son, in 2019, his senior year at BYU.

2467.  Throughout his time at BYU, Mr. Pili's name, image, likeness (NIL), and performance were actively leveraged by the university in social media campaigns, marketing efforts, and promotions. Mr. Pili was frequently featured on BYU's social media platforms and in promotional materials, including on ESPN networks, helping to increase visibility and attendance for the football program. For example, his gameday highlights were regularly used in highlight reels on social media and in gameday hype videos. His likeness was also featured on official posters and in the gameday catalogs. These efforts contributed to the substantial revenue generated by the university and Defendants, particularly through television contracts and national exposure, which brought in millions of dollars for BYU and for the Defendants. These earnings were bolstered by BYU's exclusive media rights partnership with ESPN to televise home games, the first of its kind in FBS football, which brought in millions in revenue per year for BYU and the Defendants.

**FOURTH AMENDED COMPLAINT**

2468.  Mr. Pili received none of that revenue. For all of his college career, the
NCAA's anticompetitive restrictions prevented him from receiving fair compensation for
his NIL, which would have allowed him to provide for his young family then and into the
future. The limitations imposed by the NCAA and Defendants deprived him of the ability
to benefit financially from the competitive market demand for his NIL. Had the NCAA's
unlawful restrictions not been in place, Mr. Pili would have had the opportunity to
capitalize on his popularity and marketability, maximizing the value of his NIL. His
absence from the open market was a direct result of the NCAA's anticompetitive rules,
which harmed him by limiting his earning potential during his college career.

2469.  As evidence of Mr. Pili's initiative, he was a leading participant in the More
2 Life Foundation, mentoring and motivating students and teachers in underserved
schools to achieve their very best and volunteered to help coach kids in football and life
in Harlem and Los Angeles every year. Had Mr. Pili been permitted to create and
market similar concepts on his own behalf, he would have employed the same
entrepreneurial skills and dedication to market his NIL successfully to support himself,
his family, and charitable causes of his personal choosing.

2470.  Defendants' actions caused substantial harm to Mr. Pili by adopting,
enforcing, and adhering to anticompetitive NCAA bylaws that restricted NIL
compensation and athlete mobility. This unlawful scheme prevented him from accessing
a fair market for his services, depriving him of the compensation and benefits he
rightfully earned through his athletic and personal brand. The resulting harm directly
injured Mr. Pili, limiting his ability to profit from his extraordinary, versatile skills and
popularity while playing for BYU

2471.  **The effect of Defendants' illegal conduct on Plaintiff Uriah Leiataua.**
Plaintiff Uriah Leiataua worked as a college football player at Brigham Young University
in 2016 to 2021.

**FOURTH AMENDED COMPLAINT**

2472.  The labor provided by Mr. Leiataua was of significant value to Defendants. Mr. Leiataua committed extensive time and effort year-round. His schedule demanded 60-80 hours per week during the season, with practices, meetings, film study, workouts, academic classes, and travel, often working 12-14-hour days. Off-season training still required 40-50 hours weekly, while fall camp ramped up to over 75 hours per week. In addition, Mr. Leiataua was expected to participate in media appearances and community events, leaving him with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2473.  Mr. Leiataua began his football career at Compton Dominguez High School in Compton, California, where he was widely recognized as one of the top defensive linemen in the state. He was a consensus three-star recruit on ESPN, Scout, Rivals, and 247Sports, earning recognition as the No. 33 weakside defensive end on Rivals and the No. 69 defensive end nationally on Scout. He was named to the All-CIF Defense First Team and All-CIF Southeast Division, as well as the San Gabriel Valley League MVP and a second-team Press Telegraph Dream Team honoree. Leiataua helped lead Compton Dominguez High School to an 8-4 record and a 4-1 league finish in 2013, recording 24 sacks over his junior and senior seasons. At almost 6'3" and over 230 lbs., he had a 4.8 40-yard dash and a 275-pound bench press. An exceptional student, he earned a 4.3 GPA, ranking in the top 3 of his class. After a competitive recruiting process that culminated in a high-profile flip from Stanford on National Signing Day, only endearing Mr. Leiataua to Cougar Nation all the more, Mr. Leiataua ultimately committed to BYU over Stanford, Utah, USC, UCLA, Yale, Colorado, Wisconsin, Colorado State, Washington State, and UC Davis.

2474.  Mr. Leiataua's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a defensive lineman, he played in 49 games over five seasons (2017–2021). He made an immediate impact during his redshirt freshman season in 2017, contributing to the defensive line's efforts appearing

**FOURTH AMENDED COMPLAINT**

in seven games that season and nine games the next. His redshirt junior season was
his breakout season. Mr. Leiataua played in 12 games, including the bowl game,
amassing 19 tackles (9 solo) and one sack. In 2020, although a devastating leg injury
shortened his season by over a month, causing him physical and mental pain like he
had never experienced in his life with the specter of the NFL flashing before his eyes,
Mr. Leiataua nonetheless came back to play in 8 games, including a bowl game win
over UCF, tallying 13 tackles (3 solo) and 1.5 sacks. In 2021, Mr. Leiataua played and
contributed in every game, amassing a career-high 26 tackles (16solo), 2.5 sacks, one
forced fumble, and one fumble recovery, making standout plays in marquee games
against Arizona, No.21 ranked Utah, and USC. Over the course of his career, Mr.
Leiataua was widely regarded as one of the most disruptive defensive linemen in the
program during his tenure

2475.  Nonetheless, after suffering a serious leg injury early in the 2020 season,
Mr. Leiataua lost the joy he had once found in playing football. Following the 2021
season, finding himself left out of NFL showcases like the Senior Bowl and the Shrine
Bowl, Mr. Leiataua actually retired from football until BYU's NFL liaison convinced him
to give it one more shot prior to BYU's pro day. While Mr. Leiataua did not end up
getting drafted, the journey led him to another path that could lead to financial security,
but due to the NCAA's anticompetitive rules, until then, had not been an option. Mr.
Leiataua became a rising TikTok star, documenting his NFL Draft journey under the
handle @uriahthesage with a former Utah football player also preparing for the draft. As
of February 22, 2022, Mr. Leiataua had amassed over 120,000 TikTok likes, a number
that has grown to over 876,000 as of March 22, 2025.

2476.  Throughout his football career at BYU, Mr. Leiataua's name, image, and
likeness (NIL), and performance were prominently featured in the university's
promotional materials, social media campaigns, and broadcasts. His work directly
helped increase fan engagement, drive ticket sales, and boost television viewership. For

**FOURTH AMENDED COMPLAINT**

example, on October 19, 2019, BYUtv started producing and airing a segment on YouTube called Deep Blue that would go in depth with different athletes in the BYU athletic department. Mr. Leiataua's story was the pilot episode that helped launch the series as a successful endeavor that went on to feature many other BYU football players and other athletes as well. The Defendants and BYU, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue. Mr. Leiataua was a key figure in many of these nationally televised games.

2477.  Mr. Leiataua received none of that revenue. During part of his time in college, due to the NCAA's unlawful restrictions, he was completely barred from receiving money for use of his NIL, whether from third parties or from Defendants or from his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became a TikTok sensation, he would have earned substantially more NIL compensation if not for the Defendants' unlawful conduct.

2478.  Indicative of his entrepreneurial instincts, on his own, without the infrastructure of support that today's college athletes enjoy, in September 2021, Mr. Leiataua capitalized on a viral moment he had on 247Sports Instagram after BYU's exciting victory over the No. 11 ranked Utah Utes when he responded to a reporter asking about the afterparty by saying, "I'm going to bed so I can go to church, I'm going to church!" Mr. Leiataua had shirts created with his picture from that video and the quote, "I'm going to church!" and made approximately $3,000 in sales from the shirts in his last year at BYU.

2479.  **The effect of Defendants' illegal conduct on Plaintiff Zac Dawe.**
Plaintiff Zac Dawe worked as a college football player at Brigham Young University from 2016 to 2020.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

2480.  The labor provided by Mr. Dawe was of great value to Defendants. Mr.
Dawe committed extensive time and effort year-round. His schedule demanded 60-80
hours per week in-season, with practices, meetings, film study, workouts, academic
classes, and travel, often working 12–14-hour days. Off-season training still required 40–
50 hours weekly, while fall camp ramped up to over 75 hours per week. On top of this,
Mr. Dawe was expected to participate in media appearances and community events,
with very limited time off, all while having very limited time off, all under the direction
and/or supervision, implicitly or explicitly, of his coaches or others in the athletic
department.

2481.  Mr. Dawe was a highly competitive football player coming out of Pleasant
Grove High School in Utah. He was a highly accomplished three-star prospect, ranked
as the No. 5 overall recruit in Utah and the No. 52 defensive tackle in the nation by
ESPN. Rivals.com listed him as Utah's No. 10 overall prospect. He earned First Team
5A All-State honors from the Deseret News, Salt Lake Tribune, and USA Today in 2013,
excelling as a two-way player on both the offensive and defensive lines. He was also a
two-time All-American heavyweight wrestler and received the Wendy's Heisman Award
for the state of Utah, recognizing his achievements in athletics, academics, and
community service. As a high school senior, Dawe recorded 41 tackles (32 solo), seven
sacks, and helped lead his team to a 9-3 record and a top-10 state ranking. Over his
high school career, he totaled 104 tackles, nine sacks, two fumble recoveries, and
scored a touchdown. He committed to BYU over Utah and Utah State.

2482.  Mr. Dawe's job as a college football player was essentially a full-time one,
and an important and valuable one at that. After redshirting his first season, Mr. Dawe
became a key contributor on the defensive line. Over the course of his career, he
played in 38 games and started in 22 of them. He accumulated 81 total tackles,
including 13.5 tackles for loss, along with 4.5 sacks. His contributions were not limited to

**FOURTH AMENDED COMPLAINT**

his statistical production; as a defensive lineman, his ability to occupy blockers and disrupt opposing offenses was critical to BYU's defensive success.

2483.  In the 2020 season, Mr. Dawe started all 12 games on the defensive line, anchoring a unit that helped lead BYU to an 11-1 record and national recognition. That year, the team's defense ranked among the top 10 nationally in scoring defense, allowing just 15.3 points per game. His efforts directly contributed to key victories over programs like Boise State and UCF, with BYU finishing the season ranked No. 11 in the final AP Poll.

2484.  During Mr. Dawe's career at BYU, his reputation as a relentless, hard-working leader made him a fan favorite. His presence and leadership were often featured by BYU in team promotions, social media content, and game day programs. His contributions helped bolster the team's popularity and engagement, including significant national television exposure. For example, BYU's 2020 matchup against Boise State drew over 2 million viewers in primetime, and the program's overall visibility increased, in no small part due to Mr. Dawe's leadership and on-field performance. During Mr. Dawe's career, BYU operated as an independent football program and secured favorable scheduling agreements alongside a national television contract with ESPN, reportedly worth between $6 million and $10 million per year. These nationally televised games attracted millions of viewers and generated significant revenue for BYU and the Defendants.

2485.  Despite his value to the program and his marketability as a respected leader and starting defensive lineman, Mr. Dawe received none of that revenue. Like many other college athletes, due to the Defendants' unlawful conduct, he was denied the opportunity to receive fair compensation for his work. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and the Defendants, Mr. Dawe was prevented from sharing in those profits. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive

**FOURTH AMENDED COMPLAINT**

market. Had those restrictions not been in place, Mr. Dawe would have received remuneration for his services and the use of his NIL.

2486.  Defendants' conspiracy greatly harmed Mr. Dawe. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place by the Defendants, he would have received remuneration for his services as a college football player and for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2487.  **The effect of Defendants' illegal conduct on Plaintiff Zach Wilson.** Plaintiff Zach Wilson worked as a college football player at Brigham Young University from 2018 to 2020.

2488.  The labor provided by Mr. Wilson was of great value to Defendants. Mr. Wilson committed extensive time and effort year-round. As the starting quarterback, football was not just a season. It was a year-round, full-time job that demanded everything he had to give—physically, mentally, and emotionally. He sacrificed his social life and the traditional experience because he gave his all to being the quarterback of the BYU Cougars. His schedule demanded 80-100 hours per week in-season, with practices, meetings, film study, workouts, academic classes, and travel, often working 16–18-hour days. Off-season training still required 60-80 hours weekly, while fall camp ramped up to over 80-90 hours per week.

2489.  Specifically, an exemplar of Mr. Wilson's schedule during the season, during the offseason, and even during what were supposed to be vacation breaks or "off days" is generalized from a large sample set as follows:

    a.  In-Season Weekly Schedule:

**FOURTH AMENDED COMPLAINT**

- Early Morning (5:30–7:30 AM): Personal film study, script review, or install prep before team meetings.

- 7:30–8:00 AM: Quick breakfast and recovery prep.

- 8:00–12:00 PM: Team meetings, position meetings, walk-throughs, and full practices.

- 12:00–1:00 PM: Post-practice throwing sessions with receivers, followed by treatment and nutrition focus.

- 1:00–2:00 PM: Lift sessions.

- 2:00–4:00 PM: Team meetings, offensive install, film review with coaches.

- 5:00–10:00 PM: Independent study—film breakdown of opponents, self-scout, and game plan review.

  o On many nights, Mr. Wilson was one of the last people in the facility along with coaches, often until 9 or 10 PM.

b. Weekends:

- Game days or travel (which also meant film study during flights and hotel stays).

- Sunday recovery, film review, and preparation for the next opponent.

c. Offseason Weekly Schedule (while balancing school):

- Morning or Afternoon (Depending on Classes): Lifting, speed/agility work, throwing sessions with receivers.

- Afternoons and Evenings: Film study—either of BYU's previous season or NFL QBs to improve his understanding of the game.

- Ongoing: Nutrition, treatment, public relations and recruiting events, team meetings, and sometimes informal practices or captain-led sessions.

**FOURTH AMENDED COMPLAINT**

    d.  Vacation Breaks or "Off" Days:

- Even during breaks or off days, Mr. Wilson was in the facility. He would regularly spend hours alone in the film room or on the field working on timing, mechanics, and playbook mastery. Whether the team was on the road, at a hotel, or mid-semester, Mr. Wilson's day revolved around football. It wasn't just a sport—it was his full-time job.

2490.  As the starting quarterback all three years of his career at BYU, this level of commitment and dedication was what was expected of him by the coaches and others in the athletic department.

2491.  On top of all of this, Mr. Wilson was expected to participate in media duties and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

2492.  Mr. Wilson was a highly touted football player coming out of high school. As a senior at Corner Canyon High School, in Draper, UT, he threw for an impressive 2,986 yards and 24 touchdowns. In addition to BYU, Wilson was heavily recruited by Oregon State, Boise State, California, Iowa, Syracuse, Minnesota, Colorado State, Nevada, Utah State, Idaho, Fresno State, Weber State, Rice, and Hawaii before ultimately committing to BYU, where he would dedicate almost every waking minute to the Cougars.

2493.  Mr. Wilson's job as a college football player was essentially a full-time one, and an important and valuable one at that. Mr. Wilson's freshman year at BYU in 2018 saw him start as a backup quarterback, but his skill and determination quickly earned him the starting position, and, after only two games, he became the youngest freshman quarterback ever to start for the Cougars. Over the course of nine games, he completed 120 of 182 passes for 1,578 yards, 12 touchdowns, and three interceptions. To put this in perspective, his completion percentage of 65.9% was higher than the

**FOURTH AMENDED COMPLAINT**

national average for freshman quarterbacks, which typically hovers around 60%. One of
his most memorable performances came during the Famous Idaho Potato Bowl, where
he completed all 18 of his passes for 317 yards and four touchdowns, leading BYU to a
decisive 49-18 victory over Western Michigan. This perfect game completion rate was a
rare feat and significantly benefited Defendants.

2494.  Mr. Wilson started every game his sophomore year and, in nine games,
completed 199 of 319 passes for 2,382 yards, 11 touchdowns, and nine interceptions.
In 2019, he led the Cougars to victories over Tennessee and USC. In Mr. Wilson's
junior year, he played in 12 games, completing 247 of 336 passes for 3,692 yards, 33
touchdowns, and only three interceptions. His completion percentage of 73.5% was
significantly higher than the national average of around 63% and broke a BYU record
previously held by Steve Young. His mobility on the field was also evident, as he rushed
for 254 yards and 10 touchdowns.

2495.  Under his leadership as a Team Captain in 2020, BYU achieved an
impressive 11-1 record, with notable victories against teams like Navy (55-3), Boise
State (51-17), and UCF (49-23). Mr. Wilson's outstanding performance earned him
several accolades. He finished 8th in Heisman Trophy voting and was named a finalist
for the Manning Award and the Davey O'Brien Award. He was also named to the All-
Independent First Team, PFF All-American Second Team, and received national
recognition for his accuracy, decision-making, and leadership.

2496.  During Mr. Wilson's career at BYU, his reputation and popularity soared,
and with it, BYU's and the NCAA's. He became a household name among college
football fans, known for his charismatic leadership and electrifying, dual-threat
playmaking ability, causing millions of fans to tune in to national television networks to
watch him play. For instance, the 2020 season saw BYU's game against Boise State
drawing high ratings for the Defendants, with over 2 million viewers tuning in for the
primetime matchup. BYU's social media presence also helped boost engagement,

**FOURTH AMENDED COMPLAINT**

frequently showcasing star players and game highlights to attract more fans and increase viewership. Indeed, BYU frequently featured Mr. Wilson on its social media accounts and in promotions on campus, highlighting his contributions to the team and, no doubt, using his name, image, and likeness to boost game viewership and attendance. For example, Mr. Wilson's personal Instagram account has over 300,000 followers—enough to fill BYU's LaVell Edwards Stadium nearly five times over. Despite his immense marketability and the significant revenue he helped generate for BYU and the Defendants, Mr. Wilson was prevented from receiving any share of that revenue or benefiting fully from his NIL during his college career due to the NCAA's illegal, anticompetitive restrictions.

2497.  The success of the football program translated into financial gains for the university, as BYU saw tens of millions in revenue, and the Defendants. In 2020, the program's football games contributed significantly to this revenue, with strong ticket sales, merchandise, and broadcast deals. These earnings were bolstered by the larger independent TV deals BYU signed, which brought in additional revenue. Yet, Mr. Wilson received none of that revenue. During his career at BYU, Mr. Wilson was prohibited from profiting from his name, image, and likeness due to the NCAA's unlawful restrictions. Had the NCAA's anticompetitive restrictions not been in place, Mr. Wilson would have capitalized significantly on his popularity.

2498.  Following his breakout junior season, Mr. Wilson declared for the 2021 NFL Draft and was selected by the New York Jets with the second overall pick—one of the highest draft positions ever achieved by a BYU football player. Mr. Wilson's professional career further expanded his visibility and endorsement opportunities, and he has since secured several brand deals and sponsorships, including partnerships with Nike, Chipotle, and Head & Shoulders. These endorsements underscore Mr. Wilson's significant commercial value both during and after his collegiate career—value that he

**FOURTH AMENDED COMPLAINT**

was unfairly prevented from realizing while at BYU due to the NCAA's anti-competitive restraints.

2499.  Mr. Wilson, like many other college athletes, was denied the opportunity to receive fair compensation for his work. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and the Defendants, Mr. Wilson was prevented from sharing in those profits. The NCAA's unlawful, anticompetitive rules deprived him of his rightful place in an open and competitive market. The NCAA's conspiracy directly harmed Mr. Wilson, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and anticompetitive restraints required by the NCAA, he would have received at least competitive value for his NIL from third parties, and absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools.

2500.  **The effect of Defendants' illegal conduct on Plaintiff Aaron Epps**. Plaintiff Aaron Epps worked as a college basketball player at LSU University from 2014 through 2018.

2501.  The labor provided by Mr. Epps was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

**FOURTH AMENDED COMPLAINT**

2502.  He was a highly recruited prospect from Tioga High School who gained significant attention during his high school career, receiving over 20 Division I offers. He ultimately committed to LSU, where he played college basketball for four seasons.

2503.  His job as a college basketball player at LSU was essentially a full-time occupation, and an important and valuable one at that. LSU's athletic programs, particularly its football and men's basketball program, are among the largest, most lucrative, well-known programs and have a long and storied history of competing in the powerful SEC for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL. While playing at LSU, Epps posted the improving averages from his freshman (2014-2015) season of 1.3 PPG, 1.4 RPG, 0.3 APG to his sophomore (2015-2016) season of 3.8 PPG, 1.8 RPG, 0.2 APG. His junior (2016-2017) season he continued to improve with averages of 6.2 PPG, 4.4 RPG and 0.4 APG, and by his senior season (2017-18) his averages climbed to 9.5 PPG, 5.5 RPG and 0.4 APG.

2504.  Across his four years at LSU, Epps saw steady improvement in his scoring and rebounding, finishing his career as a well-rounded forward. At LSU, Mr. Epps' performance improved each year, and he became a starting power forward by his junior season. As a senior, he averaged 9.5 points and 5.5 rebounds per game

2505.  During his years at LSU, basketball games were broadcast on a number of media outlets, with conferences negotiating the value of the media rights to their games and then collecting and distributing the proceeds of those media rights contracts to their members. In 2018, the SEC distributed $43 million to its member schools. Overall, LSU's athletic department revenue was $157 million for the 2018 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $10.8 million derived from basketball operations.

2506.  Yet Mr. Epps received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and

**FOURTH AMENDED COMPLAINT**

other education-related expenses. During his basketball career at LSU, he was prohibited from earning any income or be compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at LSU, Mr. Epps provided his valuable services to LSU without remuneration.

2507.  Mr. Epps's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2508.   Defendants' conspiracy greatly harmed Mr. Epps. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2509.  **The effect of Defendants' illegal conduct on Plaintiff Ben Richardson**. Plaintiff Ben Richardson worked as a college basketball player at Loyola University Chicago from 2014 through 2018.

2510.  The labor provided by Mr. Richardson was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the

**FOURTH AMENDED COMPLAINT**

university, and traveling on behalf of the university, he often worked seven days and
more than 40 hours per week under the direction of the university coaches.

2511.  Mr. Richardson excelled and was recruited as a two-time First Team All-
State selection and back-to-back State Champion at Blue Valley Northwest High School
in Kansas, after playing in four straight Kansas State Championships and compiling a
remarkable 94-6 record. During his senior year he received multiple scholarship offers
and ultimately committed to play basketball at Loyola University Chicago.

2512.  His job as a college basketball player at Loyola was essentially a full-time
occupation, and an important and valuable one at that. He was a full-time starter during
his junior (2016-17) and senior (2017-18) seasons, during which time he averaged 7.7
PPG/3 RPG/3.3 APG and shot 41 percent from 3-point distance. During his senior year,
he was honored as the Missouri Valley Conference Defensive Player of the Year,
named to the MVC Championship All-Tournament Team, and was named Most
Outstanding Player of the NCAA South Regional. He and his teammates became
famous during the 2018 March Madness run that saw them advance all the way to the
Final Four, during which "Sister Jean", a nun at the Jesuit university, became a national
celebrity. After three buzzer beaters and four wins, Loyola and Ben Richardson were in
the Final Four and the biggest story in college basketball. Although they ultimately lost
in the Final Four to Michigan, Richardson scored 23 points in the Elite Eight upset win
against Kansas State, including a sizzling 6/7 from distance on the big stage of the
regional finals, and was named the MOP of the region, demonstrating his ability against
the best opponents on the biggest stage in the country.

2513.  As Loyola advanced in the 2018 March Madness tournament, Richardson
and Loyola achieved newfound fame as they improbably advanced to the Final Four as
an 11 seed. However, for all of the on the court accomplishments, the most dramatic
and unexpected change came in the media coverage of Loyola Chicago and the effects
the 2018 March Madness success had on the visibility, revenue streams and financial

**FOURTH AMENDED COMPLAINT**

standing of the university. Donations to the university increased by 660 percent, ticket sales increased by 170 percent, and traffic through the website increased by 300 percent. The number of applications to attend Loyola as a student increased by 30-40 percent, and Loyola-Chicago-branded merchandise skyrocketed, with sales of five years of merchandise being sold in one month after the tournament, including thousands of jerseys bearing the numbers and names of the basketball players. It is estimated that the tournament run in 2018 generated an estimated $300+ million in media exposure for the school, and the Missouri Valley Conference, of which Loyola Chicago is a member, benefited from having one of its teams progress to the Final Four.

2514. Yet Mr. Richardson received none of the hundreds of millions of dollars in revenue and benefits; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Loyola, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL (including the popular jerseys bearing his name and number), which harmed him. During his four years playing basketball at Loyola, and especially during the Final Four March Madness run in 2018, Mr. Richardson was a critical contributor to the success and the played a key role in generating the vast amount of new revenue for the University.

2515. Mr. Richardson was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player and accomplishing things such as leading Loyola Chicago to the Final Four while being named the Most Outstanding Player in the South Region. He was never compensated for his services, in spite of the immense value of those services, the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

**FOURTH AMENDED COMPLAINT**

2516.  Defendants' conspiracy greatly harmed Mr. Richardson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2517.  **The effect of Defendants' illegal conduct on Plaintiff Cameron Krutwig**. Plaintiff Cameron Krutwig worked as a college basketball player at Loyola University Chicago from 2017 through 2021.

2518.  The labor provided by Mr. Krutwig was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2519.  Mr. Krutwig excelled and was recruited as a skilled inside player and exceptional passer while playing for Jacobs High School in Algonquin, Illinois. He was named to numerous All-Conference, All-Area and All-State teams as a senior and was the top ranked center in the State of Illinois. In the sectional final, he almost posted a quadruple double with 20 points, 24 rebounds, 12 blocks and nine assists. After receiving over 20 scholarship offers while in high school, he decided to play at Loyola University Chicago.

**FOURTH AMENDED COMPLAINT**

2520.  His job as a college basketball player at Loyola was essentially a full-time occupation, and an important and valuable one at that. He became a starter very early in his freshman season at Loyola (2017-18), igniting one of the most interesting and inspiring seasons in the history of NCAA basketball. As an exceptional passer for a big man, he went on to average 10.5 PPG, 6.1 RPG, 1.7 APG and was named the MVC Freshman of the Year, was named to the MVC All-Freshman team and was named to Third Team All-MVC. But it was in the NCAA tournament that he and his teammates became famous during a magical run to the Final Four during which "Sister Jean", a nun at the Jesuit university, became a national phenomenon. After three buzzer beaters and four wins, Loyola and Cam Krutwig were in the Final Four and the biggest story in college basketball. Although they ultimately lost in the Final Four to Michigan, Krutwig scored 17 points in the game and left no doubt that he could play against anyone in the country. Krutwig returned to Loyola for three more years (including the Covid shortened 2019-20 season) and excelled on the court and as a student, ending his college career as a 3 time All-MVC First Team player, the MVC Player of the Year honor in 2020-21, being selected as an AP All American 3rd team, being voted the MVC Scholar Athlete of the year in 202-21, winning the most games in a 4 year span in Loyola history (99), and being 1 of only 4 players in MVC history to record 1,500 points, 800 rebounds and 300 assists in a career (the other three being Larry Bird, Hersey Hawkins and Oscar Robertson). Krutwig and his Loyola team would return to the NCAA tournament in 2021 (after the tournament had been cancelled the prior year) and would defeat the Number one seed Illinois behind Krutwig's 19 points, 12 rebounds and 5 assists. After finishing his spring semester in 2021, coming off his third consecutive All MVC First team selection, winning the MVC POY and being named an AP All American, Krutwig announced he was foregoing his final year of college eligibility and would be pursuing a career in professional basketball. NCAA regulations prohibited him from earning any compensation as a college athlete at that point.

**FOURTH AMENDED COMPLAINT**

2521.  But for all of the on the court accomplishments, the most dramatic and unexpected change came in the media coverage of Loyola Chicago and the effects the 2018 March Madness success had on the visibility, revenue streams and financial standing of the university. Donations to the university increased by 660 percent, ticket sales increased by 170 percent, and traffic through the website increased by 300 percent. The number of applications to attend Loyola as a student increased by 30-40 percent, and Loyola Chicago branded merchandise skyrocketed, with sales of FIVE YEARS of merchandise being sold in one month after the tournament, including thousands of jerseys bearing the numbers and names of the basketball players. It is estimated that the tournament run in 2018 generated an estimated $300+ million in media exposure for the school, and the Missouri Valley Conference, of which Loyola Chicago is a member, benefited from having one of its teams progress to the Final Four. If Loyola (or other universities to which he could have transferred) had been allowed to pay Krutwig at that point, in 2021, in light of the hundreds of millions of dollars in economic impact that Loyola experienced as a result of Krutwig's contributions, there would have been very, very sizable offers tendered to him to have him enroll at a university and use his final year of eligibility.

2522.  Yet Mr. Krutwig received none of the hundreds of millions of dollars in revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Loyola, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL (including the incredibly popular jerseys bearing his name and number), which harmed him. During his four years playing basketball at Loyola, Mr. Krutwig was critical to the success and the vast amount of revenue generated by the program during and after the NCAA tournament in 2018.

2523.  Mr. Krutwig was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he

**FOURTH AMENDED COMPLAINT**

made that went into being a highly skilled basketball player and accomplishing things such as leading Loyola Chicago to the Final Four and being named an AP All American while playing at Loyola, in spite of the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2524.  Defendants' conspiracy greatly harmed Mr. Krutwig. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2525.  **The effect of Defendants' illegal conduct on Plaintiff Adam Kunkel**. Plaintiff Adam Kunkel worked as a college basketball player at Belmont University from 2018 through 2020 and at Xavier University from 2020 through 2023.

2526.  The labor provided by Mr. Kunkel was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2527.  He was recruited from Cooper High School in Union, Kentucky and signed to play with Belmont as a senior in high school in 2018. After a breakout year at Belmont in which he averaged 16.5 points per game in 2019-20, he received offers to

**FOURTH AMENDED COMPLAINT**

transfer from dozens of schools including Big 12 Oklahoma and Kansas and SEC Kentucky and Arkansas. Because there was still an absolute prohibition on being compensated, he accepted an offer from traditional top 20 program Xavier University, although he has stated that today he would weigh the option being compensated before choosing, a consideration that was non-existent when he was making his decision on where to transfer.

2528.  His job as a college basketball player at Belmont and Xavier was essentially a full-time occupation, and an important and valuable one at that. Mr. Kunkel provided outstanding services to Belmont and Xavier, including putting up the following statistical averages: At Belmont, for the 2018-19 season, he averaged 2.3 points, 0.6 rebounds, and 0.7 assists per game in limited action as a freshman. The next season of 2019-20 season, he had a breakout year, averaging 16.5 points, 2.8 rebounds, and 2.6 assists per game, earning First Team All-OVC honors. He then made the difficult decision to transfer and he selected Xavier and he played 3 seasons there. For the 2020-21 season he averaged 7.0 points, 1.2 rebounds, and 1.6 assists per game. During the 2021-22 season, he improved to 8.8 points, 2.2 rebounds, and 1.8assists per game, and during the 2022-23 season he contributed 10.8 points, 2.8 rebounds, and 3.0 assists per game, showcasing his growth as a key player. While Xavier is not in a Power 5 conference school, it does play a strong schedule and is ranked in the top 20 most of the time, ahead of most of the Power 5 schools.

2529.  Mr. Kunkel had every opportunity transfer to a Power 5 school, and accept one of the numerous offers to leave Belmont, but he did not and could not foresee the differences that would ensue only a couple of years later athletes are being compensated, particularly those at Power 5 schools, to bring athletic talent and services to play for them.

2530.  As a result of Kunkel's effort, Belmont and Xavier both unquestioningly were better teams because of him and the services he provided. His performance

**FOURTH AMENDED COMPLAINT**

against numerous Power 5 schools demonstrate that he was performing at that level. He was an efficient and effective player, including in games against Power 5 opponents, who warranted being paid for quality of the services he provided.

2531.  During the time Mr. Kunkel played for Belmont and Xavier, the basketball programs at both schools were successful financially and competitive in their conferences. Both were the beneficiary of media contracts negotiated by the conferences (although the amount realized is no doubt a very small compared to Power 5 schools. In 2021, for example, the Big 12 conference distributed around $42.6 million to each of its member schools.

2532.  Yet Mr. Kunkel received none of that revenue from Belmont or Xavier, nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Belmont and Xavier, he was prohibited from earning any income and he was not permitted to receive money be compensated by salary or even from third parties for his NIL, which harmed him.

2533.  Mr. Kunkel's opportunities to earn fair compensation for the valuable services her provided and the immense work and all the sacrifices he made that went into being a highly skilled basketball player were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2534.  Defendants' conspiracy greatly harmed Mr. Kunkel. His skills and ability are valuable because of the revenue they generate. Thus, it is unfair that he was prevented from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent

**FOURTH AMENDED COMPLAINT**

Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2535.  **The effect of Defendants' illegal conduct on Plaintiff Cam Taylor-Britt**. Plaintiff Cam Taylor-Britt worked as a college football player at the University of Nebraska from 2018 through 2022.

2536.  The labor provided by Mr. Taylor-Britt was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2537.  He was a highly recruited prospect as a graduate of Park Crossing High School in Montgomery, Alabama.

2538.  His job as a college football player at was essentially a full-time occupation, and an important and valuable one at that. Nebraska's athletic programs, particularly its football program, is among the largest, most lucrative, well-known athletic programs and have a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NFL. During his career at Nebraska, Mr. Taylor-Britt played in 40 games, starting 29 of those. In 2018, he played in 9 games, primarily on special teams and as a reserve defensive back, followed by a very successful season in 2019 when he played in 11 games, starting 10 of those and recording 49 tackles, 4 forced fumbles, 3 interceptions, and 1.5 sack. In 2020, he played in and started 8 games, recorded 24 tackles, 4 pass breakups, and 2 interceptions. In

**FOURTH AMENDED COMPLAINT**

2021, he played in and started 12 games, recorded 51 tackles, 11 pass breakups, and 1 interception. He was honored on the Second Team All-Big Ten Conference in 2020, and on the Second Team All-Big Ten in 2021. He was later drafted by the Cincinnati Bengals in the 2nd round of the 2022 NFL Draft.

2539.  During his years at Nebraska, Big Ten football games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2020, the Big Ten conference distributed $54.3 million to its member schools. Overall, Nebraska's athletic department revenue was $143 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $66 million derived from football operations.

2540.  Yet Mr. Taylor-Britt received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his football career at Nebraska, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing football at Nebraska, Mr. Taylor-Britt was critical to the success of the program and to the revenue generated by the program.

2541.  Mr. Taylor-Britt's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled football player in one of the NCAA's elite football programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2542.  Defendants' conspiracy greatly harmed Mr. Taylor-Britt. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an

**FOURTH AMENDED COMPLAINT**

open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2543.  **The effect of Defendants' illegal conduct on Plaintiff CJ Jackson**. Plaintiff CJ Jackson worked as a college basketball player at Ohio State University from 2016 through 2019.

2544.  The labor provided by Mr. Jackson was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2545.  He was a highly recruited prospect at Olympic High School in Charlotte, North Carolina, who then spent a year at Montverde Academy and then played a season at Eastern Florida State College, where he was named a Second Team Junior College Athletic Association All-American.

2546.  His job as a college basketball player at Ohio State was essentially a full-time occupation, and an important and valuable one at that. Ohio State's athletic programs, particularly its football and men's basketball program, are among the largest, most lucrative, well-known programs and have a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA

**FOURTH AMENDED COMPLAINT**

and NFL. In his first year at Ohio State (2016-17) he averaged 5.6 PPG, 2.5 RPG and 2.9 APG. The next year (2017-18) he increased those averages to 12.6 PPG, 3.9 RPG and 3.9 APG. In his final year he averaged 12.0 PPG, 4.0 RPG and 3.5 APG.

2547.  During his years at Ohio State, basketball games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2019, the Big Ten conference distributed $54.3 million to its member schools. Overall, Ohio State's athletic department revenue was $233 million for the 2019 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $20 million derived from basketball operations.

2548.  Yet Mr. Jackson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Ohio State, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his three years playing basketball at Ohio State, Mr. Jackson was critical to the success of the program and to the revenue generated by the program.

2549.  Mr. Jackson's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2550.  Defendants' conspiracy greatly harmed Mr. Jackson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have

**FOURTH AMENDED COMPLAINT**

received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2551.  **The effect of Defendants' illegal conduct on Plaintiff David Bell**. Plaintiff David Bell worked as a college basketball player at the Ohio State University from 2015 to 2017, and as a college basketball player at Jacksonville University from 2018 to 2020.

2552.  The labor provided by Mr. Bell was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2553.  He was recruited by Ohio State out of Garfield Heights High School where he averaged 17 points, 8 rebounds and 5 blocks per game.

2554.  His job as a college basketball player at Ohio State and Jacksonville was essentially a full-time occupation, and an important and valuable one at that. He played in 38 games at Ohio State during two seasons from 2015-16 and 2016-17, then was required to sit out a season after transferring to Jacksonville University where he played during the 2018-19 and 2019-20 seasons.

2555.  During the 2018-19 season at Jacksonville, he started 23 out of 31 games averaging 7.5 points per game, 5.7 rebounds per game and 1.3 blocks per game. He improved those numbers in 2019-20 when he started all 31 games and averaged 12

**FOURTH AMENDED COMPLAINT**

points per game, 10 rebounds per game and 2 blocks per game. He was named to the
ASUN All-Conference team in 2019-20 and was the ASUN Defensive Player of the Year
in 2019-20.

2556.  During his years at Ohio State and Jacksonville, basketball games at both
universities were generally televised, often nationally and both universities received
large sums of money from their conference's television contracts for the broadcasting of
those games. Both Ohio State University and Jacksonville take in a large amount of
revenue from ticket sales, memorabilia sales, alumni contributions and other sources
that vary depending on the success of the basketball program.

2557.  Yet Mr. Bell received none of that revenue; nor was he otherwise
compensated by Defendants for his labor other than by receiving a scholarship and
other education-related expenses. During his time at Ohio State University and
Jacksonville University, his opportunities to receive compensation for his services or
from third parties for his NIL was limited as a result of decades of restrictive regulations
imposed and enforced by the NCAA, which also harmed him.

2558.  Mr. Bell's opportunity to earn fair compensation for the immense work and
all the sacrifices he made that went into being a highly skilled basketball player playing
at the highest division in the NCAA was limited and denied as a result of NCAA
prohibitive regulations, in spite of the millions of dollars of revenue generated by media
rights, ticket sales, merchandise sales, donations and other operational income.

2559.  Defendants' conspiracy greatly harmed Mr. Bell. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college basketball player than he received,
and he would have received money for his NIL from third parties. Absent Defendants'
agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he
would have received a competitive share of the television and other revenue being

**FOURTH AMENDED COMPLAINT**

brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2560. **The effect of Defendants' illegal conduct on Plaintiff Daxter Miles**. Plaintiff Daxter Miles worked as a college basketball player at West Virginia University from 2014 through 2018.

2561. The labor provided by Mr. Miles was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2562. He was a highly recruited prospect as a graduate of Notre Dame Prep in Fitchburg, Massachusetts. He previously attended Dunbar High in Baltimore, Maryland, playing for former Mountaineer guard Cyrus Jones. He ranked as the number 8 basketball player in Maryland and number 53 in the nation in his position as a point guard according to 247Sports. While in high school, he was offered scholarships by over 30 high major D1 colleges in addition to WVU, including Oklahoma State, the University of Miami, UCF, the University of Maryland, Xavier University, Providence University.

2563. His job as a college basketball player at West Virginia University was essentially a full-time occupation, and an important and valuable one at that, particularly at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. Mr. Miles was especially popular and successful as a four-year starter at WVU, which competed in the Big 12 Conference. During the years that he played at WVU the basketball team boasted a record of 105-39, was in the NCAA tournament all 4 years, and three times advanced to

**FOURTH AMENDED COMPLAINT**

the Sweet Sixteen. Mr. Miles individually was a very large part of the success, with a
multitude of accolades, including being on the Jerry West award watchlist (Best
shooting guard in the country), being named one of top 100 players in college
basketball as a freshman at WVU, being named to the, preseason All-Big 12 Honorable
Mention, Second Team All-Big 12 Academic team, being a 1,000-point scorer,
averaging 9.6 PPG over 134 career games, and being 2nd all-time at WVU in number of
games started with 122.

2564.  During his four-year career at WVU the basketball team had great success
as well, being ranked as high as Number 2 in the country and consistently in the top 20,
winning the Puerto Rico Invitational Tournament his freshman year, the Bahamas
Invitational Tournament his sophomore year, making four NCAA tournament
appearances, advancing three times to the Sweet 16.

2565.  As a result of his individual and team success, Mr. Miles is regarded
among the most popular players in West Virginia, as documented by Sports Illustrated
in the video at https://m.youtube.com/watch?v=lps9J45W-_8. His jersey remains among
the top selling sports memorabilia in the entire state, although he never received any
compensation from the sale of merchandise bearing his name, image or likeness. In
addition to the fame and marketing he achieved as a basketball player at WVU, he
became well-known as a community activist, doing works of public service and also
appearing in multiple TV shows and media works (including the movie LUV).

2566.  During Mr. Miles's four years at West Virginia, the basketball program was
extraordinarily successful financially as a result of its consistent high national rankings
that drew large national TV audiences, including the four appearances and 11 games in
the NCAA March Madness tournament. In 2018, the Big 12 conference distributed $37
million to its member schools. Overall, WVU's athletic department revenue was $102
million for the 2018 fiscal year from sources such as media rights, ticket sales,

**FOURTH AMENDED COMPLAINT**

donations, and other operational income, and $23 million derived from basketball operations.

2567.  Yet Mr. Miles received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at West Virginia, he was not permitted to receive money for his NIL, which harmed him. During his four years as the face of the popular and successful West Virginia Mountaineers basketball program, compensation opportunities would have been especially lucrative playing for the program beloved by the state of West Virginia, in which there are not any major league professional athletic teams, during an era of extraordinary success for the program.

2568.  Mr. Miles's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2569.  Defendants' conspiracy greatly harmed Mr. Miles. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2570.  **The effect of Defendants' illegal conduct on Plaintiff Derek Culver.** Plaintiff Derek Culver worked as a college basketball player at West Virginia University from 2018 through 2021.

**FOURTH AMENDED COMPLAINT**

2571.  The labor provided by Mr. Culver was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2572.  He was a highly recruited prospect from Warren G. Harding High School in Warren, Ohio. Culver was ranked a top-75 recruit as well as a consensus four-star recruit. He eventually chose West Virginia over many other offers he had, including Arizona, Florida, Indiana, Purdue, Xavier, Kansas, and others.

2573.  His job as a college basketball player at West Virginia University was essentially a full-time occupation, and an important and valuable one at that, particularly at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. Mr. Culver was especially popular and successful as one of the most dominant centers in the country. During his freshman season (2018-19) he nearly averaged a double-double with 11.5 PPG and 9.9 RPG (Big 12 All-Freshman team and Second Team All-Big 12), and he followed that with 10.4 PPG and 8.6 RPG as a sophomore (2019-20) (All-Big 12 Honorable Mention). In his junior Season (2020-21), he averaged 14.3 PPG and 9.4 RPG and was named First Team All-Big 12. He was also named All-Big 12 Player of the Week multiple times. Culver was known for his rebounding dominance, interior scoring, and physical play, making him one of the best big men in the Big 12 Conference. Even though he would have had two years of college eligibility remaining, he declared for the NBA draft. He has stated that if he had been allowed to earn compensation, he would not have gone into the NBA draft but instead would have stayed in college.

**FOURTH AMENDED COMPLAINT**

2574.  During two of his three years at WVU the basketball team had great success as well, being ranked consistently in the top 20 during 2019-20 and 2020-21 seasons, and making the NCAA tournament in 2021 as a 3 seed (they would have likely been a 6 seed in 2020 but the tournament was cancelled due to Covid).

2575.  As a result of his individual and team success, Mr. Culver was highly regarded for his contribution to WVU basketball, and there is little doubt that but for the NCAA restrictions precluding such, it was in WVU's interest to pay him and they would have.

2576.  During the time Mr. Culver played for WVU, the basketball program was extraordinarily successful financially as a result of its consistent high national rankings that drew large national TV audiences. Competing in the Big 12 conference, in 2021, the Big 12 conference distributed about $34.5 million to its member schools. Overall, WVU's athletic department revenue was $105 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $18 million derived from basketball operations.

2577.  Yet Mr. Culver received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at West Virginia, he was not permitted to receive money for his NIL, which harmed him. During his three years as one of the most important players in the West Virginia Mountaineers basketball program, responsible to a large degree for keeping the program competitive and generating revenue, his compensation opportunities would have been especially lucrative playing for the program beloved by the state of West Virginia, in which there are not any major league professional athletic teams, during an era of extraordinary success for the program.

2578.  Mr. Culver's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in

**FOURTH AMENDED COMPLAINT**

one of the NCAA's elite basketball programs were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2579.  Defendants' conspiracy greatly harmed Mr. Culver. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2580.  **The effect of Defendants' illegal conduct on Plaintiff Derrick Barnes**. Plaintiff Derrick Barnes worked as a college football player at Purdue University from 2017 through 2020.

2581.  The labor provided by Mr. Barnes was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2582.  He was a highly recruited prospect as a graduate of Holy Cross High School in Covington, Kentucky.

2583.  His job as a college football player at Purdue was essentially a full-time occupation, and an important and valuable one at that. Purdue's athletic programs,

**FOURTH AMENDED COMPLAINT**

particularly its football and men's basketball program, are among the largest, most lucrative, well-known programs and have a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL. During his career at Purdue, Mr. Barnes played in 43 games, starting 31 of those. In 2017, he played in 12 games, primarily on special teams and as a reserve linebacker, followed by a very successful season in 2018 when he played in 13 games, starting 12 of those and recording 92 tackles, 8 TFLs, and 3 sacks. In 2019, he played in 12 games, starting 12, and recorded 63 tackles, 11 TFLs, and 7.5 sacks. In 2020, he played in 6 games (COVID-19 shortened season), starting 5, and recorded 54 tackles and 5.5 TFLs. After the 2020 season he was named Second Team All-Big Ten. He was subsequently drafted by the Detroit Lions in the 4th round of the 2021 NFL Draft.

2584.  During his years at Purdue, Big Ten football games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2020, the Big Ten conference distributed about $54.3 million to its member schools. Overall, Purdue's athletic department revenue was $102 million for the 2019 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $64 million derived from football operations.

2585.  Yet Mr. Barnes received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his football career at Purdue, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing football at Purdue, Mr. Barnes was critical to the success of the program and to the revenue generated by the program.

**FOURTH AMENDED COMPLAINT**

2586.  Mr. Barnes' opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled football player in one of the NCAA's elite football programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2587.  Defendants' conspiracy greatly harmed Mr. Barnes. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2588.  **The effect of Defendants' illegal conduct on Plaintiff Dibaji Walker.** Plaintiff Dibaji Walker worked as a college basketball player at Cleveland State from 2018 to 2019, University of Massachusetts from 2019 to 2022, and Appalachian State from 2022 to 2023.

2589.  The labor provided by Mr. Walker was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2590.  Mr. Walker excelled in high school at Independence High School in Columbus, Ohio and at Woodstock Academy in Connecticut.

**FOURTH AMENDED COMPLAINT**

2591.  While playing at Cleveland State, Massachusetts, and Appalachian State,
Mr. Walker compiled the following statistics:

      a.   Cleveland State (2018-19): 4.7 PPG/1.5 RPG/ 0.5 APG

      b.   Massachusetts (2019-20): 6.3 PPG/2.5 RPG/ 0.5 APG

      c.   Massachusetts (2020-21): 2.1 PPG/1.8 RPG/ 0.8 APG

      d.   Massachusetts (2021-22): 5.4 PPG/ 3.2 RPG/ 0.2 APG

      e.   Appalachian State (2022-23): 6.2 PPG/ 3.2 RPG/ 0.3 APG

2592.  During his years at Cleveland State, Massachusetts, and Appalachian
State, his job as a college basketball player was essentially a full-time occupation, and
an important and valuable one at that.

2593.  During the time that Walker played at Cleveland State, Massachusetts,
and Appalachian State, there was significant media coverage of the programs, including
coverage of games, through which the colleges received revenue. Cleveland State,
Massachusetts, and Appalachian State also had revenue streams through ticket sales,
memorabilia and donations to fund its athletic programs, including its basketball
program.

2594.  Yet Mr. Walker received none of that revenue; nor was he otherwise
compensated by Defendants for his labor in working tirelessly on his skills, training
regimen and performing other functions as required. During his basketball career at
Cleveland State, Massachusetts, and Appalachian State he was prohibited from earning
any income and he was not permitted to receive money or be compensated by salary or
even from third parties for his NIL, which harmed him.

2595.  Mr. Walker was denied, as a result of the NCAA prohibitive regulations,
opportunities to earn fair compensation for the immense work and all the sacrifices he
made that went into being a highly skilled basketball player. He was never compensated
for his services, in spite of the immense value of those services, the millions of dollars of

**FOURTH AMENDED COMPLAINT**

benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2596.  Defendants' conspiracy greatly harmed Mr. Walker. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2597.  **The effect of Defendants' illegal conduct on Plaintiff Dontaie Allen**. Plaintiff Dontaie Allen worked as a college basketball player at the University of Kentucky from 2019 to 2022, as a college basketball player at Western Kentucky University from 2022 to 2024, and as a college basketball player at the University of Wyoming from 2024 to 2025.

2598.  The labor provided by Mr. Allen was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2599.  He was a highly recruited prospect out of high school, ranked as the number 3 basketball player in Kentucky and awarded the title of Mr. Basketball in Kentucky in 2019. He was also ranked in the top 75players nationally when he averaged 43 points per game and 14 rebounds per game playing for Pendleton County

**FOURTH AMENDED COMPLAINT**

High School. Universities competed for his talent during the high school recruitment process and continued to compete for his talent while he was at the University of Kentucky and at Western Kentucky University in the hopes that he would transfer to another school.

2600.  His job as a college basketball player at Kentucky, Western Kentucky and Wyoming was essentially a full-time occupation, and an important and valuable one at that, particularly at the University of Kentucky where the rich college basketball tradition and virtually unrivaled fan base is demanding. As a redshirt freshman he was named the SEC Freshman of the Week and poured in 23 points for Kentucky in the season ending SEC tournament against Mississippi State. In his collegiate career he played in 133 games, 42 of them as a starter.

2601.  In 2022 he was widely recruited by Division I Power 5 conference teams through the transfer portal before transferring from the University of Kentucky to Western Kentucky University.

2602.  During his three years at Kentucky, the basketball program was one of the highest profile "blue blood" programs in the NCAA, participating the Southeastern Conference, with Kentucky basketball players generally being the most recognizable athletes in the Commonwealth of Kentucky. Mr. Allen was especially popular and important as a member of the Kentucky basketball team as a home-grown Kentucky native and former Mr. Basketball. In 2022, the SEC distributed $49.9 million to its member schools. Overall, Kentucky's athletic department revenue was $159 million for the 2022 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, with approximately $31.2 million derived from basketball operations.

2603.  Yet Mr. Allen received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at the University of Kentucky,

**FOURTH AMENDED COMPLAINT**

Western Kentucky University and the University of Wyoming, his opportunities to receive money from third parties for his NIL was limited as a result of decades of restrictive regulations imposed and enforced by the NCAA, which also harmed him. During his three years in the high-profile University of Kentucky basketball program, those opportunities would have been especially lucrative as a native son playing for the historically popular program in a state in which there are not any major league professional athletic teams.

2604. Mr. Allen's opportunity to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs was limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2605. Defendants' conspiracy greatly harmed Mr. Allen. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2606. **The effect of Defendants' illegal conduct on Plaintiff Donte Ingram.** Plaintiff Donte Ingram worked as a college basketball player at Loyola University Chicago from 2014 through 2018.

2607. The labor provided by Mr. Ingram was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills

**FOURTH AMENDED COMPLAINT**

training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2608.  Mr. Ingram excelled and was recruited while playing for Simeon High School in Chicago, Illinois. He was named All-State Special Mention as a senior in high school and won a state championship as a junior. During his senior year he committed to play basketball at Loyola University Chicago.

2609.  His job as a college basketball player at Loyola was essentially a full-time occupation, and an important and valuable one at that. He became a starter very early in his sophomore season at Loyola (2015-16). As a junior he averaged 13.6 PPG and got 6.8 RPG, and he led he Missouri Valley Conference, shooting 46 percent from 3-point range, and he was named Third Team All-MVC. As a senior (2017-18) he averaged 11.0 PPG and 6.4 RPG and he was named Most Outstanding Player of the MVC Championship. In the first round of the NCAA tournament, he made a buzzer beating 3-pointer to win the game and set in motion perhaps the greatest Cinderella story in the history of college basketball. He and his teammates became famous during the 2018 March Madness run that saw them advance all the way to the Final Four, during which "Sister Jean", a nun at the Jesuit university, became a national phenomenon. After three buzzer beaters and four wins, Loyola and Donte Ingram were in the Final Four and the biggest story in college basketball. Although they ultimately lost in the Final Four to Michigan, Ingram scored 12 points in the Elite Eight upset win against Kansas State and demonstrated that he could excel against anyone in the country.

2610.  After Ingram made the huge 3-point jump shot to propel Loyola into the second round of the NCAA Tournament in 2018, he and Loyola became famous.

**FOURTH AMENDED COMPLAINT**

However, for all of the on the court accomplishments, the most dramatic and unexpected change came in the media coverage of Loyola Chicago and the effects the 2018 March Madness success had on the visibility, revenue streams and financial standing of the university. Donations to the university increased by 660 percent, ticket sales increased by 170 percent, and traffic through the website increased by 300 percent. The number of applications to attend Loyola as a student increased by 30-40 percent, and Loyola Chicago branded merchandise skyrocketed, with sales of five years of merchandise being sold in one month after the tournament, including thousands of jerseys bearing the numbers and names of the basketball players. It is estimated that the tournament run in 2018 generated an estimated $300+ million in media exposure for the school, and the Missouri Valley Conference, of which Loyola Chicago is a member, benefited from having one of its teams progress to the Final Four.

2611.  Yet Mr. Ingram received none of the hundreds of millions of dollars in revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Loyola, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL (including the popular jerseys bearing his name and number), which harmed him. During his four years playing basketball at Loyola, Mr. Ingram was critical to the success and the vast amount of revenue generated by the program during and after the NCAA tournament in 2018.

2612.  Mr. Ingram was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player and accomplishing things such as leading Loyola Chicago to the Final Four and being named All-MVC and being named All-MVC Tournament Most Outstanding Player while playing at Loyola, in spite of the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

**FOURTH AMENDED COMPLAINT**

2613.  Defendants' conspiracy greatly harmed Mr. Ingram. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2614.  **The effect of Defendants' illegal conduct on Plaintiff Erik Stevenson**. Plaintiff Erik Stevenson worked as a college basketball player at Wichita State University from 2018 to 2020, as a college basketball player at University of Washington from 2020 to 2021, as a college basketball player at the University of South Carolina from 2021 through 2022, and as a college basketball player at West Virginia University from 2022 to 2023.

2615.  The labor provided by Mr. Stevenson was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2616.  Mr. Stevenson was a highly recruited prospect out of Timberline High School in Lacey, Washington. He had offers from competitive programs like LSU, Washington, Washington State, Utah, Oregon State and others. Universities competed for his talent during the high school recruitment process and continued to compete for

**FOURTH AMENDED COMPLAINT**

his talent while he was at the University of Massachusetts, the University of Texas, and West Virginia University in the hopes that he would transfer to another school.

2617.  In his job as a college basketball player, Stevenson played college basketball at four schools:

    a.  Wichita State (2018-19): Averaged 6.5 PPG, 3.7 RPG, and 2.1 APG.

    b.  Wichita State (2019-20): Averaged 11.1 PPG, 4.7 RPG, and 2.3 APG.

    c.  Washington   (2020–21): Averaged 9.3 PPG, 3.6 RPG, and 2.1 APG.

    d.  South Carolina (2021–22): Averaged 11.6 PPG, 4.7 RPG and 2.8 APG.

    e.  West Virginia (2022–23): Averaged 15.4 PPG, 3.4 RPG, and 2.5 APG.

2618.  Stevenson's work was essentially a full-time occupation, and an important and valuable one at that. Throughout his college career Stevenson showcased his versatility and consistency, adapting to different teams and roles and always putting up effective numbers at every school where he played.

2619.  During the years that he played at each school, particularly the years he spent at Texas and West Virginia (both Big 12 schools at the time) and Kentucky (an SEC school) the games were carried on national television, often by either an ESPN network or the Big 12 or SEC's own network. Both of those conferences distribute media rights payments on those contracts to its members, typically on the order of $30-40 million annually.

2620.  Yet Mr. Stevenson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at the Massachusetts, Texas, West Virginia and Texas, his opportunities to receive money from third parties for his NIL was limited as a result of decades of restrictive regulations imposed and enforced by the NCAA, which also harmed him.

2621.  Mr. Stevenson's opportunity to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball

**FOURTH AMENDED COMPLAINT**

player in one of the NCAA's elite basketball programs was limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2622.  Defendants' conspiracy greatly harmed Mr. Stevenson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2623.  **The effect of Defendants' illegal conduct on Plaintiff Filip Petrusev**. Plaintiff Filip Petrusev worked as a college basketball player at Gonzaga University from 2018 through 2020.

2624.  The labor provided by Mr. Petrusev was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2625.  Mr. Petrusev excelled in high school at perennial national powerhouse Montverde Academy in Montverde, Florida, an elite professional sports private prep school that a number of NBA players had come through. During his senior season, led by Petrusev and RJ Barrett, the Montverde Academy won the GEICO National High

**FOURTH AMENDED COMPLAINT**

School tournament, completing a perfect 35-0 season as national high school basketball
champions. Petrusev was a consensus four-star recruit, according to major recruiting
services and, early in his senior season he announced his commitment to Gonzaga
University.

2626.  While at Gonzaga University (NCAA member institution competing in the
West Coast Conference (WCC)) as a freshman, Petrusev averaged 6.5 points and 2.7
rebounds per game and was named to the WCC All-Freshman Team. As a team,
Gonzaga finished the season 33-4, including 16-0 to win the WCC, and they received
an at-large bid to the NCAA Tournament where they defeated Fairleigh Dickinson,
Baylor and Florida State to make the Elite Eight, where they were defeated by Texas
Tech. Returning to Gonzaga for his sophomore season, Petrusev scored a career-high
25 points in a 110–60 win over Arkansas–Pine Bluff on November 9, 2019 and on
December 21, Petrusev had 24 points and nine rebounds in a 112–77 win over Eastern
Washington. He was named to the midseason watchlist for the Wooden Award (given to
the best player in college basketball) and, at the conclusion of the regular season,
Petrusev was named WCC Player of the Year and a consensus All-American after
averaging 17.5 points and eight rebounds per game for the Gonzaga team that finished
the season with a record of 31–2, winning both the WCC regular season and the WCC
tournament.

2627.  Gonzaga was ranked Number 2 in the country and was expected to have
a very good chance to win the national championship behind its best player, Filip
Petrusev. Unfortunately, all postseason play, including the NCAA Tournament, was
cancelled amid the COVID-19 pandemic. In light of his heightened draft potential and
because college athletes were prohibited from being compensated at that time,
Petrusev left Gonzaga and declared for the 2020 NBA draft. He has subsequently
stated that, if he had been able to get compensated as a college basketball player, he

**FOURTH AMENDED COMPLAINT**

would have likely returned to college and used his remaining eligibility instead of entering the NBA draft.

2628.  During his years at Gonzaga, his job as a college basketball player was essentially a full-time occupation, and an important and valuable one at that.

2629.  During this time, Gonzaga University basketball games were generally televised, often nationally and particularly during the NCAA tournament, in which Gonzaga competed well in 2019, appearing in four games. Gonzaga was anticipated to have a good chance to win the NCAA tournament in 2020 prior to its cancellation. Gonzaga receives large sums of money from their conference's television contracts for the broadcasting of those games. Gonzaga also takes in a large amount of revenue from ticket sales, memorabilia sales, alumni contributions and other sources that vary depending on the success of the basketball program.

2630.  Yet even though Mr. Petrusev was the best player on a great team that would have been competitive to win a national championship, a highly lucrative accomplishment in terms of growing the revenues taken in by the university, Mr. Petrusev received none of that revenue, nor would he have been eligible to receive compensation the following year. He was not permitted to be compensated by Gonzaga under the regulations imposed and enforced by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Gonzaga, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL (including the popular jerseys bearing his name and number), which harmed him. During his years at Gonzaga, Petrusev was a critical contributor to the success of the basketball program and provided services to the University and played a key role in generating the vast amount of new revenue for the University.

2631.  Mr. Petrusev was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he

**FOURTH AMENDED COMPLAINT**

made that went into being a highly skilled basketball player and accomplishing things such as leading Gonzaga to a possible national championship as a consensus All-American. He was never compensated for his services, in spite of the immense value of those services, the millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2632.  Defendants' conspiracy greatly harmed Mr. Petrusev. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2633.  **The effect of Defendants' illegal conduct on Plaintiff Jacob Evans**. Plaintiff Jacob Evans worked as a college basketball player at University of Cincinnati from 2015 through 2018.

2634.  The labor provided by Mr. Evans was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2635.  Mr. Evans was a highly recruited four-star prospect from St. Michael the Archangel High School in Baton Rouge, LA. In addition to Cincinnati, he also received offers from Auburn, Houston, South Carolina, LSU, Tulane and others.

**FOURTH AMENDED COMPLAINT**

2636.  Mr. Evans job as a college basketball player at Cincinnati was essentially a full-time occupation, and an important and valuable one at that. Cincinnati's athletic programs, particularly its football and men's basketball program, compete at a very high level of college sports for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL. Mr. Evans performed well in three seasons at Cincinnati. In 2015-16 he played in 33 games with an average of 8.4 points, 4.1 rebounds, and 1.6 assists per game, and in 2016-17 he started all 36 games, averaging 13.5 points, 4.2 rebounds, and 2.7 assists. In 2017-18 he again started all 36 games, posting averages of 13.0 points, 4.7 rebounds, and 3.1 assists. After the 2017-18 season ended, facing another year of playing college basketball but not being allowed to earn money for it, Mr. Evans declared himself eligible for the NBA draft, foregoing his final year of eligibility.

2637.  During Evans' years at Cincinnati, basketball games were broadcast on a number of media outlets, including local and national television providers and networks and on radio creating millions of dollars in revenue, in addition to ticket sales, memorabilia sales, donations and other revenue streams.

2638.  Yet Mr. Evans received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Cincinnati, he was prohibited from earning any income or be compensated by salary or even from third parties for his NIL, which harmed him. During his three years playing basketball at Cincinnati, Mr. Evans was critical to the success of the program and to the revenue generated by the program.

2639.  Mr. Evans's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's historic basketball programs were limited and denied as a result of

**FOURTH AMENDED COMPLAINT**

NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2640.  Defendants' conspiracy greatly harmed Mr. Evans. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2641.  **The effect of Defendants' illegal conduct on Plaintiff Jermaine Haley**. Plaintiff Jermaine Haley worked as a college basketball player at New Mexico State from 2016 through 2017 and at West Virginia University from 2018 through 2020.

2642.  The labor provided by Mr. Haley was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2643.  He was highly recruited as a 6'7" point guard recruited from Burnaby, BC in Canada and chose New Mexico State over Washington, Gonzaga, Illinois, Louisville, Maryland, Memphis, Oregon, among others. In 2017, he transferred to West Virginia University despite offers from multiple other universities, including Indiana.

2644.  His job as a college basketball player at New Mexico State and WVU was essentially a full-time occupation, and an important and valuable one at that, particularly

**FOURTH AMENDED COMPLAINT**

at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. Mr. Haley was effective at New Mexico State and at WVU. For the 2016-17 season at New Mexico State, he averaged 3.9 PPG, 2.8 RPG and 1.5 APG. He transferred to WVU and had to sit out 2017-18 season, and then for the 2018-19 season he averaged 7.1 PPG, 4.1 RPG and 2.4 APG. For the 2019-20 season at WVU, he averaged 8.9 PPG, 4.3 RPG and 1.9 APG.

2645.  In his first season at WVU (2018-19), Haley was a part time starter and the team struggled to a sub .500 season. In the following season he became a full-time starter and important contributor and the WVU team recovered, posting a record of 21-10 and would have been a 6 or 7 seed in the NCAA tournament had it not gotten cancelled. So as a result of his effort and services, WVU became a better team than without him, and if the transfer portal had existed then and he would have had another year of eligibility, his valuable services would have been in demand and WVU would have paid for the services he provided had it not been prohibited.

2646.  During the time Mr. Haley played for New Mexico State and WVU, the basketball programs at both schools were successful financially as a result of staying competitive in their conferences. In 2021, for example, the Big 12 conference distributed around $34.5 million to its member schools. Overall, WVU's athletic department revenue was $105 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $18 million derived from basketball operations.

2647.  Yet Mr. Haley received none of that revenue from New Mexico State or from WVU; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at West Virginia, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During

**FOURTH AMENDED COMPLAINT**

his two years as one of the best players in the West Virginia Mountaineers basketball program, responsible to a large degree for keeping the program competitive and generating revenue, his compensation opportunities would have been especially lucrative playing for the program beloved by the state of West Virginia, in which there are not any major league professional athletic teams, during an era of extraordinary success for the program.

2648.  Mr. Haley's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2649.  Defendants' conspiracy greatly harmed Mr. Haley. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2650.  **The effect of Defendants' illegal conduct on Plaintiff Jerron Cage**. Plaintiff Jerron Cage worked as a college football player at the Ohio State University from 2017 through 2023.

2651.  The labor provided by Mr. Cage was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions,

**FOURTH AMENDED COMPLAINT**

participating in intercollegiate NCAA sanctioned games, providing community relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2652.  He was a highly recruited prospect as a graduate of Winton Woods High School in Cincinnati, Ohio, and was ranked as a unanimous four-star recruit, the number 3 player in the state according to ESPN, and one of the top defensive line prospects in the nation. He was also a two-time Associated Press Division II first-team all-state defensive lineman and a PrepStar Top 300 All-American. Besides Ohio State, he had offers from virtually every other Big Ten and SEC school, including Michigan, Michigan State, Purdue, Illinois, Oklahoma, Clemson, LSU, Oregon, and many others. As a senior he was selected as the Anthony Munoz Foundation Defensive Lineman of the Year.

2653.  His job as a college football player at was essentially a full-time occupation, and an important and valuable one at that. Ohio State's athletic program, particularly its football program, is among the largest, most lucrative, well-known athletic programs and has a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NFL. During his career at Ohio State, Mr. Cage played in 42 total games. Though he was a consistent contributor throughout, his best performances came in 2022, when he recorded a total of 12 tackles, including a career-high 5 tackles against Iowa.

2654.  During Mr. Cage's years at Ohio State, Big Ten football games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2021, the Big Ten conference distributed $54 million to its member schools.

**FOURTH AMENDED COMPLAINT**

Overall, Ohio State's athletic department revenue was $251 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $92 million derived from football operations.

2655.  Yet Mr. Cage received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his football career at Ohio State, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing football at Ohio State, Mr. Cage was critical to the success of the program and to the revenue generated by the program.

2656.  Mr. Cage's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled football player in one of the NCAA's elite football programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2657.  Defendants' conspiracy greatly harmed Mr. Cage. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2658.  **The effect of Defendants' illegal conduct on Plaintiff Kameron Williams**. Plaintiff Kameron Williams worked as a college basketball player at Ohio State University from 2014 through 2018.

**FOURTH AMENDED COMPLAINT**

2659.  The labor provided by Mr. Williams was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2660.  Mr. Williams was a highly recruited prospect as a graduate of Mount St. Joseph High School in Baltimore, Maryland, where he became the all-time leading scorer and was ranked 52nd nationally and named the Baltimore Catholic League (BCL) Player of the Year, named to multiple All Metro, All MIAA and All BCL teams, as well as was named the BCL MVP. Playing on the top travel circuit, the Elite Youth Basketball League (EYBL), he became well known as one of the top college recruits in the nation by leading the EYBL in scoring over many future NBA players (Devin Booker, Julius Randle, Aaron Gordon, Andrew Wiggins, Zach Levine, to name a few). He received over 60 scholarship offers, including many from Power 5 schools including Wake Forest, Clemson, Providence, Maryland, Syracuse, Washington, USC, Iowa, Nebraska, in addition to Ohio State, to which he ultimately committed. He was requested to participate in elite, invitations-only talent camps for the very top high school basketball players, including Jr All-American Camp, Five Star Basketball Camp, Roy Williams North Carolina Tarheel Basketball Camp, Chris Paul Elite Guard Camp, Nike Top 100 Camp, Kevin Durant Select Camp, and the Lebron James Nike Elite Camp, among others. He was also invited to participate in the NIKE Global Games against international competition. While still in high school he was identified as a Nike athlete, with his name, image and likeness used to market products and services, although he was prohibited by NCAA regulations from being compensated for the use of his NIL as a future NCAA athlete.

**FOURTH AMENDED COMPLAINT**

2661.  His job as a college basketball player at Ohio State was essentially a full-time occupation, and an important and valuable one at that. Ohio State's athletic programs, particularly its football and men's basketball program, are among the largest, most lucrative, well-known programs and have a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL. Over the course of his career at Ohio State, he shot 40 percent from 3-point distance and 88 percent from the free throw line, and he progressed from being a significant contributor during his first two years (2014-15 and 2015-16) to being a full-time starter his junior (2016-17) and senior (2017-18) seasons, averaging over 9.0 PPG and shooting over 40 percent from 3-point distance during those two seasons. On the biggest stage of all, the NCAA tournament in 2017-18, he led them to a win over South Dakota State with 22 points, 5 rebounds, 2 assists and 3 steals, and in two NCAA tournament games he averaged 20.5 PPG, shooting 50 percent from distance. During the years that Mr. Williams played at Ohio State, he competed in the Big Ten conference and against a host of non-conference blueblood programs (e.g., UCLA, Kentucky, Louisville, North Carolina, Gonzaga, Connecticut) in front of a national audience on a big stage, and his long-range shooting and explosive and athletic dunks made him a fan favorite among college basketball and Ohio State fans.

2662.  During his years at Ohio State, basketball games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2018, the Big Ten conference distributed $54 million to its member schools. Overall, OHIO STATE's athletic department revenue was $210 million for the 2018 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $22 million derived from basketball operations.

**FOURTH AMENDED COMPLAINT**

2663.  Yet Mr. Williams received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Ohio State, he was prohibited from earning any income or be compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at Ohio State, Mr. Williams was critical to the success of the program and to the revenue generated by the program, as demonstrated most clearly by his impact in the NCAA tournament in 2018.

2664.  Mr. Williams's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2665.  Defendants' conspiracy greatly harmed Mr. Williams. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2666.  **The effect of Defendants' illegal conduct on Plaintiff Lucas Williamson**. Plaintiff Lucas Williamson worked as a college basketball player at Loyola University Chicago from 2017 through 2022.

**FOURTH AMENDED COMPLAINT**

2667.  The labor provided by Mr. Williamson was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2668.  Mr. Williamson excelled at Whitney Young High School in Chicago, as a highly recruited two-time state champion and first team All-State selection. He was named the MVP of the Proviso West Tournament and competed on the top Nike EYBL circuit with Meanstreets. During his senior year he received multiple scholarship offers and ultimately committed to play basketball at Loyola University Chicago.

2669.  His job as a college basketball player at Loyola was essentially a full-time occupation, and an important and valuable one at that. During his career at Loyola, he led them to qualify for the post-season 4 times, including three NCAA Tournament appearances. He was a three-time All-Missouri Valley Conference Team selection, played in the most games (150) and won the most games (124) of any individual in Loyola history, and as a freshman was named to the MVC All-Freshman team. He was three times named to the All-MVC Defensive team and was twice named the MVC Defensive Player of the Year, and was widely regarded as one top defensive players in the country. His defensive skills were instrumental in forcing a turnover in the opening round game of the 2018 March Madness tournament that led to a game winning shot by his teammate, Donte Ingram, that set off one of the greatest NCAA Cinderella stories in NCAA tournament history.

2670.  He and his teammates became famous during the 2018 March Madness run that saw them advance all the way to the Final Four, during which "Sister Jean", a nun at the Jesuit university, became a national celebrity. After three buzzer beaters and

**FOURTH AMENDED COMPLAINT**

four wins in the 2018 tournament, Loyola and Lucas Williamson were in the Final Four
and the biggest story in college basketball.

2671.  As Loyola advanced in the 2018 March Madness tournament, Williamson
and Loyola achieved newfound fame as they improbably advanced to the Final Four as
an 11 seed. However, for all of the on the court accomplishments, the most dramatic
and unexpected change came in the media coverage of Loyola Chicago and the effects
the 2018 March Madness success had on the visibility, revenue streams and financial
standing of the university. Donations to the university increased by 660 percent, ticket
sales increased by 170 percent, and traffic through the website increased by 300
percent. The number of applications to attend Loyola as a student increased by 30-40
percent, and Loyola Chicago branded merchandise skyrocketed, with sales of five years
of merchandise being sold in one month after the tournament, including thousands of
jerseys bearing the numbers and names of the basketball players. It is estimated that
the tournament run in 2018 generated an estimated $300+ million in media exposure for
the school, and the Missouri Valley Conference, of which Loyola Chicago is a member,
benefited from having one of its teams progress to the Final Four.

2672.  Yet Mr. Williamson received none of the hundreds of millions of dollars in
revenue and benefits; nor was he otherwise compensated by Defendants for his labor
other than by receiving a scholarship and other education-related expenses. During his
basketball career at Loyola, he was prohibited from earning any income or being
compensated by salary or even from third parties for his NIL (including the popular
jerseys bearing his name and number), which harmed him. During his five years playing
basketball at Loyola, Mr. Williamson was a critical contributor to the success and then
played a key role in generating the vast amount of new revenue for the University.

2673.  Mr. Williamson was denied, as a result of the NCAA prohibitive
regulations, opportunities to earn fair compensation for the immense work and all the
sacrifices he made that went into being a highly skilled basketball player and

**FOURTH AMENDED COMPLAINT**

accomplishing things such as leading Loyola Chicago to the Final Four. He was never
compensated for his services, in spite of the immense value of those services, with
hundreds of millions of dollars of benefits and revenue generated by media rights, ticket
sales, merchandise sales, donations and other operational income.

2674. Defendants' conspiracy greatly harmed Mr. Williamson. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, he would have
received greater remuneration for his services as a college basketball player than he
received, and he would have received money for his NIL from third parties. Absent
Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive
bylaws, he would have received a competitive share of the television and other revenue
being brought in by Defendants and their member schools. Thus, Defendants' scheme
directly injured him.

2675. **The effect of Defendants' illegal conduct on Plaintiff Malik Curry.**
Plaintiff Malik Curry worked as a college basketball player at Old Dominion University
from 2019-2021 and at West Virginia University from 2021 through 2022.

2676. The labor provided by Mr. Curry was of great value to Defendants. And it
was a significant amount of labor. Between working out in the weight room, doing skills
training and conditioning, participating in team practices, attending film sessions,
participating in intercollegiate NCAA sanctioned games, providing community relations
services and public relations services, providing other services on behalf of the
universities, and traveling on behalf of the university, he often worked seven days and
more than 40 hours per week under the direction of the university coaches.

2677. He was recruited from Putnam Science Academy and progressed to Palm
Beach State College in Florida before transferring to Old Dominion University and later
to West Virginia University.

**FOURTH AMENDED COMPLAINT**

2678.  His job as a college basketball player at Old Dominion and WVU was essentially a full-time occupation, and an important and valuable one at that, particularly at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. Mr. Curry was effective as a point guard at Old Dominion and at WVU. For the 2019-20 season at Old Dominion he averaged 13.4 PPG, 3.1 RPG and 4.0 APG and for the 2020-21 season he averaged 15.7 PPG, 3.7 RPG and 3.6 APG (He was named to the Second Team All Conference USA). For the 2021-22 season at WVU in the Big 12 he averaged 9.7 PPG, 2.2 RPG and 1.5 APG., and he led WVU in scoring in multiple games, including a 27-point game vs. FIU.

2679.  Mr. Curry's role changed during his years at Old Dominion from being a pass first point guard to being a primary scoring option, and he became an effective scorer that made his teams better at Old Dominion and West Virginia and helped them win games.

2680.  As a result of his effort, Old Dominion and WVU were both more relevant and better teams than without him, and he was a popular and effective player who warranted being paid for the services he provided.

2681.  During the time Mr. Curry played for Old Dominion and WVU, the basketball programs at both schools were successful financially as a result of staying competitive in their conferences. In 2021, for example, the Big 12 conference distributed about $34.5 million to its member schools. Overall, WVU's athletic department revenue was $105 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $18 million derived from basketball operations.

2682.  Yet Mr. Curry received none of that revenue from Old Dominion or from WVU; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball

**FOURTH AMENDED COMPLAINT**

career at West Virginia, he was prohibited from earning any income he was not permitted to receive money, be compensated by salary, or even from third parties for his NIL, which harmed him. During his year as one of the best players in the West Virginia Mountaineers basketball program, responsible to a large degree for keeping the program competitive and generating revenue, his compensation opportunities would have been especially lucrative playing for the program beloved by the state of West Virginia, in which there are not any major league professional athletic teams, during an era of extraordinary success for the program.

2683.  Mr. Curry's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2684.  Defendants' conspiracy greatly harmed Mr. Curry. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2685.  **The effect of Defendants' illegal conduct on Plaintiff Marc Loving**. Plaintiff Marc Loving worked as a college basketball player at Ohio State University from 2013 through 2017.

**FOURTH AMENDED COMPLAINT**

2686.  The labor provided by Mr. Loving was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2687.  Before going to Ohio State, Marc Loving attended St. John's Jesuit High School in Toledo, Ohio. He was highly regarded as a high school basketball recruit, ranked number 51 nationally by 247Sports and recognized as the Number 1 recruit in Ohio. His high school statistics (senior year: 21.3 points/8.2 rebounds per game; junior year: 22.5 points/9.0 rebounds per game; sophomore year: 18.3 points/7.4 rebounds per game) explain why he had dozens of offers other than Ohio State, including Arizona, Cincinnati, Indiana, Michigan, and many others.

2688.  His job as a college basketball player at Ohio State was essentially a full-time occupation, and an important and valuable one at that. Ohio State's athletic programs, particularly its football and men's basketball program, are among the largest, most lucrative, well-known programs and have a long and storied history of competing in the powerful Big Ten Conference for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL.

2689.  Marc Loving played four seasons at Ohio State, and became just the 54th player in its long history to score 1,000 points in a career. In his freshman season (2013-14) he averaged 4.4 points, 1.7 rebounds, and 0.2 assists per game, followed quickly by his sophomore season (2014-15) when his averages improved to 9.4 points, 3.6 rebounds, and 0.6 assists per game. In his junior season (2015-16) he averaged 14.0 points, 5.3 rebounds, and 1.5 assists per game, led the team in scoring and was

**FOURTH AMENDED COMPLAINT**

All-Big Ten Honorable Mention. In his senior season (2016-17) he averaged 12.3 points, 4.7 rebounds, and 1.9 assists per game.

2690.  Over his college career, Loving showcased consistent scoring ability and versatility as a forward.

2691.  During his years at Ohio State, basketball games were broadcast on a number of media outlets, including national networks (ESPN, ESPN2, ESPNU, ABC, CBS, CBS Sports Network, FOX, FS1, The Big Ten Network, Big Ten To GO-streaming pay per view subscription service) and on radio on 97.1FM and satellite XM. In 2017, the Big Ten conference distributed $34.8 million to its member schools. Overall, Ohio State's athletic department revenue was $210 million for the 2018 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $22 million derived from basketball operations.

2692.  Yet Mr. Loving received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Ohio State, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at Ohio State, Mr. Loving was one of the most, if not the most, effective players in the program from the perspective of winning games and remaining competitive to meet the fan base and alumni expectations.

2693.  Mr. Loving's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's elite basketball programs were denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2694.  Defendants' conspiracy greatly harmed Mr. Loving. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2695.  **The effect of Defendants' illegal conduct on Plaintiff Marques Townes**. Plaintiff Marques Townes worked as a college basketball player at Fairleigh Dickinson University from 2014 through 2016 and at Loyola University Chicago from 2016 through 2019.

2696.  The labor provided by Mr. Townes was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2697.  Mr. Townes excelled in high school at St. Joseph High School in Metuchen, New Jersey where he was selected to the Star-Ledger Second Team All-State and was a three-star recruit. His team was ranked 12th in the nation and won the Tournament of Champions and finished with a 30-2 record. He began his college basketball career in 2014-15 with the Fairleigh Dickinson Knights of the Northeast Conference. In his freshman season for the Knights, he averaged 9.1 points, 3.3 rebounds, 1.3 assists, and 1.6 steals per game. As a sophomore at Fairleigh Dickinson, Townes started all 33 games, averaging 11.5 points, 3.9 rebounds, 2.7 assists, and 1.3 steals per game. He led the team to the 2016 NCAA Division I men's basketball

**FOURTH AMENDED COMPLAINT**

tournament, where they lost to Florida Gulf Coast in the First Four round. After his second season in college, Townes transferred to play for the Loyola University Chicago Ramblers. He sat out in the 2016–17 season due to NCAA transfer rules.

2698.  On November 24, 2017, now playing for Loyola, Townes scored his season-high 23 points to help beat UNC Wilmington. In the 2018 NCAA tournament, Townes helped Loyola, an 11-seed, make a Cinderella run to the Final Four. In the team's tournament Sweet 16 game against Nevada, he made the game-clinching three-pointer with 6.3 seconds left in regulation. With his success in the 2018 tournament, he garnered national attention, being featured in the New York Post and Chicago Tribune. While at Loyola, coming into his senior season (2018-19), Townes was named to the Preseason Second Team All-MVC. He was ultimately named MVC Player of the Year for 2018-19, averaging 15.3 points, 5.0 rebounds, 3.6 assists and 1.1 steals per game as Loyola won 20 games and earned a spot in the National Invitation Tournament.

2699.  His job as a college basketball player at Loyola was essentially a full-time occupation, and an important and valuable one at that. He and his teammates became famous during the 2018 March Madness run that saw them advance all the way to the Final Four, during which "Sister Jean", a nun at the Jesuit university, became a national celebrity. After winning four games, three with last second shots (including the one Townes made against Nevada), Loyola and Marques Townes were in the Final Four and the biggest story in college basketball.

2700.  As a result of the success in the 2018 March Madness tournament, the media coverage of Loyola Chicago changed the visibility, revenue streams and financial standing of the university. Donations to the university increased by 660 percent, ticket sales increased by 170 percent, and traffic through the website increased by 300 percent. The number of applications to attend Loyola as a student increased by 30-40 percent, and Loyola Chicago branded merchandise skyrocketed, with sales of FIVE YEARS of merchandise being sold in one month after the tournament, including

**FOURTH AMENDED COMPLAINT**

thousands of jerseys bearing the numbers and names of the basketball players. It is estimated that the tournament run in 2018 generated an estimated $300+ million in media exposure for the school, and the Missouri Valley Conference, of which Loyola Chicago is a member, benefited from having one of its teams progress to the Final Four.

2701.  Yet Mr. Townes received none of the hundreds of millions of dollars in revenue and benefits; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Loyola, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL (including the popular jerseys bearing his name and number), which harmed him. During his years at Loyola, Mr. Townes was a critical contributor to the success of the basketball program and provided services to the University and played a key role in generating the vast amount of new revenue for the University.

2702.  Mr. Townes was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player and accomplishing things such as leading Loyola Chicago to the Final Four while being named the Most Outstanding Player in the South Region. He was never compensated for his services, in spite of the immense value of those services, the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2703.  Defendants' conspiracy greatly harmed Mr. Townes. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he

**FOURTH AMENDED COMPLAINT**

would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2704.  **The effect of Defendants' illegal conduct on Plaintiff Matt Cross**. Plaintiff Matt Cross worked as a college basketball player at the University of Miami from 2020 through 2021, at the University of Louisville 2021 through 2022, at the University of Massachusetts from 2022 through 2024, and at Southern Methodist University from 2024 through 2025.

2705.  The labor provided by Mr. Cross was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2706.  Matt Cross was heavily recruited as a high school player at Brewster Academy in Wolfeboro, New Hampshire, a school known for its traditionally strong basketball program. As a senior, he averaged 18.6 points, 10 rebounds, and 3.0 assists per game for a team that finished with a 37-3 record and a National Prep Championship Title. He was heavily recruited as the 86th ranked player in the class of 2020, and initially chose Miami over numerous other Power 5 conference schools including Texas A&M, Florida, Butler, South Carolina, Georgia Tech, Indiana, Iowa, Penn State, Tulane and others.

2707.  His job as a college basketball player at Miami, Louisville, Massachusetts and SMU has been essentially a full-time occupation, and an important and valuable one at that. Mr. Cross has excelled at all four universities where he has played. At Miami (2020-21 season) as a freshman he played 14 games, starting 9 of them, and

**FOURTH AMENDED COMPLAINT**

averaged 6.9 points, 3.5 rebounds, and 1.4 assists per game. He was a strong shooter from beyond the arc, making 40% of his three-pointers. At the University of Louisville (2021-22 season) for his sophomore year he played in 28 games (starting 9) and averaged 5.8 points, 3.9 rebounds, and 0.5 assists per game. He had notable games such as a double-double performance against North Carolina with 13 points and 15 rebounds. At the University of Massachusetts, he raised his numbers and game, averaging 10.9 points, 6.3 rebounds, and 1.8 assists per game for the 2022-23 season. For the 2023-24 season he averaged 15.3 points, 8.3 rebounds, 3.0 assists and 1.5 steals per game and was named First-Team All-Conference. For the current 2024-25 season he is averaging 11.8 points, 7.6 rebounds and 1.7 assists per game playing for SMU in the Power 4 ACC.

2708.  During his years at Miami (ACC school), Louisville (ACC school), Massachusetts (A-10) and SMU (ACC school) basketball games at all four universities were generally televised, often nationally, particularly for the Power 5/4 schools. Miami, Louisville and SMU are all ACC schools and receive large distributions from their conferences' television contracts for the broadcasting of those games. All four schools take in vast revenues from a variety of sources, all to see the basketball and football teams perform.

2709.  Yet Mr. Cross received none of the millions of dollars in revenue and benefits realized by the schools paid by Miami, Louisville, Massachusetts, or SMU; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at the four schools, he was prohibited or limited from earning income or being compensated by salary or even from third parties for his NIL, which harmed him. During his years at each college Mr. Cross was an important contributor to the success of the basketball program and provided valuable services and played a key role in generating the revenues realized by the colleges.

**FOURTH AMENDED COMPLAINT**

2710.  Mr. Cross was denied or limited, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player. He was never compensated for his services, in spite of the immense value of those services, the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2711.  Defendants' conspiracy greatly harmed Mr. Cross. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2712.  **The effect of Defendants' illegal conduct on Plaintiff Nathan Adrian**. Plaintiff Nathan Adrian worked as a college basketball player at West Virginia University from 2014 through 2017.

2713.  The labor provided by Mr. Adrian was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2714.  He was a highly recruited prospect as the number 7 player in the state of West Virginia at Morgantown High School.

**FOURTH AMENDED COMPLAINT**

2715.  His job as a college basketball player at West Virginia University was essentially a full-time occupation, and an important and valuable one at that, particularly at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. Mr. Adrian was part time starter for the first three years of his career at WVU, but for his senior season in 2016-17 he started all 37 of the team's games, averaging 9.6 PPG, 6.0 RPG and 2.9 APG. As a native son of West Virginia, he was especially popular and successful at WVU, which competed in the Big 12 Conference. During his senior season of 2016-17, WVU finished the season 28–9, 12–6 in Big 12 play to finish in a three-way tie for second place and they advanced to the championship game of the Big 12 tournament. They received an at-large bid to the NCAA tournament where they defeated Bucknell and Notre Dame before losing in the Sweet Sixteen to Gonzaga.

2716.  During his four-year career at WVU the basketball team had great success as well, being ranked as high as Number 2 in the country and consistently in the top 20, winning the Puerto Rico Invitational Tournament his freshman year, the Bahamas Invitational Tournament his sophomore year, making four NCAA tournament appearances, advancing three times to the Sweet 16.

2717.  During his last three years at West Virginia, the basketball program was extraordinarily successful financially as a result of its consistent high national rankings that drew large national TV audiences, including three appearances and 7 games in the NCAA March Madness tournament. Competing in the Big 12 conference, in 2018, the Big 12 conference distributed $34.7 million to its member schools. Overall, WVU's athletic department revenue was $102 million for the 2018 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $23 million derived from basketball operations.

2718.  Yet Mr. Adrian received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and

**FOURTH AMENDED COMPLAINT**

other education-related expenses. During his basketball career at West Virginia, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years as a beloved native son of the popular and successful West Virginia Mountaineers basketball program, compensation opportunities would have been especially lucrative in Mr. Adrian's home state of West Virginia, in which there are not any major league professional athletic teams, during an era of marked success for the program.

2719.  Mr. Adrian's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2720.  Defendants' conspiracy greatly harmed Mr. Adrian. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2721.  **The effect of Defendants' illegal conduct on Plaintiff Nigel Johnson**. Plaintiff Nigel Johnson worked as a college basketball player at the Kansas State University from 2013 through 2015, at Rutgers University from 2016 through 2017, and at the University of Virginia from 2017 through 2018, making a significant impact at each program.

**FOURTH AMENDED COMPLAINT**

2722.  The labor provided by Mr. Johnson was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2723.  Mr. Johnson excelled in high school at Broad Run High School (VA) during his junior year, where he averaged 29.5 points, 8.4 assists, 4.4 rebounds, and 4.0 steals per game. He then transferred to Riverdale Baptist School (MD) for his senior season before moving on to play college basketball at Kansas State, Rutgers, and Virginia. He had numerous other offers coming out of high school, including George Washington.

2724.  His job as a college basketball player at Kansas State (Big 12), Rutgers (Big Ten) and Virginia (ACC) exposed him to Power 4 basketball in three of the four power conferences. In his first year at Kansas State, he averaged 4.5 points, 1.5 assists, and 1.5 rebounds per game (2013-14), and in his second year he became a part time starter and increased his numbers to 5.2 points, 1.6 rebounds and 1.7 assists per game. He then was forced to sit out a year as a transfer, but when he resumed at Rutgers in the 2016-17 season, he significantly improved, averaging 11.3 points, 3.3 rebounds, and 2.0 assists per game. After the successful season at Rutgers, he elected to transfer again to Virginia, where, based on the strength of his preceding season, he was placed on the preseason All-Conference team. At Virginia (2017-18), he played a supporting role, averaging 4.9 points, 1.6 rebound, and 1.6 assists per game at the ACC school.

2725.  Mr. Johnson provision of his services to Kansas State, Rutgers and Virginia was essentially a full-time occupation, and an important and valuable one at

**FOURTH AMENDED COMPLAINT**

that. His speed, athleticism and skill that make him a Division I Power 5 player are rare commodities, and were and are in demand.

2726. During his years at Kansas State, Rutgers and Virginia, basketball games at all three universities were generally televised, often nationally, given that all three were Power 5 schools. Kansas State from the Big 12 is getting a share (approximately $36.5 million in 2018), Rutgers is getting a Big Ten share ($54 in 2018) and Virginia got an ACC share ($29.5 million in 2018) those distributions coming primarily from the media rights licenses from the conferences' television contracts for the broadcasting of those games. Kansas State, Rutgers and Virginia all take in a large amount of revenue from ticket sales, memorabilia sales, alumni contributions and other sources derived from their athletic basketball and football programs.

2727. Yet Mr. Johnson received none of the millions of dollars in revenue and benefits realized by Kansas State, Rutgers or Virginia; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Kansas State, Rutgers and Virginia, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL. During his years at Kansas State, Rutgers and Virginia, Mr. Johnson was an important contributor to the success of the basketball program and provided valuable services and played a key role in generating the vast amount of new revenue for Kansas State, Rutgers and Virginia.

2728. Mr. Johnson was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player. He was never compensated for his services, in spite of the immense value of those services, the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

**FOURTH AMENDED COMPLAINT**

2729.  Defendants' conspiracy greatly harmed Mr. Johnson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2730.  **The effect of Defendants' illegal conduct on Plaintiff Nysier Brooks**. Plaintiff Nysier Brooks worked as a college basketball player at the University of Cincinnati from 2016 through 2019, at the University of Miami from 2019 through 2021, and at the University of Mississippi from 2021 through 2022, making a significant impact at each program.

2731.  The labor provided by Mr. Brooks was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2732.  Mr. Brooks excelled in high school at Advanced Prep International in Dallas, Texas, and Life Center Academy in Burlington, New Jersey and was recruited after being ranked number 207 nationally by 247Sports.

2733.  His job as a college basketball player at Cincinnati, Miami and Mississippi was essentially a full-time occupation, and an important and valuable one at that. At the University of Cincinnati, Brooks played three seasons (2016-17, 2017-18 and 2018-19).

**FOURTH AMENDED COMPLAINT**

In his junior year (2018-19), he started all 35 games, averaging 8.1 points, 6.3

rebounds, and 1.5 blocks. He ranked among the top players in the American Athletic

Conference in offensive rebounds, blocks, and overall rebounding. Brooks helped

Cincinnati win two AAC Tournament titles and reach the NCAA Tournament in each of

his three seasons. In 2019, Brooks transferred to the University of Miami in the ACC for

the 2020-21 season where he averaged 7.4 points, 5.8 rebounds, and 1.0 block per

game. He also led the team in offensive rebounding, ranking ninth in the ACC for this

category. Brooks transferred to the University of Mississippi in the SEC for the 2021-22

season where he started all 32 games, averaging 9.8 points, 7.3 rebounds, and 1.3

blocks per game. His strong performance on the boards ranked him third in the SEC for

offensive rebounds. Brooks was known not only for his on-court performance but also

for his leadership and community involvement, making him a valuable asset to each

team.

2734.  During his years at Cincinnati, Miami and Mississippi, basketball games at

all three universities were generally televised, often nationally. Miami, as a member of

the ACC, and Mississippi receive large distributions from their conferences' television

contracts for the broadcasting of those games. Cincinnati, Miami and Mississippi all take

in a large amount of revenue from ticket sales, memorabilia sales, alumni contributions

and other sources derived from their athletic basketball and football programs.

2735.  Yet Mr. Brooks received none of the millions of dollars in revenue and

benefits realized by Cincinnati, Miami or Mississippi; nor was he otherwise

compensated by Defendants for his labor other than by receiving a scholarship and

other education-related expenses. During his basketball career at Cincinnati, Miami and

Mississippi, he was prohibited from earning any income or being compensated by salary

or even from third parties for his NIL (including the popular jerseys bearing his name

and number), which harmed him. During his years at Cincinnati, Miami and Mississippi,

Mr. Brooks was an important contributor to the success of the basketball program and

**FOURTH AMENDED COMPLAINT**

provided valuable services and played a key role in generating the vast amount of new revenue for Cincinnati, Miami and Mississippi.

2736.  Mr. Brooks was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player. He was never compensated for his services, in spite of the immense value of those services, the hundreds of millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2737.  Defendants' conspiracy greatly harmed Mr. Brooks. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2738.  **The effect of Defendants' illegal conduct on Plaintiff Romar Reid**. Plaintiff Romar Reid worked as a college basketball player at Manhattan College from 2019 through 2022.

2739.  The labor provided by Mr. Reid was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

**FOURTH AMENDED COMPLAINT**

2740.  Mr. Reid excelled in high school at Iona Preparatory School in New York and at Woodstock Academy in Connecticut.

2741.  While playing at Manhattan from 2019 to 2022, Mr. Reid appeared in 68 games over three seasons and averaging 1.8 points, 0.7 rebounds, and 0.7 assists per game.

2742.  During his years at Manhattan, his job as a college basketball player was essentially a full-time occupation, and an important and valuable one at that.

2743.  During the time that Reid played at Manhattan, there was significant media coverage of the program, including coverage of games, through which the college received revenue. Manhattan also had revenue streams through ticket sales, memorabilia and donations to fund its athletic programs, including its basketball program.

2744.  Yet Mr. Reid received none of that revenue; nor was he otherwise compensated by Defendants for his labor in working tirelessly on his skills, training regimen and performing other functions as required. During his basketball career at Manhattan, he was prohibited from earning any income and he was not permitted to receive money or be compensated by salary or even from third parties for his NIL, which harmed him.

2745.  Mr. Reid was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player. He was never compensated for his services, in spite of the immense value of those services, the millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2746.  Defendants' conspiracy greatly harmed Mr. Reid. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2747.  **The effect of Defendants' illegal conduct on Plaintiff Spencer Macke**. Plaintiff Spencer Macke worked as a college basketball player at West Virginia University from 2019 through 2021.

2748.  The labor provided by Mr. Macke was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the university, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2749.  Mr. Macke excelled in high school at Silver Grove High School where he became the first player to ever lead the state in scoring (35 PPG) and rebounding (15RPG) and he received All District, All Region and All State recognition. He also played on the high-level Adidas travel circuit with the Kentucky Royals, and he had 24 points in the finals to win an AAU national championship.

2750.  While playing at West Virginia University during the 2019-20 and 2020-21 seasons, Mr. Macke became a fan favorite and the model for putting in hours and hours of work that the coaching staff would use to goad other players to work harder. When he made a 3 pointer against Texas in January, 2020, he was mobbed and carried off the floor by his teammates and the crowd. The moment went viral and was featured by Scott Van Pelt on ESPN as "THE BEST THING I SAW TODAY."  Mr. Macke was

**FOURTH AMENDED COMPLAINT**

featured prominently by and in WVU marketing and became, and remains, among the most identifiable and recognizable WVU players.

2751.  During his years at West Virginia, his job as a college basketball player was essentially a full-time occupation, and an important and valuable one at that.

2752.  During the time that Macke played at West Virginia, the basketball program was extraordinarily successful financially as a result of its consistent high national rankings that drew large national TV audiences competing in the Big 12 conference. In 2018, the Big 12 conference distributed $37 million to its member schools. Overall, WVU's athletic department revenue was $102 million for the 2018 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $23 million derived from basketball operations.

2753.  Yet Mr. Macke received none of that revenue; nor was he otherwise compensated by Defendants for his labor in working tirelessly on his skills, training regimen and performing other functions as required. During his basketball career at West Virginia, he was prohibited from earning any income. He was not permitted to receive money, be compensated by salary, or even from third parties for his NIL, which harmed him. Within the West Virginia Mountaineers basketball program, compensation opportunities would have been especially lucrative in Mr. Macke's case because of his large following and presence in the community because there are not any major league professional athletic teams in West Virginia.

2754.  Mr. Macke was denied, as a result of the NCAA prohibitive regulations, opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player. He was never compensated for his services, in spite of the immense value of those services, the millions of dollars of benefits and revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

**FOURTH AMENDED COMPLAINT**

2755.  Defendants' conspiracy greatly harmed Mr. Macke. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2756.  **The effect of Defendants' illegal conduct on Plaintiff Tayler Persons.** Plaintiff Tayler Persons worked as a college basketball player at Northern Kentucky University from 2014 through 2015 and at Ball State University from 2015 through 2019.

2757.  The labor provided by Mr. Persons was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2758.  He was recruited by Division I schools during his high school career at Kokomo High School in Kokomo, Indiana. During his senior year, he averaged 18.2 points per game. Later, during his successful career at Ball State, he received offers from Purdue and Xavier.

2759.  His job as a college basketball player at NKU and Ball State was essentially a full-time occupation, and an important and valuable one at that, as reflected by his impressive statistics:

**FOURTH AMENDED COMPLAINT**

    a.  2014–15 (Freshman) at Northern Kentucky: 13.1 points, 4.6 rebounds, and 3.7 assists per game.

    b.  2016–17 (Sophomore) at Ball State: 15.5 points, 3.9 rebounds, and 4.9 assists per game.

    c.  2017–18 (Junior) at Ball State: 15 points, 3.3 rebounds, and 4.3 assists per game.

    d.  2018–19 (Senior) at Ball State: 16.7 points, 4 rebounds, and 4.3 assists per game.

2760.  Throughout his collegiate career, Persons consistently demonstrated his scoring and playmaking abilities, culminating in a standout senior season.

2761.  As a result of his performance at Ball State, Mr. Persons was recognized in each of his three seasons at Ball State. He earned Second Team All-MAC honors in both his sophomore (2016–17) and junior (2017–18) seasons, and Third Team All-MAC honors in his senior (2018–19) season. He became the first player in Ball State history to accumulate over 1,500 points and 400 assists, concluding his career as the ninth-leading scorer (1,558 points) and third in assists (447) for the program.

2762.  Throughout his impressive career at Ball State, Mr. Persons was recruited and had many opportunities to play at a higher level of college basketball, although he would not have been allowed to earn compensation as a result of the NCAA's prohibitive regulations.

2763.  During the time Mr. Persons played for NKU and Ball State, the basketball programs at both schools were successful financially and derived revenue as a result of staying competitive in their conferences.

2764.  Yet Mr. Persons received none of that revenue from NKU or Ball State; nor would he have been able to be compensated for his labor at any other college, had he transferred, other than by receiving a scholarship and other education-related expenses. During his basketball career at NKU and Ball State, he was prohibited from

**FOURTH AMENDED COMPLAINT**

earning any income and he was not permitted to receive money or to be compensated by salary or even from third parties for his NIL, which harmed him.

2765.  Mr. Persons's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs were limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2766.  Defendants' conspiracy greatly harmed Mr. Persons. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2767.  **The effect of Defendants' illegal conduct on Plaintiff Tajzmel Sherman**. Plaintiff Tajzmel Sherman worked as a college basketball player at West Virginia University from 2019 through 2022.

2768.  The labor provided by Mr. Sherman was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

**FOURTH AMENDED COMPLAINT**

2769.  He was recruited during his junior college career at Collin College, in Texas, where he played for two seasons from 2017 to 2019. In his sophomore year (2018–19), he averaged 25.9 points, 4.8 rebounds, and 4.8 assists per game. He received multiple offers from Power 5 schools including Utah, SMU and Texas Tech.

2770.  His job as a college basketball player at WVU was essentially a full-time occupation, and an important and valuable one at that, particularly at WVU where for decades the WVU basketball players have been perceived and scrutinized as the most recognizable athletes in the state. He had a very successful career at West Virginia, playing in the Big 12 Conference, and compiling the following statistics:

       a.    2019–20 (Junior): 5.3 points, 0.8 rebounds, and 0.8 assists per game.

       b.    2020–21 (Senior): 13.4 points, 1.8 rebounds, and 1.4 assists per game.

       c.    2021–22: 17.7 points, 3.0 rebounds, and 2.4 assists per game

2771.  Mr. Sherman was named All-Big 12 Honorable Mention in 2020-21 and Second Team All-Big 12 in 2021-22.

2772.  During the time Sherman played at WVU, the basketball program was successful financially as a result of staying competitive in the Big 12 conference. In 2021, for example, the Big 12 conference distributed around $34.5 million to its member schools. Overall, WVU's athletic department revenue was $105 million for the 2021 fiscal year from sources such as media rights, ticket sales, donations, and other operational income, and $18 million derived from basketball operations.

2773.  Yet Mr. Sherman received none of that revenue from WVU; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at West Virginia, he was prohibited from earning any income or being compensated by salary or

**FOURTH AMENDED COMPLAINT**

even from third parties for his NIL, which harmed him. During his year as one of the best
players in the West Virginia Mountaineers basketball program, responsible to a large
degree for keeping the program competitive and generating revenue, his compensation
opportunities would have been especially lucrative playing for the program beloved by
the state of West Virginia, in which there are not any major league professional athletic
teams, during an era of extraordinary success for the program.

2774.  Mr. Sherman's opportunities to earn fair compensation for the immense
work and all the sacrifices he made that went into being a highly skilled basketball
player in one of the NCAA's elite basketball programs were limited and denied as a
result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue
generated by media rights, ticket sales, merchandise sales, donations and other
operational income.

2775.  Defendants' conspiracy greatly harmed Mr. Sherman. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, he would have
received greater remuneration for his services as a college basketball player than he
received, and he would have received money for his NIL from third parties. Absent
Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive
bylaws, he would have received a competitive share of the television and other revenue
being brought in by Defendants and their member schools. Thus, Defendants' scheme
directly injured him.

2776.  **The effect of Defendants' illegal conduct on Plaintiff Vincent Trevon
"Tre" Mitchell**. Plaintiff Vincent Trevon "Tre" Mitchell worked as a college basketball
player at the University of Massachusetts from 2019 to 2021, as a college basketball
player at University of Texas from 2021 to 2022, as a college basketball player at West
Virginia University from 2022 to 2023 and as a basketball player at the University of
Kentucky from 2023 through 2024.

**FOURTH AMENDED COMPLAINT**

2777.  The labor provided by Mr. Mitchell was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2778.  He was a highly recruited prospect out of Woodstock High School, in Connecticut. He was a four-star recruit, according to Rivals and ESPN, and was ranked as the number 72 basketball player nationally by Rivals and 73rd by ESPN. He was also named the Connecticut Gatorade Player of the Year. He had offers from Georgia Tech, Indiana, Providence, Syracuse, Virginia Tech and many others. Universities competed for his talent during the high school recruitment process and continued to compete for his talent while he was at the University of Massachusetts, the University of Texas, and West Virginia University in the hopes that he would transfer to another school.

2779.  In his job as a college basketball player Tre Mitchell played college basketball at four schools:

    a.  Massachusetts      (2019-20): Averaged 17.7 PPG, 7.2 RPG, and 1.9 APG. (2020-21): Averaged 18.8 PPG, 7.2 RPG, and 2.2 APG.

    b.  Texas              (2021–22): Averaged 8.7 PPG, 4.0 RPG, and 1.3 APG.

    c.  West Virginia      (2022–23): Averaged 11.7 PPG, 5.5 RPG and 1.8 APG.

    d.  Kentucky           (2023–24): Averaged 10.7 PPG, 7.2 RPG, and 2.6 APG.

2780.  Mitchell's work at Massachusetts, Texas, West Virginia and Kentucky was essentially a full-time occupation, and an important and valuable one at that.

**FOURTH AMENDED COMPLAINT**

Throughout his college career Mitchell showcased his versatility and consistency, adapting to different teams and roles and always putting up effective numbers at every school where he played.

2781.  Based on his consistent play, Mitchell continued to be recruited by other colleges. After being named the Atlantic 10 Rookie of the Year, on the Atlantic 10 All-Rookie team, and even on the Second Team Atlantic 10 in 2021, he continued to be recruited by other schools.

2782.  During the years that he played at each school, particularly the years he spent at Texas and West Virginia (both Big 12 schools at the time) and Kentucky (an SEC school) the games were carried on national television, often by either an ESPN network or the Big 12 or SEC's own network. Both of those conferences distribute media rights payments on those contracts to its members, typically on the order of $30-40 million annually.

2783.  Yet Mr. Mitchell received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Massachusetts, Texas, West Virginia and Kentucky, his opportunities to receive money from third parties for his NIL was limited as a result of decades of restrictive regulations imposed and enforced by the NCAA, which also harmed him.

2784.  Mr. Mitchell's opportunity to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs was limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2785.  Defendants' conspiracy greatly harmed Mr. Mitchell. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2786. **The effect of Defendants' illegal conduct on Plaintiff Trevon Scott**. Plaintiff Trevon Scott worked as a college basketball player at University of Cincinnati from 2015 through 2020.

2787. The labor provided by Mr. Scott was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2788. He was a highly recruited prospect from McIntosh County Academy in Darien, Georgia. In addition to Cincinnati, he also received offers from Georgia, Alabama, Florida Atlantic, Western Kentucky, and others.

2789. His job as a college basketball player at Cincinnati was essentially a full-time occupation, and an important and valuable one at that. Cincinnati's athletic programs, particularly its football and men's basketball program, compete at a very high level of college sports for conference and national championships and producing many future professional athletes who go on to lucrative careers in the NBA and NFL. Mr. Scott performed well in four seasons at Cincinnati. In 2016-17 he played in 35 games with an average of 3.1 points, 2.5 rebounds, and 0.6 assists per game, and in 2017-18 he played in 36 games, averaging 3.1 points, 3.6 rebounds, and 0.9 assists. In 2018-19 he started all 35 games, posting averages of 9.3 points, 6.9 rebounds, and 1.5 assists.

**FOURTH AMENDED COMPLAINT**

In 2019-20 he started in all 30 games and averaged a double-double by averaging 11.4 points, 10.5 rebounds, and 2.2 assists.

2790.  During Scott's years at Cincinnati, basketball games were broadcast on a number of media outlets, including local and national television providers and networks and on radio creating millions of dollars in revenue, in addition to ticket sales, memorabilia sales, donations and other revenue streams.

2791.  Yet Mr. Scott received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Cincinnati, he was prohibited from earning any income or be compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at Cincinnati, Mr. Scott was critical to the success of the program and to the revenue generated by the program.

2792.  Mr. Scott's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's historic basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2793.  Defendants' conspiracy greatly harmed Mr. Scott. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2794.  **The effect of Defendants' illegal conduct on Plaintiff Troy Caupain**.
Plaintiff Troy Caupain worked as a college basketball player at University of Cincinnati
from 2013 through 2017.

2795.  The labor provided by Mr. Caupain was of great value to Defendants. And
it was a significant amount of labor. Between working out in the weight room, doing
skills training and conditioning, participating in team practices, attending film sessions,
participating in intercollegiate NCAA sanctioned games, providing community relations
services and public relations services, providing other services on behalf of the
universities, and traveling on behalf of the university, he often worked seven days and
more than 40 hours per week under the direction of the university coaches.

2796.  He was a highly recruited three-star prospect as a graduate of Cosby High
School, and named a Top 50 \ shooting guard by 247Sports. He chose the University of
Cincinnati over numerous other D1 Power 5 offers including Missouri and University of
Southern California.

2797.  His job as a college basketball player at Cincinnati was essentially a full-
time occupation, and an important and valuable one at that. Cincinnati's athletic
programs, particularly its football and men's basketball program, compete at a very high
level of college sports for conference and national championships and producing many
future professional athletes who go on to lucrative careers in the NBA and NFL. Mr.
Caupain performed well in four seasons at Cincinnati. In 2013-14 he played in 34
games with an average of 5.4 points, 2.3 rebounds, and 2.2 assists per game, and in
2014-15 he started in 33 of 34 games, averaging 9.6 points, 3.6 rebounds, and 3.6
assists. In 2015-16 he again started every game, posting averages of 13.0 points, 3.8
rebounds, and 4.8 assists and in 2016-17 Caupain played in 36 games, averaging 10.5
points, 4.6 rebounds, and 4.4 assists. He was twice honored on the All AAC team, and
in 2016 he was named on the All-ACC Tourney team.

**FOURTH AMENDED COMPLAINT**

2798.  During Caupain's years at Cincinnati, basketball games were broadcast on a number of media outlets, including local and national television providers and networks and on radio creating millions of dollars in revenue, in addition to ticket sales, memorabilia sales, donations and other revenue streams.

2799.  Yet Mr. Caupain received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at Cincinnati, he was prohibited from earning any income or be compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at Cincinnati, Mr. Caupain was critical to the success of the program and to the revenue generated by the program.

2800.  Mr. Caupain's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's historic basketball programs were limited and denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2801.  Defendants' conspiracy greatly harmed Mr. Caupain. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2802.  **The effect of Defendants' illegal conduct on Plaintiff James Okonkwo.** Plaintiff James Okonkwo worked as a college basketball player at West Virginia University from 2021 to 2023, as a college basketball player at North Carolina University from 2023 to 2024, and as a college basketball player at Akron University from 2024 to 2025.

2803.  The labor provided by Mr. Okonkwo was of great value to Defendants. And it was a significant amount of labor. Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, he often worked seven days and more than 40 hours per week under the direction of the university coaches.

2804.  Mr. Okonkwo was a highly recruited prospect out of Beckley Prep Academy in West Virginia. He was ranked number 126 in his class and received offers from many Division I schools including West Virginia University (Big 12), Rutgers (Big Ten), and others. Universities competed for his talent during the high school recruitment process and continued to compete for his talent while he was at West Virginia, North Carolina and Akron in the hopes that he would transfer to another school.

2805.  Mr. Okonkwo job as a college basketball player at West Virginia, North Carolina and Akron was essentially a full-time occupation, and an important and valuable one at that. His West Virginia team got into the NCAA tournament in 2023, his North Carolina team got into the NCAA tournament in 2024 (as a Number 1 seed), and his Akron University team got into the NCAA tournament in 2025.

2806.  In 2023 and in 2024, Mr. Okonkwo was widely recruited by Division I teams through the transfer portal before transferring, first from West Virginia and second from North Carolina.

**FOURTH AMENDED COMPLAINT**

2807.  In 2022, the Big 12 distributed $42-44 million to its member schools. Overall, West Virginia's athletic department revenue was $78 million for the 2022 fiscal year from sources such as media rights, ticket sales, donations, and other operational income. In 2024, the ACC distributed $44.8 million to its member schools. Overall, North Carolina's athletic department revenue was $165 for the 2024 fiscal year from sources such as media rights, ticket sales, donations, and other operational income.

2808.  Yet Mr. Okonkwo received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at West Virginia, North Carolina and Akron, his opportunities to receive money from third parties for his NIL was limited as a result of decades of restrictive regulations imposed and enforced by the NCAA, which also harmed him.

2809.  Mr. Okonkwo's opportunity to earn fair compensation for the immense work and all the sacrifices he made that went into being a highly skilled basketball player in one of the NCAA's elite basketball programs was limited and denied as a result of the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2810.  Defendants' conspiracy greatly harmed Mr. Okonkwo. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

2811.  **The effect of Defendants' illegal conduct on Plaintiff Yoeli Childs.**
Plaintiff Yoeli Childs worked as a college basketball player at Brigham Young University
from 2016 through 2020.

2812.  The labor provided by Mr. Childs was of great value to Defendants. And it
was a significant amount of labor. Between working out in the weight room, doing skills
training and conditioning, participating in team practices, attending film sessions,
participating in intercollegiate NCAA sanctioned games, providing community relations
services and public relations services, providing other services on behalf of the
universities, and traveling on behalf of the university, he often worked seven days and
more than 40 hours per week under the direction of the university coaches.

2813.  Before going to BYU, Mr. Childs attended Bingham High School in South
Jordan, Utah. He was highly regarded as a high school basketball recruit, ranked
number 50 nationally by ESPN. He averaged 19 points, 11 rebounds, 2.3 assists, 2.4
blocks and 1.2 steals as a senior, was a McDonalds All American nominee, played in
the Ballislife All American game, was a member of the Adidas circuit All American
camp, and participated in the NBPA top 100 camp. He received offers from Auburn,
Vanderbilt, Texas Tech, Arizona State, Oregon State, Michigan State and others.

2814.  His job as a college basketball player at BYU was essentially a full-time
occupation, and an important and valuable one at that. BYU's athletic programs,
particularly its football and men's basketball program, are among the largest, most
lucrative, well-known programs and have a long and storied history of competing on a
national level and producing many future professional athletes who go on to lucrative
careers in the NBA and NFL.

2815.  Mr. Childs played four seasons at BYU and put up stellar averages:

      a.   2016-17 (Freshman): 7.8 PPG, 8.2 RPG, 0.6 APG

      b.   2017-18 (Sophomore): 17.8 PPG, 8.6 RPG, 2.2 APG

      c.   2018-19 (Junior): 21.2 PPG, 9.7 RPG, 2.1 APG

**FOURTH AMENDED COMPLAINT**

      d.    2019-20 (Senior): 22.2 PPG, 9.0 RPG, 2.0 APG

2816.  Mr. Childs received many honors and awards while at BYU:

      a.    2018-19: All-WCC First Team

      b.    2019-20: All-WCC First Team and All-WCC Tournament

      c.    2018-19: NABC All-District 9 First Team

      d.    2019-2020: AP All-American Honorable Mention

      e.    Multiple WCC Player of the Week awards

2817.  In 2018-19, Mr. Childs also led the WCC in scoring (21.2 PPG) and was among the league's leaders in rebounds.

2818.  During Mr. Childs's time at BYU, basketball games were broadcast on a number of media outlets, and generated millions of dollars in revenue through such channels as media rights, ticket sales, donations, and other operational income.

2819.  Yet Mr. Childs received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During his basketball career at BYU, he was prohibited from earning any income or being compensated by salary or even from third parties for his NIL, which harmed him. During his four years playing basketball at BYU, Mr. Childs was the most effective player in the program, and one of the elite players in the country.

2820.  Mr. Childs's opportunities to earn fair compensation for the immense work and all the sacrifices he made that went into his being a highly skilled basketball player in one of the NCAA's elite basketball programs were denied as a result of NCAA prohibitive regulations, in spite of the millions of dollars of revenue generated by media rights, ticket sales, merchandise sales, donations and other operational income.

2821.  Defendants' conspiracy greatly harmed Mr. Childs. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received

**FOURTH AMENDED COMPLAINT**

greater remuneration for his services as a college basketball player than he received, and he would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2822. **The effect of Defendants' illegal conduct on Plaintiff Madelynne Scherr.** Plaintiff Madelynne Scherr worked as a college basketball player at the University of Oregon from 2020 to 2022, as a college basketball player at University of Kentucky from 2022 to 2024, and as a college basketball player at the Texas Christian University from 2024 through 2025.

2823. The labor provided by Ms. Scherr was of great value to Defendants. And it was a significant amount of labor.  Between working out in the weight room, doing skills training and conditioning, participating in team practices, attending film sessions, participating in intercollegiate NCAA sanctioned games, providing community relations services and public relations services, providing other services on behalf of the universities, and traveling on behalf of the university, she often worked seven days and more than 40 hours per week under the direction of the university coaches.

2824. Ms. Scherr was a consensus five-star prospect, the 19th ranked player overall in the Class of 2020 (which is, without a doubt, the most famous group of women basketball players ever), a McDonalds All-American, two-time Gatorade Player of the Year in Kentucky, named Miss Basketball in the Commonwealth of Kentucky, from Ryle High School in Union, Kentucky. In short, she won virtually every award that can be won, and would have been welcomed at virtually any college she wished to attend.

2825. In her job as a college basketball player, Ms. Scherr recorded the following statistics:

**FOURTH AMENDED COMPLAINT**

a.    Oregon (2020-21): Averaged 2.3 PPG, 1.9 RPG, and 1.6 APG.

b.    Oregon (2021-22): Averaged 4.7 PPG, 3.7 RPG, and 3.3 APG.

c.    Kentucky (2022–23): Averaged 11.6 PPG, 5.1 RPG, and 4.3 APG.

d.    Kentucky (2023–24): Averaged 12.5 PPG, 4.8 RPG and 3.4 APG.

2826.  Ms. Scherr's work at Oregon, Kentucky and TCU was essentially a full-time occupation, and an important and valuable one at that. Throughout her college career Scherr showcased her versatility and consistency, adapting to different teams and roles and always putting up effective numbers at every school where she played. She took on very challenging circumstances with aplomb, and embraced very different roles in her career, from being a lockdown defender and pass first distributor at Oregon, to being primary offensive option at Kentucky, and consistently excelled.

2827.  Based on her consistent play, Ms. Scherr continued to be recruited by other colleges. Ms. Scherr began her college career at Oregon (a Pac-12 Conference, Power Five school) in the best recruiting class in the country, as one of five McDonalds All-Americans to commit. After playing two years at Oregon, she transferred to Kentucky (an SEC Power 5 school) where, in addition to the media attention Kentucky receives as part of the powerful SEC, she personally had a large and loyal fan base.

2828.  As a result of the high-profile class at Oregon, Ms. Scherr's accomplishments at Kentucky, a Power 5 school, and a dramatically increasing national interest and fan base for women's college basketball, lucrative media rights revenue flowed to Oregon and Kentucky, and both schools also enjoyed significant revenue streams from ticket sales, merchandise sales, donations and other operational income. Both of those conferences distribute media rights payments to their members, typically

**FOURTH AMENDED COMPLAINT**

on the order of $30-40 million annually, and both schools have very large athletic
department revenue (Oregon $153M and Kentucky $159M).

2829.  Yet Ms. Scherr received none of that revenue; nor was she otherwise
compensated by Defendants for her labor other than by receiving a scholarship and
other education-related expenses. During most of her time at Oregon and Kentucky her
opportunities to receive money from third parties for her NIL was limited as a result of
decades of restrictive regulations imposed and enforced by the NCAA, which also
harmed her.

2830.  Ms. Scherr's opportunity to earn fair compensation for the immense work
and all the sacrifices she made that went into being a highly skilled basketball player at
well-known and well-funded basketball programs was limited and denied as a result of
the NCAA's prohibitive regulations, in spite of the millions of dollars of revenue
generated by media rights, ticket sales, merchandise sales, donations, and other
operational income.

2831.  Defendants' conspiracy greatly harmed Ms. Scherr. It prevented her from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, she would have received
greater remuneration for her services as a college basketball player than she received,
and she would have received money for her NIL from third parties. Absent Defendants'
agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she
would have received a competitive share of the television and other revenue being
brought in by Defendants and their member schools. Thus, Defendants' scheme directly
injured her.

2832.  **The effect of Defendants' illegal conduct on Plaintiff Sean "Jack"
Michael Allison.** Jack Allison played college football as a quarterback at the University
of Miami between 2016 and 2017 and then moved to West Virginia University where he
played from 2017 through 2020.

**FOURTH AMENDED COMPLAINT**

2833.  The Defendants greatly benefited from the contributions of Mr. Allison. Throughout the season he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

2834.  After high school Mr. Allison earned recognition as an exceptional football player. At Palmetto High School in Palmetto Florida, he showed exceptional athletic skills as the quarterback. The four-star recruit achieved rankings as the 8th best quarterback in his class and 19th best player throughout Florida. As an Elite 11 Finalist he received a prestigious title that provided crucial national exposure. His impressive recruiting resume brought him scholarship proposals from premier programs prior to his commitment to the University of Miami.

2835.  Allison sat out his entire freshman year at Miami in 2016 without participating in any games due to redshirting. The same year he forwent the opportunity to be on HBO's Ballers series, which would have amplified his media presence and marketability.

2836.  During the next academic year, Allison transferred to West Virginia University. According to NCAA transfer regulations he had to sit out the 2017 season which greatly reduced his chance to play.

2837.  During the 2018 season, Allison played backup quarterback for West Virginia and participated in seven games. He managed to complete 23 passes out of 45 attempts for a total of 352 yards and scored one touchdown during his appearances. He entered the 2018 Camping World Bowl as the starting quarterback facing Syracuse and completed 27 of 35 passes for 277 yards. His restricted time on the field did not prevent him from showing his talent and preparedness to play a significant role.

2838.  In 2019 Allison assumed increased responsibilities as a partial starter for West Virginia during his junior year. Allison's starts in regular season games that year reinforced his standing as a dependable offensive asset.

**FOURTH AMENDED COMPLAINT**

2839.  Both Miami and West Virginia belonged to major NCAA conferences during his college tenure with Miami in the ACC and West Virginia in the Big 12 while their games regularly received national coverage through networks like ESPN and Fox Sports. In 2017, the ACC distributed around $27 million to each member school. West Virginia games drew large audiences especially during important Big 12 competitions. In 2019, the Big 12 conference distributed $38.8 million to each member school. Playing in the Camping World Bowl amplified Allison's visibility because the event received comprehensive national media coverage which boosted his public recognition. In 2017, Miami's athletic department made $36 million in total revenue. In 2019, West Virginia's athletic department made $86.8 million in total revenue.

2840.  During his college career Allison could not receive payment for the use of his name, image, and likeness despite his contributions. Allison's position at two Power 5 programs that received significant media attention qualified him for major NIL opportunities if NCAA restrictions had allowed it. Allison's recruiting visibility combined with his transfer to West Virginia and his bowl game participation would have boosted his chances to obtain endorsements and sponsorships.

2841.  The defendants' unlawful restrictions caused injury to Mr. Allison by blocking his access to potential opportunities. Without legal limitations on athlete compensation Allison could have gained from NIL agreements based on his field performance and media exposure. Mr. Allison would have achieved significant NIL earnings due to his status as a nationally recruited quarterback with Power 5 experience and bowl game participation.

2842.  Jack Allison demonstrated his athletic abilities by becoming a vital player for both Miami and West Virginia football teams. Allison never received equitable financial reward for his athletic contributions despite his significant media exposure and marketing opportunities.

**FOURTH AMENDED COMPLAINT**

2843.  **The effect of Defendants' illegal conduct on Plaintiff Jimmy Bell Jr**.
Jimmy Bell Jr. played college basketball as a frontcourt player at Saint Louis University
between 2019 and 2021 then transferred to West Virginia University for the 2022-2023
season before continuing his college career at Mississippi State University between
2023 and 2024. Throughout his basketball career Mr. Bell established himself as an
adaptable defender with strong rebounding abilities which made him an indispensable
member of every team he joined.

2844.  Mr. Bell delivered valuable work which served as substantial benefit to the
Defendants. His coaches directed his career efforts as he dedicated extensive hours to
his professional development. In the basketball season he maintained a six-to-seven-
day work week which included team practices, film study, strength training, travel, and
managing academic obligations. Mr. Bell maintained his commitment to conditioning
programs and team activities while developing his skills throughout the offseason.

2845.  Mr. Bell was a valuable player on Bella Vista College Preparatory School's
basketball team. During his high school career, he averaged helped the Bears to a 37-5
record and a Grind Session national championship, which is a winter tournament
featuring the top high school programs in the country. He was a three-star recruit
according to 247Sports. During his senior year, he averaged a double-double of 11
points and 10 rebounds per game. He received interest from several universities early in
his high school career.

2846.  After finishing high school, Mr. Bell became recognized as an excellent
frontcourt player. He demonstrated physical capability as a post player which resulted in
a strong defensive reputation and excellent rebounding skills. Saint Louis University
offered him a scholarship due to his outstanding play which launched his college
basketball journey.

2847.  Mr. Bell started in 30 of 31 games during his freshman year at Saint Louis
throughout the 2019-2020 season. His position as a key frontcourt player combined with

**FOURTH AMENDED COMPLAINT**

his strong rebounding ability made him essential to his team. During his 2020-2021 season at Saint Louis, Bell continued to show his value as an essential rotation member for the Billikens before moving to West Virginia.

2848.  Bell became a full-time starter for West Virginia in 2022 and participated in every one of the team's 34 games throughout the 2022-2023 season. He developed into a top rebounder and offered essential defensive support to his team. Joining the Big 12 Conference allowed him to face elite programs which increased his visibility and market value.

2849.  During the 2023-2024 season Bell moved to Mississippi State University in the SEC and earned multiple important achievements. On December 26, 2023, he received SEC Player of the Week honors and became the MVP of the Gotham Classic while contributing significantly to Mississippi State's NCAA Tournament performance. The team's interior defense and rebounding success during the season relied heavily on his pivotal impact. His leadership and community involvement earned him a spot on both the 2023-2024 SEC Community Service Team and the SEC First-Year Academic Honor Roll.

2850.  Mr. Bell participated in 119 collegiate games during his career and started 85 of those matches. The move from the Atlantic 10 to the Big 12 followed by a transition to the SEC demonstrated how Mr. Bell continually elevated his performance across more competitive basketball leagues. His consistent starting position across various Power 5 conferences boosted his recognition and visibility in collegiate basketball.

2851.  Mr. Bell earned widespread recognition at each university he attended through his visibility as a campus athlete. The basketball program and the university celebrated his contributions through regular appearances in promotional videos and magazine campaigns along with banner displays. The inclusion of Mr. Bell in promotional content expanded his public image while augmenting his appeal to sports

**FOURTH AMENDED COMPLAINT**

marketers. All three of the universities where Mr. Bell played received significant revenue during his tenure. For example, in 2022, West Virginia's athletic department made a total of $105 million in total revenue and, in 2024, Mississippi State's athletic department made $138 million in total revenue.

2852.  Mr. Bell played spring football at both West Virginia and Mississippi State during his athletic career in basketball. His outstanding physical size and athletic skills turned him into a vital asset when playing football. Mr. Bell's participation in the regular football season was blocked by the coaching staff at both West Virginia and Mississippi State despite his potential. If Mr. Bell could have played football without institutional restrictions and NCAA rules, he would have grown his earning potential even more.

2853.  Mr. Bell faced significant limitations in accessing NIL opportunities in 2021 because unclear rules and compliance concerns restricted his participation. Mr. Bell received some NIL resources and financial awards for living expenses following the Supreme Court's 2021 decision, yet these benefits were limited in scope and consistency and coaching staff manipulated them as leverage to control his behavior and performance both on and off the court. The unclear conditions and limiting environment prevented Mr. Bell from fully utilizing his NIL value during this time.

2854.  Mr. Bell missed out on the full range of NIL benefits which should have showcased his genuine marketability as a top collegiate athlete. Had the NCAA not imposed their illegal restrictions Bell would have accessed substantial NIL opportunities because of his status as a starting player in two Power 5 conferences and his leadership reputation in multiple programs. The defendants' unlawful restrictions caused injury to Mr. Bell by blocking his access to potential opportunities. His high-profile status across multiple conferences aligned him for endorsement opportunities and team-driven partnerships along with personal branding campaigns.

2855.  Mr. Bell significantly impacted every program he joined through his exceptional defensive play, rebounding skills, and scoring from inside the paint. Bell

**FOURTH AMENDED COMPLAINT**

played a major role and maintained regular exposure on prominent platforms yet faced wrongful exclusion from financial opportunities that should have been available due to his marketability as a college athlete.

2856.  **The effect of Defendants' illegal conduct on Plaintiff Zion Bethea.** Zion Bethea worked as a college basketball player at Hofstra University from 2020 to 2022, St. Francis Brooklyn from 2022-2023, and the University of Delaware from 2023 to 2024.

2857.  The labor provided by Mr. Bethea was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

2858.  Bethea was a highly recruited prospect out of high school who possessed unique talent. He was a three-star recruit and 2020 Third Team All-State Player of the Year in the Super Essex Conference whose athleticism, defensive presence, and versatility positioned him as a sought-after player at the collegiate level. Despite receiving offers from UMass, Penn State, and Minnesota, he chose to play for Hofstra University and eventually transferred to St. Francis Brooklyn and then to the University of Delaware. His recruitment and subsequent performance in these programs provided significant value to his respective programs.

2859.  Bethea's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career, Mr. Bethea was a key contributor at Hofstra before transferring to Delaware, where he continued to develop his game and played a significant role in the backcourt.

2860.  During his freshman year at Hofstra (2020-21), he played in three games and played a season-high five minutes in second outing against Drexel.

2861.  In 2022-23, he transferred to St. Francis Brooklyn. Hofstra had a successful season, playing in 28 games and making one start while averaging 10.7

**FOURTH AMENDED COMPLAINT**

points, 1.4 assists, and 3.5 rebounds. He also led the Terriers in three-point percentage (42.2 percent) and tied for the team high in steals (35).

2862.  In 2023-24, Mr. Bethea transferred to Delaware and averaged 2.7 points, 1.3 rebounds, and 0.3 assists per game while shooting 42.5% from the field. He had season highs of five points and had two rebounds against UNCW.

2863.  In the 2023-24 season, Mr. Bethea played a pivotal role in Hofstra's backcourt, averaging 9.2 points, 3.4 rebounds, and 2.7 assists per game. His defensive presence was crucial in key conference matchups, helping Hofstra finish with a 23-12 overall record and 14-4 in conference play. The team earned another postseason berth and continued to be one of the most consistent mid-major programs in the country.

2864.  During his collegiate career, the basketball games of Hofstra and Delaware were broadcast on national television networks, including CBS Sports. Millions of people watched these basketball games on TV, and thousands attended games in person. All three programs frequently featured Mr. Bethea on their social media accounts, further increasing his visibility and marketability.

2865.  During Mr. Bethea's tenure, Hofstra, St. Francis Brooklyn, and Delaware generated substantial revenue from their basketball programs. Hofstra and Delaware were members of the Colonial Athletic Association (CAA) (now the Coastal Athletic Association), and St. Francis Brooklyn was a member of the Northeast Conference. Both conferences, along with all three schools, benefited from national TV exposure and growing NIL opportunities. However, Mr. Bethea received none of that revenue.

2866.  During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. Even when NIL compensation became available, Mr. Bethea did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a player who consistently developed and played in well-exposed conferences, his financial potential was significantly diminished due to NCAA-imposed limitations.

**FOURTH AMENDED COMPLAINT**

2867.  Defendants' conspiracy greatly harmed Mr. Bethea. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Bethea would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2868.  **The effect of Defendants' illegal conduct on Plaintiff Elijah Blades.** Elijah Blades was a college football player at Texas A&M university from 2019-2020, the University of Florida from 20202-2021, and the University at Buffalo from 2021-2022. The challenges Mr. Blades faced during his athletic career highlight the struggles athletes experienced with coaching changes and restricted NIL financial opportunities under NCAA rules before the NIL era.

2869.  Elijah was a four-star recruit who received offers to play football at multiple different universities but ultimately chose to play for Texas A&M and then Florida and the University at Buffalo. Texas A&M brought in Mr. Blades during the 2019 season when he was recognized as the top cornerback in junior college football. Mr. Blades quickly showed Texas A&M his top-notch coverage skills and his ability to compete at the highest levels within the Southeastern Conference (SEC). He played in seven games, making six starts and made two tackles, including 1.0 for a 3-yard loss in his A&M debut against Texas State. Mr. Blades' rapid rise as a coveted defensive back at Texas A&M reveals how athletes with his profile now stand to earn significant NIL contracts because of their potential performance and market visibility.

2870.  During a Texas A&M team practice, Mr. Blades suffered a hamstring tear injury. His coaches and teammates left him alone on the practice field because they were disappointed with his perceived ineffective play after he injured himself.

**FOURTH AMENDED COMPLAINT**

Abandoned, Mr. Blades endured hobbling 800 yards through rain and mud to the sports facility without any apology from the university, coaching staff or teammates, even after they realized the significance of his injury. The incident illustrates how athletes operated in a harsh system that demanded peak performance yet were offered only limited and controlling rewards.

2871.  Looking for a better environment the talented Mr. Blades transferred to the University of Florida in 2020. Despite his incredible talent, coaching staff hindered his chances to play were limited to only three games. When he expressed frustration at his unmet expectations from the promises of his recruitment, Mr. Blades was released from the team. Mr. Blades' career disruption and the absence of NIL frameworks at the time hindered his capability to maximize his market value for financial gains. The University of Florida stands with Texas A&M as two of the leading NIL collectives in America and current defensive backs with comparable profiles possess significant NIL earnings.

2872.  In 2021, Mr. Blades transferred to the University at Buffalo in the Mid-American Conference (MAC) where he completed his college football career in 2022. Mr. Blades functioned at a lower level but continued to demonstrate talent as a defensive back while his experience with Power 5 and Group of 5 teams positioned him to gain from regional NIL agreements. He appeared in eight games and made three starts, with 27 tackles, 1.5 tackles for loss, and four pass breakups on the season. His involvement in three various conferences allowed him to demonstrate his abilities across key markets such as Texas, Florida, and New York. A well-defined direction would have allowed these location changes to open substantial NIL prospects in advanced markets.

2873.  The visibility of Mr. Blades' public image increased when he became part of campus promotional campaigns that combined team media content with visual displays at athletic venues and targeted team marketing initiatives. NCAA rules along

**FOURTH AMENDED COMPLAINT**

with institutional regulations prevented him from monetizing his platform during his crucial eligibility period.

2874.  All three schools made significant revenue during Mr. Blades' tenure. In 2020, Texas A&M's athletic department made over $161.8 million in total revenue. In 2021, Florida's made over $190.4 million in total revenue. And in 2022, the University at Buffalo made over $40.1 million. Mr. Blades received none of that revenue.

2875.  Mr. Blades used social media to consistently engage with fans and recruiting circles which resulted in amplified recognition throughout the football community during his career period. If the regulations had allowed it his social engagement would have enhanced his NIL opportunities.

2876.  Mr. Blades's NIL potential was limited because the early NIL landscape presented uncharted situations which caused universities and compliance offices to operate under uncertainty. After the 2021 Supreme Court decision made available some financial resources the results were limited and inconsistent which allowed coaching staff to manage athlete performance and behavior through this access. The unpredictable environment during his college career prevented Mr. Blades from establishing reliable NIL contracts.

2877.  Mr. Blades story demonstrates how the NCAA and conferences injured former athletes by creating organizational barriers by participating in restrictive practices that limited athletes from turning their abilities and fame into significant financial rewards. The defendants' unlawful restrictions caused injury to Mr. Blades by blocking his access to potential opportunities. Mr. Blades's placement at high level programs coupled with his high transfer value created earning potential that athletes today are now benefiting from in the new NIL landscape.

2878.  **The effect of Defendants' illegal conduct on Plaintiff Damuzhea "Bubba" Bolden.** Damuzhea "Bubba" Bolden played collegiate football. at the University of Southern California (USC) from 2017 to 2018 and the University of Miami

**FOURTH AMENDED COMPLAINT**

from 2019 to 2021. Over his collegiate career, Bolden established himself as a dominant presence, earning recognition as one of the top safeties in both the Pac-12 and Atlantic Coast Conference (ACC).

2879.  Mr. Bolden dedicated extensive hours each week to his sport. Bolden committed six to seven days per week to practices, film study, conditioning, and travel obligations, balancing these with his academic requirements. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

2880.  Bolden entered college as a highly regarded four-star recruit from Bishop Gorman High School in Las Vegas, Nevada. A top safety in the 2017 class, Bolden's combination of size, athleticism, and football intelligence allowed him to make an early impact. He was selected to the 2016 First Team Parade All-American, the Prep Star All-American Dream Team, and Max Preps All-American first team during high school. He was also named the USA Today All-Nevada Defensive Player of the Year. Despite receiving offers from multiple universities, Mr. Bolden decided to play for USC. Following his high-profile transfer to Miami in 2019, Bolden became a defensive leader, earning Second-Team All-ACC honors in 2020 and being named a semifinalist for the prestigious Jim Thorpe Award, recognizing the nation's top safety.

2881.  In the 2018 season, he played 14 games and totaled 8 tackles with 1 assist. After transferring to Miami in 2019, he finished an injury-shortened first season with 11 tackles (nine solo), one interception, and one forced fumble.

2882.  In the 2020 season, Bolden led Miami's defense with 74 total tackles, 6.5 tackles for loss, one sack, one interception, and four forced fumbles. He twice earned ACC Defensive Back of the Week honors and was known for his hard-hitting style and ability to deliver game-changing plays. Bolden's performances placed him in primetime matchups on ESPN, CBS Sports, and the ACC Network, boosting his exposure and marketability.

**FOURTH AMENDED COMPLAINT**

2883.  Off the field, Bolden's role as a team captain demonstrated his leadership and influence within the Miami program. He was one of only three players selected to represent Miami at the 2021 ACC Media Days, reflecting his status as a respected leader. Additionally, Bolden was prominently featured in team promotional materials, including Miami's iconic Turnover Chain campaign, which became a national sensation.

2884.  Both USC and Miami's athletic departments made significant revenue during Mr. Bolden's tenure. In 2018, USC made over $116.9 million in total revenue. In 2021, Miami also made millions of dollars in revenue. Mr. Bolden received none of this revenue.

2885.  Even after the Supreme Court's ruling in 2021 due to the lack of clarity surrounding NIL policies and the conference's and university's failure to implement clear processes and structures, Bolden was unable to earn from his NIL during the early stages of the NIL era. His role as a standout defensive leader in Power Five football and extensive media exposure, would have positioned him for endorsement deals and brand partnerships had NIL rights been available.

2886.  Bolden's strong social media presence, which included over 58,000 Instagram followers by his senior year, further enhanced his marketability. His defensive prowess, leadership, and media presence aligned him with other prominent safeties who leveraged their visibility for NIL opportunities.

2887.  Bolden's on-field impact extended to community engagement. As a key figure in Miami's defensive unit, his leadership was instrumental in maintaining team cohesion during challenging periods, further solidifying his reputation as a respected figure within the program.

2888.  In sum, Damuzhea "Bubba" Bolden's role as a top defensive back, respected team leader, and social media figure positioned him as a prime candidate for NIL opportunities. His inability to capitalize on his achievements due to restrictive NCAA policies underscores the financial limitations placed on athletes in the pre-NIL era and

**FOURTH AMENDED COMPLAINT**

highlights the need for compensatory consideration. The defendants' unlawful

restrictions caused injury to Mr. Bolden by blocking his access to potential opportunities.

2889. **The effect of Defendants' illegal conduct on Plaintiff Trevon**

**Bradford.** During his time at Oregon State University from 2016 to 2021 Trevon

Bradford evolved into a top performer among Pac-12 Conference wide receivers.

Bradford entered college with strong recruiting credentials as a three-star wide receiver

ranked 6th recruit in the state in 2016 before showing continuous improvement

throughout his college career.

2890. Bradford showed his dedication to football through his rigorous weekly

routine which comprised six to seven days of practices, film study, conditioning and

travel commitments while managing his academic work. Through his dedicated

preparation work he became an essential offensive player for the Beavers.

2891. Bradford showed consistent field performance during his six-year tenure at

Oregon State. In his redshirt freshman year during 2017 he registered five catches for

60 yards and a touchdown. In 2017, he appeared in 11 games, making 2 starts. During

the 2018 season he achieved 56 catches for 649 yards and three touchdowns which led

to him receiving All-Pac-12 Honorable Mention. In 2019, he missed the first seven

games of the season due to injury and played four total, redshirting. In 2020, he played

in five games, making four starts, making Fourth Team preseason All-Pac-12. In 2021

when he achieved 42 receptions totaling 631 yards and five touchdowns that resulted in

preseason Fourth Team All-Pac-12 from both Pro Football Focus and Phil Steele.

2892. Oregon State's athletic department made significant revenue during Mr.

Bradford's tenure for over $83.4 million in total revenue in 2021. Mr. Bradford received

none of that revenue.

2893. The NCAA's unlawful restrictions prevented Bradford from benefiting

financially through NIL from his market value during his 2016-2020 period despite his

strong athletic performance and leadership qualities. The Supreme Court's 2021

**FOURTH AMENDED COMPLAINT**

decision removed previous limitations but continuous ambiguity around NIL regulations and the fear of compliance breaches resulted in restrictive practices that impeded Bradford from obtaining NIL opportunities in his last season of 2021.

2894.  Bradford's long-standing role as a starting team captain alongside his robust performance in a significant conference made him a prime target for NIL sponsorships and endorsements due to his steady output and presence in Pac-12 media coverage. The outdated NCAA rules that stopped athletes from earning money from their sports achievements and public recognition created an unfair situation that prevented him from taking full advantage of his marketability opportunities. The defendants' unlawful restrictions caused injury to Mr. Bradford by blocking his access to potential opportunities.

2895.  **The effect of Defendants' illegal conduct on Plaintiff Tevin Lavell Broyles**. Plaintiff Tevin Lavell Broyles worked as a college basketball player at the University of New Orleans from 2013-2017. The labor provided by Mr. Broyles was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

2896.  Mr. Broyles was a highly recruited prospect out of high school who possessed unique talent. He attended Gautier High School in Gautier, MS, where he helped lead the Gators to a combined 51-40 overall record, an 11-11 mark in District 7-5A action and a pair of trips to the state playoffs. He was named first-team all-district in each of his final two prep seasons and as a senior was tabbed All-South Mississippi by the Biloxi Sun-Herald. He claimed a spot on the Region All-Tournament Team after averaging 18.7 points, 9.8 rebounds and 4.2 assists per game and was voted Offensive Player of the Year, averaged 14.1 points, 10.4 rebounds and 5.0 assists per game in route to earning GHS Offensive Player of the Year recognition.

**FOURTH AMENDED COMPLAINT**

2897.  Mr. Broyles' job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his collegiate basketball career, Mr. Broyles was one of the most impactful players for the University of New Orleans.

2898.  In the 2016-2017 season, Broyles was a key contributor to the University of New Orleans basketball program, playing a significant role in the team's Southland Conference Championship run and NCAA Tournament appearance. As a defensive specialist, he was instrumental in shutting down opponents' top perimeter players while also contributing offensively. His efforts helped the Privateers secure their first NCAA Tournament berth in over 20 years. He started 31 of the 32 games during the 2016-17 season, averaging 7.8 points, 2.9 rebounds, and 2.5 assists per game. He played a critical role in the Southland Conference Tournament Championship game, helping secure the team's bid to March Madness. In the NCAA Tournament, he played key minutes in the First Four, contributing on both ends of the floor.

2899.  During his collegiate career, the basketball games of the University of New Orleans, especially during its NCAA Tournament run were broadcast on national television networks, including ESPN and CBS Sports. Millions of people watched New Orleans basketball games on TV, and thousands attended in person. The University of New Orleans frequently featured Mr. Broyles on its social media accounts, highlighting his defensive dominance and contributions to the team's championship run, further boosting game attendance and fan engagement. The program also generated millions of dollars in revenue through ticket sales, media rights, and conference distributions.

2900.  Mr. Broyles received none of that revenue. During his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. As a multi-year starter and one of the top perimeter defenders in the Southland Conference, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

2901.  Defendants' conspiracy greatly harmed Mr. Broyles. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, the Defendants' scheme directly injured him.

2902.  **The effect of Defendants' illegal conduct on Plaintiff Edgar Burrola.** Edgar Burrola worked as a college football player at the University of Arizona from 2017 to 2020.

2903.  The labor provided by Burrola was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaching staff at the University of Arizona.

2904.  Burrola was a rotational offensive lineman and eventual starter in the Pac-12 Conference, where his size, strength, and consistency in run blocking made him a valuable asset to the Wildcats' offensive front. His ability to protect the quarterback and facilitate the running game positioned him as a key player, particularly as a starting right tackle. Despite these contributions, NCAA regulations at the time prohibited him from monetizing his NIL, preventing him from accessing financial opportunities that would have been available under current policies.

2905.  When Burrola graduated from Desert Pines High School in Las Vegas in 2017 he was a three-year letterwinner as a defensive and offensive lineman and also earned two letters in wrestling. He was a Scholar-Athlete Award winner while qualifying for the state wrestling tournament in the heavyweight division. He was an all-Conference selection and was rated as a three-star recruit by 247sports.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

2906.  Burrola's job as a college football player was essentially a full-time one, and an important and valuable one at that. He played an integral role in Arizona's offensive schemes, developing into a critical piece of the Wildcats' blocking unit.

2907.  During his freshman season in 2018, Burrola appeared in six games, showing promise as a future contributor on the offensive line. The Wildcats finished the season with a 5-7 record under head coach Kevin Sumlin, narrowly missing out on bowl eligibility. The team's offense, led by dynamic quarterback Khalil Tate, averaged 31.3 points per game, demonstrating the effectiveness of the offensive scheme that Burrola helped support.

2908.  In his sophomore season in 2019, Burrola started six games and became a key figure in the team's offensive line rotation, demonstrating reliability in pass protection and run blocking. Arizona's offense remained potent, ranking among the top half of the Pac-12 in total yards per game. However, the Wildcats struggled defensively and finished with a 4-8 record, failing to reach a bowl game. Despite the team's struggles, Burrola's presence on the offensive line contributed to a unit that consistently provided stability for the run game and pass protection.

2909.  In 2020, Burrola opted out of the season due to COVID-19 disruptions but remained an integral part of the program. That year, Arizona played a shortened season and finished 0-5, marking one of the most challenging periods in the program's history. Had Burrola been able to play in a full-length season, his experience and physicality could have contributed to stabilizing an offensive line that faced significant challenges in a tumultuous year.

2910.  During his collegiate career, Arizona football games were broadcast on national television networks, including ESPN, Fox Sports, and the Pac-12 Network. Millions of people watched Arizona's games, and the team generated substantial revenue from television contracts, ticket sales, and merchandise. Burrola, as a

**FOURTH AMENDED COMPLAINT**

contributing player on the offensive line, was frequently featured in team promotions and media coverage, further enhancing his marketability.

2911.  Despite his substantial contributions, Burrola was denied the opportunity to monetize his NIL due to NCAA-imposed restrictions. Offensive linemen, particularly those with starting experience in a Power Five conference, have marketability through regional and local sponsorships, but he was never given the chance to capitalize on such opportunities.

2912.  The University of Arizona's football program benefited financially from his performance, as the Pac-12 secured lucrative media rights deals and distributed millions of dollars in revenue to its member institutions. However, Burrola received none of the financial benefits his play helped generate.

2913.  During his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. As a Power Five offensive lineman with starting experience, his financial potential was significantly diminished due to NCAA-imposed limitations.

2914.  Defendants' conspiracy greatly harmed Burrola. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Burrola would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2915.  **The effect of Defendants' illegal conduct on Plaintiff Stephen Carr.** Stephen Carr represented the University of Southern California (USC) as a collegiate football player from 2017 until 2021 before playing for Indiana University in 2021. Carr

**FOURTH AMENDED COMPLAINT**

started college as a five-star recruit who stood among America's premier running backs which set high expectations for his performance.

2916.  As a running back at Summit High School in Fontana, California, Mr. Carr was awarded 2016 Prep Star All-American Dream Team, Max Preps All-American first team, Tacoma News Tribune Western 100, USA Today All-California first team, Cal-Hi Sports All-State second team, Cal-Hi Sports All-State Medium Schools first team, All-CIF Division 6, Orange County Register Fab 15 first team and Riverside Press-Enterprise All-Area second team. In his senior season alone (2016), he ran for 2,123 yards on 233 carries (9.1 avg) with 31 TDs, plus caught 20 passes for 466 yards (23.3 avg) with 5 TDs, returned 5 kickoffs for 170 yards (34.0 avg) and 4 punts for 83 yards (20.8 avg) and made 12 tackles

2917.  In college, Mr. Carr demonstrated his football commitment by maintaining a regular schedule where he worked six to seven days per week on practices, film study, conditioning sessions and travel while managing his schoolwork. His rigorous schedule showcased his dedication to improving as an athlete and achieving his academic objectives.

2918.  During his freshman season at USC in 2017, Mr. Carr received an All-Pac-12 Honorable Mention after rushing 363 yards and scoring three touchdowns. During his time at USC, Mr. Carr played crucial offensive roles in Pac-12 games and national TV matches. Mr. Carr managed to achieve 1,329 rushing yards and 12 touchdowns throughout his four-season tenure at USC despite injuries that affected his playing time.

2919.  Mr. Carr started playing for Indiana University in 2021 as their primary running back. By amassing 600 rushing yards and six touchdowns he established himself as a top player in the Big Ten conference.

2920.  Both USC and Indiana made substantial revenue during Mr. Carr's tenure. In 2021, USC's athletic department made millions of dollars in total revenue and, in the

**FOURTH AMENDED COMPLAINT**

same year, Indiana's athletic department made $166.7 in total revenue. Mr. Carr received none of this revenue.

2921.  Mr. Carr's inability to generate NIL income between 2017 and 2020 stemmed from unlawful NCAA rules that blocked athletes from utilizing their market value despite his achievements as a top recruit and Power Five player in both the Pac-12 and Big Ten. The Supreme Court lifted the NCAA restrictions through their 2021 decision but unclear NIL guidelines together with widespread fear of compliance violations caused players, programs, and conferences to adopt restrictive practices which further limited Mr. Carr's earning potential at Indiana.

2922.  Mr. Carr emerged as an optimal candidate for NIL sponsorships and marketing opportunities because of his noteworthy recruiting background and his achievements at two major programs combined with his consistent exposure on ESPN, FOX Sports, and the Big Ten Network. The outdated NCAA policies prevented Mr. Carr from monetizing available endorsement possibilities which clearly demonstrates the unfairness of these regulations. Thus, the Defendants' scheme directly injured him.

2923.  **The effect of Defendants' illegal conduct on Plaintiff Amari Catchings.** Amari Catchings played a vital role as an offensive lineman from 2017 through 2021 at Jackson State University, a proud HBCU (Historically Black College and Universities).

2924.  As a high school athlete, Mr. Catchings was a two-year letterman at Murrah High School before transferring his senior year to Callaway High School in Jackson, MS.

2925.  In the 2017 season, Mr. Catchings redshirted while developing his skills and adjusting to the collegiate level. Although his on-field contributions were limited, his presence during this period reflected his growing potential as a future starter on Jackson State's offensive line.

**FOURTH AMENDED COMPLAINT**

2926.  After redshirting his 2017 season and not playing in 2018, Mr. Catchings became a key part of the offensive line in 2019, providing stability that helped Jackson State rank among the best offenses in the conference. He appeared in 12 games and helped produce a Tiger offense that scored 26.08 points per game. His consistent presence contributed to improved pass protection and enhanced the team's rushing success.

2927.  In 2021, Jackson State's run-heavy offensive strategy limited Mr. Catchings' statistics, but his role as a blocking tight end contributed greatly to their offensive success. His leadership and ability to execute in high-pressure situations played an important role in the team's performance.

2928.  Throughout his career, Mr. Catchings dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His dedication extended beyond scheduled practices, often sacrificing personal time to improve his craft and master his role on the field.

2929.  Jackson State University made substantial revenue during Mr. Catchings' tenure. In 2021, the school's athletic department made over $12.8 million in total revenue. Mr. Catchings' did not receive any of this revenue.

2930.  Amari Catchings' career exemplifies perseverance, dedication, and impact. Despite his success, Mr. Catchings played during a period when NCAA restrictions provided no window for players to earn from their NIL, limiting his financial opportunities despite his significant contributions on the field. Thus, the Defendants' scheme directly injured him.

2931.  **The effect of Defendants' illegal conduct on Plaintiff Jacob Cox.** Jacob Cox played offensive line at the University of Central Arkansas (UCA) from 2022-2023 after transferring from Mississippi Gulf Coast University (JUCO).

2932.  Mr. Cox was a 3-year letterman at Amory High School in Amory, MS under the leadership of Coach Allen Glenn. As a senior, Cox was named to the

**FOURTH AMENDED COMPLAINT**

Mississippi Association of Coaches Class 3A All-State First Team and was selected to play in the Bernard Blackwell All-Star Game.

2933.  Cox was a solid contributor on both the offensive and defensive lines, providing depth and stability for the team. His role extended beyond game-day performance, as he maintained a strong presence in practices and team preparations.

2934.  As a freshman at Central Arkansas, Mr. Cox played in 5 games and earned Distinguished Academic All-MACCC honors.

2935.  In the 2022 season, Cox played in nine games as a defensive lineman, offering valuable depth on the line. While his statistical impact was limited, his ability to contribute in key rotational moments ensured stability for UCA's defensive unit.

2936.  The University of Central Arkansas has steadily gained media exposure through regular appearances on regional networks, ESPN+, and other digital platforms. As a member of the ASUN Conference, UCA's games frequently draw coverage, providing athletes like Cox valuable visibility, with ESPN+ and regional network broadcasts typically attracting audiences ranging from several thousand to over 100,000 viewers, depending on the matchup and timing. This exposure provided Cox valuable visibility despite playing in a smaller NIL market.

2937.  Throughout his career, Cox dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His dedication often meant sacrificing personal time to improve his craft and master his role on the field.

2938.  Central Arkansas and Mississippi Gulf Coast received substantial revenue during Mr. Cox's tenure. In 2022, Central Arkansas' athletic department made over $17.5 million in total revenue. In 2021, Mississippi Gulf Coast also made millions of dollars in total revenue. Mr. Cox received none of that revenue.

2939.  Despite his contributions, Cox has navigated a collegiate career during a period in which the NCAA's shifting NIL policies have created an environment where

**FOURTH AMENDED COMPLAINT**

institutions and athletes have faced inconsistencies in a slowly evolving landscape,
specifically as an athlete at a non-power 5 school. As a result, the actions of the
defendants have caused injury to him.

2940.  **The effect of Defendants' illegal conduct on Plaintiff Montell Cozart.**
Montell Cozart worked as a college football player at the University of Kansas from
2013 to 2016 and at Boise State University in 2017.

2941.  The labor provided by Cozart was of great value to Defendants. During the
season, he worked at least six days a week and often more than 40 hours per week.
Even during the offseason, he worked a significant number of hours under the direction
of the coaches at both universities.

2942.  Cozart was a dual-threat quarterback whose athleticism and versatility
allowed him to excel at two different FBS programs. His ability to impact the game both
as a passer and a rusher made him a valuable asset to both Kansas and Boise State's
football programs. Despite his contributions, NCAA regulations at the time prohibited
him from monetizing his NIL, significantly limiting his financial opportunities.

2943.  Cozart's job as a college football player was essentially a full-time one,
and an important and valuable one at that. He played an instrumental role at both
Kansas and Boise State, helping drive the performance and visibility of each program.

2944.  Cozart earned first-team all-state honors after leading Bishop Miege High
School to the Kansas Class 5A State Championship game in 2012. As a senior, he
threw for 2,759 yards and 25 touchdowns under head coach Jon Holmes. Rated as a
three-star quarterback by Rivals.com, he was recruited by multiple programs, ultimately
choosing Kansas over offers from Indiana, Kansas State, Minnesota, Northern Illinois,
and West Virginia.

2945.  At Kansas, Cozart's career was affected by injuries, including a season-
ending injury four games into his junior year, for which the NCAA granted him an extra
year of eligibility. His most productive season came in his fourth year with the Jayhawks

**FOURTH AMENDED COMPLAINT**

(2016), where he completed 112 of 190 pass attempts for 1,075 yards, 7 touchdowns, and 9 interceptions. Despite Kansas' struggles as a program during this period, Cozart's leadership and dual-threat capabilities kept the team competitive in multiple games.

2946.  On February 21, 2017, Cozart announced his decision to leave Kansas as a graduate transfer, ultimately committing to Boise State on May 4, 2017. At Boise State, Cozart played a critical role in the Broncos' offense. In the 2017 season, he played in 14 games, throwing for 754 yards and 10 touchdowns while rushing for 361 yards and 4 touchdowns. His contributions helped Boise State secure the Mountain West Championship, reinforcing the program's dominance in the conference.

2947.  During his collegiate career, Mr. Cozart played in multiple nationally televised games, particularly during his time at Boise State, where the Broncos frequently competed in prime-time matchups. His presence on the field was instrumental in Boise State's ability to generate revenue through television rights, ticket sales, and merchandise. The heightened visibility of the program during his tenure further emphasized the economic impact of his performances.

2948.  Despite the millions of dollars of revenue generated by both Kansas and Boise State, Mr. Cozart did not receive any compensation due to NCAA-imposed restrictions. At the time, FBS quarterbacks—especially dual-threat playmakers like Mr. Cozart—had significant marketability potential through endorsements, sponsorships, and social media deals. Yet, he was denied access to these financial benefits.

2949.  If Mr. Cozart had played in the NIL era, his ability to lead a Mountain West Championship team and serve as a starting quarterback at two FBS programs would have made him an attractive figure for NIL opportunities. Local and national businesses seeking athlete endorsements would have likely pursued deals with Mr. Cozart, given his visibility and impact on the field.

2950.  Defendants' conspiracy greatly harmed Mr. Cozart. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

Case No. 1:23-cv-03076-CNS-STV    Document 163    filed 06/06/25    USDC Colorado
pg 697 of 841


market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Cozart would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2951. **The effect of Defendants' illegal conduct on Plaintiff Hannah Crofut.** Hannah Crofut worked as a college athlete at Bryant University, competing in both soccer and softball from 2013 to 2018. The labor provided by Crofut was of great value to Defendants. During the season, she worked at least six days a week and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at Bryant University.

2952. At Williamsville North High School, Crofut was a four-year starting midfielder who helped the Spartans to three consecutive Erie County Interscholastic Conference titles and two Section 6 Championships. She earned first-team All-State honors as a senior and was an All-American nominee. Her stellar performance earned her an offer from Bryant University.

2953. Crofut was a standout two-sport Division I athlete, excelling in both soccer and softball. Beyond her athletic contributions, she was the face of Bryant Athletics, extensively featured in the school's branding, recruitment materials, alumni catalogs, social media campaigns, and even marketing efforts for sports she did not participate in. Despite her significant marketability and institutional use of her NIL, NCAA restrictions prevented her from benefiting financially. Additionally, Crofut played on a semi-professional soccer team but was prohibited from monetizing her status as a college athlete, further limiting her earning potential.

2954. Crofut's job as a college athlete was essentially a full-time one, and an important and valuable one at that. She played an integral role in the success and

**FOURTH AMENDED COMPLAINT**

visibility of both the Bryant University soccer and softball programs. In soccer, she was named to the All-NEC Rookie Team and earned First Team All-Conference honors. The following year, she continued her dominance on the field, earning NEC First Team and NEC Academic Honors. Her performance in 2017 remained strong, where she played a key role in her team's success, scoring the go-ahead goal against Quinnipiac and starting all 18 games in her senior year. Her exceptional talent and leadership earned her NEC Academic Honor Roll.

2955.  In 2018, Crofut appeared in nine games in her first season of collegiate softball after a four-year soccer career. She walked twice in six plate appearances, both coming in the May 5 win over Central Connecticut. She also scored a run in the season finale against the Blue Devils and was named to the NEC Academic Honor Roll.

2956.  As a dual-sport athlete, Crofut transitioned to softball while still being actively marketed as a representative of Bryant soccer. Her ability to excel in multiple sports only heightened her value to the university, reinforcing her status as one of Bryant's most prominent athletes.

2957.  During Crofut's tenure, Bryant University made substantial revenue. In 2018, the university's athletic department made millions of dollars in total revenue. Crofut received none of this revenue.

2958.  Crofut's visibility extended beyond the field, as she was featured in numerous promotional materials produced by Bryant University. Her likeness was utilized in recruitment campaigns, alumni engagement initiatives, and social media advertisements that promoted the university's athletic programs. Even after her graduation in 2018, Bryant University continued to use her image for marketing purposes, further demonstrating her enduring marketability.

2959.  As media rights and streaming coverage expanded for NEC sports, athletes like Crofut gained additional exposure. At this time, the full extent of her national television appearances is still being evaluated, but her consistent presence in

**FOURTH AMENDED COMPLAINT**

university marketing materials and on conference platforms positioned her as a marketable athlete within the collegiate sports landscape. Despite this, she was unable to capitalize on her own name, image, and likeness due to the NCAA's restrictions, which prohibited her from securing any financial compensation for her contributions.

2960.  In addition to her collegiate career, Crofut played semi-professional soccer from 2013 to 2018. However, NCAA rules barred her from monetizing this opportunity, effectively preventing her from earning compensation despite competing at a high level. Had NIL opportunities been available during her playing years, she would have been an ideal candidate for local sponsorships and endorsement deals, given her reputation as a high-performing, multi-sport athlete with strong academic credentials.

2961.  If Crofut had played in the NIL era, her accomplishments in both soccer and softball, along with her extensive marketing presence, would have made her a strong candidate for financial opportunities. The NCAA's restrictions, however, prevented her from benefiting financially from her athletic performance, even as Bryant University continued to use her NIL in promotional materials for years after her graduation.

2962.  Defendants' conspiracy greatly harmed Crofut. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college athlete. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Crofut would have received a competitive share of the financial opportunities available to athletes with her level of exposure and success. Thus, Defendants' scheme directly injured her.

2963.  **The effect of Defendants' illegal conduct on Plaintiff Carter "Jakob" Cunningham**. Carter "Jakob" Cunningham played college football as an offensive lineman at Jackson State University from 2020 to 2022. The labor provided by Mr.

**FOURTH AMENDED COMPLAINT**

Cunningham was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaching staff.

2964.  Mr. Cunningham transferred to Jackson State University from Itawamba Community College in Fulton, MS, where he was recruited as a 3-Year letterman, Amory 1st Team All District, 3rd team all-state junior year, and Academic All-American at ICC from Louisville High School in Louisville, MS. Joining the program during a transformational period for HBCU football, his time at Jackson State coincided with the arrival of Deion Sanders as head coach, an event that significantly elevated the program's visibility and reshaped its national perception. Under Sanders' leadership, Jackson State saw an influx of media attention, sponsorships, and national coverage, with appearances on ESPN, College GameDay, and other major sports networks. Despite this unprecedented level of exposure, Mr. Cunningham, like all players at the time, were unable to capitalize on his name, image, and likeness due to the NCAA's restrictive policies.

2965.  During the 2021 spring season, Mr. Cunningham played in three games as a freshman offensive lineman. His role on the team was limited, but he contributed to the program's foundation under its new leadership. His early collegiate career, however, was marked by the same financial restrictions that affected all student-athletes prior to NIL reform. The heightened visibility of Jackson State football in this era provided an opportunity for branding and marketing value, yet he was not allowed to benefit from it in any meaningful way.

2966.  As a key part of Jackson State's blocking unit, he played an integral role in protecting the quarterback and creating rushing lanes, contributing to the team's success on the field. The program had continued its rise in prominence, with increased media coverage, high-profile matchups, and a surge in national recognition. While his value as an athlete grew alongside the program's success, he remained unable to

**FOURTH AMENDED COMPLAINT**

receive financial compensation for his contributions. The exposure generated by Jackson State's new status as a media-favored HBCU program brought increased revenues to the school, its conference, and sponsors, but the athletes who made that success possible were still left out of the financial benefits.

2967.  Throughout his collegiate career, Jackson State football games were broadcast on national networks, creating significant exposure for the program and its players. The university frequently leveraged its athletes' performances in promotional materials, social media content, and branding initiatives, all of which contributed to the school's financial success. However, despite his presence in this growing environment, Mr. Cunningham was unable to capitalize on the program's increased marketability due to outdated NCAA policies.

2968.  In 2022, Jackson State's athletic department received over $12.8 million in total revenue. Mr. Cunningham received none of this revenue.

2969.  The NCAA's restrictions not only prevented Mr. Cunningham from earning compensation during his playing years but also denied him the financial security that could have helped him further develop his career. Had he been able to access NIL revenue, he could have secured additional resources for training, healthcare, and long-term athletic development. Instead, he was placed in the same restrictive system that limited athletes' ability to benefit from their labor while their schools and conferences reaped the rewards.

2970.  Defendants' conspiracy greatly harmed Mr. Cunningham. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television

**FOURTH AMENDED COMPLAINT**

and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

2971.  **The effect of Defendants' illegal conduct on Plaintiff Jayden Curry.** Jayden Curry played college football as a defensive back at the University of South Florida from 2019 to 2023 before transferring to the University of Maine for the 2024 season. Throughout his collegiate career, Curry committed himself to the rigorous demands of Division I football, balancing intensive training, academic requirements, and game preparation while dedicating well over forty hours per week to his role as a student-athlete. His steady development saw him transition from a reserve player to a key contributor in the secondary, particularly during his junior season. Despite his increasing role and performance on the field, Curry was unable to fully capitalize on his name, image, and likeness due to the inconsistent and unstructured rollout of NIL opportunities, which were heavily influenced by university compliance concerns, undefined regulations, and institutional fears of NCAA repercussions.

2972.  Mr. Curry was a highly regarded recruit coming out of IMG in Bradenton, FL, earning a three-star rating and receiving a Scout Grade of 70. 247Sports also ranked him as No. 148 in his position of cornerback, as well as the No. 211 player in the state and No. 1565 nationally, demonstrating strong potential as a defensive back. His combination of speed, physicality, and defensive instincts attracted attention from multiple collegiate programs before he committed to the University of South Florida. His ability to read the game, deliver impactful tackles, and force turnovers made him a promising addition to USF's roster.

2973.  During his freshman year, he saw action in one game. In 2020, Curry played in all nine games and saw significant action on special teams. He posted seven tackles on the year. In 2022, he saw action in 12 games, making six starts, and posting 40 tackles to go with two fumble recoveries and an interception. During his senior year

**FOURTH AMENDED COMPLAINT**

in 2023, he saw action in 11 games, making two starts, and posting 14 tackles, 0.5 TFL, and one pass break-up.

2974.  After transferring to Maine in 2023, Curry played in 10 games.

2975.  Curry's development and on-field production earned him recognition within the American Athletic Conference. His 2022 season, in which he recorded forty tackles, two fumble recoveries, and an interception, demonstrated his ability to make plays in high-pressure situations. As a starting defensive back, he played a crucial role in his team's defensive efforts, but despite his contributions, he was unable to fully capitalize on NIL opportunities due to the disorganized and ambiguous nature of the NCAA's NIL policy implementation. With no clear national standard and an evolving legal landscape, many universities—including USF—operated cautiously, leading to limited and inconsistent compensation structures. Universities and athletic departments feared running afoul of NCAA compliance regulations, which resulted in athletes like Curry receiving inconsistent opportunities for financial compensation, often based on internal program politics rather than merit or performance.

2976.  Beyond his athletic achievements, Curry's performances contributed to the overall visibility and financial success of the University of South Florida's football program. USF games were regularly broadcast within the American Athletic Conference, including appearances on ESPN networks and other regional sports platforms, providing exposure for Curry and his teammates. The university actively utilized its athletes in social media promotions, marketing campaigns, and donor engagement efforts, leveraging player success to increase fan engagement, ticket sales, and media coverage. While Curry's efforts on the field helped elevate the program's visibility, he remained unable to directly benefit from the millions of dollars of revenue his contributions helped generate.

2977.  Despite the financial gains that his school and conference generated, Curry's NIL earnings were limited due to "uncharted waters," university compliance

**FOURTH AMENDED COMPLAINT**

fears, and a lack of structured collective processes. Payments to athletes remained inconsistent and were frequently used as leverage by coaching staff to manipulate performance and behavior, creating an environment where NIL compensation was not equitably distributed. The absence of a structured system meant that athletes were left without clear guidance or meaningful earning opportunities, further disadvantaging players like Curry, whose financial potential was stifled by the uncertainty surrounding NIL policies.

2978.  Curry's career trajectory exemplifies the broader inequities within the NCAA's handling of NIL compensation. His steady rise from a reserve defensive back to a key contributor demonstrated his ability to adapt, improve, and provide meaningful value to his team. However, because of NCAA-imposed restrictions and the delayed, fractured implementation of NIL rights, he was unable to fully monetize his athletic performance. Had the marketplace been truly open and structured to support athletes, his earning potential would have been significantly higher, particularly following his breakout 2022 season. His case serves as a clear example of how NCAA regulations and institutional hesitation unfairly restricted college athletes' ability to benefit from their own talent, visibility, and marketability, further highlighting the substantial revenue he was unjustly denied.

2979.  **The effect of Defendants' illegal conduct on Plaintiff Rashard Davis**. Rashard Davis played college football at James Madison University, where he competed as a wide receiver and return specialist from 2013 to 2017. Throughout his collegiate career, he dedicated himself to rigorous training and competition, devoting well over forty hours per week to the demands of his sport. His speed, agility, and playmaking ability set him apart as one of the most electrifying athletes in FCS football, culminating in his key role in JMU's 2016 FCS National Championship-winning season.

2980.  Davis was raised in Charlottesville, Virginia, where he attended Charlottesville High School. As a standout athlete, he showcased exceptional versatility,

**FOURTH AMENDED COMPLAINT**

excelling both as a receiver and a return specialist. His ability to create explosive plays in open space drew interest from several collegiate programs, leading him to commit to James Madison University. His high school career was marked by his speed and elusiveness, traits that would later define his success at the collegiate level.

2981.  During his time at JMU, Davis steadily developed into one of the premier special teams players in the country while also contributing as a reliable receiver. His senior season in 2016 was his most productive, as he made 29 catches for 408 yards and four touchdowns. As a receiver, he recorded forty-two receptions for 530 yards and three touchdowns, providing a consistent target for the Dukes offense. However, it was on special teams where he left his most significant mark. That season, he set both JMU and CAA single-season records with four punt return touchdowns, leading all of FCS in that category. His ability to shift the momentum of a game was on full display in the FCS Quarterfinals against Sam Houston State, where he returned a punt seventy-two yards for a touchdown. His impact continued through the postseason, as he recorded three receptions for fifty-two yards and a touchdown in JMU's victory in the FCS National Championship Game. Earlier in the year, he demonstrated his dynamic ability with a five-catch, 111-yard performance against Rhode Island.

2982.  Davis was a four-year letter winner, playing in 50 games for the Dukes. He finished his career with 114 receptions for 1,549 yards and 11 touchdowns. He also had four punt returns for a touchdown, all in 2016 to lead the nation. A 2016 Colonial Athletic Association Special Teams Player of the Year, he was a First Team All-American by STATS, Walter Camp and HERO Sports while earning Second Team honors from the AP in his senior campaign.

2983.  Davis's contributions extended beyond the field, as his performances generated significant media exposure for both himself and JMU. His explosive playmaking ability was featured in national broadcasts, with his games airing on major networks such as ESPN. The visibility of JMU's football program increased substantially

**FOURTH AMENDED COMPLAINT**

during its championship run, drawing national attention and elevating Davis's profile. The university leveraged his success in its marketing efforts, regularly featuring him in social media campaigns and promotional materials. His role in JMU's success helped drive fan engagement, ticket sales, and increased television viewership, all of which benefitted the university while he remained unable to profit from his own image.

2984.  James Madison University's athletic department received significant revenue during Davis's tenure. In 2017, the department made over $51.7 million in total revenue. Mr. Davis did not receive any of this revenue.

2985.  Despite his significant contributions to JMU's football program, Davis received no financial compensation for the value he provided. Under the NCAA's rules at the time, he was barred from earning money from his name, image, and likeness, even as the university and its conference capitalized on his achievements. His performances during the 2016 season contributed to increased revenue for the program, as JMU's championship run boosted ticket sales, merchandise revenue, and television contracts. However, Davis was denied any share of these financial gains. Even after the Supreme Court's 2021 ruling permitted NIL compensation, early opportunities remained limited and sporadic, often manipulated by coaching staff as a means of controlling player behavior and performance. Had NIL opportunities been available during his collegiate career, Davis's national recognition and record-setting performances would have made him an ideal candidate for endorsement deals, particularly within the regional and FCS markets.

2986.  Rashard Davis was one of the most dynamic return specialists in FCS history, setting records and playing a crucial role in JMU's national championship victory. His performances generated exposure and financial gains for his university, yet he was unjustly prohibited from profiting from his own athletic success. The NCAA's restrictions deprived him of the ability to negotiate fair compensation during the peak of his collegiate career. Had the market been open, he would have commanded

**FOURTH AMENDED COMPLAINT**

significantly greater financial opportunities. His case serves as a clear example of the systemic financial limitations placed on college athletes before the implementation of NIL rights, underscoring the substantial compensation he was unfairly denied.

2987. **The effect of Defendants' illegal conduct on Plaintiff Stanley Dye Jr.** Stanley Dye Jr. was a special teams and defensive specialist at UTSA during the 2013-2017 seasons.

2988. Dye demonstrated game-changing ability during his time at Ridgeview High School in Orange Park, FL, where he served as a team captain while playing both receiver and free safety. Over his final two seasons, he scored 19 total touchdowns and earned second-team All-Class 5A and All-First Coast (Florida Times-Union) honors, along with first-team all-district and All-North Atlantic Conference recognition as a senior. That season, he recorded 25 catches for 574 yards and eight touchdowns, while also intercepting three passes. Coached by Tom McPherson, Dye was additionally a three-time regional qualifier in track & field, setting the school's 100-meter dash record. He also excelled academically as an honor roll student.

2989. Dye Jr. focused his efforts in the 2016 season on special teams while delivering dependable support for UTSA's defensive strategy despite minimal defensive stats. Dye was essential to securing field position and enhancing special teams' execution. The disciplined approach of Dye as a committed team member helped UTSA advance throughout this time frame.

2990. Dye expanded his significance in the 2017 season by participating in all 11 games as a defensive player for UTSA which maintained one of the top defensive rankings in Conference USA. The combination of his unwavering dedication and football intelligence along with his execution of defensive plays made him a key part of the team's achievements.

2991. Dye became an esteemed and prominent member of the UTSA athletic community during his time at the university. UTSA's defensive achievements appeared

**FOURTH AMENDED COMPLAINT**

in team media content alongside Dye who featured in their promotional materials and
publications. His participation in public-facing media content increased his NIL value
and highlighted his role as an ambassador for the defensive program.

2992.  Dye Jr. committed six to seven days per week during his career to practice
defensive maneuvers and special teams strategies while preparing for competitive
scenarios. He invested around eight hours daily in practice sessions, film analysis, and
physical conditioning while giving up personal time to advance his abilities and support
his team.

2993.  Through his college tenure Stanley Dye Jr. demonstrated exceptional
resilience and discipline while maintaining a strong commitment to his sport. Dye Jr.
could not access NIL benefits because NCAA rules at that time restricted his financial
opportunities despite his defensive and special teams impact. During his time in
Conference USA as a defensive player Dye Jr. competed under NCAA rules that
prohibited athletes from earning NIL money, which prevented him from reaping financial
benefits even though he offered substantial contributions both during games and
outside the field.

2994.  **The effect of Defendants' illegal conduct on Plaintiff Hunter Echols.**
Hunter Echols played college football for the University of Southern California from 2017
to 2021 before transferring to the University of Arizona for 2022. Echols started his
college career as a top four-star recruit and U.S. Army All-American with high
expectations and a leading recruit profile.

2995.  Echols received offers from **36 schools**, including powerhouse programs
such as **USC**, **Oklahoma**, **Alabama**, **LSU**, **Miami**, **Michigan**, **Notre Dame**, and **Texas
A&M**, showcasing his status as a highly sought-after recruit. Echols arrived at USC as
one of the nation's leading defensive ends in the 2017 recruiting class with substantial
ability and potential for success on the field.

**FOURTH AMENDED COMPLAINT**

2996.  Echols demonstrated his dedication to football through the rigorous
schedule he followed throughout his college years. He spent six to seven days each
week training and studying films while maintaining his academic schedule which
included conditioning sessions and travel requirements.

2997.  Following his redshirting year at USC in 2017 Echols served as a
rotational defensive player from 2018 through 2021. Echols accumulated 30 total
tackles and 1.5 sacks while maintaining consistent participation in USC's defensive
rotation during his time from 2017 to 2021. Echols' standout performances in important
matches earned him consistent broadcast coverage on ESPN, FOX Sports, and the
Pac-12 Network.

2998.  Echols moved to the University of Arizona in 2022 where he secured a
starting position and had his most successful college season. During his time at
Arizona, he achieved 54 tackles alongside 8.5 tackles for loss and 4.5 sacks which
established him as one of the team's top defensive performers. His exceptional season
performance branded him as Arizona's defensive leader while boosting his market
value.

2999.  Even though Echols had a notable recruiting history and received
significant media attention along with a standout final season performance, the NCAA's
unlawful restrictions stopped him from generating NIL revenue between 2017 and 2021
by illegally blocking athletes from monetizing their market value. The Supreme Court
determined in 2021 that these restrictions were illegal but persistent uncertainty about
NIL rules combined with fear of compliance violations among players and programs
resulted in restrictive actions that restricted Echols' NIL possibilities during his last year
at Arizona.

3000.  Echols' status as a top recruit combined with his visibility in both USC
media and Arizona media and his achievement of becoming a starter in 2022 gave him
strong positioning to leverage NIL deals through brand partnerships and sponsorships.

**FOURTH AMENDED COMPLAINT**

Although USC and Arizona's athletic department made millions of dollars in revenue during Mr. Echols' tenure, he received none of that revenue. Restrictive NCAA policies unjustly prevented athletes from earning money which resulted in his inability to benefit from available opportunities. The Defendants' actions directly injured Mr. Echols.

3001.  **The effect of Defendants' illegal conduct on Plaintiff Davion Ervin-Poindexter.** Davion Ervin-Poindexter's worked as college football player at Indiana University and Western Kentucky University. His journey demonstrates his relentless perseverance and leadership qualities alongside his steadfast dedication. At Indiana University, Mr. Ervin-Poindexter started as a walk-on player before gradually gaining more playing time through persistent dedication and continuous effort. He played for Indiana from 2019 to 2021 before transferring to Western Kentucky for his junior and senior seasons (2022-2023).

3002.  During his time at Brother Rice High School, Ervin-Poindexter was a running back who earned honorable mention All-State and rushed for 1,100 yards and 15 touchdowns. He also lettered in track and field. His stellar performance earned him an offer to play for Indiana.

3003.  Ervin-Poindexter did not see any action during his freshman season, but in his sophomore season he played in all eight games on special teams and was named IU's Christ Beaty Outstanding Walk-On Player of the Year. He received a scholarship from Indiana in 2021 which marked an important achievement in his athletic career. During that season he delivered crucial offensive performances, starting the final three games and appearing in all 12, and rushing for 226 yards and one touchdown. He was named a Burlsworth Trophy nominee and earned Academic All-Big Ten. Through his development as a dependable player, he demonstrated both his progression as an athlete and his capability to perform during crucial times.

3004.  After achieving success at Indiana, Ervin-Poindexter moved to Western Kentucky to play the 2022 season. During his time as a transfer at Western Kentucky,

**FOURTH AMENDED COMPLAINT**

he played in 27 games with nine starts during which time he rushed for 766 yards and four touchdowns with 179 carries. His successful transition to a new team system and rapid establishment as a vital player demonstrated his leadership abilities in all aspects of his role.

3005.  During his last year of college football in 2023 Ervin-Poindexter took on a leadership position at Western Kentucky where he became an essential part of the team's offensive lineup. Through 125 carries he produced 600 rushing yards and five touchdowns to demonstrate his dependable performance during crucial moments. The combination of his accomplishments in games and his skill at building relationships with teammates elevated him to a position of respect within the program.

3006.  His steady commitment and determination throughout his career at Indiana led to his receiving the Chris Beaty Outstanding Walk-On Player of the Year award which highlighted his resilience and impact. Major networks including ESPN, ESPN2, ESPN+, ABC, CBS, FOX, FSN1, BTN, and CBS Sports Network aired Poindexter's performances. ESPN's SportsCenter featured his highlight plays which demonstrated his impactful presence on the field.

3007.  Both Indiana and WKU's athletic departments made millions of dollars of total revenue during Ervin-Poindexter's tenure. He received none of that revenue.

3008.  NCAA rules at the time prevented Poindexter from taking full advantage of his market potential and NIL prospects despite his successful career. Scholarship restrictions as a walk-on player limited his potential earning power during the early phase of his career. Despite earning a scholarship his ability to pursue endorsement deals and sponsorship opportunities was delayed due to changes in NCAA policies. Poindexter moved to Western Kentucky as the Supreme Court issued its landmark antitrust ruling which prompted a sluggish NCAA response to NIL reform. Ervin-Poindexter missed chances to increase his income potential despite playing essential roles at two different schools.

**FOURTH AMENDED COMPLAINT**

3009.  Ervin-Poindexter's journey embodies strong dedication paired with unwavering resolve. His work demonstrated value at both universities despite the NCAA restricting his potential to earn. These restrictions by the Defendants' directly injured Mr. Ervin-Poindexter.

3010.  **The effect of Defendants' illegal conduct on Plaintiff Cameron Echols-Luper.** Cameron Echols-Luper worked as a college football player from 2013-2017 at Texas Christian University (2013-2014), Arkansas State University (2015-2016), and Western Kentucky University (2016-2017).

3011.  Echols-Luper helped guide Auburn High School to the 2013 6A Alabama State Championship title. As a track athlete he won three individual state titles as a senior, taking gold in the 200-meter dash (21.81), the long jump (24-3.75) and anchored the state-title winning 4x100 relay team (24.34). He also won the state championship titles in the 200-meter dash (21.28), long jump (23-6) and 4x100 relay as a junior.

3012.  The labor provided by Echols-Luper was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaching staff at both universities.

3013.  Echols-Luper was a dynamic wide receiver and return specialist with elite speed and national recognition. He was featured in NFL.com's "16-for-16: College Football's Most Freakish Athletes" and named by Sporting News as the fastest receiver in the Sun Belt Conference. His athleticism and explosive playmaking ability made him a standout at both Arkansas State and Western Kentucky, increasing his exposure and marketability.

3014.  Echols-Luper's job as a college football player was essentially a full-time one, and an important and valuable one at that. Throughout his collegiate football career, he was one of the most impactful skill players on the field.

**FOURTH AMENDED COMPLAINT**

3015.  During his 2014 season at TCU, Echols-Luper was named to the 2014 Outdoor USTFCCCA All-American Second Team for the 4x100 relay. He also He was a dual sport athlete, playing football and competing in the sprints and jumping events for the Horned Frogs.

3016.  During the 2016 season at Arkansas State, Echols-Luper was a key offensive weapon, recording 26 receptions for 407 yards (15.7 yards per catch) and 1 touchdown. He demonstrated consistency, registering at least two catches in nine of 13 games and playing a crucial role in Arkansas State's AutoNation Cure Bowl victory over UCF. His speed and return ability made him one of the most exciting players in the Sun Belt Conference.

3017.  In 2017, Echols-Luper transferred to Western Kentucky, where he competed in Conference USA and played in a more competitive NIL market with increased exposure. That season, he recorded 42 receptions for 473 yards (11.3 yards per catch) and 4 touchdowns, with a long reception of 38 yards. His ability to stretch defenses and contribute in the return game solidified his reputation as one of the most dynamic playmakers in Conference USA.

3018.  During his collegiate career, Echols-Luper played in nationally and regionally televised games, increasing his exposure and marketability. His feature on NFL.com's list of top freak athletes, along with his performance in two different conferences, positioned him as an ideal NIL candidate had the current rules been in place during his playing years. The transition from Arkansas State to Western Kentucky further expanded his NIL potential, as he moved into a more visible market with greater financial opportunities.

3019.  Despite his national recognition and significant contributions on the field, Echols-Luper was unable to capitalize on NIL opportunities due to NCAA-imposed restrictions. His speed and explosiveness made him an attractive figure for endorsements and sponsorships, yet he was denied these financial opportunities.

**FOURTH AMENDED COMPLAINT**

3020.  During Echols-Luper's tenure, the Arkansas State and Western Kentucky athletic programs generated substantial revenue — $39.4 million (2016) and $30.5 million (2017), respectively — from media rights, ticket sales, and sponsorships. Despite his visibility and impact, Echols-Luper received none of the revenue his contributions helped generate.

3021.  During his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his universities. As a nationally recognized player with elite athleticism and significant exposure, his financial potential was completely stifled due to NCAA-imposed limitations.

3022.  Defendants' conspiracy greatly harmed Echols-Luper. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Echols-Luper was positioned to receive a competitive share of the television and other revenue brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3023.  **The effect of Defendants' illegal conduct on Plaintiff Lamont Evans IV.** Lamont Evans IV worked as a collegiate basketball player at the University of South Florida (USF) (2021-2022) and later transferred to Saint Louis University (SLU) (2022-2024) in the Atlantic 10 Conference. While his time on the court was limited, Evans' perseverance and adaptability allowed him to contribute meaningfully to both programs. His journey reflects the challenges faced by walk-on athletes striving to establish themselves in competitive environments.

3024.  Evans attended Blanche Ely High School in Pompano Beach, Florida, where he helped the Tigers secure the Florida 8A state championship in 2019,

**FOURTH AMENDED COMPLAINT**

averaging 10 points, 2.5 assists, and 1.9 rebounds across 22 games during his senior season. He chose to attend USF over offers from other institutions.

3025.  As a freshman (2021-2022), he appeared in one game and contributed minimally. Despite his limited playing time, Evans gained exposure through the American Athletic Conference's (AAC) televised games on ESPN+ and regional networks. This exposure increased his visibility despite his limited role.

3026.  In 2022-2023, Evans transferred to Saint Louis University and appeared in three games. His increased participation improved his NIL opportunities, as SLU's games were broadcast on CBS Sports Network and ESPN+. His improved contributions, averaging 0.7 points per game in limited minutes, marked a positive step in his development as a collegiate athlete.

3027.  During the 2023-2024 season, Evans continued his growth, appearing in four games and averaging 1.3 points per game in 2.8 minutes of play per game. While his on-court role remained modest, Evans' perseverance and continued presence on Atlantic 10 broadcasts allowed him to maintain some NIL visibility.

3028.  Throughout his career, regardless of on-court minutes, Evans dedicated 6-7 days a week to refining his skills, spending approximately 8 hours daily in practices, film study, and training. His dedication extended beyond scheduled sessions, often sacrificing personal time to support his team and develop his role.

3029.  During his tenure at USF and St. Louis, both universities' athletic departments received millions of dollars in total revenue. Mr. Evans received none of that revenue.

3030.  Evans' collegiate journey reflects resilience in navigating the challenges that walk-on athletes often face. Limited initial exposure, coaching changes, and his efforts to find the right program environment limited his NIL opportunities. Despite these obstacles, Evans remained committed to improving his craft and contributing where possible.

**FOURTH AMENDED COMPLAINT**

3031.  Evans' collegiate career occurred during a period when the Defendants' inconsistent responses to the Supreme Court ruling in 2021 has left athletes like Evans unprotected from unfair restraints and restrictions.

3032.  **The effect of Defendants' illegal conduct on Plaintiff Greg Francis.** Greg Francis played as a defensive back and safety at both the University of Nevada, Las Vegas (UNLV) (2017-2019) and the University of North Texas (UNT) (2020-2021).

3033.  His football journey began at Bishop Gorman High School, where he was a three-year letterwinner at the powerhouse program under former UNLV coach Tony Sanchez and then Kenny Sanchez. He appeared in multiple episodes of "QB1: Beyond the Lights" —a popular sports documentary on Netflix—alongside his teammates Tate Martell and Bubba Bolden. He also appeared on the TV show "Snoop & Son: A Dad's Dream."

3034.  Rated as a three-star prospect by Scout and ranked the No. 21 recruit in Nevada by 247Sports, Mr. Francis helped guide the Gaels to three consecutive state titles and USA Today national championships with a perfect 15-0 record each season. He earned second-team all-league honors as a senior.

3035.  His collegiate career spanned from 2017 through 2021, with each season contributing to his development and impact on the field.

3036.  In his freshman year at UNLV, Francis appeared in 12 games, recording 21 total tackles, including 13 solo tackles. His immediate involvement demonstrated his readiness to contribute to the team's defensive efforts.

3037.  During the 2018 season, Francis played in 8 games, achieving 12 total tackles, with 8 solo tackles. His consistent performance underscored his growing reliability within the defensive unit.

3038.  Francis's junior year marked a peak in his performance at UNLV. He participated in 11 games, amassing 42 total tackles, including 22 solo tackles, and

**FOURTH AMENDED COMPLAINT**

recorded 2 passes defended. This season highlighted his significant role in the team's defense.

3039.  After transferring to the University of North Texas, Francis appeared in 4 games during the 2021 season, contributing 3 solo tackles. His experience added depth to UNT's defensive backfield.

3040.  His collegiate career concluded with a total of 78 tackles and 2 pass deflections, thriving as a lockdown corner that transitioned to starting safety.

3041.  Throughout his career, Francis dedicated 6-7 days a week to refining his skills, spending approximately 8 hours daily in practices, film study, and training. His commitment extended beyond scheduled sessions, often sacrificing personal time to enhance his performance and support his team's success.

3042.  Both Nevada and North Texas' athletic departments made millions of dollars in revenue during Mr. Francis' tenure. He received none of this revenue.

3043.  Francis's collegiate tenure occurred during a period when NCAA restrictions prevented players from earning from their Name, Image, and Likeness (NIL). Consequently, despite remaining in his hometown (Las Vegas) market, fresh of his media exposure through Netflix's QB1 and his on-field contributions, he was unable to capitalize on potential financial opportunities now available to student-athletes.

3044.  Greg Francis's career exemplifies dedication and resilience. His consistent defensive contributions across multiple programs underscore his adaptability and commitment, reinforcing his value as a role model for future student-athletes. Despite his hard work the Defendants' restrictions directly injured Mr. Francis.

3045.  **The effect of Defendants' illegal conduct on Plaintiff Hasahn French.** During his time at Saint Louis University from 2017 to 2021, Hasahn French emerged as one of the Atlantic 10 Conference's leading defensive players. French, a 6'7" forward from Middletown, NY played a fundamental role in the Billikens program while receiving multiple honors through his leadership in SLU's defense.

**FOURTH AMENDED COMPLAINT**

3046.  French, number 90 recruit from Commonwealth Academy in Middletown, New York, was offered scholarships by 15 programs including Virginia Tech, USC, Providence and UNLV. French chose St. Louis and began collegiate career in 2017.

3047.  Upon joining SLU as a freshman French showed outstanding performance with averages of 9.3 points, 7.1 rebounds and 1.8 blocks each game which earned him a spot on the Atlantic 10 All-Rookie Team. During his career development he achieved Third-Team All-Atlantic 10 honors in 2018-19 and Second-Team All-Atlantic 10 recognition in 2019-20. French earned his place on the Atlantic 10 All-Defensive Team for both the 2018-19 and 2019-20 seasons which solidified his standing as one of the most powerful defenders in the conference.

3048.  French was essential to SLU's successful 2019 run through the Atlantic 10 Championship and their NCAA Tournament participation. Through his defensive skills, rebounding ability, and leadership qualities he became one of the Billikens' most significant players. At the conclusion of his time at Saint Louis University French held the record for most blocked shots while standing among the highest rebounders in the program's history.

3049.  During Mr. French's tenure at St. Louis University, the athletic department received millions of dollars of revenue. He received none of this revenue.

3050.  French received many awards, and high-profile performances yet could not benefit financially from his NIL between 2017 and 2020 because NCAA rules unlawfully blocked athletes from exploiting their market value. After the Supreme Court removed those restrictions in 2021 the remaining doubts and concerns about compliance infractions among players and institutions resulted in restrictive measures that still hampered French's earning potential during his last season in 2020-21.

3051.  French demonstrated his commitment to basketball through his intense weekly schedule that involved practicing six to seven days a week along with film study and conditioning sessions while managing his academic duties. His consistent

**FOURTH AMENDED COMPLAINT**

dedication to his work paved the way for him to become one of the conference's most
influential players.

3052.  French's long-standing role as a starting player and defensive standout in
both the Atlantic 10 and NCAA Tournament positioned him to obtain profitable NIL deals
through sponsorships and partnerships. The NCAA's restrictive policies created an
unjust financial situation for French as he was completely restricted from earning
opportunities and from receiving his fair market value for his contributions. The
Defendants' actions directly injured Mr. French.

3053.  **The effect of Defendants' illegal conduct on Plaintiff Palaie Gaoteote
IV.**  From 2018 to 2020, Plaintiff Palaie Gaoteote IV played collegiate football at the
University of Southern California (USC) before transferring to Ohio State University
where he played from 2021 to 2022.

3054.  Mr. Gaoteote was a highly decorated high school football player who
excelled as a linebacker at Bishop Gorman High School in Las Vegas, Nevada. In 2017
alone, he earned several prestigious honors, including Max Preps All-American First
Team, PrepStar Dream Team, USA Today All-USA Second Team, Orange County
Register Fab 15 First Team, Tacoma News Tribune Western 100, USA Today All-
Nevada Defensive Player of the Year, and Polynesian Football Hall of Fame Polynesian
High School Football Player of the Year finalist. That season, Mr. Gaoteote recorded 80
tackles, including 20 tackles for loss with 3 sacks, along with 2 deflections, 2 forced
fumbles, and 3 blocked punts. He also caught a 6-yard touchdown pass and played a
pivotal role in helping Bishop Gorman secure its ninth consecutive state championship.
Regarded as a top recruit, Mr. Gaoteote was ranked by ESPN as the No. 1 linebacker
nationally, No. 2 regionally at all positions, and No. 1 in the state in all positions. He was
also No. 18 on ESPN's top 300. His exceptional talent earned him over 30 scholarship
offers from universities across the nation.

**FOURTH AMENDED COMPLAINT**

3055.  Gaoteote demonstrated his football dedication through a rigorous weekly routine that involved practices, film study, conditioning, travel commitments alongside academic work. His steadfast dedication enabled him to become a crucial defensive player during his career despite battling injury setbacks and NCAA eligibility problems.

3056.  During his freshman season at USC in 2018, Mr. Gaoteote played 10 games achieving 38 total tackles and 2.0 sacks demonstrating his effectiveness at the line of scrimmage. During the 2019 season, he participated in eight games accumulating 58 tackles. He also posted a 74.3 run-defense grade, which ranked third among Pac-12 linebackers. He managed to play only two games throughout the 2020 season because injuries restricted his participation.

3057.  Unlawful NCAA rules created eligibility problems during Mr. Gaoteote's transfer which affected his preparation and playing time and limited his development and NIL opportunities. He appeared in eight games during 2021 and achieved nine total tackles. During his last season at college in 2022 he participated in 11 games as a rotational linebacker and achieved nine tackles. Mr. Gaoteote maintained his status as a respected team member even as injuries and role changes challenged him.

3058.  The NCAA's unlawful limitations blocked Mr. Gaoteote from generating NIL revenue from 2018 to 2020 despite his prominent recruitment status and Power Five playing experience. Mr. Gaoteote continued to face restrictions in his NIL opportunities at Ohio State because programs and conferences feared compliance violations even after the Supreme Court removed NCAA restrictions in 2021. Yet, Ohio State athletics brought in over $250M in 2021, and USC athletics also brought in millions in 2019. None of which was given to Mr. Gaoteote.

3059.  The combination of Mr. Gaoteote's five-star recruit status, experience as a starter in two Power Five conferences and his prominent defensive role put him in an excellent position to obtain NIL benefits through various endorsement deals and promotional activities. The outdated NCAA policies that prohibited athletes from earning

**FOURTH AMENDED COMPLAINT**

money through their NIL, popularity and athletic achievements directly injured Mr.
Gaoteote.

3060. **The effect of Defendants' illegal conduct on Plaintiff Anthony Gould.**
Anthony Gould played football at Oregon State University from 2019-2023 where his
abilities as a dynamic playmaker developed alongside his speed and versatility. Mr.
Gould was a three-star recruit with a Scout Grade 75. He was ranked 4th among in-
state recruits overall, 134 in his position nationally, and 172 overall player regionally. Mr.
Gould was also recognized as a First Team All-American as a returner and First Team
All-Pac-12 Honoree.

3061. The commitment Anthony Gould put into football showed through his
rigorous routine that encompassed six to seven days each week of practices, film
review, conditioning sessions, travel arrangements while he also managed his
schoolwork. His relentless dedication to his work empowered him to achieve continuous
advancement throughout his professional journey.

3062. Gould achieved his breakout season in 2022 by earning First-Team All-
Pac-12 honors for his outstanding special teams performance. The player achieved 27
receptions totaling 457 yards with three touchdowns and added another score from a
punt return. His outstanding performance during the season led to his recognition as the
Pac-12 Special Teams Player of the Week in September 2022. In 2023, Mr. Gould was
named a preseason 2023 Pac-12 All-Conference Football Team as the return specialist.
He also added 44 receptions for 718 yards and two touchdowns to his offensive stat.

3063. Gould could not generate income from his NIL from 2019 through 2020
because NCAA restrictions deemed unlawful blocked athletes from leveraging their
market value. The NCAA restrictions ended when the Supreme Court ruled in 2021 but
Oregon State maintained restrictive practices due to unclear NIL guidelines and
compliance fears which limited Mr. Gould's NIL opportunities during his remaining time

**FOURTH AMENDED COMPLAINT**

at the university. Oregon State University athletics brought in over $9M in 2021, none of which was given to Mr. Gould.

3064.  Gould's increasing prominence as both a wide receiver and special teams star positioned him as a prime candidate for sponsorship deals, brand partnerships, and media exposure. Mr. Gould's failure to maximize his possible income demonstrates the unfair effect of old NCAA rules which blocked athletes from accessing the market fairly and caused direct injury to Mr. Gould.

3065.  **The effect of Defendants' illegal conduct on Plaintiff Kellan Grady.**
Kellan Grady began his collegiate career at Davidson College from 2017 through 2021 after being recruited as an all-star athlete from Northfield Mount Hermon before he transferred to play for the University of Kentucky during the 2021-22 season. Throughout his career at Davidson College, Grady showed consistent scoring ability and leadership which earned him national recognition as one of the top players in the Atlantic 10 (A-10) Conference before moving to the SEC.

3066.  Grady demonstrated his basketball dedication through a demanding weekly routine that consisted of six to seven days spent on practices, film study, conditioning and travel while managing his academic requirements. His demanding schedule demonstrated his commitment to pursuing excellence both in sports and academics.

3067.  Grady established himself as both the leading scorer and team captain while playing for Davidson. He earned Atlantic 10 Rookie of the Year honors in his freshman season during 2017-18 while averaging 18.0 points per game. During his senior season Grady became Davidson's standout player and earned him All-A-10 First Team honors in 2018-19 while surpassing 1,000 career points. His accomplishments established him as one of the most decorated players in the history of Davidson basketball.

**FOURTH AMENDED COMPLAINT**

3068.  Grady moved to the University of Kentucky in 2021 where he secured a starting position and made significant contributions to the Wildcats' team. His leadership skills and perimeter shooting made Kentucky's offense stronger while his standout performances caught the attention of major sports networks such as ESPN, CBS Sports, and the SEC Network. When Grady relocated to Kentucky his fame increased because he now associated with other top SEC athletes.

3069.  Grady's scoring skills alongside his leadership abilities and vast national exposure did not translate into NIL earnings from 2017 to 2020 because NCAA's unlawful rules unlawfully blocked athletes from harnessing their market value. Grady transferred to Kentucky during a time when the Supreme Court lifted NCAA restrictions, but the NCAA policies retained enough uncertainty to prevent programs from fully exploring NIL opportunities. The NCAA's unclear policies restricted his potential income during his last Kentucky season. In 2020, Kentucky athletics brought in over $121M, none of which was afforded to Grady.

3070.  Grady's performance as a top scorer and long-term starter along with his prominent role in the A-10 and a high-profile transfer to a SEC powerhouse, made him perfectly suited for NIL sponsorships and endorsement deals. Outdated NCAA rules barred athletes from earning profits from their sports achievements and fame which created an unfair financial situation that directly harmed Mr. Grady.

3071.  **The effect of Defendants' illegal conduct on Plaintiff Westin Graves.** Plaintiff Westin Graves worked as a college football player at Mississippi State University from 2016 to 2017 after being recruited from Jackson Prep high school as a MAIS 3A district champion and MAIS All-District Offense First Team athlete.

3072.  The labor provided by Mr. Graves was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

**FOURTH AMENDED COMPLAINT**

3073.  Mr. Graves was a highly recruited prospect out of high school who possessed unique talent. He attended Jackson Preparatory High School in Flowood, Mississippi, where he kicked 50-54 PATs and 11-17 Field Goals. Westin started in 13 games as a senior, leading his team to win the MAIS 3A State Championship under head coach Ricky Black.

3074.  Mr. Graves' job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Mr. Graves was one of the most impactful players for Mississippi State. During his junior year season at Mississippi State, he was one of the leading kickers in the SEC, collecting 15-18 field goals and 52-54 PATs.

3075.  Graves was forced to play through a persistent back injury as the coaching staff threatened to revoke his scholarship. Ultimately, Graves made the difficult decision to end his playing career and undergo career-ending back surgery — a situation that was preventable with proper treatment. This ended Graves's dreams of being an NFL kicker, a real possibility for the one-time SEC conference leading kicker.

3076.  During his collegiate career, Mississippi State football games were broadcast on national television networks, including ESPN and CBS Sports. Millions of people watched Mississippi State football games on TV, and tens of thousands packed the stadiums to watch in person. Mississippi State also frequently featured Mr. Graves on its social media accounts, highlighting his accomplishments and using him to boost game attendance and viewership. Mississippi State athletics brought in over $100M in 2016 and has increased its year-over-year revenues ever since.

3077.  Mr. Graves received none of that revenue. During his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. As a high-performing college football player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

3078.  Defendants' conspiracy greatly harmed Mr. Graves. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3079.  **The effect of Defendants' illegal conduct on Plaintiff Josh Gray.** Josh Gray is a collegiate basketball star who has played at Louisiana State University (LSU) (2020-21), and the University of South Carolina (2021-2023). Gray currently plays for the University of Missouri (2023-present), where regulations and collective control actions deprived him of his financial opportunities and led him to move further away from his family support. Gray's defensive skills and rebounding expertise led him to become one of the SEC's most dominant frontcourt players during his tenure at South Carolina and Missouri, a track record of excellence that began when he was a high school athlete at Putnam Science Academy leading his team to the co-National Prep Championship.

3080.  Gray demonstrated his dedication to the universities through a rigorous weekly routine that required six to seven days focused on practices, film study, conditioning and travel while he also maintained his academic commitments. Through his dedication, he achieved significant growth as a defensive and rebounding leader during his professional career.

3081.  Gray became a prominent SEC player but couldn't benefit from his NIL opportunities between 2020 and 2021 because NCAA restrictions unlawfully blocked athletes from profiting from their market value. Following the Supreme Court's 2021 decision which invalidated such restrictions as unlawful many players, programs, and

**FOURTH AMENDED COMPLAINT**

conferences continued to engage in restrictive practices out of compliance violation fears which kept Gray from accessing full NIL opportunities. In 2021, South Carolina athletics brought in over $142M, none of which was afforded to Gray.

3082.  Gray secured a position among the top rebounders in the SEC during his junior season at South Carolina by finishing 11th in conference rebounds per game during league matches. His ability to average 7.9 rebounds per game demonstrated his steadfast presence as a dominant interior force. His defensive contributions together with shot-blocking skills and position as an important SEC player earned him visibility across national broadcasts on ESPN and CBS Sports as well as the SEC Network.

3083.  Gray demonstrated significant defensive capabilities and played an important role in SEC matchups while building a media presence which would have made him an excellent candidate for sponsorships and marketing partnerships during his college football career. The Defendants' restrictions in the early part of his career and lack of clarity in the later part of his career directly injured Mr. Gray.

3084.  **The effect of Defendants' illegal conduct on Plaintiff Mike Harley Jr.** During his tenure at the University of Miami from 2017 to 2021, Mike Harley Jr. established himself as the school's top wide receiver and broke the record for program receptions ahead of NFL icons Michael Irvin, Reggie Wayne, and Andre Johnson.

3085.  Mike Harley Jr. was a consensus four-star wide receiver prospect, earning recognition from 247Sports, ESPN, Rivals, and Scout. He participated in the prestigious U.S. Army All-American Game and was ranked as the 24th-best player in Florida by Rivals and the 40th-best by 247Sports. During his high school career at St. Thomas Aquinas, Harley was named to the *Miami Herald* First Team All-Broward and the *Sun-Sentinel* First Team All-County. In his senior season, he helped lead St. Thomas Aquinas to a 12-2 record and a 7A Florida State High School Championship, where he caught three touchdown passes in the title game. Coached by Roger Harriott, Harley

**FOURTH AMENDED COMPLAINT**

chose Miami over offers from Kentucky, Louisville, Maryland, Michigan, West Virginia, and Wisconsin.

3086.  Harley signed with Miami as a four-star recruit and quickly made his mark with his exceptional speed, precise route-running, and dependable hands. He became a vital component of Miami's offensive lineup, particularly during his junior and senior seasons when he emerged as the team's top receiver, delivering consistent performances in key conference games and major televised matchups.

3087.  Harley's influence reached far beyond his performance on the football field. In his capacity as team captain, he earned widespread recognition as a leader who played an essential role in keeping team morale intact throughout the COVID-19 pandemic. His leadership earned him enormous respect within the Miami program, and he stood as one of only three players chosen to represent the Hurricanes at ACC Media Days, highlighting his role as a program ambassador.

3088.  His dedication to Miami's local community reinforced his positive standing through participation in programs like Make-A-Wish Foundation and other charitable actions which support needy children and demonstrate his admirable character.

3089.  Every time he played on the field his performances were broadcast on national television and his on the field performance as well as his leadership role during Covid-19 received coverage from ESPN, CBS Sports and the ACC Network.

3090.  NCAA regulations prevented Harley from gaining financial benefits from NIL deals during his college football career despite his successful track record and leadership abilities. The combination of being Miami's record holder for receptions and his role as a team leader would have made him an ideal candidate for endorsement contracts and media appearances with NIL guidelines in place. Miami football brought in over $70M in revenue, none of which was afforded to Harley for his labor.

3091.  Harley expanded his influence beyond football by developing a substantial online following with nearly 35,000 followers and multiple hundreds of thousands of likes

**FOURTH AMENDED COMPLAINT**

and views. His marketability expanded through participation in sports video games which enhanced his visibility and interaction with fans. His digital presence connected him to ACC athletes who later used similar platforms for NIL opportunities.

3092.  Mike Harley Jr.'s combination of record-breaking achievements and leadership skills together with his considerable presence in the media established him as an ideal choice for NIL opportunities. The restrictive NCAA policies before NIL prevented him from benefiting from his playing career and directly injured Mr. Harley.

3093.  **The effect of Defendants' illegal conduct on Plaintiff Demetris Harris.** Demetris Harris was a dominant offensive lineman at the University of South Florida (USF) from 2017 to 2022 after being recruited out of Robert E. Lee High School as a Florida All-State three-star athlete. As a multi-year starter and team captain, Harris played a crucial role in the Bulls' offensive success, providing consistent protection and contributing to record-setting rushing performances. Despite his vital role, Harris was unable to capitalize on NIL opportunities due to restrictive NCAA policies that prevented him from monetizing his platform.

3094.  Harris began his career at USF in 2017 as a redshirt freshman, dedicating time to developing his skills and preparing for a starting role. By 2018, Harris was a key member of the offensive line, playing in 11 games and helping USF's offense rank 33rd nationally in total offense and 43rd in rushing offense. His contributions helped running back Jordan Cronkrite achieve a 1,000-yard rushing season and set a school record with five consecutive 100-yard rushing performances.

3095.  In 2019, Harris started all 12 games at left guard, anchoring an offensive line that supported a rushing attack producing over 1,900 total yards. His consistency provided stability to the offense, helping running backs Jordan Cronkrite and Kelley Joiner Jr. achieve multiple 100-yard rushing performances.

3096.  During the 2020 season, Harris started six games in a pandemic-shortened year. Despite limited opportunities, he played a pivotal role in a 646-yard

**FOURTH AMENDED COMPLAINT**

offensive explosion against UCF, where USF posted 242 rushing yards and two touchdowns. His presence enabled key performances from rushers Kelley Joiner Jr. and Brian Battie.

3097.  In 2021, Harris continued his leadership as a team captain and started all 12 games at left guard. His contributions led USF to a school-record 421 rushing yards in a single game against Temple. He was named to the All-AAC Second Team and earned a spot on Athlon's All-Conference Third Team for his efforts.

3098.  In his final season in 2022, Harris earned Phil Steele All-AAC Third Team honors while starting all 12 games. He concluded his career as USF's all-time leader in career starts with 53, tied for second in career games played. His performance helped Brian Battie become just the sixth USF player to post a 1,000-yard rushing season, contributing to seven games of 200+ rushing yards that season.

3099.  Harris' impact extended beyond the field, with his performances regularly featured on major sports networks such as ESPN, ABC, and CBS. His games received significant national coverage, attracting millions of viewers, and further enhancing his visibility and marketability. USF athletics brought in over $56M in revenue in 2021, none of which was afforded to Harris for his labor.

3100.  Throughout his career, Harris dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His relentless commitment extended beyond scheduled practices, often sacrificing personal time to enhance his performance and contribute to his team's success. His dedication to refining his skills, improving his craft, and mastering his role on the field reflects the extensive effort required to excel as a Division I offensive lineman.

3101.  Despite his accomplishments, Harris was denied the financial opportunities now available to athletes with comparable achievements. Offensive linemen in the AAC with similar accolades and career longevity have since secured

**FOURTH AMENDED COMPLAINT**

lucrative NIL deals. The Defendants' scheme directly injured Harris, denying him the opportunity to monetize his talent and contributions under previous NCAA policies.

3102.  **The effect of Defendants' illegal conduct on Plaintiff Malik Hausman.** Malik Hausman's collegiate journey exemplifies perseverance, growth, and leadership. Starting as a three-star defensive back recruit from Bishop Gorman High School at the University of Arizona, Hausman steadily developed through his time with the Wildcats before transferring to the University of Hawaii, where he emerged as a standout defensive leader. His career is marked by his dedication to both athletic performance and academic success, culminating in a breakout graduate season at Hawaii.

3103.  Hausman dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His relentless commitment extended beyond scheduled practices, often sacrificing personal time to enhance his performance and contribute to his team's success, improving his defensive craft and mastering his role on the field.

3104.  Hausman's collegiate career began at the University of Arizona in 2017. As a product of the prestigious Bishop Gorman High School football program, Hausman's recruitment was bolstered by his participation in the popular sports documentary "QB1: Beyond the Lights". While not the central figure in the series, his exposure through Bishop Gorman's prominence enhanced his visibility and early NIL marketability.

3105.  During his time at Arizona, Hausman transitioned from a developing backup to a rotational defensive back with increasing contributions. His consistent performance as a special teams player and defender demonstrated his commitment to team success. By his final season at Arizona in 2021, Hausman had established himself as a consistent presence, balancing his defensive role with leadership on and off the field.

**FOURTH AMENDED COMPLAINT**

3106.  In 2022, Hausman transferred to the University of Hawaii, where he experienced his most successful collegiate season. As a key defensive leader, he recorded 47 tackles and 3 interceptions. His performance not only anchored Hawaii's defensive secondary but also earned him Academic All-Mountain West honors. Hausman's ability to lead both on and off the field reflected his maturity and dedication to improving those around him.

3107.  His standout season in Hawaii's defensive system exemplifies the impact of athletes who excel following a transfer. Hausman's efforts, both statistically and through leadership, highlighted his value as a complete student-athlete.

3108.  Throughout his collegiate career, Hausman demonstrated leadership qualities that extended beyond the field. He consistently maintained strong academic performance, culminating in his Academic All-Mountain West recognition. His role as a mentor to younger players was especially impactful at Hawaii, where he took on a leadership role to guide teammates both in preparation and performance.

3109.  Hausman's presence on campus was bolstered by his involvement in promotional campaigns for Arizona and Hawaii football programs. He appeared in team materials, game-day videos, and team-focused promotional content, increasing his visibility within the student body and athletic community.

3110.  As an advocate for teammates and as a student leader, Hausman's contributions reflected his consistent efforts to elevate those around him. His experiences navigating transfers and adjusting to new team environments demonstrate his resilience and dedication.

3111.  Malik Hausman's collegiate career reflects a balance of athletic performance, leadership, and academic dedication. His progression from a three-star recruit to a standout defensive player at Hawaii underscores his growth as an athlete and leader. With a well-rounded combination of on-field success, academic achievement, and leadership contributions, Hausman's story illustrates the value of

**FOURTH AMENDED COMPLAINT**

perseverance, mentorship, and adaptability in collegiate athletics. While Hawaii athletics
brought in over $49M in revenue in 2021, Hausman was afforded none of that despite
his labor.

3112.  Despite his accomplishments, Hausman was denied the financial
opportunities now available to athletes with comparable achievements. The Defendants'
scheme directly injured Hausman, denying him the opportunity to monetize his talent
and contributions under previous NCAA policies.

3113.  **The effect of Defendants' illegal conduct on Plaintiff Timmy
Hernandez.** During his time at Oregon State University from 2016 to 2018 Timmy
Hernandez established himself as a dependable wide receiver while maintaining
consistent offensive production. After transferring from a junior college program, where
he was recruited as an All-Arizona athlete from Mountain Pointe High School, and
shifting positions from cornerback to wide receiver Hernandez conquered initial
obstacles to establish himself as a vital playmaker for Oregon State's team.

3114.  Hernandez demonstrated his commitment to football by maintaining a
rigorous weekly routine that incorporated practices, film study, conditioning, and travel
for six to seven days while also fulfilling his academic obligations. His dedication to
excellence enabled him to achieve success in his athletic performance and academic
life.

3115.  During his initial season with Oregon State in 2016 Hernandez achieved
19 receptions totaling 241 yards along with one touchdown. His expanded role in 2017
led to 30 receptions for 357 yards and three touchdowns while earning Pac-12 All-
Academic First Team honors. During the 2018 season Hernandez achieved his best
performance by securing 58 receptions which resulted in 661 yards and three
touchdowns. Hernandez's exceptional performance led to his inclusion on the Google
Cloud CoSIDA Academic All-America Second Team and another selection to the Pac-
12 All-Academic First Team.

**FOURTH AMENDED COMPLAINT**

3116.  Between 2016 and 2020 Hernandez was blocked from earning through his NIL despite his reliable performance and academic success because NCAA restrictions unlawfully blocked athletes from benefiting from their market value. Hernandez continued to face barriers in exploiting NIL opportunities as the Supreme Court struck down restrictive rules in 2021 while players and programs remained uncertain about compliance standards. In 2021, Oregon State athletics brought in over $83M in revenue, of which Hernandez was afforded nothing despite his labor for the school.

3117.  The combination of his athletic performance and academic accomplishments underscores how the Defendants' rules unfairly restricted his ability to earn from his NIL and directly harmed Mr. Hernandez.

3118.  **The effect of Defendants' illegal conduct on Plaintiff Kylin Hill.** Kylin Hill played collegiate football at Mississippi State University from 2017 to 2020, emerging as one of the top running backs in the Southeastern Conference (SEC). Known for his powerful running style and dynamic playmaking ability as a runner and receiver out of the backfield, Hill developed into a premier performer in college football, achieving significant on-field success and gaining national attention for his advocacy work.

3119.  Hill entered Mississippi State as a four-star recruit, ranked sixth at his position in the 2017 class. He quickly earned a reputation as a consistent playmaker and team leader. By his junior season in 2019, Hill led the SEC in rushing with 1,350 yards, earning First-Team All-SEC honors and finishing as a finalist for the Conerly Trophy, awarded to the best college football player in Mississippi.

3120.  Off the field, Hill made national headlines for his advocacy in support of changing the Mississippi state flag, which at the time prominently displayed the Confederate battle emblem, a sign linked to white supremacy and hate for almost 150 years. Hill's demand to change the flag was the decisive factor that led to its removal. Without intending to become a social justice advocate, Hill's influence — driven by his

**FOURTH AMENDED COMPLAINT**

media attention, status as a state hero, and role as a top SEC running back — played a pivotal role in driving this historic change. This activism drew widespread media attention, including coverage by major outlets such as CNN, ESPN, and *Sports Illustrated*. As a result, Hill became one of the most recognizable college athletes in the country during that period.

3121.  Hill's combination of athletic performance and social influence positioned him alongside other prominent social justice advocates who have secured significant NIL deals for their advocacy work and visibility. However, due to NCAA regulations, Hill was unable to capitalize on his heightened public profile. His exposure on major networks such as ESPN, CBS Sports, and the SEC Network strengthened his marketability, yet these financial opportunities were unjustly withheld. To contextualize, Mississippi State athletics brought in over $110M in revenue, none of which was afforded to Hill for his labor.

3122.  His on-field success and social justice advocacy positioned him for lucrative sponsorships with athletic brands, regional businesses, and social advocacy campaigns.

3123.  In the pre-NIL landscape, Hill was faced with the decision to remain at Mississippi State and risk potential injury or leave early to protect his professional future. Mississippi State's coaching staff had planned to position Hill as a focal point in the offense during the 2020 season, which would have led to both significant exposure and increased potential for career-altering or career-ending injury.

3124.  In addition to his athletic accolades, Hill's social media presence, including Instagram and Twitter posts, received views and likes in the millions, amplifying his influence and reinforcing his national visibility. This visibility created strong opportunities for paid social media endorsements, reinforcing the economic potential lost due to NCAA-imposed restrictions.

**FOURTH AMENDED COMPLAINT**

3125.  In sum, Kylin Hill's success on the field, combined with his social justice advocacy and national exposure, positioned him as one of the most marketable college football players of his era. His inability to access NIL opportunities during his playing career directly harmed Mr. Hill and highlights the unjust financial limitations imposed by outdated NCAA policies.

3126.  **The effect of Defendants' illegal conduct on Plaintiff Everett Hunter.** Plaintiff Everett Hunter worked as a college football player at the University of New Mexico from 2023 to 2024. The labor provided by Mr. Hunter was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

3127.  Mr. Hunter was a highly recruited prospect out of high school who possessed unique talent. He attended Modesto Christian High School. As a JUCO prospect he was ranked as a three-star prospect, 180 overall, and the number 9 tight end JUCO prospect in the country by 247Sports.

3128.  Mr. Hunter's job as a college football player was essentially a full-time one, and an important and valuable one at that. During the 2023 season, Mr. Hunter played in 11 games, both as a tight end and on special teams, and recorded two catches for 18 yards on the season. He continued to contribute in the 2024 season, making appearances in 4 games and helping his offense produce 4,927 offensive yards during the season.

3129.  During Mr. Hunter's collegiate career, the football games of the University of New Mexico were broadcast on national television networks, including CBS Sports Network and ESPN affiliates. Millions of people watch New Mexico football games on TV, and tens of thousands pack the stadiums to watch in person. For example, specific viewership stats are not publicly available. The University of New Mexico also frequently featured Mr. Hunter on its social media accounts, highlighting his accomplishments and,

**FOURTH AMENDED COMPLAINT**

no doubt, using him to boost game attendance and viewership. The program also made millions of dollars. For instance, New Mexico's athletic department generated approximately $44.88 million in revenue in the 2022-2023 fiscal year.

3130. Mr. Hunter received none of that revenue. During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. Even for the time in which he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from third parties, Defendants, or his university that he would have received had the NCAA's unlawful restrictions been lifted earlier. As a highly sought-after high school recruit who became one of the most productive tight ends in the Mountain West Conference, he would have earned substantially more NIL compensation if not for the NCAA's unlawful restrictions.

3131. Defendants' conspiracy greatly harmed Mr. Hunter. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3132. **The effect of Defendants' illegal conduct on Plaintiff Ishmael Hyman.** Ishmael Hyman played football during the 2014-2017 seasons at James Madison University. After a season ending injury in 2016, Hyman returned to limited playtime appearing in 10 games with only 5 receptions for 75 yards. Though his on the field contributions were limited his sideline leadership played a significant role in JMU winning FCS National Championship.

**FOURTH AMENDED COMPLAINT**

3133.  The 2017 season saw Hyman emerge as one of JMU's most dependable receivers with remarkable route-running skills and reliable hands enabled him to execute critical game-changing plays. He finished his career with 11 touchdowns, over 1,000 receiving yards and an average of 14 yards per reception.

3134.  Hyman trained 6-7 days each week across his career by spending about 8 hours daily on practice sessions combined with film study and training exercises. He devoted time outside of regular practices to enhance his abilities and fully understand his position on the field by giving up his personal time.

3135.  Hyman established himself as a well-known person in JMU's sporting community during his years at the university. Hyman participated in JMU's promotional content and team publications alongside media features that showcased their football program. Hyman's active participation in JMU's athletic community magnified his possible NIL value during his time on campus.

3136.  The trajectory of Ishmael Hyman's career demonstrates his relentless perseverance and dedication together with significant impact. Beyond his athletic achievements, Hyman became a prominent figure in university circles and set an example for the next generation of student-athletes. During his playing time under NCAA rules that barred athletes from NIL income, Hyman suffered direct financial harm when the Defendants' actions further restricted his monetary opportunities despite his athletic performance.

3137.  **The effect of Defendants' illegal conduct on Plaintiff Vance Jackson.** During his collegiate basketball career, Vance Jackson attended UConn between 2016 and 2017 before moving to the University of New Mexico from 2018 to 2020 and playing for the University of Arkansas between 2020 and 2021 before concluding his college journey at East Carolina University from 2021 to 2022. Jackson arrived at college as a top 60 four-star recruit with strong expectations due to his noteworthy recruiting background.

**FOURTH AMENDED COMPLAINT**

3138.  Jackson demonstrated his commitment to basketball through a demanding weekly routine that involved six to seven days of practice, film study, conditioning sessions, and travel while he managed his academic obligations. Jackson demonstrated his dedication to player development and program contribution through his rigorous daily routine.

3139.  Jackson made his mark at UConn as a freshman by winning AAC All-Rookie Team honors after achieving the highest three-point shooting percentage (.484) in conference games. Jackson joined the New Mexico team in 2018 and became an essential player for the Lobos which led to his selection to the Mountain West All-Tournament Team in 2019 after achieving averages of 25.5 points and 11 combined rebounds and assists per game during the tournament.

3140.  During his season with the Razorbacks in 2020 Jackson transferred to Arkansas and exceeded both 1,000 career points and 500 career rebounds. Jackson played his final college basketball season at East Carolina University in 2021-22 and maintained his role as a versatile forward.

3141.  Jackson faced NCAA unlawful restrictions from 2016 to 2020 that stopped him from making money through his NIL rights despite his productive and versatile athletic performance. The Supreme Court ruled against these restrictions in 2021 but Jackson's frequent transfers continued to complicate his eligibility which restricted his NIL chances despite the legal decision. In 2021, UCONN athletics brought in more than $99M in revenue, none of which was afforded to Jackson.

3142.  Jackson's exceptional recruiting background and experience across multiple major conferences along with his elite-level performances made him an ideal match for NIL opportunities. The outdated NCAA policies blocked athletes from profiting from their own athletic success and marketability which resulted in direct injury to Mr. Jackson.

**FOURTH AMENDED COMPLAINT**

3143. **The effect of Defendants' illegal conduct on Plaintiff Malique Jacobs**. During his time at Kent State University from 2020 to 2023, Malique Jacobs emerged as a standout guard by proving himself as an elite defensive player and a vital on-court leader. His athletic career illustrates how successful players before NIL implementation could not benefit from name, image, and likeness opportunities despite their marketability and achievements.

3144. Jacobs started at Kent State during the 2020-21 season while earning All-MAC Defensive Team honors and achieving second place in the MAC for steals. His consistent offensive disruption skills combined with elite rebounding at guard position established him as a top defensive talent.

3145. During the 2021-22 season, Jacobs received All-MAC Defensive Team honors and additional Honorable Mention All-MAC recognition. He achieved Kent State's first triple-double in program history which showcased his multifaceted skills and importance to the team.

3146. Jacobs received the MAC Defensive Player of the Year title for the 2022-23 season while also joining the All-MAC Second Team and earning All-MAC Defensive Team recognition. He became the NCAA leader in steals per game while establishing a new singles-game steals record at Kent State with 10 steals. These accomplishments demonstrated that he had mastered defensive play while influencing games throughout the nation.

3147. Jacobs committed himself to practice and training sessions for 6 to 7 days weekly throughout his career while devoting about 8 hours daily to skill development through practice, film study, and training. His unwavering dedication led him to give up personal time beyond scheduled practices to improve his performance while supporting his team's achievements. Jacobs' commitment to enhancing his skills while developing his defensive abilities and mastering his court position demonstrates the demanding level of effort needed to succeed at the Division I level.

**FOURTH AMENDED COMPLAINT**

3148.  Jacobs' outstanding defensive achievements and awards did not translate
into financial opportunities and benefits that similar players now receive. MAC athletes
who have demonstrated similar defensive accomplishments and received national
attention now have NIL agreements with regional enterprises and social media
platforms based on their performance on the court. The NIL opportunities that existed
today were unavailable to Jacobs during his career which stopped him from using
potential revenue streams to his advantage. In 2021, Kent State athletics brought in
over $28M in revenue, none of which was afforded to Jacobs for his labor.

3149.  Restrictive NCAA regulations throughout his career prevented Jacobs
from monetizing his athletic talent and achievements. Despite Jacobs reaching national
recognition through his high-level performance, he missed out on financial opportunities
that today's athletes with similar achievements obtain. The Defendants' actions harmed
Jacobs whose performance and defensive skills would qualify him for significant NIL
agreements if not for outdated NCAA rules blocking those opportunities.

3150.  **The effect of Defendants' illegal conduct on Plaintiff Jawon Johnson.**
Jawon Johnson played as an offensive lineman for Mississippi State University during
the 2013-2017 seasons.

3151.  In 2016, Johnson contributed as a reserve offensive lineman for
Mississippi State. While he did not see playing time in official games, he played a
crucial role as a scout team member, providing vital support to the team's preparation
and development. His role in practice was essential to ensuring the starting unit was
ready for weekly SEC matchups. Playing in the SEC provided Johnson with notable
media exposure, as the conference's games frequently drew national attention and
coverage.

3152.  In 2017, Johnson continued his role as a reserve lineman, maintaining his
presence on the scout team and contributing to the program's depth at the offensive line

**FOURTH AMENDED COMPLAINT**

position. His consistent effort and commitment to preparation supported Mississippi State's offensive line success in the competitive SEC.

3153. Johnson's contributions, while less visible, were significant in helping the team remain competitive in a demanding conference. He earned the Scout Lineman Award in recognition of his hard work and dedication to the program.

3154. Throughout his career, Johnson dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His commitment extended beyond scheduled practices, often sacrificing personal time to improve his craft and contribute to his team's success. Mississippi State athletics brought in over $103M in 2017, none of which was afforded to Johnson for his labor.

3155. Despite his contributions, Johnson played during a period when NCAA restrictions provided no window for players to earn from their NIL. His position within an SEC program, combined with the conference's extensive media coverage, would have created additional NIL opportunities had they been available during his playing days. As a result, he was denied the opportunity to capitalize on financial opportunities that players with similar contributions now enjoy.

3156. **The effect of Defendants' illegal conduct on Plaintiff Kahlil Johnson**. Plaintiff Kahlil Johnson worked as a college football player at Jackson State University from 2016 to 2020.

3157. The labor provided by Mr. Johnson was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3158. Mr. Johnson was a highly competitive football player out of high school. A versatile athlete at Provine High School in Jackson, Mississippi, he was a three-year letterman in basketball and a two-year letterman in football. His size, strength, and

**FOURTH AMENDED COMPLAINT**

defensive capabilities made him a highly sought-after prospect. As a standout defensive end, he ultimately enrolled at Jackson State over offers from Tulane and Alcorn State.

3159.  Mr. Johnson's job as a college football player was essentially a full-time one, and an important and valuable one at that. After starting his career as a reserve, he became the team's starting defensive end in his sophomore season. His continued effort and output on the field drew attention from local news and earned him Preseason All-SWAC recognition before the 2019 season, where he recorded 35 tackles, two tackles for loss, and two fumble recoveries in ten games. Although his career was short from an injury he suffered in the 2020 season, he had been an integral member of the Jackson State defense. Throughout his collegiate career, he tallied 104 solo tackles, 20 tackles for loss, nine sacks, and seven forced fumbles.

3160.  During Mr. Johnson's time at Jackson State University, the program was a member of the Southwestern Athletic Conference and its important games were carried by national broadcasters ESPN and Fox Sports. After the 2019 season, Jackson State claimed the Football Championship Subdivision (FCS) attendance title for the second year in a row, attracting 168,808 fans for an average of 33,762 fans for each home game.

3161.  Between ticket and jersey sales, media rights, conference distributions, and other sources, Jackson State University has made a considerable amount of money from its football program. In fact, in 2019, Jackson State made $8.3 million in revenue from its football program alone, including $1.5 million from ticket sales.

3162.  Mr. Johnson received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Jackson State, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from his school. As an outstanding player at Jackson State, Mr. Johnson would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

3163.  Defendants' conspiracy greatly harmed Mr. Johnson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties.

3164.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Johnson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3165.  **The effect of Defendants' illegal conduct on Plaintiff Brevin Jordan.** During his tenure at the University of Miami from 2018 to 2020 Brevin Jordan emerged as one of the nation's leading tight ends. ESPN and 247Sports ranked Brevin Jordan as the No. 1 tight end in the country among his peers from Bishop Gorman High School where he earned a four-star recruit status. ESPN and 247Sports ranked Jordan as the No. 1 tight end in the country who played in nationally televised games before attending the University of Miami thus boosting his marketability and he entered Miami with an outstanding recruiting profile before demonstrating his skills on the field.

3166.  Jordan showed his dedication to football through a rigorous weekly routine that required him to spend six to seven days on practices, film study, conditioning, and travel obligations while managing his academic workload. His on-field success resulted from his continuous investment in developing his skills.

3167.  Jordan earned Second-Team All-ACC honors during his freshman season in 2018 because he quickly made an impact by recording 32 receptions for 287 yards and four touchdowns. During his sophomore season of 2019, he improved his performance which led him to earn First-Team All-ACC honors and reach the finals for the John Mackey Award which identifies the top tight end in the nation. In that season Jordan achieved 35 receptions alongside 495 yards and two touchdowns. During 2020

**FOURTH AMENDED COMPLAINT**

Jordan showcased his strong performances by achieving semifinalist status for the Mackey Award through 38 receptions totaling 576 yards and seven touchdowns. ESPN, CBS Sports, and the ACC Network regularly featured him during his career because he produced consistent results and performed well in important games.

3168.  Jordan demonstrated leadership at Miami by serving as a captain and maintaining a strong influence in the locker room throughout his time with the program. Coaches and teammates held him in high esteem which solidified his status as a leading figure in the program.

3169.  Before the NIL era Jordan skipped his college senior year and went to the NFL Draft where the Houston Texans picked him in round five in 2021. Present-day conditions would have allowed Jordan to both generate college income as a senior and boost his draft valuation like Hurricane tight ends David Njoku (1st round), Greg Olsen (1st round), and Jimmy Graham (3rd round) resulting in an eight-million-dollar draft day valuation difference. As one of the top tight ends in the nation, Jordan would likely have secured multiple endorsement deals and media partnerships under current NIL regulations. Additionally, Miami athletics brought in over $74 million, none of which was afforded to Jordan for his labor at the university. Brevin Jordan became an ideal candidate for NIL opportunities through his impressive athletic career and leadership qualities despite NCAA policies blocking access to these benefits. This case demonstrates how financial restrictions limited college athletes before NIL rights existed while showing why continuing reforms are necessary to provide them proper compensation.

3170.  **The effect of Defendants' illegal conduct on Plaintiff Chad Kelly**. Chad Kelly played quarterback at Ole Miss during the 2015 and 2016 seasons. Chad Kelly's time at Ole Miss was enshrined in history by his guiding Ole Miss to a Sugar Bowl triumph and receiving MVP recognition while reestablishing the team as a competitive force in both the SEC and national scene.

**FOURTH AMENDED COMPLAINT**

3171.  The intensity of Kelly's weekly schedule demonstrated his unwavering commitment to his sport. His weekly schedule consisted of practicing six to seven days while studying film and conditioning himself but also included travel commitments and academic duties.

3172.  Chad Kelly transferred to Ole Miss as a top quarterback and is the nephew of NFL Hall of Famer Jim Kelly. His leadership position stemmed from his powerful arm strength combined with agility and rapid play extension capabilities. Playing in 9 games during the 2016 season, before being injured, Chad Kelly recorded 2,758 passing yards with 19 touchdowns and contributed 332 rushing yards in addition to five rushing touchdowns. A season with expectations for All-American honors ended prematurely due to an ACL injury. A season prior, Chad Kelly accumulated 4,042 passing yards with 31 touchdowns.

3173.  Kelly's impact extended beyond statistics. Through his leadership and playmaking abilities, he turned Ole Miss into a competitive program within the SEC. His exceptional performances in critical games resulted in features on ESPN, CBS Sports, and the SEC Network. The combination of his MVP performance in the Sugar Bowl and his family background increased his appeal to sponsors.

3174.  Kelly had ideal characteristics to attract sponsorships and media promotions but couldn't access NIL opportunities because NCAA and conference policies violated constitutional laws by restricting athletes from obtaining their market value. Ole Miss athletics brought in over $117 million in 2016, none of which was afforded to Kelly for his labor.

3175.  Chad Kelly became a prime NIL candidate through his successful SEC quarterback career, his leadership role at Ole Miss and his significant media exposure. The old NCAA rules blocked his opportunities and unfairly prevented him from achieving his full market value.

**FOURTH AMENDED COMPLAINT**

3176.  **The effect of Defendants' illegal conduct on Plaintiff Mekhi LaPointe.**
Mekhi LaPointe worked as a college football player at the University of South Florida
(USF) from 2018 to 2022.

3177.  The labor provided by LaPointe was of great value to Defendants. During
the season, he worked at least six days a week and often more than 40 hours per week.
Even during the offseason, he worked a significant number of hours under the direction
of the coaching staff at USF.

3178.  LaPointe was a highly recruited defensive back with unique talent. He
attended high school in Florida, where he established himself as a standout player in his
class. His athleticism, coverage ability, and playmaking skills earned him offers from
multiple Division I programs before he ultimately committed to the University of South
Florida.

3179.  LaPointe's job as a college football player was essentially a full-time one,
and an important and valuable one at that. During his collegiate football career,
LaPointe was one of the most impactful players for USF. He developed into a multi-year
starter and team captain, demonstrating his leadership and skill over five seasons.

3180.  During his freshman year at USF in 2018, LaPointe played in 10 games,
starting four. He recorded 34 tackles and 1 interception, quickly establishing himself as
a key contributor to the defense. In 2019, he played in nine games, adding 14 tackles
and 1 pass breakup, continuing his steady development within the program.

3181.  By his sophomore year in 2020, LaPointe's role expanded as he started
six games, finishing the season with 33 tackles and 2 interceptions. His ability to
generate turnovers and read opposing offenses made him an integral part of the
defensive unit. In his junior year (2021), LaPointe was named team captain and started
all 11 games, recording 59 tackles and 2 interceptions. His leadership and playmaking
ability helped anchor the Bulls' secondary.

**FOURTH AMENDED COMPLAINT**

3182.  In his senior season (2022), LaPointe continued his consistent performance, playing in 11 games and registering 53 tackles, 1 interception, and 1 sack. His experience and leadership made him a veteran presence on the team, guiding younger players and maintaining his status as a defensive leader.

3183.  During his collegiate career, USF football games were broadcast on national television networks, including ESPN, CBS Sports, and other major platforms. Millions of people watched USF games on TV, and tens of thousands packed Raymond James Stadium to watch in person. USF Athletics frequently featured LaPointe on their social media accounts, promoting his accomplishments and leveraging his image to generate interest in the program.

3184.  The University of South Florida's football program generated millions of dollars through media rights deals, ticket sales, and sponsorship agreements. The American Athletic Conference, of which USF is a member, has lucrative television contracts that bring in millions of dollars in annual revenue. Despite his on-field contributions and media presence, LaPointe received none of this revenue.

3185.  During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. Even when NIL compensation became permissible, LaPointe did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a high-profile defensive back and team captain, his financial potential was significantly diminished due to NCAA-imposed limitations.

3186.  Defendants' conspiracy greatly harmed LaPointe. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, LaPointe would have received a competitive share of the television and other revenue

**FOURTH AMENDED COMPLAINT**

being brought in by Defendants and their member schools. Thus, the Defendants'
scheme directly injured him.

3187.  **The effect of Defendants' illegal conduct on Plaintiff Tyjon Lindsey.**
Tyjon Lindsey competed at the University of Nebraska between 2017 and 2018 before
transferring to Oregon State University where he played from 2019 to 2022. Entering
college as a top four-star wide receiver recruit from the 2017 class gave Lindsey a
strong recruiting profile and established high expectations for his performance.

3188.  Lindsey demonstrated his commitment to football with his weekly routine
that involved six to seven days of practices, film study, conditioning, travel and
academic work. His demanding routine demonstrated his dedication to enhancing his
athletic abilities while also advancing his academic achievements.

3189.  At Oregon State Lindsey emerged as an essential offensive player during
his collegiate career. During the 2022 season he appeared in every game and achieved
second place on the team with 30 receptions totaling 317 yards and one touchdown.
During the 2021 season he recorded 16 receptions which totaled 232 yards and three
touchdowns and he performed exceptionally at USC with 102 yards and two
touchdowns in a single game. Lindsey delivered notable performances during his time
at Nebraska by recording 11 receptions for 159 yards with three touchdowns in 2020
and 18 catches for 209 yards with two touchdowns in 2019.

3190.  Lindsey's high productivity during his college career did not translate into
NIL earnings from 2017 through 2020 because NCAA rules unlawfully restricted him
from making money from his market value. Despite the Supreme Court declaring these
restrictions illegal in 2021, unclear NIL guidelines and widespread compliance concerns
maintained limiting practices that prevented Lindsey from taking full advantage of NIL
opportunities during his last seasons at Oregon State. In 2021, Oregon State athletics
brought in over $83 million in revenue, none of which was afforded to Lindsey for his
labor.

**FOURTH AMENDED COMPLAINT**

3191.  The combination of Lindsey's high-profile recruitment status and his significant contributions to the Power Five along with his remarkable performance in the Pac-12 made him the perfect choice for endorsement deals and promotional opportunities because of his on-field presence and media visibility. The outdated NCAA policies that prevented athletes from receiving fair market value for their contributions become clear when observing his failure to capitalize on available opportunities.

3192.  **The effect of Defendants' illegal conduct on Plaintiff Kevin Marfo.** Kevin Marfo's collegiate basketball career included playing for George Washington University from 2016 to 2017 and Quinnipiac University from 2018 to 2020 before joining Texas A&M University between 2020 and 2021 and returning to Quinnipiac University for his graduate season in 2021-22. Marfo demonstrated top-tier rebounding abilities alongside his dominant paint presence which resulted in steady team improvements on the court, a work ethic that began when he was a senior at Bergen Catholic who had become senior captain and was the former number 3 prospect in Massachusetts.

3193.  Marfo committed to basketball through a demanding weekly routine involving six or seven days of practice sessions, film review, conditioning exercises, and travel commitments while maintaining his academic studies. His dedication to improving himself enabled him to achieve success in various programs.

3194.  During the 2019-20 season at Quinnipiac Marfo achieved his best basketball performance by becoming the nation's top rebounder with an average of 13.3 per game and receiving All-MAAC Second Team recognition. During the 2020-21 season, he played a critical role for Texas A&M while facing elite competition in the SEC. Marfo reinforced his reputation as a top college basketball big man during his 2021-22 graduate season at Quinnipiac which led to his second All-MAAC Second Team selection.

**FOURTH AMENDED COMPLAINT**

3195.  Marfo could not generate earnings from his NIL between 2016 and 2020 because NCAA restrictions prevented athletes from monetizing their market value despite being unlawful. The Supreme Court's 2021 decision ended previous restrictions but Marfo still faced limited NIL potential because the NCAA's ambiguous reaction to the ruling discouraged programs and collectives from leveraging NIL opportunities in his graduate season. Quinnipiac athletics generated over $40 million, none of which was afforded to Marfo for his labor.

3196.  Marfo earned his position as an ideal candidate for NIL sponsorships and endorsements through his extended starting tenure and elite rebounding performance in both mid-major and Power Five basketball leagues. Restrictive NCAA policies created an unjust financial impact by preventing him from fully capitalizing on his athletic success and public profile to earn profits.

3197.  **The effect of Defendants' illegal conduct on Plaintiff Tathan "Tate" Martell.** Tate Martell was the quarterback at the Ohio State University between 2017 and 2018 before moving to the University of Miami where he played from 2019 until 2021 and then transferred to the University of Nevada, Las Vegas (UNLV) where he played from 2021 to 2022. As a collegiate athlete, Martell consistently ranked among the nation's top sports figures due to his highly publicized recruitment process, strong social media activity, and participation in Netflix's "QB1: Beyond the Lights". His significant marketability could not be utilized due to NCAA regulations.

3198.  Martell emerged from Bishop Gorman High School as one of history's most successful quarterbacks. In his role as a five-star dual-threat quarterback and Blue-Chip recruit, he achieved a perfect 45-0 record while leading his team to three consecutive state championships. The Gatorade Football Player of the Year 2016 title and his Elite 11 quarterback finalist standing cemented his role as the nation's premier quarterback prospect. The recruitment profile that showcased his strong skills brought

**FOURTH AMENDED COMPLAINT**

him to Ohio State in 2017 where he redshirted during his first season and then played
limited backup roles in his second year.

3199.  The University of Miami received Martell as one of the most awaited
transfers during the year 2019. The pressure of his fame hindered Martell from securing
a starting role because his status lacked the financial benefits that usually accompany
such fame. During the subsequent two seasons, he played infrequently as he competed
for playing time behind Jarren Williams who transferred from JUCO as the No.1 pick in
2019 and D'Eriq King who arrived as the top overall transfer quarterback in 2020. The
coaching transitions at Miami disrupted team stability which compounded his challenges
and limited his chances to compete regularly.

3200.  Martell transferred home to UNLV in 2021 where injuries and consecutive
coaching changes obstructed his efforts to establish himself on the field.

3201.  Throughout his career, Martell managed to stay an important public figure
despite numerous obstacles. The athlete maintained a large social media presence with
over 140,000 Instagram followers which made him one of college athletics' key social
media figures. The media frequently broadcasted his athletic performances while the
show QB1: Beyond the Lights showcased his life away from sports. Competing in two
top-tier college football markets enhanced his exposure which positioned him as a
prime prospect for high-value endorsement deals but NCAA rules prevented him from
accessing these opportunities.

3202.  NCAA compliance issues made it impossible for Martell to earn money
from QB1 and various endorsement deals despite not choosing this limitation. Choosing
these opportunities at that point could have led to him losing his eligibility while also
exposing his school to NCAA penalties. His early football achievements and extensive
recruitment coverage created the foundation that allowed hundreds of elite quarterbacks
to later take advantage of the NIL opportunities. Miami athletics generated over $74
million, none of which was afforded to Martell for his labor.

**FOURTH AMENDED COMPLAINT**

3203.  The story of Martell serves as one of the clearest examples of NCAA limitations stopping athletes from making money from their fame. Martell, who played quarterback for the top-ranked high school team nationally and became the main attraction of a popular sports documentary while leading the premier sports program that brought recognition to Las Vegas sports, had a strong potential to earn money in a system supportive of NIL. The NCAA policies blocked him from gaining financial opportunities which led to a career characterized by unfulfilled monetary potential despite his high level of public visibility during his athletic years.

3204.  Tate Martell became a marketable and valuable athlete throughout his college career because of his high-profile recruitment and widespread national exposure along with his social media influence. The NCAA's unfair regulations blocked him from accessing financial opportunities even though his media presence and visibility should have opened those doors. His experience demonstrates the impact of NCAA restrictions and establishes the necessity for financial compensation for former athletes who lost their fair market earning potential.

3205.  **The effect of Defendants' illegal conduct on Plaintiff Erick Neal.** Erick Neal worked as a college basketball player at the University of Texas at Arlington (UT Arlington) from 2014 to 2018 where he was recruited out of high school as an ESPN 3-star recruit and was given all-state honors.

3206.  The labor provided by Neal was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at UT Arlington.

3207.  Neal was an exceptional point guard whose playmaking ability and leadership made him one of the most valuable players in the Sun Belt Conference. His ability to score, facilitate, and defend placed him among the elite players in UT Arlington

**FOURTH AMENDED COMPLAINT**

history. He was the first player in Sun Belt history to register over 1,500 career points, 700 assists, 400 rebounds, and 200 steals.

3208.  Neal's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his tenure at UT Arlington, Neal was a critical component of the team's success, leading the Mavericks to multiple strong seasons in the Sun Belt Conference.

3209.  During his junior year (2016-17), Neal averaged 10.6 points, 3.5 rebounds, and 6.6 assists per game. His ability to orchestrate the offense and control the pace of the game helped UT Arlington finish with a 27-9 overall record and a 14-4 mark in Sun Belt play. The team won the Sun Belt regular-season championship and advanced to the NIT quarterfinals, marking one of the most successful seasons in program history.

3210.  In his senior year (2017-18), Neal continued to elevate his game, averaging 16.7 points, 4.2 rebounds, and 6.7 assists per game. His leadership and dynamic play led UT Arlington to a 21-13 overall record and a 10-8 finish in Sun Belt competition. The Mavericks reached the Sun Belt Conference championship game, further solidifying their position as a top mid-major program.

3211.  During his collegiate career, UT Arlington's basketball games were broadcast on regional and national platforms, including ESPN networks, increasing the visibility of the program. Thousands of fans attended games, and Neal was frequently featured in team marketing campaigns, showcasing his importance to the program.

3212.  Despite his significant impact on the court, Neal was not able to monetize his NIL during his playing years due to NCAA restrictions. The Sun Belt Conference and UT Arlington's athletic department generated substantial revenue during Neal's tenure, benefiting from his on-court performances, yet he received none of that revenue.

3213.  If Neal had played in the NIL era, his marketability as a record-setting point guard at a competitive mid-major program would have positioned him for meaningful financial opportunities. His statistics, leadership, and national recognition

**FOURTH AMENDED COMPLAINT**

would have made him an ideal candidate for local endorsements and sponsorship deals. However, due to NCAA-imposed limitations, he was denied the ability to capitalize on his athletic success. In 2021, UT Arlington generated over $17.9 million, none of which was afforded to Neal for his labor.

3214.  Defendants' conspiracy greatly harmed Neal. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Neal would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3215.  **The effect of Defendants' illegal conduct on Plaintiff Bryce Nze**. Bryce Nze worked as a college basketball player at the University of Wisconsin-Milwaukee between 2016 and 2018 before transferring to Butler University, where he worked from 2018 through 2022. Nze earned recognition as a key player for both the Horizon League and BIG EAST conferences through his ability to play multiple positions as well as his strong rebounding skills and defensive impact.

3216.  Nze showed his commitment to basketball through his intensive weekly routine that consisted of six to seven days of practices, film study, conditioning and travel while maintaining his academic obligations. The constant commitment he placed in his skill enhancement enabled him to perform exceptionally in various court positions.

3217.  In his first two seasons at Milwaukee, Nze received Horizon League Freshman of the Week on January 23, 2017; established a new school record for rebounds in 2017-18; and was also named to the Black & Gold Shootout All-Tournament Team. His standout defensive performances made him one of the conference's foremost defensive anchors.

**FOURTH AMENDED COMPLAINT**

3218.  Nze joined Butler in 2018 then redshirted for one season before becoming a crucial player on the BIG EAST team. His outstanding field goal percentage placed him at the top of the conference during 2019-20 while he ascended to become one of the Bulldogs' leading rebounders throughout three subsequent seasons. During the 2021-22 season Nze took on the leadership role of team captain while continuing to serve as an indispensable player both on the court and through off-court contributions. His performances frequently earned him placement in televised games across FS1, CBS Sports, ESPN and the BIG EAST Digital Network which enhanced his public recognition and commercial appeal.

3219.  Even though Nze received many honors, NCAA rules blocked him from earning NIL income between 2016 and 2020 because they prevented athletes from making money from their personal brand. The Supreme Court ruled against restrictions in 2021 but ongoing confusion about NIL policies and compliance fears prevented players like Nze from fully benefiting from NIL rights during his last season at Butler.

3220.  Nze established himself as an excellent sponsorship candidate through his consistent achievements as a multi-year starter and leader at programs from two major conferences. The outdated NCAA policies produced an unjust effect by preventing him from earning fair market value for his contributions to capitalize fully on available opportunities.

3221.  **The effect of Defendants' illegal conduct on Plaintiff Maurice Odum.** Maurice "Moe" Odum excelled as a playmaker and leader throughout his collegiate basketball career while making substantial impacts during both offensive and defensive plays. At the University of the Pacific his basketball career started when he immediately gained recognition as a vital team member. The 2022-2023 season saw Odum receive WCC All-Freshman Team accolades which affirmed his standing as one of the conference's premier young talents. The combination of his defensive skills with his scoring generation made him a vital player for Pacific's team.

**FOURTH AMENDED COMPLAINT**

3222.  During his second year at Pacific, Odum expanded on his first-year achievements by becoming the third highest assist leader in the WCC and starting in 28 matches. Media coverage of his performances expanded throughout the nation when he appeared on television networks including ESPN+ and CBS Sports. His dual ability to lead effectively on offense and defend on the court positioned him as a standout player in the competitive WCC landscape.

3223.  Odum moved to Pepperdine University in 2024 to join a program located in the profitable Los Angeles media market. Odum's playtime during the 2024 season at Pepperdine University allowed him to build substantial visibility opportunities and sponsorship potential. The exposure Odum gained from national TV broadcasts enabled him to enhance his status as an established college basketball player through his contributions in prominent events.

3224.  Odum's professional accomplishments demonstrate his expert abilities alongside his commitment and determination. The recognition as a WCC All-Freshman Team honoree combined with his status as a top assists leader and his key contributions to two basketball programs showed Odum's capability to maintain high performance under pressure. Odum's transfer to Pepperdine demonstrates his growing prominence in college basketball through his placement in a leading NIL market.

3225.  Odum achieved notable success but faced significant obstacles when trying to take advantage of his athletic value. Even though Odum met eligibility requirements for NIL opportunities during his athletic career his program's inadequate understanding of NIL processes combined with unclear implementation guidelines following the 2021 Supreme Court ruling limited his ability to take advantage of these opportunities. During his rise at Pacific Odum failed to utilize his local fame to create endorsement deals in the Bay Area. NIL policies developed too late for Odum, which limited his career opportunities and caused him to miss out on significant financial gains.

**FOURTH AMENDED COMPLAINT**

3226.  The experience of Odum illustrates how mid-major athletes have been unfairly restricted from earning opportunities by the NCAA's outdated regulations. Odum demonstrated exceptional playmaking and defensive abilities which allowed him to provide significant value outside of basketball through his leadership and community influence.

3227.  **The effect of Defendants' illegal conduct on Plaintiff Ikem Okeke.** Ikem Okeke was a dedicated and formidable defensive back who played for the University of Hawaii from 2016 to 2019. His contributions to the team were invaluable, and his commitment to the sport demanded an extraordinary level of dedication.

3228.  During the season, Okeke trained and competed at least six days a week, often exceeding forty hours of labor under the direction of his coaches. Even in the offseason, his responsibilities persisted, with rigorous workouts, film study, and team activities consuming a significant portion of his time.

3229.  Before arriving at Hawaii, Okeke was a highly sought-after recruit, recognized for his athletic ability and defensive prowess. He attended Bishop Gorman High School in Las Vegas, Nevada, where he excelled as an outside linebacker. In his senior season, he recorded 42 tackles, including 27 solo stops, three tackles for loss, one sack, and one interception. His performance led his team to consecutive Nevada Division I State Championships and two straight USA Today national championships. He earned first-team all-Southwest League honors and was listed on the Nevada Prep Report All-Prospect Team. He was rated a three-star recruit by Rivals, Scout, and 247Sports, ranking as the No. 10 outside linebacker in the West and first in Nevada by Scout, and the No. 8 player in Nevada by 247Sports.

3230.  During his tenure at the University of Hawaii, Okeke proved himself to be one of the team's most reliable and impactful defenders. His junior season in 2018 was a breakout year, as he tied for second on the team with 87 tackles, including a team-leading 60 solo stops, establishing himself as one of the premier defensive players in

**FOURTH AMENDED COMPLAINT**

the Mountain West Conference. In his senior year, he further cemented his leadership role in the secondary, recording three interceptions and leading the team in pass deflections. Over the course of his four-year career, he consistently developed his game, demonstrating a steady rise in productivity and reliability.

3231.  Okeke's efforts on the field did not go unnoticed. Hawaii football games were regularly broadcast on national television networks such as ESPN and CBS Sports, drawing millions of viewers. Thousands of fans filled the stadiums each week, and the university capitalized on the success of its football program through ticket sales, merchandise, and sponsorships. Okeke was frequently highlighted in promotional content across the school's official social media platforms, further enhancing the program's visibility and revenue-generating capabilities.

3232.  The University of Hawaii's football program generated significant revenue during Okeke's collegiate career. The team's success and national exposure played a direct role in boosting the university's financial gains, contributing to conference distributions and athletic department earnings. Despite this, Okeke received none of the revenue that his labor helped generate. Under NCAA restrictions, he was barred from profiting from his name, image, and likeness, even as his contributions directly benefited the university, its sponsors, and its business partners.

3233.  While the NCAA eventually permitted NIL compensation, the restrictions that were in place during Okeke's playing career prevented him from earning what he was rightfully owed. By the time the rules changed, his most marketable years as a collegiate athlete had passed. Had the NCAA's restrictions been lifted earlier, Okeke would have had the opportunity to negotiate sponsorship deals, receive compensation for promotional appearances, and secure financial benefits commensurate with his talent and contributions.

3234.  The NCAA's restrictive policies deprived Okeke of the opportunity to benefit from a competitive market. Without these unjust restraints, he would have been

**FOURTH AMENDED COMPLAINT**

able to negotiate fair remuneration for his services as a collegiate football player. The
financial benefits that should have been available to him were instead retained by the
university and its conference, reinforcing an inequitable system that enriched institutions
while preventing athletes like Okeke from receiving their fair share. As a result, Okeke
suffered direct economic harm, missing out on compensation that he otherwise would
have been entitled to receive.

3235. **The effect of Defendants' illegal conduct on Plaintiff Micah Parten.**
Micah Parten played as an offensive lineman for the University of Central Arkansas
(UCA) from 2016 through 2017.

3236. Prior to his time at UCA, Parten played at East Central (Mississippi)
Community College, where he served as a team captain during the 2015 season. He
played a key role in East Central's playoff appearance that year and competed in the
Heart of Texas Bowl. His leadership helped East Central achieve a ranking of 10th in
the nation, and he maintained a 3.0 grade-point average while balancing academic and
athletic demands.

3237. In 2016, Parten started all 13 games on the offensive line for UCA. His
leadership played a crucial role both on and off the field, and his presence as a vocal
leader set the tone for the team's success. His consistent presence on the field played a
key role in the team's offensive production, providing critical blocking support and
protection for the backfield. His contributions were essential in helping UCA maintain
one of the most effective rushing attacks in the Southland Conference that season.

3238. In 2017, Parten again played a crucial role on the offensive line,
continuing as a team captain and earning Honorable Mention All-Southland Conference
honors. His reliability as a blocker and his ability to anchor the offensive line contributed
significantly to the team's overall success. Due to the team's success, UCA had multiple
nationally televised games on ESPN, during which Parten emerged as one of the faces
of the university. He was frequently featured in university promotional videos and was

**FOURTH AMENDED COMPLAINT**

covered in ESPN's 'Fat Bowl II' segment by Scott Van Pelt, further enhancing his visibility and public profile.

3239.  Throughout his collegiate career, Parten dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His commitment extended beyond scheduled practices, often sacrificing personal time to improve his craft and master his role on the field.

3240.  Despite his contributions and leadership, Parten played during a period when NCAA restrictions provided no window for players to earn from their NIL. As a result, he was denied the opportunity to capitalize on financial opportunities that players with similar impact and visibility now enjoy.

3241.  **The effect of Defendants' illegal conduct on Plaintiff Donell Paster**. Donell Paster played as an offensive lineman from 2016-2018 at Jackson State University, a proud Historically Black College and University (HBCU).

3242.  In 2016, Paster contributed as a versatile lineman, playing multiple positions along the offensive line except for center. His adaptability made him a key rotational player, providing critical depth and stability for Jackson State's offensive front. His physicality and coachability earned him recognition as a dependable contributor despite being early in his collegiate career.

3243.  In 2017, Paster's role expanded, and he became a consistent presence on the offensive line. His ability to shift between guard and tackle ensured Jackson State maintained a solid offensive front. His leadership also emerged as a key attribute, as he took on mentoring responsibilities within the offensive unit.

3244.  In 2018, Paster's impact reached its peak. He started multiple games at both guard and tackle and played a vital role in the team's offensive production. His performance contributed to Jackson State's success in the SWAC, earning him strong internal recognition as one of the most versatile linemen in the program. His academic

**FOURTH AMENDED COMPLAINT**

achievements also stood out, earning him a spot on the Dean's List and the Student-Athletes Above 3.0 Award all three years of his career.

3245.  Beyond his on-field contributions, Paster maintained a positive presence within the university community. He participated in community initiatives and volunteered at Jackson State's Football Camp, further strengthening his role as a student-athlete leader.

3246.  Throughout his career, Paster dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His commitment extended beyond scheduled practices, often sacrificing personal time to improve his craft and master his role on the field.

3247.  Despite his strong contributions, Paster played during a period when NCAA restrictions provided no window for players to earn from their NIL. As a result, he was denied the opportunity to capitalize on financial opportunities that players with similar impact and visibility now enjoy.

3248.  **The effect of Defendants' illegal conduct on Plaintiff Alex Perry.** Alex Perry worked as a college football player at Arizona State University from 2017 to 2018 and at the University of Nevada, Las Vegas (UNLV) from 2018 to 2019.

3249.  The labor provided by Perry was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

3250.  Perry was a highly recruited prospect out of high school who possessed unique talent. He attended Bishop Gorman High School in Nevada, where he was ranked the No.25 cornerback nationally as a four-star recruit. His exceptional performance and elite athleticism attracted interest from top football programs across the country.

**FOURTH AMENDED COMPLAINT**

3251.  Perry's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate career, he was one of the most impactful players for Arizona State and UNLV.

3252.  During his freshman year at Arizona State, Perry saw playing time as a defensive back, contributing to the team's secondary depth. After transferring to UNLV, he played in seven games and recorded 24 tackles. In 2019, he was awarded a medical redshirt. Despite the challenges he faced, Perry's presence on the field and his status as a high-profile recruit reinforced his marketability as a collegiate athlete.

3253.  During his collegiate career, the football games of both universities were broadcast on national television networks, including ESPN and CBS Sports. Millions of people watched Arizona State and UNLV football games on TV, and tens of thousands packed stadiums to watch in person. Perry was also frequently featured on the social media accounts of both universities, highlighting his accomplishments and further boosting game attendance and viewership.

3254.  Both Arizona State and UNLV made millions of dollars in revenue from their football programs. For example, in 2021-22, the Pac-12 Conference distributed over $400 million in total revenue to its member schools, for an average of $37 million per school. The Mountain West Conference, to which UNLV belongs, also generates substantial revenue from media rights deals and sponsorships and distributes around $5-7 million to each member school annually. Perry, however, received none of that revenue.

3255.  During his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. As a highly sought-after high school recruit who played at both a Power Five and a Group of Five school, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

**FOURTH AMENDED COMPLAINT**

3256.  Defendants' conspiracy greatly harmed Perry. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Perry would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3257.  **The effect of Defendants' illegal conduct on Plaintiff N'Kosi Perry.**
N'Kosi Perry played football for the University of Miami from 2017 to 2020 before moving to Florida Atlantic University (FAU) where he competed from 2021 to 2022. Perry came to college as a highly sought-after quarterback recruit from Vanguard High School in Ocala, Florida with substantial expectations based on his four-star rating.

3258.  N'Kosi Perry demonstrated his commitment to football through his rigorous weekly routine that consisted of six to seven days of practices, film study sessions, conditioning exercises and travel commitments while he also maintained his academic duties. Continuous preparation enabled him to become a successful starting quarterback for two collegiate programs.

3259.  Perry competed in 24 Miami games throughout 2018-2020 and as a redshirt freshman he started six games in 2018 where he achieved 1,091 passing yards and 13 touchdowns. Perry contributed significantly to Miami's 2020 season in the Cheez-It Bowl where he demonstrated an outstanding performance, finishing 19-for-34 for 228 passing yards with two touchdowns over Oklahoma. In 2021 when he transferred to FAU Perry secured a starting quarterback position and became team captain producing 2,771 passing yards with 20 touchdown passes and four rushing touchdowns. After his impressive 2021 performance he achieved 2,712 passing yards along with 25 touchdowns in 2022 which resulted in PFF C-USA All-Third Team honors.

**FOURTH AMENDED COMPLAINT**

3260.  From 2017 to 2020 Perry couldn't generate any NIL revenue because NCAA rules operated against the law to prevent athletes from realizing their economic potential. The Supreme Court found the NCAA's NIL restrictions to be illegal in 2021 but Perry continued to experience limited NIL opportunities due to unclear NCAA policies and widespread fear of compliance violations. As a starting quarterback in the South Florida market, Perry's Name, Image and Likeness was used throughout his career including promotional item, figurines and other merchandise in which he was unable to personally benefit financially.

3261.  Perry's record of sustained starting positions in the ACC and Conference USA made him an ideal candidate for earning through NIL deals. Perry's marketability grew because his social media following reached over 30,000 Instagram users. NCAA regulations prevented Perry from using his NIL to generate earnings during his peak marketable years despite his qualifications.

3262.  **The effect of Defendants' illegal conduct on Plaintiff Nathaniel Pierre-Louis.** Nathaniel Pierre-Louis emerged as a standout guard for Temple University from 2017-2020 where he demonstrated superior defensive skills and explosive offensives abilities playing in the American Athletic Conference (AAC). Nathaniel Pierre-Louis's college experience demonstrates the difficulties athletes faced when they couldn't utilize NIL opportunities despite strong performances and significant market exposure before the NIL era.

3263.  Pierre-Louis impressed as a freshman during the 2017-18 season which earned him a place on the AAC All-Rookie Team. His strong defensive skills and athletic abilities made him one of the standout young guards in the conference. Competing in a major media market such as Philadelphia helped boost his exposure while placing him alongside similar program athletes who are now receiving major endorsement opportunities and promotional partnerships in the NIL environment.

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

3264.  Pierre-Louis delivered much improved performances throughout his second season (2018-19). He became one of Temple's strongest scorers and defensive leaders which led him be named the Most Improved Player in both the AAC and the Philadelphia Big 5. His NIL value would have experienced substantial growth because his presence and role within Temple's system became more prominent.

3265.  Pierre-Louis topped Temple in rebounds per game at 8.5 RPG during his junior year (2019-20) while upholding his position as one of the AAC's premier defensive guards. His status as an elite rebounding guard combined with strong defensive performance enhanced his potential for NIL opportunities. The modern NIL landscape allowed similarly contributing AAC athletes to gain endorsement deals with regional businesses while expanding their social media presence and gaining exposure through nationally televised games, advantages that Pierre-Louis lost because of outdated NCAA policies.

3266.  During his collegiate career Pierre-Louis kept his social media accounts active with over 50,000 followers across various platforms while interacted with his fanbase to showcase his accomplishments. In the absence of restrictions this popularity has proven lucrative for athletes like Nathaniel.

3267.  During Pierre-Louis' time at Temple University the AAC basketball program received more national media attention when they participated in the NCAA Tournament garnering national media attention. Athletes from Temple University are positioned nicely in Philadelphia's dynamic sports market, with strong alumni and sponsorship support for NIL collectives today.

3268.  Pierre-Louis' journey demonstrates that talented players from mid-major conferences such as the AAC encountered similar unjust constraints to those found in Power 5 programs. The Defendants' actions caused direct harm to the Plaintiff which stripped him of NIL deal opportunities that his performance and social reach would have otherwise earned under modern NCAA rules.

**FOURTH AMENDED COMPLAINT**

3269.  **The effect of Defendants' illegal conduct on Plaintiff Joshua Pierre-Louis.** Joshua Pierre-Louis played collegiate basketball at Temple University between 2019 and 2020 followed by transferring to UC Santa Barbara from 2020 through 2024. Pierre-Louis maintained consistent contributions at both ends of the court thanks to his high-energy style combined with defensive strength and offensive proficiency throughout his entire professional basketball career.

3270.  Joshua Pierre-Louis demonstrated his dedication to basketball through his rigorous weekly routine that spanned six to seven days of practices, film study, conditioning and travel commitments while he balanced his schoolwork. Due to his strong work ethic Pierre-Louis emerged as one of the most impactful guards in both the American Athletic Conference and the Big West Conference.

3271.  While playing for the Owls at Temple University, Pierre-Louis demonstrated significant defensive skills along with athletic abilities and intensity. The Gauchos secured their Big West Conference Championship during the 2020-21 season with significant contributions from Pierre-Louis following his transfer to UCSB. The progress Pierre-Louis made at UCSB allowed him to make greater contributions every season and ultimately become a veteran leader in the 2023-24 season.

3272.  Between 2019 and 2020 Pierre-Louis could not generate income from his NIL rights because NCAA rules blocked athletes from leveraging their market value despite his defensive excellence and conference achievements. The Supreme Court's 2021 decision declared these restrictions illegal yet residual uncertainty about NIL policies along with fears of compliance breaches among players and programs led to additional restrictive practices that diminished Pierre-Louis's NIL opportunities at UCSB.

3273.  Pierre-Louis demonstrated strong leadership qualities as a key player for UCSB's championship team which matched the characteristics of athletes who achieved successful NIL partnerships. He could not monetize these opportunities

**FOURTH AMENDED COMPLAINT**

because outdated NCAA policies created financial barriers stopping him from benefiting from his sports success and marketability.

3274.  **The effect of Defendants' illegal conduct on Plaintiff Justin Ragin**. Plaintiff Justin Ragin played college football as a defensive lineman for Jackson State University in the Southwestern Athletic Conference (SWAC) from 2019 to 2022. The labor provided by Mr. Ragin was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaching staff.

3275.  Mr. Ragin was a dominant force on the defensive line, establishing himself as a premier pass rusher and run-stopper in the SWAC. His consistent impact on the field positioned him as one of the top defensive players in the conference, making him a valuable asset both to his team and to the broader football program. Despite his contributions, the NCAA's restrictions on NIL compensation denied him the opportunity to capitalize on his marketability and high level of performance.

3276.  By 2021, Mr. Ragin's career trajectory aligned with a transformational period in SWAC football, as Deion Sanders took over as head coach at Jackson State University. Sanders' presence dramatically elevated national interest in the conference, increasing media coverage, sponsorships, and television appearances for SWAC programs. Under this heightened exposure, Mr. Ragin's performance on the defensive line was showcased to a much wider audience. His games were featured on ESPN networks, attracting more attention than ever before to the talent within the SWAC. The arrival of Coach Sanders led to increased television viewership, expanded recruiting pipelines, and a level of visibility that had previously been unattainable for many SWAC athletes.

3277.  During the 2019 season, Mr. Ragin was a key contributor on the defensive line, recording 25 tackles, including 13.5 tackles for loss, and establishing himself as a

**FOURTH AMENDED COMPLAINT**

rising presence within the program. His early success set the foundation for a highly productive career, yet he remained entirely restricted from receiving any compensation for the value he brought to the program.

3278. By 2021, Mr. Ragin had elevated his impact, recording 5 sacks in six games and delivering dominant performances in key matchups. His ability to disrupt opposing offenses made him one of the most impactful defensive players in the SWAC. His recognition at the conference level further demonstrated his ability to compete at a high level, yet he was still unable to monetize his growing reputation due to the NCAA's restrictive policies. His performance, alongside the growing media exposure generated by Sanders' leadership, could have significantly increased his NIL potential, but he remained barred from benefiting financially from the attention surrounding SWAC football.

3279. In 2022, Mr. Ragin had a breakout season, recording 38 tackles, 16 tackles for loss and 10 sacks – all career highs - ranking among the top defensive linemen in the SWAC. His performances played a crucial role in his team's defensive success and drew significant attention from scouts and analysts. The exposure he generated contributed to increased game attendance, higher television viewership, and broader recognition for his program. Despite these measurable benefits to his school, he remained unable to profit from the use of his name, image, and likeness.

3280. Throughout his collegiate career, Mr. Ragin played in games that were broadcast on national networks and regional sports channels, enhancing his visibility and making him an attractive candidate for NIL opportunities had they been available. His team leveraged his on-field success to boost its marketing, ticket sales, and overall program prestige, yet he was denied any financial benefit from his contributions. The rise of SWAC football under Coach Sanders further highlighted the unjust nature of the NCAA's restrictions, as players like Mr. Ragin were instrumental in the increased attention and revenue but were unable to access their rightful share.

**FOURTH AMENDED COMPLAINT**

3281.  The NCAA's restrictions not only prevented Mr. Ragin from earning compensation during his playing years but also forced him to navigate his collegiate career without the financial security that could have been available under a fair NIL system. Had he been able to access NIL revenue, he could have secured financial stability, pursued additional training resources, and invested in his long-term athletic development. Instead, he was placed at a financial disadvantage, unable to capitalize on his peak earning years as a collegiate athlete.

3282.  Defendants' conspiracy greatly harmed Mr. Ragin. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3283.  **The effect of Defendants' illegal conduct on Plaintiff Charleston Rambo.** Charleston Rambo played college football at the University of Oklahoma from 2017 to 2020 before transferring to the University of Miami in 2021. As a four-star recruit and the 45th best wide receiver prospect of the 2017 graduating class, Rambo began his college football career with substantial expectations.

3284.  Rambo demonstrated his commitment to football through the rigorous routine he followed during his college years. He allocated six to seven days weekly for practices, film review sessions, physical conditioning routines, and travel needs while managing his academic tasks.

3285.  Rambo left an instant mark at Oklahoma through his role in consecutive Big 12 Championship teams during 2018 and 2019 and his appearances in several College Football Playoff contests. He stood out in Oklahoma's dynamic offense through

**FOURTH AMENDED COMPLAINT**

his flexible skill set combined with his ability to create game-changing plays which led to frequent national TV appearances on ESPN, FOX Sports, and CBS Sports.

3286.  Rambo transferred to the University of Miami in 2021 where he delivered a standout season and broke the Hurricanes' single-season receptions record by securing 79 catches for 1,172 yards and seven touchdowns. His record-setting performance resulted in earning second-team All-ACC honors. His commanding presence during games and clutch performances in major matchups made him stand out as one of the premier wide receivers in the ACC.

3287.  Although the Supreme Court ruled in 2021 that such restrictions were unlawful, widespread fear of compliance violations led to restrictive practices that persisted, limiting Rambo's ability to capitalize on his market value his senior year. Given his status as a record-setting receiver and high-profile transfer, Rambo would have been a prime candidate for endorsements, regional partnerships, and national media promotions under NIL conditions.

3288.  Rambo's moves between two Power Five conferences and his record-breaking season at Miami transformed him into a sought-after NIL asset while significantly increasing his public profile. The outdated NCAA policies unjustly limited athletes from earning profits based on their athletic success and public recognition which directly affected his earning potential. Rambo was unable to earn from his NIL from 2017 to 2020 due to the NCAA's unlawful restrictions.

3289.  **The effect of Defendants' illegal conduct on Plaintiff Jaylon Robinson.** Jaylon Robinson played college football at the University of Oklahoma between 2018 and 2019 before transferring to the University of Central Florida from 2019 through 2021 and then moving to the University of Mississippi for the 2022 season before ending his college career at Texas Christian University in 2023. Robinson came to college as a four-star wide receiver recruit and people expected great things from him because of his strong recruiting background.

**FOURTH AMENDED COMPLAINT**

3290.  The demanding schedule Robinson kept throughout his college football years demonstrated his dedication to the sport. He dedicated six to seven days each week to practices, film study, conditioning, and travel duties while managing his academic responsibilities.

3291.  Robinson started his college career at Oklahoma where he played as a freshman before he transferred to UCF. His standout 2020 season featured 55 receptions totaling 979 yards and six touchdowns which secured him First-Team All-AAC recognition. He earned a place on the 2021 Biletnikoff Award Watch List because of his performance but injuries restricted his influence during that season. Robinson faced limited playing time at Ole Miss in 2022 because of an injury. Robinson concluded his TCU tenure in 2023 by logging 32 receptions for 397 yards.

3292.  The NCAA's unlawful policies prevented Robinson from profiting through his NIL during his 2018 to 2020 period despite his strong performance and transfer to high-profile programs. The Supreme Court declared these restrictions unlawful in their 2021 decision but players and programs continued restrictive practices out of compliance concerns which further diminished Robinson's NIL earning potential.

3293.  Robinson's skillset as a dynamic playmaker across the Big 12, AAC, SEC and Big 12 conferences led to his recognition as a perfect candidate for endorsements and media opportunities. Restrictive NCAA policies which prohibited athletes from monetizing their success prevented Robinson from fully benefiting from his athletic accomplishments and public image.

3294.  **The effect of Defendants' illegal conduct on Plaintiff Vincent Sampson.** Vincent Sampson worked as a college football player at Jackson State University (JSU) from 2016 to 2018 and from 2020 to 2021.

3295.  The labor provided by Sampson was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week.

**FOURTH AMENDED COMPLAINT**

Even during the offseason, he worked a significant number of hours under the direction of the coaches at JSU.

3296.  Sampson was a highly dedicated offensive lineman who consistently contributed to his team's success. His strength, technical ability, and leadership allowed him to play an integral role in JSU's football program throughout his collegiate career.

3297.  Sampson's job as a college football player was essentially a full-time one, and an important and valuable one at that. Throughout his tenure at JSU, he participated in 30 games, starting 25 of them. His contributions on the offensive line provided stability and protection for the team's offensive unit, reinforcing his role as a critical asset to the program.

3298.  During his freshman season in 2016, Sampson developed foundational skills and contributed in a rotational role. By his sophomore year in 2017, his game time and responsibilities increased significantly, solidifying his place as a valuable lineman. By his junior year in 2018, he was an established starter, consistently performing in key games.

3299.  In 2019, Sampson's contributions were limited due to injury, yet he remained an essential part of the team's roster. His leadership and presence continued to influence the offensive unit. In 2020, he returned as a veteran offensive lineman, playing a pivotal role in JSU's key victories and mentoring younger players. His final season in 2021 saw him as a veteran leader, providing consistency and leadership on the field.

3300.  During the 2020 and 2021 seasons, Deion Sanders took over as the head coach at Jackson State, bringing unprecedented national attention to the program. Sanders' influence significantly boosted JSU's visibility, leading to increased television exposure, sponsorships, and recruitment rankings. This heightened media presence would have further elevated Sampson's marketability in a fair NIL environment, increasing his potential financial opportunities.

**FOURTH AMENDED COMPLAINT**

3301.  During his collegiate career, Jackson State's football games were broadcast on national and regional television networks, including ESPN and other SWAC-affiliated platforms. Millions of viewers watched JSU football games, and thousands of fans attended games in person, highlighting the program's growing national prominence. Despite his significant contributions, Sampson was not able to monetize his NIL during his playing career due to NCAA restrictions.

3302.  Jackson State University and the SWAC conference generated substantial revenue from their football programs. Jackson State, in particular, saw increased media coverage and financial growth during Sampson's tenure. However, Sampson received none of that revenue.

3303.  During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his university. Even when NIL compensation became permissible, he did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. Given his consistent performance, leadership, and role in advancing HBCU football, Sampson's potential NIL earnings would have been significant in today's environment.

3304.  Defendants' conspiracy greatly harmed Sampson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Sampson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3305.  **The effect of Defendants' illegal conduct on Plaintiff Bryan Schor.** Bryan Schor distinguished himself as an exceptional quarterback at James Madison University by being instrumental in guiding his team to the National Championship in

**FOURTH AMENDED COMPLAINT**

2017. As a two-year team captain, Schor demonstrated leadership and performance that made him one of James Madison University's most significant football players of all time. The restrictive NCAA policies limited Mr. Schor from earning revenue from his personal brand or sharing revenue made by the university due to his investment.

3306.  During the 2016 season Schor started 14 games at quarterback for JMU and received HERO Sports FCS Second Team All-American honors, the Bill Dudley Award, which is presented to the top Division I player in Virginia, and CAA Offensive Player of the Year title. He earned accolades as JMU Male Athlete of the Year and VaSID Offensive Player of the Year along with Roanoke Times Division I State Player of the Year. During his career he received honors as the CAA Offensive Player of the Week four times while earning the 12th spot in the STATS FCS Walter Payton Award. During that season Schor successfully completed 217 passes out of 297 attempts for 3,002 yards and scored 29 touchdown passes along with running for 569 yards and 10 touchdowns. Schor topped the national rankings in both completion percentage (73.1%) and pass efficiency (186.2), establishing himself as one of the country's most proficient quarterbacks, regardless of conference.

3307.  Schor played in every game as starting quarterback during the 2017 season, finishing 271 out of 417 pass attempts for 3,222 yards and 26 touchdowns, and guided JMU to a 14-1 season falling just short of repeating as national champions. He was a Walter Payton Award Finalist, Second Team All-CAA, VaSID Second Team All-State and the recipient of Gary Clark's Offensive MVP award his senior year.

3308.  Schor became JMU's all-time leader in passing touchdowns with 62 and passing yards at 7,078 while also setting records for completions at 559 and total offense with 8,241. Schor secured ninth place in national completion percentage charts and achieved top standings in passing touchdowns alongside efficiency and total offense categories. Scholars will remember him for the five-TD game against ETSU and

**FOURTH AMENDED COMPLAINT**

his remarkable playoff showings that featured 359 passing yards during the FCS
quarterfinals against Weber State.

3309.  During his collegiate career Schor spent six to seven days each week
refining his skills with 8 hours daily dedicated to practices, film study, and training. He
went above and beyond scheduled practices by sacrificing personal time to better his
performance and support his team's achievements. His commitment to skill refinement,
craft improvement, and role mastery demonstrates the significant effort needed to
succeed as a Division I quarterback.

3310.  Even though Schor is the most decorated quarterback in program history,
a proven leader and national champion, he was unable to access financial opportunities
that are now available to similar accomplished athletes today. Quarterbacks from FCS
programs who win conference awards and playoff trophies are free to obtain NIL
agreements from local enterprises and fan groups along with social media platforms.

3311.  The Defendants' actions created financial barriers for Schor which
stopped him from gaining monetary opportunities available to athletes with similar
accomplishments. The Defendants' scheme directly injured him by preventing him from
capitalizing on his substantial NIL value potential due to his national platform built by his
performance and leadership abilities on and off the field.

3312.  **The effect of Defendants' illegal conduct on Plaintiff Alexander Shaw.**
Alexander Shaw worked as a college football player at Jackson State University from
2018 to 2020 and at Mississippi State University in 2022.

3313.  The labor provided by Shaw was of great value to Defendants. During the
season, he worked at least six days a week and often more than 40 hours per week.
Even during the offseason, he worked a significant number of hours under the direction
of the coaching staff at both universities.

3314.  Shaw was a highly recruited defensive back with unique talent. Coming
out of high school in 2018, he was a three-star recruit and received offers from Jackson

**FOURTH AMENDED COMPLAINT**

State, Mississippi State, Southern Miss, and Memphis before ultimately committing to Jackson State. His athleticism, coverage ability, and playmaking skills earned him the opportunity to play Division I football, beginning his career at Jackson State University before transferring to Mississippi State.

3315.  Shaw's job as a college football player was essentially a full-time one, and an important and valuable one at that. During his collegiate football career, Shaw was a multi-year contributor, demonstrating his ability to make an impact in the secondary and developing into a key player at both the FCS and FBS levels.

3316.  During his freshman year at Jackson State in 2018, Shaw quickly made an impact on the roster as he adjusted to the collegiate level. In 2019, he played in 8 games, recording 7 tackles, solidifying his role in the secondary. By 2020, Shaw had developed into a consistent playmaker, switching to the cornerback position and finishing the season with 15 tackles, three pass breakups and two forced fumbles.

3317.  After transferring to Mississippi State in 2022, Shaw appeared in 3 games and registered one tackle. His contributions helped Mississippi State remain competitive in the SEC, one of the most challenging conferences in college football.

3318.  During his collegiate career, Shaw played in multiple nationally and regionally televised games, particularly during his time at Mississippi State, where SEC football enjoys extensive media coverage. Millions of people watched Mississippi State games on major networks, and stadiums were filled with tens of thousands of fans each game. Both Jackson State and Mississippi State frequently featured Shaw in team media content, using his image to promote the football programs and generate engagement with fans.

3319.  Despite his substantial contributions, Shaw was unable to capitalize on NIL opportunities due to NCAA-imposed restrictions. As a defensive standout at two different programs, he would have been well-positioned for endorsement deals and local sponsorships, yet he was denied these financial opportunities.

**FOURTH AMENDED COMPLAINT**

3320.  Mississippi State and Jackson State football programs generated significant revenue from media rights, ticket sales, and sponsorships during Shaw's time with both teams. The SEC, in particular, has one of the largest revenue-sharing models in college athletics. However, Shaw received none of the revenue his play helped generate.

3321.  During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his universities. Even when NIL compensation became permissible, Shaw did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a high-profile defensive back who transitioned from an FCS program to a Power Five school, his financial potential was significantly diminished due to NCAA-imposed limitations.

3322.  Defendants' conspiracy greatly harmed Shaw. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Shaw would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3323.  **The effect of Defendants' illegal conduct on Plaintiff Trevon Sidney.** Trevon Sidney played college football at USC between 2016 and 2018 and at the University of Illinois from 2019 to 2020, and finished his college career at San Jose State University in 2021. Sidney arrived at college as a four-star recruit placed in the national top 200, and had over 25,000 social media followers, which brought substantial expectations and notable NIL opportunities.

3324.  Sidney demonstrated his dedication to each university through his demanding weekly routine which included six to seven days focused on practices, film study, conditioning and travel commitments along with his academic work. Sidney's rigorous daily routine demonstrated his dedication to improving his athletic performance and his commitment to his educational achievements.

3325.  Sidney suffered from significant injuries after being pressured to play hurt to keep a prominent role against stiff competition in the receiver room. This was the biggest contributing factor which initially restricted his performance on the field at USC. He improved his stats in 2018 by securing seven receptions for 104 yards despite facing various difficulties. Sidney moved to Illinois in 2019 and recorded his most productive season with 16 receptions for 123 yards and one touchdown. In 2021 Sidney finished his career at San Jose State because NCAA eligibility rules stopped him from playing further, diminishing his NIL value during an important year.

3326.  The NCAA's unlawful limits stopped Sidney from earning NIL income between 2016 and 2020 even though he had a solid recruiting profile and demonstrated productivity at USC and Illinois. The Supreme Court ruled against the NCAA's restrictions in 2021 but Sidney's NIL opportunities stayed constrained because of ongoing NCAA administrative mishandling during his transition and graduation period.

3327.  Sidney's professional advancement suffered because of the NCAA's management of his eligibility status at San Jose State University. Sidney fulfilled all academic and athletic requirements yet prolonged administrative uncertainty blocked him from participating in his final season. Sidney lost a chance to demonstrate his skills through this mismanagement while simultaneously suffering a loss in his reputation as a seasoned athlete with market potential.

3328.  Sidney's status as a top recruit and successful player in the Big Ten positioned him for substantial NIL opportunities through endorsement deals and

**FOURTH AMENDED COMPLAINT**

promotional efforts. Restrictive NCAA policies created an unjust financial barrier which prevented him from maximizing his potential earnings from available opportunities.

3329.  **The effect of Defendants' illegal conduct on Plaintiff Amarveer Singh.** Plaintiff Amarveer Singh played college basketball at Seton Hall University from 2015 to 2017. The labor provided by Mr. Singh was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

3330.  Mr. Singh was a highly recruited four-star prospect coming out of high school. Mr. Singh was ranked No. 23 in his position, No. 32 regionally, and No. 2 in the state by ESPN, making him one of the most sought-after recruits. His arrival at Seton Hall University coincided with a period of great success for the program, with Seton Hall making two consecutive NCAA Tournament appearances. The team's success and frequent national television exposure on networks such as FS1, CBS, and FOX Sports enhanced Singh's marketability despite his limited contributions.

3331.  As a freshman during the 2015-16 season, Mr. Singh played in 30 games, starting one, while averaging 8.9 minutes per game. He contributed 2.2 points and 1.2 rebounds per contest. Seton Hall won the Big East Tournament that season, earning an automatic bid to the NCAA Tournament, where they played in a nationally televised game on CBS during March Madness. Over the course of the season, Seton Hall was featured in more than 20 nationally broadcast games, providing significant exposure to the entire roster, including Mr. Singh. His four-star recruiting status and affiliation with a successful, highly visible program further increased his value.

3332.  During the 2016-17 season, Mr. Singh appeared in nine games, averaging 9.3 minutes, 1.3 points, and 1.6 rebounds per game. Seton Hall again secured an NCAA Tournament berth, playing in nationally televised games on CBS and TNT. The team maintained its high visibility, competing in over 20 games broadcast on FS1, CBS,

**FOURTH AMENDED COMPLAINT**

or FOX Sports. Mr. Singh benefited from national exposure due to the team's continued success.

3333.  Despite his high-profile position within a nationally recognized program, Mr. Singh was unable to capitalize on NIL opportunities due to NCAA restrictions. His injury not only affected his performance but also his ability to secure financial stability. With his family facing financial and medical struggles, Mr. Singh had no viable option but to leave basketball entirely. Had NIL compensation been available, he could have supported himself and his family while continuing his career.

3334.  During his collegiate career, Seton Hall games were broadcast on major national networks, and the university frequently used Mr. Singh's image and likeness in promotional materials and social media campaigns. The exposure he helped generate contributed to the program's financial success, yet he received no share of the revenue.

3335.  The outdated NCAA policies forced Mr. Singh into an impossible situation. Denied the ability to earn compensation from his own name, image, and likeness, he was left without financial security at a time when he needed it most. Had he been allowed to monetize his NIL, he could have pursued better medical treatment and continued his playing career. Instead, the constraints placed on him by the NCAA's unlawful restrictions cut short his future in basketball.

3336.  Defendants' conspiracy greatly harmed Mr. Singh. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**FOURTH AMENDED COMPLAINT**

3337. **The effect of Defendants' illegal conduct on Plaintiff Carson Strong.**
During his time at the University of Nevada from 2018 until 2021 Carson Strong
emerged as one of the nation's top quarterbacks. Strong's outstanding arm strength and
accurate gameplay combined with his strategic decision-making skills gave him national
exposure and recognition.

3338. Strong demonstrated his commitment to his sport by maintaining a
rigorous weekly routine that involved six to seven days of practices, film study,
conditioning and travel duties alongside his academic responsibilities. His unwavering
commitment to preparation enabled him to perform outstandingly on the field and
achieve premier quarterback status.

3339. Strong achieved recognition in his college football career with several
honors including being a two-time Mountain West Offensive Player of the Year award.
His athletic prowess earned him semifinalist positions for both the Unitas Golden Arm
Award and the Manning Award and made him a member of the Davey O'Brien
Quarterback Class of 2021. The high-level games that Strong played resulted in his
appearances on national broadcasts from ESPN, CBS Sports, and FOX Sports which
boosted his marketability and visibility.

3340. Strong could not profit from his NIL between 2018 and 2020 because the
NCAA's unlawful rules prohibited athletes from deriving income from their personal
market value. The Supreme Court declared NIL restrictions unlawful in 2021 yet
ongoing policy uncertainty and the fear of compliance issues led to practices that
continued to limit Strong's NIL possibilities throughout his senior year.

3341. Strong matched nationally recognized QBs through his two-time Mountain
West Offensive Player of the Year recognition and multiple national award semifinalist
honors. Outdated NCAA regulations prevented Strong from earning his deserved
market value from his NIL during his peak performance years.

**FOURTH AMENDED COMPLAINT**

3342.  **The effect of Defendants' illegal conduct on Plaintiff Tru Cymon Thompson.** Tru Thompson worked as a college football player at Florida State University from 2019 to 2021 and at Jackson State University from 2022 to 2024.

3343.  The labor provided by Thompson was of great value to Defendants. During the season, he worked at least six days a week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaching staff at both universities.

3344.  Thompson's job as a college football player was essentially a full-time one, and an important and valuable one at that. His ability to compete at a high level and adapt to different defensive schemes demonstrated his versatility and value on the field.

3345.  Thompson began his collegiate career at Florida State University, where he played in 12 games as a freshman in 2019, recording 15 tackles, including two tackles for loss and one sack. He started in the Sun Bowl against Arizona State, where he posted a season-high four tackles. In his sophomore season in 2020, he played in eight games, registering seven tackles and one sack while showing continued development as a key rotational player. During his junior season in 2021, he appeared in one game, recording half a sack against UMass.

3346.  In 2022, Thompson transferred to Jackson State, where he played in three games, recording four total tackles, including three solo stops. The following season, in 2023, he played in 11 games, finishing with 22 tackles, 10 solo stops, five tackles for loss, and three and a half sacks. He also recorded an interception, two pass breakups, and a blocked kick. In 2024, he played a pivotal role in Jackson State's defensive front, contributing 46 total tackles, 19 solo tackles, 27 assisted tackles, two sacks, and one forced fumble. His leadership and presence on the defensive line were integral to the team's success.

**FOURTH AMENDED COMPLAINT**

3347.  Thompson was a four-star defensive tackle prospect by ESPN and a three-star recruit by 247Sports and Rivals. He was ranked as the 29th-best defensive tackle in the nation and the 50th overall prospect in Georgia. In his senior season at Grayson High School, he helped lead a defense that held opponents to just 15.2 points per game while advancing to the quarterfinals of the 7A state playoffs. He recorded over 25 tackles, five tackles for loss, and 13 quarterback hurries as a senior. As a junior, he posted more than 30 tackles, five tackles for loss, and four sacks, anchoring a defense that allowed only 11.8 points per game. His recruitment was highly competitive, and he committed to Florida State over offers from Florida, Miami, Louisville, LSU, and Michigan State.

3348.  Throughout his collegiate career, Thompson played in nationally and regionally televised games, increasing his exposure and marketability. His time at Florida State placed him in one of the most visible conferences in college football, while his role at Jackson State aligned him with a program that gained significant national attention. His performances in bowl games, rivalry matchups, and high-profile SWAC contests showcased his abilities on large stages. Despite his on-field contributions, Thompson was unable to capitalize on NIL opportunities due to NCAA-imposed restrictions. As a defensive lineman with experience at two competitive programs, he would have been well-positioned for endorsement deals and local sponsorships, yet he was denied these financial opportunities. In 2021, Florida State Athletics brought in over $161 million in revenue, none of which was afforded to Mr. Thompson despite his labor.

3349.  Florida State and Jackson State football programs generated substantial revenue from media rights, ticket sales, and sponsorships during Thompson's time with both teams. The ACC, in particular, secures large television contracts that contribute significantly to its revenue distribution model. However, Thompson received none of the revenue his play helped generate.

**FOURTH AMENDED COMPLAINT**

3350.  During part of his time in college, he was completely barred from receiving money for the use of his NIL, whether from third parties, Defendants, or his universities. Even when NIL compensation became permissible, Thompson did not receive the full amount he would have earned had the NCAA's unlawful restrictions been lifted earlier. As a defensive lineman who contributed at both the ACC and SWAC levels, his financial potential was significantly diminished due to NCAA-imposed limitations.

3351.  Defendants' conspiracy greatly harmed Thompson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Thompson would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3352.  **The effect of Defendants' illegal conduct on Plaintiff Ron Tiavaasue.** Ron Tiavaasue played both high school rugby and football in New Zealand. His collegiate career spanned 6 years and 4 programs including Snow, Missouri State, Utah State, and New Mexico State. Ron was recruited from Akid Secondary School where his skills brought him the attention of coach Andrew Mitchell.

3353.  After a season at Snow College in Utah, Tiavaasue transferred to Missouri State in 2020. While there, Tiavaasue tallied 21 receptions totaling 247 yards and 2 touchdowns during the pandemic-shortened campaign. His play delivered essential offensive support while he continuously demonstrated his commitment to the team in a season that many decided to opt out.

3354.  The run-focused offensive approach of Missouri State in 2021 and then Utah State in 2022 seasons resulted in limited statistical output from Tiavaasue.

**FOURTH AMENDED COMPLAINT**

However, his growing reputation as a premier blocking tight end played a significant role in their offensive achievements.

3355.  During the 2023 season at New Mexico State Tiavaasue tallied 3 receptions for 44 yards and 1 touchdown while generating more holes for his team running backs and receivers.

3356.  Tiavaasue showed unwavering dedication to his sport during his college years. Tiavaasue allocated 6-7 days per week for training, film study, and practice while sacrificing personal time to ensure his excellence as a player. Tiavaasue's dedication to preparation for games highlighted his drive to help his teams succeed.

3357.  Tiavaasue reached significant accomplishments outside of his athletic participation. His leadership responsibilities as Missouri State team captain showcased his strong leadership abilities which positively affected both team unity and performance. The Conference USA Commissioner's Honor Roll listed him for his commitment to academic success. As one of only a handful of New Zealanders to reach Division I football, Mr. Tiavaasue was positioned to earn unique NIL opportunities. In 2021, Missouri State athletics brought in over $29 million, none of which was afforded to Mr. Tiavaasue despite his labor.

3358.  However, Mr. Tiavaasue spent his first two seasons under NCAA rules, later deemed unlawful which completely restricted his earnings. Without clear direction from the NCAA, smaller conferences and programs were slow to respond in the NIL landscape even after the Supreme Court's rulings. The Defendants' restrictions directly harmed Tiavaasue by limiting his earning potential.

3359.  **The effect of Defendants' illegal conduct on Plaintiff Jordan Tucker.** Jordan Tucker competed for Duke University's basketball team during the 2017-18 season before moving to Butler University where he played from 2018 to 2020. The journey of four-star recruit Tucker to Duke University became highly publicized when he joined the class of 2017, recruited from Wheeler High School as a Second Team All-

**FOURTH AMENDED COMPLAINT**

League athlete, making him a central player in one of the leading basketball programs
in the country. His substantial recruiting background together with his strong social
media presence made him highly valuable for NIL opportunities.

3360.  Tucker entered his basketball journey at Duke but played only a minor role
in his first season before moving to Butler. Tucker's limited gameplay time at Duke did
not prevent him from gaining widespread recognition because of his connection to this
renowned college basketball program. Tucker became a vital player for Butler during
the 2018-19 and 2019-20 seasons after his move to the university. Tucker's exceptional
shooting skills together with his participation in prominent BIG EAST conference games
increased his national television visibility. Tucker's performance helped Butler reach the
2017-18 NCAA Tournament which boosted his public profile.

3361.  Tucker ranked among the top five NCAA athletes on social media with his
over 260,000 Instagram followers and TikTok fan base that exceeded 500,000 followers
along with 10 million likes. His most viewed TikTok video earned him the title "the best-
looking man in college basketball" which attracted considerable engagement and
boosted his influence. Tucker's content which featured collaborations with recognized
creators like Addison Rae attracted millions of viewers.

3362.  Tucker's TikTok profile which has accumulated 10 million likes translates
to brand deals that earn between $50,000 and $100,000. During his playing career, his
Instagram following of nearly 300,000 users created an earning potential range of
$1,500 to $3,000 per sponsored post. Tucker demonstrated substantial marketability
through these figures but NCAA rules did not allow him to convert this into revenue.

3363.  NCAA regulations stopped Tucker from monetizing his obvious NIL
marketability during his playing career. Tucker appeared on key sports networks such
as ESPN and FOX Sports which expanded his audience reach but he could not convert
this exposure into marketing deals due to NCAA restrictions. If NIL rules were
operational during his college career, Tucker would have been ideal for endorsement

**FOURTH AMENDED COMPLAINT**

deals and apparel sponsorships while also benefiting from social media marketing campaigns that exploited his widespread audience and national exposure.

3364.  The financial losses Tucker experienced demonstrate how outdated NCAA regulations create financial disadvantages for athletes. Since he was a high-profile recruit at Duke his early career visibility qualified him as an excellent candidate for NIL deals. His move to Butler led to increased marketability as he became a prominent scorer in the BIG EAST conference. NCAA restrictions prevented his social media platform from turning into actual brand partnerships, which would otherwise have been powerful opportunities.

3365.  Throughout his college career Jordan Tucker became an ideal candidate for NIL opportunities because of his athletic talent combined with his social media reach and national recognition. NCAA rules prevented him from leveraging his public profile and resulting influence which led to significant financial losses. This case demonstrates the necessity of providing equitable monetary compensation to former student-athletes who faced unfair restrictions on their market earnings potential.

3366.  **The effect of Defendants' illegal conduct on Plaintiff Marcus Wallace.** Marcus Wallace played as a point guard for the University of Arkansas at Pine Bluff (UAPB), a Historically Black College and University (HBCU) from 2016 through 2020. His contributions to the team steadily increased each year, culminating in a leadership role and consistent on-court performance during his upperclassmen seasons.

3367.  In the 2016-2017 season, Wallace contributed as a developing player in the backcourt rotation. His role focused on supporting the team's defensive efforts and providing depth for the guard position.

3368.  In the 2017-2018 season, Wallace's role expanded, and he became a steady contributor in UAPB's guard rotation. His improved scoring and defensive presence helped strengthen the team's backcourt. His leadership qualities also began to emerge as he mentored younger players on the roster.

**FOURTH AMENDED COMPLAINT**

3369.  During the 2018-2019 season, Wallace's role grew significantly as he became a key contributor on both ends of the floor. His leadership on the court, combined with his steady scoring output, established him as a vital presence in UAPB's lineup. His increased responsibilities also included serving as a two-year team captain, reinforcing his impact as a vocal leader.

3370.  In the 2019-2020 season, Wallace's senior campaign was his most impactful. In his senior year, he started 15 of 25 games, finished with 104 points, and had 26 assists and 23 steals. His presence on the floor helped stabilize the team during key matchups within the SWAC. As a team captain, Wallace played an integral role in guiding the team's strategy and inspiring teammates through his consistent effort.

3371.  Off the court, Wallace played an active role in representing UAPB athletics. He served as the liaison for the men's basketball team to the university, strengthening communication between players, coaches, and campus leadership. He was an active participant on campus and was used for various promotional efforts. His name, image, and likeness were used extensively at the university and conference level, further elevating his visibility as a leader and ambassador for UAPB.

3372.  Throughout his collegiate career, Wallace dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training. His dedication extended beyond scheduled practices, often sacrificing personal time to improve his craft and master his role on the court.

3373.  Despite his contributions, Wallace played during a period when NCAA restrictions provided no window for players to earn from their NIL. As a result, he was denied the opportunity to capitalize on financial opportunities that players with similar contributions now enjoy. In 2020, UAPB athletics generated over $8.7 million, none of which was afforded to Wallace despite his labor.

3374.  **The effect of Defendants' illegal conduct on Plaintiff Rashad Williams.** Rashad Williams played college basketball as a guard at Cleveland State

**FOURTH AMENDED COMPLAINT**

University, Oakland University, Saint Louis University, and the University of Arkansas at
Pine Bluff from 2018 to 2023. A high-scoring and sharpshooting guard, Williams made
significant contributions at multiple programs, demonstrating an ability to thrive in
various offensive systems. His scoring ability, particularly from beyond the arc, made
him a valuable asset, and his impact was felt across multiple conferences. Despite his
contributions on the court, Williams was unable to fully capitalize on name, image, and
likeness (NIL) opportunities due to the NCAA's restrictive policies and the chaotic rollout
of NIL rights. His earnings were severely limited due to "uncharted waters," university
compliance fears, and the absence of structured collective processes. Payments were
inconsistent and often used as leverage by the coaching staff to manipulate
performance and behavior, further restricting his financial opportunities.

3375.  Williams was recruited out of high school as a scoring-oriented guard,
ultimately committing to Cleveland State University. His ability to score efficiently from
the perimeter made him a valuable asset early in his career. As a freshman at
Cleveland State, he averaged 10.8 points per game, with 1.8 rebounds and 0.7 assists
per game, led the Horizon League in 3-point field goal percentage (0.408), and was
named to the Horizon League All-Freshman team. His scoring ability and impact as a
freshman garnered interest from other programs, leading to his decision to transfer to
Oakland University, where his role and visibility expanded significantly.

3376.  During the 2019–2020 season at Oakland, Williams had a breakout year,
averaging 19.5 points per game, along with 3.1 rebounds and 1.8 assists, making him
one of the most productive offensive players in the Horizon League. As a sophomore,
Williams made a team-high 61 3-pointers, scored a career-high 37 points against Detroit
Mercy, and had 34 points after making 11 of 19 shots at Northern Kentucky, earning
Horizon League Player of the Year honors. He continued to be a key contributor for
Oakland during the 2020–2021 season, where he averaged 13.6 points per game and
was a two-time Horizon League Player of the Week (Dec. 7 and Dec. 14).

**FOURTH AMENDED COMPLAINT**

3377.  After two productive seasons at Oakland, Williams transferred to Saint
Louis University for the 2021–2022 season. However, his role at Saint Louis was
diminished, playing 19 games and starting at none, averaging 2.2 points per game. The
reduced playing time and lack of offensive opportunities limited his impact, prompting
him to seek a program where he could return to a more significant role. For his final
collegiate season in 2022–2023, he transferred to the University of Arkansas at Pine
Bluff (UAPB), where he resumed his role as a primary scorer, leading the team in
scoring with 17.7 points per game and serving as a key contributor in SWAC
competition, ending the season with a record 513 total points. Williams' collegiate
career coincided with the NCAA's fractured and inconsistent NIL rollout, limiting his
ability to secure meaningful financial opportunities. His presence on multiple campuses
provided increased exposure, yet universities restricted NIL engagement due to fears of
violating unclear NCAA policies. Schools exercised caution in NIL implementation,
preventing athletes from fully leveraging their market value. As a result, payments
remained inconsistent and frequently contingent upon coaching staff approval, which
influenced playing time, roster decisions, and performance expectations. This arbitrary
system left athletes like Williams without financial security, despite their contributions to
their programs.

3378.  Williams' on-campus visibility was significant, particularly at Oakland and
UAPB, where his scoring ability made him a central figure in team promotions. While
these institutions actively leveraged his performances to promote their basketball
programs, Williams himself was barred from receiving financial compensation for the
use of his image and likeness. His games were broadcast through conference-affiliated
networks and regional sports platforms, further increasing his exposure. At Oakland,
Horizon League matchups provided him with a national platform, yet he was unable to
benefit from the revenue generated through these broadcasts.

**FOURTH AMENDED COMPLAINT**

3379.  Despite his status as a top scorer and a marketable athlete, Williams' NIL opportunities were fragmented and unreliable. The absence of structured opportunities prevented him from securing the financial benefits that his talent warranted.

3380.  Williams' career exemplifies the challenges faced by athletes navigating the pre-and early-NIL era without clear protections or guarantees. His ability to transition across multiple programs while maintaining high-level production highlights the financial opportunities he was denied due to outdated NCAA regulations. Had NIL rights been properly structured and enforced, Williams' marketability as a high-volume scorer would have positioned him for substantial endorsement deals, particularly at Oakland, where he was one of the Horizon League's most prominent offensive players. These schools brought in millions of dollars in athletics revenue as a result, at least in part, of Mr. Williams. Yet, Mr. Williams was not afforded any of this income despite his labor.

3381.  His case underscores the broader issue of NCAA-imposed restrictions on athlete compensation, which prevented him from fully leveraging his success. While universities and conferences profited from his contributions, he remained without meaningful NIL compensation due to a disorganized system that allowed payments to be dictated by coaching staff influence rather than fair market value.

3382.  **The effect of Defendants' illegal conduct on Plaintiff Dixie Wooten III**. Dixie Wooten III was a guard for the University of Houston from 2018 to 2019, where he played a contributing role in the team's offensive line. Despite his contributions to the team, Wooten was unable to monetize his NIL during his collegiate years due to restrictive NCAA policies.

3383.  Wooten began his collegiate career in 2018, redshirting his freshman year to develop his skills. By 2019, he had established himself as a guard, providing vital protection for Houston's quarterbacks and opening lanes for the rushing attack, making four starts in the six games he played.

**FOURTH AMENDED COMPLAINT**

3384.  While Wooten's impact was limited due to his brief career in Houston, he dedicated 6-7 days a week to refining his skills, spending approximately 8 hours a day in practices, film study, and training throughout his two-year career. His relentless commitment extended beyond scheduled practices, often sacrificing personal time to improve his technique and enhance his team's success. His dedication to refining his skills, improving his craft, and mastering his role on the field reflects the extensive effort required to excel as a Division I offensive lineman.

3385.  Despite his achievements, Wooten was denied the financial opportunities now available to athletes with comparable accolades. Players in similar positions at AAC and Big 12 programs have since secured significant NIL deals due to their performance, leadership, and visibility in major televised games. The Defendants' scheme directly injured Wooten, denying him the opportunity to monetize his talent and contributions under previous NCAA policies. Wooten was not afforded any of the millions of dollars that Houston athletics brought in, at least in part, as a result of his labor.

3386.  **The effect of Defendants' illegal conduct on Plaintiff Aaron Nesmith**. Plaintiff Aaron Nesmith worked as a college basketball player at Vanderbilt University from 2019 to 2020.

3387.  The labor provided by Mr. Nesmith was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3388.  Mr. Nesmith was a highly recruited basketball player out of Porter-Gaud School in Charleston, South Carolina, where he was a three-time South Carolina Independent School Association (SCISA) Class 3A player of the year. After winning the SCISA Class 3A state title as the team's leading scorer his sophomore year, he led Porter-Gaud to two more Class 3A state championships in his final two seasons. In his

**FOURTH AMENDED COMPLAINT**

senior year, he averaged 21 points, 4.5 rebounds, and 1.8 assists per game and was named the South Carolina Gatorade Player of the Year. Mr. Nesmith was a unanimous four-star recruit by 247 Sports, Rivals.com and ESPN and received 34 offers before committing to Vanderbilt.

3389.  Mr. Nesmith's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He played in all 32 games as a freshman, making 19 starts and leading the team in scoring in SEC games with 13.5 points per game. His 5.5 rebounds per game tied for the eighth-most by the Vanderbilt freshman in a single season, and he scored 20 or more points in four SEC games, including a career-high 26-point game at Florida.

3390.  Mr. Nesmith continued to impress as a sophomore despite only playing 14 games due to a season-ending injury. At the time of his injury, he averaged 23 points, 4.9 rebounds, and 1.4 steals per game. Not only was he the leading scorer in all of SEC, but he also scored double figures in every game, including two 34-point performances at Richmond and over UNC Wilmington. He was also a standout three-point shooter, ranking second in the country with 4.28 three-pointers made per game. Moreover, his .522 three-point shooting percentage his sophomore season is the best by a Vanderbilt player in a single season. After his surgery in January 2020, he declared for the 2020 NBA Draft and was selected in the first round as the 14th overall pick by the Boston Celtics.

3391.  During Mr. Nesmith's time at Vanderbilt University, the program was a member of the Southeastern Conference and its games were regularly carried by the conference's own SEC Network, with key matchups broadcast nationally by ESPN. For example, ESPN broadcast Vanderbilt's home game against the top-ranked Kentucky on ESPN Super Tuesday, no doubt raising the program's national profile. Vanderbilt also enjoys strong local support, with home games averaging 9,610 and 9,374 in attendance per game in 2019 and 2020, respectively.

**FOURTH AMENDED COMPLAINT**

3392.  Between ticket sales, media rights, Southeastern Conference
disbursements, and other sources, Vanderbilt University has made a considerable
amount of money from its men's basketball program. For example, for the 2018-2019
season, Vanderbilt made over $10 million in revenue from its men's basketball program
alone, with that number ballooning to over $14 million the following season. Vanderbilt
also received $44.6 million in revenue disbursements from the SEC following the 2018-
2019 season.

3393.  Mr. Nesmith received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during his time at Vanderbilt University, he was not
permitted to receive money for use of his NIL, whether from third parties, from
Defendants, or from Vanderbilt. As a highly recruited college basketball talent, he would
have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3394.  Defendants' conspiracy greatly harmed Mr. Nesmith. It prevented him
from enjoying the benefit of bargaining for competitive remuneration and benefits in an
open market. But for the illegal and unfair restraints put in place, he would have
received greater remuneration for his services as a college basketball player than he
received, and he would have received money for his NIL from third parties.

3395.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, Mr. Nesmith would have received a competitive share
of the television and other revenue being brought in by Defendants and their member
schools. Thus, Defendants' scheme directly injured him.

3396.  **The effect of Defendants' illegal conduct on Plaintiff Cade
Cunningham.** Plaintiff Cade Cunningham worked as a college basketball player at
Oklahoma State University from 2020 to 2021.

3397.  The labor provided by Mr. Cunningham was of great value to Defendants.
And it was a significant amount of labor. During the season, he worked at least six days

**FOURTH AMENDED COMPLAINT**

per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3398. Mr. Cunningham was a highly recruited player and one of the top prospects of his high school graduating class. He started at Bowie High School in Arlington, Texas, where he averaged 15.2 points and 6.4 rebounds per game in his freshman year to help the team reach the District 6A Region I final—after which he also won the District 4-6A Newcomer of the Year award. Though his sophomore season was cut short by injury, he averaged 18.8 points and 8.2 rebounds per game, was named the District 4-6A Co-Most Valuable Player, and earned Texas Association of Basketball Coaches All-Region honors.

3399. Entering his junior year of high school, Mr. Cunningham transferred to Montverde Academy in Florida, a program known for its basketball success. He adapted well to the new environment, scoring 26 points and making nine assists in the National Hoopfest tournament to secure the win against Oak Hill Academy—one of the best high school teams in the nation. That summer, Mr. Cunningham was named Nike Elite Youth Basketball League MVP after averaging 25.1 points, 6.6 rebounds, and 5.2 assists per game for the Texas Titans.

3400. Mr. Cunningham continued to excel in his senior year at Monteverde, averaging 13.9 points, 6.4 assists, and 4.2 rebounds per game and helping the team achieve a perfect 25-0 record. A MaxPreps National Player of the Year and Naismith Prep Player of the Year, Mr. Cunningham was a consensus five-star recruit with a 97 ESPN grade. He received college offers from some of the best basketball programs in the country, including Duke, Kentucky, and North Carolina, and ultimately committed to Oklahoma State, becoming the highest-ranked committed recruit in program history.

3401. Mr. Cunningham's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. His first and only season at the collegiate level demonstrated why he was such a highly rated prospect. He recorded 21

**FOURTH AMENDED COMPLAINT**

points and 10 rebounds in his debut over UT Arlington and followed up in less than two weeks with a tremendous 29-point game, including 13 points in the final 91 seconds, in an 83-78 victory over Oral Roberts. His momentum never let up over the course of the season. He posted a career-high 40 points in an overtime win against Oklahoma in February and tallied 25 points, eight rebounds, and five assists in an upset win against top-seeded Baylor in the Big 12 Tournament semifinals in March.

3402. Averaging 20.1 points, 6.2 rebounds 3.5 assists, and 1.6 steals per game as a true freshman, Mr. Cunningham became the first player in program history to be named to the Associated Press All-America First Team, and only the fourth player in Big 12 history to win Big 12 Player of the Year and Big 12 Freshman of the Year in the same season. He was also unanimously selected to First-Team All-Big 12, the All-Freshman Team, and the All-Newcomer Team—among many other accolades.

3403. Mr. Cunningham was drafted with the first overall pick of the 2021 NBA draft by the Detroit Pistons.

3404. During Mr. Cunningham's time at Oklahoma State, the program was a member of the Big 12 Conference, and the majority of its games were broadcast by ESPN. Additionally, the team's matchup against No. 2 Baylor was carried by CBS and NCAA tournament games received national coverage on TBS, including a key game against Oregon State in March 2021 that saw 3.59 million in television viewership.

3405. Between ticket sales, media rights, Big 12 Conference disbursements, and other sources, Oklahoma State has made a considerable amount of money from its men's basketball program. For example, from the 2020-2021 season, Oklahoma State made $9.3 million in revenue from its men's basketball program alone, including nearly $500,000 from ticket sales and $6.5 million from media rights. Oklahoma State also received $34.5 million in revenue disbursements from the Big 12 following that same season.

**FOURTH AMENDED COMPLAINT**

3406.  Mr. Cunningham received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. During his time in college, Mr. Cunningham was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Oklahoma State. As a nationally recognized college basketball star, not to mention the best recruit in Oklahoma State program history and eventual first overall pick in the NBA draft, Mr. Cunningham would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3407.  Defendants' conspiracy greatly harmed Mr. Cunningham. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

3408.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Cunningham would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3409.  **The effect of Defendants' illegal conduct on Plaintiff Derrick White**. Plaintiff Derrick White worked as a college basketball player at the University of Colorado – Colorado Springs from 2012 to 2015 and at the University of Colorado – Boulder from 2016 to 2017.

3410.  The labor provided by Mr. White was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3411.  Mr. White's journey to college hoops—and later, the NBA—was a true underdog story. Despite an impressive high school career at Legend High School in

NO. 1:23-cv-03076-CNS-STV

**FOURTH AMENDED COMPLAINT**

Parker, Colorado, in which he averaged 17.1 points, 3.8 rebounds, 3.1 assists, and 2.1 steals per game as a senior, he received no scholarship offers from Division I programs. He ultimately caught the attention of Jeff Culver, who in April 2012 became the head coach of men's basketball at the University of Colorado-Colorado Springs, a Division II program. Culver offered Mr. White a room-and-board stipend for his freshman season, kickstarting a remarkable basketball career.

3412.  Mr. White's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He grew tremendously in size and basketball acumen over a short period of time and became a star at UCCS. He started every game of his three-year career and left as the school's career leader with 1,912 points and 343 assists. In his junior season, he averaged 25.8 points, 7.4 rebounds, and 5.2 assists per game, leading the team to the 2015 Division II NCAA tournament.

3413.  After receiving All-American recognition, Mr. White transferred to the Division I program at the University of Colorado Boulder. He excelled there as well, averaging 18.1 points, 4.1 rebounds, and 4.4 assists per game in the 2016-2017 season, and earning First Team All-Pac-12 and All-Defensive team honors. Mr. White was subsequently drafted as the 29th pick of the 2017 NBA draft by the San Antonio Spurs. He went on to have a successful professional career, including winning the NBA Championship with the Boston Celtics in 2024.

3414.  During Mr. White's time at the University of Colorado Boulder, the program was a member of the Pac-12 Conference and its games were regularly carried by the conference's own Pac-12 Network, with key matchups broadcast nationally by ESPN and Fox. For example, in 2017, one of the regular season matchups against No. 7 Oregon was broadcast on Fox, and the end-of-season National Invitation Tournament received national coverage on ESPN3. CU Boulder also enjoys strong local support with home games averaging 7,771 in attendance per game during the 2016-2017 season.

**FOURTH AMENDED COMPLAINT**

3415.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources, CU Boulder has made a considerable amount of money from its men's basketball program. For the 2016-2017 season, for example, the men's basketball program generated $8.4 million in total revenue, including $2.1 million from ticket sales, $1.25 million from conference distributions, and $3.8 million from media rights.

3416.  Mr. White received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Colorado, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from CU Boulder. As an exceptionally talented college basketball star and All-American, he would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3417.  Defendants' conspiracy greatly harmed Mr. White. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

3418.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. White would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3419.  **The effect of Defendants' illegal conduct on Plaintiff Donovan Clingan.**  Plaintiff Donovan Clingan worked as a college basketball player at the University of Connecticut (UConn) from 2022 to 2024.

3420.  The labor provided by Mr. Clingan was of great value to Defendants. During the season, he often worked six to seven days per week and frequently more

**FOURTH AMENDED COMPLAINT**

than 40 hours per week. Even during the offseason, he dedicated substantial time and effort under the direction of UConn's coaching staff.

3421.  Mr. Clingan was a nationally recognized center who became one of the premier players in college basketball during his time at UConn. A native of Bristol, Connecticut, he attended Bristol Central High School, where he was named Connecticut Gatorade Player of the Year in both 2021 and 2022. A consensus top 50 recruit in the country, he scored a school record 2,268 career points, which ranks seventh all-time in state history, and also set school records for career rebounds and blocked shots. As a senior, he averaged 30.3 points, 18.4 rebounds and 6.2 blocks as he led Central to a 28-0 record, the Central Conn. Conference Championship and the Connecticut Division II State Championship. He was also a two-time Max Preps Connecticut High School Player of the Year, three-time Central Connecticut Conference Player of the year, and MVP of both Conn. High School Coaches Association Boys Basketball Festival and the Robert Saulsbury All-Star Game. Despite receiving offers from multiple universities, Mr. Clingan chose to play for UConn.

3422.  Mr. Clingan's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During his freshman season with UConn, he appeared in all 39 games for the Huskies, averaging 6.9 points, 5.6 rebounds, 1.8 blocks per game, while shooting .655 overall, setting a UConn record for field goal percentage. That year, he had four double-doubles, including career highs of 21 points against LIU and 11 rebounds against LIU and Providence. He was also named MVP of the 2022 Phil Knight Invitational Tournament after recording a double-double in the championship game, named Big East Freshman of the Week twice, and named to Big East All-Freshman Team.

3423.  Mr. Clingan had a standout 2023-24 season, showcasing his dominance on both ends of the floor. He was named the NCAA East Region Most Outstanding Player and earned a spot on the NCAA Final Four All-Tournament Team for his pivotal

**FOURTH AMENDED COMPLAINT**

role in leading UConn to the 2024 National Championship. He was also selected to the 2024 Big East All-Conference Honorable Mention team and was featured on the midseason watch list for the Kareem Abdul-Jabbar Award, recognizing the nation's top center. Appearing in 35 games, Mr. Clingan averaged 13.0 points, 7.4 rebounds, 1.5 assists, and 2.5 blocks in just 22.5 minutes per game that season, while shooting an 63.9% from the field. He tallied six double-doubles, including two during the NCAA Tournament, and scored 15 or more points in 13 games, including four 20-point performances.

3424.  Mr. Clingan delivered some of his best efforts on the biggest stage. In the NCAA Second Round against Northwestern, he recorded a UConn single-game NCAA Tournament record with eight blocked shots, along with 14 points and 14 rebounds. He followed that with a dominant 22-point, 10-rebound, five-block performance in just 22 minutes against Illinois in the Elite Eight.

3425.  During the 2024 NBA Draft, Mr. Clingan was selected with the seventh overall pick by the Portland Trail Blazers.

3426.  During Mr. Clingan's collegiate career, his games were broadcast on networks such as ABC, ESPN, and FS1. Millions of viewers watched UConn basketball games during this period with over 14.8 million viewers watching the UConn-Purdue National Championship Game in 2024. Thousands of fans attended UConn basketball games in person during this period with an average of 12,733 attendees per game in 2023-24 for a total of 203,722 attendees that season. UConn frequently featured Mr. Clingan on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2024, UConn's athletic department reported $8.3 million in ticket sales revenue from men's basketball. In 2024, the Big East Conference distributed millions of dollars to UConn.

3427.  Mr. Clingan received none of that revenue. Even though he was permitted to earn compensation from the use of his NIL, he did not receive the full amount from

**FOURTH AMENDED COMPLAINT**

third parties, from Defendants, or from UConn he would have received had the NCAA's
unlawful restrictions been lifted earlier. As a highly sought-after high school recruit, he
would have earned substantially more NIL compensation if not for the NCAA's unlawful
restrictions.

3428.  Defendants' conspiracy greatly harmed Mr. Clingan. It prevented him from
enjoying the benefit of bargaining for competitive remuneration and benefits in an open
market. But for the illegal and unfair restraints put in place, he would have received
greater remuneration for his services as a college basketball player than he received
and would have received compensation for his NIL.  Absent Defendants' agreement to
adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have
received a competitive share of the television and other revenue being brought in by
Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3429.  **The effect of Defendants' illegal conduct on Plaintiff Drew Eubanks.**
Plaintiff Drew Eubanks worked as a college basketball player at Oregon State University
from 2015 to 2018.

3430.  The labor provided by Mr. Eubanks was of great value to Defendants. And
it was a significant amount of labor. During the season, he worked at least six days per
week, and often more than 40 hours per week. Even during the offseason, he worked a
significant number of hours under the direction of his coaches.

3431.  Mr. Eubanks was one of the top basketball prospects from Oregon.
Playing for Reynolds High School in Troutdale, Oregon, he averaged 18 points, 10.4
rebounds, and 4.2 blocks as a senior and was named to Second Team All-State. He
was also a highly competitive baseball player, winning Pitcher of the Year in 2014 and
earning Second Team All-State honors as both a junior and senior. He ultimately chose
basketball as a career, earning a four-star rating by ESPN and ranking as the best high
school prospect from Oregon. He committed to Oregon State for college over
competitive programs such as California, Oregon, and Washington State.

**FOURTH AMENDED COMPLAINT**

3432.  Mr. Eubanks's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. As a true freshman, he played in all 32 games and started in 30 and finished the season with 39 blocked shots—the second most by a freshman in program history. He showed growth in both offense and defense throughout his 32 starts in his sophomore season, averaging 14.5 points, 8.3 rebounds, and 2.2 blocked shots per game. He scored in double figures in 24 games and grabbed double-figure rebounds in nine. Most notably, he had at least one blocked shot in 17 consecutive games, the second-longest streak in Oregon State history. His performance that season earned him an All-Pac-12 Honorable Mention.

3433.  Mr. Eubanks continued to impress in his junior season, with an average of 13.2 points, 6.8 rebounds, and 1.7 blocked shots per game. His 218 rebounds that season were the eighth most by a junior in program history, and he again showcased his defense with multiple blocked shots in six consecutive games and 55 blocked shots on the season. He ultimately signed with the San Antonio Spurs after playing for the organization in the NBA Summer League.

3434.  During Mr. Eubanks's time at Oregon State University, the program was a member of the Pac-12 Conference, and its games were regularly carried by the conference's own Pac-12 Network, with key matchups broadcast nationally by Fox and ESPN. Oregon State also enjoys strong local support, with home games averaging around 5,000 in attendance per game during the 2016-2017 season.

3435.  Between ticket sales, media rights, Pac-12 Conference disbursements, and other sources, Oregon State has made a considerable amount of money from its men's basketball program. For example, in 2017 alone, the university made over $80 million in athletic revenue, including from basketball.

3436.  Mr. Eubanks received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Oregon State, he was not permitted

**FOURTH AMENDED COMPLAINT**

to receive money for use of his NIL, whether from third parties, from Defendants, or from Oregon State. As the top prospect from Oregon and a standout college basketball player, he would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3437.  Defendants' conspiracy greatly harmed Mr. Eubanks. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

3438.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Eubanks would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3439.  **The effect of Defendants' illegal conduct on Plaintiff Khyri Thomas**. Plaintiff Khyri Thomas worked as a college basketball player at Creighton University from 2015 to 2018.

3440.  The labor provided by Mr. Thomas was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3441.  Mr. Thomas was a highly competitive player coming from Nebraska. He started at Benson High School, where he led the state of Nebraska's Class A scorers as a senior with 19.2 points per game and surpassed 1,000 career points.  He was named the captain of the 100th Omaha World-Herald's 2014 All-Nebraska Team after leading his team to the state tournament, and he also received NebraskaHSHoops.com's inaugural "Mr. Basketball" award, given to the top male high school player in the state. He then transferred to Fork Union Military Academy in Virginia for one season, where

**FOURTH AMENDED COMPLAINT**

he averaged 18 points and seven rebounds per game. He attained a three-star prospect rating from 247 Sports and ESPN and ultimately enrolled at Creighton University.

3442. Mr. Thomas's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He was the third true freshman in over 20 years in program history to start the regular-season opener. In fact, he started the team's first 24 games, and his season-high 22 points in 28 minutes at Loyola Chicago were the most by a Creighton freshman in a road game since 1996. He upped his performance in the end-of-season National Invitation Tournament, where he averaged 12.3 points and 4.7 rebounds per game.

3443. Mr. Thomas carried that momentum into his sophomore season, averaging 12.3 points, 5.8 rebounds, and 3.9 assists over 35 starts while leading the team in steals. He led the team with 18 points in a win over No. 9 Wisconsin to start the season, tallied 19 points over Providence, and notched a career-high eight assists against Xavier in the Big East Tournament, becoming Creighton's second player ever to be named the Big East Defensive Player of the Year. He won that distinction again in his junior season—after receiving a preseason All-Big East Honorable Mention—averaging 15.1 points and 4.4 rebounds per game. His performance was particularly impressive that season: he scored in double-figures while making 50% or better of his field goals in 13 of his last 15 games and earned Second Team All-Big East honors. He was subsequently drafted 38th overall by the Philadelphia 76ers in the 2018 NBA draft.

3444. During Mr. Thomas's time at Creighton University, the program was a member of the Big East Conference and its games were regularly carried by national broadcasters such as Fox, ESPN, and TNT. For example, in the 2017-2018 season, Creighton's matchups against Big East rival and No.1 Villanova were carried on Fox while its first-round game against Kansas State in the NCAA tournament received

**FOURTH AMENDED COMPLAINT**

national coverage on TNT. Creighton also enjoys tremendous local support with thousands of in-person attendees per game.

3445.  Between ticket sales, media rights, Big East Conference disbursements, and other sources, the men's basketball program generates a significant amount of money for Creighton University—especially given that the school does not have a football team. For example, it is estimated that Creighton made $35 million from its men's basketball team for the 2022-2023 season, including about $6.5 million from Big East distributions.

3446.  Mr. Thomas received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. And during his time at Creighton University, he was not permitted to receive money for use of his NIL, whether from third parties, from Defendants, or from Creighton. As a highly competitive college basketball talent, he would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3447.  Defendants' conspiracy greatly harmed Mr. Thomas. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

3448.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Thomas would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3449.  **The effect of Defendants' illegal conduct on Plaintiff Marcus Zegarowski.**  Plaintiff Marcus Zegarowski worked as a college basketball player at Creighton University from 2018 to 2021.

**FOURTH AMENDED COMPLAINT**

3450.  The labor provided by Mr. Zegarowski was of great value to Defendants. Throughout his career, he often worked six to seven days per week and frequently more than 40 hours per week. Even during the offseason, he dedicated substantial time and effort under the direction of Creighton's coaching staff.

3451.  Mr. Zegarowski, a nationally respected point guard, was one of the Big East Conference's top players during his time at Creighton. A native of Hamilton, Massachusetts, he starred at Hamilton-Wenham High School, earning Salem Evening News Player of the Year and Cape Ann League Player of the Year honors while leading his team to a 25-0 season and a state title. He later transferred to Tilton School in New Hampshire, where he was a four-star ESPN recruit. As a senior, he averaged 23 points, six rebounds, and five assists, earning NEPSAC Class AA Player of the Year honors and leading Tilton to a 28-4 record and a NEPSAC title. That season, he also scored a career-high 57 points in a double-overtime win over South Kent. A two-time All-NEPSAC selection, he finished his high school career with averages of 18 points, six assists, and five rebounds, surpassing 1,000 career points. Despite offers from Minnesota, Washington, and Ohio State, he committed to Creighton.

3452.  Mr. Zegarowski's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Over the course of his three seasons at Creighton, he appeared in 92 games, starting 75, and averaged 14.1 points, 4.2 assists, and 3.5 rebounds per game while shooting 77% for free-throws and 42.3% from three-point range.

3453.  During Mr. Zegarowski's freshman season (2018-19), he started 16 out of 32 total appearances, averaging 10.4 points, 3.4 assists, and 3.2 rebounds per game. He was one of two unanimous selections to the Big East's All-Freshman Team and ranked first in the Big East among all players in three-point percentage as well as third among Big East freshman in points per game.  His 28.6 minutes per game were the most by a Creighton freshman since 2011, and most by a Blue Jay freshman guard

**FOURTH AMENDED COMPLAINT**

since 2006.  His 60 three-pointers also ranked fourth-most in program history for a freshman.  That season, he earned Big East Freshman of the Week after contributing 13 points and six rebounds in a win against Green Bay.

3454.  As a sophomore, Mr. Zegarowski earned Second Team All-American honors from NBC Sports, Third Team honors from Stadium, and an Honorable Mention from the Associated Press. He led Creighton with 156 assists (5.0 apg) and ranked second in scoring with 500 points (16.1 ppg) while shooting 42.4% from three-point range. In the Big East, he ranked third in assists and three-point percentage, fifth in assist/turnover ratio, and sixth in points, minutes, and threes per game, as well as 11th in field goal percentage. He became just the sixth player in Creighton history to score 500+ points as a sophomore. On February 24, he was named Big East Player of the Week after averaging 21.0 points and 4.0 rebounds in top-25 wins over Marquette and Butler, and was also honored as the USBWA National Player of the Week. He became the 71st player in NCAA history to shoot a perfect 7-for-7 or better from three-point range in a single game.

3455.  During the 2020-21 season, Mr. Zegarowski started all 29 games, leading Creighton with 15.8 points and 4.2 assists per game. He topped the Big East in total three-pointers (80) and threes per game (2.76), earning First Team All-Big East honors along with USBWA All-District VI and NABC All-District 5 selections. He was also named to the Big East All-Tournament Team. Mr. Zegarowski surpassed 1,000 career points in his 75th game (vs. Providence) and was honored as Big East Player of the Week on two separate occasions, also earning NCAA.com National Player of the Week on February 15. A Preseason Big East Player of the Year, he was named a Preseason First Team All-American by Basketball Times and Blue Ribbon College Basketball Yearbook, and was among the preseason watch lists for the Naismith Trophy, Wooden Award, and Bob Cousy Point Guard of the Year Award. He later made the Naismith Midseason Team.

**FOURTH AMENDED COMPLAINT**

3456.  Statistically, he ranked first in the Big East in three-pointers per game, fourth in assists and assist/turnover ratio, fifth in three-point percentage, sixth in scoring, and top 15 in several other categories. Nationally, he ranked 19th among active players in three-point percentage (.423) and 68th in total threes made (215). He led all scorers with 17 points and eight assists in Creighton's NCAA Tournament win over UC Santa Barbara.

3457.  Mr. Zegarowski finished his Creighton career ranked sixth in made threes (215), ninth in three-point percentage (.423), tenth in assists (389), and 22nd in scoring (1,293 points). In Creighton's NCAA Tournament record book, he's tied for first in threes made in a single tournament (10), second in points (56), and fourth in assists (12). He's the only player in school history to score 17+ points in each of his first three NCAA Tournament games, and holds the program's best three-point percentage in Big East Tournament play (.556), while ranking third in assists (15), third in steals (5), and fifth in points (56).

3458.  Mr. Zegarowski declared for the NBA Draft on April 13, 2021. He was selected in the second round of the 2021 NBA draft with the 49th pick by the Brooklyn Nets.

3459.  During Mr. Zegarowski's tenure at Creighton, his games were regularly broadcast on networks such as FS1.  Thousands of fans attended Creighton basketball games with an average of 15,980 attendees per game in the 2018-19 season for a total of 303,629 that season.  Creighton frequently featured Mr. Zegarowski on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2020, the Big East conference distributed over $4.4 million to Creighton.

3460.  Mr. Zegarowski received none of that revenue. During his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties, from Defendants, or from Creighton. As a highly sought-after high school recruit

**FOURTH AMENDED COMPLAINT**

who became one of the best players in the Big East, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

3461.  Defendants' conspiracy greatly harmed Mr. Zegarowski. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received compensation for his NIL.

3462.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3463.  **The effect of Defendants' illegal conduct on Plaintiff Naz Reid.** Plaintiff Naz Reid worked as a college basketball player at Louisiana State University (LSU) during the 2018–2019 season.

3464.  The labor provided by Mr. Reid was of great value to Defendants. During the season, he often worked six to seven days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

3465.  Mr. Reid, a standout forward from Asbury Park, New Jersey, rose to national prominence as one of the top freshmen in the SEC during his time at LSU. He attended Roselle Catholic High School, where he was rated a five-star recruit, ranked 18th nationally in the 247Sports Composite Rankings, and earned Prep All-American honors. In 2018, he averaged 14.8 points, 7.7 rebounds, and 2.1 assists. Mr. Reid delivered a memorable game-winning alley-oop dunk with 6.3 seconds left to secure the Non-Public B state title, finishing with 22 points. He matched that performance with another 22-point outing in the New Jersey Tournament of Champions final, leading Roselle to victory. His outstanding high school career earned him a spot in the

**FOURTH AMENDED COMPLAINT**

McDonald's All-Star Game, where he posted 15 points, 11 rebounds, and two assists. After receiving multiple offers, Mr. Reid ultimately committed to LSU.

3466.  Mr. Reid's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. In his freshman (and only) season at LSU, he appeared in 34 games, starting 32, and posted impressive averages of 13.6 points and 7.32 rebounds per game. He scored in double figures in 24 contests, including four games with 20 or more points, earning a spot on the All-SEC Freshman Team. His performance was instrumental in leading LSU to a regular-season SEC championship and a berth in the NCAA Sweet 16.

3467.  Mr. Reid declared for the 2019 NBA and signed a contract with the Minnesota Timberwolves.

3468.  During Mr. Reid's tenure at LSU, his games were regularly broadcast on networks such as ESPN and SEC. Millions of viewers watched LSU basketball games during this time period, and thousands of fans attended LSU basketball games in person in 2018 with an average of 10,500 attendees per game for a total of 179,116 attendees that season. LSU frequently featured Mr. Reid on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. In 2018, LSU's athletic department made tens of millions in revenue from ticket sales, driven by football and basketball.  That same year, the SEC distributed around $44.6 million to each of its member schools, including LSU.

3469.  Mr. Reid received none of that revenue. During his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties, from Defendants, or from LSU. As one of the top high school recruits in the country, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

3470.  Defendants' conspiracy greatly harmed Mr. Reid. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL.

3471.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3472.  **The effect of Defendants' illegal conduct on Plaintiff Saddiq Bey.** Plaintiff Saddiq Bey worked as a college basketball player at Villanova University from 2018 to 2020.

3473.  The labor provided by Mr. Bey was of great value to Defendants. During the season, he often worked six to seven days per week and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

3474.  Mr. Bey was a nationally recognized small forward who became one of the best players in college basketball during his time at Villanova. A native of Largo, Maryland, he attended Sidwell Friends School and Paul VI Catholic High School, where he was rated a four-star recruit by Rivals and 247Sports.  As a senior, he averaged 21.2 points and eight rebounds per game.  Mr. Bey originally committed to North Carolina State before re-opening his recruitment in May 2018 and committing to Villanova the following month.

3475.  Mr. Bey's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. Over the course of his two seasons at Villanova, he appeared in 67 games, starting 60, and averaged 11.9 points and 4.9 rebounds, establishing himself as of the top players in the nation in the process.

3476.  During Mr. Bey's 2018-2019 season, he made an instant impact at Villanova and was named to the Big East All-Freshman team. He averaged 8.2 points,

**FOURTH AMENDED COMPLAINT**

5.1 rebounds, and 29.6 minutes per game, starting 29 games that season. During the Big East Tournament, Mr. Bey averaged 8.7 points per game, 6.3 rebounds per game, and two assists per game, and recorded a double-double against Seton Hall in the Big East Championship game. After scoring ten points and adding six rebounds against Marquette, he was named to the Big East Honor Roll.

3477. In the 2019-20 season, Mr. Bey had a breakout year, averaging 16.1 points and 4.7 rebounds per contest in 31 regular season appearances. His exceptional play earned him several prestigious honors, including unanimous First Team All-Big East, the Julius Erving Small Forward of the Year award, a spot as one of 15 finalists for the John R. Wooden Award, and the Robert V. Geasey Philadelphia Big Five Player of the Year title.

3478. Following his collegiate career, Mr. Bey was selected 19th overall in the first round of the 2020 NBA Draft by the Brooklyn Nets.

3479. During Mr. Bey's collegiate basketball career, Villanova's basketball games were broadcast on national television networks such as FS1, ESPN, CBS, and Fox. Villanova frequently featured Mr. Bey on its social media platforms, highlighting his achievements to enhance game attendance and viewership. Tens of thousands of fans attended Villanova basketball games during the 2019-2020 season with an average of 11,299 attendees per game, generating significant revenue for the university. In 2020, the Big East conference distributed around $5.15 million to Villanova.

3480. Mr. Bey received none of that revenue. During his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties, from Defendants, or from Villanova. As a highly sought-after high school recruit who became a unanimous all-conference player, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

3481. Defendants' conspiracy greatly harmed Mr. Bey. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open

**FOURTH AMENDED COMPLAINT**

market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received and would have received money for his NIL.

3482.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3483.  **The effect of Defendants' illegal conduct on Plaintiff Tyler Herro.** Plaintiff Tyler Herro worked as a college basketball player at the University of Kentucky from 2018 to 2019.

3484.  The labor provided by Mr. Herro was of great value to Defendants. And it was a significant amount of labor. During the season, he worked at least six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of his coaches.

3485.  Mr. Herro was a highly recruited player coming out of Whitnall High School in Greenfield, Wisconsin and was one of the top basketball prospects of his graduating class. He had one of the most prolific seasons of any player in the country his senior year, averaging 32.9 points, 7.4 rebounds, and 3.6 assists per game, and earning a unanimous First Team All-State selection.  He finished his high school career scoring over 2,000 points and was widely considered the best basketball prospect from Wisconsin. Rated a four-star recruit by 247 Sports, Rivals.com, and ESPN, Mr. Herro ultimately committed to Kentucky over top programs such as Wisconsin, Florida, and Villanova.

3486.  Mr. Herro's job as a college basketball player was essentially a full-time one, and an important and valuable one at that. He averaged 14 points, 4.5 rebounds, and 2.5 assists per game as a freshman and was the only player on the team to start all 37 games. He also led the team with 60 three-pointers and 29 double-figure games and

**FOURTH AMENDED COMPLAINT**

was second in scoring, assists, and steals.  In a particularly notable performance in
2019, he scored a career-high 29 points, making nine out of ten field goals and all six
free throws, to lead Kentucky to a comeback victory against Arkansas.  Among his
distinctions, he received an All-Freshman First Team selection by Basketball Times as
well as the Southeastern Conference Newcomer of the Year by the Associated Press.
He declared for the NBA draft in April of 2019 and was selected by the Miami Heat with
the 13th overall pick.

3487.  During Mr. Herro's time at the University of Kentucky, the program was a
member of the Southeastern Conference and its games were regularly carried by the
conference's own SEC Network, with key matchups broadcast nationally by ESPN,
TBS, and CBS.  For example, a regular season matchup against No.1 Tennessee was
broadcast on ESPN College GameDay, and that season's NCAA tournament, where
Kentucky reached the Elite Eight, saw the second-highest rating for the Elite Eight since
2011, with national coverage from CBS and TBS. Kentucky also enjoys tremendous
local support, with home games averaging 21,695 in attendance per game during the
2018-2019 season, which ranked second in the nation.

3488.  Between ticket sales, media rights, Southeastern Conference
disbursements, and other sources, the University of Kentucky has made a significant
amount of money from its men's basketball program. For example, over a six-month
period in 2018, Kentucky made $21.7 million in revenue from its men's basketball
program alone, including $19.3 million from ticket sales.  Kentucky also received $44.6
million in revenue disbursements from the SEC following the 2018-2019 season.

3489.  Mr. Herro received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. And during his time at the University of Kentucky, he was
not permitted to receive money for use of his NIL, whether from third parties, from

**FOURTH AMENDED COMPLAINT**

Defendants, or from Kentucky. As a nationally recognized college basketball star, he would have earned substantial NIL compensation if not for NCAA's unlawful restrictions.

3490.  Defendants' conspiracy greatly harmed Mr. Herro. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college basketball player than he received, and would have received money for his NIL from third parties.

3491.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Herro would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3492.  **The effect of Defendants' illegal conduct on Plaintiff Marcel Dancy.** Plaintiff Marcel Dancy worked as a college football player at Laney College from 2016 to 2017 and the University of California, Berkeley from 2018 to 2021.

3493.  The labor provided by Mr. Dancy was of great value to Defendants. During the season, he often worked six days per week or more and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

3494.  Mr. Dancy was a highly recruited prospect out of high school who possessed unique talent. As a senior in 2015 at West High School in Tracy, California, he was named Tri-City Athletic League Offensive Player of the Year and earned All-State honors as a running back. He also received First Team All-San Joaquin Section recognition at both running back and safety, helping lead his team to the first round of the San Joaquin Section playoffs. That season, he rushed for 1,914 yards and 25 touchdowns on 291 carries, caught 24 passes for 386 yards and three touchdowns, and returned 17 kickoffs for 461 yards and a touchdown. He added nine punt returns for 130 yards, intercepted five passes for 175 return yards and another touchdown, and totaled

**FOURTH AMENDED COMPLAINT**

an impressive 3,066 all-purpose yards and 30 touchdowns. He also contributed eight points on four successful two-point conversions. Defensively, he recorded 94 tackles, one forced fumble, and one fumble recovery.

3495.  Mr. Dancy was a skilled and accomplished running back who transferred to Cal after a standout career at Laney College in Oakland. During his time at Laney, he appeared in all 22 games over two seasons, helping the team compile an impressive 18-4 overall record, including a 9-1 mark in National Valley League play. Over those two seasons, he rushed for 1,994 yards and 16 touchdowns on 313 carries, while also contributing 27 receptions for 302 yards and three touchdowns. On special teams, he added three kickoff returns for 67 yards, amassing a total of 2,359 all-purpose yards. As a freshman, he led the team with 162 carries for 961 rushing yards and four touchdowns, and had five catches for 61 yards and one kickoff return for 11 yards, finishing the season with 1,023 all-purpose yards.

3496.  In his sophomore season, Mr. Dancy earned All-State, All-Region, and All-National Valley League honors, while also being recognized as an Academic All-American. He ranked among the top 25 players in California in several statistical categories, including seventh in yards per carry, 13th in total rushing yards, 15th in both rushing yards per game and rushing touchdowns, and 23rd in total carries. He recorded a total of 1,326 all-purpose yards that season, including 1,033 rushing yards and 12 touchdowns on a team-leading 151 carries. He also contributed 22 receptions for 241 yards and three touchdowns, along with two kickoff returns for 56 yards and four punt returns for a net loss of four yards. His standout performance helped lead his team to a 9-2 overall record, an undefeated 5-0 mark in National Valley League play, and a league championship.

3497.  In 2018, Mr. Dancy joined the Golden Bears and became a steady contributor out of the backfield. His job as a college football player was essentially a full-time one, and an important and valuable one at that. Prior to the season, Mr. Dancy was

**FOURTH AMENDED COMPLAINT**

featured in a Cal publication touting his on-field and off-the-field contributions that impressed coaches and teammates.

3498.  Over the course of his four seasons with the Bears, he played in 32 games, totaling 646 yards rushing and five touchdowns on the ground on 128 carries, while adding 46 receptions for 334 yards and two kick returns for 36 yards to total 1,016 all-purpose yards.

3499.  During Mr. Dancy's redshirt junior season in 2018, he played in four games but redshirted and did not use a season of eligibility.  He contributed 81 yards rushing and one touchdown on 14 carries while adding two receptions for 15 yards and a career-high-tying one kick return and 18 kick return yards (also career long) for a total of 114 all-purpose yards.  He also posted 80 yards rushing against Idaho State on a team-high 11 carries with his lone touchdown of the season while adding one reception for 14 yards.

3500.  During his junior season in 2019, Mr. Dancy appeared in 12 of Cal's 13 games and was honored for both his on-field contributions and community involvement. He was selected to the prestigious Allstate AFCA Good Works Team in recognition of his volunteer work with the Oakland Dynamites Youth Football and Cheer program, and he represented Cal at the Allstate Sugar Bowl as part of the Good Works Team festivities. He was one of only two Cal players to receive multiple team awards that season, earning both the Stub Allison Award for his dedication to strength and conditioning and the Ted Agu Award for his consistent commitment to community service—the latter of which he would win again as a senior in 2021. On the field, Mr. Dancy set career highs in carries (57), rushing yards (248), receptions (20), receiving yards (153), all-purpose yards (419), and tackles (1), while tying personal bests in rushing touchdowns (2), total touchdowns (2), points (12), kick returns (1), and kick return yards (18). One of his standout performances came in a victory over then-No. 14 Washington, where he recorded seven second-half carries for 72 yards, including two

**FOURTH AMENDED COMPLAINT**

touchdowns in the third quarter. For his efforts, he was named Cal's Co-Offensive Player of the Week.

3501.  During his 2020 senior season, Mr. Dancy was Cal's nominee for the Burlsworth Trophy, which is awarded annually to the nation's top Football Bowl Subdivision player who began his collegiate career as a walk-on.  He played in all four games of the Covid-shortened season with two starts and posted 31 carries for 156 yards while adding nine receptions for 68 yards to total 224 all-purpose yards.  He rushed a career-high 17 times for 76 yards (both team highs) including a 23-yarder on the game's first play from scrimmage while adding three receptions for 29 yards for a career-high-tying 105 all-purpose yards at Oregon State.  He also had 42 yards rushing on seven carries, as well as three receptions for 24 yards to total 66 all-purpose yards against Stanford.

3502.  During his final senior season in 2021, Mr. Dancy again earned Cal's Ted Agu Award for being the most consistently involved in community service for the second consecutive season.  Mr. Dancy also earned the Walter A. Haas Jr. Community Service Award for his outstanding contribution to community service as a volunteer youth football coach.  He played in all 12 games and registered 26 rushes for 161 yards as well as 15 receptions for 98 yards.  Among other standout performances, he rushed for 92 yards against rival Stanford.

3503.  During his time at Cal, Cal football games were televised nationally on major networks including FS1, ESPNU, ESPN, and ABC. Cal regularly showcased Mr. Dancy across its social media channels and other promotional content, emphasizing his accomplishments to boost game attendance, increase viewership, and attract prospective student-athletes. Notably, Mr. Dancy appeared in a Cal commercial titled "What Do You See UC Berkeley," which aired on ESPN and FS1, as well as another Cal promotional video, "Cal Athletics: Together We Earn It." In addition to television spots, Mr. Dancy's likeness continues to appear in various football recruiting resources.

**FOURTH AMENDED COMPLAINT**

3504.  Cal football games attracted not only significant television audience but also large in-person crowds, with tens of thousands of attendees per game, generating substantial revenue. In 2021-22, the Pac-12 Conference had a record year for revenue, distributing an average of $37 million to each member institution.

3505.  Mr. Dancy received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. During most of his time at Cal, he was completely barred from receiving money for the use of his NIL, whether from third parties, from Defendants, or from UC Berkeley. As a highly recruited athlete out of high school and as a top transfer from Laney College, he would have earned substantially more NIL compensation if not for the NCAA's unlawful rules.

3506.  Defendants' conspiracy greatly harmed Mr. Dancy. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

3507.  Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, Mr. Dancy would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3508.  **The effect of Defendants' illegal conduct on Plaintiff Seth Beer.** Plaintiff Seth Beer worked as a college baseball player at Clemson University from 2016 to 2018.

3509.  The labor provided by Mr. Beer was of great value to Defendants. During the season, he often worked six to seven days per week and frequently more than 40 hours per week. Even during the offseason, he dedicated substantial time and effort under the direction of Clemson's coaching staff.

**FOURTH AMENDED COMPLAINT**

3510.  Mr. Beer was a nationally recognized outfielder and first baseman who became one of the premier players in college baseball during his time at Clemson. During his high school career at Lambert High School in Georgia, Perfect Game ranked him as the No. 2 overall player in the nation, the No. 1 outfielder, and the top player in Georgia. As a sophomore, he led his team to both a USA Today national title and a state championship, and was named National Sophomore Player of the Year by MaxPreps, Player of the Year by the Atlanta Journal-Constitution, and an Underclass All-American by Perfect Game. Mr. Beer was twice selected as an Under Armour All-American and was a finalist for Georgia's Gatorade Player of the Year as a junior. He earned First-Team All-American honors from both Louisville Slugger and the National Coaches Association in his sophomore and junior years, and was recognized as Region and County Player of the Year in those same seasons. Additionally, he represented his country as a member of the USA Baseball 18U Tournament of Stars team and the 17U Developmental team.

3511.  Beyond baseball, Mr. Beer was also an exceptional swimmer, setting national age-group records in the 50m and 100m backstroke for the 11- and 12-year-old categories. Regarded as one of the top prospects in the country, he ultimately committed to playing collegiate baseball at Clemson.

3512.  Mr. Beer's job as a college baseball player was essentially a full-time one, and an important and valuable one at that. Over the course of his three-year career at Clemson, he posted impressive statistics: 41 doubles, 56 home runs, 177 RBIs, 172 runs scored, and 180 walks (35 of them intentional), against just 98 strikeouts. A consistent offensive force, he finished his career with a .321 batting average and a .489 on-base percentage across 188 games—all of them starts. In Clemson history, Mr. Beer ranks first in career slugging percentage (.648) among players with at least 500 at-bats, and first in walk rate, drawing a walk every 3.59 at-bats. He is tied for second in total walks, fourth in home runs, and fifth in slugging percentage among players with at least

**FOURTH AMENDED COMPLAINT**

100 at-bats. From April 1, 2016, through the end of the 2018 season, he started every game—an impressive streak of 165 consecutive starts.

3513.  He became the first Clemson player ever to hit 16 or more home runs in three separate seasons, the first to lead the team in home runs three times since Matthew LeCroy (1995-97), and the first to lead the team in slugging percentage three times since Jim McCollom (1983-85). Between 2016 and 2017, he reached base via hit or walk in 66 consecutive games with a plate appearance, and overall, reached base in 178 of the 187 games in which he had a plate appearance.

3514.  Mr. Beer was a three-time All-American, becoming only the second in Clemson history to achieve that honor, alongside Rusty Adkins (1965-67). He was also one of just four players in school history to be named a two-time First-Team All-American. Additional accolades include being a three-time All-Atlantic Region selection by the ABCA, three-time All-ACC selection, two-time Clemson Regional All-Tournament honoree, and a four-time ACC Player of the Week. He also represented the United States as a two-time member of the USA Collegiate National Team.

3515.  Mr. Beer made an immediate and historic impact as a freshman at Clemson, becoming the first freshman ever to win the prestigious Dick Howser Trophy, awarded to the nation's top college baseball player. He also earned national freshman-of-the-year honors from Baseball America, D1Baseball, Perfect Game, and others, and was a finalist for the Golden Spikes Award. That season, he hit .369 with 18 home runs, 70 RBIs, and boasted a .700 slugging percentage and .535 on-base percentage in 62 starts. He ranked among the national leaders in walks, on-base percentage, slugging, and RBIs, and set a school freshman record for home runs. His accolades included ACC Player of the Year, ACC Freshman of the Year, and First-Team All-American honors from six major outlets—making him the first Clemson freshman ever to earn first-team All-America recognition. He also played for the USA Collegiate National Team, competing internationally in Taiwan, Japan, and Cuba.

**FOURTH AMENDED COMPLAINT**

3516.  Mr. Beer continued his dominance throughout his career. As a sophomore, he hit .298 with 16 homers, 53 RBIs, and a .478 on-base percentage, earning second-team All-American honors and ranking second in the nation in walks. His junior season was equally impressive: he posted a .301 average with 22 home runs, 54 RBIs, and a .642 slugging percentage, leading the ACC in home runs, slugging, and total bases. In each of his sophomore and junior seasons, he was named an All-American, a semifinalist for the Dick Howser Trophy, and on the watch list for the Golden Spikes Award.

3517.  During the 2018 MLB draft, Mr. Beer was drafted in the first round as the number 28 overall pick by the Houston Astros.

3518.  During Mr. Beer's tenure at Clemson, his games were regularly broadcast on TV and streaming platforms, such as ESPNU, SEC Network+, and ACC Network Extra. Tens of thousands of fans attended Clemson baseball games during this period. Clemson frequently featured Mr. Beer on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. Further, numerous replicas of Mr. Beer's jersey were sold during his time at Clemson—without his consent and without any proceeds going to him—and his jersey remains popular among Clemson fans to this day. In 2018, Clemson's athletic department made over $75 million in revenue, including baseball. That same year, the ACC distributed around $26.6 million to each of its member schools, including Clemson.

3519.  Mr. Beer received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a partial scholarship and other education-related expenses. During his time at Clemson, he was not permitted to receive money for his NIL from third parties, from Defendants, or from Clemson. Had the NCAA permitted NIL compensation earlier, he would have earned significant financial opportunities as one of the top players in the country.

**FOURTH AMENDED COMPLAINT**

3520.  Defendants' conspiracy greatly harmed Mr. Beer. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college baseball player than he received and would have received money for his NIL. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

3521.  Mr. Beer received only a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Beer. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment.

3522.  But for the illegal and unfair restraints put in place, Mr. Beer would have received a greater amount of scholarship money than he received. As one of the top players in the nation, he would have received a full athletic scholarship absent Defendants' bylaws. Thus, Defendants' scheme directly injured him.

3523.  **The effect of Defendants' illegal conduct on Plaintiff Benjamin Burr-Kirven.**  Plaintiff Benjamin Burr-Kirven worked as a college football player at the University of Washington from 2015 to 2018.

3524.  The labor provided by Mr. Burr-Kirven was of great value to Defendants. During the season, he often worked six to seven days per week and frequently more than 40 hours per week. Even during the offseason, he dedicated substantial time and effort under the direction of Washington's coaching staff.

3525.  Mr. Burr-Kirven was a nationally recognized linebacker who emerged as one of college football's top defensive players during his time at the University of Washington. A standout at Sacred Heart Prep in California, he earned numerous honors, including MaxPreps All-Northern California Defensive Player of the Year,

**FOURTH AMENDED COMPLAINT**

Division III State Player of the Year, and the San Jose Mercury News Player of the Year as both a junior and senior. He was also a two-time MaxPreps Small Schools All-American, Cal-Hi Sports' Small Schools Division Player of the Year, and a finalist for California's Mr. Football award. During his senior season, he led Sacred Heart to a perfect 13-0 record and a CIF Central Coast Section Open Division title, recording 116 tackles despite missing early games due to injury, while also rushing for over 1,000 yards and scoring 19 touchdowns. Ranked among the top linebacker prospects nationally, he received offers from programs including Harvard, Arizona, and Boise State before committing to Washington.

3526.  Mr. Burr-Kirven was a standout linebacker for the University of Washington, where he developed into one of the top defensive players in college football while balancing elite academic performance. He played in nearly every game across four seasons, making an immediate impact as a true freshman by earning UW's Most Outstanding Special Teams Player award. By his junior year, he was a regular starter and earned Second-Team All-Pac-12 honors, as well as First-Team Academic All-Pac-12 and CoSIDA Academic All-District recognition. That season, he led the team in tackles multiple times and was twice named the coaches' defensive player of the game.

3527.  His senior season in 2018 was historic. Mr. Burr-Kirven led the entire NCAA-FBS with 176 total tackles—more than double any of his teammates—marking the most by a Husky since 1987 and the seventh-most in school history. He posted double-digit tackles in 12 of 14 games and earned First-Team All-America honors from the Associated Press, FWAA, ESPN, and others. He was named the Pat Tillman Pac-12 Defensive Player of the Year and Pac-12 Scholar-Athlete of the Year—becoming the first player in conference history to earn both honors in the same season. He was also a finalist for the Lott IMPACT Trophy and a semifinalist for the Bednarik Award. Mr. Burr-

**FOURTH AMENDED COMPLAINT**

Kirven capped off his collegiate career with 11 tackles, including a sack, in the Rose Bowl against Ohio State and was named UW's Most Outstanding Defensive Player.

3528.  During the 2019 NFL draft, Mr. Burr-Kirven was selected by the Seattle Seahawks in the fifth round (142nd overall).

3529.  During this time, the University of Washington's football games were broadcast on national television networks such as Fox Sports Net, ESPN, ABC, and the Pac-12 Network. Millions of viewers watched Mr. Burr-Kirven's football games. For instance, the 2019 Rose Bowl against OSU amassed 16.78 million viewers. Tens of thousands of fans attended Washington Football games during this period with an average attendance of 69,068 in 2018 for a total of 414,405 attendees that year.  The University of Washington's football team frequently featured Mr. Burr-Kirven on its social media platforms and other promotional materials, highlighting his achievements to enhance game attendance and viewership. The University of Washington athletic department made millions of dollars in football ticket sales during Mr. Burr-Kirven's tenure. In 2018, the Pac-12 Conference distributed an average of $29.5 million to each member university, including Washington.

3530.  Mr. Burr-Kirven received none of that revenue. During his time in college, he was completely barred from receiving money for use of his NIL, whether from third parties, from Defendants, or from the University of Washington. As a highly sought-after high school recruit who became one of the most decorated college football players in Washington football history, he would have earned substantial NIL compensation if not for the NCAA's unlawful restrictions.

3531.  Defendants' conspiracy greatly harmed Mr. Burr-Kirven. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL.

**FOURTH AMENDED COMPLAINT**

3532.  Absent Defendants' agreement to adopt, enforce, and abide by the
NCAA's anti-competitive bylaws, he would have received a competitive share of the
television and other revenue being brought in by Defendants and their member schools.
Thus, Defendants' scheme directly injured him.

3533.  **The effect of Defendants' illegal conduct on Plaintiff Neil Pau'u.**
Plaintiff Neil Pau'u, a resident of the State of Utah, worked as a college football player at
Brigham Young University (BYU) from 2017 to 2021.

3534.  The labor provided by Mr. Pau'u was of significant value to Defendants.
Mr. Pau'u committed extensive time and effort to his responsibilities as a BYU football
player, dedicating 60-80 hours per week during the season to practices, meetings,
workouts, film sessions, academic classes, travel, and team obligations—often working
12–14-hour days. During the off-season, his training and required participation still
consumed 40-50 hours per week. Fall camp was especially demanding, reaching or
exceeding 75 hours per week. Additionally, Mr. Pau'u was expected to participate in
team-organized community engagements, media interviews, and marketing events, all
under the direction and/or supervision—whether explicit or implied—of his coaches or
athletic department officials.

3535.  Mr. Pau'u was a talented and versatile athlete coming out of Servite High
School in Anaheim, California. A triple sport athlete, Mr. Pau'u played varsity volleyball,
basketball, and football. He played multiple positions on the football team, including
quarterback, wide receiver, and free safety. During his sophomore year (2011), Mr.
Pau'u helped lead Servite to a 10-2 record, securing first place in their league. In his
junior year (2012), the team had a 3-7 record, finishing fourth in the league. Pau'u's
senior year (2013) saw the team improve to a 6-6 record, again placing fourth in the
league. Mr. Pau'u was recruited, offered, and signed by BYU as a high school
sophomore in 2012. Mr. Pau'u knew early on that BYU was his dream school because

**FOURTH AMENDED COMPLAINT**

he wanted to play with his brother, former standout BYU linebacker Butch Pau'u (2015-2018). The Pau'u brothers shared the field as Cougars together in 2017-2018.

3536.  Mr. Pau'u's job as a college football player was essentially a full-time one, and an important and valuable one at that. As a freshman (2017), he played in 11 games, recording 14 receptions for 139 yards and two touchdowns. He averaged 9.9 yards per catch and made a strong debut with a career-long 28-yard touchdown reception against Portland State. In his sophomore season (2018), he appeared in all 13 games, starting three. He recorded 18 receptions for 216 yards and one touchdown, including a season-long 40-yard catch and a season-high 62 receiving yards at UMass. He also threw a 40-yard pass on a trick play at Boise State. Pau'u tied his career high with four receptions and a ten-yard touchdown against No. 17 Utah. After redshirting for the 2019 season, Mr. Pau'u came back for his junior season (2020) with a renewed sense of purpose and became a leader on and off the field. Mr. Pau'u helped lead BYU to an 11-1 record that season. He played in all 12 games, starting nine, and was named Second Team All-Independent. He ranked second on the team with 45 receptions and third with 603 receiving yards, adding four touchdowns. Pau'u contributed to a high-powered BYU offense that ranked top-ten nationally in scoring, total offense, and passing. He had a season-long 35-yard catch, completed two 16-yard passes on memorable trick plays against Texas State and UCF, and recorded three special teams tackles, including two solo stops.

3537.  In his final season (2021), Mr. Pau'u started all ten games he played before a season-ending injury. Despite this injury, he still led BYU in receptions with 46 for 526 yards and a career-best six touchdowns, which also tied him for team lead in touchdown receptions. He averaged 11.4 yards per catch and 52.6 yards per game. Mr. Pau'u posted three games with over 50 receiving yards and scored in five different games. His season highlights included a career-high 126 yards and two touchdowns against Arizona, featuring the team's longest reception of the year—a 67-yard

**FOURTH AMENDED COMPLAINT**

touchdown. Mr. Pau'u was named to the Pro Football Network All-Independent Second
Team Offense.

3538.  Throughout his time at BYU, Mr. Pau'u's name, image, likeness, and
performance were prominently featured in the university's promotional materials, social
media campaigns, and broadcasts. His work directly helped increase fan engagement,
drive ticket sales, and boost television viewership. BYU and the Defendants, during this
period, profited substantially from national television contracts, including a lucrative
agreement with ESPN, generating tens of millions of dollars in revenue for BYU and the
Defendants.

3539.  Mr. Pau'u received none of that revenue, nor was he otherwise
compensated by Defendants for his labor other than receiving a scholarship and other
education-related expenses. Nor was he permitted to receive money for use of his NIL,
whether from third parties or from Defendants or from his school. Mr. Pau'u, like many
other college athletes, was denied the opportunity to receive fair compensation for his
work. Despite playing a pivotal role in BYU football's success and helping generate
millions of dollars in revenue for the university and Defendants, Mr. Pau'u was
prevented from sharing in those profits. The NCAA's anticompetitive rules deprived him
of his rightful place in an open and competitive market. Had those restrictions not been
in place, Mr. Pau'u would have received competitive remuneration for his services and
the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to
profit from his extraordinary talent and popularity during his time as a college athlete.

3540.  As evidence of Mr. Pau'u's entrepreneurial instincts and ability to
conceptualize and successfully execute a marketing campaign, Mr. Pau'u and some of
his 2020 teammates, including Jake Oldroyd, Isaiah Kaufusi, Hayden Livingston, Lopini
Katoa, Malik Moore, Jared Kapisi, and Keenan Ellis, were central in creating and
executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The
campaign was a response to the social and racial injustice Mr. Pau'u and his

**FOURTH AMENDED COMPLAINT**

teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another." In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXIfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Pau'u and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Pau'u was heavily involved in the design, creation, and marketing of the shirts through several social media posts. The shirts were sold to the general public and ultimately raised over $150,000 to fund approximately 63 scholarships in the multicultural department at BYU.

**FOURTH AMENDED COMPLAINT**



3541.  Had Mr. Pau'u been permitted to create and market similar concepts on his own behalf, he would have employed the same entrepreneurial skills and dedication to market his NIL successfully to support himself, his family, and charitable causes of his personal choosing.

3542.  Following his BYU career, Mr. Pau'u signed as an undrafted free agent with the Buffalo Bills in 2022, further demonstrating his professional potential and commercial value. However, because of Defendants' unlawful conduct, he permanently lost the opportunity to profit from his most prominent and visible years—those spent as a standout player at BYU.

3543.  Defendants' actions caused direct and substantial harm to Mr. Pau'u. By agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL compensation and athlete mobility, Defendants prevented him from accessing a fair and competitive market for his services. As a result, he was denied the opportunity to earn a

**FOURTH AMENDED COMPLAINT**

competitive share of the significant revenue he helped generate for BYU and other member schools. This unlawful scheme directly injured Mr. Pau'u, depriving him of the benefits and compensation he rightfully earned.

3544. **The effect of Defendants' illegal conduct on Plaintiff Jared Kapisi.** Plaintiff Jared Kapisi, a resident of the State of Utah, worked as a college football player at Brigham Young University (BYU) from 2017 to 2021.

3545. The labor provided by Mr. Kapisi was of significant value to Defendants. Mr. Kapisi committed extensive time and effort to his responsibilities as a BYU football player, dedicating 60-80 hours per week during the season to practices, meetings, workouts, film sessions, academic classes, travel, and team obligations—often working 12–14-hour days. During the off-season, his training and required participation still consumed 40-50 hours per week. Fall camp was especially demanding, reaching or exceeding 75 hours per week. Additionally, Mr. Kapisi was expected to participate in team-organized community engagements, media interviews, and marketing events, all under the direction and/or supervision—whether explicit or implied—of his coaches or athletic department officials.

3546. Mr. Kapisi was a multi-sport athlete out of Maui High School in Hawaii. He played both wide receiver and defensive back in high school and was also a standout in soccer and track and field. Mr. Kapisi led the Maui Interscholastic League in receptions as a junior and was fourth as a senior. He was an All-League first team at wide receiver in 2012 and 2013, named special teams MVP, lettered in soccer and track and field, and was on the academic honor roll. After being recruited by the University of Hawaii and several other schools, Mr. Kapisi ultimately chose to continue his football career at BYU, initially as a walk-on.

3547. Mr. Kapisi's job as a college football player was essentially a full-time one, and an important and valuable one at that. After redshirting the 2014 season and serving his mission, Mr. Kapisi spent the next several years developing into a reliable

**FOURTH AMENDED COMPLAINT**

contributor to BYU's defense and special teams units. Mr. Kapisi started playing at kicker, punter, and corner until settling into his role as a safety. In 2018, Mr. Kapisi appeared in 12 games, mostly on special teams. Over the course of his collegiate career, Mr. Kapisi accumulated 11 total tackles, five solo and six assisted. In 2019, capping off a 7-5 season, the BYU Cougars played in the Hawaii Bowl, a homecoming for Mr. Kapisi that would have provided him many opportunities for NIL but for the Defendants' anticompetitive rules. In the 2020 season, he played in nine games, recorded an interception against Texas State, two pass deflections, and two sacks. Mr. Kapisi's consistent performance contributed significantly to BYU's defensive efforts during his tenure, including an 11-1 record and a national ranking of No.11 in 2020. Mr. Kapisi's performance during the 2020 season earned him a scholarship. In 2021, Mr. Kapisi played in 11 games, contributing on defense and special teams.

3548.  Throughout his time at BYU, Mr. Kapisi's name, image, likeness, and performance were prominently featured in the university's promotional materials, social media campaigns, and broadcasts. For example, Mr. Kapisi was frequently featured in interviews as a "fan favorite" and was often highlighted as the only player born and raised in Hawaii. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. BYU and the Defendants, during this period, profited substantially from national television contracts, including a lucrative agreement with ESPN, generating tens of millions of dollars in revenue for BYU—which was still independent during this time, but later joined the Big 12 in July 2023—and the Defendants.

3549.  Mr. Kapisi received none of that revenue, nor was he otherwise compensated by Defendants for his labor other than receiving a scholarship and other education-related expenses. Nor was he permitted to receive money for use of his NIL, whether from third parties or from Defendants or from his school. Mr. Kapisi, like many other college athletes, was denied the opportunity to receive fair compensation for his

**FOURTH AMENDED COMPLAINT**

work. Despite playing a pivotal role in BYU football's success and helping generate millions of dollars in revenue for the university and Defendants, Mr. Kapisi was prevented from sharing in those profits. The NCAA's anticompetitive rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Kapisi would have received competitive remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

3550.  As evidence of Mr. Kapisi's entrepreneurial instincts, when he was a walk-on, he started a successful business giving teammates and others haircuts for $10.00 each to earn money to pay his bills. Showcasing his ability to conceptualize and successfully execute a marketing campaign, Mr. Kapisi and some of his 2020 teammates, including Jake Oldroyd, Isaiah Kaufusi, Hayden Livingston, Lopini Katoa, Malik Moore, Neil Pau'u, and Keenan Ellis, were central in creating and executing the "Love One Another" pre-game warmup t-shirt campaign in fall 2020. The campaign was a response to the social and racial injustice Mr. Kapisi and his teammates saw in the world around them at the time. The message, "Love One Another," was the result of a team meeting where the 2020 BYU team came together and chose the messaging from the line of a song in the hymn book for the Church of Jesus Christ of Latter-Day Saints, "As I have loved you, love one another." In a message posted on @BYUfootball Twitter and Facebook, https://www.facebook.com/share/v/15Wmwbv9bX/?mibextid=wwXIfr, and other social media, by putting the slogan on t-shirts and wearing them during pre-game warmups, Mr. Kapisi and his 2020 teammates "wanted to spread a message to the world and to our country. And that message is of unity and of love. A message that to us exemplifies how everyone should live life. Love your peers, love one another regardless of their skin color, culture or background." Mr. Kapisi was heavily involved in the design, creation, and marketing of the shirts through several social media posts.

**FOURTH AMENDED COMPLAINT**

The shirts were sold to the general public and ultimately raised over $150,000 to fund

approximately 63 scholarships in the multicultural department at BYU.



3551.  Had Mr. Kapisi been permitted to create and market similar concepts on

his own behalf, he would have employed the same entrepreneurial skills and dedication

to market his NIL successfully to support himself, his family, and charitable causes of

his personal choosing.

3552.  Defendants' actions caused direct and substantial harm to Mr. Kapisi. By

agreeing to adopt, enforce, and abide by NCAA bylaws that restricted NIL

compensation and athlete mobility, Defendants prevented him from accessing a fair and

competitive market for his services. As a result, he was denied the opportunity to earn a

competitive share of the significant revenue he helped generate for BYU and other

member schools. This unlawful scheme directly injured Mr. Kapisi, depriving him of the

benefits and compensation he rightfully earned.

**FOURTH AMENDED COMPLAINT**

## COUNT I – Violations of Sections 1 & 3 of the Sherman Act

## (Brought by Plaintiffs)

1.      Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

2.      Defendants and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Since at least four years before the filing of this action, and for certain allegations at least four years from the filing of the *House* complaint, the trusts formed by Defendants' cartel has restrained trade and commerce in violation of Sections 1 and 3 of the Sherman Act, and the behavior continues today.

3.      This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including inter alia: (a) fixing the compensation of Plaintiffs (and members of the Alternative Proposed Class) at artificially low levels, since Plaintiffs (and members of the Alternative Proposed Class) have been unable to negotiate for compensation in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market. It also had the effect of preventing the Plaintiffs (and members of the Alternative Proposed Class) from receiving free market compensation for the use of their NILs, whether from third parties, from Defendants for broadcast NIL or other NIL, from the schools, or otherwise.

4.      As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs (and members of the Alternative Proposed Class) have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

**FOURTH AMENDED COMPLAINT**

5.      Absent Defendants' rules, Plaintiffs (and members of the Alternative Proposed Class) would have received a competitive share of the television revenue and other revenue being brought in from Plaintiffs' (and members of the Alternative Proposed Class's) labor, and would otherwise have received competitive compensation for their athletic services.

6.      Further, Plaintiffs (and members of the Alternative Proposed Class) whose collegiate careers ended before the NCAA's interim rule change would have received substantial compensation for the use of their NILs but for the NCAA's unlawful restraint, whether from broadcast NIL, third-party NIL, NIL from schools or conferences, or otherwise. For Plaintiffs (and members of the Alternative Proposed Class) that were eligible to receive NIL money after this rule change, they would have received substantially more compensation for the use of their NILs if the NCAA's unlawful restraints were lifted earlier or never were in place, whether from broadcast NIL, third-party NIL, NIL from schools or conferences, or otherwise.

7.      Further, for Plaintiffs (and members of the Alternative Proposed Class) who received only partial scholarships, Defendants' conspiracy has resulted in (a) fixing the scholarship money that such Plaintiffs (and members of the Alternative Proposed Class) received at artificially low levels, since such Plaintiffs (and members of the Alternative Proposed Class) were unable to negotiate for scholarship money in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendant's member schools when it comes to the scholarship money paid for skilled labor in the market. Absent Defendant's rules, the partial scholarship Plaintiffs (and members of the Alternative Proposed Class) would have received more scholarship money in exchange for their services.

8.      As a result, Plaintiffs (and members of the Alternative Proposed Class) have suffered damages in an amount to be proved at trial.

**FOURTH AMENDED COMPLAINT**

9.      Defendants' agreements or conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

10.     Defendants' agreements or conspiracies have and had no procompetitive effect or purposes, or alternatively, even if they did, less restrictive alternatives could have been implemented to achieve any purported procompetitive objectives that Defendants might prove.

11.     Plaintiffs (and members of the Alternative Proposed Class) seek treble damages caused by Defendants' violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and any other relief permitted by law.

### Prayer for Relief

WHEREFORE, Plaintiffs seek the following relief:

- A finding that Defendants have violated Sections 1 and 3 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiffs have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

- Actual damages in an amount to be determined at trial;

- Treble damages awarded under the Sherman Act to Plaintiffs for the damages sustained by them as a result of Defendants' conduct;

- Judgment entered against Defendants for the amount to be determined and as permitted by law and equity;

- Pre-judgment and post-judgment interest as permitted by law;

- A declaratory judgment that the practices complained of herein are unlawful;

- Such other relief as the Court shall deem just and proper.

**FOURTH AMENDED COMPLAINT**

WHEREFORE, in the event the court in *House* denies final approval of the proposed settlement and Plaintiffs assert claims on behalf of the Alternative Proposed Class, Plaintiffs on behalf of the Alternative Proposed Class would seek the following additional relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- Designation of Plaintiffs as class representatives and designation of counsel of record as Class Counsel;

- A permanent injunction prohibiting Defendants from continuing or reinstating their unfair and unlawful policies and practices as described within this Complaint;

- Reasonable incentive awards for the Plaintiffs;

- Such other relief for the Alternative Proposed Class as the Court shall deem just and proper.


**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.


DATED: June 6, 2025

By: */s/ Garrett Broshuis*
STEPHEN M. TILLERY
stillery@koreintillery.com
GARRETT R. BROSHUIS
gbroshuis@koreintillery.com
CAROL O'KEEFE
cokeefe@koreintillery.com
STEVEN M. BEREZNEY
sberezney@koreintillery.com
MARC A. WALLENSTEIN

**FOURTH AMENDED COMPLAINT**

mwallenstein@koreintillery.com
ANDREW ELLIS
aellis@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS
gzelcs@koreintillery.com
PAMELA I. YAACOUB
pyaacoub@koreintillery.com
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

ERIC OLSON
eolson@olsongrimsley.com
SEAN GRIMSLEY
sgrimsley@olsongrimsley.com
ISABEL BROER
ibroer@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

*Attorneys for All Plaintiffs*

/s/ R. Christian Macke
R. CHRISTIAN MACKE
(admission application forthcoming)
chrismacke@fuse.net
10 W. 4th Street
Newport, KY 41071
Telephone: (859) 261-0012

/s/ Robert R. Sparks
ROBERT R. SPARKS (Ky. Bar #83685)
rrsparks@strausstroy.com
**STRAUSS TROY CO, LPA**
150 East Fourth Street
Cincinnati, OH 45202
Telephone: (513) 621-2120

*Attorneys for Plaintiffs identified in
paragraphs 282 and 285 through 320*

**FOURTH AMENDED COMPLAINT**

JOHN ARTHUR EAVES, JR.
(MS Bar No. 8843)
(admission application forthcoming)
johnjr@eaveslawmail.com
CHRISTOPHER BRADY EAVES
(MS Bar No. 106474)
(admission application forthcoming)
brady@eaveslawmail.com
STERLING OVERTON EAVES
(MS Bar No. 106642)
(admission application forthcoming)
sterling@eaveslawmail.com
**EAVES LAW FIRM, LLC**
101 North State Street
Jackson, MS  39201
Telephone: (601) 355-7961
Facsimile: (601) 355-0530

***Attorneys for Plaintiffs identified in paragraphs 214 through 281 and 283 through 284***

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

/s/ *Garrett R. Broshuis*
Garrett R. Broshuis

**FOURTH AMENDED COMPLAINT**